Edward Jason Dennis
jdennis@lynnllp.com
Samuel B. Hardy
shardy@lynnllp.com
Christian Orozco
California State Bar No. 285723
corozco@lynnllp.com
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
(214) 981-3800 - Telephone
(214) 981-3839 - Facsimile

Special Litigation Counsel for
Plaintiff

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
NORTHERN DIVISION

| | |
|---|---|
| In re<br><br>CHANNEL TECHNOLOGIES GROUP, LLC,<br>　　*Debtor.* | CASE NO. 9:16-bk-11912-DS |
| CORPORATE RECOVERY ASSOCIATES, LLC, as Trustee for the Liquidating Trust of Channel Technologies Group, LLC,<br>　　*Plaintiff,*<br>v.<br><br>BLUE WOLF CAPITAL PARTNERS, LLC, BLUE WOLF CAPITAL FUND II, L.P., GLADSTONE INVESTMENT CORPORATION, BLUE WOLF CAPITAL ADVISORS L.P., BW PIEZO HOLDINGS, LLC, FIDUS INVESTMENT CORPORATION, FIDUS MEZZANINE CAPITAL II, L.P., AVANTE MEZZANINE PARTNERS SBIC, LP, AVANTE MEZZANINE PARTNERS II, INC., PENGDI HAN, DHAN, LLC, GRANT THORNTON, LLP, CTG ADVANCED MATERIALS, LLC, CTS CORPORATION, and ELECTRO OPTICAL INDUSTRIES,<br>　　*Defendants.* | ORIGINAL COMPLAINT |

Plaintiff Corporate Recovery Associates, LLC, solely in its capacity as Trustee for the Liquidating Trust of Debtor Channel Technologies Group, LLC ("Plaintiff") files this Original Complaint against Blue Wolf Capital Partners, LLC, Blue Wolf Capital Fund II, L.P., Gladstone Investment Corporation, Blue Wolf Capital Advisors L.P., BW Piezo Holdings, LLC— (collectively, the "Blue Wolf Entities")—Defendants Fidus Investment Corporation; Fidus Mezzanine Capital II, L.P., Avante Mezzanine Partners SBIC, LP, Avante Mezzanine Partners II, Inc.—(collectively, the "Mezzanine Lenders")— and Defendants Grant Thornton, LLP, CTG Advanced Materials, LLC, CTS Corporation, Electro Optical Industries, Pengdi Han, DHAN, LLC, Duff & Phelps, and CIT Bank, N.A. and respectfully shows as follows:

**I.**
**SUMMARY**

1.     This is a fraudulent transfer case. In an abuse of the corporate form, the Blue Wolf Entities organized and structured a series of shell corporations to separate the assets and liabilities of CTG despite running CTG, its parent company, sister company, and subsidiaries as a single entity.  The Blue Wolf Entities did this to make distributions to themselves and avoid liabilities to creditors.  Upon facing financial difficulty, in 2016, the Blue Wolf Entities sold CTG's de facto assets for over $70 million and distributed $30 million to themselves, their equity partners, and others involved in the transactions. Insufficient funds were retained or distributed to CTG for the protection of its creditors. Later that year, and having already disadvantaged CTG's creditors, the Blue Wolf Entities put CTG into bankruptcy. While Blue Wolf repaid itself a secured loan to CTG, the bankruptcy left approximately $35 million in unsecured general creditors holding the liabilities while $70 million was distributed earlier that year to the Defendants.

## II.
### PARTIES

2.    Plaintiff Corporate Recovery Associates, LLC is a California limited liability company and Trustee for the Liquidating Trust of Debtor Channel Technologies Group, LLC.

3.    Debtor Channel Technologies Group, LLC ("CTG") is a privately owned California limited liability company.

4.    Defendant Blue Wolf Capital Partners, LLC is a Delaware limited liability company, with its principal place of business in New York, New York.  It may be served via its registered agent for service of process, The Corporation Trust Company, 1209 Orange St., Wilmington, Delaware 19801, or wherever else it may be found.

5.    Defendant Blue Wolf Capital Fund II, L.P., is a Delaware limited partnership, with its principal place of business in New York, New York.  It may be served via its registered agent for service of process, The Corporation Trust Company, 1209 Orange St., Wilmington, Delaware 19801, or wherever else it may be found.

6.    Defendant Gladstone Investment Corporation is a Delaware corporation.  It may be served via its registered agent for service of process, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808, or wherever else it may be found.

7.    Defendant Blue Wolf Capital Advisors L.P., is a Delaware limited partnership, with its principal place of business in New York, New York.  It may be served via its registered agent for service of process, The Corporation Trust Company, 1209 Orange St., Wilmington, Delaware 19801, or wherever else it may be found.

8.    Defendant BW Piezo Holdings, LLC is a Delaware limited liability company, with its principal place of business in New York, New York.  It may be served via its registered agent for service of process, The Corporation Trust Company, 1209 Orange St., Wilmington, Delaware

19801, or wherever else it may be found.

9.      Defendant Fidus Investment Corporation is a Maryland corporation, with its principal place of business in Evanston, Illinois.  It may be served via its registered agent for service of process, National Registered Agents, Inc., 208 Lasalle St., Suite 814, Chicago, Illinois, 60604, or wherever else it may be found.

10.     Defendant Fidus Mezzanine Capital II, L.P., is a Delaware limited partnership, with its principal place of business in Evanston, Illinois.  It may be served via its registered agent for service of process, National Registered Agents, Inc., 160 Greentree Drive, Suite 101, Dover, Delaware, 19904, or wherever else it may be found.

11.     Defendant Avante Mezzanine Partners SBIC, LP is a Delaware limited partnership, with its principal place of business in Los Angeles, California.  It may be served via its registered agent for service of process, 3H Agent Services, Inc., 1201 North Orange Street, Suite 710., Wilmington, Delaware 19801, or wherever else it may be found.

12.     Defendant Avante Mezzanine Partners II, Inc., is a Delaware corporation, with its principal place of business in Los Angeles, California.  It may be served via its registered agent for service of process, 3H Agent Services, Inc., 1201 North Orange Street, Suite 710., Wilmington, Delaware 19801, or wherever else it may be found.

13.     Grant Thornton, LLP is an Illinois limited liability partnership, with its principal place of business in 171 N. Clark Street, Suite 200, Chicago, IL 60601. It may be served via its registered agent for service of process, The Corporation Trust Company, 1209 Orange St., Wilmington, Delaware 19801, or wherever else it may be found.

14.     CTG Advanced Materials, LLC is a Delaware limited liability company, with its principal place of business in Bolingbrook, Illinois.  It may be served via its registered agent for

service of process, Cogency Global Inc., 600 South Second St., Suite 404, Springfield, Illinois, 62704, or wherever else it may be found.

15.     CTS Corporation is a Delaware corporation, with its principal place of business in Lisle, Illinois.  It may be served via its registered agent for service of process, Cogency Global, Inc., 850 New Burton Road, Suite 201, Dover, Delaware, 19904, or wherever else it may be found.

16.     Electro Optical Industries, Inc. is a Delaware corporation, with its principal place of business in Goleta, California.  It may be served via its registered agent for service of process, The Corporation Trust Company, 1209 Orange St., Wilmington, Delaware, 19801, or wherever else it may be found.

17.     Defendant Pengdi Han is a natural person and resident of Washington.  He may be served at 14304 SE 88th Place, Newcastle, Washington, 98059, or wherever else he may be found.

18.     DHAN, LLC is a Washington limited liability company, with its principal place of business in 34827 Pacific Hwy S, Federal Way, Washington, 98003.  It may be served at its principal place of business or wherever else it may be found.

19.     Duff & Phelps is a Delaware corporation, with its principal place of business in New York, New York.  It may be served via its registered agent for service of process, Corporate Creations Network, Inc., Wilmington, Delaware, 19810, or wherever else it may be found.

20.     CIT Bank, N.A. is a Delaware corporation, with its principal place of business in 888 E. Walnut Street, Pasadena, California, 91101.  It may be served via its registered agent for service of process, The Corporation Trust Company, 1209 Orange St., Wilmington, Delaware 19801, or wherever else it may be found.

21.     CTG is informed and believes, and therefore alleges, that at all relevant times alleged herein existed a unity of interest and ownership between the Blue Wolf Entities and CTG, and each of them, such that any individuality and separateness between them has ceased to exist. Adherence to the fiction of the separate existence of the Blue Wolf Entities and CTG from one another would permit an abuse of the corporate privilege, would sanction fraud, and promote injustice.

22.     CTG is informed and believes, and therefore alleges, that all relevant times alleged herein, the Blue Wolf Entities were agents, employees, representatives, partners, subsidiaries, affiliates, and/or joint venturers of each other, and in undertaking the actions complained of below were acting within the course and scope of such relationships and with the knowledge, authorization, consent, and ratification of each other.

### III.
### JURISDICTION

23.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334, and 11 U.S.C. §523. This matter constitutes a core proceeding within the meaning of 28 U.S.C. §157(b)(2)(I) and (O). Venue is proper in this District pursuant to 28 U.S.C. §§1408 and 1409 because the Debtor's bankruptcy case is pending in this District and the causes asserted herein arise under the Bankruptcy Code and arise in a case under the Bankruptcy Code.

### IV.
### FACTS

**A.     Blue Wolf Entities Acquire CTG**

24.     CTG designed and manufactured piezoelectric ceramics, transducers, sonar equipment, and other related products sold primarily to military, commercial, and industrial customers in the United States and internationally. CTG was founded in 1959 and was based in

Santa Barbara, California.

25.    The Blue Wolf Entities are a self-described "special-situation" investment firm that targets middle-market companies facing structural, financial, or regulatory issues.

26.    On or about December 2011, Blue Wolf Capital Partners, through Blue Wolf Capital Fund and agents Adam Blumenthal, Haranjeet Narulla, and Charles Miller, formed BW Piezo for the sole purpose of acquiring CTG from Alta Properties, Inc.  After the acquisition, on December 28, 2011, BW Piezo and CTG executed the Operating Agreement of CTG, naming BW Piezo as the sole member of CTG.  Pursuant to the Operating Agreement, BW Piezo maintained the rights to remove or replace CTG's manager and dissolve CTG in its sole discretion. *See* Ex. 1 (CTG Operating Agreement).

27.    The Operating Agreement named Kevin Ruelas and Pierre Chao as managers of CTG.  As managers, Mr. Ruelas and Mr. Chao were vested with the full, exclusive, and complete discretion to manage and control the affairs of CTG.  Additionally, the Operating Agreement required that the entirety of CTG's assets and company funds be held in the name of CTG.  Mr. Ruelas was named President, Secretary, and Treasurer of CTG.

**B.    Blue Wolf Makes Changes at CTG**

28.    After over a year of controlling CTG, the Blue Wolf Entities, Mr. Blumenthal, Mr. Narrulla, and Mr. Miller ("Blue Wolf") decided to make changes at CTG.  First, Blue Wolf decided to remove Mr. Ruelas and began interviewing potential management candidates.  Next, Blue Wolf decided to expand CTG's business to medical, ocean, and mining applications.  To effect this, Blue Wolf began negotiations with Pengdi Han to acquire H.C. Materials, Inc. ("HC Materials"), a crystal manufacturer with a focus on medical ultrasound imaging, ocean mining, and ocean exploration systems.

29.    On or about June 2013, Blue Wolf replaced Kevin Ruelas as a manager and officer with Ralph L. Phillips, hiring Mr. Phillips as President and Chief Executive Officer of CTG.  As a condition of his employment, Mr. Phillips was required to, and did, invest $250,000 to be directed to working capital of CTG.  *See* Ex. 2 (Phillips Complaint) Blue Wolf did not direct Mr. Phillips's investment to CTG as working capital as represented; instead, Blue Wolf distributed the funds to former and out-going CTG executives, including Mr. Ruelas.  In addition, Blue Wolf represented to Mr. Phillips that CTG was in the process of acquiring H.C. Materials and that the value of the equity he would be awarded in CTG would include the value of H.C. Materials.

30.    After hiring Mr. Phillips, Blue Wolf continued to negotiate with Mr. Han regarding the acquisition of H.C. Materials.  To obtain a loan to purchase H.C. Materials, Blue Wolf represented to lenders that CTG was purchasing H.C. Materials as a wholly-owned subsidiary.  Blue Wolf mortgaged CTG's assets, forced CTG to guarantee the significant loan, and directed CTG to contribute its own cash assets for the purchase of H.C. Materials.  Blue Wolf's actions left CTG saddled with significant debt and limited CTG's business.

31.    On or about October 2013, Blue Wolf used the loan proceeds and CTG's cash to acquire H.C. Material's assets for $48 million.  Immediately, the Blue Wolf Entities, Mr. Blumenthal, and Mr. Narulla issued press releases and represented to news media that CTG had acquired H.C. Materials.  *See* Ex. 2 (October 15, 2013 Press Release).

32.    Blue Wolf surreptitiously decided to segregate the companies on paper.  Blue Wolf created a new entity named CTG Advanced Materials to hold the H.C. Materials assets, and Blue Wolf structured CTG Advanced Materials to be a sister company to CTG under the ownership of BW Piezo instead of as a wholly-owned subsidiary of CTG as it represented to the public and CTG's creditors.

33.     The segregation was fictional.  Blue Wolf directed Mr. Phillips to run CTG Advanced Materials as a division of CTG, and the companies, along with BW Piezo, were operated as a single enterprise.  *See* Ex. 3 (Phillips Complaint).  As detailed below, BW Piezo, CTG, and CTG Advanced Materials commingled funds and assets of the companies.  Blue Wolf indiscriminately directed CTG to transfer funds to pay for CTG Advanced Materials's liabilities, including payroll, professional services, and legal bills, and vice versa.  CTG also guaranteed loans for CTG Advanced Materials's benefit and the assets of each company were treated as one in the same.  Further, all entities used the same business locations and employees, shared the same control group, and shared corporate records.  Moreover, CTG and CTG Advanced Materials were held out publicly to be the same entity, and CTG even represented to the federal government that CTG had acquired H.C. Materials and was its successor legal entity.

**D.     CTG's Financial Struggles**

34.     These actions took their toll on CTG.  Throughout 2014 and 2015, CTG struggled to balance its finances and, upon information and belief, its debt payments were nearly equal to the combined sales of CTG and CTG Advanced Materials.  *See* Ex. 3 (Phillips Complaint).

35.     In middle to late 2015, CTG's management discovered that CTG had material liabilities that threatened CTG's status as a going concern.  CTG's management brought this to the attention of Blue Wolf, and Blue Wolf undertook a plan to liquidate CTG's assets in a manner to maximize their own recovery in the event of likely bankruptcy.  Blue Wolf began by soliciting offers for and negotiating the sale of CTG Advanced Materials.

36.     On or about January 2016, Blue Wolf removed Mr. Phillips from his position at CTG and replaced him with Christopher Holmes.  CTG was not in the financial position to repurchase Mr. Phillips's ownership interests and needed to convince Mr. Phillips to maintain

his equity position.  To do so, Mr. Blumenthal represented to Mr. Phillips that Blue Wolf was in the process of selling CTG Advanced Materials and misrepresented that the proceeds would go to CTG.

**E.    CTG (and CTG Advanced Materials) Was Habitually Cash-Strapped and Desperately in Need of Operating Capital**

37.    As noted, prior to filing for bankruptcy, CTG was habitually cash-strapped and in desperate need of operating capital.  Indeed, it was standard operating procedure for CTG to "string along" its vendors, because it simply did not have the funds to pay its debts.  By way of just a few examples:

- By October of 2015, BW Piezo board minutes indicate that CTG needed to be in a better financial position and was walking a "tightrope."  *See* Ex. 4 (attachment to 2/5/16 email from L. Chen to K. Carrington).  In fact, by this same time, BW Piezo was already contemplating the sale of CT Advanced Materials and noting that it needed to focus on "how to improve cash flow to . . . direct capital to [Advanced Materials] . . . to improve the value before exit."  *See* Ex. 4 (attachment to 2/5/16 email from L. Chen to K. Carrington).

- By January 2016, CTG was instructing CT Advanced Materials that: "we do need you to stretch your payments out to suppliers as much as possible . . . [a]s you know we [*i.e.*, CTG] are managing our cash very tightly and will need [Advanced Materials] to slow down the outflows as well."  *See* Ex. 5 (1/27/16 email from L. Chen to S. Hoyos).

- Unsurprisingly, then, by January 2016, vendors were complaining to CTG of its late payments on invoiced billings and failure to honor extended payment plans.  *See* Ex. 6 (1/22/16 mail from L. Chen to J. Rumsey).

- By February 2016, CTG was lamenting its cash flow, noting that forecasts "do[] not look good."  *See* Ex. 7 (2/9/16 email from S. Hoyos to L. Chen).

- Also, by February 2016, CTG Advanced Materials could not even make its payroll without borrowing funds from CTG.  *See* Ex. 8 (2/17/16 email from C. Hanna to J. Hager).

38.    CTG's precarious financial position was apparently due to a variety of factors, among them:

- The failure to implement a sustainable manufacturing environment. *See* Ex. 9 (8/8/16 email from V. Caruso to C. Holmes).

- A weak management team that was not aware of the significant risks to company business operations, including: (i) operational discipline, (ii) insufficient processes, procedures, and tooling, and (iii) customer mismanagement. *See* Ex. 10 (6/3/16 email from C. Holmes to A. Melconian and attachment).

- Insufficient manpower, equipment, and facility infrastructure. *See* Ex. 10 (6/3/16 email from C. Holmes to A. Melconian and attachment).

- The sale of Electro-Optical Industries to "a foreign interest," which CTG reported left the Department of State "appalled" and jeopardized CTG's security accreditation. *See* Ex. 11 (6/24/16 email from C. Holmes to V. Caruso); Ex. 12 (6/20/16 email from C. Holmes to V. Caruso).

- CTG's assumption of CTG Advanced Material's and other affiliates and subsidiaries' liabilities and use of CTG's capital and assets to maintain CTG Advanced Material's and other affiliates and subsidiaries' businesses.

F.   **Blue Wolf Liquidates CTG's Assets and Prepares for Bankruptcy Filing**

39.   On or about March 2016, Blue Wolf sold CTG Advanced Materials for approximately $73 million.  Instead of returning to CTG the proceeds from the sale of assets of CTG Advanced Materials, Blue Wolf structured the transaction to have the purchaser, CTS Corporation, transfer the proceeds to the Blue Wolf Entities, CIT Bank, N.A., the Mezzanine Lenders, Pengdi Han, and to the Blue Wolf Entities' insiders as bonus payments.  The transfers related to the sale of CTG Advanced Materials are described in further detail in the attached **Exhibit A**.

40.   Subsequently, Blue Wolf and Mr. Holmes began to position CTG to declare for bankruptcy.  Blue Wolf was desperate to delay CTG's filing for bankruptcy protection as long as possible to protect the validity of the transfers related to the CTG Advanced Materials sale.  To accomplish this, Blue Wolf and Mr. Holmes directed CTG, in April 2016, to enter a prepetition lending agreement with Blue Wolf  Capital Fund II, L.P., to provide a cash infusion in exchange

for a security interest in CTG's assets.  Next, in June 2016, Blue Wolf sealed CTG's ultimate fate by selling one of its most profitable subsidiaries, Electro-Optical Industries, at a cut-rate price in June 2016.

41.    With these actions in place, Blue Wolf directed CTG to file for bankruptcy in late 2016 to leave the other creditors of CTG "holding the bag" while Defendants enjoyed the $70 million in distributions from the sale of CTG Advanced Materials.

### V.
### VEIL PIERCING / ALTER EGO THEORY OF LIABILITY

42.    The foregoing and following paragraphs are hereby incorporated by reference as if fully set forth herein are made by way of information and belief, which is expected to be borne out through discovery,

43.    Blue Wolf's use of CTG and CTG Advanced Materials was a sham to perpetrate a fraud. Blue Wolf used BW Piezo, CTG, and CTG Advanced Materials to manipulate the assets and liabilities between the entities.  Blue Wolf abused the corporate form by segregating the shared assets and liabilities in separate entities with the intent to avoid performance by relying on the corporate form as a shield.

44.    In addition, and in the alternative, BW Piezo, CTG, and CTG Advanced Materials were organized and operated as a single business enterprise.  Although Blue Wolf identified CTG and CTG Advanced Materials as separate entities in company organizational charts, in practice, there was no corporate separateness between the two (or BW Piezo).  Blue Wolf—utilizing its "shell company" BW Piezo—routinely commingled funds and assets between the two to cover company liabilities.  Among other things, upon information and belief:

- CTG funds were used to pay for the liabilities of CTG Advanced Materials, including payroll.  *See* Ex. 13 (1/26/16 email from L. Chen to C. Hanna); Ex. 14

(1/5/16 email from L. Chen to C. Hanna); Ex. 8 (2/17/16 email from C. Hanna to J. Hager).

- CTG Advanced Materials funds were used to pay for the liabilities of CTG, including accounts receivable.  *See* Ex. 15 (12/2/15 email from L. Chen to C. Hanna).

- CTG Advanced Materials' revenues were accounted for as part of CTG's overall revenues.  *See* Ex. 16 (1/21/16 email from L. Chen to S. Hoyos).

- CTG funds were transferred to BW Piezo to pay out CTG Advanced Materials bonuses and legal expenses.

- CTG's "cash flow" position was forecasted to include the "cash flow" position of CTG Advanced Materials).

- The liabilities of all BW Piezo subsidiaries were paid through CTG's operating account.  *See* Ex. 16 (1/21/16 email from L. Chen to A. Ortega).

- CTG expenses were accrued between CTG and BW Piezo.  *See* Ex. 17 (1/15/16 email from L. Chen to C. Hanna).

- BW Piezo would pay for certain CTG-related expenses directly and then seek reimbursement from CTG.  *See* Ex. 18 (2/2/16 email from L. Chen to D. Oldham).

- CTG incurred BW Piezo's legal expenses.  *See* Ex. 19 (3/8/16 email from C. Hanna to A. Ortega).

- Legal expenses incurred in relation to CTG matters were charged to BW Piezo's general liabilities.  *See* Ex. 20 (1/12/16 email from L. Chen to C. Hanna).

- BW Piezo held board meetings at the offices of CTG.  *See* Ex.21 (attachment to 2/5/16 email from L. Chen to K. Carrington).

- CTG's corporate documents and communications with auditors represented CTG Advanced Materials as a "division" of CTG.  *See* Ex. 22 (pdf attachment to

12/26/15 email rom L. Chen to D. Ligon); Ex. [x] (attachment to 1/19/16 email from L. Chen to J. Cherry).

- CTG Advanced Materials was represented in government submissions and public press releases as being a subsidiary of CTG. *See* Ex. 24 (Dorsey Whitney letter).

45.    In addition, and in the alternative, BW Piezo and CTG were organized and operated as alter egos of each other.  The entities commingled funds and company assets and freely transferred funds between the entities to pay for another entity's liabilities.  Blue Wolf dominated the entities' affairs, and the entities shared business locations, employees, and corporate records.

46.    In addition, and in the alternative, CTG and CTG Advanced Materials were organized and operated as alter egos of each other.  The entities commingled funds and company assets and freely transferred funds between the entities to pay for another entity's liabilities.  The Blue Wolf Entities dominated the entities' affairs, and the entities shared business locations, employees, and corporate records.

47.    In addition, and in the alternative, the Blue Wolf Entities formed, organized, and operated BW Piezo, CTG, and CTG Advanced Materials to evade government regulation, legal obligations, and debt obligations.

48.    In addition, and in the alternative, the Blue Wolf Entities allowed the entities to operate with inadequate capital for the type of business they were conducting. siphoned CTG's assets and capital to repay Blue Wolf and make distributions to themselves.

# VI.
## CAUSES OF ACTION

**A. Avoidance of Actual Fraudulent Transfers Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)**

*(Defendants the Blue Wolf Entities, the Mezzanine Lenders, Pengdi Han, DHAN, LLC, Duff & Phelps, and CIT Bank, N.A.)*

49.    The foregoing and following paragraphs are hereby incorporated by reference as if fully set forth herein.

50.    Upon information and belief, each of the transfers specified in **Exhibit A** were made with property of CTG.  Specifically, the proceeds from the sale of CTG Advanced Materials belonged to CTG.

51.    In addition, the Blue Wolf Entities forced CTG to enter into a Loan and Security Agreement, dated April 20, 2016, with Blue Wolf Capital Fund II, L.P.  As part of the Loan and Security Agreement, CTG became liable for a line of credit of $2.86 million in exchange for security interests and liens over substantially all of CTG's personal property.

52.    Upon information and belief, each of the transfers or obligations were made or entered into after October 14, 2014.

53.    Blue Wolf, through its officers, employees, and agents made the transfers and incurred the obligations specified in **Exhibit A** with the actual intent to hinder, delay, and defraud CTG's creditors.

54.    Each transfer and obligation incurred was made, or entered into, in furtherance of the scheme perpetrated by the Blue Wolf Entities.  By causing such transfers to be made, the Blue Wolf Entities hoped to distribute to themselves the proceeds from a sale of CTG Advanced Materials.

55.    At the time the transfers and obligations incurred were made, or entered into, the

Blue Wolf Entities understood that causing those transfers and incurring those obligations would inevitably harm CTG's creditors. The Blue Wolf Entities knew CTG would be left insolvent and the transfers would reduce the amount of funds available to repay creditors.

56.     The Blue Wolf Entities held an ownership interest in CTG and exercised complete control over CTG and CTG Advanced Materials. The Blue Wolf Entities controlled the transfer of funds, the ability for CTG to incur obligations, and the ability to direct those purchasing CTG's assets to transfer the proceeds from their sale.

57.     The transfers were received by the beneficiaries as specified in **Exhibit A**.

58.     Plaintiff may avoid each of the transfers and obligations under 11 U.S.C. §§ 548(a)(1)(A) and 550.

**B. Avoidance of Constructive Fraudulent Transfers Under 11 U.S.C. § 548(a)(1)(B)**

*(Defendants the Blue Wolf Entities, the Mezzanine Lenders, Pengdi Han, DHAN, LLC, Duff & Phelps, and CIT Bank, N.A.)*

59.     The foregoing and following paragraphs are hereby incorporated by reference as if fully set forth herein

60.     Upon information and belief, each of the transfers specified in **Exhibit A** were made with property of CTG. Specifically, the proceeds from the sale of CTG Advanced Materials belonged to CTG.

61.     In addition, the Blue Wolf Entities forced CTG to enter into a Loan and Security Agreement, dated April 20, 2016, with Blue Wolf Capital Fund II, L.P. As part of the Loan and Security Agreement, CTG became liable for a line of credit of $2.86 million in exchange for security interests and liens over substantially all of CTG's personal property.

62.     Upon information and belief, each of the transfers or obligations were made or entered into after October 14, 2014.

63.    CTG did not receive reasonably equivalent value in exchange for the property transferred.

64.    As a result of the transfers and obligations, CTG became insolvent and undercapitalized.

65.    Additionally, and in the alternative, the Blue Wolf Entities intended and knew that the obligations CTG incurred were beyond its ability to pay as the debts matured.

66.    The Blue Wolf Entities held an ownership interest in CTG and exercised complete control over CTG and CTG Advanced Materials.  The Blue Wolf Entities controlled the transfer of funds, the ability for CTG to incur obligations, and the ability to direct those purchasing CTG's assets to transfer the proceeds from their sale.

67.    The transfers were received by the beneficiaries as specified in **__Exhibit A__**.

68.    Plaintiff may avoid each of the transfers and obligations under 11 U.S.C. § 548(a)(1)(A)

**C.    Violation of California Uniform Fraudulent Transfer Act (Actual Fraud)**

*(Defendants the Blue Wolf Entities, the Mezzanine Lenders, Pengdi Han, DHAN, LLC, Duff & Phelps, and CIT Bank, N.A.)*

69.    The foregoing and following paragraphs are hereby incorporated by reference as if fully set forth herein.

70.    Upon information and belief, each of the transfers specified in **__Exhibit A__** were made with property of CTG.  Specifically, the proceeds from the sale of CTG Advanced Materials belonged to CTG.

71.    In addition, the Blue Wolf Entities forced CTG to enter into a Loan and Security Agreement, dated April 20, 2016, with Blue Wolf Capital Fund II, L.P.  As part of the Loan and

Security Agreement, CTG became liable for a line of credit of $2.86 million in exchange for security interests and liens over substantially all of CTG's personal property.

72.     Upon information and belief, each of the transfers or obligations were made or entered into after October 12, 2014 , or within one year of Plaintiff's discovery of the same.

73.     Blue Wolf, through its officers, employees, and agents made the transfers and incurred the obligations specified in **Exhibit A** with the actual intent to hinder, delay, and defraud CTG's creditors.

74.     Each transfer and obligation incurred was made, or entered into, in furtherance of the scheme perpetrated by the Blue Wolf Entities.  By causing such transfers to be made, the Blue Wolf Entities hoped to distribute to themselves the proceeds from a sale of CTG Advanced Materials.

75.     At the time the transfers and obligations incurred were made, or entered into, the Blue Wolf Entities understood that causing those transfers and incurring those obligations would inevitably harm CTG's creditors.  The Blue Wolf Entities knew CTG would be left insolvent and the transfers would reduce the amount of funds available to repay creditors.

76.     The Blue Wolf Entities held an ownership interest in CTG and exercised complete control over CTG and CTG Advanced Materials.  The Blue Wolf Entities controlled the transfer of funds, the ability for CTG to incur obligations, and the ability to direct those purchasing CTG's assets to transfer the proceeds from their sale.

77.     The transfers were received by the beneficiaries as specified in **Exhibit A**.

**D.     Violation of California Uniform Fraudulent Transfer Act  (Constructive Fraud)**

*(Defendants the Blue Wolf Entities, the Mezzanine Lenders, Pengdi Han, DHAN, LLC, Duff & Phelps, and CIT Bank, N.A.)*

78.    The foregoing and following paragraphs are hereby incorporated by reference as if fully set forth herein

79.    Upon information and belief, each of the transfers specified in **Exhibit A** were made with property of CTG.  Specifically, the proceeds from the sale of CTG Advanced Materials belonged to CTG.

80.    In addition, the Blue Wolf Entities forced CTG to enter into a Loan and Security Agreement, dated April 20, 2016, with Blue Wolf Capital Fund II, L.P.  As part of the Loan and Security Agreement, CTG became liable for a line of credit of $2.86 million in exchange for security interests and liens over substantially all of CTG's personal property.

81.    Upon information and belief, each of the transfers or obligations were made or entered into after October 12, 2014.

82.    CTG did not receive reasonably equivalent value in exchange for the property transferred.

83.    As a result of the transfers and obligations, CTG became insolvent and undercapitalized.

84.    Additionally, and in the alternative, the Blue Wolf Entities intended and knew that the obligations CTG incurred were beyond its ability to pay as the debts matured.

85.    The Blue Wolf Entities held an ownership interest in CTG and exercised complete control over CTG and CTG Advanced Materials.  The Blue Wolf Entities controlled the transfer of funds, the ability for CTG to incur obligations, and the ability to direct those purchasing CTG's assets to transfer the proceeds from their sale.

86.    The transfers were received by the beneficiaries as specified in **Exhibit A**.

**E.      Avoidance of Actual Fraudulent Transfers Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)**

*(All Defendants)*

87.      Alternatively, in the event an alter ego determination is not made, CTG pleads the following cause of action.

88.      The foregoing and following paragraphs are hereby incorporated by reference as if fully set forth herein.

89.      Upon information and belief, each of the transfers specified in **Exhibit B** were made with property of CTG.

90.      Upon information and belief, each of the transfers or obligations were made or entered into after October 14, 2014.

91.      CTG, through its officers, employees, and agents made the transfers and incurred the obligations specified in **Exhibit B** with the actual intent to hinder, delay, and defraud CTG's creditors.

92.      Each transfer and obligation incurred was made, or entered into, in furtherance of the scheme perpetrated by CTG's management and controlling shareholder.  By causing such transfers to be made, CTG's management and controlling shareholder hoped to enrich themselves from the eventual sale or dissolution of CTG, CTG Advanced Materials, LLC, and Electro Optical Industries.

93.      At the time the transfers and obligations incurred were made, or entered into, CTG's management and controlling shareholder understood that causing those transfers and incurring those obligations would inevitably harm CTG's creditors.  CTG's management and controlling shareholder knew CTG would be left insolvent and the transfers would reduce the amount of funds available to repay creditors.

94.      CTG's management and controlling shareholder held an ownership interest in CTG and/or exercised complete control over CTG.  CTG's management and controlling shareholder controlled the transfer of funds, the ability for CTG to incur obligations, and the ability to direct those purchasing CTG's assets to transfer the proceeds from their sale.

95.      The transfers were received by the beneficiaries as specified in **Exhibit B**.

96.      Plaintiff may avoid each of the transfers and obligations under 11 U.S.C. §§ 548(a)(1)(A) and 550.

**F.      Avoidance of Constructive Fraudulent Transfers Under 11 U.S.C. § 548(a)(1)(B)**

*(All Defendants)*

97.      Alternatively, in the event an alter ego determination is not made, CTG pleads the following cause of action.

98.      The foregoing and following paragraphs are hereby incorporated by reference as if fully set forth herein.

99.      Upon information and belief, each of the transfers specified in **Exhibit B** were made with property of CTG.

100.    Upon information and belief, each of the transfers or obligations were made or entered into after October 14, 2014.

101.    CTG did not receive reasonably equivalent value in exchange for the property transferred.

102.    As a result of the transfers and obligations, CTG became insolvent and undercapitalized.

103.    Additionally, and in the alternative, CTG's management and controlling shareholder intended and knew that the obligations CTG incurred were beyond its ability to pay

as the debts matured.

104.    CTG's management and controlling shareholder held an ownership interest in CTG and/or exercised complete control over CTG.  The Blue Wolf Entities controlled the transfer of funds, the ability for CTG to incur obligations, and the ability to direct those purchasing CTG's assets to transfer the proceeds from their sale.

105.    The transfers were received by the beneficiaries as specified in **Exhibit B**.

106.    Plaintiff may avoid each of the transfers and obligations under 11 U.S.C. § 548(a)(1)(A)

**G.    Violation of California Uniform Fraudulent Transfer Act (Actual Fraud)**

*(All Defendants)*

107.    Alternatively, in the event an alter ego determination is not made, CTG pleads the following cause of action.

108.    The foregoing and following paragraphs are hereby incorporated by reference as if fully set forth herein.

109.    Upon information and belief, each of the transfers specified in **Exhibit B** were made with property of CTG.

110.    Upon information and belief, each of the transfers or obligations were made or entered into after October 12, 2014, or within one year of Plaintiff's discovery of the same.

111.    CTG, through its officers, employees, and agents made the transfers and incurred the obligations specified in **Exhibit B** with the actual intent to hinder, delay, and defraud CTG's creditors.

112.    Each transfer and obligation incurred was made, or entered into, in furtherance of the scheme perpetrated by CTG's management and controlling shareholder.  By causing such

transfers to be made, CTG's management and controlling shareholder hoped to enrich themselves from the eventual sale or dissolution of CTG Advanced Materials, LLC, Electro Optical Industries, and Materials Systems, Inc.

113.    At the time the transfers and obligations incurred were made, or entered into, CTG's management and controlling shareholder understood that causing those transfers and incurring those obligations would inevitably harm CTG's creditors.  CTG's management and controlling shareholder knew CTG would be left insolvent and the transfers would reduce the amount of funds available to repay creditors.

114.    CTG's management and controlling shareholder held an ownership interest in CTG and/or exercised complete control over CTG.  CTG's management and controlling shareholder controlled the transfer of funds, the ability for CTG to incur obligations, and the ability to direct those purchasing CTG's assets to transfer the proceeds from their sale.

115.    The transfers were received by the beneficiaries as specified in **Exhibit B**.

## H.    Violation of California Uniform Fraudulent Transfer Act  (Constructive Fraud)

*(All Defendants)*

116.    Alternatively, in the event an alter ego determination is not made, CTG pleads the following cause of action.

117.    The foregoing and following paragraphs are hereby incorporated by reference as if fully set forth herein.

118.    Upon information and belief, each of the transfers specified in **Exhibit B** were made with property of CTG.

119.    Upon information and belief, each of the transfers or obligations were made or entered into after October 12, 2014.

120.   CTG did not receive reasonably equivalent value in exchange for the property transferred.

121.   As a result of the transfers and obligations, CTG became insolvent and undercapitalized.

122.   Additionally, and in the alternative, CTG's management and controlling shareholder intended and knew that the obligations CTG incurred were beyond its ability to pay as the debts matured.

123.   CTG's management and controlling shareholder held an ownership interest in CTG and/or exercised complete control over CTG.  The Blue Wolf Entities controlled the transfer of funds, the ability for CTG to incur obligations, and the ability to direct those purchasing CTG's assets to transfer the proceeds from their sale.

124.   The transfers were received by the beneficiaries as specified in **Exhibit B**.

I.   **Unjust Enrichment**

*(All Defendants)*

125.   The foregoing and following paragraphs are hereby incorporated by reference as if fully set forth herein.

126.   Defendants received the following benefits:

- Proceeds of sale of Electro-Optical Industries, Inc.;

- Proceeds of sale of CTG Advanced Material to BW Piezo, and, subsequently, to other Blue Wolf Entities; and

- CTG's capital to Blue Wolf Entities, including Blue Wolf Capital Fund II, L.P. in connection with the Prepetition Credit Agreement.

- In the alternative, in the event an alter ego determination is not made,

Defendants Grant Thornton, LLP, CTG Advanced Materials, LLC, CTS Corporation, Electro Optical Industries received transfers from CTG or benefits from CTG paying its liabilities.

127.   Defendants' continued retention of these benefits is unjust.

128.   Defendants acquired these benefits by coercion and abuse of control.

**E.    Conversion**

129.   The foregoing and following paragraphs are hereby incorporated by reference as if fully set forth herein.

130.   CTG owned, possessed, or had the rights to immediate possession of the proceeds from the sale of its assets, including CTG Advanced Materials.

131.   Defendants wrongfully exercised dominion or control over the property.

132.   CTG suffered injury as a result including but not limited to actual damages, exemplary damages, pre- and post-judgment interest, and court costs.

**D.    Breach of Fiduciary Duty**

*(Defendants Blue Wolf Entities)*

133.   The foregoing and following paragraphs are hereby incorporated by reference as if fully set forth herein.

134.   A fiduciary relationship existed between BW Piezo and CTG. BW Piezo was the controlling shareholder of CTG and owed CTG certain fiduciary duties including but not limited to the duty of loyalty and utmost good faith, the duty of candor, the duty to refrain from self-dealing, the duty to act with integrity of the strictest kind, the duty of fair, honest dealing, and the duty of full disclosure.

135.   BW Piezo breached their fiduciary duties owed to CTG by engaging in the following conduct, which includes but is not limited to:

- Self-dealing, including but not limited to,
  - Pursuing their self-interests at the expense of CTG and their obligations as fiduciaries;
  - Misdirecting CTG funds to pay for undue benefits and distributions for themselves; and
  - Using the advantage of their position to misappropriate CTG's assets and proceeds from the sale of the same to themselves; and
- Engaging in transactions on behalf of themselves that were not fair and equitable to CTG and violated their fiduciary duties to CTG.
- Diverting funds that would have been retained by CTG, thereby rendering CTG insolvent and unable to pay its debts to its creditors.
- Making improper corporate distribution in violation of California Corporate Code sections 17704.05–.06.

136.   The aforementioned breaches resulted in great damage to CTG's business operations, breaches of ongoing contracts, a severe impairment in the value of CTG, and ultimately a bankruptcy filing by CTG and a liquidation of CTG, all to the detriment of CTG's creditors. As a result, CTG is entitled to damages including but not limited to actual damages, exemplary damages, rescission, an accounting, pre- and post-judgment interest, and court costs.

## VII.
### JURY DEMAND

Plaintiffs demand a trial by jury.

## VIII.
### PRAYER FOR RELIEF

WHEREFORE PREMISES CONSIDERED, upon final trial, CTG prays for the following relief:

(a)    Actual damages against Defendants in an amount to be proven at trial;

(b)    Reasonable and necessary attorneys' fees and court costs;

(c)    Prejudgment and post-judgment interest at the highest lawful rates; and

(d)    All such other relief to which CTG may show itself to be justly entitled.

Respectfully submitted,

/s/ *Christian Orozco*
Edward Jason Dennis
jdennis@lynnllp.com
Samuel B. Hardy
shardy@lynnllp.com
Christian Orozco
California State Bar No. 285723
corozco@lynnllp.com
**Lynn Pinker Cox & Hurst, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
(214) 981-3800 - Telephone
(214) 981-3839 - Facsimile

**Special Litigation Counsel for
Corporate Recovery Associates, LLC,
Trustee for the Liquidating Trust of
Debtor Channel Technologies Group, LLC**

## EXHIBIT A

**Transfers Related to Sale of CTG Advanced Materials**

|   | DATE | AMOUNT | RECEIVED TRANSFER/BENEFICIARY |
|---|------|--------|-------------------------------|
| 1. | On or about March 2016 | 37,134,772.79 | CIT Bank, N.A.; OneWest Bank N.A. |
| 2. | On or about March 2016 | 7,264,770.39 | Fidus Investment Corporation; Fidus Mezzanine Capital II, L.P. |
| 3. | On or about March 2016 | 7,263,263.90 | Avante Mezzanine Partners SBIC, LP |
| 4. | On or about March 2016 | 1,340.39 | Avante Mezzanine Partners II, Inc. |
| 5. | On or about March 2016 | 1,515,005.70 | CTG Advanced Materials |
| 6. | On or about March 2016 | 26,000.00 | Pengdi Han; DHAN, LLC |
| 7. | On or about March 2016 | 16,612,424.11 | Blue Wolf Fund II, L.P. |

**Subsequent Transfers Related to Sale of CTG Advanced Materials (Blue Wolf Fund II, L.P.)**

|   | DATE | AMOUNT | RECEIVED TRANSFER/BENEFICIARY |
|---|------|--------|-------------------------------|
| 1. | On or about March 2016 | 2,303,366.24 | Pengdi Han; DHAN, LLC |
| 2. | On or about March 2016 | 633,872.00 | Blue Wolf Capital Partners, LLC |
| 3. | On or about March 2016 | 752,245.09 | Gladstone Investment Corporation |
| 4. | On or about March 2016 | 1,340.39 | Avante Mezzanine Partners II, Inc. |
| 5. | On or about March 2016 | 199,861.70 | Fidus Investment Corporation; Fidus Mezzanine Capital II, L.P. |
| 6. | On or about March 2016 | 199,861.70 | Avante Mezzanine Partners SBIC, LP; Avante Mezzanine Partners II, Inc. |

<div align="center">

**EXHIBIT B**

</div>

**CTG Transfers for the Benefit of Affiliates and Subsidiaries**

| | DATES | TOTAL AMOUNT | RECEIVED TRANSFERS | BENEFICIARY |
|---|---|---|---|---|
| 1. | 1/25/2013– 3/15/2017 | $1,105,115.85 | Grant Thornton, LLP | Blue Wolf Entities; CTG Advanced Materials, LLC |
| 2. | 12/20/2012– 9/30/2016 | $789,579.14 | Holland & Knight | Blue Wolf Entities CTG Advanced Materials, LLC |
| 3. | 12/20/2013– 12/31/2015 | $1,959,987.31 | Fidus Investment Corporation; Fidus Mezzanine Capital II, L.P. | Blue Wolf Entities; CTG Advanced Materials, LLC |
| 4. | 12/3/2012– 6/10/2016 | $2,731,668.15 | Gladstone Investment Corporation | Blue Wolf Entities; CTG Advanced Materials, LLC |
| 5. | 12/11/2015 | $50,000.00 | Raymond James & Associates, Inc | Blue Wolf Entities CTG Advanced Materials, LLC |
| 6. | 12/19/2013– 2/18/2016 | $1,957,300.44 | Avante Mezzanine Partners SBIC, LP; Avante Mezzanine Partners II, Inc. | Blue Wolf Entities; CTG Advanced Materials, LLC |
| 7. | 1/10/2013– 5/13/2016 | $1,984,330.21 | Blue Wolf Capital Partners, LLC | Blue Wolf Entities CTG Advanced Materials, LLC |
| 8. | 7/24/2013– 10/28/2014 | $18,752,915.42 | CIT Bank, N.A.; OneWest Bank N.A. | Blue Wolf Entities CTG Advanced Materials, LLC |
| 9. | 5/31/2013– 2/25/2016 | $9,409,002.23 | CIT Bank, N.A.; OneWest Bank N.A. | Blue Wolf Entities CTG Advanced Materials, LLC; Electro Optical Industries |
| 10. | 4/3/2015 | $36,995.00 | Duff & Phelps, LLC | Blue Wolf Entities CTG Advanced Materials, LLC; Electro Optical Industries |
| 11. | 3/11/2015– 5/26/2016 | $165,365.86 | McDermott Will & Emery, LLP | Blue Wolf Entities CTG Advanced Materials, LLC |

# Exhibit  1

EXECUTION VERSION

# OPERATING AGREEMENT
## of
## CHANNEL TECHNOLOGIES GROUP, LLC

This Operating Agreement (the "Agreement") of Channel Technologies Group, LLC (the "Company") is entered into as of December  28 , 2011 by and between the Company and BW Piezo Holdings, LLC, as the sole member of the Company (the "Member").

## R E C I T A L S

WHEREAS, the Company became a limited liability company pursuant to the filing of articles of organization – conversion with the Office of the Secretary of State of the State of California, which was accepted for record on the ___ day of December (the "Articles of Organization"); prior thereto, the Company was a corporation formed pursuant to the California Corporations Code.

WHEREAS, the Company and the Member desire to enter into this Agreement in order to form and provide for the governance of the Company and the conduct of its business;

NOW, THEREFORE, the Member hereby agrees as follows:

## ARTICLE I: ORGANIZATION

1.1.    <u>Formation</u>.  The Member hereby acknowledges that the Company became a limited liability company on December ___, 2011 pursuant to the Beverly-Killea Limited Liability Company Act, as amended (the "Act"); prior thereto, the Company was a corporation formed pursuant to the California Corporations Code.

1.2.    <u>Name</u>.  The name of the Company is Channel Technologies Group, LLC.

1.3.    <u>Principal Executive Office</u>.  The principal executive office of the Company is at 879 Ward Drive, Santa Barbara, California 93111, or such other place or places as may be determined by the Managers (as such term is defined below) from time to time.

1.4.    <u>Agent for Service of Process</u>.  The initial agent for service of process on the Company shall be Corporation Service Company which will do business in California as CSC-Lawyers Incorporating Service.  The address for the initial agent shall be 2730 Gateway Oaks Drive, Suite 100, Sacramento, CA, 95833.  The Managers may from time to time change the Company's agent for service of process.

1.5.    <u>Purpose</u>.  The Company will be formed for the purposes of engaging in any lawful business permitted under the law.

1.6.    <u>Limited Liability</u>.  The Member intends the Company to be a limited liability company under the Act.  The Member shall not be bound by, or be personally liable for, the expenses, liabilities, or obligations of the Company except as otherwise provided in the Act or in this Agreement.

1.7.    Term.  The term of existence of the Company shall commence on the effective date of filing of Articles of Organization with the California Secretary of State, and shall continue until terminated by the provisions of this Agreement or as provided by law.

## ARTICLE II: FINANCIAL MATTERS

2.1.    Capital Contribution.  The Member shall contribute to the capital of the Company as the Member's initial capital contribution (together with any future contributions of capital, the "Capital Contribution") the amount specified in Exhibit "A" to this Agreement.  The Member may contribute such additional amounts of capital to the Company as the Member deems necessary or appropriate from time to time.

2.2.    Capital Account.  To the extent required by the Internal Revenue Code and the U.S. Treasury Regulations, a capital account shall be maintained for the Member consisting of the Capital Contribution, (1) increased by the Member's share of Company profits, (2) decreased by the Member's share of Company losses, and (3) otherwise adjusted as required in accordance with applicable provisions of such code and regulations.

2.3.    No Interest.  Except as specifically provided for in this Agreement, no interest shall be paid on funds contributed to the capital of the Company or on the balance of the Member's capital account, if any.

2.4.    Loans to Company.  In addition to the Capital Contribution, the Member may, from time to time, loan money to the Company.  Such loans shall be repaid with a reasonable interest based on prevailing loan rates.

2.5.    Allocation of Profits and Losses.  The profits and losses of the Company and all items of Company income, gain, loss, deduction, or credit shall be allocated, for Company book purposes and for tax purposes, to the Member.

2.6.    Distributions.  All cash resulting from the normal business operations of the Company (including cash proceeds from the sale of Company assets, if any) shall be distributed to the Member at such times as the Managers deem appropriate.

2.7.    Certificated Interests.  The membership interests in the Company shall be certificated.  So long as the Company is a single member limited liability company, the certificates shall reference the percentage interest owned by the Member (i.e., 100%).  If the Company becomes a multi-member limited liability company, this Agreement shall be amended and restated so that ownership in the Company is reflected by membership units instead of percentage interests.  The membership interests of the Company shall be securities governed by Article 8 of the Uniform Commercial Code as adopted and in effect in the State of California.

## ARTICLE III: MANAGEMENT

3.1.    Management by Managers.  The responsibility for managing the business and affairs of the Company shall be delegated to two Managers who, effective as of the date of this Agreement, shall be Kevin Ruelas and Pierre Chao (each a "Manager" and together the "Managers").  Any person or entity previously named as manager of the Company is hereby

removed and replaced by the named Managers as of the date of this Agreement.  Except as otherwise provided herein, any actions taken by the two Managers must be taken by Managers appointed by the Member.  At any time, with or without cause and in its sole discretion, the Member may (i) change the number of Managers, (ii) remove a Manager, (iii) replace a Manager or (iv) become a Manager.  If the number of Managers is decreased to one (1), then all references herein to "Managers" shall be read to say "Manager."  The Managers may act by vote taken at a meeting of Managers where a quorum is present or by written consent, pursuant to Section 4.6.

3.2.    Compensation.  The Managers shall be entitled to such reasonable compensation for his services as the Managers may determine from time to time.

3.3.    Power and Authority of the Managers.  Subject to the terms hereof, the Managers will have full, exclusive and complete discretion in the management and control of the affairs of the Company, will make all decisions affecting Company affairs, and will have all of the rights, powers and obligations of a manager under the Act and otherwise as provided by law.  Except as otherwise expressly provided in this Agreement, the Managers are hereby granted the right, power and authority to do on behalf of the Company all things that, in their judgment, are necessary or appropriate to manage the Company's affairs and to fulfill the purposes of the Company

3.4.    Officers.  The Managers hereby appoint as the initial officers of the Company, Kevin Ruelas as President, Secretary and Treasurer of the Company.  The President, Secretary and Treasurer of the Company shall report to the Managers of the Company.  The Managers or the Member may from time to time appoint additional officers, in each case by written consent, with such duties, authorities, responsibilities and titles as the Managers may deem appropriate.  Such officers shall serve until their successors are duly appointed by the Managers or until their earlier removal by the Managers or their resignation.

3.5.    Title to Company Assets.  All Assets of the Company, whether real or personal, shall be held in the name of the Company.

3.6.    Banking.  All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company at such locations as shall be determined by the Managers.  Withdrawal from such accounts shall require the signature of such person or persons as the Managers may designate.

## ARTICLE IV
## MEETINGS AND CONSENTS OF MANAGERS

4.1    Meetings.    Any matter requiring the consent of the Managers under this Agreement may be considered at a meeting of the Managers held not less than two (2) nor more than ten (10) days after notice of that meeting has been given to all Managers.  Any notice of a meeting shall be delivered personally, by mail or by other means of written communication addressed to the Manager at its address appearing on the books of the Company.  All meetings shall be held at the principal executive office of the Company or such other reasonable place as the Managers designate and during normal business hours, unless waived by all the Managers.

4.2     Records of Meetings.  A record of all actions, meetings or proceedings of the Managers shall be maintained in a Company minute book under the supervision of the Managers.

4.3     Participation.  Managers may participate in any meeting either in person or by means of a conference telephone or similar communications equipment through which all persons participating in the meeting can hear each other.  Participation in a meeting pursuant to this Section 4.3 shall constitute presence in person at the meeting.

4.4     Manner of Acting.  Except as otherwise provided by law or this Agreement, the action of a majority of Managers at any meeting at which a quorum is present shall be the act of the Company.

4.5     Quorum.  For purposes of this Agreement, the presence of a majority of the Managers shall constitute a quorum for the transaction of business.  Though less than a quorum, a majority of Managers present at a meeting may adjourn the meeting, from time to time and without further notice, until a quorum shall be present; provided, however, that any Managers absent from the adjourned meeting shall be provided written notice of such adjournment.

4.6     Consent of Managers in Lieu of Meeting.  Subject to the terms hereof, any action which may be taken at any meeting of the Managers may be taken without a meeting, without prior notice and without a vote if a written consent, setting forth the action so taken, is signed by both Managers.  Such consent shall be filed with the minutes of the meetings of Managers in the records of the Company.  Such written consent may be executed in counterparts, each of which, so executed, shall constitute one and the same original document.  Facsimile signatures shall be deemed originals for purposes of this Section 4.6.

**ARTICLE V**
**RESIGNATION OR REPLACEMENT OF MANAGER**

5.1     Removal or Replacement of Manager.  The removal or replacement (with or without cause) of any Manager shall be at the Member's (or its, his or her successor's or assign's) request and in such Member's sole discretion.

5.2     Resignation of Manager.  Any person serving in the capacity of a Manager may resign as Manager by giving at least ten (10) days' prior written notice of his or her resignation to the Member.  The resigning Manager shall cooperate fully with the successor Manager so that the responsibilities of the resigning Manager may be transferred to the successor Manager with as little disruption of the Company's business and affairs as is practicable.

5.3     Vacancy in Manager Position.   In the event that any Manager designated hereunder (or by any of its, his or her successors or assigns) for any reason ceases to serve as a Manager during his or her term of office, whether as a result of removal or resignation, the resulting vacancy in such position shall be filled by a new Manager designated by the Member (or such Member's successors or assigns).

5.4     Appointment of a Successor Manager.  The appointment of any person to be a successor Manager under this Article V shall be effective only if that person has accepted and assumed in writing all the terms and provisions of this Agreement.

- 4 -

## ARTICLE VI: ACCOUNTS AND RECORDS

6.1.    <u>Company Books</u>.  Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office.

6.2.    <u>Accounting; Fiscal Year</u>.  A balance sheet and income statement of the Company shall be prepared promptly following the close of each fiscal year in a manner appropriate to and adequate for the Company's business and for carrying out the provisions of this Agreement.  The fiscal year of the Company shall be January 1 through December 31 or as otherwise determined by the Managers.

6.3.    <u>Records to be Maintained</u>.  At all times during the term of existence of the Company, and beyond that term if the Managers deem it necessary, the Managers shall keep or cause to be kept the books of account referred to in <u>Section 6.2</u>, and the following:

(a)    A document including the full name and current business or residence address of the Member, together with the Capital Contribution and the share in Profits and Losses of the Member;

(b)    A copy of the Articles of Organization, as amended;

(c)    Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

(d)    Executed copy of this Agreement, as amended;

(e)    Financial statements of the Company for the six most recent fiscal years; and

(f)    The books and records of the Company as they relate to the Company's internal affairs for the current and past four fiscal years.

6.4.    <u>Information Provided to the Member</u>.  Within 90 days after the end of each taxable year of the Company, the Company shall send to the Member any information requested by the Member.

## ARTICLE VII: DISSOLUTION AND WINDING UP

7.1.    <u>Events Causing Dissolution</u>.  The Company shall be dissolved on the first to occur of the following events:

(a)    The decision of the Member to dissolve the Company;

(b)    The sale or disposition of substantially all of the Company's assets;

(c)    The election by the Managers to dissolve the Company following the distribution to the Members or other sale or disposition at any one time of all or substantially all of the assets of the Company; or

- 5 -

(d)      Entry of a decree of judicial dissolution pursuant to the California Corporations Code.

7.2.    <u>Winding Up</u>.  On the dissolution of the Company, the Company shall engage in no further business other than that necessary to wind up the business and affairs of the Company. The Managers or a liquidating trustee, if one is appointed, shall wind up the affairs of the Company and shall give written notice of the commencement of winding up by mail to all known creditors and claimants against the Company whose addresses appear in the records of the Company.  After paying or adequately providing for the payment of all known debts of the Company (except debts owing to the Member) the remaining assets of the Company shall be distributed or applied in the following order of priority:

(a)      To pay the expenses of liquidation;

(b)      To repay outstanding loans to the Member; and

(c)      To the Member.

## ARTICLE VIII: GENERAL PROVISIONS

8.1.    <u>Entire Agreement</u>.  This Agreement constitutes the whole and entire agreement with respect to the subject matter of this Agreement.  This Agreement may be modified only by written instrument signed by the Member.

8.2.    <u>Governing Law; Severability</u>.  This Agreement shall be construed and enforced in accordance with the internal laws of the State of California.  If any provision of this Agreement is determined by any court of competent jurisdiction or arbitrator to be invalid, illegal, or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or unenforceability or, if that is not possible, such provision shall, to the extent of such invalidity, illegality, or unenforceability, be severed, and the remaining provisions of this Agreement shall remain in effect.

8.3.    <u>Titles and Headings</u>.  The article, section, and paragraph titles and headings contained in this Agreement are inserted as matter of convenience and for ease of reference only and shall be disregarded for all other purposes, including the construction or enforcement of this Agreement or any of its provisions.

8.4.    <u>No Third Party Beneficiary Intended</u>.  This Agreement is made solely for the benefit of the Member and his permitted successors and assigns, and no other person or entity shall have or acquire any right by virtue of this Agreement.

*(Signature Page Follows.)*

IN WITNESS WHEREOF, the undersigned have executed this Agreement on the day and year first above written.

**COMPANY:**

**CHANNEL TECHNOLOGIES GROUP, LLC**

By: _____
     Name:
     Title:

**SOLE MEMBER:**

**BW PIEZO HOLDINGS, LLC**

By: _____
     Name:
     Title:

*Signature Page to Channel Technologies Group, LLC Operating Agreement*

IN WITNESS WHEREOF, the undersigned have executed this Agreement on the day and year first above written.

COMPANY:

**CHANNEL TECHNOLOGIES GROUP, LLC**

By: _____
    Name:
    Title:


**SOLE MEMBER:**

**BW PIEZO HOLDINGS, LLC**

By: _____
    Name: Adam Blumenthal
    Title: President

*Signature Page to Channel Technologies Group, LLC Operating Agreement*

**EXHIBIT A**

**MEMBERSHIP INTERESTS**

| Member | Membership Interest | Initial Capital Contribution |
| --- | --- | --- |
| BW Piezo Holdings, LLC | 100% | $1,000.00 |

#10835136_v7

# Exhibit  2

## *PE-backed Channel Tech makes first add-on deal*

The Deal Pipeline

October 15, 2013 Tuesday

Copyright 2013 The Deal, L.L.C. All Rights Reserved

**Length:** 435 words

**Byline:** by Tatjana Kulkarni

## Body

Private equity-backed ***Channel Technologies Group*** LLC has acquired piezoelectric crystal producer H.C. Materials Inc. for an undisclosed amount, its first add-on deal since **Blue Wolf Capital Partners LLC** annexed it to its portfolio nearly two years ago.

Santa Barbara, Calif.-based CTG, a ceramic solutions manufacturer, acquired H.C. Materials from entrepreneur Pingdi Han, who will remain in a management role.

"We are working on strengthening and growing CTG," said Adam Blumenthal, managing partner of New York PE firm Blue Wolf Capital, by phone. "We plan on keeping the company in our portfolio for several years before selling it."

CTG, which was acquired by Blue Wolf Capital on Jan. 3, 2012, manufactures and distributes piezoelectric ceramic solutions, transducers and navigation systems.

"The fit is perfect," Blumenthal said about the add-on deal. "H.C. makes the high-quality crystals, which Channel will now use in manufacturing its products."

Prior to the acquisition, CTG's key customers were from the military and navy industries. With the addition of H.C. Materials, CTG will be poised to expand its customer base to markets such as medical ultrasound imaging, ocean mining and sonar systems.

"The quality of crystal H.C. makes will really give (CTG) a huge advantage in the medical and ocean exploration space," Blumenthal stated.

In a statement, CTG CEO Ralph L. Phillips specifically mentioned that the acquisition "strengthens our advanced materials segment."

H.C. Materials will maintain its headquarters in Bolingbrook, Ill.

Geoff Ligibel from **Houlihan Lokey Inc.**was H.C. Materials' financial adviser on the transaction.

CTG's financial adviser was **Lincoln International LLC**. It received legal counsel from **Holland & Knight LLP**.

Blue Wolf typically invests a minimum of $10 million in middle-market companies that have revenues of at least $25 million and are in the midst of some structural, financial or regulatory difficulty.

"We are a special-situation investment firm," Blumenthal said, "so when we noticed that Channel, which had such strong technical capabilities, was going through a lot of financial challenges, we became interested."

PE-backed Channel Tech makes first add-on deal

Blumenthal, who sits on CTG's board, declined to specify what type of financial difficulty CTG was facing at the time. But he did say the company was suffering "from neglect from its previous owners."

"What we have done was really give it the operational and strategic assistance it needed to strengthen ties with its customers, specifically the Navy industry," Blumenthal said.

H.C. Materials officials couldn't be reached for comment.

**DEAL SIZE**

Undisclosed

**Load-Date:** October 29, 2013

_____

End of Document

Jason Dennis

# Exhibit  3

1 | GARY W. NEVERS, ESQ., SB#82512

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
9/8/2016 1:41:00 PM
By: Sarah Sisto, Deputy

1 | GARY W. NEVERS, ESQ., SB#82512
*gnevers@npwlaw.com*
2 | SHARLENE D. LEE, ESQ., SB#274033
*slee@npwlaw.com*
3 | NEVERS, PALAZZO, PACKARD,
WILDERMUTH & WYNNER, PC
4 | 31248 Oak Crest Drive, Suite 100
Westlake Village, California 91361
5 | Telephone: (818) 879-9700
Facsimile: (818) 879-9680
6 |
7 | Attorneys for Plaintiff Ralph L. Phillips
8 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
9 | **COUNTY OF SANTA BARBARA**
10 |
11 | RALPH L. PHILLIPS,
12 | Plaintiff,
13 | vs.
14 | PIEZO INVESTMENT HOLDINGS, LLC, a limited liability company; BW PIEZO
15 | HOLDINGS, LLC, a limited liability company; CHANNEL TECHNOLOGIES
16 | GROUP, LLC, a limited liability company; and DOES 1 through 180, inclusive,
17 |
18 | Defendants.
19 |

CASE NO. 16CV03968

**COMPLAINT FOR**

1. **FRAUD AND DECEIT BY INTENTIONAL MISREPRESENTATION**
2. **FRAUD AND DECEIT BY CONCEALMENT**
3. **RESCISSION AND RESTITUTION BASED ON FRAUD IN THE INDUCEMENT**
4. **DECLARATORY RELIEF**
5. **MONEY OWED PLAINTIFF**
6. **ACCOUNTING**

**REQUEST FOR JURY TRIAL**

20 |
21 | Plaintiff Ralph L. Phillips alleges as follows:
22 | <u>GENERAL ALLEGATIONS</u>
23 |     1.    Plaintiff Ralph L. Phillips (hereinafter "Plaintiff" or "Phillips") is now, and at all
24 | times herein mentioned was, an individual residing in County of Ventura, State of California.
25 |     2.    Plaintiff is informed and believes and thereon alleges that Defendant Piezo
26 | Investment Holdings, LLC (hereinafter "Piezo LLC" or "Piezo") is a limited liability company
27 | organized and existing under the laws of Delaware which at all times relevant hereto has been doing
28 | business in the County of Santa Barbara, State of California.

1      3.      Plaintiff is informed and believes and thereon alleges that Defendant BW Piezo

2  Holdings, LLC (hereinafter "BW Piezo LLC" or "BW Piezo") is a limited liability company

3  organized and existing under the laws of Delaware which at all times relevant hereto has been doing

4  business in the County of Santa Barbara, State of California, and that Piezo LLC has been at all

5  relevant times an owner of membership interests in BW Piezo LLC.

6      4.      Plaintiff is informed and believe and thereon alleges that Defendant Channel

7  Technologies Group, LLC (hereinafter "CTG LLC" or "CTG") is a limited liability company

8  organized and existing under the laws of California which had its principal place of business in

9  Santa Barbara, California, and that CTG has at all relevant times been a subsidiary of BW Piezo

10 LLC.

11      5.      Plaintiff is ignorant of the true names and capacities of the Defendants sued herein

12 as Does 1 through 180, inclusive, and therefore sue said Defendants by such fictitious names.

13 Plaintiff will seek leave to amend this Complaint to allege the true names and capacities of such

14 Defendants when ascertained.  Plaintiff is informed and believes and based thereon alleges that each

15 of the fictitiously named Defendants is responsible in some manner for the occurrences herein

16 alleged, and that Plaintiff's damages as herein alleged were proximately caused by their conduct.

17      6.      Each reference in this Complaint to "defendant," "defendants," "co-defendants,"

18 "defendant companies," "company defendants," "all persons acting under, in concert with, or for

19 him/her/it", or to any specifically named defendant refers also to all Defendants, including those

20 sued or sued and served herein under fictitious names.

21      7.      Plaintiff is informed and believes and thereon alleges that at all times herein

22 mentioned, each of the Defendants was the actual or ostensible duly authorized agent, managing

23 agent, servant, employee, representative, alter ego, co-conspirator, incorporator, officer, director,

24 shareholder, member, parent, brother or sister company or corporation, predecessor and successor-

25 in-interest of each of the remaining co-defendants, and in doing the things hereinafter alleged, was

26 acting within the course and scope of said agency, employment and office, with the express and/or

27 implied permission, consent, resolution, direction, authorization and ratification of the remaining

28 co-defendants, and each of them.

8.     Plaintiff is informed and believes and thereon alleges that Defendants Piezo LLC,
BW Piezo LLC, CTG LLC, and Does 1 through 180, inclusive, are controlled and operated as a
single enterprise. Plaintiff is informed and believes, and on that basis alleges, that at all times
relevant herein, each one of the Defendants Piezo LLC, BW Piezo LLC, CTG LLC, and Does 1
through 180, inclusive, were the alter ego of one another and each of them, and that such a unity of
interest and ownership existed between them that separate personalities have not in reality existed;
and there would be an inequitable result if the acts and omissions at issue in this case were treated
as those of any of the Defendants Piezo LLC, BW Piezo LLC, CTG LLC, and Does 1 through 180
alone. Plaintiff is further informed and believes that the Defendants Piezo LLC, BW Piezo LLC,
CTG LLC, and Does 1 through 100 commingle funds and assets among themselves, that the
Defendants Piezo LLC, BW Piezo LLC, CTG LLC, and Does 1 through 180 have identical, nearly
identical or effectively identical owners, that the Defendants Piezo LLC, BW Piezo LLC, CTG LLC,
and Does 1 through 180 have the same offices, directors, and officers and that the Defendants Piezo
LLC, BW Piezo LLC, CTG LLC, and Does 1 through 180 use one another as a mere shell or conduit
for the affairs of one another. In addition, Plaintiff is informed and believes that each of the
Defendants Piezo LLC, BW Piezo LLC, CTG LLC, and Does 1 through 180 disregard requisite
formalities, shares employees and each transfers assets or properties away and/or creates or shifts
liabilities so that each may be left with insufficient capital to meet the needs of each entity's business
and its liabilities and without consideration to the detriment of the entity's creditors.

9.     BW Piezo LLC was a desperate private equity company that owned CTG LLC. BW
Piezo had terminated the CEO of CTG LLC, needed money to pay him off, and needed a new CEO
with a history of turning companies around to save their company that was losing money and
confidence. Defendants started courting Plaintiff, painting a rosy picture of millions of dollars of
profits with a glowing bank financing package and a story describing how with the acquisition of a
company called HC Materials, the profitable operation of CTG LLC would combine with the even
more profitable operation of HC Materials and make everyone a lot of money.

10.    In the weeks prior to signing the Employment Agreement, Plaintiff met with Adam
Blumenthal, Haran Narulla, and Charlie Miller, each of whom were principals or managing

1  members of Piezo LLC, BW Piezo LLC and CTG LLC. Each were representatives of the referenced

2  Defendants, who had authority to speak for the Defendants, to negotiate the terms of  the

3  Employment Agreement and to enter that agreement on behalf of CTG LLC. Specifically, Plaintiff

4  met with Mr. Blumenthal, Mr. Narulla, and Mr. Miller in person in New York City, NY, and with

5  Mr. Blumenthal and Mr. Narulla in person in Santa Barbara, CA.  In addition, prior to executing

6  the Employment Agreement, Plaintiff spoke by telephone multiple times with Mr. Blumenthal and

7  Mr. Narulla.

8        11.    Defendants promised Plaintiff 4% of CTG LLC in equity incentives, and Plaintiff

9  was encouraged to buy a bigger stake.  To further encourage him, Defendants promised that for

10 every dollar Plaintiff invested, Plaintiff would receive a matching dollar from Defendants, with no

11 downside.

12        12.    Plaintiff believed the Defendants' story, and was hired as President and Chief

13 Executive Officer of CTG LLC under a written Employment Agreement in 2013. The Employment

14 Agreement provided Plaintiff a salary of $300,000 per year plus discretionary performance bonuses,

15 "Equity Compensation" consisting of restricted units equaling  approximately 4% of the fully-

16 diluted equity of CTG LLC, and the opportunity to invest $500,000 in CTG LLC. CTG LLC agreed

17 in the Employment Agreement that BW Piezo LLC, the parent company of CTG LLC, would lend

18 Plaintiff up to $250,000 of the $500,000 purchase price of units, secured only by the units purchased

19 with the loan.  Shortly after signing the Employment Agreement, Plaintiff made his $250,000 cash

20 contribution.

21        13.    In the discussions preceding execution of the Employment Agreement, the

22 representatives of the referenced Defendants, who had authority to speak for the Defendants, to

23 negotiate the terms of the Employment Agreement and enter that agreement on behalf of CTG LLC,

24 made the following material representations to Plaintiff:

25        (a)    The Defendants and in particular CTG LLC, were profitable and were in good

26 financial condition.  This representation was not true.  Defendants overstated the financial

27 performance of Defendants, and in particular CTG LLC. CTG LLC was not profitable.

28        (b)    CTG LLC would be merged with a company that CTG LLC was in the

1  process of acquiring, HC Materials, such that Plaintiff would be buying a direct ownership in the
2  combined company.  Defendants also represented that the merged CTC LLC/HC entity would be
3  very profitable, and together be in excellent financial condition.  This representation was not true.
4  Defendants overstated the financial performance of HC Materials, and the projections for the
5  financial strength of the combined CTC LLC/HC entity were overstated.  Defendants' assertions of
6  the reasonably achievable performance of the combined CTC LLC/HC entity were overstated and
7  not warranted by the facts known to Defendants.  Additionally, HC Materials and CTG LLC were
8  not merged, but HC Materials was instead acquired by BW Piezo.

9          (c)     When Plaintiff purchased the units by investing $250,000, Defendants would
10  match Plaintiff's investment as a loan, with all units purchased thereby belonging to Plaintiff, and
11  the loan would be repayable only on the sale of CTG LLC or out of a 50% of the amount of any
12  annual performance bonus above a $150,000 bonus target with the sole remedy of Defendants being
13  recourse against the shares purchased with the loaned funds, so that Plaintiff would never be sued
14  for collection of the Note and his other assets other than the units purchased with the loaned funds
15  would not be subject to collection for any liability under the Note. This representation was not true.

16     14.     After Plaintiff accepted the offered position, signed the Employment Agreement,
17  began working as CEO and President of CTG LLC, and contributed $250,000 in cash, Defendants
18  presented documents to Plaintiff stating that they documented the agreement regarding Plaintiff's
19  purchase of units and the loan for the purchase. A copy of the Piezo Investment Holdings, LLC
20  Mirror Unit Grant Agreement as of October 11, 2013 (the "October 11, 2013 Grant Agreement") is
21  attached hereto as Exhibit A and incorporated by this reference.  A copy of the Piezo Investment
22  Holdings, LLC Mirror Unit Grant Agreement as of October 14, 2013 (the "October 14, 2013 Grant
23  Agreement") (collectively, with the October 11, 2013 Grant Agreement, the "October Grant
24  Agreements") is attached hereto as Exhibit B and incorporated by this reference.  A copy of the
25  Promissory Note ("Note") made by Phillips as of October 11, 2013 in favor of BW Piezo LLC for
26  $250,000 is attached hereto as Exhibit C and incorporated by this reference.  A copy of the Pledge
27  Agreement ("Pledge') between Phillips and BW Piezo LLC dated as of October 11, 2013 is attached
28  hereto as Exhibit D and incorporated by this reference.

15.     Plaintiff reviewed the Note, Pledge, and October Grant Agreements before signing them but did not have them reviewed by an attorney. Plaintiff did not understand before signing the Note, Pledge, and October Grant Agreements that the terms of the Note, Pledge and October Grant Agreements were inconsistent in material respects from the terms of the Employment Agreement, as well as from the representations made by Defendants prior to commencement of Plaintiff's employment. For example:

(a)     The Employment Agreement states that the loan will be repayable only on sale of the company or out of a 50% of the amount of any annual performance bonus above a $150,000 bonus target. However, the Note states that the Note is due in 5 years, or on an earlier cessation of Phillips' employment.

(b)     The Employment Agreement states that the loan will be secured only by the units purchased by the loan. However, the Note and Pledge state that the loan is not only collectible by resort to the units purchased, but at BW Piezo's election could be collected by a suit for a money judgment against Plaintiff personally in the full amount of the Note, interest and attorney fees and costs. The Note and Pledge also state that the units are not the only recourse but BW Piezo LLC could collect in any manner, and purports to name BW Piezo LLC as Plaintiff's attorney in fact in the event of default to transfer Plaintiff's units and assume the benefits thereof to the exclusion of Plaintiff.

(c)     The Employment Agreement states that Plaintiff would have the opportunity to invest up to $500,000 in CTG LLC. However, under the October 11, 2013 Grant Agreement, Piezo LLC granted Plaintiff 269 "Mirror Preferred Units" and 268,908 "Mirror Common Units" in Piezo LLC. Similarly, under the October 14, 2013 Grant Agreement, Piezo LLC granted Plaintiff 1,208,841 "Mirror Common Units" in Piezo LLC. Thus, Plaintiff was not issued ownership units in CTG LLC as promised in the Employment Agreement, but units of membership interest in Piezo LLC called mirror units. These mirror units purported to tie performance of Piezo, LLC membership interests with units of membership interest in BW Piezo LLC owned by Piezo LLC.

16.     Plaintiff signed the Note, the Pledge, and the October Grant Agreements without consulting counsel and without understanding the discrepancy or the details concerning the nature

1 | of the units granted.

2 |      17.    Defendants did not use Plaintiff's $250,000 cash investment as working capital for

3 | CTG LLC, but instead used the funds to pay off the CEO Plaintiff had replaced.  Plaintiff later

4 | became aware that other executives of CTG LLC whose employment had ended received their

5 | invested funds back and were forgiven amounts loaned to them to make their investments.

6 |      18.    The bank also bought Defendants' story, and loaned Defendants the majority of the

7 | cash they needed to acquire HC Materials.  Although Defendants represented that CTG LLC and

8 | HC Materials were profitable and in good financial condition, that HC Materials would be merged

9 | with CTG LLC, that the merged CTC LLC/HC entity would be very profitable, and that together

10 | the merged entity's profits would generate sufficient cash flow to comfortably service its debt

11 | obligations, Plaintiff discovered that these representations were not true.  CTG LLC was not

12 | profitable but instead had been losing money.  BW Piezo LLC acquired HC Materials for $48

13 | million in October 2013 and changed its name to CTG Advanced Materials, but HC Materials and

14 | CTG LLC were not merged as previously represented by Defendants.  Instead HC Materials was

15 | acquired by BW Piezo, and Plaintiff was told to run the HC Materials as if it were combined with

16 | CTG LLC.  Plaintiff pushed forward, working hard to make CTG LLC and HC Materials profitable.

17 | But he eventually discovered that (i) the overall financial condition of BW Piezo LLC, CTG LLC's

18 | parent company, was poor because of heavy debt load, and BW Piezo LLC was in violation of lender

19 | covenants, (ii) Defendants had overstated the financial performance of CTG LLC and HC Materials

20 | and the projections for the financial strength of the merged CTC LLC/HC entity had been overstated,

21 | and (iii) Defendants' assertions of the reasonably achievable performance of the merged CTC

22 | LLC/HC entity had been overstated and not warranted by the facts known to Defendants.  BW Piezo

23 | had put so much debt on CTC LLC that the payment burden of the debt was crushing CTC's growth.

24 | While HC Materials continued to generate operating profit throughout the time it was owned by BW

25 | Piezo LLC, the acquisition of HC Materials saddled Defendants with a heavy debt load and

26 | Defendants' operating profits were insufficient to meet their debt obligations, and they became in

27 | violation of lender covenants.

28 |      19.    Defendants thought another acquisition was the key to getting out of their debt

1   problem, and convinced Plaintiff in Fall 2014 to put up another $190,000 to help Defendants acquire

2   another company, MSI, and as an equity cure for Defendants' violation of the lender covenants.

3   Thus, in September 2014, Plaintiff was given the opportunity to purchase additional preferred units

4   in the company. However, Plaintiff was again not issued ownership units in CTG LLC, but units of

5   Piezo LLC. Plaintiff purchased 89 additional preferred units for $167,966.34 in cash, under a Grant

6   Agreement dated September 30, 2014 (the "September 30, 2014 Grant Agreement").  In December

7   2014, Plaintiff purchased 11 additional preferred units in Piezo LLC for $22,834.43 in cash, under

8   a Grant Agreement dated December 31, 2014 (the "December 31, 2014 Grant Agreement").

9   Plaintiff's total investment in units of Piezo LLC thus is $690,800.77. A copy of the September 30,

10  2014 Grant Agreement is attached hereto as Exhibit E and incorporated by this reference.  A copy

11  of the December 31, 2014 Grant Agreement is attached hereto as Exhibit F and incorporated by this

12  reference.

13          20.     In October 2014, BW Piezo acquired MSI.  Plaintiff continued to work hard and

14  brought in major contracts worth tens of millions of dollars.  The going was hard, cash was always

15  scarce, and one Chief Financial Officer after another quit.  Throughout 2015, the Defendants

16  continued to be highly leveraged, with bank debt almost equaling the combined sales of CTG LLC

17  and HC Materials.

18          21.     Plaintiff continued to push forward, but in the fall of 2015, he hit a new roadblock-

19  discovery of a hidden liability that could cost the company millions of dollars, ruin his reputation

20  and result in regulatory disaster.  Plaintiff learned that prior to his joining CTG LLC, Defendants

21  had received reports and other information demonstrating significant material actual and potential

22  liability which would result in expenses to CTG LLC of upwards of $2 million or more and could

23  result in substantially more liability.  Plaintiff had not been advised of the significant material actual

24  and potential liability prior to his employment, prior to making his $500,000 investment relating to

25  the October 11, 2013 Grant Agreement, prior to making his $167,966.34 investment relating to the

26  September 30, 2014 Grant Agreement, or prior to making his $22,834.43 investment relating to the

27  December 31, 2014 Grant Agreement.

28          22.     In January 2016, Plaintiff's employment as CEO and President of CTG LLC was

1    terminated. However, Plaintiff still had a sizeable investment in the company. Although the new

2    contracts brought in by Plaintiff were ramping up, CTG LLC still had little available cash. Adam

3    Blumenthal, President of BW Piezo LLC and Piezo LLC, advised Plaintiff that Defendants were

4    unable to repurchase his membership interests by returning his purchase payments and canceling

5    the Note after his employment terminated, as was done with his predecessor and other employees

6    upon termination. Instead, Mr. Blumenthal told Plaintiff that Defendants would allow him to keep

7    his equity and benefit from the fruits of his labors. Mr. Blumenthal advised Plaintiff of negotiations

8    underway for BW Piezo to sell the HC Materials business for approximately $70 million, that the

9    imminent sale would result in a significant paydown of bank debt and the accrued 8% accrued annual

10   return to preferred unit holders, and that Plaintiff's equity would be allowed to remain in place and

11   would likely result in at least a two times capital return when it was sold.

12         23.    In March 2016, HC Materials was sold for $73 million. Plaintiff is informed and

13   believes, and thereon alleges that Defendants used the money from the sale of HC Materials to pay

14   off $48 million in debt to the bank. Plaintiff is informed and believes, and thereon alleges that some

15   of sales proceeds was used to buy out the old owner of HC Materials, who had taken units of Piezo

16   LLC in connection with his sale of HC Materials but was tired of waiting for his money. Plaintiff

17   is informed and believes and thereon alleges that some of the sales proceeds was used to attempt to

18   mitigate some of the undisclosed liabilities described above. Plaintiff is informed and believes and

19   thereon alleges that $11.5 million was distributed to preferred unit holders.

20         24.    Instead of paying Plaintiff his share of the distribution, on April 20, 2016, Adam

21   Blumenthal on behalf of BW Piezo LLC sent Plaintiff a Notice of Default under the Note and the

22   Pledge Agreement, with the termination of his employment described as the default event. The

23   Notice of Default demanded immediate payment and declared that a 12% default interest would

24   apply instead of the 3.5% original rate.

25         25.    On April 29, 2016, Charlie Miller sent an e-mail message to Plaintiff informing him

26   that a Preferred Return had been declared and distributed to preferred unit holders other than

27   Plaintiff. The e-mail message advised that Plaintiff's $143,751 preferred return that Plaintiff should

28   have received had been retained by Piezo LLC (without notice to or consent of Plaintiff) and used

1  to pay down Plaintiff's Note in favor of BW Piezo LLC. Plaintiff was also advised that he owed a

2  remaining balance on his Note of $128,173, which he needed to pay immediately or he would be

3  sued personally for the money with 12% penalty interest. The April 29, 2016 e-mail told Plaintiff

4  that instead of paying the Note, he could just give all his equity back and he would not be sued.

5  Counsel for Defendants later informed Plaintiff that his $690,800 investment in units of Piezo LLC

6  is virtually worthless, such that Plaintiff should be happy to surrender his units to Piezo LLC, and

7  if he did not, he would be sued in Delaware, a jurisdiction 3,000 miles from his home and from CTG

8  LLC.

9  <u>**FIRST CAUSE OF ACTION**</u>

10  **(By Plaintiff Ralph L. Phillips for Damages for Fraud and Deceit by Intentional**

11  **Misrepresentation against Defendants Piezo LLC, BW Piezo LLC, CTG LLC and DOES 1 to**

12  **30, inclusive)**

13  26.     Plaintiff refers to and incorporates herein by this reference each of the allegations set

14  forth in paragraphs 1 through 25 of this Complaint as though here set forth in full.

15  27.     In 2013, prior to execution by Plaintiff of the Employment Agreement between

16  Plaintiff and CTG LLC, the Note, the Pledge, and the October 11, 2013 Grant Agreement,

17  Defendants Piezo LLC, BW Piezo LLC, CTG LLC and Does 1 through 30, each represented to

18  Plaintiff that

19  (a)     The Defendants and in particular CTG LLC, were profitable and were in good

20  financial condition.

21  (b)     CTG LLC would be merged with a company that CTG LLC was in the

22  process of acquiring, HC Materials, such that Plaintiff would be buying a direct ownership in the

23  combined company. Defendants also represented that the combined CTC LLC/HC entity would be

24  very profitable, and together be in excellent financial condition.

25  (c)     When Plaintiff purchased the preferred units by investing up to $250,000,

26  Defendants would match Plaintiff's investment as a loan, with all units purchased thereby belonging

27  to Plaintiff, and the loan would be repayable only on sale of the company or out of a 50% of the

28  amount of any annual performance bonus above a $150,000 bonus target, with the sole remedy of

1    the company being recourse against the shares purchased with the loaned funds, so that Plaintiff

2    would never be sued for collection of the Note and his other assets other than the units purchased

3    with the loaned funds would not be subject to collection for any liability under the Note ((a), (b),

4    and (c) collectively, the "Representations").

5          28.     The Representations made by Defendants were false.

6          29.     The true facts were as follows:

7            (a)     The Defendants, and in particular CTG LLC, were losing money. Defendants

8    overstated the financial performance of Defendants, and in particular CTG LLC. CTG LLC was

9    not profitable.

10           (b)     Defendants also overstated the financial performance of HC Materials, and

11    the projections for the financial strength of the merged CTC LLC/HC entity were overstated and

12    phony. Defendants' assertions of the reasonably achievable performance of the combined CTC

13    LLC/HC entity were overstated and not warranted by the facts known to Defendants. Additionally,

14    HC Materials and CTG LLC were not merged, but HC Materials was instead acquired by BW Piezo.

15           (c)     The Note states that the Note is due in five years, or on an earlier cessation

16    of Phillips' employment. Under the Note and Pledge, the loan is not only collectible by resort to the

17    shares purchased, but at BW Piezo's election can be collected by a suit for a money judgment against

18    Plaintiff personally in the full amount of the Note, interest and attorney fees and costs without

19    proceeding against the pledged units. The Note and Pledge also state that the units are not the only

20    recourse but BW Piezo can collect in any manner and purports to name BW Piezo LLC as Plaintiff's

21    attorney in fact in the event of default to transfer Plaintiff's units and assume the benefits thereof to

22    the exclusion of Plaintiff.

23           (d)     Prior to Plaintiff's joining CTG LLC, BW Piezo had received reports and

24    other information demonstrating significant material actual and potential liability which would

25    result in expenses to CTG LLC of upwards of $2 million or more and could result in substantially

26    more liability.

27          30.     When Defendants made and published the Representations, they knew or should

28    have known them to be false and made these Representations with the intention to induce Plaintiff

1  to act in reliance on these Representations in the manner alleged herein or with the expectation that

2  Plaintiff would so act.

3       31.    Plaintiff, at the time of the Representations were made by Defendants and at the time

4  Plaintiff took the actions herein alleged, were ignorant of the falsity of Defendants' representations

5  and believed them to be true.

6       32.    In justifiable reliance on the Representations, Plaintiff was induced to and did enter

7  into the Employment Agreement, invested $250,000 cash, and signed the $250,000 Note and Pledge

8  to purchase the units in the October 11, 2013 Grant Agreement. Had Plaintiff known the actual

9  facts, he would not have taken such actions. Plaintiff's reliance on Defendants' Representations was

10  justified because Defendants held themselves out as reputable and honest business entities and

11  persons and Plaintiff trusted Defendants' claims, representations and assertions.

12       33.    As a direct, legal and proximate result of the fraudulent Representations and conduct

13  of Defendants, and each of them, as herein alleged, Plaintiff was induced to enter into the Note,

14  Pledge, and the October 11, 2013 Grant Agreement, to purchase $500,000 in units in October 2013,

15  and to incur expenses and forgo other opportunities and has been damaged in the sum of not less

16  than $2,000,000, according to proof.

17       34.    As a further proximate result of the conduct of Defendants as herein alleged, Plaintiff

18  sustained and suffered, and continues to sustain and suffer, special damages in a sum or sums

19  according to proof at time of trial. Plaintiff will seek leave to amend this Complaint to insert herein

20  the true and correct amount of all such damages at such time as the same are ascertained, or upon

21  proof thereof at the time of trial.

22       35.    In acting as herein alleged, Defendants, and each of them, acted with fraud,

23  oppression and malice and with the intent to cause injury to Plaintiff. The conduct of Defendants

24  and each of them was fraudulent, despicable, oppressive and was taken in conscious disregard of

25  the rights of Plaintiff. Accordingly, Plaintiff is entitled to recover exemplary and punitive damages

26  from Defendants, and each of them, jointly and severally, in a sum sufficient to punish and make an

27  example of Defendants and each of them, which sum shall be shown according to proof at trial.

28  ///

## SECOND CAUSE OF ACTION

**(By Plaintiff Ralph L. Phillips for Damages for Fraud and Deceit by Concealment against Defendants Piezo LLC, BW Piezo LLC, CTG LLC and DOES 31 to 60, inclusive)**

36.     Plaintiff refers to and incorporates herein by this reference each of the allegations set forth in paragraphs 1 through 27 and 27 through 35 of this Complaint as though here set forth in full.

37.     In 2013 before commencement by Plaintiff of his position as CEO and President of CTG LLC, Piezo LLC, BW Piezo LLC CTG LLC, through their Managers Adam Blumenthal, Haran Narulla, and Charlie Miller and Does 31 through 60,  and each of them concealed and suppressed material information which they were each obligated to disclose to Plaintiff, and each of them, in order to make their disclosures of other information not misleading, or that would materially affect the value of Plaintiff's decision to enter into the Employment Agreement, Note, Pledge and the October 11, 2013 Grant Agreement (the "2013 Concealed Information").  The 2013 Concealed Information was as follows:

(a)     The Defendants, and in particular CTG LLC, were losing money;

(b)     Defendants were planning to have HC Materials acquired by BW Piezo instead of CTG LLC;

(c)     The pro forma projections of HC Material's performance showed that HC Material's operating profits, as well as CTG LLC's operating profits, would be insufficient to meet Defendants' debt obligations;

(d)     Under the Note and Pledge, the loan would be not only collectible by resort to the shares purchased, but at BW Piezo's election could be collected by a suit for a money judgment against Plaintiff personally in the full amount of the Note, interest and attorney fees and costs; and

(e)     Prior to Plaintiff's joining CTG LLC, BW Piezo had received reports and other information demonstrating significant material actual and potential liability which would result in expenses to CTG LLC of upwards of $2 million or more and could result in substantially more liability.

38.     Defendants' suppression and concealment of the 2013 Concealed Information

1   materially reduced the value of Plaintiff's opportunity as CEO and President of CTG LLC, and the

2   units he purchased in the October 11, 2013 Grant Agreement.  When Defendants concealed and

3   suppressed the 2013 Concealed Information, they did so with the intention to induce Plaintiff to

4   enter the Employment Agreement, Note, Pledge and the October 11, 2013 Grant Agreement under

5   which he purchased the units, and to act in reliance on the state of affairs as represented by

6   Defendants in the manner alleged herein or with the expectation that Plaintiff would so act.

7        39.    Plaintiff, at the time these concealments were made by Defendants and at the time

8   Plaintiff took the actions herein alleged, was ignorant of the true state of affairs.

9        40.    In justifiable reliance on the accuracy of the represented state of affairs, Plaintiff was

10   induced to and did enter into the Employment Agreement, Note, Pledge and the October 11, 2013

11   Grant Agreement under which he purchased the units, and to take all actions he took in the belief in

12   the state of affairs as represented by Defendants.  Had Plaintiff known the actual facts, he would not

13   have taken such actions. Plaintiff's reliance on the state of affairs as represented by Defendants was

14   justified because Defendants held themselves out as reputable and trustworthy business entities and

15   persons, and Plaintiff trusted Defendants.

16        41.    In 2014 before Plaintiff entered into the September 30, 2014 Grant Agreement and

17   the December 31, 2014 Grant Agreement, under which Plaintiff purchased the units, Piezo LLC,

18   BW Piezo LLC CTG LLC, through their Managers Mr. Blumenthal, Mr. Narulla and Does 31

19   through 60,  and each of them concealed and suppressed material information which they were each

20   obligated to disclose to Plaintiff, and each of them, in order to make their disclosures of other

21   information not misleading, or that would materially affect the value of Plaintiff's decision to enter

22   into the September 30, 2014 Grant Agreement  and the December 31, 2014 Grant Agreement (the

23   "2014 Concealed Information").   The 2014 Concealed Information was that prior to Plaintiff's

24   joining CTG LLC, BW Piezo had received reports and other information demonstrating significant

25   material actual and potential liability which would result in expenses to CTG LLC of upwards of $2

26   million or more and could result in substantially more liability.

27        42.    Defendants' suppression and concealment of the 2014 Concealed Information

28   materially reduced the value of the units Plaintiff purchased in the September 30, 2014 Grant

<div align="center">14</div>

1   Agreement and December 31, 2014 Grant Agreement.  When Defendants concealed and suppressed

2   the Concealed Information, they did so with the intention to induce Plaintiff to enter the September

3   30, 2014 Grant Agreement and the December 31, 2014 Grant Agreement under which Plaintiff

4   purchased the units, and to act in reliance on the value of the state of affairs as represented by

5   Defendants in the manner alleged herein or with the expectation that Plaintiff would so act.

6          43.    Plaintiff, at the time these concealments were made by Defendants and at the time

7   Plaintiff took the actions herein alleged, was ignorant of the true state of affairs.

8          44.    In justifiable reliance on the accuracy of the represented state of affairs, Plaintiff was

9   induced to and did enter into the September 30, 2014 Grant Agreement and the December 31, 2014

10  Grant Agreement under which he purchased the  units, and to take all actions he took in the belief

11  in the state of affairs as represented by Defendants.  Had Plaintiff known the actual facts, he would

12  not have taken such actions.  Plaintiff's reliance on the state of affairs as represented by Defendants

13  was justified because Defendants held themselves out as reputable and trustworthy business entities

14  and persons, and Plaintiff trusted Defendants.

15         45.    As a direct, legal and proximate result of the conduct of Defendants, and each of

16  them, as herein alleged, Plaintiff was induced to enter into the Employment Agreement, Note,

17  Pledge, the October 11, 2013 Grant Agreement, the September 30, 2014 Grant Agreement and the

18  December 31, 2014 Grant Agreement, to incur expenses and to forgo other opportunities, and has

19  been damaged in the sum of not less than $2,000,000, according to proof.

20         46.    As a further proximate result of the conduct of Defendants as herein alleged, Plaintiff

21  sustained and suffered, and continues to sustain and suffer, special damages in a sum or sums

22  according to proof at time of trial. Plaintiff will seek leave to amend this Complaint to insert herein

23  the true and correct amount of all such damages at such time as the same are ascertained, or upon

24  proof thereof at the time of trial.

25         47.    In acting as herein alleged, Defendants, and each of them, acted with fraud,

26  oppression and malice and with the intent to cause injury to Plaintiff.  The conduct of Defendants

27  and each of them was fraudulent, despicable, oppressive and was taken in conscious disregard of

28  the rights of Plaintiff.  Accordingly, Plaintiff is entitled to recover exemplary and punitive damages

1   from Defendants, and each of them, jointly and severally, in a sum sufficient to punish and make an

2   example of Defendants and each of them, which sum shall be shown according to proof at trial.

3   <u>**THIRD CAUSE OF ACTION**</u>

4   **(By Plaintiff Ralph L. Phillips for Rescission and Restitution based on Fraud in the**

5   **Inducement against Defendants Piezo LLC, BW Piezo LLC and Does 61-90)**

6       48.    Plaintiff refers to and incorporates herein by this reference each of the allegations set

7   forth in paragraphs 1 through 25, 27 through 35 and 37 through 47 of this Complaint as though here

8   set forth in full.

9       49.    In justifiable reliance on the intentional misrepresentations and concealments alleged

10  above, Plaintiff was induced to enter the Note, Pledge, the October 11, 2013 Grant Agreement, the

11  September 30, 2014 Grant Agreement, and the December 31, 2014 Grant Agreement and to pay the

12  following amounts for preferred units in Piezo LLC:

13              October 11, 2013            $250,000 in cash and $250,000 through the

14                                          Note

15              September 20, 2014          $167,966.34

16              December 31, 2014           $22,834.43

17      50.    By the filing of this Complaint Plaintiff gives notice to BW Piezo LLC of his

18  rescission of the Note and Pledge.  By the filing of this complaint Plaintiff gives notice to BW Piezo

19  LLC of his rescission of the Grant Agreements of the following dates and his purchase of preferred

20  units of Piezo LLC thereunder:

21              October 11, 2013            $250,000 in cash and $250,000 through the

22                                          Note

23              September 20, 2014          $167,966.34

24              December 31, 2014           $22,834.43

25      51.    By this pleading, subject to the Court's entry of a judgment in Plaintiff's favor of

26  rescission of the Note and Pledge and conditioned upon Piezo's return of Plaintiff's funds in the

27  amount of $690,800 plus interest thereon at the legal rate, Plaintiff hereby tenders a return of the

28  $250,000 loaned to him under the Note.

1    52.    By this pleading, subject to the Court's entry of a judgment in Plaintiff's favor of

2    rescission of the three referenced Grant Agreements and Piezo's return of Plaintiff's funds paid

3    thereunder in the amount of $690,800 plus interest thereon at the legal rate, Plaintiff hereby tenders

4    return to Piezo LLC of his 396 preferred units in Piezo LLC and any distributions he has received

5    based on his ownership of such units.

6    53.    Plaintiff seeks restitution of benefits conferred on Defendants, and each of them, as

7    a result of the rescinded transactions and consequential damages not including duplicate or

8    inconsistent items of recovery.  Plaintiff seeks payments or other relief which the Court deems

9    proper to adjust the equities between the parties following rescission.

10    54.    Plaintiff seeks such further relief in law and equity as is appropriate based upon the

11    Court's ordering rescission and restitution as requested herein.

12    <u>**FOURTH CAUSE OF ACTION**</u>

13    **(By Plaintiff Ralph L. Phillips for Declaratory Relief against Defendant BW Piezo LLC,**

14    **Piezo LLC and Does 91-120)**

15    55.    Plaintiff refers to and incorporates herein by this reference each of the allegations set

16    forth in paragraphs 1 through 25, 27 through 35, 37 through 47, 49 through 54 of this Complaint as

17    though here set forth in full.

18    56.    An actual controversy has arisen between Plaintiff on the one hand and Defendants

19    BW Piezo LLC and Does 91-120 on the other hand.  Plaintiff is informed and believes and thereon

20    alleges that Defendant BW Piezo LLC and Does 91-120 contend that :

21    (a)    There is now due and owing from Plaintiff Phillips to BW Piezo LLC and

22    Does 91-120 under the terms of the Note the amount of $128,173 plus interest at either the 3.5%

23    annual rate specified in the note or the 12% default interest rate specified in the Note, plus attorney

24    fees and costs,

25    (b)    Defendants BW Piezo LLC and Does 91-120 have security interests in

26    Plaintiff's preferred units he purchased under one or more of the referenced Grant Agreements and

27    are entitled under the Pledge to exercise remedies to acquire, sell, or otherwise realize on or benefit

28    from such collateral under the terms of the Pledge or provisions of law.

1      57.    Plaintiff Phillips on the other hand denies the contentions of Defendants BW Piezo

2 and Does 91-120 set forth in the preceding paragraph and instead contends that no such amount is

3 due and said defendants have no rights to acquire, sell or otherwise realize on or benefit from the

4 referenced collateral for the reasons set forth in the incorporated paragraphs of this Complaint.

5      58.    Plaintiff desires a judicial determination and declaration that:

6          (a)    As a result of the conduct alleged herein, no amount is due under the Note;

7 and

8          (b)    Defendants BW Piezo LLC and Does 91-120  have no rights to acquire, sell

9 or otherwise realize on or benefit from the referenced collateral.

10      59.    A judicial declaration regarding the items in controversy is necessary and appropriate

11 at this time in order to clarify the rights, interests and obligations of the parties with respect to the

12 matters in dispute and to avoid further litigation

13 <div align="center">**FIFTH CAUSE OF ACTION**</div>

14 <div align="center">**(By Plaintiff Ralph L. Phillips For Money Owed Plaintiff by Defendants Piezo LLC and**</div>

15 <div align="center">**Does 121-150)**</div>

16      60.    Plaintiff refers to and incorporates herein by this reference each of the allegations set

17 forth in paragraphs 1 through 25, 27 through 35, 37 through 47, 49 through 54 and 56 through 59 of

18 this Complaint as though here set forth in full.

19      61.    Within the past two years Defendants Piezo LLC and Does 121-150 became indebted

20 to Plaintiff in the amount of $143,751 for money owed as a result of a distribution declared to be

21 paid  to all preferred unit holders in Piezo LLC which was paid to other preferred unit holders but

22 not paid to Plaintiff.

23      62.    $143,751 is due and unpaid to Plaintiff by said defendants despite Plaintiff's demand,

24 plus prejudgment interest at the legal rate from the date of such distribution according to proof.

25 <div align="center">**SIXTH CAUSE OF ACTION**</div>

26 <div align="center">**(By Plaintiff Ralph L. Phillips For An Accounting by Defendants Piezo LLC, BW Piezo LLC**</div>

27 <div align="center">**and Does 151-180)**</div>

28      63.    Plaintiff refers to and incorporates herein by this reference each of the allegations set

<div align="center">18</div>

1  forth in paragraphs 1 through 25, 27 through 35, 37 through 47, 49 through 54, 56 through 59, and

2  61 through 62 of this Complaint as though here set forth in full.

3       64.   Plaintiff was provided in August 2016 a copy of his K-1 for Piezo which shows on

4  Line 1 of Part III an ordinary business loss of $189,513, an amount which differs significantly from

5  a draft he had previously been provided.  The K-1 shows at item J of Part II that Plaintiffs share of

6  loss was 59.16% at the beginning of the year, and 67.19% at the end of the year, percentages which

7  Plaintiff does not understand and which have not been explained to him.

8       65.   As alleged above, Defendant BW Piezo in 2016 sold the business formerly known

9  as HC Materials for $73 million.  Plaintiff is informed and believes that approximately $50 million

10  of the proceeds were used to pay debt.  Plaintiff is informed that a distribution of approximately $11

11  million was made to preferred unit holders.  Plaintiff has requested an accounting of the funds

12  generated by the referenced sale and the uses and application of those funds which affects the

13  valuation of units owned by Plaintiff.  Defendants have refused to produce such documents and

14  information relating to the sale proceeds and their use.

15       66.   Defendants Piezo LLC, BW Piezo LLC and Does 151-180 should be required to

16  provide a full accounting relating to the 2015 K-1, including revenues and expenses for 2015, as

17  well as the funds generated by the referenced sale, the uses and application of those funds which

18  affects the valuation of units owned by Plaintiff and the losses allocated to Plaintiff's units.

19       WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, jointly

20  and severally, as follows:

21       As to the First and Second Causes of Action:

22       1.   For compensatory damages in an amount not less than $2,000,000, according to

23  proof;

24       2.   For special damages according to proof;

25       3.   For punitive damages, according to proof;

26       As to the Third Cause of Action:

27       4.   For a judicial decree and judgment that the Note and Pledge have been rescinded;

28       5.   For a judicial decree and judgment that the Grant Agreements between Plaintiff and

1  Piezo LLC dated as of October 11, 2013, September 30, 2014 and December 31, 2014 have been

2  rescinded;

3      6.    That Defendant Piezo LLC and Does 61-90 shall pay to Plaintiff restitution of

4  $690,800 plus interest at the legal rate of 10% per annum from dates according to proof at trial;

5      7.    That the Court grant Plaintiff such further relief in law and equity as is appropriate

6  based upon the Court's ordering rescission and restitution as requested herein;

7      As to the Fourth Cause of Action

8      8.    For a judicial declaration and judgment that:

9          (a)    There is no amount due and owing from Plaintiff Phillips to BW Piezo LLC,

10 Piezo LLC, Does 91-120, or any other party under the terms of the Note and such Defendants may

11 not attempt to collect from Plaintiff the amount of $128,173 or any other amount, any interest or

12 any attorney fees or costs:

13         (b)    Neither Defendant BW Piezo LLC, Piezo LLC nor any of Does 91-120 has

14 any security interest in Plaintiff's preferred units he purchased under one or more of the Grant

15 Agreements dated October 11, 2013, September 30, 2014 and December 31, 2014 and none of such

16 defendants is entitled under the Pledge to exercise any remedy to acquire, sell, or otherwise realize

17 on or benefit from such collateral under the terms of the Pledge or any provision of law.

18     As to the Fifth Cause of Action

19     9.    For an award to Plaintiff and against Defendant Piezo LLC and Does 121-150  for

20 money owed to Plaintiff by each such defendant in the amount of $143,751 plus interest at the legal

21 rate from a date or dates according to proof at trial.

22     10.    For reasonable attorneys' fees and costs pursuant to contract or statute, according to

23 proof;

24     As to the Sixth Cause of Action

25     11.    For a full accounting from Defendants Piezo LLC, BW Piezo LLC and Does 151-

26 180 of any and all distributions and capitalizations involving Plaintiff's units, including without

27 limitation relating to the 2015 K-1, including revenues and expenses for 2015, the funds generated

28 by the HC Materials sale, the uses and application of these funds which affects the valuation of units

1   owned by Plaintiff, and the losses allocated to the Plaintiff's units, to be performed at the expense

2   of Defendants Piezo LLC, BW Piezo LLC and Does 151-180 by an independent certified public

3   accountant firm familiar with such matters in accordance with generally accepted accounting

4   principles;

5       <u>On all Causes of Action:</u>

6       12.   For interest on the damages, according to proof, at the legal rate from and after dates

7   according to proof;

8       13.   For reasonable attorneys' fees and costs pursuant to contract or statute, according to

9   proof;

10      14.   For costs of suit and expenses herein incurred; and

11      15.   For such other and further relief as the Court deems just, fair and proper.

12   DATED: September 8, 2016       Nevers, Palazzo, Packard,
                    Wildermuth & Wynner, PC

13

14

15       By: _____

16           Gary W. Nevers
          Sharlene D. Lee

17           Attorneys for Plaintiff Ralph L. Phillips

18

19

20

21

22

23

24

25

26

27

28

## REQUEST FOR JURY TRIAL

Plaintiff respectfully requests a jury trial of all issues appropriately to be tried to a jury.

DATED:  September 8, 2016              Nevers, Palazzo, Packard,
                                       Wildermuth & Wynner, PC


By: _____
    Gary W. Nevers
    Sharlene D. Lee
    Attorneys for Plaintiff Ralph L. Phillips

W:\Working\16423\01\W0148338.DOCX v6

---

1

COMPLAINT

**Piezo Investment Holdings, LLC**
**Mirror Unit Grant Agreement**

October 11, 2013

Ralph Phillips
1290 Heritage Place
Westlake Village, CA 91362

Re: Grant of Mirror Units in Piezo Investment Holdings, LLC

Piezo Investment Holdings, LLC (the "Company") is pleased to grant to you (the "Participant") all rights, title and interest in the ownership of Two Hundred Sixty Nine (269) Mirror Preferred Units and Two Hundred Sixty Eight Thousand Nine Hundred Eight (268,908) Mirror Common Units of the Company (collectively, the "Mirror Units").

Such Mirror Units are being issued in connection with the issuance by BW Piezo Holdings, LLC ("HoldCo") of Two Hundred Sixty Nine (269) Series A-2 Preferred Units and Two Hundred Sixty Eight Thousand Nine Hundred Eight (268,908) Class A-2 Common Units (collectively, the "Underlying Units"), and is subject to the terms and conditions set forth in this agreement (this "Agreement"), the Company LLC Agreement, the HoldCo LLC Agreement, and the grant agreement between the Company and HoldCo regarding the corresponding Units issued by HoldCo to the Company.

Capitalized terms used herein but not defined herein have the meanings set forth in Exhibit A hereto or otherwise given to such terms in the Company LLC Agreement or the HoldCo LLC Agreement, as the context requires.

1.      Issuance of Units. Subject to the restrictions, terms and conditions of this Agreement, the Company hereby awards to the Participant the Mirror Units.

2.      Mirror Units. The Mirror Units shall have no voting rights. The Participant shall have the right to receive and retain any distributions payable to holders of the Underlying Units, and to exercise all other rights, powers and privileges, and shall be subject to the liabilities and obligations, of a holder of Mirror Units, with the exceptions that any distributions will be subject to the restrictions provided in Section 3 and the obligation to return tax distributions under certain circumstances pursuant to Section 6.1(d) of the Company LLC Agreement.

3.      Company Transfer Restrictions. Call Rights; Required Sale.

(a)      The Mirror Units are subject to the restrictions on transfer, call rights and Required Sale provisions as provided in the LLC Agreements.

(b)      In addition to the foregoing, in the event of the Participant's Termination for any reason or no reason, the Company may at any time within one year after such Termination repurchase (or may cause its designee to purchase) from the Participant any or all Mirror Units at a repurchase price equal to the Fair Market Value on the date of Termination. If the Company

1



elects to exercise its rights under this Section 3(b), it shall do so by delivering to the Participant a notice of such election, specifying the number of Mirror Units to be purchased and the closing date and time. Such closing shall take place at the Company's principal executive offices. At such closing, the Company (or its designee) will pay the Participant the repurchase price as specified in this Section (b) in cash, by issuing a promissory note (such promissory note to have a five year term, bear interest at the prime rate then in effect, and be payable in full upon a Change in Control of HoldCo) in favor of the Participant, or any combination of the foregoing.

4.  Ownership Rights/Dividends; Profits Interest. The Participant acknowledges that the Participant's rights to receive distributions from the Company shall be limited to those distributions received by the Company in respect of the Underlying Units. Participant further acknowledges that the Mirror Common Units and corresponding Underlying Units are intended to be treated as "profits interests." Accordingly, if (i) HoldCo's assets were sold for their respective fair market values immediately after the date hereof, (ii) HoldCo was liquidated as of such date and its creditors paid and (iii) the remaining assets of HoldCo were distributed in accordance with the terms of the HoldCo LLC Agreement, then (A) no amounts would be distributable by HoldCo to the Company in respect of the corresponding Underlying Units granted by HoldCo to the Company in connection with the grant of the Mirror Common Units to the Participant and (B) no amounts would be distributable by the Company to the Participant in respect of the Mirror Common Units.

5.  Withholding of Taxes. The Company shall have the right to take any action as may be necessary or appropriate to satisfy any federal, state or local tax withholding obligations of the Company or HoldCo in connection with the Mirror Units, including, but not limited to, the right to redeem Mirror Units and cause a corresponding number of Underlying Units to be redeemed by HoldCo or its assignee, with the proceeds of such redemption being used to satisfy such withholding obligation. In the event that the proceeds of such sale shall exceed the legally required withholding amount, the Company shall remit the difference in cash to the Participant. In the event that the proceeds of such sale are less than the legally required withholding amount, HoldCo and/or the Company may withhold the difference from any cash or other amounts then or thereafter payable to the Participant.

6.  Securities Representations. Unless and until the Underlying Units are registered pursuant to the Securities Act, the Company shall rely upon the following express representations and warranties of the Participant:

(a)  The Participant is acquiring and will hold the Mirror Units for investment for the Participant's account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act.

(b)  The Participant has been advised that the Mirror Units have not been registered under the Securities Act or other applicable securities laws on the grounds that no distribution or public offering of the securities is to be effected (it being understood, however, that the securities are being issued and sold in reliance on the exemption provided under Rule 701 promulgated under the Securities Act), and that such Mirror Units must be held indefinitely, unless subsequently registered under the applicable securities laws or the Participant obtains an opinion of counsel (in the form and reasonably satisfactory to the Company and its counsel) that

2

registration is not required. In connection with the foregoing, the Company is relying in part on the Participant's representations set forth in this Section 6. The Participant further acknowledges and understands that the Company is under no obligation hereunder to register such Mirror Units.

(c)      The Participant is aware of the adoption of Rule 144 by the United States Securities and Exchange Commission under the Securities Act, which permits limited public resales of securities acquired in a non-public offering, subject to the satisfaction of certain conditions. The Participant acknowledges that the Participant is familiar with the conditions for resale set forth in Rule 144, and acknowledges and understands that the conditions for resale set forth in Rule 144 have not been satisfied and that the Company has no plans to satisfy these conditions in the foreseeable future.

(d)      The Participant will not Transfer the Mirror Units in violation of the LLC Agreements, this Agreement, the Securities Act (or the rules and regulations promulgated thereunder) or under any other applicable securities laws. The Participant agrees that the Participant will not dispose of such Mirror Units unless and until the Participant has complied with all requirements of the LLC Agreements and this Agreement applicable to the disposition of such Mirror Units and the Underlying Units.

(e)      The Participant has been furnished with, and has had access to, such information as the Participant considers necessary or appropriate for deciding whether to invest in the Mirror Units, and the Participant has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the issuance of such Mirror Units.

(f)      The Participant is aware that an investment in the Company is a highly speculative investment that has limited liquidity and is subject to the risk of complete loss. The Participant is able, without impairing the Participant's financial condition, to hold the Mirror Units for an indefinite period and to suffer a complete loss of his investment in such Mirror Units.

(g)      The Participant agrees (i) that any certificate representing such Mirror Units may bear such legend or legends as the Manager deems appropriate in order to assure compliance with applicable securities laws and (ii) that the Company may refuse to register the transfer of the Mirror Units acquired pursuant to this Agreement on the unit transfer records of the Company if such proposed transfer would, in the opinion of counsel satisfactory to Company, constitute a violation of any applicable securities law.

7.      <u>Reorganization of the Company</u>.  The existence of this Agreement shall not affect in any way the right or power of the Company, the Manager, HoldCo or its Members to make or authorize any or all adjustments, recapitalizations, reorganizations or other changes in the Company's or HoldCo's capital structure or its business; any merger or consolidation of the Company or HoldCo; any issuance of bonds, debentures, preferred or prior preference units ahead of or affecting the Mirror Units or units of HoldCo or the rights thereof; the dissolution or liquidation of the Company or HoldCo; any sale or transfer of all or any part of its assets or business; or any other act or proceeding, whether of a similar character or otherwise.

8.    Recapitalization Events.  In the event of Mirror Unit distributions or distributions of Units of HoldCo, spin-offs of assets or other extraordinary distributions, recapitalizations, mergers, consolidations, reorganizations, liquidations, issuances of rights or warrants and similar transactions or events involving the Company or HoldCo ("Recapitalization Events"), then for all purposes references herein to Mirror Units or Units of HoldCo shall mean and include all securities or other property (other than cash) that holders of Mirror Units or Units of HoldCo are entitled to receive in respect of Mirror Units or Units of HoldCo, as applicable, by reason of each successive Recapitalization Event, which securities or other property (other than cash) shall be treated in the same manner and shall be subject to the same restrictions as the underlying Mirror Units, in each case, to the extent determined by the Manager.

9.    Certain Restrictions.  By executing this Agreement, the Participant acknowledges that the Participant will enter into such further written representations, warranties and agreements and execute such documents as the Company may reasonably request in order to comply with the terms of this Agreement, the LLC Agreements, any securities laws or any other applicable laws, rules or regulations. The Participant hereby acknowledges that the Participant (i) has read this Agreement and the LLC Agreements and (ii) accepts and agrees to become a Member of the Company and be bound by the terms of the Company LLC Agreement directly and the HoldCo LLC Agreement indirectly.

10.    No Obligation to Continue Employment.  This Agreement is not an agreement of employment. This Agreement does not guarantee that the Company or its Affiliates will employ or retain, or to continue to, employ or retain the Participant during the entire, or any portion of the, term of this Agreement, including but not limited to any period during which the Mirror Units are outstanding, nor does it modify in any respect the Company or its Affiliate's right to terminate or modify the Participant's employment or compensation.

11.    Irrevocable Proxy and Power of Attorney.  The Company, its successors and assigns, is hereby appointed the proxy and attorney-in-fact, with full power of substitution and resubstitution, of the Participant for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instruments which such proxy and attorney-in-fact may deem necessary or advisable to accomplish the purposes hereof. The Company, as proxy and attorney-in-fact for the Participant, may in the name and stead of the Participant, make and execute all conveyances, assignments and transfers of the Mirror Units and property provided for herein, and the Participant hereby ratifies and confirms all that the Company, as said attorney-in-fact, shall do by virtue hereof. Nevertheless, the Participant shall, if so requested by the Company, execute and deliver to the Company all such instruments as may, in the judgment of the Company, be advisable for the purpose. Each of the proxy and power of attorney granted pursuant to this Section 11 is given in consideration of the agreements and covenants of the Company and HoldCo in connection with the transactions contemplated by this Agreement and, as such, each is coupled with an interest and shall be irrevocable. The Participant hereby revokes any and all previous proxies or powers of attorney with respect to the Mirror Units and shall not hereafter, unless and until this Agreement terminates, purport to grant any other proxy or power of attorney with respect to any of the Mirror Units, deposit any of the Mirror Units into a voting trust or enter into any agreement (other than this Agreement), arrangement or understanding with any person, directly or indirectly, to vote, grant any proxy or give instructions with respect to the voting of any of the Mirror Units, in each case, with respect to any of the matters set forth herein.

4

12.   <u>Miscellaneous</u>.

(a)    This Agreement may not be amended, waived or discharged except by a writing signed by the Company and the Participant.

(b)    Any notices permitted or required hereunder may be given in the manner set forth in the Company LLC Agreement.

(c)    This Agreement shall be binding upon and shall inure to the benefit of the respective heirs, successors, permitted assigns and legal representatives of the parties hereto.

(d)    In the event that any provision of this Agreement shall be held illegal, invalid or unenforceable for any reason, such provision shall be fully severable and shall not affect the remaining provisions of this Agreement, and this Agreement shall be construed and enforced as if the illegal, invalid or unenforceable provision had never been included herein.

(e)    The Participant agrees to execute such further documents and take such other actions as may be permitted or required by law to implement the purposes, objectives, terms, and provisions of this Agreement.

(f)    The failure of any party hereto at any time to require performance by another party of any provision of this Agreement shall not affect the right of such party to require performance of that provision, and any waiver by any party of any breach of any provision of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, a waiver of the provision itself, or a waiver of any right under this Agreement.

(g)    Any matter, dispute, claim or controversy arising out of or related to this Agreement shall be construed by, subject to and governed in accordance with the internal laws of the State of Delaware without giving effect to conflict of laws or other principles which would result in the application of laws other than the internal laws of the State of Delaware.

(h)    This Agreement may be executed in one or more counterparts, all of which taken together shall constitute one contract.

*[Signature page to follow]*

Please sign below to confirm you are in agreement with this Agreement.

Sincerely,

PIEZO INVESTMENT HOLDINGS, LLC

By: _____
    Name: Adam Blumenthal
    Title:  President

[Signature Page- Mirror Unit Grant Agreement]

Agreed and accepted:

Ralph Phillips

[Signature Page- Mirror Unit Grant Agreement]

**Exhibit A**

**Certain Definitions**

1.      "Company LLC Agreement" means the Limited Liability Company Agreement of the Company, dated as of December 29, 2011, as originally executed and as it may be amended, modified, restated or supplemented from time to time, as the context requires.

2.      "HoldCo LLC Agreement" means the Second Amended and Restated Limited Liability Company Agreement of HoldCo, dated as of October 11, 2013, as originally executed and as it may be amended, modified, restated or supplemented from time to time, as the context requires.

3.      "LLC Agreements" means, collectively, the HoldCo LLC Agreement and the Company LLC Agreement.

4.      "Securities Act" means the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder. Any reference to any section of the Securities Act shall also be a reference to any successor provision.

5.      "Termination" means that the Participant is no longer acting as an employee of or consultant to the Employer. Any question as to whether and when there has been a Termination and the cause of such Termination, shall be determined by the Manager in its sole discretion, and its determination shall be final.

**Piezo Investment Holdings, LLC**
**Mirror Unit Grant Agreement**

October 14, 2013

Ralph Phillips
1290 Heritage Place
Westlake Village, CA 91362

Re:  Grant of Mirror Units in Piezo Investment Holdings, LLC

      Piezo Investment Holdings, LLC (the "Company") is pleased to grant to you (the "Participant") all rights, title and interest in the ownership of One Million Two Hundred Eight Thousand Eight Hundred Forty One (1,208,841) Mirror Common Units of the Company (the "Mirror Units").

      Such Mirror Units are being issued in connection with the issuance by BW Piezo Holdings, LLC ("HoldCo") of One Million Two Hundred Eight Thousand Eight Hundred Forty One (1,208,841) Class C Common Units (the "Underlying Units") to the Company, and are subject to the terms and conditions set forth in this agreement (this "Agreement"), the Company LLC Agreement, the HoldCo LLC Agreement, and the grant agreement between the Company and HoldCo regarding the corresponding Units issued by HoldCo to the Company.

      Capitalized terms used herein but not defined herein have the meanings set forth in Exhibit A hereto or otherwise given to such terms in the Company LLC Agreement or the HoldCo LLC Agreement, as the context requires.

1.     Issuance of Units.  Subject to the restrictions, terms and conditions of this Agreement, the Company hereby awards to the Participant the Mirror Units.  Pursuant to Section 4 hereof, the Mirror Units are subject to certain restrictions, which restrictions relate to the passage of time as an employee of HoldCo or any of its direct or indirect majority-owned subsidiaries (collectively, the "Employer").  While such restrictions are in effect, the Mirror Units subject to such restrictions shall be referred to herein as "Restricted Units."

2.     Restricted Units.

     (a)    Rights with Regard to Mirror Units.  The Mirror Units shall have no voting rights.  The Participant shall have the right to receive and retain any distributions payable to holders of the Underlying Units, and to exercise all other rights, powers and privileges, and shall be subject to the liabilities and obligations, of a holder of Mirror Units, with the exceptions that: (i) the Company (or its designated agent) will retain custody of any certificates or other items representing the Mirror Units and the other Restricted Property (as defined below) until the Mirror Units are fully vested; (ii) no Restricted Property shall bear interest or be segregated in separate accounts at any time; and (iii) any distributions will be subject to the restrictions provided in Section 3(b) and Section 4 and the obligation to return tax distributions under certain circumstances pursuant to Section 6.1(d) of the Company LLC Agreement.

Exhibit 

(b)    Treatment of Distributions and Restricted Property.  In the event the Participant receives a distribution on the Restricted Units other than money, whether in securities or other property (collectively "Restricted Property"), the Participant will also immediately deposit with and deliver to the Company any of such Restricted Property, including any certificates representing shares duly endorsed in blank or accompanied by stock powers duly executed in blank, and such Restricted Property shall be subject to the same restrictions, including that of Section 4, as the Restricted Units with regard to which they are issued and shall herein be encompassed within the term "Restricted Units."

3.    Vesting.  The Restricted Units granted pursuant to Section 1 above shall become vested and cease to be subject to the first sentence of Section 3(b) below as follows, provided that the Participant has not had a Termination any time prior to the applicable vesting date:

| Vesting Date | Percentage Vested |
|---|---|
| October 14, 2014 | 20% |
| October 14, 2015 | 40% |
| October 14, 2016 | 60% |
| October 14, 2017 | 80% |
| October 14, 2018 | 100% |

(a)    Change in Control.  Immediately prior to and conditioned upon the closing of a Change in Control, all unvested Restricted Units shall become fully vested Mirror Units.

(b)    Forfeiture.  Except as provided in Section 3(a) above, the Participant shall forfeit to the Company, without compensation, any and all unvested Restricted Units and Restricted Property upon the Participant's Termination for any reason or no reason.  In addition, in the event the Participant's employment with the Employer terminates for Cause, the Participant shall also forfeit to the Company, without compensation, fifty percent (50%) of the vested Mirror Units owned by the Participant or any transferee thereof.  In the event the Participant engages in Detrimental Activity prior to, or during the one year period after, any vesting of Restricted Units, the Manager may direct that all unvested Restricted Units, together with any Mirror Units and Restricted Property which has vested shall be immediately forfeited to the Company.

4.    Company Transfer Restrictions, Call Rights; Required Sale.

(a)    The Mirror Units are subject to the restrictions on transfer, call rights and Required Sale provisions as provided in the LLC Agreements.

(b)    In addition to the foregoing, in the event of the Participant's Termination for any reason or no reason, the Company may at any time within one year after such Termination repurchase (or may cause its designee to purchase) from the Participant any or all vested Mirror Units at a repurchase price equal to the Fair Market Value on the date of Termination.  If the Company elects to exercise its rights under this Section 4(b), it shall do so by delivering to the Participant a notice of such election, specifying the number of Mirror Units to be purchased and the closing date and time.  Such closing shall take place at the Company's principal executive offices.  At such closing, the Company (or its designee) will pay the Participant the repurchase price as specified in this Section 4(b) in cash, by issuing a promissory note (such promissory note to have a five year term, bear interest at the prime rate then in effect, and be

2

payable in full upon a Change in Control of HoldCo) in favor of the Participant, or any combination of the foregoing.

5.      Ownership Rights/Dividends; Profits Interest.    The Participant acknowledges that the Participant's rights to receive distributions from the Company shall be limited to those distributions received by the Company in respect of the Underlying Units. Participant further acknowledges that the Mirror Units and corresponding Underlying Units are intended to be treated as "profits interests." Accordingly, if (i) HoldCo's assets were sold for their respective fair market values immediately after the date hereof, (ii) HoldCo was liquidated as of such date and its creditors paid and (iii) the remaining assets of HoldCo were distributed in accordance with the terms of the HoldCo LLC Agreement, then (A) no amounts would be distributable by HoldCo to the Company in respect of the corresponding Underlying Units granted by HoldCo to the Company in connection with the grant of the Mirror Units to the Participant and (B) no amounts would be distributable by the Company to the Participant in respect of the Mirror Units.

6.      Withholding of Taxes; Section 83(b) Election.

        (a)     The Company shall have the right to take any action as may be necessary or appropriate to satisfy any federal, state or local tax withholding obligations of the Company or HoldCo in connection with the Mirror Units, including, but not limited to, the right to redeem Mirror Units and cause a corresponding number of Underlying Units to be redeemed by HoldCo or its assignee, with the proceeds of such redemption being used to satisfy such withholding obligation. In the event that the proceeds of such sale shall exceed the legally required withholding amount, the Company shall remit the difference in cash to the Participant. In the event that the proceeds of such sale are less than the legally required withholding amount, HoldCo and/or the Company may withhold the difference from any cash or other amounts then or thereafter payable to the Participant. The Participant acknowledges that it is his or her sole responsibility, and not the Company's, to file timely and properly the election under Section 83(b) of the Code and any corresponding provisions of state tax laws if he or she elects to utilize such election.

        (b)     As a further condition to the grant of Mirror Units under this Agreement, no later than 30 days following the date hereof, the Participant shall file an election pursuant to Section 83(b) of the Code with respect to the Mirror Units. Unless otherwise determined by the Manager, if the Participant refuses or fails to file such election, the Participant will forfeit the unvested Mirror Units granted under this Agreement, the Company shall forfeit the corresponding units of HoldCo, this Agreement shall be each null and void *ab initio* and of no force or effect, the Company shall have no obligations to the Participant with respect to the forfeited Mirror Units and HoldCo shall have no obligations to the Company with respect to the forfeited corresponding units of HoldCo. The Participant shall promptly provide the Company with a copy of any such election that the Participant files or that is filed on behalf of the Participant, along with a copy of proof of mailing. The Participant should consult with the Participant's tax advisor to determine the tax consequences of acquiring the unvested Mirror Units subject to this Agreement. The Participant acknowledges that it is the Participant's sole responsibility, and not that of the Company or HoldCo, to file a timely election under Section 83(b) of the Code, even if the Participant requests the Company or HoldCo or its representatives to make this filing on the Participant's behalf.

7.      Securities Representations. Unless and until the Underlying Units are registered pursuant to the Securities Act, the Company shall rely upon the following express representations and warranties of the Participant:

        (a)     The Participant is acquiring and will hold the Mirror Units for investment for the Participant's account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act.

3

(b)      The Participant has been advised that the Mirror Units have not been registered under the Securities Act or other applicable securities laws on the grounds that no distribution or public offering of the securities is to be effected (it being understood, however, that the securities are being issued and sold in reliance on the exemption provided under Rule 701 promulgated under the Securities Act), and that such Mirror Units must be held indefinitely, unless subsequently registered under the applicable securities laws or the Participant obtains an opinion of counsel (in the form and reasonably satisfactory to the Company and its counsel) that registration is not required.   In connection with the foregoing, the Company is relying in part on the Participant's representations set forth in this Section 7.   The Participant further acknowledges and understands that the Company is under no obligation hereunder to register such Mirror Units.

(c)      The Participant is aware of the adoption of Rule 144 by the United States Securities and Exchange Commission under the Securities Act, which permits limited public resales of securities acquired in a non-public offering, subject to the satisfaction of certain conditions.   The Participant acknowledges that the Participant is familiar with the conditions for resale set forth in Rule 144, and acknowledges and understands that the conditions for resale set forth in Rule 144 have not been satisfied and that the Company has no plans to satisfy these conditions in the foreseeable future.

(d)      The Participant will not Transfer the Mirror Units in violation of the LLC Agreements, this Agreement, the Securities Act (or the rules and regulations promulgated thereunder) or under any other applicable securities laws.   The Participant agrees that the Participant will not dispose of such Mirror Units unless and until the Participant has complied with all requirements of the LLC Agreements and this Agreement applicable to the disposition of such Mirror Units and the Underlying Units.

(e)      The Participant has been furnished with, and has had access to, such information as the Participant considers necessary or appropriate for deciding whether to invest in the Mirror Units, and the Participant has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the issuance of such Mirror Units.

(f)      The Participant is aware that an investment in the Company is a highly speculative investment that has limited liquidity and is subject to the risk of complete loss.   The Participant is able, without impairing the Participant's financial condition, to hold the Mirror Units for an indefinite period and to suffer a complete loss of his investment in such Mirror Units.

(g)      The Participant agrees (i) that any certificate representing such Mirror Units may bear such legend or legends as the Manager deems appropriate in order to assure compliance with applicable securities laws and (ii) that the Company may refuse to register the transfer of the Mirror Units acquired pursuant to this Agreement on the unit transfer records of the Company if such proposed transfer would, in the opinion of counsel satisfactory to Company, constitute a violation of any applicable securities law.

8.      Reorganization of the Company.   The existence of this Agreement shall not affect in any way the right or power of the Company, the Manager, HoldCo or its Members to make or authorize any or all adjustments, recapitalizations, reorganizations or other changes in the Company's or HoldCo's capital structure or its business; any merger or consolidation of the Company or HoldCo; any issuance of bonds, debentures, preferred or prior preference units ahead of or affecting the Mirror Units or units of HoldCo or the rights thereof; the dissolution or liquidation of the Company or HoldCo; any sale or transfer of all or any part of its assets or business; or any other act or proceeding, whether of a similar character or otherwise.

4

9.     Recapitalization Events.  In the event of Mirror Unit distributions or distributions of Units of HoldCo, spin-offs of assets or other extraordinary distributions, recapitalizations, mergers, consolidations, reorganizations, liquidations, issuances of rights or warrants and similar transactions or events involving the Company or HoldCo ("Recapitalization Events"), then for all purposes references herein to Mirror Units or Units of HoldCo shall mean and include all securities or other property (other than cash) that holders of Mirror Units or Units of HoldCo are entitled to receive in respect of Mirror Units or Units of HoldCo, as applicable, by reason of each successive Recapitalization Event, which securities or other property (other than cash) shall be treated in the same manner and shall be subject to the same restrictions as the underlying Mirror Units, in each case, to the extent determined by the Manager.

10.     Certain Restrictions.  By executing this Agreement, the Participant acknowledges that the Participant will enter into such further written representations, warranties and agreements and execute such documents as the Company may reasonably request in order to comply with the terms of this Agreement, the LLC Agreements, any securities laws or any other applicable laws, rules or regulations. The Participant hereby acknowledges that the Participant (i) has read this Agreement and the LLC Agreements and (ii) accepts and agrees to become a Member of the Company and be bound by the terms of the Company LLC Agreement directly and the HoldCo LLC Agreement indirectly.

11.     No Obligation to Continue Employment. This Agreement is not an agreement of employment. This Agreement does not guarantee that the Company or its Affiliates will employ or retain, or to continue to, employ or retain the Participant during the entire, or any portion of the, term of this Agreement, including but not limited to any period during which the Mirror Units are outstanding, nor does it modify in any respect the Company or its Affiliate's right to terminate or modify the Participant's employment or compensation.

12.     Irrevocable Proxy and Power of Attorney.  The Company, its successors and assigns, is hereby appointed the proxy and attorney-in-fact, with full power of substitution and resubstitution, of the Participant for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instruments which such proxy and attorney-in-fact may deem necessary or advisable to accomplish the purposes hereof.  The Company, as proxy and attorney-in-fact for the Participant, may in the name and stead of the Participant, make and execute all conveyances, assignments and transfers of the Mirror Units and property provided for herein, and the Participant hereby ratifies and confirms all that the Company, as said attorney-in-fact, shall do by virtue hereof.  Nevertheless, the Participant shall, if so requested by the Company, execute and deliver to the Company all such instruments as may, in the judgment of the Company, be advisable for the purpose.  Each of the  proxy and power of attorney granted pursuant to this Section 12 is given in consideration of the agreements and covenants of the Company and HoldCo in connection with the transactions contemplated by this Agreement and, as such, each is coupled with an interest and shall be irrevocable.  The Participant hereby revokes any and all previous proxies or powers of attorney with respect to the Mirror Units and shall not hereafter, unless and until this Agreement terminates, purport to grant any other proxy or power of attorney with respect to any of the Mirror Units, deposit any of the Mirror Units into a voting trust or enter into any agreement (other than this Agreement), arrangement or understanding with any person, directly or indirectly, to vote, grant any proxy or give instructions with respect to the voting of any of the Mirror Units, in each case, with respect to any of the matters set forth herein.

13.     Miscellaneous.

        (a)     This Agreement may not be amended, waived or discharged except by a writing signed by the Company and the Participant.

5

(b)     Any notices permitted or required hereunder may be given in the manner set forth in the Company LLC Agreement.

(c)     This Agreement shall be binding upon and shall inure to the benefit of the respective heirs, successors, permitted assigns and legal representatives of the parties hereto.

(d)     In the event that any provision of this Agreement shall be held illegal, invalid or unenforceable for any reason, such provision shall be fully severable and shall not affect the remaining provisions of this Agreement, and this Agreement shall be construed and enforced as if the illegal, invalid or unenforceable provision had never been included herein.

(e)     The Participant agrees to execute such further documents and take such other actions as may be permitted or required by law to implement the purposes, objectives, terms, and provisions of this Agreement.

(f)     The failure of any party hereto at any time to require performance by another party of any provision of this Agreement shall not affect the right of such party to require performance of that provision, and any waiver by any party of any breach of any provision of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, a waiver of the provision itself, or a waiver of any right under this Agreement.

(g)     Any matter, dispute, claim or controversy arising out of or related to this Agreement shall be construed by, subject to and governed in accordance with the internal laws of the State of Delaware without giving effect to conflict of laws or other principles which would result in the application of laws other than the internal laws of the State of Delaware.

(h)     This Agreement may be executed in one or more counterparts, all of which taken together shall constitute one contract.

*[Signature page to follow]*

Please sign below to confirm you are in agreement with this Agreement.

Sincerely,

PIEZO INVESTMENT HOLDINGS, LLC

By: _____
    Name: Adam Blumenthal
    Title:  President

[Signature Page- Mirror Unit Grant Agreement]

Agreed and accepted:

Ralph Phillips

[Signature Page- Mirror Unit Grant Agreement]

<u>Exhibit A</u>

**Certain Definitions**

1.      "Cause" means, with respect to the Participant's Termination, the following:  (a) in the event there is no employment agreement, consulting agreement, change in control agreement or similar agreement in effect between the Company or an Affiliate and the Participant on the date hereof (or where there is such an agreement but it does not define "cause" (or words of like import)), termination due to the Participant's dishonesty, fraud, material insubordination, moral turpitude, willful misconduct, refusal to perform his or her duties or responsibilities for any reason other than illness or incapacity, as determined by the Committee in its sole discretion; or (b) in the case where there is an employment agreement, consulting agreement, change in control agreement or similar agreement in effect between the Company or an Affiliate and the Participant on the date hereof, "cause" as defined under such agreement; provided, however, that with regard to any agreement under which the definition of "cause" only applies on occurrence of a change in control, such definition of "cause" shall not apply until a change in control actually takes place and then only with regard to a termination thereafter.

2.      "Change in Control" means the occurrence of any of the following events:  (i) any "person" or "group" (as such terms are used in Section 13(d) and Section 14(d) of the Securities Exchange Act of 1934, as amended), other than a corporation owned directly or indirectly by the members of HoldCo in substantially the same proportions as their ownership of Units of HoldCo, is or becomes the "beneficial owner" (as defined in Rule 13d-3 under said Act), directly or indirectly, of securities of the Company representing more than 50% of the total voting power represented by the Company's then outstanding voting securities, (ii) the Company merges or consolidates with any other entity, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) a majority of the total voting power represented by the voting securities of the Company or such surviving entity outstanding immediately after such merger or consolidation, (iii) the sale or disposition by the Company, in one transaction or a series of transactions, of all or substantially all the Company's assets, or (iv) the dissolution, liquidation or winding up of the Company.

3.      "Code" means the Internal Revenue Code of 1986, as amended.  Any reference to any section of the Code shall also be a reference to any successor provision and any Treasury Regulation promulgated thereunder.

4.      "Company LLC Agreement" means the Limited Liability Company Agreement of the Company, dated as of December 29, 2011, as originally executed and as it may be amended, modified, restated or supplemented from time to time, as the context requires.

5.      "Detrimental Activity" means:

       a.      disclosing, divulging, furnishing or making available to anyone at any time, except as necessary in the furtherance of Participant's responsibilities to the Company or any of its Affiliates, either during or subsequent to Participant's service relationship with the Company or its Affiliates, any knowledge or information with respect to confidential or proprietary information, methods, processes, plans or materials of the Company or any of its Affiliates, or with respect to any other confidential or proprietary aspects of the business of the Company or any of its Affiliate, acquired by the Participant at any time prior to the Participant's Termination;

b.      any activity while employed or performing services that results, or if known could reasonably be expected to result, in the Participant's Termination that is classified by the Company as a termination for Cause;

c.      (i) directly or indirectly soliciting, enticing or inducing any employee of the Company or of any of its Affiliates to be employed by any person, firm or corporation that is, directly or indirectly, in competition with the business or activities of the Company or any of its Affiliates; (ii) directly or indirectly approaching any such employee for these purposes; (iii) authorizing or knowingly approving the taking of such actions by other persons on behalf of any such person, firm or corporation, or assisting any such person, firm or corporation in taking such action; (iv) directly or indirectly soliciting, raiding, enticing or inducing any person, firm or corporation who or which is, or at any time from and after the date of this Agreement was, a customer or prospective customer of the Company or of any of its Affiliates to become a customer for the same or similar products or services that it purchased from the Company or any of its Affiliates, or any other person, firm or corporation, or approaching any such customer for such purpose or authorize or knowingly approving the taking of such actions by any other person;

d.      the rendering of services for any organization, or engaging, directly or indirectly, in any business, which is competitive with the Company or an Affiliate, or the rendering of services to such organization or business if such organization or business is otherwise prejudicial to or in conflict with the interests of the Company or an Affiliate;

e.      the Participant's Disparagement, or inducement of others to do so, of the Company or an Affiliate or their past and present officers, directors, employees or products; or

f.      a breach of any agreement between the Participant and the Company or an Affiliate (including, without limitation, any employment agreement or non-competition or non-solicitation or confidentiality agreement).

Detrimental Activity shall not be deemed to occur after the end of the one-year period following the Participant's Termination.

6.      "Disparagement" means making comments or statements to the press, the Company's or its Affiliates' employees, consultants or any individual or entity with whom the Company or its Affiliates has a business relationship that could reasonably be expected to adversely affect in any manner: (a) the conduct of the business of the Company or its Affiliates (including, without limitation, any products or business plans or prospects); or (b) the business reputation of the Company or its Affiliates, or any of their products, or their past or present officers, directors or employees.

7.      "Fair Market Value" means, with respect to any Mirror Unit, the value of the corresponding Underlying Unit in the event HoldCo was sold to a third party purchaser in an arms length transaction in which such purchaser purchased all of the outstanding equity interest in HoldCo for a purchase price equal to the value of the entire business and operations of HoldCo as a going concern, and the proceeds of such sale were distributed in accordance with the applicable provisions of the LLC Agreements, as determined in good faith by the Manager in whatever manner it considers appropriate.

8.      "HoldCo LLC Agreement" means the Second Amended and Restated Limited Liability Company Agreement of HoldCo, dated as of October 11, 2013, as originally executed and as it may be amended, modified, restated or supplemented from time to time, as the context requires.

9.      "LLC Agreements" means, collectively, the HoldCo LLC Agreement and the Company LLC Agreement.

10.     "Securities Act" means the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder.  Any reference to any section of the Securities Act shall also be a reference to any successor provision.

11.     "Termination" means that the Participant is no longer acting as an employee of or consultant to Employer or any of its Affiliates.  Any question as to whether and when there has been a Termination and the cause of such Termination, shall be determined by the Manager in its sole discretion, and its determination shall be final.

PROMISSORY NOTE

$250,000                                                   As of October 11, 2013

FOR VALUE RECEIVED, the undersigned, Ralph Phillips, an individual having an address at 1290 Heritage Place, Westlake, CA 91362 (the "*Maker*"), hereby promises to pay to the order of BW Piezo Holdings, LLC, a Delaware limited liability company having an address at c/o Blue Wolf Capital, One Liberty Plaza, 52nd Floor, (165 Broadway), New York, NY 10006, Attention: Adam Blumenthal and Chief Compliance Officer, Facsimile Nos.: (646) 349-2244 and (646) 607-3889 ("*Payee*"), or any other place designated in writing by the holder of this Promissory Note ("*Note*"), the principal sum of $250,000 (the "*Principal Sum*"), together with interest, payable in immediately available funds as follows:

1.   <u>Interest</u>. Interest shall accrue at 3.5% per annum (the "*Interest Rate*").

2.   <u>Required and Optional Prepayment</u>. If Maker receives any bonus or other distribution (other than a tax distribution, a "*Bonus*") from Payee or one of its affiliates including Piezo Investment Holdings, LLC ("*InvestCo*"), then Maker will pay to Payee 50% of the post-tax amount of such Bonus (until this Note has been paid in full). Maker may, at any time and from time to time without penalty, prepay all or any portion of the outstanding obligations under this Note.

3.   <u>Repayment and Maturity</u>. On or before the first to occur of (each of (a), (b) or (c), the "*Maturity Date*"): (a) a Change of Control, (b) the five (5) year anniversary of the date of this Note, or (c) such earlier date, upon acceleration, in the event of default hereunder or otherwise, Maker will pay to Payee the unpaid Principal Sum together with all then accrued and unpaid interest thereon at the Interest Rate. All interest payable hereunder will be calculated on the basis of a three hundred sixty (360) days per year factor applied to the actual days on which there exists an unpaid balance hereunder. For purposes of this Note, "*Change of Control*" means any of the following transactions: (i) the sale of more than 50% of the then outstanding equity interests of Payee to persons or entities that did not hold equity interests in Payee prior to such transaction; (ii) the sale of more than 80% of the then outstanding equity interests of InvestCo to persons or entities that did not hold equity interests in Payee or InvestCo prior to such transaction; (iii) the consummation of a merger or consolidation of the Payee with or into another entity or any other reorganization, if more than 50% of the combined voting power of the continuing or surviving entity's securities outstanding immediately after the merger, consolidation or other reorganization is owned by persons or entities who were not equity holders of Payee immediately before the merger, consolidation or other reorganization, (iv) the consummation of a merger or consolidation of InvestCo with or into another entity or any other reorganization, if more than 80% of the combined voting power of the continuing or surviving entity's securities outstanding immediately after the merger, consolidation or other reorganization is owned by persons or entities who were not equity holders of Payee or InvestCo immediately before the merger, consolidation or other reorganization; or (v) the sale, transfer or other disposition of all or substantially all of the Payee's assets (excluding, however, any pledge of a security interest in the assets). A transaction will not constitute a Change in Control if its sole purpose is to change the state of the Payee's or InvestCo's formation, to create a holding company that will be owned in substantially the same proportions by the persons who held the

1

Exhibit _____ C

equity interests of the Payee or InvestCo immediately before the transaction, or to convert the Payee or InvestCo to another form of legal entity.

4.    Default. The following will constitute a "*Default*" hereunder:

(a)    *Nonpayment.* Failure of Maker to make any payment hereunder within three (3) days of the date required hereunder.

(b)    *Nonperformance.* Material breach by Maker of any provision under this Note or any other instrument, agreement or document in connection with this Note or in connection with Maker's services to Payee or InvestCo (including without limitation any operating agreement, employment agreement or pledge agreement), which breach that continues for twenty (20) days after Maker learns of or receives notice of such breach.

(c)    *Bankruptcy.* Institution of bankruptcy, insolvency, reorganization or receivership proceedings by or against Maker in any state or federal court or the appointment of a receiver, assignee, custodian, trustee or similar official under any federal or state insolvency or creditors' rights law for any property of Maker, or the inability of Maker to pay its debts when due; provided that Maker will have sixty (60) days to dismiss any involuntary bankruptcy proceeding to which it does not consent.

(d)    *Employment.* Maker ceasing to be an employee of Payee, InvestCo or one of their affiliates (for any reason including without limitation termination without cause).

5.    Remedies on Default. Upon the occurrence of a Default hereunder: (A) the whole of the Principal Sum or any part thereof and all accrued and unpaid interest, will forthwith and thereafter, at the option of the Payee, become immediately due and payable; provided, that upon a Default of the type described in Section 4(c), such amounts will automatically become due and payable; (B) interest will accrue thereafter on the unpaid Principal Sum and all other amounts due hereunder at the rate of twelve percent (12%) per annum; (C) Payee may, inter alia, proceed to protect and enforce its rights by an action at law, suit in equity or other appropriate proceeding, whether for the specific performance of any agreement contained in this Note, or for an injunction against a violation of any of the terms hereof or the exercise of any power granted hereby or by law. No right conferred upon Payee by this Note shall be exclusive of any other right referred to herein or now or hereafter available at law, in equity, by statute or otherwise. Maker shall not have the right to set-off any amounts owed hereunder.

6.    Negative Covenants. Maker covenants and agrees that, so long as any obligations under this Note remain unpaid and/or outstanding, unless otherwise agreed to in writing signed by Payee, Maker will not transfer or encumber any equity interests in Payee or InvestCo or their affiliates ("*Units*") owned by Maker without the express written consent of Payee, or fail to take an action that would avoid an encumbrance on the Units.

7.    Security Agreement. As collateral security for the prompt and complete payment and performance when due of all the obligations under this Note, and in order to induce Payee to cause this Note to be made, Maker hereby enters into that certain Pledge Agreement dated of even date herewith. For the avoidance of doubt, such pledge shall not be the sole recourse in connection with a Default.

2

8.    Waiver.  Maker hereby waives presentment for payment, demand, notice of non-payment and dishonor, protest and notice of protest; consents to any renewals, extensions and partial payments of this Note or the indebtedness for which it is given, and consents that no such renewals, extensions or partial payments will discharge Maker from liability herein in whole or in part.  The rights and remedies of the holder hereof under this Note will be deemed cumulative and the exercise of any right or remedy will not be regarded as barring any other remedy or remedies.  The institution of any action to recover any portion of the indebtedness evidenced by this Note will not be deemed a waiver of any other rights of the holder of this Note.  MAKER (AND HOLDER BY ITS ACCEPTANCE HEREOF) HEREBY WAIVES ANY AND ALL RIGHTS HE OR IT MAY HAVE TO A JURY TRIAL IN CONNECTION WITH ANY LITIGATION, PROCEEDING OR COUNTERCLAIM ARISING WITH RESPECT TO RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO OR WITH RESPECT TO ANY CLAIMS ARISING OUT OF ANY DISCUSSIONS, NEGOTIATIONS OR COMMUNICATIONS INVOLVING OR RELATED TO ANY PROPOSED RENEWAL, EXTENSION, AMENDMENT, MODIFICATION, RESTRUCTURE, FORBEARANCE, WORKOUT, OR ENFORCEMENT OF THE TRANSACTIONS CONTEMPLATED HEREUNDER.

9.    Collection.  Maker hereby agrees to pay to Payee on demand all reasonable costs and expenses of collection, enforcement, modification, restatement, replacement or amendment of this Note, including all costs and expenses of any action, including attorneys' fees whether or not suit is brought, together with any disbursements incurred, which will be added to, and recoverable with the amount due under this Note.

10.    Amendment.  This Note may not be changed, amended, modified or terminated orally but only by an instrument signed by Maker and Payee.

11.    Transfer of Note.  This Note may not be assigned by Maker without the written consent of Payee.  This Note may be assigned, conveyed, pledged or otherwise transferred by Payee to any affiliate of Payee, or any of their respective lenders.

12.    Interest and Adjustments.  If the provisions of this Note would at any time otherwise require payment by Maker to the holder of an amount of interest in excess of the maximum amount then permitted by law, then the interest payments to the holder will be reduced to the extent necessary so that the holder will not receive interest in excess of such maximum amount.

13.    Notices.  All payments, notices, communications, demands and requests to be made under this Note must be in writing and will be effective (a) upon delivery, if delivered by hand or a nationally recognized overnight courier service, or given by electronic facsimile transmission, and (b) within three (3) business days, if mailed by first class certified mail, return receipt requested, postage prepaid.  All notices will be addressed as set forth in the first paragraph hereof, or to such other address as either Maker or Payee will have furnished to the other in writing in accordance herewith.

14.    Governing Law and Jurisdiction.  This Note is and will be deemed to have been made and delivered in the State of Delaware and in all respects will be governed and construed in accordance with the laws of that State.  Maker and Payee (by acceptance hereof) each hereby

irrevocably consent to the non-exclusive jurisdiction of the state and federal courts located in the State of Delaware in any and all actions and proceedings whether arising hereunder or under any other agreement or undertaking. Maker waives any objection which Maker may have based upon lack of personal jurisdiction, improper venue or forum non conveniens. Maker irrevocably agrees to service of process by certified mail, return receipt requested to the address of the appropriate party set forth herein.

15.   Miscellaneous.

(a)   The word "*Maker*" will include Maker's successors and permitted assigns and the word "*Payee*" will include Payee's successors and permitted assigns.

(b)   The provisions of this Note are severable. If any clause or provision will be held invalid or unenforceable, in whole or in part, then such invalidity or unenforceability will affect only such clause or provision, or part thereof, and will not in any manner affect any other clause or provision in this Note.

(c)   No modification or waiver of or with respect to any provision of this Note, or consent by Payee to any departure by Maker from any of the terms or conditions hereof, will, in any event, be effective unless it will be in writing and executed by Payee. Such waiver or consent will, in any event, be effective only in the specific instance and for the purpose for which it was given. No notice to or demand on Maker in any case will, of itself, entitle Maker to any other or further notice or demand in similar or other circumstances.

(d)   No failure or delay by the holder in exercising any right, power or privilege under this Note will operate as a waiver thereof, nor will any single or partial exercise thereof preclude any other or further exercise of any such right, power or privilege.

(e)   Maker, by execution hereof, hereby acknowledges that Maker has had the opportunity to be represented by counsel of its choice. Accordingly, the rule of construction against the drafter is hereby waived.

(f)   This Note, and all other agreements, documents and instruments executed by Maker and delivered pursuant to or in connection with this Note which evidence or secure the indebtedness described herein or any other obligation of Maker to Payee arising as set forth therein, contain the entire agreement between Maker and Payee relating to the subject matter hereof and thereof. Maker expressly acknowledges that Payee has not made and Maker is not relying on any oral representations, agreements or commitments of Payee or any officer, employee, agent or representative thereof.

[SIGNATURE PAGE TO IMMEDIATELY FOLLOW]

4

IN WITNESS WHEREOF, this Promissory Note has been duly executed by Maker on the date referenced above.

MAKER:

_____

Print name: Ralph Phillips

WITNESS:

Name: Maria Miller
Date:   October 11, 2013

5

## PLEDGE AGREEMENT

This Pledge Agreement (this "*Agreement*") is entered into as of October 11, 2013 by and among BW Piezo Holdings, LLC, a Delaware limited liability company, having an address at c/o Blue Wolf Capital, One Liberty Plaza, 52nd Floor, (165 Broadway), New York, NY 10006, Attention: Adam Blumenthal and Chief Compliance Officer, Facsimile No.: (646) 349-2244 and (646) 607-3889 ("*Company*"), and Ralph Phillips, having an address for notices at 1290 Heritage Place, Westlake, VA 91362 (the "*Pledgor*").

### RECITALS

A.    Pledgor is also party to an operating agreement (the "*Operating Agreement*") pursuant to which Piezo Investment Holdings, LLC a limited liability company that owns equity in the Company ("*InvestCo*") is issuing Pledgor units of InvestCo (collectively, the "*Units*").

B.    Pledgor has incurred certain obligations to Company, including without limitation the obligation to pay indebtedness under a certain Promissory Note with the Company, dated of even date herewith (the "*Note*").

C.    The obligations of Pledgor under the Note are to be secured by the pledge of the Units as provided herein.

NOW, THEREFORE, in consideration of the premises and mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto incorporate the Recitals into this Agreement and agree as follows:

1.    Grant of Security Interest:  Subject to the terms and conditions of this Agreement, Pledgor grants to Company a security interest in the Units as security for Pledgor's obligations under the Note.

2.    Perfection of Security Interest:  The Units shall not be transferred on the books of the Company, except upon the occurrence of an Event of Default as provided in Paragraph 5 of this Agreement. So long as an Event of Default has not occurred and subject to the terms of the Note, Pledgor shall retain all rights with respect to the Units, including the right to all dividends and distributions in respect of the Units. In furtherance of perfecting the Company's security interest, Pledgor hereby agrees (a) to the filing of a Form UCC-1 Financing Statement evidencing the pledge hereunder and (b) to take any actions requested by the Company in connection therewith.

3.    Warranties and Representations:  Pledgor represents and warrants to the Company that:

(a)    All of the representations and warranties made by Pledgor in the Operating Agreement, any related subscription agreement, and Note are true, correct and complete, and Pledgor has performed all of Pledgor's obligations under, and is in compliance with, all agreements, covenants, terms and other provisions contained in the Operating Agreement, any such subscription agreement and the Note.

Exhibit 

(b)    Except as specified herein and in the Operating Agreement, Pledgor has title to all the Units and no other person has or purports to have or, upon acquisition, will have any right, title, encumbrance, adverse claim, interest, or lien in any of the Units.

(c)    Pledgor has the authority to enter into this Agreement and has duly executed this Agreement.

(d)    Any and all information now or hereafter supplied to the Company by Pledgor under the Operating Agreement, any subscription agreement, the Note or hereunder, whether or not at Company's request or instruction, is or shall be correct.

4.    <u>Affirmative and Negative Covenants of Pledgor</u>.  Pledgor hereby covenants with Company that, from the date of this Agreement and for so long as this Agreement remains in effect, or any amount due under the Note (or any successor obligation relating to the Note) shall be outstanding:

(a)    Pledgor shall perform and observe all of his obligations, covenants and agreements under, and shall comply with every provision of, the Note.

(b)    All of the representations and warranties made in Paragraph 3 of this Agreement shall remain true and correct.

(c)    Pledgor shall promptly notify Company of any condition or event which constitutes, or with the lapse of time and/or giving notice would constitute, an Event of Default under this Agreement.

5.    <u>Events of Default</u>.  The occurrence of any one of the following events, acts, or omissions, shall constitute an "Event of Default" under this Agreement:

(a)    the occurrence of any "Default" as defined under the Note; or

(b)    Pledgor's failure to perform any other agreement or other obligation required under this Agreement and the continuation of such failure for a period of five (5) days after Company gives Pledgor written notice of such failure to perform.

6.    <u>Remedies</u>.  Upon the occurrence of an Event of Default, after ten (10) days' notice in writing to Pledgor, Company shall have all of the rights of a secured creditor under the Uniform Commercial Code or as otherwise provided by law.  Company shall also have the right to immediately transfer the Units into the name of Company or Company's designee (including without limitation InvestCo), and thereafter the Company or such designee shall have the right to exercise all rights appurtenant thereto and to exclude Pledgor therefrom.  In this regard, Pledgor hereby appoints Company, acting through its managers (or board of managers), as Pledgor's attorney-in-fact, which power of attorney shall be deemed a power coupled with an interest and therefore irrevocable, to do any and all acts and to execute any and all documents as may be required to enable Company or InvestCo to transfer the Units and to exercise the rights established by this Agreement under applicable law.  The Company shall have the right to be reimbursed for all reasonable attorneys' fees incurred by the Company to effectuate or protect its rights under this Agreement.

2

7.    Additional Documents. The parties agree to execute such additional documents, including transactions, as may reasonably be required an order to effectuate the provisions of Paragraph 2 above pertaining to the pledge of the Units.  To the extent that the Units are certificated, the Company shall have the right to possess such certificate(s) until the Note has been paid in full.

8.    Miscellaneous Provisions.

(a)    Time of Essence. Time is of the essence of the Agreement.

(b)    Waiver.   Company's acceptance of partial or delinquent payments or failure of Company to exercise any right or remedy shall not be a waiver of any obligation of Pledgor or right of Company nor constitute a modification of the Agreement, nor constitute a waiver of any other similar default subsequently occurring.

(c)    Entire Agreement.   This Agreement and the other agreements and instruments executed in connection herewith contain the entire agreement between Company and Pledgor with respect to the subject matter hereof.

(d)    Assignments, etc.  The provisions of this Agreement are hereby made applicable to and shall inure to the benefit of Company's successors in interest, and assigns, and bind Pledgor's personal representatives, successors in interest and assigns.

(e)    Notices.  All payments, notices, communications, demands and requests to be made under this Agreement must be in writing and will be effective (a) upon delivery, if delivered by hand or a nationally recognized overnight courier service, or given by electronic facsimile transmission, and (b) within three (3) business days, if mailed by first class certified mail, return receipt requested, postage prepaid.  All notices will be addressed as set forth in the first paragraph hereof, or to such other address as either the Company or Pledgor will have furnished to the other in writing in accordance herewith.

(f)    This Agreement is and will be deemed to have been made and delivered in the State of Delaware and in all respects will be governed and construed in accordance with the laws of that State.   Each party hereto hereby irrevocably consents to the non-exclusive jurisdiction of the state and federal courts located in the State of Delaware in any and all actions and proceedings whether arising hereunder or under any other agreement or undertaking.  Each party hereto waives any objection which such party may have based upon lack of personal jurisdiction, improper venue or forum non conveniens. Each party hereto irrevocably agrees to service of process by certified mail, return receipt requested to the address of the appropriate party set forth herein.

*{Signature page(s) follows.}*

3

IN WITNESS WHEREOF, the parties hereto have caused this PLEDGE AGREEMENT to be executed and delivered as of the date first set forth above.

BW PIEZO HOLDINGS, LLC:

By: _____
Name: Adam Blumenthal
Title:  President


PLEDGOR:


_____
Print name:  Ralph Phillips

4

IN WITNESS WHEREOF, the parties hereto have caused this PLEDGE AGREEMENT to be executed and delivered as of the date first set forth above.

BW PIEZO HOLDINGS, LLC:

By:_____
Name: Adam Blumenthal
Title:   President

PLEDGOR:

_____
Print name:  Ralph Phillips

4

**Piezo Investment Holdings, LLC**
**Mirror Unit Grant Agreement**

September 30, 2014

Ralph Phillips
1290 Heritage Place
Westlake Village, CA 91362

**Re: Grant of Mirror Units in Piezo Investment Holdings, LLC**

Piezo Investment Holdings, LLC (the "Company") is pleased to grant to you (the "Participant") all rights, title and interest in the ownership of Eighty Nine (89) Mirror Preferred Units and Eighty Eight Thousand Seven Hundred Seventy Eight (88,778) Mirror Common Units of the Company (collectively, the "Mirror Units").

Such Mirror Units are being issued in connection with the issuance by BW Piezo Holdings, LLC ("HoldCo") of Eighty Nine (89) Series A-2 Preferred Units and Eighty Eight Thousand Seven Hundred Seventy Eight (88,778) Class A-2 Common Units (collectively, the "Underlying Units"), and is subject to the terms and conditions set forth in this agreement (this "Agreement"), the Company LLC Agreement, the HoldCo LLC Agreement, and the grant agreement between the Company and HoldCo regarding the corresponding Units issued by HoldCo to the Company.

Capitalized terms used herein but not defined herein have the meanings set forth in Exhibit A hereto or otherwise given to such terms in the Company LLC Agreement or the HoldCo LLC Agreement, as the context requires.

1.    Issuance of Units. Subject to the restrictions, terms and conditions of this Agreement, the Company hereby awards to the Participant the Mirror Units.

2.    Mirror Units. The Mirror Units shall have no voting rights. The Participant shall have the right to receive and retain any distributions payable to holders of the Underlying Units, and to exercise all other rights, powers and privileges, and shall be subject to the liabilities and obligations, of a holder of Mirror Units, with the exceptions that any distributions will be subject to the restrictions provided in Section 3 and the obligation to return tax distributions under certain circumstances pursuant to Section 6.1(d) of the Company LLC Agreement.

3.    Company Transfer Restrictions. Call Rights: Required Sale.

(a)    The Mirror Units are subject to the restrictions on transfer, call rights and Required Sale provisions as provided in the LLC Agreements.

(b)    In addition to the foregoing, in the event of the Participant's Termination for any reason or no reason, the Company may at any time within one year after such Termination repurchase (or may cause its designee to purchase) from the Participant any or all Mirror Units at a repurchase price equal to the Fair Market Value on the date of Termination. If the Company

1



Exhibit ____

elects to exercise its rights under this Section 3(b), it shall do so by delivering to the Participant a notice of such election, specifying the number of Mirror Units to be purchased and the closing date and time. Such closing shall take place at the Company's principal executive offices. At such closing, the Company (or its designee) will pay the Participant the repurchase price as specified in this Section (b) in cash, by issuing a promissory note (such promissory note to have a five year term, bear interest at the prime rate then in effect, and be payable in full upon a Change in Control of HoldCo) in favor of the Participant, or any combination of the foregoing.

4.      Ownership Rights/Dividends; Profits Interest. The Participant acknowledges that the Participant's rights to receive distributions from the Company shall be limited to those distributions received by the Company in respect of the Underlying Units. Participant further acknowledges that the Mirror Common Units and corresponding Underlying Units are intended to be treated as "profits interests." Accordingly, if (i) HoldCo's assets were sold for their respective fair market values immediately after the date hereof, (ii) HoldCo was liquidated as of such date and its creditors paid and (iii) the remaining assets of HoldCo were distributed in accordance with the terms of the HoldCo LLC Agreement, then (A) no amounts would be distributable by HoldCo to the Company in respect of the corresponding Underlying Units granted by HoldCo to the Company in connection with the grant of the Mirror Common Units to the Participant and (B) no amounts would be distributable by the Company to the Participant in respect of the Mirror Common Units.

5.      Withholding of Taxes. The Company shall have the right to take any action as may be necessary or appropriate to satisfy any federal, state or local tax withholding obligations of the Company or HoldCo in connection with the Mirror Units, including, but not limited to, the right to redeem Mirror Units and cause a corresponding number of Underlying Units to be redeemed by HoldCo or its assignee, with the proceeds of such redemption being used to satisfy such withholding obligation. In the event that the proceeds of such sale shall exceed the legally required withholding amount, the Company shall remit the difference in cash to the Participant. In the event that the proceeds of such sale are less than the legally required withholding amount, HoldCo and/or the Company may withhold the difference from any cash or other amounts then or thereafter payable to the Participant.

6.      Securities Representations. Unless and until the Underlying Units are registered pursuant to the Securities Act, the Company shall rely upon the following express representations and warranties of the Participant:

        (a)      The Participant is acquiring and will hold the Mirror Units for investment for the Participant's account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act.

        (b)      The Participant has been advised that the Mirror Units have not been registered under the Securities Act or other applicable securities laws on the grounds that no distribution or public offering of the securities is to be effected (it being understood, however, that the securities are being issued and sold in reliance on the exemption provided under Rule 701 promulgated under the Securities Act), and that such Mirror Units must be held indefinitely, unless subsequently registered under the applicable securities laws or the Participant obtains an opinion of counsel (in the form and reasonably satisfactory to the Company and its counsel) that

2

registration is not required. In connection with the foregoing, the Company is relying in part on the Participant's representations set forth in this Section 6. The Participant further acknowledges and understands that the Company is under no obligation hereunder to register such Mirror Units.

(c)     The Participant is aware of the adoption of Rule 144 by the United States Securities and Exchange Commission under the Securities Act, which permits limited public resales of securities acquired in a non-public offering, subject to the satisfaction of certain conditions. The Participant acknowledges that the Participant is familiar with the conditions for resale set forth in Rule 144, and acknowledges and understands that the conditions for resale set forth in Rule 144 have not been satisfied and that the Company has no plans to satisfy these conditions in the foreseeable future.

(d)     The Participant will not Transfer the Mirror Units in violation of the LLC Agreements, this Agreement, the Securities Act (or the rules and regulations promulgated thereunder) or under any other applicable securities laws. The Participant agrees that the Participant will not dispose of such Mirror Units unless and until the Participant has complied with all requirements of the LLC Agreements and this Agreement applicable to the disposition of such Mirror Units and the Underlying Units.

(e)     The Participant has been furnished with, and has had access to, such information as the Participant considers necessary or appropriate for deciding whether to invest in the Mirror Units, and the Participant has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the issuance of such Mirror Units.

(f)     The Participant is aware that an investment in the Company is a highly speculative investment that has limited liquidity and is subject to the risk of complete loss. The Participant is able, without impairing the Participant's financial condition, to hold the Mirror Units for an indefinite period and to suffer a complete loss of his investment in such Mirror Units.

(g)     The Participant agrees (i) that any certificate representing such Mirror Units may bear such legend or legends as the Manager deems appropriate in order to assure compliance with applicable securities laws and (ii) that the Company may refuse to register the transfer of the Mirror Units acquired pursuant to this Agreement on the unit transfer records of the Company if such proposed transfer would, in the opinion of counsel satisfactory to Company, constitute a violation of any applicable securities law.

7.     <u>Reorganization of the Company</u>.   The existence of this Agreement shall not affect in any way the right or power of the Company, the Manager, HoldCo or its Members to make or authorize any or all adjustments, recapitalizations, reorganizations or other changes in the Company's or HoldCo's capital structure or its business; any merger or consolidation of the Company or HoldCo; any issuance of bonds, debentures, preferred or prior preference units ahead of or affecting the Mirror Units or units of HoldCo or the rights thereof; the dissolution or liquidation of the Company or HoldCo; any sale or transfer of all or any part of its assets or business; or any other act or proceeding, whether of a similar character or otherwise.

8.     Recapitalization Events.   In the event of Mirror Unit distributions or distributions of Units of HoldCo, spin-offs of assets or other extraordinary distributions, recapitalizations, mergers, consolidations, reorganizations, liquidations, issuances of rights or warrants and similar transactions or events involving the Company or HoldCo ("Recapitalization Events"), then for all purposes references herein to Mirror Units or Units of HoldCo shall mean and include all securities or other property (other than cash) that holders of Mirror Units or Units of HoldCo are entitled to receive in respect of Mirror Units or Units of HoldCo, as applicable, by reason of each successive Recapitalization Event, which securities or other property (other than cash) shall be treated in the same manner and shall be subject to the same restrictions as the underlying Mirror Units, in each case, to the extent determined by the Manager.

9.     Certain Restrictions.   By executing this Agreement, the Participant acknowledges that the Participant will enter into such further written representations, warranties and agreements and execute such documents as the Company may reasonably request in order to comply with the terms of this Agreement, the LLC Agreements, any securities laws or any other applicable laws, rules or regulations. The Participant hereby acknowledges that the Participant (i) has read this Agreement and the LLC Agreements and (ii) accepts and agrees to become a Member of the Company and be bound by the terms of the Company LLC Agreement directly and the HoldCo LLC Agreement indirectly.

10.     No Obligation to Continue Employment. This Agreement is not an agreement of employment. This Agreement does not guarantee that the Company or its Affiliates will employ or retain, or to continue to, employ or retain the Participant during the entire, or any portion of the, term of this Agreement, including but not limited to any period during which the Mirror Units are outstanding, nor does it modify in any respect the Company or its Affiliate's right to terminate or modify the Participant's employment or compensation.

11.     Irrevocable Proxy and Power of Attorney.   The Company, its successors and assigns, is hereby appointed the proxy and attorney-in-fact, with full power of substitution and resubstitution, of the Participant for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instruments which such proxy and attorney-in-fact may deem necessary or advisable to accomplish the purposes hereof. The Company, as proxy and attorney-in-fact for the Participant, may in the name and stead of the Participant, make and execute all conveyances, assignments and transfers of the Mirror Units and property provided for herein, and the Participant hereby ratifies and confirms all that the Company, as said attorney-in-fact, shall do by virtue hereof. Nevertheless, the Participant shall, if so requested by the Company, execute and deliver to the Company all such instruments as may, in the judgment of the Company, be advisable for the purpose. Each of the proxy and power of attorney granted pursuant to this Section 11 is given in consideration of the agreements and covenants of the Company and HoldCo in connection with the transactions contemplated by this Agreement and, as such, each is coupled with an interest and shall be irrevocable. The Participant hereby revokes any and all previous proxies or powers of attorney with respect to the Mirror Units and shall not hereafter, unless and until this Agreement terminates, purport to grant any other proxy or power of attorney with respect to any of the Mirror Units, deposit any of the Mirror Units into a voting trust or enter into any agreement (other than this Agreement), arrangement or understanding with any person, directly or indirectly, to vote, grant any proxy or give instructions with respect to the voting of any of the Mirror Units, in each case, with respect to any of the matters set forth herein.

4

12.    <u>Miscellaneous</u>.

(a)    This Agreement may not be amended, waived or discharged except by a writing signed by the Company and the Participant.

(b)    Any notices permitted or required hereunder may be given in the manner set forth in the Company LLC Agreement.

(c)    This Agreement shall be binding upon and shall inure to the benefit of the respective heirs, successors, permitted assigns and legal representatives of the parties hereto.

(d)    In the event that any provision of this Agreement shall be held illegal, invalid or unenforceable for any reason, such provision shall be fully severable and shall not affect the remaining provisions of this Agreement, and this Agreement shall be construed and enforced as if the illegal, invalid or unenforceable provision had never been included herein.

(e)    The Participant agrees to execute such further documents and take such other actions as may be permitted or required by law to implement the purposes, objectives, terms, and provisions of this Agreement.

(f)    The failure of any party hereto at any time to require performance by another party of any provision of this Agreement shall not affect the right of such party to require performance of that provision, and any waiver by any party of any breach of any provision of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, a waiver of the provision itself, or a waiver of any right under this Agreement.

(g)    Any matter, dispute, claim or controversy arising out of or related to this Agreement shall be construed by, subject to and governed in accordance with the internal laws of the State of Delaware without giving effect to conflict of laws or other principles which would result in the application of laws other than the internal laws of the State of Delaware.

(h)    This Agreement may be executed in one or more counterparts, all of which taken together shall constitute one contract.

*[Signature page to follow]*

5

Please sign below to confirm you are in agreement with this Agreement.

Sincerely,

PIEZO INVESTMENT HOLDINGS, LLC

By: _____
   Name: Adam Blumenthal
   Title:  President

Agreed and accepted:

Ralph Phillips

[Signature Page – Mirror Unit Grant Agreement]

## Exhibit A

## Certain Definitions

1.      "Company LLC Agreement" means the Limited Liability Company Agreement of the Company, dated as of December 29, 2011, as originally executed and as it may be amended, modified, restated or supplemented from time to time, as the context requires.

2.      "HoldCo LLC Agreement" means the Second Amended and Restated Limited Liability Company Agreement of HoldCo, dated as of October 11, 2013, as amended by that certain First Amendment, dated as of September 30, 2014, as originally executed and as it may be amended, modified, restated or supplemented from time to time, as the context requires.

3.      "LLC Agreements" means, collectively, the HoldCo LLC Agreement and the Company LLC Agreement.

4.      "Securities Act" means the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder. Any reference to any section of the Securities Act shall also be a reference to any successor provision.

5.      "Termination" means that the Participant is no longer acting as an employee of or consultant to the Employer. Any question as to whether and when there has been a Termination and the cause of such Termination, shall be determined by the Manager in its sole discretion, and its determination shall be final.

#30483931_v1

**Piezo Investment Holdings, LLC**
**Mirror Unit Grant Agreement**

December 31, 2014

Ralph Phillips
1290 Heritage Place
Westlake Village, CA 91362

**Re: Grant of Mirror Units in Piezo Investment Holdings, LLC**

Piezo Investment Holdings, LLC (the "Company") is pleased to grant to you (the "Participant") all rights, title and interest in the ownership of Eleven (11) Mirror Preferred Units and Eleven Thousand Two Hundred Seventy Three (11,273) Mirror Common Units of the Company (collectively, the "Mirror Units").

Such Mirror Units are being issued in connection with the issuance by BW Piezo Holdings, LLC ("HoldCo") of Eleven (11) Series A-2 Preferred Units and Eleven Thousand Two Hundred Seventy Three (11,273) Class A-2 Common Units (collectively, the "Underlying Units"), and is subject to the terms and conditions set forth in this agreement (this "Agreement"), the Company LLC Agreement, the HoldCo LLC Agreement, and the grant agreement between the Company and HoldCo regarding the corresponding Units issued by HoldCo to the Company.

Capitalized terms used herein but not defined herein have the meanings set forth in Exhibit A hereto or otherwise given to such terms in the Company LLC Agreement or the HoldCo LLC Agreement, as the context requires.

1.    Issuance of Units. Subject to the restrictions, terms and conditions of this Agreement, the Company hereby awards to the Participant the Mirror Units.

2.    Mirror Units. The Mirror Units shall have no voting rights. The Participant shall have the right to receive and retain any distributions payable to holders of the Underlying Units, and to exercise all other rights, powers and privileges, and shall be subject to the liabilities and obligations, of a holder of Mirror Units, with the exceptions that any distributions will be subject to the restrictions provided in Section 3 and the obligation to return tax distributions under certain circumstances pursuant to Section 6.1(d) of the Company LLC Agreement.

3.    Company Transfer Restrictions. Call Rights: Required Sale.

(a)    The Mirror Units are subject to the restrictions on transfer, call rights and Required Sale provisions as provided in the LLC Agreements.

(b)    In addition to the foregoing, in the event of the Participant's Termination for any reason or no reason, the Company may at any time within one year after such Termination repurchase (or may cause its designee to purchase) from the Participant any or all Mirror Units at a repurchase price equal to the Fair Market Value on the date of Termination. If the Company elects to exercise its rights under this Section 3(b), it shall do so by delivering to the Participant a

Exhibit 

notice of such election, specifying the number of Mirror Units to be purchased and the closing date and time. Such closing shall take place at the Company's principal executive offices. At such closing, the Company (or its designee) will pay the Participant the repurchase price as specified in this Section (b) in cash, by issuing a promissory note (such promissory note to have a five year term, bear interest at the prime rate then in effect, and be payable in full upon a Change in Control of HoldCo) in favor of the Participant, or any combination of the foregoing.

4.     Ownership Rights/Dividends: Profits Interest. The Participant acknowledges that the Participant's rights to receive distributions from the Company shall be limited to those distributions received by the Company in respect of the Underlying Units. Participant further acknowledges that the Mirror Common Units and corresponding Underlying Units are intended to be treated as "profits interests." Accordingly, if (i) HoldCo's assets were sold for their respective fair market values immediately after the date hereof, (ii) HoldCo was liquidated as of such date and its creditors paid and (iii) the remaining assets of HoldCo were distributed in accordance with the terms of the HoldCo LLC Agreement, then (A) no amounts would be distributable by HoldCo to the Company in respect of the corresponding Underlying Units granted by HoldCo to the Company in connection with the grant of the Mirror Common Units to the Participant and (B) no amounts would be distributable by the Company to the Participant in respect of the Mirror Common Units.

5.     Withholding of Taxes. The Company shall have the right to take any action as may be necessary or appropriate to satisfy any federal, state or local tax withholding obligations of the Company or HoldCo in connection with the Mirror Units, including, but not limited to, the right to redeem Mirror Units and cause a corresponding number of Underlying Units to be redeemed by HoldCo or its assignee, with the proceeds of such redemption being used to satisfy such withholding obligation. In the event that the proceeds of such sale shall exceed the legally required withholding amount, the Company shall remit the difference in cash to the Participant. In the event that the proceeds of such sale are less than the legally required withholding amount, HoldCo and/or the Company may withhold the difference from any cash or other amounts then or thereafter payable to the Participant.

6.     Securities Representations. Unless and until the Underlying Units are registered pursuant to the Securities Act, the Company shall rely upon the following express representations and warranties of the Participant:

(a)     The Participant is acquiring and will hold the Mirror Units for investment for the Participant's account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act.

(b)     The Participant has been advised that the Mirror Units have not been registered under the Securities Act or other applicable securities laws on the grounds that no distribution or public offering of the securities is to be effected (it being understood, however, that the securities are being issued and sold in reliance on the exemption provided under Rule 701 promulgated under the Securities Act), and that such Mirror Units must be held indefinitely, unless subsequently registered under the applicable securities laws or the Participant obtains an opinion of counsel (in the form and reasonably satisfactory to the Company and its counsel) that registration is not required. In connection with the foregoing, the Company is relying in part on

the Participant's representations set forth in this Section 6. The Participant further acknowledges and understands that the Company is under no obligation hereunder to register such Mirror Units.

(c)     The Participant is aware of the adoption of Rule 144 by the United States Securities and Exchange Commission under the Securities Act, which permits limited public resales of securities acquired in a non-public offering, subject to the satisfaction of certain conditions. The Participant acknowledges that the Participant is familiar with the conditions for resale set forth in Rule 144, and acknowledges and understands that the conditions for resale set forth in Rule 144 have not been satisfied and that the Company has no plans to satisfy these conditions in the foreseeable future.

(d)     The Participant will not Transfer the Mirror Units in violation of the LLC Agreements, this Agreement, the Securities Act (or the rules and regulations promulgated thereunder) or under any other applicable securities laws. The Participant agrees that the Participant will not dispose of such Mirror Units unless and until the Participant has complied with all requirements of the LLC Agreements and this Agreement applicable to the disposition of such Mirror Units and the Underlying Units.

(e)     The Participant has been furnished with, and has had access to, such information as the Participant considers necessary or appropriate for deciding whether to invest in the Mirror Units, and the Participant has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the issuance of such Mirror Units.

(f)     The Participant is aware that an investment in the Company is a highly speculative investment that has limited liquidity and is subject to the risk of complete loss. The Participant is able, without impairing the Participant's financial condition, to hold the Mirror Units for an indefinite period and to suffer a complete loss of his investment in such Mirror Units.

(g)     The Participant agrees (i) that any certificate representing such Mirror Units may bear such legend or legends as the Manager deems appropriate in order to assure compliance with applicable securities laws and (ii) that the Company may refuse to register the transfer of the Mirror Units acquired pursuant to this Agreement on the unit transfer records of the Company if such proposed transfer would, in the opinion of counsel satisfactory to Company, constitute a violation of any applicable securities law.

7.     <u>Reorganization of the Company</u>.  The existence of this Agreement shall not affect in any way the right or power of the Company, the Manager, HoldCo or its Members to make or authorize any or all adjustments, recapitalizations, reorganizations or other changes in the Company's or HoldCo's capital structure or its business; any merger or consolidation of the Company or HoldCo; any issuance of bonds, debentures, preferred or prior preference units ahead of or affecting the Mirror Units or units of HoldCo or the rights thereof; the dissolution or liquidation of the Company or HoldCo; any sale or transfer of all or any part of its assets or business; or any other act or proceeding, whether of a similar character or otherwise.

3

8.    Recapitalization Events.  In the event of Mirror Unit distributions or distributions of Units of HoldCo, spin-offs of assets or other extraordinary distributions, recapitalizations, mergers, consolidations, reorganizations, liquidations, issuances of rights or warrants and similar transactions or events involving the Company or HoldCo ("Recapitalization Events"), then for all purposes references herein to Mirror Units or Units of HoldCo shall mean and include all securities or other property (other than cash) that holders of Mirror Units or Units of HoldCo are entitled to receive in respect of Mirror Units or Units of HoldCo, as applicable, by reason of each successive Recapitalization Event, which securities or other property (other than cash) shall be treated in the same manner and shall be subject to the same restrictions as the underlying Mirror Units, in each case, to the extent determined by the Manager.

9.    Certain Restrictions.  By executing this Agreement, the Participant acknowledges that the Participant will enter into such further written representations, warranties and agreements and execute such documents as the Company may reasonably request in order to comply with the terms of this Agreement, the LLC Agreements, any securities laws or any other applicable laws, rules or regulations. The Participant hereby acknowledges that the Participant (i) has read this Agreement and the LLC Agreements and (ii) accepts and agrees to become a Member of the Company and be bound by the terms of the Company LLC Agreement directly and the HoldCo LLC Agreement indirectly.

10.    No Obligation to Continue Employment. This Agreement is not an agreement of employment. This Agreement does not guarantee that the Company or its Affiliates will employ or retain, or to continue to, employ or retain the Participant during the entire, or any portion of the, term of this Agreement, including but not limited to any period during which the Mirror Units are outstanding, nor does it modify in any respect the Company or its Affiliate's right to terminate or modify the Participant's employment or compensation.

11.    Irrevocable Proxy and Power of Attorney.  The Company, its successors and assigns, is hereby appointed the proxy and attorney-in-fact, with full power of substitution and resubstitution, of the Participant for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instruments which such proxy and attorney-in-fact may deem necessary or advisable to accomplish the purposes hereof. The Company, as proxy and attorney-in-fact for the Participant, may in the name and stead of the Participant, make and execute all conveyances, assignments and transfers of the Mirror Units and property provided for herein, and the Participant hereby ratifies and confirms all that the Company, as said attorney-in-fact, shall do by virtue hereof. Nevertheless, the Participant shall, if so requested by the Company, execute and deliver to the Company all such instruments as may, in the judgment of the Company, be advisable for the purpose. Each of the proxy and power of attorney granted pursuant to this Section 11 is given in consideration of the agreements and covenants of the Company and HoldCo in connection with the transactions contemplated by this Agreement and, as such, each is coupled with an interest and shall be irrevocable. The Participant hereby revokes any and all previous proxies or powers of attorney with respect to the Mirror Units and shall not hereafter, unless and until this Agreement terminates, purport to grant any other proxy or power of attorney with respect to any of the Mirror Units, deposit any of the Mirror Units into a voting trust or enter into any agreement (other than this Agreement), arrangement or understanding with any person, directly or indirectly, to vote, grant any proxy or give instructions with respect to the voting of any of the Mirror Units, in each case, with respect to any of the matters set forth herein.

4

12.    <u>Miscellaneous</u>.

(a)    This Agreement may not be amended, waived or discharged except by a writing signed by the Company and the Participant.

(b)    Any notices permitted or required hereunder may be given in the manner set forth in the Company LLC Agreement.

(c)    This Agreement shall be binding upon and shall inure to the benefit of the respective heirs, successors, permitted assigns and legal representatives of the parties hereto.

(d)    In the event that any provision of this Agreement shall be held illegal, invalid or unenforceable for any reason, such provision shall be fully severable and shall not affect the remaining provisions of this Agreement, and this Agreement shall be construed and enforced as if the illegal, invalid or unenforceable provision had never been included herein.

(e)    The Participant agrees to execute such further documents and take such other actions as may be permitted or required by law to implement the purposes, objectives, terms, and provisions of this Agreement.

(f)    The failure of any party hereto at any time to require performance by another party of any provision of this Agreement shall not affect the right of such party to require performance of that provision, and any waiver by any party of any breach of any provision of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, a waiver of the provision itself, or a waiver of any right under this Agreement.

(g)    Any matter, dispute, claim or controversy arising out of or related to this Agreement shall be construed by, subject to and governed in accordance with the internal laws of the State of Delaware without giving effect to conflict of laws or other principles which would result in the application of laws other than the internal laws of the State of Delaware.

(h)    This Agreement may be executed in one or more counterparts, all of which taken together shall constitute one contract.

*[Signature page to follow]*

5

Please sign below to confirm you are in agreement with this Agreement.

Sincerely,

PIEZO INVESTMENT
HOLDINGS, LLC

By: _____
Name: Adam Blumenthal
Title:  President

[Signature Page – Mirror Unit Grant Agreement]

Agreed and accepted:

Signed:

Print Name:  _R. L. PHILLIPS_

[Signature Page – Mirror Unit Grant Agreement]

## Exhibit A

## Certain Definitions

1.    "Company LLC Agreement" means the Limited Liability Company Agreement of the Company, dated as of December 29, 2011, as originally executed and as it may be amended, modified, restated or supplemented from time to time, as the context requires.

2.    "HoldCo LLC Agreement" means the Second Amended and Restated Limited Liability Company Agreement of HoldCo, dated as of October 11, 2013, as amended by that certain First Amendment, dated as of September 30, 2014, and that certain Second Amendment, dated as of December 31, 2014, as originally executed and as it may be amended, modified, restated or supplemented from time to time, as the context requires.

3.    "LLC Agreements" means, collectively, the HoldCo LLC Agreement and the Company LLC Agreement.

4.    "Securities Act" means the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder. Any reference to any section of the Securities Act shall also be a reference to any successor provision.

5.    "Termination" means that the Participant is no longer acting as an employee of or consultant to the Employer. Any question as to whether and when there has been a Termination and the cause of such Termination, shall be determined by the Manager in its sole discretion, and its determination shall be final.

ORIGIN ID:BLVA (618) 219-3700
RALPH PHILLIPS
EHRHARDT TOOL & MACHINE CO.
#25 CENTRAL INDUSTRIAL DRIVE

GRANITE CITY, IL 62040
UNITED STATES US

SHIP DATE: 12JUL17
ACTWGT: 1.00 LB
CAD: 100404100/INET3850

BILL SENDER

TO C/O PRIME CLERK, LLC
CTG,LLC CLAIMS PROCESSING CENTER
830 3RD AVENUE, 3RD FLOOR

NEW YORK NY 10022
(855) 628-7541 REF
INV
PO DEPT

546J1/C0C2563C1

FedEx Express

E

THU - 13 JUL 10:30A
PRIORITY OVERNIGHT

TRK# 0201 7796 1098 7740

10022
NY-US EWR

XA JRBA

PRIME CLERK LLC
JUL 1 3 2017
RECEIVED

**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

# Exhibit  4

| | |
|---|---|
| **From:** | Lynn Chen |
| **Sent:** | Friday, February 05, 2016 9:58 AM |
| **To:** | Katherine Carrington |
| **Subject:** | Re: October Board Minutes |
| **Attachments:** | CTG Q3 2015 BoD minutes.pdf |

Here you go

>>> On 2/5/2016 at 6:31 AM, in message <882846ac0a144e1e901c7d14e21034a5@bw-prod-exch.blue-wolf.com>, Katherine Carrington <Katherine@bluewolfcapital.com> wrote:

Hi Lynn,

Do you mind sending me the October Board minutes?

Best,

Katherine

**Katherine Carrington**

**Blue Wolf Capital Partners**

One Liberty Plaza, 52nd Floor

New York, NY 10006

Phone: 212-488-3685

Fax: 917-677-8233

katherine@bluewolfcapital.com

<div align="center">

**MINUTES OF THE REGULAR MEETING OF THE**
**BOARD OF MANAGERS OF**
**BW PIEZO HOLDINGS LLC**
October 29, 2015

</div>

**In Attendance:**

| | |
|---|---|
| Managers: | Adam Blumenthal, Jeremy Kogler, Pengdi Han, Pierre Chao, Ralph Phillips, Lynn Chen |
| Advisory Board: | Vice Admiral John (Jay) Donnelly, USN, Ret., Rear Admiral Nevin Carr, USN, Ret. |
| Observers: | Chris Curti, Andy Worth (Fidus), Jeri Harman (Avante), Brian (Fidus)*, Anthony (Fidus), Greg Bowie (Gladstone), Rick Winegar, Vic Caruso, Stephen Dynan*, Arsen Melconian, Katherine Covington |

\*= via teleconference

A regular meeting of the Board of Directors (the "***Board***") of **BW PIEZO HOLDINGS LLC** (the "***Company***") was convened at CTG in New York at approximately 9:00 a.m. (EST) on the date set forth above. Attendees were present in person and via teleconference call. The Company distributed materials for the meeting to the Board in advance of the meeting, and all members of the Board confirmed receipt.

A.      **Call to Order; Quorum; Secretary of the Meeting**

Mr. Ralph Phillips called the meeting to order and noted that all directors were present and that a quorum existed. He then went through the agenda for the meeting and made introductions. Ms. Chen acted as secretary of the meeting and recorded the minutes.

Mr. Phillips greeted the group and turned the floor over to Mr. Blumenthal to make some opening comments.

B.      **BW Opening comments**

Mr. Blumenthal opened and noted the amount of work, sacrifice and effort managing the business and cash flow during the recent months, and thanked the team for meeting the financial covenant for Q3.  However, as it is still the case for Q4, we need to be in a better position.  The decision to start the process of the sale of AM, with Raymond James taking the lead as the Investment Banker was confirmed. We will need to spend time on tactical, financial and strategic issues in the context of the sale of AM.  We will need to focus on SB and how to improve cash flow to either direct capital to AM or to SB to improve the value before exit. We need to get people out of sacrificing and into growth.

Q2 and Q3 was a tightrope, and the team made a lot of sacrifices to make the covenants. There is a lot happening but the time for certain decisions and business won 2 years ago is starting to pay off.

C.    **Approval of Prior Meeting Minutes**

The meeting minutes from August 12, 2015 were approved as written without discussion.

D.    **CEO Update**

Mr. Phillips then provided an update to the Board on the Company's Q3 2015 results, beginning with Safety. We have kept a close eye on safety but are still worse than best practices. We have made some changes in headcount to take safety to the next level and be more proactive, which will require some investment, mostly in management. Based on our internal audit of safety, we have some corrective actions to take, which will be driven by the new quality headcount and reorganization or the Ceramics team.

Mr. Blumenthal noted that at another portfolio company, there was a fatality, despite having strong safety policies & procedures on paper, and appropriate training. Need to ensure that the Culture is there, in addition to the People and Policies & Procedures.  For next Board meeting, CTG should prepare a presentation on Safety.

September was better than the rest of Q3, with shipments increasing.  CTGAM yields also improving in Q3. We are having some challenges on the MK-54, which is being addressed, and will slow us down.  Bookings slowed in Q3, with some that were delayed to Q4, but October and November should be good.

R&D efforts have slowed due to clamp down on spend due to cashflow challenges, but will increase spend in 2016. Operations improving and Ceramics delivery improving in OTD and yields. TR-343 on track, but watching daily, as testing is in very early stages.

E.    **Financial Summary**

Ms. Chen provided an update on the Company's Q3 2015 financial performance. Revenues were in line with the last forecast, and lower that the Budget for the quarter. Q3 Gross Margin was unfavorable to both the last forecast and the Budget for the quarter.  Q3 SG&A was favorable to the last forecast and to Budget. Q3 Management EBITDA and Bank Adjusted EBITDA were in line with the last forecast at $2.4M and $7.8M, respectively, but below Budget of $3.3M and $8.1M, respectively.

F.    **Q4 Forecast – October**

Ms. Chen provided the Q4 forecast.  Q4 revenues consistent with the last Board forecast at $14.4M, with a Management EBTIDA of $3M. In our base case, we are in compliance with the leverage ratio covenant, however, with minimal cushion.

Discussion around Q4 covenants and communication and ask with Lender Group.

G.    **AOP Key Assumptions**

Mr. Phillips and Ms. Chen provided the Board with a preview of the Revenue assumptions and current status of the 2016 AOP Budget preparation. The first pass of Revenues shows a strong Q4, need to level load throughout the year if possible.

H.    <u>Ceramics Action Plan Status</u>

Mr. Melconian provided the Board with an update on the Ceramics Division and the current status on action plans. Yields have improved overall with big progress in TR-343 program, with all trends favorable. Organization fully staffed now.  Schedule working well, still some issues with powder manufacturing and deliveries, would like to have more inventory on hand.  Having some setbacks on preventative maintenance, due to spending and headcount constraints.

Working closely on EHS activities, assessing lead compliance (monitoring and maximum exposure test), need to spend some money to put in some engineering controls, walls and air flow management to control lead contaminants to other work areas, other buildings or home. Working with consultant and hired EHS full time person to prepare a plan. Need to improve EHS to ensure risk of lead contamination is minimized.  CTG should not compromise on safety of people. If we stay in this business, need to be best in class, or don't stay in this business.

Two main actions to take:
1. find Environmental Counsel to ensure liability risk understood and managed. Follow up meeting to be set up with Adam, Charlie, Rick, Ralph and Arsen (and possibly David Critchfield – BW Environmental Consultant) to assess Legal and Environmental risk assessment in California, and do 3rd party review. To do immediately.
2. Need to make strategic decision on Ceramics Strategy. Discussed how much is under long-term supply agreements with external Ceramics customers, which are with Alcon, Syquest (repairs) and Ultra (shown on slide 39). Any make or buy decision needs to consider internal customer demand and impact on Sensors.

I.    <u>Ceramics Strategic Actions</u>

Mr. Melconian's update on the Ceramics Strategic Action is postponed until later.

J.    <u>Advanced Materials Capital Plan Status</u>

Mr. Dynan discussed the addition of the new BD person for AM, and provided the Board an overview of the Advanced Materials proposed expansion plan.   Some delay in the investment due to cash constraints during Q3 and A4.  Schedule updated based on this, which will begin to generate revenues in early Q3 16.  Advanced Technology roadmap includes larger diameter boules (+78% increase in material) and longer boule length (+50% increase in material) during 2016-2018. These advancements will help mitigate the price challenge from customers and maintain margins by reducing costs.

K.    <u>R&D Projects (Preliminary 2016)</u>

Mr. Phillips provided the Board with an overview of R&D activities, which builds on what was started in 2015.

L.    <u>New Business Growth Status</u>

Mr. Phillips provided the Board with an overview of Business Development activities.

Ceramics is still focused on operations and supporting internal demands vs new opportunities. Transducers new business focused on Northrop and Lockeed proposal for MK-48. TR-343 is still significant for the next few years. Pierre to help get information to CTG on the LDUUV opportunity. Systems business has done really well, exceeding expectations. This will continue into next year. MSI has big potential win on MK-54 Mod 1 with Progeny, MLTA still in place, just delayed and smaller.

M.    **Optics**

Mr. Phillips presented an overview of the Optics business, and will have a strategic discussion on this business later this year. Will end up close to Budget for 2015, with 2016 actions to improve bottom line.

N.    **Adjournment**

There being no further business to come before the Board, last comments were made from the participants. Mr. Chao noted that there should be some unlocking of the US Government Budget and potential additional business in Q4 and beyond. Mr. Blumenthal gave a status on the sale of Advanced Materials. Will discuss strategic options tomorrow together with BW and come back with the Board in January with results from that discussion.

Respectfully submitted,

Lynn Chen,
Secretary (acting)

# Exhibit 5

**Ewelina Johnson**

| | |
|---|---|
| **From:** | Lynn Chen |
| **Sent:** | Wednesday, January 27, 2016 12:55 PM |
| **To:** | Sergio De Hoyos; John Hager |
| **Cc:** | Art Ortega; Stephen Dynan |
| **Subject:** | Re: CTGAM Cash Flow Forecast |
| **Attachments:** | CTGAM Cash Flow Roll Forward-we 1-25-2015-16 WK.xlsx |

Hi John,

Thanks for doing that quickly, that helps for today.  However, we do need you to stretch your payments out to suppliers as much as possible, at least a week out from your current payment stream.  As you know we are managing our cash very tightly and will need AM to slow down the outflows as well.  We need you to reduce payments by at least $45k over the next week (through Feb 5).

Thanks, lynn

>>> On 1/27/2016 at 9:31 AM, in message
<BY2PR05MB2542A65688434259E29047692D90@BY2PR05MB254.namprd05.prod.outlook.com>, John
Hager <john.hager@hcmat.com> wrote:

I was able to get it completed – buyers are on a tour.  See attached

John P. Hager

Controller



CTG Advanced Materials

Formerly HC Materials

John.hager@hcmat.com

630-754-8630  direct

479 Quadrangle Dr

Bolingbrook, Il  60440

# Exhibit 6

**Ewelina Johnson**

| | |
|---|---|
| **From:** | Lynn Chen |
| **Sent:** | Friday, January 22, 2016 9:37 AM |
| **To:** | Jeff Rumsey |
| **Cc:** | Jim Smith; Vinnie Odell |
| **Subject:** | Re: Payments - NRL & Associates |

Hi Jeff,

I understand your frustration and apologize for the delay. Let me follow up today and let you know what we can do to catch up.

Thanks,

Lynn

> On Jan 22, 2016, at 7:26 AM, Jeff Rumsey <jrumsey@nrlassoc.com> wrote:
>
> Good morning Lynn.  I have been working with Cheryl Hanna for several months and wanted to reach out to you.
>
> I'm writing regarding the recent payment patterns of CTG.  In November, Terry Jamba requested that NRL  push out several deliveries into January 2016.  We accepted his request and moved several orders to January 2016 deliveries to assist CTG with your inventory issues.  Terry agreed to a payment schedule and left a week later for another company. Damon made sure our payments were received as promised.
>
> On January 13, 2016 Damon sent Vinnie Odell a schedule with expected pay dates for our open invoices totaling $424,120.  We expected a payment of $88,601.56 on Jan 15th based on Damon's prior commitment to Terry's payment schedule, our commitment to CTG by delaying shipments, and Damon's expected payment schedule.  We didn't receive a payment until Jan 20th and it was for only $47,178.40.  Per Cheryl, after several emails, we received another $21,120 towards the original amount of $88,601 today.  We are still short of our original expectations by $20,303 and this invoice is now at 53 days.
>
> We are requesting that our invoices be paid as Damon proposed based on our flexibility with CTG at year end and the Net 30 terms we agreed to on the PO's.  We are asking for your commitment to meet these dates.  Cheryl tells us each week that she doesn't know what the payments will be and that she has no say in what gets paid.
>
> Please contact us with any questions or comments.  Thanks in advance for your reply.
>
> Best regards,
>
> Jeff Rumsey
> Controller
> NRL & Associates, Inc
> 410-643-4063 x 315
> <Mime.822>

# Exhibit 7

## Ewelina Johnson

**From:** Sergio De Hoyos
**Sent:** Tuesday, February 09, 2016 12:34 PM
**To:** Lynn Chen
**Cc:** Art Ortega; Cheryl Hanna; David Oldham
**Subject:** Cash Flow Forecast, 2.8.16
**Attachments:** CTG Daily Cash Flow Forecast_02.08.16.xlsx

Lynn,

Attached is the latest cash flow forecast. It does not look good. I took out the $1.8m of 'existing AP' payments but we still go negative on 3/31 (plenty of liquidity through then) and remain so for most of April.

One reason for the dip versus the prior forecast is that we had ~$650k of collections this quarter for MK-54shipments that have been (and were then already) delayed.

I'll revise again after discussion.

Sergio

# Exhibit 8

## Ewelina Johnson

**From:** Cheryl Hanna
**Sent:** Wednesday, February 17, 2016 9:51 AM
**To:** John Hager
**Subject:** Re: Cash needs

Okay thanks. I'll send it now. Art had on his list that you had 10k in CapEx and 16,484 in AP and 152,534 in fixed costs (PR/401K is 99K so I don't know what the rest was) Is his report correct? As I stated before it looks like you only have enough for payroll this week.

Thanks,
Cheryl

+ for AP and 155K for PR and I'm assuming more AP, but there isn't enough in your account for that. Is his forecast incorrect?

Cheryl

>>> John Hager <john.hager@hcmat.com> 2/17/2016 7:49 AM >>>
Cheryl with the addition of another $20K+ today you only need to send us $35K for payroll.

Thanks,

John P. Hager
Controller
[cid:image001.png@01D09213.D3015C20]
CTG Advanced Materials
Formerly HC Materials
John.hager@hcmat.com<mailto:John.hager@hcmat.com>
630-754-8630 direct
479 Quadrangle Dr
Bolingbrook, Il 60440

# Exhibit 9

**Ewelina Johnson**

**From:** Vic Caruso <Vic@bluewolfcapital.com>
**Sent:** Monday, August 08, 2016 11:40 AM
**To:** Chris Holmes
**Subject:** RE: Do not read if you are in a bad mood.

Ok.
I won't share then.
V

Victor Caruso
Blue Wolf Capital
Mobile 415.385.0865
vic@bluewolfcapital.com
One Liberty Plaza
52nd Floor
New York, NY 10006

---

**From:** Chris Holmes [mailto:CHolmes@channeltech.com]
**Sent:** Monday, August 8, 2016 12:24 PM
**To:** Vic Caruso <Vic@bluewolfcapital.com>
**Subject:** Re: Do not read if you are in a bad mood.

No.

---

**From:** Vic Caruso <Vic@bluewolfcapital.com>
**Sent:** Monday, August 8, 2016 11:32:58 AM
**To:** Chris Holmes; Dave Oldham
**Subject:** RE: Do not read if you are in a bad mood.

Wow.
w/t/f.

Ok if I share with Adam/Charlie?

V

Victor Caruso
Blue Wolf Capital
Mobile 415.385.0865
vic@bluewolfcapital.com
One Liberty Plaza
52nd Floor
New York, NY 10006

**From:** Chris Holmes [mailto:CHolmes@channeltech.com]
**Sent:** Friday, August 5, 2016 6:14 PM
**To:** Vic Caruso <Vic@bluewolfcapital.com>; Dave Oldham <doldham@channeltech.com>
**Subject:** Do not read if you are in a bad mood.

Answer to your first question is $1.5M and about 2 years.

In November 2012, CTG implemented the PLEX **Accounting and Finance**, **Supply Chain Management**, **Inventory Tracking**, and **Shipping / Distribution** Modules.  Each of these modules were the basic starter modules for this ERP system.  The modules were deployed in a simplified mode and did not include may of the typical core functionality of the module with advanced capabilities.

In March 2013, the simplified **Production Management** module was deployed along with two components of the **Planning and Scheduling** module.  This included the "Production Requirements Planning" component to identified which work orders (Jobs) needed to be created and the "Materials Requirements Planning" component to trigger material requisitions based on the part bill of materials.  Some components of the **Product Data Management** module where also deployed during the manufacturing "Go-live" phase to support engineering functionality.  These components include the "Part List" for part creation; "Process Routings" for part manufacturing and "Bill of Materials" for configuration management. There was a PLEX team on site for the implementation supporting the CTG implementation team.

By July of 2013, many system issues materialized on the manufacturing floor and the remaining implementation phases were halted by Executive Management.  All PLEX efforts moving forward were invested into understanding the CTG business processes and configuring the system to meet requirements from both a manufacturing and accounting perspective. The Operators struggled with the new system given its input requirements and the daily tracking of inventory labels.  PLEX creates a new WIP label for every operation completed on a work order (Job).  The language barriers also contributed to production errors as the system was configured.  The core implementation failure was that CTG went live with a new ERP system without fully blueprinting and defining the process and data requirements prior to implementation for the business.  These are the basics of any ERP implementation and the number one failure for most implementations.  CTG blueprinted over the next three years in production as the production team grew in experience with PLEX its configuration limits.  It was not designed to effectively support government accounting program management.  It was quickly realized that most of PLEX's platform modules and reporting were designed to support standard cost accounting and not actual costing.  CTG is on actual costing. Most of the reports in PLEX where designed for standard costing and not actual. Decision making data out of the system was problematic from "Go-Live".  Modifications were made to PLEX in 2014 to capture all costs by a project or accounting job in the Job Costing Activity Module to be more in alignment with the project based accounting system for the company.  Other early issues were the management of work orders on the production floor by work centers.  Shortly after implementation it was discovered that more than one operator could not be logged into the same work center at the same time with different jobs.  This lead to an explosion in the number of work centers, in excess of 1000, assigned to people instead of "Where" the work would be manufactured which was counterproductive to the design of the system.  This rendered the Dispatch List or the daily production schedule inaccurate and not useful.  CTG has operated without a Master Production Schedule effectively since "Go-Live".

In early 2015 a comprehensive security audit was completed and roles and security permissions were tightened in the system eliminating the creation or movement of inventory by non-authorized employees.  This was in response to the inventory management issues and write-offs completed in subsequent years.  There had always been an unresolved issues of actual labor costs not adding correctly to each job and to project margins upon shipment.  It was during this time that a significant bug was identified in the PLEX system impacting accounting.  The hours that the operators were logging into the system where not being charged to WIP but were going into Stranded Costs and not reconciled into the General Ledger.  PLEX had to write new code to

correct this error and it was deployed in November of 2015.  All of the manufacturing leads were retrained on how to use the Control Panel, Suspect and manage scrap by the end of the year.

After the new code was deployed, all of the manufacturing operators were retrained in February 2016 on how to properly process jobs and manage suspect material in the control panel as part of the sustaining strategy.  In addition, Finite Scheduling was blueprinted and implemented in May of 2016 to create a Master Schedule for production.  There is still a significant amount of clean-up work in the system around job management and process routers that still needs to be completed before the Finite Scheduling will be fully beneficial but the platform is deployed.  Only the starter functions of PLEX continue to be utilized and no additional modules are planned for release without blueprinting the business processes and documenting the data requirements.  However, CTG continues to pay monthly for the full PLEX suite.  In addition, CTG no longer has a fully dedicated PLEX implementation team.

There are several core modules that have not been fully implemented but are needed to drive a sustainable manufacturing environment:

- **Product Data Management** module:  Key components of this module include the "Engineering Change Request" to manage all configuration changes on parts through production and material purchases. "Multi-out production" is needed to manage the depletion of inventory on an older part configuration and change over to the new engineering configuration. The "Manufacturing Masters" component to link multiple parts to MIL SPEC standards.

- **Quality Management** module: Only the "Rejection Tracking" and the "Supplier Return" components have been fully deployed in the Quality Module.  Other critical components that have not been deployed include "Statistical Process Control", "Document Control Systems", "Specification Management Control", "Cost Recovery", "Process Flow Charts", and "Supplier Scorecard" to manage material SCARS.  "Internal and Supplier Auditing" and many other components that would need to be blueprinted and evaluated for the best use at CTG.  This is one of the most complexed modules and critical to the growth of CTG.

- **Tool Tracking and Maintenance** Module: There is currently no systematic way to manage tools and dies purchased or built in house for manufacturing. It is done manually in Excel.  This module maintains a "Master Tool List" tied to bills of material and process routers.  It provides for "Tool Requirements Planning" and the management of calibration for all tools on a timely basis or the lock out of tools past calibration.  The maintenance module inventories all critical equipment to design "Preventative Maintenance" schedules through "Work Requests" to maximize machine uptime.

- **Program Management** module: Parts of this module have been tested but the module was never fully deployed.  It is the module that manages the overall "Customer Programs" and "Project Accounting" to roll up aggregate project management costs.

- **Customer and Sales Management** module: Besides the CRM database functionality this module also manages "Customer Sales Forecasts", "Sales Price Management", "Revenue Reporting" and "Sales Quote Management.  It has always been pushed to the back of the priority list.

# Exhibit 10

**From:**          Chris Holmes
**Sent:**          Friday, June 03, 2016 5:58 PM
**To:**            Arsen Melconian; Art Krokus; Bill Cidzik; Brent Febo; Dave Oldham
**Subject:**       Go-Forward
**Attachments:**   CTG Mid-Year Strategic Review 06032016.docx

Guys,

By month end I want to be in a position to put a full blown presentation on our needs to enable the sales plan in front of us with all the appropriate back-up.

Please find attached a preliminary string of thoughts on how to proceed.

Probably towards the end of next week we will have a sit-down and break this down along lines of responsibility.

The timeframes are loose as is the lack of identified costs.

I want to have every nut, bolt and piece of wire thought of and costed as this will likely be a downward negotiation only.

C.

1. CTG Mid-Year Strategic Review
2. Base 2016 Plan
3. Performance to Date
4. Underlying Assumptions used during 2016 planning
   a. Limited number of problem programs
   b. Program management team was weak, but sufficient
   c. Program win rate was projected to be lower
   d. New programs awarded over a broad period of time
      i. Program proposals would include funds for capital investment
   e. Sufficient Technical and Operational Headcount
      i. Redundancies in some areas
   f. Sufficient Cash needs spread over a broader period
   g. Surges in volumes could be handled with overtime
5. Changes in underlying assumptions over first six months
   a. Growth in number of problem programs in addition to existing MK54 and TR-343 program issues
      i. AQS-20
      ii. Archerfish
      iii. OTAA technical issues
   b. New programs awarded simultaneously coupled with program re-starts
      i. MK54 – re-start
      ii. MK48
      iii. TR-343
      iv. OTAA follow-on
   c. Technical and Operational teams consumed by immediate problem programs
      i. Unable to begin pre-award planning
      ii. Unable to staff IRAD projects
   d. More sophisticated management team is uncovering significant risks to business operations
      i. Contract acceptance criteria
      ii. Program financial performance
      iii. Program planning and control
      iv. Operational discipline
         1. Delivery schedule
         2. Manpower allocation
      v. Insufficient processes, procedures and tooling
      vi. Customer mismanagement
6. New Projected Sales Plan
   a. Current potential sales over next five years
   b. Current gross margin over next five years
7. There is insufficient manpower, equipment or facility infra-structure to deliver against this increase in program mix and volume
8. Major Projects
   a. Convert current GFE storage area to MK48 Production area ( 9 months)

         i. Insufficient space available on campus
        ii. Move GFE to space previously occupied by EOI
      iii. Power/Shop air/HVAC already in place
      iv. Need production equipment and tooling
       v. Need to build rooms for secure equipment storage and testing

b. Install / Repair vertical lifts (4 months)
         i. New programs comprised of many heavy items
           1. TR-343 unit weighs
              a. Need to build XXX over program period
           2. MK48 Nose unit weighs
              a. Need to build YYY over program period
        ii. Need to be moved between first and second floors of two buildings

c. Re-Furbish Test Tank Area ( 12 months)
         i. Numerous EH&S concerns
        ii. No equipment to test MK48 and TR-343
      iii. No automation
      iv. No clear product flow through test area

d. New machine tools required for MK-48 ( 3 months )
         i. CNC-Lathe

9. Requirements to effectively execute projected sales plan
a. Estimated Manpower
         i. Salary
           1. Technical
           2. Operational
        ii. Hourly
           1. Touch-labor
           2. Quality Assurance

b. Capital Expense
         i. EH&S
        ii. Factory Equipment
      iii. Automation
      iv. Obsolesce
       v. Material Handling

10. Timeframe
a. Total effort projected to take 18 months
         i. Test tank effort alone could take up to 12 months

b. MK-54
         i. Program in-house
        ii. Maximum output at 28 units / month against 47 unit / month requirement

c. TR-343
         i. Full shipset due for delivery July 2017
           1. Assembly area ready
           2. Need personnel
           3. Need test tank capability

    d. OTAA
        i. Need personnel to address volume increase
    e. MK-48
        i. Full-up from scratch program
        ii. Need to design, build and qualify
        iii. Production deliveries begin 11/2017
        iv. Need program manager
        v. Need additional technical resources
        vi. Need factory ready
        vii. Need touch labor

# Exhibit 11

**Ewelina Johnson**

| | |
|---|---|
| **From:** | Chris Holmes |
| **Sent:** | Friday, June 24, 2016 11:21 AM |
| **To:** | Vic Caruso |
| **Subject:** | FW: EOI Sale |

Please review before I send to Adam and Charlie. Thanks

---

**From:** Bill Cidzik
**Sent:** Friday, June 24, 2016 8:28 AM
**To:** Chris Holmes <CHolmes@channeltech.com>
**Subject:** EOI Sale

As discussed earlier this week…

The sale of EOI to a foreign interest and the way it was handled has far reaching implications that may adversely impact CTG's business going forward.

First off, the Department of State is appalled that they were not notified, as required by law, 60-days in advance of the sale. Notifications were subsequently submitted however we don't yet know what, if any, fines, penalties, or criminal charges may be levied on CTG or its employees. There may also be ITC related escapes that occurred during the due diligence process with prospective buyers and the new owners which could compound the situation.

Defense Security Services (DSS) is also distraught that they were not notified of the pending sale and doesn't understand why the FSO was not consulted during the process. Although we are working collaboratively with DSS to clean up the mess and process the appropriate notifications and update the various government databases and systems, CTG's security accreditation is at risk. At a minimum, I don't expect CTG's annual audit by DSS to go as smoothly as they have in the past and the corrective actions could be onerous to our business.

And, EOI has a classified contract with NAWC that was awarded 4/18/2016. NAWC is extremely upset that they were not notified of 1) The pending sale before they entered into the contract and 2) Not notified until after the sale took place which may be a violation of the terms of the contract. As a result, NAWC is reviewing the situation with their legal department and will be terminating the contract. The type of termination (default or convenience) is unknown at this time. Termination for default has long term (7–years) ramifications that may adversely impact our ability to compete for new government contracts. It may also impact option year awards for IDIQ contracts that we have in-house.

Summary of Discoveries/Actions to Date follows:

- DSS was notified of sale EOI to HGH Infrared Systems, Inc. on Monday 6/13.

- It was determined that EOI had one active classified contract, this order was issued on 4/18/2016, no production work has been done.

- Cecily met with Steve Scopatz, Thierry Campos (HGH President) and Cliff Warren (HGH Consultant) to discuss the facility clearance and the company organizational structure.

- After reporting the organizational structure to DSS it was determined that the Facility Clearance could not be transferred without sponsorship from the Government Customer or a currently cleared defense contractor.

- All classified holdings were pulled from EOI and moved to CTG Security safe while awaiting direction from NAWC Customer.

- All cleared EOI employees were debriefed and removed from our PSM net in JPAS with the exception of Chris Holmes, Linda Akens and Cecily. Chris will be debrief upon his return to the office, Linda and Cecily are waiting for direction from DSS.

- Cecily notified Billie Tomlinson Security Specialist for NAWC of the sale on 6/17 as requested by DSS.

- On 6/22 NAWC decided to cancel the classified contract and will not be sponsoring EOI for a facility clearance at this time because of their foreign ownership.

  o We will be receiving a final dd-254 with disposition of the classified documents involved in the contract.

  o Faith Lagore, Contracting Officer with NAWC will be send a bilateral modification to cancel the contract.  Not sure who will need to sign the modification however, Brent Lindstrom is the POC on the contract.

- Cecily met with Steve and Brent today 6/22 to inform them of NAWC's decision.

  o Steve would like to know what happens with all the purchased parts for the order.

  o Brent will be contacting customer to follow up on decision.

- The 27751 Cage code will stay with BWPH Services LLC and will eventually expire in SAM.

- Linda Akens was called in to handle all Export/ITAR actions, a letter was written and signed by Chris. Maria should have sent it to the state department.

- Cecily left a voicemail for the DSS Rep today 6/22 to find out what our next step is to void the facility clearance and remove it from JPAS.

Let me know if you need anything else.


- Bill

# Exhibit 12

**Ewelina Johnson**

| | |
|---|---|
| **From:** | Chris Holmes |
| **Sent:** | Monday, June 20, 2016 5:30 PM |
| **To:** | Vic Caruso |
| **Cc:** | Dave Oldham |
| **Subject:** | EOI Sale |

As expected, the first major issue has emerged regarding the sale.

Within a contract that EOI has is a requirement that DSS be informed 60 days prior to any change in control. In our haste to get the deal done a proper review was not completed nor was the customer informed.

As such, both DSS and Navy legal have been engaged and we have quarantined the product, documentation, de-briefed personnel and removed their names from JPAS.

This will likely cause either an additional audit of CTG and will likely put our company clearance under review during the next audit. We received a commendable rating last time.

The inability of CTG to have a compliant security system will jeopardize existing work and the ability to quote/perform future work in our core array business.

I will have a complete report generated and ready for submittal to BW by week end.

I hope the deal was worth it.

# Exhibit 13

**Ewelina Johnson**

| | |
|---|---|
| **From:** | Lynn Chen |
| **Sent:** | Tuesday, January 26, 2016 5:20 PM |
| **To:** | Cheryl Hanna |
| **Cc:** | Art Ortega |
| **Subject:** | Re: BDO statement to Blue Wolf forwarded to you |

No, we need to pay and book it to BWP to consulting

>>> On 1/26/2016 at 3:11 PM, in message <56A78FF1.8D9F.00F8.0@channeltech.com>, Cheryl Hanna <Hanna@channeltech.com> wrote:

If it's for CTGAM,  I can book it to intercompany in CTG to CTGAM and we can pay it, or I can send the invoice to CTGAM to pay it themselves, or we can book pay it in CTG and book it in BWP.  Since I don't know what it is for, I don't know which is the correct option.  I'll get an invoice and then I'll let you decide once we see what we are getting billed for.

Cheryl

>>> Lynn Chen 1/26/2016 3:02 PM >>>
I dont know about it except that BDO was doing some work for Advanced Materials.  So, this would normally be charged to BWP and you definitely dont need to pay it this week.  Go ahead and ask for an invoice(s).  Do you know where they came from (who gave it to Lia)?

>>> On 1/26/2016 at 2:41 PM, in message <56A78B91.8D9F.00F8.0@channeltech.com>, Cheryl Hanna <Hanna@channeltech.com> wrote:
Hi Lynn

Lia put a statement from BDO on my chair because it was with the Holland and Knight invoices she was given.  Am I to pay this?  The statement was originally mailed to Blue Wolf so I am assuming they are telling us that we should pay it.   Is it okay for me to call BDO and ask for an invoice?  The statement doesn't tell me anything.  Also, it's for 69,752.14 invoice dated 12/09.  Am I to pay it this week?  Does it reduce the 300K AP Art said we should pay this week?  Damon's Critical list alone was 316K. Mine for CTG is 56K (once again ignoring the  16K customer reimbursements we owe from Aug.)   I'm about to look at EOI's aging now.

Thanks,
Cheryl

# Exhibit 14

**Ewelina Johnson**

**From:**       Lynn Chen
**Sent:**       Tuesday, January 05, 2016 8:39 PM
**To:**         Cheryl Hanna
**Cc:**         Art Ortega
**Subject:**    Re: Funds transfer to CTGAM

Ok

> On Jan 5, 2016, at 6:27 PM, Cheryl Hanna <Hanna@channeltech.com> wrote:
>
> I still need to send CTGAM 100K to cover their payroll, but do you want me to go ahead and send them 75K for AP?
They had originally asked for 150K, but since they got 74K in today, I'm guessing I can get away with just sending the
75K.  We do have confirmations for tomorrow from BAE 135K and Northrop 601K so we have the money.
>
> Thanks,
> Cheryl

# Exhibit 15

## Ewelina Johnson

| | |
|---|---|
| **From:** | Lynn Chen |
| **Sent:** | Wednesday, December 02, 2015 8:19 PM |
| **To:** | Cheryl Hanna |
| **Cc:** | Art Ortega |
| **Subject:** | Re: AP Selections  345,579.22 (includes the 56,991.00 for Nabertherm that was supposed to be 80k last week) |

Go ahead and borrow and pay all that you have this week.

Thanks

>>> On 12/2/2015 at 6:14 PM, in message <565F3729.8D9F.00F8.0@channeltech.com>, Cheryl Hanna wrote:

Is that 250K including the 56,991.00 for Nabertherm that was supposed to go out last week?  This week's selections were 288K so we are over 38k.  Do you want me to take off some of mine or Terry's to try to get to 250K?  We would still be short 60K unless anything more money comes in tomorrow that we didn't know about.  CTGAM has only had a deposit on Monday and I took 275K from that as John Hager said that's what he could give us.  He still has 63K available, but he probably is still doing payments this week.


Cheryl


>>> Lynn Chen 12/2/2015 6:07 PM >>>
Hi Cheryl,
Ok.  We were only going to pay out $250k or so per our cash flow.  I suppose all of this is critical? If so, go ahead and borrow what we need to pay these. Do you know if AM has extra cash?
Thanks, lynn

>>> On 12/2/2015 at 6:05 PM, in message <565F3439.8D9F.00F8.0@channeltech.com>, Cheryl Hanna <Hanna@channeltech.com> wrote:
Damon added another 66K for NRL to keep to Terry's original schedule that he had given them that I did not adhere to because that was not what was on the 11/17 file.  Damon also had to add 4,400.00 for Brylen because they won't bring back Hioki equipment (I think that's what Damon said) until we get caught up.  Terry didn't have that until next week.  Mine went up because the projections were not known by week and I have to use the current aging to see what really is due.    The one I just sent out had the most recent updated file by week.  Damon only gave me what had to be paid this week.  He didn't look any further for adjusting the future payments so I left Terry's schedule out there.  Does that answer your question?


Cheryl


>>> Lynn Chen 12/2/2015 5:40 PM >>>

Cheryl,

This went up by about $100k for Terry/Damons input for this week (from the schedule that you sent out to be updated to this one now).  Do you know why?  We still need a schedule that goes out by week, do you have that?

Thanks, lynn

>>> On 12/2/2015 at 5:29 PM, in message <565F9AF8.A8A : 170 : 37913>, Cheryl Hanna <> wrote:
I've attached the updated selections on the combined file and also the detail files from each company that I will use to select from Plex and so you can see the detail and the real days since the combined file has the days old from a 11/17 aging.  I did pick some old invoices that were not very much money on vendors I normally don't select.  They total around 10K so I can take them off if you want.  You can filter on the "x" on column "U" if you want to see what I'm talking about.  I already know of 96,620.00 that is supposed to be deposited in our account tomorrow from Alcon and Raytheon.  After that we will still be short about 100K to cover all of this.  We will need to borrow tomorrow morning before 9:00 to get the funds in our account tomorrow.  Damon's list is critical.  He only picked 4 suppliers, but I kept what Terry had for this week also.    I didn't include Sergio or Katherine on this until it's approved.


Cheryl

CTG257,627.44
EOI27,649.61
MSI3,311.17
288,588.22
56,991.00 ARSEN LAST WEEK'S 80k
345,579.22

# Exhibit 16

**Ewelina Johnson**

---

**From:**        Lynn Chen
**Sent:**        Thursday, January 21, 2016 6:58 PM
**To:**          Art Ortega; Cheryl Hanna
**Subject:**     Fwd: Re: Equ


Yes into our CTG account since I think we only have the Escrow account for BWP, right?
So CIT account# 1311010565, ABA 322270288 ?

>>> On 1/21/2016 at 4:56 PM, in message <56A10F4C.8D9F.00F8.0@channeltech.com>, Cheryl Hanna <Hanna@channeltech.com>
wrote:

So the money is going to come to our CTG bank account?  I know that info, just not any BWP bank accounts :)  The
bank name is now CIT Bank and not OWB


Cheryl


>>> Art Ortega 1/21/2016 4:53 PM >>>
Lynn
See red below.  Money for cure was sent to us and then we sent to bank.
Hope this helps.




Art Ortega
Controller
Office: (805) 690-5236
Cell   : (818) 274-8008
>>> Haran Narulla <haran@bluewolfcapital.com> 12/29/2014 10:17 AM >>>
Thanks, got it.



> On Dec 29, 2014, at 13:13, Cheryl Hanna <Hanna@channeltech.com> wrote:
>
> Attached should be sufficient information.
>
> Cheryl
>
>>>> Haran Narulla <haran@bluewolfcapital.com> 12/29/2014 9:29 AM >>>
> Can you get the full info for the account, including bank location details, etc.?  They sometimes ask that for wire
funding purposes.
>

1

> On Dec 29, 2014, at 11:17 AM, "Art Ortega" <AOrtega@channeltech.com <mailto:AOrtega@channeltech.com>>
wrote:
>
> Haran
> See account information in red below.  Also attached is banking info sheet referenced by Cheryl
> ao
>
>
>
>
> Art Ortega
> Controller
> Office: (805) 690-5236
> Cell   : (818) 274-8008
>>>> Cheryl Hanna 12/29/2014 8:05 AM >>>
> That is the correct account and ABA.  Attached is the banking info sheet we send our customers in case you ever
need it and I am not available.
>
> Cheryl
>
>>>> Art Ortega 12/29/2014 7:39 AM >>>
>
> Cheryl
> See Message from Haran below.
>
> Please confirm right away that this is where the money should be wired to and is there any other info needed - i
don't think so but confirm
> .
> OWB account# 1311010565, ABA 322270288.
>
> thanks
> ao
>
>
>
>
> Art Ortega
> Controller
> Office: (805) 690-5236
> Cell   : (818) 274-8008
>>>> Haran Narulla <haran@bluewolfcapital.com <mailto:haran@bluewolfcapital.com>> 12/29/2014 6:17 AM >>>
>
> Art,
> Can you send us the wire information for your main CTG operating account?  As you know, we need to wire some
funds to OneWest to cure the financial covenant default.  The game plan is for everyone to send wires to the CTG
account, and then for you and Chris to wire the funds to OneWest Bank.  Please send the wire information along

ASAP.
>
> Thanks,
>
>
> _____
> Haranjeet Narulla
> Blue Wolf Capital Partners
> One Liberty Plaza, 52nd Floor
> New York, NY  10006
> p:   212.488.1343
> f:   646.607.3889
> [haran@bluewolfcapital.com](mailto:haran@bluewolfcapital.com)<mailto:haran@bluewolfcapital.com>
>
> Please note that all Blue Wolf Capital email addresses have changed effective December 8, 2014.
>
> <CTG banking instructions_divisions_05-2014 OWB_1 from Cheryl.pdf>
>
> <OWB CONFIRMATION LETTER ACCT 565.pdf>

# Exhibit 17

| | |
|---|---|
| **From:** | Lynn Chen |
| **To:** | Cheryl Hanna |
| **Cc:** | Art Ortega |
| **Subject:** | Re: EH&S Liability Accrual |
| **Date:** | Friday, January 15, 2016 2:16:54 PM |

Whatever is easiest for you, changing it now or doing a JE to fix and change later.
Thanks, lynn

>>> On 1/15/2016 at 12:08 PM, in message <5698E48C.8D9F.00F8.0@channeltech.com>, Cheryl Hanna
<Hanna@channeltech.com> wrote:

Do you want me to override the expense account on the POs that have already been received this month?
The first Advanced Geoenvironmental invoice for 2,000.00 lead awareness training was coded to 6600-01-
4000 (Ceramics training and education manufacturing)  You want all of this to 9132-00-0000 Other expenses
(non-operating), right?  If this is all part of the 640K, I need to correct every invoice that has been received
to something different than the other expense account or do a journal entry to correct the account.  I need
to make all of the invoices received + the accrual equal 640K to 9132-00-0000

Cheryl

>>> Lynn Chen 1/15/2016 11:35 AM >>>
Hi Cheryl,
Why dont you move that back to CTG for now, and accrue in CTG.
Sorry for the confusion, thanks, lynn

>>> On 1/15/2016 at 11:22 AM, in message <5698DAE4.8D9F.00F8.0@channeltech.com>, Cheryl Hanna
<Hanna@channeltech.com> wrote:
I think Lia was told to put the legal as I/C and put that on BWP books.  We already accrued
43K in Dec. in BWP for EHS on a Holland & Knight bill.  Do you want me to move that back to
CTG or accrue the whole 161,000 legal fees portion of the 640K accrual into BWP (less the 43K
already accrued)?

Cheryl

>>> Lynn Chen 1/8/2016 3:23 PM >>>
Hi Cheryl,
As discussed yesterday, please accrue $640K (see attached pdf) to accrued liabilities at
12/31/15 for the EH&S clean up project (non-Capex), less any invoices already paid or accrued
related to this project (see detail list attached of POs for reference). Lets charge all EH&S
clean up (non-Capex) to CTG CO Other Non-Operating Expenses (if possible).
Let me know if you have any questions.
Thanks, lynn

# Exhibit 18

**Ewelina Johnson**

**From:** Sergio De Hoyos
**Sent:** Tuesday, February 09, 2016 12:34 PM
**To:** Lynn Chen
**Cc:** Art Ortega; Cheryl Hanna; David Oldham
**Subject:** Cash Flow Forecast, 2.8.16
**Attachments:** CTG Daily Cash Flow Forecast_02.08.16.xlsx

Lynn,

Attached is the latest cash flow forecast.  It does not look good.  I took out the $1.8m of 'existing AP' payments but we still go negative on 3/31 (plenty of liquidity through then) and remain so for most of April.

One reason for the dip versus the prior forecast is that we had ~$650k of collections this quarter for MK-54shipments that have been (and were then already) delayed.

I'll revise again after discussion.

Sergio

# Exhibit 19

| | |
|---|---|
| **From:** | Cheryl Hanna |
| **To:** | Art Ortega; Jane Alexander |
| **Subject:** | Re: Legal Confirmation Templates |
| **Date:** | Tuesday, March 08, 2016 5:49:09 PM |

All invoices get paid by CTG and I don't have BWP letterhead so I will just use the CTG template.

Thanks,
Cheryl

>>> "Alexander, Jane" <Jane.Alexander@us.gt.com> 3/8/2016 10:52 AM >>>
Hi Cheryl and Art,

Please see attached for legal confirmation templates. There are 3 law firms to confirm with:

1.    Under BWP - McDermott, Will, & Emery

2.    Under CTG - Holland & Knight and Tressler LLP

I wasn't sure if a separate letterhead/letter was needed for BWP, but I attached a BWP version just in case.

Thanks,

Jane Alexander | Audit - Senior Associate, CPA
Grant Thornton LLP
515 S. Flower Street, 7th Floor | Los Angeles, CA | 90071 | United States
T +1 213 596 6728
E jane.alexander@us.gt.com

www.grantthornton.com

_____

[GT Image]
<http://www.grantthornton.com/>Grant Thornton LLP is the U.S. member firm of Grant Thornton International Ltd.
<http://www.grantthornton.com/Legal> Grant Thornton International Ltd and its member firms are not a worldwide
partnership, as each member firm is a separate and distinct legal entity. In the U.S., visit Grant Thornton LLP at
www.GrantThornton.com<http://www.grantthornton.com/>.

Please consider the environment before printing this email.

Please understand that, unless expressly stated otherwise, any written advice given by Grant Thornton LLP that is
contained in, forwarded with, or attached to this e-mail is: (1) limited to the matters and potential tax consequences
specifically addressed herein, and; (2) not intended or written by Grant Thornton LLP as advice on the application
or potential application of any penalties that may be imposed under any federal, state, or foreign statute or regulation
in any manner.

This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or
privileged information. Any review, dissemination, copying, printing or other use of this e-mail by persons or
entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender
immediately and delete the material from any computer.

# Exhibit 20

**Ewelina Johnson**

| | |
|---|---|
| **From:** | Lynn Chen |
| **Sent:** | Tuesday, January 12, 2016 3:29 PM |
| **To:** | Cheryl Hanna |
| **Cc:** | Art Ortega; Sergio De Hoyos |
| **Subject:** | Fwd: FW: CTG rent deferral |
| **Attachments:** | Legal fees statement.pdf; Union Bank Escrow fee invoice.pdf |

Cheryl,

Could you please process this wire this week to Alta for $14,045 ($9,545 reimbursement of legal fees) and $4,500 (escrow bank fees), and charge both to BWP GL? Let me know once it is paid.

Thanks, lynn

>>> On 1/12/2016 at 1:10 PM, in message <382910a7aa52431b96886448872358d6@bw-prod-exch.blue-wolf.com>, Charlie Miller <charlie@bluewolfcapital.com> wrote:

Lynn:


See below from  Tom Harding on behalf of Alta properties.


As noted, these amounts must be paid within 10 days.


Please confirm that payment has been made.


Thanks,

Charlie


**From:** Tom Harding [mailto:THARDING@seedmackall.com]
**Sent:** Tuesday, January 12, 2016 4:07 PM
**To:** Charlie Miller <charlie@bluewolfcapital.com>
**Cc:** Apieh Claybrook <aclaybrook@altapropertiesinc.com>; Ralph Phillips <RPhillips@channeltech.com>; Lynn Chen <LChen@channeltech.com>
**Subject:** CTG rent deferral

Charlie

I hope your new year is off to a good start.

I am following up on Section 7 of the letter agreement dated December 9, 2015 executed by BW Piezo Holdings, Channel Technologies Group, and Alta Properties.  It provides that  BWP and CTG will reimburse Alta for legal fees incurred in connection with the negotiation and preparation of the letter agreement.  Attached is our firm's statement in the amount of $9,545.00. The letter agreement provides for payment within 10 days.

Separately, Union Bank (the escrow agent for the transaction) belated determined that it had not billed the annual escrow fee on the environmental escrow for the last three years.  Accordingly, it withheld $9,000 (three years at $3,000 per year) from the final disbursement paid to Alta.  Union Bank's invoice is attached. Section 7 of the Environmental Escrow Agreement provides that BWP and Alta are each responsible for 50% of all fees.  Accordingly, BWP should reimburse Alta for $4,500.00.

Please arrange for a wire transfer of both of these amounts to Alta using the following wire transfer instructions:

| | |
|---|---|
| Bank Name: | Wells Fargo Bank, N.A. |
| Address: | 1026 Anacapa St., Santa Barbara, CA 93101 |
| ABA No.: | 121000248 |
| Account No.: | 153-433-5441 |
| Account Name: | Alta Properties, Inc. (f/k/a Channel Technologies,  Inc.) |

Best regards.

Tom

Thomas N. Harding
Seed Mackall LLP

2

1332 Anacapa St., Suite 200
Santa Barbara, CA 93101
Phone: (805) 963-0669
Fax: (805) 435-1498
E-Mail:  tharding@seedmackall.com

*This e-mail message and any attachments are intended only for the use of the addressee(s) named above and may contain information that is confidential or subject to attorney-client privilege and/or the attorney work product privilege. If you are not an intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you received this e-mail message in error, please immediately notify the sender by replying to this message or by telephone and delete this e-mail message from your computer.*

# Exhibit 21

**Ewelina Johnson**

---

| | |
|---|---|
| **From:** | Lynn Chen |
| **Sent:** | Friday, February 05, 2016 9:58 AM |
| **To:** | Katherine Carrington |
| **Subject:** | Re: October Board Minutes |
| **Attachments:** | CTG Q3 2015 BoD minutes.pdf |

Here you go

>>> On 2/5/2016 at 6:31 AM, in message <882846ac0a144e1e901c7d14e21034a5@bw-prod-exch.blue-wolf.com>, Katherine Carrington <Katherine@bluewolfcapital.com> wrote:

Hi Lynn,

Do you mind sending me the October Board minutes?

Best,

Katherine

**Katherine Carrington**

**Blue Wolf Capital Partners**

One Liberty Plaza, 52nd Floor

New York, NY 10006

Phone: 212-488-3685

Fax: 917-677-8233

katherine@bluewolfcapital.com

**MINUTES OF THE REGULAR MEETING OF THE**
**BOARD OF MANAGERS OF**
**BW PIEZO HOLDINGS LLC**
October 29, 2015

**In Attendance:**

| | |
|---|---|
| Managers: | Adam Blumenthal, Jeremy Kogler, Pengdi Han, Pierre Chao, Ralph Phillips, Lynn Chen |
| Advisory Board: | Vice Admiral John (Jay) Donnelly, USN, Ret., Rear Admiral Nevin Carr, USN, Ret. |
| Observers: | Chris Curti, Andy Worth (Fidus), Jeri Harman (Avante), Brian (Fidus)*, Anthony (Fidus), Greg Bowie (Gladstone), Rick Winegar, Vic Caruso, Stephen Dynan*, Arsen Melconian, Katherine Covington |

*= via teleconference

A regular meeting of the Board of Directors (the "*Board*") of **BW PIEZO HOLDINGS LLC** (the "*Company*") was convened at CTG in New York at approximately 9:00 a.m. (EST) on the date set forth above. Attendees were present in person and via teleconference call. The Company distributed materials for the meeting to the Board in advance of the meeting, and all members of the Board confirmed receipt.

A.    **Call to Order; Quorum; Secretary of the Meeting**

Mr. Ralph Phillips called the meeting to order and noted that all directors were present and that a quorum existed. He then went through the agenda for the meeting and made introductions. Ms. Chen acted as secretary of the meeting and recorded the minutes.

Mr. Phillips greeted the group and turned the floor over to Mr. Blumenthal to make some opening comments.

B.    **BW Opening comments**

Mr. Blumenthal opened and noted the amount of work, sacrifice and effort managing the business and cash flow during the recent months, and thanked the team for meeting the financial covenant for Q3.  However, as it is still the case for Q4, we need to be in a better position.  The decision to start the process of the sale of AM, with Raymond James taking the lead as the Investment Banker was confirmed. We will need to spend time on tactical, financial and strategic issues in the context of the sale of AM.  We will need to focus on SB and how to improve cash flow to either direct capital to AM or to SB to improve the value before exit. We need to get people out of sacrificing and into growth.

Q2 and Q3 was a tightrope, and the team made a lot of sacrifices to make the covenants. There is a lot happening but the time for certain decisions and business won 2 years ago is starting to pay off.

C.    **Approval of Prior Meeting Minutes**

The meeting minutes from August 12, 2015 were approved as written without discussion.

D.    **CEO Update**

Mr. Phillips then provided an update to the Board on the Company's Q3 2015 results, beginning with Safety. We have kept a close eye on safety but are still worse than best practices. We have made some changes in headcount to take safety to the next level and be more proactive, which will require some investment, mostly in management. Based on our internal audit of safety, we have some corrective actions to take, which will be driven by the new quality headcount and reorganization or the Ceramics team.

Mr. Blumenthal noted that at another portfolio company, there was a fatality, despite having strong safety policies & procedures on paper, and appropriate training. Need to ensure that the Culture is there, in addition to the People and Policies & Procedures.  For next Board meeting, CTG should prepare a presentation on Safety.

September was better than the rest of Q3, with shipments increasing.  CTGAM yields also improving in Q3. We are having some challenges on the MK-54, which is being addressed, and will slow us down.  Bookings slowed in Q3, with some that were delayed to Q4, but October and November should be good.

R&D efforts have slowed due to clamp down on spend due to cashflow challenges, but will increase spend in 2016. Operations improving and Ceramics delivery improving in OTD and yields. TR-343 on track, but watching daily, as testing is in very early stages.

E.    **Financial Summary**

Ms. Chen provided an update on the Company's Q3 2015 financial performance. Revenues were in line with the last forecast, and lower that the Budget for the quarter. Q3 Gross Margin was unfavorable to both the last forecast and the Budget for the quarter.  Q3 SG&A was favorable to the last forecast and to Budget. Q3 Management EBITDA and Bank Adjusted EBITDA were in line with the last forecast at $2.4M and $7.8M, respectively, but below Budget of $3.3M and $8.1M, respectively.

F.    **Q4 Forecast – October**

Ms. Chen provided the Q4 forecast.  Q4 revenues consistent with the last Board forecast at $14.4M, with a Management EBTIDA of $3M. In our base case, we are in compliance with the leverage ratio covenant, however, with minimal cushion.

Discussion around Q4 covenants and communication and ask with Lender Group.

G.    **AOP Key Assumptions**

Mr. Phillips and Ms. Chen provided the Board with a preview of the Revenue assumptions and current status of the 2016 AOP Budget preparation. The first pass of Revenues shows a strong Q4, need to level load throughout the year if possible.

H.     <u>Ceramics Action Plan Status</u>

Mr. Melconian provided the Board with an update on the Ceramics Division and the current status on action plans. Yields have improved overall with big progress in TR-343 program, with all trends favorable. Organization fully staffed now.  Schedule working well, still some issues with powder manufacturing and deliveries, would like to have more inventory on hand.  Having some setbacks on preventative maintenance, due to spending and headcount constraints.

Working closely on EHS activities, assessing lead compliance (monitoring and maximum exposure test), need to spend some money to put in some engineering controls, walls and air flow management to control lead contaminants to other work areas, other buildings or home. Working with consultant and hired EHS full time person to prepare a plan. Need to improve EHS to ensure risk of lead contamination is minimized.  CTG should not compromise on safety of people. If we stay in this business, need to be best in class, or don't stay in this business.

Two main actions to take:
1. find Environmental Counsel to ensure liability risk understood and managed. Follow up meeting to be set up with Adam, Charlie, Rick, Ralph and Arsen (and possibly David Critchfield – BW Environmental Consultant) to assess Legal and Environmental risk assessment in California, and do 3rd party review. To do immediately.
2. Need to make strategic decision on Ceramics Strategy. Discussed how much is under long-term supply agreements with external Ceramics customers, which are with Alcon, Syquest (repairs) and Ultra (shown on slide 39). Any make or buy decision needs to consider internal customer demand and impact on Sensors.

I.     <u>Ceramics Strategic Actions</u>

Mr. Melconian's update on the Ceramics Strategic Action is postponed until later.

J.     <u>Advanced Materials Capital Plan Status</u>

Mr. Dynan discussed the addition of the new BD person for AM, and provided the Board an overview of the Advanced Materials proposed expansion plan.   Some delay in the investment due to cash constraints during Q3 and A4.  Schedule updated based on this, which will begin to generate revenues in early Q3 16.  Advanced Technology roadmap includes larger diameter boules (+78% increase in material) and longer boule length (+50% increase in material) during 2016-2018. These advancements will help mitigate the price challenge from customers and maintain margins by reducing costs.

K.     <u>R&D Projects (Preliminary 2016)</u>

Mr. Phillips provided the Board with an overview of R&D activities, which builds on what was started in 2015.

L.     <u>New Business Growth Status</u>

Mr. Phillips provided the Board with an overview of Business Development activities.

Ceramics is still focused on operations and supporting internal demands vs new opportunities. Transducers new business focused on Northrop and Lockeed proposal for MK-48. TR-343 is still significant for the next few years. Pierre to help get information to CTG on the LDUUV opportunity. Systems business has done really well, exceeding expectations. This will continue into next year. MSI has big potential win on MK-54 Mod 1 with Progeny, MLTA still in place, just delayed and smaller.

M.    **Optics**

Mr. Phillips presented an overview of the Optics business, and will have a strategic discussion on this business later this year. Will end up close to Budget for 2015, with 2016 actions to improve bottom line.

N.    **Adjournment**

There being no further business to come before the Board, last comments were made from the participants. Mr. Chao noted that there should be some unlocking of the US Government Budget and potential additional business in Q4 and beyond. Mr. Blumenthal gave a status on the sale of Advanced Materials. Will discuss strategic options tomorrow together with BW and come back with the Board in January with results from that discussion.

Respectfully submitted,

Lynn Chen,
Secretary (acting)

# Exhibit 22

**Ewelina Johnson**

| | |
|---|---|
| **From:** | Lynn Chen |
| **Sent:** | Saturday, December 26, 2015 8:53 AM |
| **To:** | David Ligon; Ryan Lassen |
| **Cc:** | Ralph Phillips; Jeremy Kogler |
| **Subject:** | CTG November MD&A |
| **Attachments:** | CTG November 2015 MD&A - Lender Group.pdf; November 2015 CTG Financials - Lender Group.xlsx |

Hi all,

November results attached.  Let me know if you have any questions or would like to set up a call.

Thanks, and very happy holidays!

lynn

**December 21, 2015**



**Channel Technologies Group**

**November 2015 Monthly Operating Report**

**Management Discussion & Analysis (MD&A) — Lender Group**

# November 2015 Summary

 Channel Technologies Group

# November Results - Summary

- No reportable Safety incidents in November
- Sales for the month of $3,696K, unfavorable to Plan by $1,095K and unfavorable to last Board Forecast by $183K
- Bookings for the month of $3,899K, unfavorable to Plan by 1,662K
- Backlog at the end of November of $31.5M, down $0.9M from October and below Plan of $36.5M
- Gross Margin for the month at 23% vs. 49% Plan (variance -$1,501K) and 36% Forecast (variance -$856K), primarily driven by mix of low margin sales for all divisions, inventory adjustments in Santa Barbara (scrap, cycle retires), and under absorption of overhead
- SG&A for the month favorable to Plan by $500K and favorable to Forecast by $148K, due primarily to positive headcount trends, cost containment & reduction actions, as well as savings from MSI integration
- Management EBITDA for the month of $248K vs. $1,300K Plan and $1,005K Forecast negatively driven by volume, gross margin, with some offset by favorable SG&A
- $1,288K Bank EBITDA vs. $1,684K Plan
- $2.1M Liquidity;   $7.9M Revolver o/s vs. $2.9M plan
- Net Working Capital at $10.7M (slightly down by $0.2M from the end of October) vs Budget of $7.6M – driven by increase in an current liabilities ($0.8M), partially offset by an increase in AR/Unbilled ($0.3M) and increase in Inventory ($0.3M) during the month
- YTD Capital Expenditures of $2.3M, below Plan of $2.6 YTD, with full year expected to be below Plan of $2.8M
- MSI Integration on-track;  Project-to-date costs of $930K vs. original plan of $1.7M;  Annualized Hard Cost Savings of $1.0M, favorable to budget of $0.4M


Channel Technologies Group

# Safety



|               | Dec-14 | Jan-15 | Feb-15 | Mar-15 | Apr-15 | May-15 | Jun-15 | Jul-15 | Aug-15 | Sep-15 | Oct-15 | Nov-15 |
|---------------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|
| # Recordables | -      | 1      | -      | 2      | 1      | -      | -      | 1      | 1      | -      | -      | -      |
| Headcount     | 305    | 305    | 310    | 309    | 301    | 304    | 288    | 286    | 273    | 274    | 267    | 262    |
| RIR           | 1.5    | 1.9    | 1.9    | 2.5    | 2.9    | 2.5    | 2.0    | 2.4    | 2.8    | 2.8    | 2.5    | 2.1    |

- No reportable incidents in November
- Company reinforcing training to reduce RIR, avoidable accidents



Confidential   3

# Combined Company Results — P&L

| COMBINED COMPANY (CTG SBA, AM, MSI) | Nov 15 Month Actual | Nov 15 Month Plan | Variance | Var% | Nov 15 YTD Actual | Nov 15 YTD Plan | Variance | Var% |
|---|---|---|---|---|---|---|---|---|
| Revenue | 3,696 | 4,791 | (1,095) | -23% | 46,329 | 52,911 | (6,582) | -12% |
| Cost of Sales | 2,859 | 2,453 | (406) | -17% | 29,735 | 30,488 | 752 | 2% |
| Gross Margin | 837 | 2,338 | (1,501) | -64% | 16,594 | 22,423 | (5,829) | -26% |
| | 23% | 49% | -26% | | 36% | 42% | -7% | |
| SG&A | 1,012 | 1,511 | 499 | 33% | 14,029 | 17,352 | 3,322 | 19% |
| (Inc. R&D, B&P) | | | | | | | | |
| Operating Income | (175) | 826 | (1,001) | -121% | 2,564 | 5,071 | (2,507) | -49% |
| Management EBITDA | 248 | 1,300 | (1,052) | -81% | 7,461 | 10,074 | (2,613) | -26% |
| % of Sales | 6.7% | 27.1% | | | 16.1% | 19.0% | | |
| Bank EBITDA | 1,288 | 1,684 | (397) | -24% | 8,500 | 10,458 | (1,958) | -19% |

- Revenues for November below October Board Forecast at Ceramics (-$35K), Systems (-$146K), and Optics (-$131K), and favorable to Forecast at AM (+$54K), Transducers (+$35K) and MSI (+$30K)

- GM% behind plan and behind forecast for the month primarily due to under absorption of overhead costs in Santa Barbara, mix of lower margin sales, plus higher inventory adjustments (scrap and cycle retires) during the month than planned

- SG&A favorable to plan and to forecast, including R&D, B&P Expenses, primarily due to headcount and cost containment actions in place, and lower MSI integration costs.


Channel Technologies Group

Confidential

4

# Combined Company Results – Balance Sheet

| BALANCE SHEET | 30-Nov Month Actual | 30-Nov Month Plan | Var ($) | Var% |
|---|---|---|---|---|
| *Summary* | | | | |
| Cash | 225 | 249 | (24) | -10% |
| Accounts Receivable | 7,405 | 8,816 | (1,411) | -16% |
| Unbilled A.R. | 3,734 | 1,291 | 2,442 | 189% |
| Inventory | 9,360 | 6,453 | 2,907 | 45% |
| Other Current Assets | 870 | 857 | 13 | 2% |
| **Total Current Assets** | **21,594** | **17,667** | **3,927** | **22%** |
| Fixed Assets | 12,662 | 12,402 | 260 | 2% |
| Other Non-Current Assets | 56,320 | 63,230 | (6,910) | -11% |
| **Total Assets** | **90,576** | **93,299** | **(2,723)** | **-3%** |
| | | | | |
| Accounts Payable | 3,242 | 1,602 | 1,640 | 102% |
| Deferred Revenue | 1,620 | 1,715 | (95) | -6% |
| Other Current Liabilities | 5,789 | 6,528 | (739) | -11% |
| **Total Current Liabilities** | **10,651** | **9,845** | **805** | **8%** |
| | | | | |
| Revolver | 7,950 | 2,931 | 5,019 | 171% |
| Long-Term Debt | 43,015 | 41,208 | 1,807 | 4% |
| *Less Current Portion* | (3,003) | (2,519) | (484) | 19% |
| Other Liabilities | 1,164 | 6,603 | (5,440) | -82% |
| **Total Long-Term Liabilities** | **49,126** | **48,224** | **902** | **2%** |
| Equity | 30,800 | 35,230 | (4,430) | -13% |
| **Total Liabilities & Equity** | **90,576** | **93,299** | **(2,723)** | **-3%** |

- **AR (incl. Unbilled) -** $1M higher than Plan and increase of $0.3M from October.  DSO decreased from 43 to 52 during November due to TR-343 milestone billing of $1.1M not in revenue (POC revenue recognition), collected in December.

- **Inventory** - $2.9M higher than Plan and slight increase of $0.3M from October. Inventory turns decreased slightly from 3.8 to 3.7 during November, consistent with to buildup from MK-54, TR-343 and BAE programs.

- **Revolver -** $5.0M unfavorable to Plan, due to delays in shipments of some major programs and cash outlay to build inventory and investments at AM and Ceramics.

- **Long-Term Debt -**  $1.3M unfavorable to plan, due to borrowing against Capex Term Loan.

 Channel Technologies Group

# Performance Summary – Key Metrics











Budget    Actual    Prior Year

**Channel Technologies Group**

Confidential    6

# Bank Covenant Compliance - November

| | Actual Jan-15 | Actual Feb-15 | Actual Mar-15 | Actual Apr-15 | Actual May-15 | Actual Jun-15 | Actual Jul-15 | Actual Aug-15 | Actual Sep-15 | Actual Oct-15 | Actual Nov-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Management EBITDA | $536,100 | $984,936 | $1,304,615 | $533,495 | $457,671 | $461,596 | $583,602 | $432,610 | $1,401,102 | $516,490 | $248,373 |
| HC Integration Costs Add-Back | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Equity Cure | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **EBITDA incl HC Integ. And Cure** | **$536,100** | **$984,936** | **$1,304,615** | **$533,495** | **$457,671** | **$461,596** | **$583,602** | **$432,610** | **$1,401,102** | **$516,490** | **$248,373** |
| LTM EBITDA | $9,802,131 | $10,173,280 | $10,397,986 | $10,550,690 | $9,878,574 | $9,024,151 | $9,298,454 | $9,080,090 | $8,988,591 | $8,434,597 | $7,669,737 |
| Annualized Cost Savings | 611,106 | 877,262 | 852,738 | 942,270 | 827,329 | 1,018,916 | 873,366 | 727,053 | 1,049,088 | 878,803 | 1,039,257 |
| **LTM Adjusted EBITDA** | **$10,413,237** | **$11,050,542** | **$11,250,725** | **$11,492,960** | **$10,705,903** | **$10,043,067** | **$10,171,820** | **$9,807,143** | **$10,037,679** | **$9,313,400** | **$8,708,994** |
| **Net Funded Debt** | **$48,451,750** | **$48,601,750** | **$48,606,077** | **$49,606,077** | **$48,956,077** | **$48,410,404** | **$49,110,404** | **$49,560,404** | **$48,364,732** | **$51,864,732** | **$50,964,732** |
| **Leverage ratio** | **4.65x** | **4.40x** | **4.32x** | **4.32x** | **4.57x** | **4.82x** | **4.83x** | **5.05x** | **4.82x** | **5.57x** | **5.85x** |
| Senior Covenant | -- | -- | 5.10x | – | – | 5.00x | – | – | 4.85x | – | – |
| Junior Covenant | -- | -- | 5.35x | – | – | 5.25x | – | – | 5.10x | – | – |
| Monthly interest expense | 284,402 | $272,312 | $301,213 | $290,852 | $278,580 | $298,140 | $291,836 | $285,356 | $308,064 | $299,489 | $298,174 |
| Quarterly Term Loan Reduction | -- | -- | 545,673 | – | – | 545,673 | – | – | 545,673 | – | – |
| TTM Principal Payments | $1,743,750 | $1,743,750 | $1,901,923 | $1,901,923 | $1,901,923 | $2,060,096 | $2,060,096 | $2,060,096 | $2,218,268 | $2,218,268 | $2,218,268 |
| TTM Interest Payments | 3,597,825 | 3,581,751 | 3,591,621 | 3,574,123 | 3,539,212 | 3,538,156 | 3,539,201 | 3,534,337 | 3,530,334 | 3,531,397 | 3,549,541 |
| **TTM Fixed Charges** | **$5,341,575** | **$5,325,501** | **$5,493,543** | **$5,476,046** | **$5,441,135** | **$5,598,252** | **$5,599,296** | **$5,594,433** | **$5,748,603** | **$5,749,666** | **$5,767,810** |
| LTM Adjusted EBITDA | $10,413,237 | $11,050,542 | $11,250,725 | $11,492,960 | $10,705,903 | $10,043,067 | $10,171,820 | $9,807,143 | $10,037,679 | $9,313,400 | $8,708,994 |
| Less: Capital Expenditures | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) |
| **LTM Adjusted EBITDA less CapE** | **$9,913,237** | **$10,550,542** | **$10,750,725** | **$10,992,960** | **$10,205,903** | **$9,543,067** | **$9,671,820** | **$9,307,143** | **$9,537,679** | **$8,813,400** | **$8,208,994** |
| **Fixed Charge Coverage ratio** | **1.86x** | **1.98x** | **1.96x** | **2.01x** | **1.88x** | **1.70x** | **1.73x** | **1.66x** | **1.66x** | **1.53x** | **1.42x** |
| Senior Covenant | -- | -- | 1.25x | – | – | 1.25x | – | – | 1.25x | – | – |
| Junior Covenant | -- | -- | 1.08x | – | – | 1.08x | – | – | 1.08x | – | – |
| **Net Funded Debt** | | | | | | | | | | | |
| Revolver | 5,500,000 | $5,650,000 | $6,200,000 | $7,200,000 | $6,550,000 | $6,550,000 | $6,850,000 | $7,300,000 | $6,650,000 | $8,850,000 | $7,950,000 |
| Term Loan | 27,101,750 | 27,101,750 | 26,556,077 | 26,556,077 | 26,556,077 | 26,010,404 | 26,010,404 | 26,010,404 | 25,464,732 | 25,464,732 | 25,464,732 |
| Mezz Loans | 14,000,000 | 14,000,000 | 14,000,000 | 14,000,000 | 14,000,000 | 14,000,000 | 14,000,000 | 14,000,000 | 14,000,000 | 14,000,000 | 14,000,000 |
| Capex Line | 1,850,000 | 1,850,000 | 1,850,000 | 1,850,000 | 1,850,000 | 1,850,000 | 2,250,000 | 2,250,000 | 2,250,000 | 3,550,000 | 3,550,000 |
| **Total Debt** | **$48,451,750** | **$48,601,750** | **$48,606,077** | **$49,606,077** | **$48,956,077** | **$48,410,404** | **$49,110,404** | **$49,560,404** | **$48,364,732** | **$51,864,732** | **$50,964,732** |

- MSI Annualized Hard Cost Savings are ahead of Plan at the end of November ($1,039K vs $384K Plan) and will stay ahead of Plan ($300K Plan) at the end of Q4 due to additional unplanned departures

- Leverage ratio at the end of Q4 2015 will be very tight against covenant of 4.75x due to higher debt balances and lower EBITDA than Plan.

- Fixed Charge ratio should continue to be ahead of Q4 2015 covenant of 1.15x

**CTG** Channel Technologies Group

Confidential

# Sales, Bookings, Backlog



# Sales vs. Forecast*

| | MONTH (NOV) ACTUAL | MONTH (NOV) FORECAST | VARIANCE | VARIANCE RATIONALE |
|---|---|---|---|---|
| **REVENUE:** | | | | |
| **CERAMICS** | $ 288,945 | $ 330,324 | $ (41,379) | Syqwest $49K unfav to forecast (due to credit issued) |
| **TRANSDUCERS** | $ 1,092,275 | $ 1,594,420 | $ (502,145) | POC revenue ($324K) unfav to fcst BAE ($162K) unfav to fcst (delay) NUWC ($201K) unfav to fcst |
| **SYSTEMS** | $ 668,702 | $ 815,000 | $ (146,298) | AAS ($136K) unfav to fcst |
| **OPTICS** | $ 221,020 | $ 478,963 | $ (257,943) | Nightline ($180K) unfav to fcst New Business ($58K) unfav to fcst |
| **ADV MAT** | $ 1,054,796 | $ 1,094,951 | $ (40,155) | InfraredX ($63K) unfav to fcst |
| **MSI** | $ 446,769 | $ 395,072 | $ 51,697 | MK-54/Progeny $194K fav to fcst; AQS-20 ($127K) unfav to fcst |
| **INTERCOMPANY** | $ (76,646) | $ - | $ (76,646) | |
| **TOTAL CTG REVENUE** | **$ 3,695,859** | **$ 4,708,729** | **$ (1,012,870)** | |

\* Forecast presented at Q3 Board Meeting in October


**Channel Technologies Group**

# Sales vs. Budget (Plan)

| | MONTH (NOV) ACTUAL | MONTH (NOV) BUDGET | VARIANCE | VARIANCE RATIONALE |
|---|---|---|---|---|
| **REVENUE:** | | | | |
| **CERAMICS** | $ 288,945 | $ 623,380 | $ (334,435) | Syqwest ($39K) unfav to plan (credit issued); Ultra Electronic ($30K) unfav to plan Ultra-USSI ($35K) unfav to plan; ENL, Kodak, Tenex ($25K) ea. unfav to plan |
| **TRANSDUCERS** | $ 1,092,275 | $ 1,157,815 | $ (65,541) | POC Revenue $464K fav to plan; OTAA ($250K) unfav to plan; DT-511/574 ($70K) unfav to plan; Colleague Medical ($100K unfav to plan) |
| **SYSTEMS** | $ 668,702 | $ 799,142 | $ (130,440) | Navy ($42K) unfav to plan |
| **OPTICS** | $ 221,020 | $ 497,137 | $ (276,117) | Nightline/NV Goggles ($78K) unfav to plan Catalog / Repairs & Cal under plan |
| **ADV MAT** | $ 1,054,796 | $ 1,084,098 | $ (29,302) | Philips ($183K) unfav to plan; Samsung $135K fav to plan |
| **MSI** | $ 446,769 | $ 629,549 | $ (182,780) | MLTA program delay to FY16 |
| **INTERCOMPANY** | $ (76,646) | $ - | $ (76,646) | |
| **TOTAL CTG REVENUE** | $ 3,695,859 | $ 4,791,121 | $ (1,095,262) | |



Channel Technologies Group

Confidential

10

# Bookings / Backlog vs Plan

| BOOKINGS | Nov 15 Month Actual | Nov 15 Month Plan | Variance | Var% | | Nov 15 YTD Actual | Nov 15 YTD Plan | Variance | Var% |
|---|---|---|---|---|---|---|---|---|---|
| TOTAL COMPANY | 3,899 | 5,562 | (1,662) | -30% | | 44,506 | 55,463 | (10,958) | -20% |
| Ceramics | 65 | 599 | (534) | -89% | | 1,790 | 5,529 | (3,740) | -68% |
| Transducers | (16) | 2,160 | (2,176) | -101% | | 14,462 | 16,410 | (1,948) | -12% |
| Systems | 1,569 | 411 | 1,158 | 282% | | 9,837 | 7,868 | 1,969 | 25% |
| Optics | 619 | 482 | 136 | 28% | | 4,381 | 5,810 | (1,429) | -25% |
| Advanced Materials | 1,663 | 1,788 | (125) | -7% | | 12,561 | 12,478 | 83 | 1% |
| MSI | - | 121 | (121) | -100% | | 1,473 | 7,367 | (5,894) | -80% |

**Bookings**:

- Ceramics behind Plan due to focus on improving operational issues during the year.  November Plan included $117K in Defense customers not booked, plus $120K Ultrasonic, and $180K Western Geco. YTD negative variance primarily due to Defense customers, largest being Ultra Electronics (-$1.2M).

- Transducers Plan in November included $1M for MK-48 (not yet booked), and actuals included a debooking for RA Industries of $668K.  YTD positive to Plan for BAE ($2.1M) and MK-54 ($7M), negative for TR-343 ($2.7M), MK-54 Mod 0 ($2.5M), Ion ($0.7M) and Baxter ($0.6M)

- Systems ahead YTD primarily due to Navy NT-120/121 $4.0M ($1.4M Plan)

- Optics behind primarily due to lower NV goggles bookings (YTD $0.4M Actuals vs $1.2M Plan YTD)

- AM unfavorable for the month due to Samsung ($-180K), partially offset by a positive variance for Humanscan (+$49K), partially offset by Philips.  YTD actuals include Samsung $2.5M ($2.2M Plan), Philips $5.0M ($5.1M Plan), GE $2.4M ($2.9M Plan)

- MSI YTD actuals include AQS-20 partial award of $.4M with additional $1.6M to book in December ($1.1M Plan), MLTA $0 ($2.0M Plan), Atlas delayed ($.8M Plan), Archerfish ($.6M Plan) and SAES $.1M ($.7M Plan) awarded late.

| BACKLOG | Nov 15 Month Actual | Nov 15 Month Plan | Variance | Var% |
|---|---|---|---|---|
| TOTAL COMPANY | 31,499 | 36,468 | (4,969) | -14% |
| Ceramics | 2,227 | 4,572 | (2,345) | -51% |
| Transducers | 15,522 | 15,850 | (328) | -2% |
| Systems | 4,403 | 3,201 | 1,201 | 38% |
| Optics | 1,975 | 3,070 | (1,094) | -36% |
| Advanced Materials | 6,368 | 6,139 | 229 | 4% |
| MSI | 1,004 | 3,636 | (2,632) | -72% |

**Backlog** – behind Plan due to lower bookings in November for all divisions, except Systems, due to timing vs Plan or weak order activity as noted in Bookings variance explanation

**Channel Technologies Group**

# Divisional Results



# Ceramics

| CERAMICS | Nov 15 Month Actual | Nov 15 Month Plan | Variance $ | Var% | Nov 15 YTD Actual | Nov 15 YTD Plan | Variance | Var% |
|---|---|---|---|---|---|---|---|---|
| Revenue | 289 | 623 | (334) | -54% | 3,925 | 5,319 | (1,394) | -26% |
| Cost of Sales | 752 | 457 | (295) | -65% | 5,546 | 5,162 | (384) | -7% |
| Gross Margin | (463) | 166 | (629) | -378% | (1,621) | 157 | (1,778) | -1133% |
| GM% | -160% | 27% | -187% | | -41% | 3% | -44% | |
| SG&A | 8 | 2 | (6) | -278% | 26 | 22 | (4) | -20% |
| (Inc. R&D, B&P) | | | | | | | | |
| Operating Income | (470) | 164 | (635) | -386% | (1,648) | 135 | (1,782) | -1321% |
| Management EBITDA | (419) | 228 | (647) | -283% | (1,079) | 732 | (1,811) | -247% |
| % of Sales | -145.0% | 36.6% | | | -27.5% | 13.8% | | |

- Sales for the month behind Plan but in line with last Forecast (excluding the Syqwest credits). Largest customers for the month included Alcon Surgical ($92K), Ultra Electronics ($57K), Kaiyo ($39K), and Syqwest ($38K shipped less credits of $47K)

- Operating Income and EBITDA below Plan, due to unfavorable inventory adjustments ($323K) from scrap and inventory clean up efforts, plus under absorption of OH ($138K).

- Ceramics KPIs show consistent performance in November as the recent months:

  - Consistent G/L scrap charges ~$45K vs $50K in October (over $100K per month during most of 1H)

  - Overtime % at 3.1%, slightly up from 1.7% in October (down from over 14.0% in Q1)

  - Low utilization for the month at 62% (over 80% since June)

  - Continued high yield for the month at 89% (89% in October and 62% target)

 **Channel Technologies Group**

# Transducers

| TRANSDUCERS | Nov 15 Month Actual | Nov 15 Month Plan | Variance | Var% | Nov 15 YTD Actual | Nov 15 YTD Plan | Variance | Var% |
|---|---|---|---|---|---|---|---|---|
| Revenue | 1,092 | 1,158 | (66) | -6% | 13,022 | 14,642 | (1,620) | -11% |
| Cost of Sales | 746 | 722 | (24) | -3% | 8,683 | 9,924 | 1,241 | 13% |
| Gross Margin | 346 | 435 | (90) | -21% | 4,339 | 4,718 | (379) | -8% |
| GM% | 32% | 38% | -6% | | 33% | 32% | 1% | |
| SG&A | 18 | 86 | 68 | 79% | 621 | 948 | 326 | 34% |
| (Inc. R&D, B&P) | | | | | | | | |
| Operating Income | 328 | 349 | (21) | -6% | 3,718 | 3,770 | (53) | -1% |
| Management EBITDA | 338 | 367 | (29) | -8% | 3,833 | 3,905 | (71) | -2% |
| % of Sales | 30.9% | 31.7% | | | 29.4% | 26.7% | | |

- Sales for the month behind Plan but in line with forecast. Largest shipments for the month included MK-54 OY1 ($449K), TR-343 ($139K), MK-54 ($72K), BAE ($110K) and NUWC ($65K). YTD variance primarily due to delays in MK-54 and TR-343 deliveries.

- Gross Margin for the month unfavorable to Plan due to higher mix of low margin programs (MK-54 at 15%, MK-54 OY1 at 14%, TR-343 at 0%), under absorption on OH ($83K), offset by positive inventory adjustments ($117KK). YTD GM in line with Plan.

- SG&A favorable to Plan by for the month and YTD due to lower direct R&D and B&P charged to Transducers ($72K for the month and $330K YTD)

- EBITDA in line with Plan for the month and YTD


**Channel Technologies Group**

# Systems

| SYSTEMS | Nov 15 Month Actual | Nov 15 Month Plan | Variance | Var% | Nov 15 YTD Actual | Nov 15 YTD Plan | Variance | Var% |
|---|---|---|---|---|---|---|---|---|
| Revenue | 669 | 799 | (130) | -16% | 8,922 | 8,154 | 768 | 9% |
| Cost of Sales | 466 | 508 | 42 | 8% | 5,545 | 5,846 | 301 | 5% |
| Gross Margin | 202 | 291 | (89) | -30% | 3,376 | 2,307 | 1,069 | 46% |
| GM% | 30% | 36% | -6% | | 38% | 28% | 10% | |
| SG&A | 25 | 39 | 13 | 35% | 597 | 427 | (170) | -40% |
| (Inc. R&D, B&P) | | | | | | | | |
| Operating Income | 177 | 252 | (75) | -30% | 2,779 | 1,880 | 899 | 48% |
| Management EBITDA | 190 | 267 | (77) | -29% | 2,925 | 2,036 | 889 | 44% |
| % of Sales | 28.4% | 33.4% | | | 32.8% | 25.0% | | |

- Sales for the month primarily to the Navy ($576K), unfavorable to Plan and Forecast due to NT-120.

- GM unfavorable to Plan for the month due to lower margin recorded for NT-120 sales (20%) and under absorption of OH ($26K).  YTD GM favorable to Plan due to mix of higher margin sales.

- SG&A favorable to Plan by for the month and YTD due to higher direct R&D and B&P charged to Systems ($14K for the month and $170K YTD)

- EBITDA unfavorable to Plan for the month due to unfavorable GM%, and favorable YTD due to mix of higher margin sales, partially offset by unfavorable SG&A

 Channel Technologies Group

# Optics

| OPTICS | Nov 15 Month Actual | Nov 15 Month Plan | Variance | Var% | Nov 15 YTD Actual | Nov 15 YTD Plan | Variance | Var% |
|---|---|---|---|---|---|---|---|---|
| Revenue | 221 | 497 | (276) | -56% | 3,966 | 4,300 | (335) | -8% |
| Cost of Sales | 186 | 279 | 92 | 33% | 3,239 | 2,875 | (364) | -13% |
| Gross Margin | 35 | 218 | (184) | -84% | 727 | 1,426 | (699) | -49% |
| GM% | 16% | 44% | -28% | | 18% | 33% | -15% | |
| SG&A | 98 | 121 | 24 | 20% | 1,297 | 1,265 | (32) | -2% |
| (Inc. R&D, B&P) Operating Income | (63) | 97 | (160) | -165% | (570) | 160 | (730) | -456% |
| Management EBITDA | (54) | 107 | (162) | -151% | (470) | 272 | (742) | -272% |
| % of Sales | -24.5% | 21.6% | | | -11.8% | 6.3% | | |

- Sales below Plan and Forecast for the month and year primarily due to Nightline shipment delays and lower catalog sales. Largest shipments for the month include Bost ($73K), Nightline ($72K) and L-3 ($63K).
- Negative GM due primarily to low sales volume and high mix of low margin sales (Nightline and L-3)
- SG&A in line with Plan for the month and YTD with higher R&D costs ($188K), offset by favorable commissions ($106K), reversal of bonus accrual ($28K) and other cost containment efforts and actions


**Channel Technologies Group**

Confidential    |    16

# Advanced Materials

| ADVANCED MATERIALS | Nov 15 Month Actual | Nov 15 Month Plan | Variance | Var% | Nov 15 YTD Actual | Nov 15 YTD Plan | Variance | Var% |
|---|---|---|---|---|---|---|---|---|
| Revenue | 1,055 | 1,084 | (29) | -3% | 12,196 | 12,342 | (146) | -1% |
| Cost of Sales | 346 | 305 | (41) | -13% | 3,966 | 3,494 | (472) | -14% |
| | - | - | | | - | - | | |
| Gross Margin | 709 | 779 | (70) | -9% | 8,230 | 8,848 | (618) | -7% |
| GM% | 67% | 72% | -5% | | 67% | 72% | | |
| SG&A | 393 | 401 | 8 | 2% | 4,001 | 4,419 | 419 | 9% |
| (Inc. R&D, B&P) | | | | | | | | |
| Operating Income | 316 | 378 | (62) | -16% | 4,229 | 4,428 | (199) | -4% |
| Management EBITDA | 514 | 593 | (79) | -13% | 6,331 | 6,770 | (440) | -6% |
| % of Sales | 48.7% | 54.7% | | | 51.9% | 54.9% | | |

- November sales in line with Plan with an unfavorable variance with Philips (-$183K) offset by a favorable variance with Samsung (+$135K). Sales ahead of Forecast due to positive variances at GE ($97K), and Samsung ($93K), and a negative variance at Infraredx ($63K). Largest shipments for the month include Philips ($191K), Samsung ($363K), GE ($312K), and Humanscan ($67K),

- GM unfavorable to Plan in the month due primarily to higher temp labor and overtime costs ($31K), and higher scrap than planned.

- SG&A in line with Budget for the month, with lower benefits and costs savings, partially offset by higher sales commissions and rent. Favorable to Plan YTD primarily due to positive adjustments on bonus accruals and other cost containment efforts (lower benefits, R&D, consulting, and recruiting), partially offset by a higher allocation from CTG, legal costs and rent

- EBITDA unfavorable to Plan due to unfavorable GM for the month and YTD, partially offset by savings in SG&A

**Channel Technologies Group**

# MSI

| MSI | Nov 15 Month Actual | Nov 15 Month Plan | *Variance* | *Var%* | Nov 15 YTD Actual | Nov 15 YTD Plan | *Variance* | *Var%* |
|---|---|---|---|---|---|---|---|---|
| **Revenue** | **447** | **630** | *(183)* | *-29%* | **4,892** | **8,155** | *(3,262)* | *-40%* |
| **Cost of Sales** | **428** | **176** | *(252)* | *-144%* | **3,076** | **3,195** | *119* | *4%* |
| **Gross Margin** | **19** | **454** | **(435)** | **-96%** | **1,817** | **4,960** | **(3,144)** | **-63%** |
| GM% | *4%* | *72%* | *-68%* | | *37%* | *61%* | | |
| **SG&A** | **131** | **364** | *233* | *64%* | **2,814** | **4,459** | *1,645* | *37%* |
| (Inc. R&D, B&P) | | | | | | | | |
| **Operating Income** | **(113)** | **90** | **(202)** | **-226%** | **(998)** | **501** | **(1,499)** | **-299%** |
| **Management EBITDA** | **(77)** | **101** | *(178)* | *-177%* | **(609)** | **624** | *(1,233)* | *-198%* |
| *% of Sales* | *-17.3%* | *16.0%* | | | *-12.4%* | *7.7%* | | |

- November sales lower than Plan due to delays in Alion MLTA program, but above Forecast due to a positive variance for Progeny (+$194K), partially offset by a negative variance for AQS-20 (-$127K). Largest shipments for the month include MK-54 (Progeny) ($214K), AQS-20 ($137K), and ARL-UT ($53K)
- GM unfavorable to Plan due to lower sales than Plan and high mix of low margin product
- SG&A ahead of plan due to lower integration costs and more headcount savings than planned


**Channel Technologies Group**

Confidential | 18

# CTG CO (SG&A)

| CTG CO | Nov 15 Month Actual | Nov 15 Month Plan | Variance | Var% | | Nov 15 YTD Actual | Nov 15 YTD Plan | Variance | Var% |
|---|---|---|---|---|---|---|---|---|---|
| Revenue | - | - | - | - | | - | - | - | - |
| Cost of Sales | 10 | 6 | (4) | -72% | | 274 | (7) | (281) | 3791% |
| Gross Margin | (10) | (6) | (4) | 72% | | (274) | 7 | (281) | -3791% |
| GM% | | | | | | | | | |
| SG&A | 310 | 469 | 159 | 34% | | 4,350 | 5,488 | 1,139 | 21% |
| (Inc. R&D, B&P) | | | | | | | | | |
| Operating Income | (320) | (475) | 155 | -33% | | (4,623) | (5,481) | 858 | -16% |
| Management EBITDA | (243) | (364) | 120 | -33% | | (3,471) | (4,266) | 795 | -19% |

| Cost Center | Actuals | Budget | | Variance, Actuals vs. Budget (U) |
|---|---|---|---|---|
| 0006 - General G&A | (6,165) | 15,793 | | 21,958 |
| 1000 - Office of the President | 43,371 | 119,500 | | 76,129 |
| 1200 - Business Development | 46,283 | 65,470 | | 19,187 |
| 1250 - Advanced Systems | 21,482 | 52,455 | | 30,973 |
| 1400 - Support services (Contracts, legal) | 26,794 | 36,538 | | 9,744 |
| 1401 - IT | 61,949 | 58,582 | | (3,366) |
| 1402 - HR | 25,452 | 22,776 | | (2,676) |
| 1600 - Accounting and Finance | 90,906 | 97,897 | | 6,991 |
| | 310,071 | 469,011 | | 158,940 |

- SG&A for the month favorable due to no bonus accrual booked ($73K), lower spend in Advanced Systems ($31K) and other cost containment actions in all departments

- YTD favorable due to reversal of bonuses accrued ($575K), lower spend in Advanced Systems ($238K), Finance ($148K) and BD ($68K), and cost containment efforts in all departments (less travel, lower discretionary spend, delay in hiring and increases, and PTO actions


**Channel Technologies Group**

**Overhead and SG&A**



# Total SG&A, including R&D and B&P

| SG&A | Nov 15 Month Actual | Nov 15 Month Plan | Variance | Var% | Nov 15 YTD Actual | Nov 15 YTD Plan | Variance | Var% |
|---|---|---|---|---|---|---|---|---|
| **TOTAL SANTA BARBARA** | 458 | 717 | 259 | 36% | 6,892 | 8,151 | 1,259 | 15% |
| General G&A | 72 | 167 | 94 | 57% | 1,832 | 1,832 | 0 | 0% |
| Office of the President | 60 | 146 | 85 | 58% | 742 | 1,386 | 644 | 46% |
| Business Development | 99 | 137 | 38 | 28% | 1,435 | 1,618 | 183 | 11% |
| Advanced Systems | 21 | 52 | 31 | 59% | 250 | 487 | 238 | 49% |
| Support services | 27 | 37 | 10 | 27% | 432 | 442 | 10 | 2% |
| IT | 62 | 59 | (3) | -6% | 641 | 657 | 16 | 3% |
| HR | 25 | 23 | (3) | -12% | 272 | 293 | 21 | 7% |
| Accounting and Finance | 91 | 98 | 7 | 7% | 1,288 | 1,436 | 148 | 10% |
| **CTG AM** | 393 | 401 | 8 | 2% | 4,001 | 4,419 | 419 | 9% |
| **MSI** | 131 | 364 | 233 | 64% | 2,814 | 4,459 | 1,645 | 37% |
| **BWP** | 29 | 29 | (0) | 0% | 323 | 323 | - | 0% |
| **TOTAL SG&A** | 1,012 | 1,511 | 499 | 33% | 14,029 | 17,352 | 3,322 | 19% |

- Total SG&A variance for the month of $259K is a result of $186K favorable for SG&A and $73K favorable for R&D and B&P*.  YTD variance of $1,259K is a result of $1,318K favorable for SG&A and $59K unfavorable for R&D and B&P.

- SG&A variance, excluding R&D and B&P, is primarily due to lower costs for CTG CO (see CTG CO SG&A slide), lower commissions ($106K) and bonus ($28K) at Optics, cost containment efforts at Advanced Materials, and MSI integration costs significantly below plan

- YTD R&D and B&P variance is primarily due to higher R&D costs (-$188K) at EOI than planned for new product development (primarily NV-2500), offset by a favorable B&P variance for Transducers/Systems

*R&D and B&P costs within SG&A departments (including those charged to product lines) are included in the figures above*


**Channel Technologies Group**

# Overhead Spending (Santa Barbara)

| OVERHEAD | Nov 15 Month Actual | Nov 15 Month Plan | Variance | Var% | Nov 15 YTD Actual | Nov 15 YTD Plan | Variance | Var% |
|---|---|---|---|---|---|---|---|---|
| TOTAL SANTA BARBARA | 1,088 | 1,154 | 67 | 6% | 12,217 | 12,778 | 561 | 4% |
| General Overhead | 131 | 157 | 25 | 16% | 1,326 | 1,649 | 323 | 20% |
| EHS/Facilities | 248 | 226 | (23) | -10% | 2,733 | 2,518 | (215) | -9% |
| Manufacturing | 349 | 320 | (30) | -9% | 3,696 | 3,427 | (268) | -8% |
| Mat & Prod Planning | 91 | 84 | (8) | -9% | 1,138 | 977 | (161) | -16% |
| Quality | 54 | 66 | 12 | 18% | 743 | 785 | 41 | 5% |
| IMS | 21 | 29 | 8 | 27% | 253 | 297 | 44 | 15% |
| Procurement | 30 | 31 | 0 | 1% | 351 | 371 | 20 | 5% |
| Engineering | 132 | 185 | 53 | 29% | 1,617 | 2,079 | 462 | 22% |
| Program Management | 29 | 58 | 29 | 49% | 360 | 675 | 315 | 47% |

- These costs represent the actual incurred overhead costs in Santa Barbara, including Optics, before absorption

- Overhead costs in line with Plan for November overall, favorable from SB ($76K) and unfavorable from EOI (-$9K)

- YTD favorable variance to Plan from SB ($663K) and unfavorable from EOI (-$102K) due to:

  - General Overhead due to lower Depreciation & Amortization ($137K), and Business Insurance ($19K)

  - EHS/Facilities due to higher costs for EH&S, including consulting fees ($82K), higher janitorial costs ($43K), security ($11K), licenses ($17K) and higher general repairs & maintenance and facilities costs offset in Manufacturing below ($99K), slightly offset by lower payroll costs ($37K)

  - Manufacturing supplies and uniforms ($86K), recruiting costs ($19K), consulting ($35K), payroll related costs ($472K), offset by lower maintenance and facilities costs (offset in EHS above) ($96K), travel ($25K), tooling & supplies ($122K)

  - Mat & Prod Planning due to higher payroll costs ($107K), recruiting costs ($12K) and higher freight costs ($59K)

  - Engineering due to lower payroll related costs ($237K), recruiting ($47K), consulting ($32K), supplies ($32K), and travel ($55K)

  - Program Management due to lower payroll related costs ($314K)

**Channel Technologies Group**

# Capital Expenditures



**Channel Technologies Group**

# Capital Expenditures

**CTG CAPITAL EXPENDITURES - NOVEMBER 2015**

| Number | | Description | 2015 Jan | 2015 Feb | 2015 Mar | 2015 Apr | 2015 May | 2015 Jun | 2015 Jul | 2015 Aug | 2015 Sep | 2015 Oct | 2015 Nov | 2015 TOTAL | Nov YTD Budget | Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *CTG Santa Barbara* | | | | | | | | | | | | | | | | |
| 2014-C006-01 | C | Tooling - Ceramics | 422 | 640 | - | - | - | - | - | - | - | - | - | 1,062 | | |
| 2015-C001-01 | C | Multifunction Reconfigurable I/O device | - | 7,568 | - | - | - | - | - | - | - | - | - | 7,568 | | |
| 2015-C002-01 | C | Tooling requirements for pressing equipment | - | 18,690 | - | 9,750 | 7,255 | (590) | - | 516 | 4,800 | 9,103 | 9,338 | 58,863 | | |
| 2014-C014-01 | C | Blanchard | - | 20,000 | - | - | - | - | - | - | - | - | - | 20,000 | | |
| 2014-C018-00 | C | Remodel mezzanine | 47,630 | 38,973 | 33,413 | 5,448 | 15,764 | 11,212 | 13,987 | 2,920 | 7,707 | - | - | 177,054 | | |
| 2014-C019-01 | C | Environmental Chamber | - | 5,156 | - | - | - | - | - | - | - | - | - | 5,156 | | |
| 2012-0043-01 | C | New Powder Room | - | - | 6,366 | (6,366) | - | - | - | - | - | - | - | - | | |
| 2014-C016-01 | C | Powder Scales | - | - | 5,683 | - | - | - | - | - | - | - | - | 5,683 | | |
| 2015-C005-01 | C | Weigh Out Improvement | - | - | 11,781 | - | 7,683 | 3,031 | - | - | - | - | - | 22,496 | | |
| 2014-T019-00 | T | Remodel 2nd floor | 3,285 | 52,496 | - | - | - | 1,329 | - | 210 | - | - | - | 57,319 | | |
| 2014-T020-01 | T | Pressers | 7,673 | - | - | - | - | - | - | - | - | - | - | 7,673 | | |
| 2015-T003-01 | T | Test Equipment | - | 256 | 37,232 | 132,496 | 87,149 | 131,818 | 85,729 | 17,259 | 16,153 | 1,192 | 137 | 509,421 | | |
| 2015-T004-01 | T | MSI move to Transducers | - | 16,633 | (1,102) | - | - | 400 | 648 | 705 | - | - | 174 | 17,457 | | |
| 2015-T010-01 | T | Motor Controller for Acoustic Tank #2 | - | - | - | - | 3,182 | - | - | - | - | - | - | 3,182 | | |
| 2014-S011-01 | S | 3 D prototype printer for engineering | - | 66 | - | - | - | - | - | - | - | - | - | 66 | | |
| 2015-S006-01 | S | Systems Engineering Computers | - | - | 15,734 | 50 | - | - | - | - | - | - | - | 15,783 | | |
| 2015-0007-01 | | SCIF Electronic Locks | - | - | 4,190 | (196) | - | 1,265 | - | - | - | - | - | 5,260 | | |
| 2015-0008-01 | | Workstation | - | - | 2,624 | 42 | - | - | - | - | - | - | - | 2,666 | | |
| 2013-0009-01 | | Planning for Facility Modernization | - | - | 1,071 | (1,072) | - | - | - | - | - | - | - | (1) | | |
| 2014-0017-01 | | Software | - | - | 1,215 | - | - | - | - | - | - | - | - | 1,215 | | |
| 2014-C015-01 | C | Inkprint System | - | - | - | - | - | 7,265 | - | - | - | - | - | 7,265 | | |
| 2015-0013-01 | | Shredder/Alarm upgrade | - | - | - | - | - | 3,153 | - | - | - | - | - | 3,153 | | |
| 2015-C015-01 | C | Security cameras | - | - | - | - | - | 7,068 | - | - | - | - | - | 7,068 | | |
| 2015-C014-01 | C | Optical CMM Inspection Equipment | - | - | - | - | - | 58,978 | 2,590 | - | - | - | - | 61,568 | | |
| 2015-C012-01 | C | Coolant filtration systemCeramic grinding | - | - | - | - | - | - | 1,040 | - | - | - | - | 1,040 | | |
| 2015-S017-01 | S | Frequency counters, engineering test lab | - | - | - | - | - | - | 3,018 | (92) | - | - | - | 2,926 | | |
| PLEX2015 | | Plex Reimplementation 2015 | 9,648 | 10,720 | 16,088 | 5,360 | 16,080 | 11,801 | 65,318 | 26,111 | 9,495 | 12,637 | 9,495 | 192,751 | | |
| | | **CTG Santa Barbara** | **68,658** | **154,565** | **145,215** | **151,379** | **136,959** | **159,001** | **243,409** | **54,368** | **38,064** | **22,932** | **19,143** | **1,193,694** | **1,535,667** | **341,973** |
| | | | | | | | | | | | | | | | | |
| EOI | E | EOI | - | - | - | - | - | - | - | - | - | - | - | - | 59,000 | 59,000 |
| | | | | | | | | | | | | | | | | |
| Adv Mat | AM | Advanced Materials | 71,900 | 113,609 | 109,767 | 136,680 | 323,449 | 103,058 | 79,609 | 25,810 | - | 67,083 | 30,682 | 1,061,648 | 713,000 | (348,648) |
| MSI | MSI | MSI Computers & Equipment | 5,549 | - | - | - | 5,035 | - | - | - | - | - | - | 10,584 | 276,000 | 265,416 |
| | | **CTG AM/MSI** | **77,449** | **113,609** | **109,767** | **136,680** | **328,484** | **103,058** | **79,609** | **25,810** | **-** | **67,083** | **30,682** | **1,072,231** | | |
| | | | | | | | | | | | | | | | | |
| | | **TOTAL** | **146,107** | **268,174** | **254,982** | **288,059** | **465,443** | **262,059** | **323,019** | **80,178** | **38,064** | **90,014** | **49,825** | **2,265,925** | **2,583,667** | **317,742** |



Channel Technologies Group

# MSI Integration



**Channel Technologies Group**

# MSI Integration – Status Update

### Update

- As of November 30, we are 14 months in.  Both integrations costs and synergies are favorable to plan.
- Integration costs through November 30 are $930K, below the original plan of $1.7M and the revised plan of $953K. Some equipment moves were not completed and are planned for a later date.
- Plans to transition additional programs (MLTA, AQS20, PS60, Archerfish) are being developed as orders arrive using the Stage Gate process.

### Synergies Achieved

- Total synergies to date include:  Carol Bowen (at closing – on target), Thomas Tiano (engineer terminated in April 2014 – favorable to plan), Patricia Modzelewski (on 10/31/2014 – favorable to plan of 01/31/2015), Nazeeh Shaheen (on 12/4/2014 – favorable to plan of 01/31/2015), Gary Douville (favorable to plan of June 2015), Phira Chep (on 2/6/2014 – favorable to plan), and Phil Canada (on 2/13/2015 – favorable to plan). Five MSI operators (Chea, Phouthakhio, Ramos, Urrutia, and Vann) on 3/31/2015 – on target.  Additional synergies on 5/29/2015 include:  Barbara Lilley, Karen Cerritelli, and 2 technicians (Gogoun, Lindsay), Nazeeh Shaheen is the synergy BD position.  Gary Douville is a synergy management position.  Additional savings beginning September 2015  include a Director of Manufacturing, a contracts position, an engineer, and a technician; former Vice President of MSI beginning in November 2015.  Favorable to plan.

### Annualized Hard Cost Savings

- As of November 30,  actual annualized hard cost savings of $1,039K vs Budget of $384K due to additional reductions and timing of planned reductions.


**Channel Technologies Group**

# MSI Integration – Budget vs. Actual

**Integration Costs**

| Item | Original Plan November ITD | Revised Plan* November ITD | November ITD Actuals | November Month Actuals |
|------|---------------------------|----------------------------|----------------------|------------------------|
| Severance / Relocation Packages | $        540 | $        349 | $        394 | $        31 |
| Integration Manager/Professional Services | $        280 | $        250 | $        302 | $        - |
| Travel | $         50 | $         50 | $         78 | $        - |
| Elect. Product Data Management S/W | $         50 | $         44 | $         - | $        - |
| Video / Conf. and IT Misc. | $         50 | $         20 | $         - | $        - |
| Move Equipment | $        110 | $        100 | $         24 | $        - |
| Training | $         50 | $         10 | $         18 | $        - |
| Scrap (Process Exp.) | $         50 | $         10 | $         - | $        - |
| Recruiting Fees | $         60 | $         20 | $         - | $        - |
| Misc. | $        440 | $        100 | $        113 | $         2 |
| **Integration Costs ($000)** | **$      1,680** | **$        953** | **$        930** | **$        33** |
| *Budget revised 12Mar15 | | | | |

# **Appendix**

- • Financial Statements
- • Working Capital
- • Borrowing Base


**Channel Technologies Group**

# Income Statement

| Nov 15 Month Actual | 2015 Month Plan | 2014 Month Prior Yr | Favorable/ (Unfavorable) Difference Plan | Favorable/ (Unfavorable) Difference Prior Yr | BWP-CTG-EOI-AM-MSI Combined Statement of Earnings | Nov 15 YTD Actual | Nov 15 YTD Plan | 2014 YTD Prior Yr | Favorable/ (Unfavorable) Difference Plan | Favorable/ (Unfavorable) Difference Prior Yr |
|---|---|---|---|---|---|---|---|---|---|---|
| $ 3,695,859 | $ 4,791,121 | $ 5,258,538 | $ (1,095,262) | $ (1,562,679) | Sales/Shipments | $ 46,329,076 | $ 52,910,751 | $ 43,498,302 | $ (6,581,675) | $ 2,830,775 |
| - | - | - | - | - | Inter-Company Sales | - | - | - | - | - |
| 3,695,859 | 4,791,121 | 5,258,538 | (1,095,262) | (1,562,679) | Total Revenue | 46,329,076 | 52,910,751 | 43,498,302 | (6,581,675) | 2,830,775 |
| | | | | | | | | | | |
| 2,858,806 | 2,453,281 | 3,347,203 | (405,526) | 488,396 | Cost of Sales | 29,735,207 | 30,487,537 | 28,489,044 | 752,330 | (1,246,163) |
| 837,053 | 2,337,840 | 1,911,336 | (1,500,788) | (1,074,283) | Gross Margin | 16,593,870 | 22,423,214 | 15,009,258 | (5,829,344) | 1,584,612 |
| 22.6% | 48.8% | 36.3% | -26.1% | -13.7% | Gross Margin % | 35.8% | 42.4% | 34.5% | -6.6% | 1.3% |
| 926,537 | 1,346,615 | 1,118,346 | 420,079 | 191,810 | General & Administrative Expenses | 12,145,199 | 15,453,798 | 9,948,069 | 3,308,599 | (2,197,131) |
| 75,678 | 111,861 | 83,725 | 36,183 | 8,047 | IR&D | 1,506,796 | 1,315,031 | 476,777 | (191,764) | (1,030,018) |
| 9,793 | 53,000 | 26,684 | 43,207 | 16,891 | B&P | 377,499 | 583,000 | 619,507 | 205,501 | 242,007 |
| 1,012,007 | 1,511,476 | 1,228,755 | 499,469 | 216,748 | Total SG&A | 14,029,494 | 17,351,829 | 11,044,352 | 3,322,335 | (2,985,141) |
| (174,954) | 826,364 | 682,581 | (1,001,319) | (857,535) | Operating earnings | 2,564,376 | 5,071,385 | 3,964,905 | (2,507,009) | (1,400,530) |
| -4.7% | 17.2% | 13.0% | -22.0% | -17.7% | Operating earnings % | 5.5% | 9.6% | 9.1% | -4.0% | -3.6% |
| (47,501) | (43,660) | (159,975) | 3,841 | (112,474) | Non-Operation Income (Expenses) | (1,001,914) | (480,260) | (2,003,921) | 521,654 | (1,002,008) |
| (222,455) | 782,704 | 522,606 | (1,005,159) | (745,060) | Income Before Interest Expense | 1,562,462 | 4,591,125 | 1,960,984 | (3,028,662) | (398,522) |
| (298,174) | (256,329) | (280,030) | (41,846) | (18,144) | Interest Expense & Other Financial Charges | (3,208,418) | (3,002,042) | (3,260,469) | (206,376) | 52,051 |
| (520,629) | 526,376 | 242,576 | (1,047,005) | (763,205) | Pretax Income (Loss) | (1,645,956) | 1,589,083 | (1,299,484) | (3,235,038) | (346,471) |
| - | - | - | - | - | Income Taxes | (32,990) | (2,100) | (2,479) | (30,890) | (30,511) |
| $ (520,629) | $ 526,376 | $ 242,576 | $ (1,047,005) | $ (763,205) | Net Income | $ (1,678,945) | $ 1,586,983 | $ (1,301,963) | $ (3,265,928) | $ (376,982) |



# EBITDA Detail

| Nov 15 Month Actual | 2015 Month Plan | 2014 Month Prior Yr | Favorable/ (Unfavorable) Difference Plan | Favorable/ (Unfavorable) Difference Prior Yr | BWP-CTG-EOI-AM-MSI Combined Statement of Earnings | Nov 15 YTD Actual | Nov 15 YTD Plan | 2014 YTD Prior Yr | Favorable/ (Unfavorable) Difference Plan | Favorable/ (Unfavorable) Difference Prior Yr |
|---|---|---|---|---|---|---|---|---|---|---|
| $ (520,629) | $ 526,376 | $ 242,576 | $ (1,047,005) | $ (763,205) | **Net Income** | $ (1,678,945) | $ 1,586,983 | $ (1,301,963) | $ (3,265,928) | $ (376,982) |
| | | | | | | | | | | |
| $ - | $ - | $ - | $ - | $ - | **Income Taxes** | $ 32,990 | $ 2,100 | $ 2,479 | $ 30,890 | $ 30,511 |
| 302,015 | 256,329 | 280,030 | 45,687 | 21,985 | **Interest Expense and other** | 3,736,183 | 3,002,042 | 3,323,562 | 734,141 | 412,621 |
| 387,739 | 438,111 | 341,908 | (50,372) | 45,832 | **Depreciation & Amortization** | 4,498,641 | 4,610,839 | 3,662,226 | (112,198) | 836,415 |
| 29,338 | 29,338 | 29,338 | 0 | 0 | **G&A Loan Fees** | 322,713 | 322,713 | 322,713 | - | - |
| 1,993 | 1,993 | 1,993 | - | - | **Non Op Loan Fees** | 21,924 | 21,924 | 21,924 | - | 0 |
| 6,250 | 6,250 | 6,250 | - | - | **Board Fees** | 68,750 | 68,750 | 68,750 | - | - |
| 41,667 | 41,667 | 41,667 | (0) | - | **Blue Wolf Management Fees** | 458,333 | 458,336 | 458,334 | (2) | (1) |
| $ 248,373 | $ 1,300,063 | $ 943,761 | $ (1,051,691) | $ (695,388) | **EBITDA** | $ 7,460,589 | $ 10,073,686 | $ 6,558,025 | $ (2,613,097) | $ 902,563 |

| $ 1,039,257 | $ 384,394 | | **Annualized Hard Cost Savings** | $ 1,039,257 | $ 384,394 |
|---|---|---|---|---|---|
| $ 1,287,629 | $ 1,684,458 | | **Bank EBITDA** | $ 8,499,845 | $ 10,458,081 |



# Balance Sheet - Assets

| NOV 2015 CHANNEL TECHNOLOGIES COMBINED Balance Sheet | Total Combined NOV 2015 Actual 15 | Total Combined NOV 2015 Budget | Variance NOV 2015 Actual vs Budget |
|---|---|---|---|
| | Combined | Combined | Combined |
| **Balance Sheet** | **NOV 2015** | **NOV 2015** | **NOV 2015** |
| | | | |
| **CURRENT ASSETS** | | | |
| Cash | $          225,499 | $          249,456 | $          (23,958) |
| Accounts Receivable | 7,408,199 | 8,896,453 | (1,488,255) |
| Unbilled A/R | 3,733,691 | 1,291,353 | 2,442,338 |
| Allowance for bad debt | (3,257) | (80,029) | 76,772 |
| Other Receivables | 235 | 235 | (0) |
| Inventories | 9,360,178 | 6,452,915 | 2,907,262 |
| Prepaid Expenses | 869,631 | 856,412 | 13,219 |
| | | | |
| | | | - |
| **TOTAL CURRENT ASSETS** | **21,594,176** | **17,666,796** | **3,927,380** |
| | | | |
| **FIXED ASSETS** | | | |
| Projects in process | 1,331,743 | 2,201,869 | (870,126) |
| Shop Equipment | 10,255,230 | 10,504,173 | (248,943) |
| Lab. Demo & Test Equip | 1,674,992 | 799,982 | 875,009 |
| Office Equipment | 1,981,876 | 1,926,862 | 55,014 |
| Vehicle Equipment | 24,250 | 24,250 | - |
| Leasehold Improvement | 2,909,160 | 2,736,468 | 172,692 |
| | 18,177,251 | 18,193,604 | (16,354) |
| **Less Depreciation** | (5,514,813) | (5,791,337) | 276,524 |
| **TOTAL FIXED ASSETS** | 12,662,438 | 12,402,268 | 260,170 |
| | | | |
| **OTHER ASSETS** | | | |
| Restricted Cash | 1,138,283 | 6,578,018 | (5,439,735) |
| Deposits | 53,699 | 39,669 | 14,030 |
| Goodwill | 24,888,354 | 28,948,467 | (4,060,113) |
| Identified Intangible Assets: | 26,229,313 | 23,661,465 | 2,567,848 |
| Trained & Assembled Workforce: | 2,715,000 | 2,715,000 | - |
| Long Term Note | 268,351 | 260,500 | 7,851 |
| Prepaid Loan Fee | 1,026,813 | 1,026,813 | - |
| **TOTAL OTHER ASSETS** | 56,319,812 | 63,229,932 | (6,910,119) |
| | | | |
| **TOTAL ASSETS** | $     90,576,426 | $     93,298,995 | $     (2,722,569) |

**Channel Technologies Group**

Confidential    31

# Balance Sheet – Liabilities & Equity

| November ▼  NOV 2015  CHANNEL TECHNOLOGIES COMBINED  Balance Sheet | Total Combined NOV 2015 Actual 15 | Total Combined NOV 2015 Budget | Variance NOV 2015 Actual vs Budget |
|---|---|---|---|
| | Combined | Combined | Combined |
| **Balance Sheet** | **NOV 2015** | **NOV 2015** | **NOV 2015** |
| | | | |
| **CURRENT LIABILITIES** | | | |
| Accounts Payable | $      3,241,999 | $      1,601,917 | $      1,640,082 |
| Accrued Expenses | 2,786,266 | 4,009,650 | (1,223,384) |
| Deferred Revenue | 1,619,505 | 1,715,000 | (95,495) |
| Current Portion Long Term Debt | 3,002,755 | 2,518,750 | 484,005 |
| | | | |
| **TOTAL CURRENT LIABILITIES** | **10,650,525** | **9,845,317** | **805,208** |
| | | | |
| **LONG TERM LIABILITIES** | | | |
| Revolver OWB | 7,950,000 | 2,930,844 | 5,019,156 |
| Contingent Liability -Indemnification & Environmenta | 1,138,283 | 6,578,018 | (5,439,735) |
| OWB Term Loan | 25,464,732 | 25,358,000 | 106,732 |
| Avante Junior Financing | 7,000,000 | 7,000,000 | - |
| Fidus Junior Financing | 7,000,000 | 7,000,000 | - |
| OWB CapEx Term | 3,550,000 | 1,850,000 | 1,700,000 |
| Rent: Security Deposit | 25,413 | 25,413 | - |
| Total Gross Long Term | **52,128,427** | **50,742,275** | **1,386,152** |
| | | | |
| Less Amounts Due in 1 Year | (3,002,755) | (2,518,750) | (484,005) |
| **TOTAL LONG TERM LIABILITIES** | **49,125,672** | **48,223,525** | **902,147** |
| | | | |
| STOCKHOLDERS' EQUITY | | | |
| Members Equity | 32,479,175 | 6,451,000 | 26,028,175 |
| Retained Earnings - | | 27,192,171 | (27,192,171) |
| Net Profit Y-T-D | (1,678,945) | 1,586,983 | (3,265,928) |
| | | | 0 |
| **TOTAL STOCKHOLDERS EQUITY** | 30,800,229 | 35,230,153 | (4,429,924) |
| | | | |
| **TOTAL LIABILITIES &** | | | |
| **STOCKHOLDERS' EQUITY** | $      90,576,426 | $      93,298,995 | $      (2,722,569) |

Channel Technologies Group

# Balance Sheet – Trend

| BALANCE SHEET ($K) | DEC-14 | JAN-15 | FEB-15 | MAR-15 | APR-15 | MAY-15 | JUN-15 | JUL-15 | AUG-15 | SEP-15 | OCT-15 | NOV-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Summary* | | | | | | | | | | | | |
| Cash | 234 | 956 | 277 | 161 | 590 | 36 | 81 | 491 | 307 | 53 | 1,069 | 225 |
| Accounts Receivable | 8,572 | 6,187 | 7,348 | 9,106 | 8,508 | 7,618 | 6,566 | 5,185 | 5,917 | 5,828 | 6,364 | 7,405 |
| Unbilled A.R. | 1,189 | 1,865 | 2,317 | 2,987 | 3,328 | 3,391 | 2,031 | 2,686 | 3,195 | 3,651 | 4,490 | 3,734 |
| Inventory | 6,316 | 6,669 | 6,965 | 7,078 | 7,113 | 7,256 | 7,359 | 8,012 | 8,491 | 8,688 | 9,037 | 9,360 |
| Other Current Assets | 871 | 879 | 852 | 744 | 1,525 | 812 | 916 | 811 | 747 | 925 | 900 | 870 |
| **Total Current Assets** | **17,181** | **16,556** | **17,759** | **20,076** | **21,063** | **19,113** | **16,953** | **17,185** | **18,657** | **19,146** | **21,859** | **21,594** |
| Fixed Assets | 12,724 | 12,680 | 12,745 | 12,743 | 12,832 | 13,090 | 13,145 | 13,257 | 13,125 | 12,951 | 12,827 | 12,662 |
| Other Non-Current Assets | 64,297 | 64,055 | 63,811 | 63,577 | 63,344 | 63,040 | 62,805 | 62,536 | 62,303 | 57,072 | 56,566 | 56,320 |
| **Total Assets** | **94,201** | **93,291** | **94,314** | **96,396** | **97,239** | **95,243** | **92,902** | **92,978** | **94,085** | **89,168** | **91,252** | **90,576** |
| | | | | | | | | | | | | |
| Accounts Payable | 2,410 | 1,473 | 1,993 | 2,261 | 1,997 | 1,568 | 2,536 | 2,173 | 2,734 | 3,823 | 3,180 | 3,242 |
| Other Current Liabilities | 6,795 | 6,816 | 6,954 | 8,479 | 8,842 | 8,419 | 6,286 | 6,409 | 6,995 | 6,801 | 6,681 | 7,409 |
| **Total Current Liabilities** | **9,206** | **8,289** | **8,947** | **10,740** | **10,839** | **9,987** | **8,822** | **8,582** | **9,729** | **10,623** | **9,862** | **10,651** |
| | | | | | | | | | | | | |
| Revolver | 5,250 | 5,500 | 5,650 | 6,200 | 7,200 | 6,550 | 6,550 | 6,850 | 7,300 | 6,650 | 8,850 | 7,950 |
| Long-Term Debt | 40,564 | 40,564 | 40,564 | 39,836 | 39,836 | 39,836 | 39,063 | 39,463 | 39,463 | 38,712 | 40,012 | 40,012 |
| Other Liabilities | 6,603 | 6,604 | 6,587 | 6,587 | 6,587 | 6,516 | 6,514 | 6,495 | 6,495 | 1,497 | 1,208 | 1,164 |
| **Total Long-Term Liabilities** | **52,417** | **52,668** | **52,801** | **52,623** | **53,624** | **52,903** | **52,127** | **52,807** | **53,257** | **46,859** | **50,070** | **49,126** |
| Equity | 32,578 | 32,334 | 32,566 | 33,033 | 32,777 | 32,353 | 31,954 | 31,589 | 31,099 | 31,686 | 31,321 | 30,800 |
| **Total Liabilities & Equity** | **94,201** | **93,291** | **94,314** | **96,396** | **97,239** | **95,243** | **92,902** | **92,978** | **94,085** | **89,168** | **91,252** | **90,576** |



**Channel Technologies Group**

# Balance Sheet – Trends



Channel Technologies Group

# Cash Flow Statement

| BWP-CTG-EOI-AM-MSI | | Combined BWP-CTG NOV 2015 YTD Actual | Combined BWP-CTG-AM NOV 2015 YTD Budget |
|---|---|---|---|
| November | | | |
| **Statement of Cash Flow** | | | |
| | | | |
| Pretax income | | $ (1,645,956) | $ 1,589,083 |
| Income taxes | | (32,990) | (2,100) |
| | | | |
| **Adjustments to reconcile net income to net cash:** | | | |
| Depreciation & amortization | | 4,498,641 | 4,610,839 |
| **Other adjustments:** | | - | |
| Change in Accounts Receivable | | 1,243,639 | (244,616) |
| Change in Unbilled Revenue-Milestone Billings | | (2,545,130) | 4,797,495 |
| Change in Allowance for bad debt | | (76,772) | - |
| Change in Inventories | | (3,044,533) | (137,271) |
| Change in Prepaid Expenses | | 1,311 | 50,144 |
| Change in Deposits | | 1,789 | (19,794) |
| Change in Goodwill/Intangible Assets | | (198,601) | (0) |
| Change in Trained & Assembled Workforce: | | 198,601 | - |
| Change in Long Term Note | | (7,851) | - |
| Change in Prepaid Loan Fee | | 322,713 | 322,713 |
| Change in Accts Payable | | 831,653 | (808,429) |
| Change in Accrued Expenses | | (327,564) | 900,457 |
| Change in Deferred Revenue | | 325,820 | (4,478,971) |
| | | | |
| **Cash From Operations** | | $ (455,229) | $ 6,579,549 |
| | | | |
| **Investing & financing activities:** | | | |
| Purchase & retirement of property, plant & equipment | | (2,217,142) | (2,502,516) |
| | | | |
| Cash from internal operations | | (2,672,372) | 4,077,034 |
| | | | |
| **Cash Flow From Financing Activities** | | | |
| Revolver OWB | | 2,700,000 | (2,319,156) |
| OWB Term Loan | | (1,637,018) | (1,743,750) |
| OWB CapEx Term | | 1,700,000 | - |
| Refund of Former President Equity | | 25,000 | - |
| Additional Equity Investment | | (124,065) | - |
| **Total From Financing Activities** | | 2,663,917 | (4,062,906) |
| | | | |
| Total Cash Generated (Used) | | $ (8,455) | $ 14,128 |
| Net-Inter-company change-borrowing (payback) | | 0 | - |
| **Total change in cash** | | **($8,455)** | **$14,128** |

- YTD Cash flow from Operations impacted by growth in Unbilled Revenue and Inventory vs. Plan, partially offset by strong collections and increase in AP

**Channel Technologies Group**

# Working Capital – AR, AP

| Metric | Jan-15 | Feb-15 | Mar-15 | Apr-15 | May-15 | Jun-15 | Jul-15 | Aug-15 | Sep-15 | Oct-15 | Nov-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Accounts Receivable Aging** | | | | | | | | | | | |
| Current | $3,485 | $4,884 | $6,336 | $4,440 | $4,067 | $4,233 | $2,988 | $3,579 | $4,944 | $4,660 | $5,193 |
| 31-60 Days | $2,170 | $1,383 | $1,945 | $3,170 | $2,968 | $1,604 | $1,796 | $1,507 | $694 | $1,454 | $1,507 |
| 61-90 Days | $251 | $722 | $426 | $350 | $188 | $593 | $279 | $546 | $22 | $83 | $480 |
| > 90 Days | $309 | $380 | $408 | $552 | $398 | $139 | $125 | $289 | $171 | $169 | $228 |
| **Gross Trade AR** | $ 6,215 | $ 7,369 | $ 9,115 | $ 8,511 | $ 7,622 | $ 6,569 | $ 5,189 | $ 5,921 | $ 5,831 | $ 6,367 | $ 7,408 |
| **DSO** | 46.1 | 53.1 | 63.0 | 57.5 | 51.4 | 44.5 | 35.2 | 40.4 | 39.6 | 43.5 | 52.2 |
| **Accounts Payable Aging** | Jan-15 | Feb-15 | Mar-15 | Apr-15 | May-15 | Jun-15 | Jul-15 | Aug-15 | Sep-15 | Oct-15 | Nov-15 |
| Current | $1,354 | $1,592 | $1,722 | $1,405 | $1,126 | $1,956 | $1,443 | $1,442 | $1,861 | $2,084 | $1,366 |
| 31-60 Days | $115 | $397 | $472 | $584 | $421 | $506 | $697 | $945 | $994 | $732 | $1,360 |
| 61-90 Days | $3 | $4 | $27 | $7 | $20 | $24 | $9 | $330 | $771 | $109 | $207 |
| > 90 Days | $1 | $1 | $40 | $0 | $1 | $50 | $24 | $16 | $198 | $255 | $308 |
| **Gross Trade AP** | $ 1,473 | $ 1,993 | $ 2,261 | $ 1,997 | $ 1,568 | $ 2,536 | $ 2,173 | $ 2,734 | $ 3,823 | $ 3,180 | $ 3,242 |
| **AP Days** | 36.8 | 48.7 | 52.2 | 43.9 | 34.2 | 54.3 | 46.7 | 58.6 | 88.9 | 72.0 | 75.7 |

- Positive trend in accounts receivable collections, with improved and stable DSO in recent months. Increase in November due to invoicing of TR-343 ($1.1M) not included in Revenues in November (POC revenue recognition method)

- Cash outflows at quarter end restricted to critical vendor payments, and therefore higher AP days than the normal trend.



Channel Technologies Group

# Working Capital – Inventory

| Metric | Jan-15 | Feb-15 | Mar-15 | Apr-15 | May-15 | Jun-15 | Jul-15 | Aug-15 | Sep-15 | Oct-15 | Nov-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Inventory** | | | | | | | | | | | |
| Raw Material | $ 4,540 | $ 4,544 | $ 4,556 | $ 4,481 | $ 4,328 | $ 4,101 | $ 4,220 | $ 4,673 | $ 4,660 | $ 5,130 | $ 5,369 |
| WIP | $ 5,543 | $ 6,262 | $ 6,781 | $ 7,230 | $ 7,347 | $ 8,145 | $ 8,856 | $ 8,491 | $ 9,679 | $ 10,334 | $ 10,623 |
| Eng/PM | $ 1,419 | $ 1,589 | $ 1,753 | $ 1,979 | $ 2,135 | $ 2,335 | $ 2,485 | $ 2,776 | $ 3,010 | $ 3,611 | $ 3,928 |
| POC | $ (4,808) | $ (5,348) | $ (5,849) | $ (6,412) | $ (6,694) | $ (7,082) | $ (7,139) | $ (7,259) | $ (8,326) | $ (9,553) | $ (10,326) |
| WIP Total | $ 2,154 | $ 2,502 | $ 2,684 | $ 2,797 | $ 2,788 | $ 3,398 | $ 4,203 | $ 4,007 | $ 4,363 | $ 4,392 | $ 4,225 |
| FG | $ 626 | $ 663 | $ 703 | $ 819 | $ 837 | $ 848 | $ 882 | $ 971 | $ 979 | $ 1,019 | $ 1,100 |
| Reserves | $ (651) | $ (745) | $ (865) | $ (984) | $ (697) | $ (987) | $ (1,293) | $ (1,161) | $ (1,315) | $ (1,504) | $ (1,334) |
| Net Inventory | $ 6,669 | $ 6,965 | $ 7,078 | $ 7,113 | $ 7,256 | $ 7,359 | $ 8,013 | $ 8,491 | $ 8,688 | $ 9,037 | $ 9,360 |
| | | | | | | | | | | | |
| Total Inventory | **$ 6,669** | **$ 6,965** | **$ 7,078** | **$ 7,113** | **$ 7,256** | **$ 7,359** | **$ 8,013** | **$ 8,491** | **$ 8,688** | **$ 9,037** | **$ 9,360** |
| | | | | | | | | | | | |
| **Inventory Turns** | 5.0 | 4.8 | 4.9 | 5.0 | 4.9 | 4.8 | 4.4 | 4.2 | 4.0 | 3.8 | 3.7 |

- Inventory turns deterioration in last 6 months due to delays in shipping and inventory builds on MK-54, TR-343 and BAE programs

**Channel Technologies Group**

# Borrowing Base – November 30, 2015

**BORROWING BASE CERTIFICATE**

**For:**     **11/30/15**

OneWest Bank™

| # | ACCOUNTS RECEIVABLE | | |
|---|---|---|---|
| 1 | Total Accounts Receivable Current Period | $ | 7,408,199 |
| 2 | *Less:*     Total Ineligible Accounts | $ | (226,534) |
| 3 | Total Eligible Accounts Receivable *(Line 1 - Line 2)* | $ | 7,181,665 |
| 4 | Accounts Receivable Advance Rate (80%) | | **80%** |
| 5 | Accounts Receivable Availability *(Line 3 * Line 4)* | $ | 5,745,332 |

| # | INVENTORY | | |
|---|---|---|---|
| 6 | Total Inventory Current Period (A) | $ | 9,360,178 |
| 7 | *Less:*     Total Ineligible Inventory | $ | - |
| 8 | Total Eligible Inventory *(Line 6 - Line 7)* | $ | 9,360,178 |
| 9 | Inventory Advance Rate (50%; may be 60% up to 90 consecutive days) | | **50%** |
| 10 | Inventory Availability *(Line 8 * Line 9)* | $ | 4,680,089 |

| | BORROWING BASE | | |
|---|---|---|---|
| 11 | Total Collateral Availability *(Line 5 + Line 10)* | $ | 10,425,421 |
| 12 | Total Revolving Line of Credit | **$** | **10,000,000** |
| 13 | Borrowing Base *(Lesser of Line 11 or Line 12)* | $ | 10,000,000 |
| 14 | Less: Outstanding L/C's (e*nter as negative)* | $ | (7,950,000) |
| 15 | Less: Usage (Outstanding Line of Credit) (e*nter as negative)* | $ | - |
| 16 | Total Outstanding | $ | (7,950,000) |
| 17 | **Net Borrowing Availability** | $ | 2,050,000 |

**(A) Inventory is net of reserves.**



# Exhibit  23

## Ewelina Johnson

| | |
|---|---|
| **From:** | Lynn Chen |
| **Sent:** | Tuesday, January 19, 2016 12:30 PM |
| **To:** | Joshua Cherry-Seto; Tom Ellis |
| **Cc:** | Damon Frier; Kenny Shrainer; Rich Simitian |
| **Subject:** | Re: FW: CTS Corp - CTG Conflict Waiver |
| **Attachments:** | Conflict Waiver Letter_CTS Corp - CTG LC signed.pdf |

Hi Tom,

Here is my signature.

Thanks, lynn

Lynn Chen
Chief Financial Officer



Channel Technologies Group
879 Ward Drive
Santa Barbara, CA  93111
805-690-5132 (direct)
805-403-5488 (cell)
www.channeltechgroup.com

Confidentiality Notice:
This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged
information. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Any
unauthorized review, use, disclosure, or distribution is prohibited.


>>> On 1/19/2016 at 9:05 AM, in message
<DM2PR0801MB556E231C8AAE8FB5F36D42AD3C10@DM2PR0801MB556.namprd08.prod.outlook.com>, "Ellis, Tom"
<Thomas.Ellis@us.gt.com> wrote:

> Mr, Cherry-Seto,
>
>
> Rich Simitian has asked me to revise the subject waiver letter to refer to Blue Wolf Capital Fund II, L.P. rather than
> Blue Wolf Capital Management.  I have attached the amended waiver letter as you requested.
>
>
> If you agree with the changes, please sign and return to me and Rich Simitian.  Ms. Chen may also use the attached
> letter to sign and return to me and Rich as well.

We greatly appreciate your assistance.


Best regards,

Tom


**Thomas Ellis** | **Managing Director**

Grant Thornton LLP

**T**  214 561 2566

M 214 215-6442

**E** thomas.ellis@us.gt.com | **W** www.grantthornton.com



**From:** Simitian, Rich
**Sent:** Tuesday, January 19, 2016 9:37 AM
**To:** Ellis, Tom <Thomas.Ellis@us.gt.com>
**Subject:** Fwd: CTS Corp - CTG Conflict Waiver





Begin forwarded message:

**From:** Joshua Cherry-Seto <jcs@bluewolfcapital.com>
**Date:** January 19, 2016 at 7:29:51 AM PST
**To:** "Simitian, Rich" <Rich.Simitian@us.gt.com>, Lynn Chen <LChen@channeltech.com>
**Cc:** "Frier, Damon" <Damon.Frier@us.gt.com>
**Subject: RE: CTS Corp - CTG Conflict Waiver**

Rich – please update to reflect Blue Wolf Capital Fund II, L.P. throughout for us.


I can then sign.


Josh


_____
**Joshua Cherry-Seto**

**Blue Wolf Capital Partners**

One Liberty Plaza, 52nd Floor

New York, NY  10006

p:  212.488.1347

f:   917.677.8980

c:  917.204.5967

jcs@bluewolfcapital.com

**From:** Simitian, Rich [mailto:Rich.Simitian@us.gt.com]
**Sent:** Tuesday, January 19, 2016 10:20 AM
**To:** Lynn Chen <LChen@channeltech.com>; Joshua Cherry-Seto <jcs@bluewolfcapital.com>
**Cc:** Frier, Damon <Damon.Frier@us.gt.com>
**Subject:** Fwd: CTS Corp - CTG Conflict Waiver

Josh

Per our phone call this morning I am attaching the conflict waiver. CTS has signed.  I will need both you and Lynn to sign as well

Once in place I will coordinate with Damon on the tax side and we will talk to you about next steps

Thank you

Rich Simitian

7143214481 mobile

Begin forwarded message:

**From:** "Ellis, Tom" <Thomas.Ellis@us.gt.com>
**Date:** January 18, 2016 at 8:31:46 PM PST

**To:** "Simitian, Rich" <Rich.Simitian@us.gt.com>

**Subject: CTS Corp - CTG Conflict Waiver**

Hi, Rich,

I've attached a copy of the subject waiver letter executed by CTS Corp.

Please provide the CTS-executed letter to CTG and Blue Wolf for their files after they have executed and returned the letters you provided to them for signature.

Thanks, Rich!

Tom

**Thomas Ellis | Managing Director**

Grant Thornton LLP

**T**  214 561 2566

M 214 215-6442

**E** thomas.ellis@us.gt.com | **W** www.grantthornton.com

Grant Thornton LLP is the U.S. member firm of Grant Thornton International Ltd. Grant Thornton International Ltd and its member firms are not a worldwide partnership, as each member firm is a separate and distinct legal entity. In the U.S., visit Grant Thornton LLP at www.GrantThornton.com.

Please consider the environment before printing this email.

**Please understand that, unless expressly stated otherwise, any written advice given by Grant Thornton LLP
that is contained in, forwarded with, or attached to this e-mail is: (1) limited to the matters and potential tax
consequences specifically addressed herein, and; (2) not intended or written by Grant Thornton LLP as
advice on the application or potential application of any penalties that may be imposed under any federal,
state, or foreign statute or regulation in any manner.**

This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or
privileged information. Any review, dissemination, copying, printing or other use of this e-mail by persons or entities
other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender immediately
and delete the material from any computer.

_____

Grant Thornton LLP is the U.S. member firm of Grant Thornton International Ltd. Grant Thornton International Ltd and its member firms are not a
worldwide partnership, as each member firm is a separate and distinct legal entity. In the U.S., visit Grant Thornton LLP at www.GrantThornton.com.

Please consider the environment before printing this email.

**Please understand that, unless expressly stated otherwise, any written advice given by Grant Thornton LLP
that is contained in, forwarded with, or attached to this e-mail is: (1) limited to the matters and potential tax
consequences specifically addressed herein, and; (2) not intended or written by Grant Thornton LLP as
advice on the application or potential application of any penalties that may be imposed under any federal,
state, or foreign statute or regulation in any manner.**

This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or
privileged information. Any review, dissemination, copying, printing or other use of this e-mail by persons or entities
other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender immediately
and delete the material from any computer.



**Grant Thornton LLP**
Grant Thornton Tower
171 N. Clark St., Suite 200
Chicago, IL  60601

T 312 856 0200
F 312 565 4719
www.GrantThornton.com

January 18, 2016

Ms. Lynn Chen
Chief Financial Officer
**Channel Technologies Group**
879 Ward Drive
Santa Barbara, CA  93111

Mr. Ashish Agrawal
Chief Financial Officer
**CTS Corporation**
905 West Boulevard North
Elkhart, IN  46514

Mr. Joshua Cherry-Seto
Chief Financial Officer
**Blue Wolf Capital Fund II, L.P.**
One Liberty Plaza
165 Broadway, 52nd Floor
New York, NY  10006

Re: Notice and Waiver of Conflict of Interest and Acknowledgement of Grant Thornton LLP's
Professional Responsibilities

Dear Ms. Chen, Mr. Cherry-Seto, and Mr. Agrawal:

Grant Thornton LLP ("Grant Thornton") provides financial statement audit and tax services for
Channel Technologies Group ("Channel Technologies"), which is a portfolio company of Blue
Wolf Capital Fund II, L.P. ("Blue Wolf") for whom Grant Thornton also has provided tax and
diligence services.  Collectively, these services for Channel Technologies and Blue Wolf are
referred to herein as the "Existing Services."  In addition, Grant Thornton has been requested
to provide professional services to CTS Corporation ("CTS"), a financial statement audit client
of Grant Thornton, with respect to financial and tax diligence on CTG Advanced Materials LLC
("CTG Materials"), a subsidiary of Channel Technologies (the "Proposed Services").

**Grant Thornton**

2

Under professional standards, including IRS regulations governing tax practice, performing the Proposed Services may represent a potential or actual conflict of interest, as the interests of Channel Technologies and Blue Wolf may not be in alignment with the interests of CTS. Applicable professional standards require Grant Thornton to assess whether we believe that we are able to perform the Proposed Services and continue performing the Existing Services (collectively, "Professional Services") with the requisite integrity and objectivity. If we determine that we can provide the Professional Services with the requisite integrity and objectivity, we are then required to disclose the potential conflict of interest to both parties and obtain their consent before proceeding with the engagements.

By way of this letter, Grant Thornton affirms to Channel Technologies, Blue Wolf and CTS that based on our internal consultations we have come to the conclusion that we can provide the Professional Services with the requisite integrity and objectivity (subject to certain safeguards being put in place).

Grant Thornton believes that it can perform the Professional Services with the requisite integrity and objectivity by implementing the following safeguards to minimize threats to our integrity and objectivity.

- Grant Thornton will separate the engagement teams to create ethical walls and protect the confidentiality of information. Although the separate engagement teams will not communicate with each other directly (except as noted herein), we will establish a communication channel between the engagement teams using our national office or professional standards personnel to address any issues that arise during the delivery of the Professional Services.

- In certain limited circumstances, the separate engagement teams may need to directly communicate with each other.  Such circumstances will be limited to those situations when Grant Thornton determines that professional standards necessitate the two engagement teams to be in direct contact with each other.

- Grant Thornton will not permit access to any of the Channel Technologies and Blue Wolf engagement documentation by any staff members of the CTS engagement team without specific consent from the parties.  Similarly, Grant Thornton will not permit access to any of the CTS documentation by any staff members of the Channel Technologies and Blue Wolf engagement teams without receiving specific consent from the applicable parties.

- Unless compelled to do so by law, court order, or subpoena and otherwise consistent with our confidentiality obligations, Grant Thornton will not allow third party access to any of your information in our possession without your specific consent.  In addition, access to Grant Thornton workpapers shall only be provided subject to securing a standard Grant Thornton work paper access letter.

**Grant Thornton**

3

- Grant Thornton will establish security procedures related to the communication of any of the work product or deliverables provided to either party or its counsel. Further, all documentation relating to the Proposed Services will be stored in a secure Grant Thornton site that will be password protected with access limited only to CTS's engagement team members.

In addition, if during the course of performing the Professional Services, if any matter arises that Grant Thornton perceives as impacting our ability to continue performing the Professional Services with the requisite objectivity and integrity, we will apprise the affected parties to try and resolve the matter. In the event the matter is not able to be resolved to permit our continuing in the engagement, Grant Thornton may be required to withdraw from performing either the Existing Services or the Proposed Services, or both.

By signing below, you:

- Acknowledge notice of Grant Thornton's possible or actual conflict of interest as stated herein;

- Understand that the written consent of Channel Technologies, Blue Wolf, CTS and the Audit Committee Chairman of CTS all will be required before proceeding with the Professional Services;

- Agree to the sufficiency of the proposed safeguards described above and authorize our national office or professional standards personnel to communicate with each affected engagement team as we deem necessary;

- Channel Technologies and Blue Wolf consent to Grant Thornton providing the Proposed Services; CTS consents to Grant Thornton continuing to provide Existing Services;

- Waive any claim you might otherwise have against Grant Thornton based on any conflict, real or perceived, arising out of Grant Thornton's performance of both the Existing Services and Proposed Services; and

- Represent that you are legally authorized to execute this letter.

Please return via e-mail a PDF version of this letter once it has been signed and dated to the appropriate Grant Thornton representative.

**Grant Thornton**

4

We must receive the executed letter from all parties prior to performing the Proposed Services.


Sincerely,

**GRANT THORNTON LLP**


Rich Simitian
Audit Partner


John Iwanski
Transaction Services Principal


Mick Rennick
Audit Partner

Copy to:  Mr. Lawrence J. Ciancia
             Chairman, Audit Committee
             **CTS Corporation**


**Agreed and accepted by:**

**CHANNEL TECHNOLOGIES GROUP**


Ms. Lynn Chen                              Date: 1/19/2016
Chief Financial Officer

**Grant Thornton**

5

**BLUE WOLF CAPITAL FUND II, L.P.** _ON BEHALF OF ITSELF, BW PIEZO
HOLDINGS LLC, AND CTG ADVANCED MATERIALS LLC

_____          Date: _____

Mr. Joshua Cherry-Seto
Chief Financial Officer

**CTS CORPORATION**

_____          Date: _____

Mr. Ashish Agrawal
Chief Financial Officer

# Exhibit  24

**DORSEY**™
DORSEY & WHITNEY LLP

NELSON G. DONG
Partner
(206) 903-8871
FAX (206) 260-9085
dong.nelson@dorsey.com

January 6, 2015

PROPRIETARY & CONFIDENTIAL –
EXEMPT FROM FOIA DISCLOSURE

**VIA FEDERAL EXPRESS**

Mr. Frederick F. Monroe
Office of Defense Trade Controls Policy
Directorate of Defense Trade Controls
U.S. Department of State
2401 E Street, NW
Washington, DC 20037

Re:    **Export Control Reform follow-Up on Case No. CJ 1226-11**

Dear Mr. Monroe:

Our law firm acts as outside legal counsel to Channel Technologies Group, LLC ("CTG"). CTG is the successor legal entity to H.C. Materials Corporation in Bolingbrook, Illinois, to whom your office issued CJ No. 1226-11 on May 5, 2012 ("CJ 1226-11"), a copy of which is attached as Exhibit A to this letter for your convenience. CJ 1226-11 determined that certain single crystal piezoelectric materials should be ITAR controlled and others should be EAR controlled, depending upon the size and dimension of the material involved. As noted on the face of CJ 1226-11, we believe you were the DDTC analyst who worked on CJ 1226-11, and that CJ directs any future inquiries should be submitted to you directly.

CTG now writes to inform you and your colleagues at DDTC that CTG has just received a CCATS from the Bureau of Industry and Security ("BIS") that confirms two forms of single crystal piezoelectric ("PE") materials in the form of final finished crystals or crystal blanks (regardless of size or dimensions) are now subject to the EAR and, as such, are "EAR99" items as of December 30, 2014. The PE materials in final finished crystals or crystal blanks are: (1) those made of lead magnesium – lead titanate ("PMN-PT"); and (2) those made of lead indium niobate – lead magnesium – lead titanate ("PIN-PMN-PT"). For convenience, we will refer to CTG's PMN-PT and PIN-PMN-PT single crystal products collectively as "the PE Products." I enclose a copy of CCATS No. Z1429241 dated December 31, 2014 ("CCATS Z1429241") as Exhibit B to this letter.

Because of the Obama Administration's recent Export Control Reform ("ECR") efforts, Category XI (Military Electronics) of the International Traffic in Arms Regulations' U.S. Munitions List ("USML") was revised as of December 30, 2014 (the Effective Date"). Those changes altered the USML basis upon which CJ 1226-11 was originally issued. CCATS Z1429241 from BIS now confirms, from and after that Effective Date, all of CTG's PE Products should be considered subject to the EAR and, as such, are "EAR99" items.

Frederick F. Monroe
January 6, 2015
Page 2



## 1.  **Background on CTG and its PE Products.**

Channel Industries was originally founded in 1959 in Santa Barbara, California, to produce PE ceramics.  The company, later renamed as the "Channel Technologies Group," grew both organically and through a series of acquisitions over the years.  In October 2013, CTG acquired H.C. Materials Corporation ("HC Materials"), a worldwide leader in the development and manufacture of large PE single crystals.  HC Materials had been founded in 1995 by Dr. Pengdi Han in Bolingbrook, Illinois.  (It was HC Materials that originally filed for CJ 1226-11.)  Building upon the research and development efforts pioneered by HC Materials, CTG now has the expertise to produce both PMN-PT and PIN-PMN-PT based PE crystals and finished crystal elements.  The addition of these PE Products to CTG's portfolio significantly increased the range of devices possible for CTG to create in-house.

## 2.  **Items That Have Been Reclassified.**

CTG had asked that BIS classify final finished crystals and crystal blanks cut from boules of PMN-PT and PIN-PMN-PT material produced at the CTG facility in Bolingbrook, Illinois (formerly known as the HC Materials facility until CTG purchased it in 2013).  In response, through CCATS Z1429241, BIS effectively confirmed CTG's analysis of the new post-ECR rules that PMN-PT or PIN-PMN-PT materials in the form of final finished crystals or crystal blanks (regardless of size or dimension) should be EAR-controlled as of the Effective Date.  BIS also confirmed that, under the EAR, such PMN-PT and PIN-PMN-PT materials in the form of final finished crystals and crystal blanks will be considered EAR99 items as of the Effective Date.  CTG can furnish such PE Products either unfinished or finished with a gold coating.

## 3.  **Legal Analysis of Post-ECR Rule Changes.**

This part of our letter repeats the legal analysis we had offered to BIS in reaching the conclusion that Export Control Reform has significantly altered the regulatory framework for the PE Products.  The Department of State announced its revised USML Category XI in July 2014 (the "Relevant USML Amendment").  (See 79 Fed. Reg. 37536 (July 1, 2014).)  The Department of Commerce announced its companion changes to the Commerce Control List ("CCL") to pick up the various items moved by the Relevant USML Amendment from Department of State jurisdiction to Department of Commerce jurisdiction (the "CCL Electronics Amendment").  (See 79 Fed. Reg. 37551 (July 1, 2014).)  In addition, the Department of Commerce has expressly cited PE materials in its revisions to CCL Category 6 with respect to sensors and lasers (the "CCL Sensors Amendment").  (See 79 Fed. Reg. 45288 (August 4, 2014).)  This Section 3 of my letter to DDTC will thus review the pertinent portions of the Relevant USML Amendment, the CCL Electronics Amendment and the CCL Sensors Amendment to demonstrate to DDTC (as was done earlier to BIS) that none of these rules sets forth any controls on PMN-PT or PIN-PMN-PT materials in the form of final finished crystals and crystal blanks.

Based on that analysis, CTG believed that, by the process of elimination, as of the Effective Date, neither the USML nor the CCL controls the CTG PE Products and, instead, those items are now entirely subject to the EAR, regardless of size or dimension.  CTG further believed such PE Products may be exported as EAR99 items.  In CCATS Z1429241 dated December 31, 2014 (attached as <u>Exhibit A</u> to this letter), BIS agreed entirely with this legal analysis by CTG.  Accordingly, CTG believes that CJ 1226-11 (<u>Exhibit B</u> to this letter) has become moot and no longer applies to any of its PE Products, regardless of size or dimension.

Frederick F. Monroe
January 6, 2015
Page 3

 DORSEY™

### 3.1 The Relevant USML Amendment.

As one reads through the Relevant USML Amendment for Category XI, it is quickly evident that none of the "equipment" or "systems" level controls in paragraphs XI(a) or XI(b) can be applied to cover PMN-PT or PIN-PMN-PT materials produced in the form of final finished crystals or crystal blanks.  If the revised USML Category XI would have any provision for such parts, that would appear in the "parts, components, accessories, attachments and associated equipment" provisions of USML paragraph XI(c).   However, when one reviews through all the items enumerated in paragraph XI(c), one sees that item (12) controls:

> underwater sensors (acoustic vector sensors, hydrophones, or transducers) or projectors, specially designed for systems controlled by paragraphs (a)(1) and (a)(2) of this category having any of the following: ...(vi) Designed to withstand pressure during normal operating at depths exceeding 1,000 m and having transducers with any of the following: ...
>
> (B) Incorporating other than lead zirconate titanate as the transduction element.

This is plainly a control only on "sensors (acoustic vector sensors, hydrophones or transducers or projectors" but not on PMN-PT or PIN-PMN-PT materials in the form of final finished crystals or crystal blanks as such.  Item 12 is therefore not relevant to the two classes of PE Products that CTG sought to have classified by BIS in CCATS Z1429241.

There is also item (13) in USML paragraph XI(c), which covers "[p]arts or components containing [PE] materials which are specially designed for underwater hardware, equipment, or systems controlled under paragraph (c)(12)."  Again, the plain language of item (13) speaks to "parts or components containing" such PE materials but not to the PE Products themselves as final finished crystals or crystal blanks, long before they are incorporated by other companies into any other part or component.

Elimination of items (12) and (13) in USML paragraph XI(c) exhausts all the places in which CTG's PMN-PT or PIN-PMN-PT materials in the form of final finished crystals or crystal blanks could be potentially covered as ITAR-controlled defense articles in the post-ECR version of USML Category XI.  It thus seems readily apparent that the Department of State does not intend for the PE Products, in and of themselves, to be ITAR-controlled defense articles after the Effective Date.

### 3.2 The CCL Electronics Amendment.

When one reviews the CCL Electronics Amendment, it is clear that the Department of Commerce intends to control devices manufactured from the CTG PE Products, which are only raw materials in the form of final finished crystals or crystal blanks.  However, in the CCL Electronics Amendment, there is no entry in the CCL that controls the PE Products themselves. More specifically, there is this technical note for ECCN 3A611.x:

> **Note 2 to ECCN 3A611.x:** ECCN 3A611.x controls "parts" and "components" "specially designed" for underwater sensors and projectors controlled by USML Category XI(c)(12) containing single-crystal lead magnesium niobate lead titanate (PMN-PT) based piezoelectrics.

Frederick F. Monroe
January 6, 2015
Page 4

 DORSEY™

Significantly, in the CCL Electronics Amendment ECCN 3A611 controls "military electronics;" ECCN 3B611 controls related "test, inspection, and production commodities for military electronics;" ECCN 3D611 controls "specially designed" "software" for military electronics; and ECCN 3E611 controls "technology" "required" for military electronics. However, there is <u>no</u> provision for an ECCN 3<u>C</u>611 that would control "materials" for military electronics.

That omission, CTG submits, is material and highly significant to this CCR, because, when the Department of Commerce clearly had the opportunity to set forth an explicit control on such materials such as the PE Products, which it clearly understands from Note 2 to ECCN 3A611.x to be a vital constituent material from which such underwater sensors and projectors can be produced, it apparently chose <u>not</u> to do so. In the absence of any affirmative ECCN in CCL Category 3 that applies to PMN-PT or PIN-PMN-PT materials in the form of final finished crystals or crystal blanks, the only logical conclusion, again by the process of elimination, is that CTG's PE Products, by themselves and long before they are fabricated by others into sensors or projectors, are <u>not</u> controlled under any Category 3 ECCN. BIS wholly agreed with this logic in CCATS Z1429241 as of December 31, 2014.

### 3.3     The CCL Sensors Amendment.

In the CCL Sensors Amendment published on August 4, 2014, the Department of Commerce was explicit about controlling certain <u>devices</u> made from the PE materials at issue. The Department of Commerce wrote with respect to an explanation of the revised ECCN 6A001:

> 6A001 (Acoustic systems, equipment and components)
>
> Note 3 is added to the introductory paragraph a.1.c, in order to clarify that 6A001.a.1.c applies to projectors or transducers designed and manufactured using either of two high performance transduction materials: 1) lead-magnesium-niobate/lead-titanate $(Pb(Mg_{1/3}Nb_{2/3})O_3$-$PbTiO_3$, or PMN-PT), or 2) lead-indium-niobate/lead-magnesium-niobate/lead-titanate $(Pb(In_{1/2}Nb_{1/2})O_3$-$Pb(Mg_{1/3}Nb_{2/3})O_3$-$PbTiO_3$, PIN-PMN-PT). These materials are currently being used in medical ultrasound applications, but are increasingly being used in high performance military and civil projectors and transducers. . . .
>
> Paragraph a.2.a.3.d (Lead-magnesium-niobate/lead-titanate (i.e., Pb(Mg1/3Nb2/3)O3-PbTiO3, or PMN-PT) piezoelectric single crystals grown from solid solution) and paragraph a.2.a.3.e (Lead-indium-niobate/lead-magnesium niobate/lead-titanate (i.e., Pb(In1/2Nb1/2)O3-Pb(Mg1/3Nb2/3)O3-PbTiO3, or PIN-PMN-PT) piezoelectric single crystals grown from solid solution) are added as parameters for hydrophone sensing elements, because PMN-PT and PIN-PMN-PT single crystals are a new generation of piezoelectric materials that exhibit superior piezoelectric properties over PZT ceramics. Hydrophones designed using PIN-PMN-PT have greater bandwidth and sensitivity, as well as lower self-noise.

In the above quoted language from the CCL Sensors Amendment, two clear factors emerge: (1) the Department of Commerce is clearly and technically aware of the existence of PMN-PT and PIN-PMN-PT as the raw materials from which sensitive sensors such as transducers or hydrophones can be made; and (2) these materials themselves are acknowledged as being classically "dual use" in nature because the Department of Commerce



expressly notes the utility of such materials in both civilian ("high performance ... civil projectors and transducers" and "medical ultrasound applications") and military uses.

Moreover, when one examines updated CCL Category 6 after the CCL Sensors Amendment and looks at all the "materials" entries in Category 6C, one can readily see that ECCNs 6C002 (materials for optical sensors), 6C004 (optical materials), 6C005 (synthetic crystalline laser host material in unfinished form) and 6C992 (optical sensing fibers) do not cover PMN-PT or PIN-PMN-PT materials in the form of final finished crystals or crystal blanks. Once again, the Department of Commerce has had ample opportunity – in collaboration with the other Wassenaar Arrangement member nations – to develop and promulgate a separate "materials"-type control on the CCL that would fit PMN-PT or PIN-PMN-PT materials in the form of final finished crystals or crystal blanks, but that was not done.

Accordingly, given the "positive" control list philosophy inherent in the CCL's structure, the conclusion must be that there is no applicable ECCN in either Category 3 or Category 6 that applies to PMN-PT or PIN-PMN-PT materials in the form of final finished crystals or crystal blanks, even if devices, systems or equipment made from such PE materials may be controlled items under either Category 3 or Category 6. That means such PMN-PT or PIN-PMN-PT materials in the form of final finished crystals and crystal blanks must be treated as EAR99 items. In CCATS Z1429241, BIS has in fact confirmed to CTG that its PE Products are EAR99 items as December 31, 2014.

## 4.    Prior Commodity Jurisdiction from DDTC.

As noted above in the summary of CTG's history, CTG acquired HC Materials in October 2013. HC Materials had sought a commodity jurisdiction from DDTC on PMN-PT single crystals (cut, partially finished and/or coated for commercial uses such as in medical devices). DDTC responded with CJ 1226-11 dated March 5, 2012 in which it concluded that PMN-PT single crystals were not subject to ITAR controls as long as they have: (a) a thickness of 2 mm or less; (b) a frequency of 1 MHz or higher; and (c) no linear dimension greater than 200 mm, but that materials which exceeded these limitations would be ITAR-controlled. (In CJ 1226-11, DDTC indicated it would later issue a separate CJ as to PIN-PMN-PT materials, but there is no record that DDTC ever did so.) CJ 1226-11 was obviously predicated with the wording of USML Category XI as it existed in March 2012.

CTG believes that CJ 1226-11 became moot on the Effective Date because the basis for that 2012 CJ was the wording of USML Category XI as of March 2012, but USML Category XI was revised on the Effective Date under the Relevant USML Amendment. The new post-ECR ITAR and EAR provisions in the Relevant USML Amendment, the CCL Electronics Amendment and the CCL Sensors Amendment that are summarized above, taken together, now supersede CJ 1226-11 because the Department of State has rewritten the very control rules upon which that CJ 1226-11 was based.

The "positive" list approach in revising the USML means that, to be ITAR-controlled after the Effective Date, the Department of State must list the particular characteristics of the goods that it wishes to cover through the USML. The Department of State has apparently declined to do so in the revised form of USML Category XI(c), as explained at length above in Section 3 of this letter. Once the revised USML Category XI(c) took effect on the Effective Date, the legal predicate for CJ 1226-11 was removed. Any residual ITAR control of PMN-PT material after the



Frederick F. Monroe
January 6, 2015
Page 6

Effective Date must either stand or fall on the basis of the control list shown in the revised form of USML Category XI(c).

Accordingly, CTG believes that, if its PMN-PT materials in the form of final finished crystals or crystal blanks meet the three criteria laid out in CJ 1226-11, then those particular final finished crystals and crystal blanks would be outside ITAR control by the terms of CJ 1226-11. However, with the adoption of the Relevant USML Amendment, the CCL Electronics Amendment and the CCL Sensors Amendment, CTG now also believes that PMN-PT materials in the form of final finished crystals or crystal blanks that do not meet those three criteria are subject to the EAR's jurisdiction after the Effective Date. More specifically, as noted above, CTG believes all PMN-PT materials in the form of final finished crystals or crystal blanks and all PIN-PMN-PT materials in the form of final finished crystals or crystal blanks, regardless of size or dimension, are EAR99 items as of the Effective Date because of the ECR changes to the CCL.

BIS has studied and accepted this CTG legal analysis and, as a result, on December 31, 2014, issued CCATS Z1429241 to CTG. CTG thus believes that CJ 1226-11 is now moot. We bring all this directly to your attention because you were directly involved in the preparation of CJ 1226-11 and in the analysis at DDTC that led up to that earlier CJ.

**5.**     **Further Information.**

If you or any of your DDTC colleagues require any additional information or have any technical questions about CTG's PE Products, which are PMN-PT or PIN-PMN-PT materials in the form of final finished crystals or crystal blanks, please contact me at the phone number or email address above.

**6.**     **Conclusion.**

CTG hopes that the enclosed information in this letter will lead DDTC to agree with BIS that all of CTG's PE Products, which are PMN-PT and PIN-PMN-PT single crystal materials in the form of final finished crystals or crystal blanks (regardless of size or dimension), are now not ITAR-controlled but, instead, are all only subject to the EAR. Under the EAR, in CCATS Z1429241, BIS has stated these PE materials are all EAR99 items, which CTG believes took effect as of the Effective Date because of the Relevant USML Amendment, the CCL Electronics Amendment and the CCL Sensors Amendment.

Thank you for your consideration of this letter and the attached materials submitted on CTG's behalf. Please do not hesitate to contact me if you or any of your DDTC colleagues has any further question about CTG's position with respect to the relevant U.S. export controls applicable the PE Products and the mootness of CJ 1226-11 as of the Effective Date, that is, as of December 31, 2014.

Yours truly,

Nelson G. Dong
Special Counsel for Channel Technologies Group, LLC

Frederick F. Monroe
January 6, 2015
Page 7

⟨ ⟩⟩ DORSEY™

Exhibits

A        CCATS No. Z1429241 (December 31, 2014)

B        CJ No. 1226-11 (March 5, 2012)

DORSEY & WHITNEY LLP

**EXHIBIT A**

**CCATS NO. Z1429241 (DECEMBER 31, 2014)**

**UNITED STATES DEPARTMENT OF COMMERCE
BUREAU OF INDUSTRY AND SECURITY
WASHINGTON, D.C. 20230**

CASE NUMBER: Z1429241

Channel Technologies Group, LLC
C/O DORSEY & WHITNEY LLP                    December 31, 2014
ATTN: KELLY NAKATA                          G158747
701 FIFTH AVENUE
SUITE 6100
SEATTLE, WA 98104

THE FOLLOWING INFORMATION IS IN RESPONSE TO YOUR INQUIRY OF November 26, 2014
REQUESTING COMMODITY CLASSIFICATION(S) FOR:

| COMMODITY | ECCN | SUBPARAGRAPH |
|-----------|------|--------------|
| Single crystal piezoelectric (¿PE¿) materials in final finished crystals or crystal blanks made of lead magnesium ¿ lead titanate (¿PMN-PT¿) | EAR99 | |
| Single crystal piezoelectric (¿PE¿) materials in final finished crystals or crystal blanks made of lead indium niobate ¿ lead magnesium ¿ lead titanate (¿PIN-PMN-PT") | EAR99 | |

COMMENTS FROM LICENSING OFFICER(S):

ITEM #1:
Single crystal piezoelectric ("PE") materials in final finished crystals or crystal blanks made of lead magnesium - lead titanate ("PMN-PT") is classified as EAR99 and does not require a license to most destinations. The applicant must however comply with Prohibitions four (4) through ten (10) listed in Part 736 of the Export Administration Regulations.

ITEM #2:
Single crystal piezoelectric ("PE") materials in final finished crystals or crystal blanks made of lead indium niobate - lead magnesium - lead titanate ("PIN-PMN-PT") is classified as EAR99 and does not require a license to most destinations. The applicant must however comply with Prohibitions four (4) through ten (10) listed in Part 736 of the Export Administration Regulations.

                                        FOR INFORMATION CONCERNING
                                        THIS CLASSIFICATION CONTACT
                                        DARRELL SPIRES
DENNIS KREPP                            PHONE #: 202-482-1954

FORM BXA-6002L(REV. 7/96)



**UNITED STATES DEPARTMENT OF COMMERCE
BUREAU OF INDUSTRY AND SECURITY
WASHINGTON, D.C. 20230**

DIVISION DIRECTOR                                    BIS/EA/STC/SA

FORM BXA-6002L(REV. 7/96)

**EXHIBIT B**

**CJ NO. 1226-11 (MARCH 5, 2012)**

# Status of Commodity Jurisdiction Determination

**United States Department of State**

*Bureau of Political-Military Affairs*
*Directorate of Defense Trade Controls*

*Washington, D.C. 20522-0112*

**MAR 05 2012**

In Reply refer to
DDTC Case CJ 1226-11

YOUR LETTER DATED: January 19, 2012

COMMODITY JURISDICTION DETERMINATION FOR:
**PMN-PT Piezoelectric Single Crystals: Cut, Partially Finished and or Coated for Commercial Use (e.g. Medical Devices) (A re-submission of CJ 613-11)**

Your commodity jurisdiction (CJ) request was resubmitted (prior CJ Case Number CJ 613-11) on behalf of H.C. Materials Corporation and was referred to the Departments of Defense, Commerce and Homeland Security, and the National Aeronautics and Space Administration for review and recommendations. The items are single lead indium niobate-lead magnesium niobate – lead titanate (PMN-PT) piezoelectric single crystals: cut, partially finished, and/or coated. This determination does not include the boule.

The Department of State has determined that the **PMN-PT Piezoelectric Single Crystals: Cut, Partially Finished and/or Coated for Commercial Use (e.g. Medical Devices), are not subject to the licensing jurisdiction of the Department of State** as long as they meet all of the following criteria: (a) a thickness of 2 mm. or less; (b) a frequency of 1 MHz or higher; and (c) no linear dimension greater than 200 mm. However, export may require authorization from the Department of Commerce (DOC). Please consult the DOC Office of Exporter Services at (202) 482-4811 to make a Classification Request (CCATS) and satisfy applicable requirements prior to export.

Continued on Page Two

---

Page Two

In Reply Refer to
DDTC Case CJ 1226-11

A separate commodity jurisdiction should be submitted for any PMN-PT piezoelectric single finished parts that do not meet any of these criteria. A jurisdiction determination for the bulk (boule) PMN-PT Piezoelectric Single Crystals will be rendered via a separate final determination letter.

Should you not concur with this determination and have additional facts not included in the original submission, you may submit a new CJ request. If you do not concur with this determination and have no additional facts to present, then you may request that this determination be reviewed by the Deputy Assistant Secretary of State for Defense Trade and Regional Security.

Should you require further assistance on this matter, please contact Frederick ("Tad") F. Monroe at Monroeff@state.gov or 202 663-2920.

Sincerely,



Robert S. Kovac
Managing Director

cc:    Dr. Pengdi Han
       H.C. Materials Corporation
       479 Quadrangle Drive
       Suite E
       Bollingbrook, IL 60440

1

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>CORPORATE RECOVERY ASSOCIATES, LLC, as Liquidating Trustee appointed under the confirmed Chapter 11 plan of Channel Technologies Group, LLC | DEFENDANTS<br>Blue Wolf Capital Partners, LLC et al |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Christian Orozco<br>California State Bar No. 285723<br>corozco@lynnllp.com<br>Lynn Pinker Cox & Hurst, LLP<br>2100 Ross Avenue, Suite 2700<br>Dallas, Texas 75201<br>(214) 981-3800 - Telephone | ATTORNEYS (If Known) |

**PARTY** (Check One Box Only)
- ☐ Debtor
- ☐ U.S. Trustee/Bankruptcy Admin
- ☐ Creditor
- ☐ Other
- ☑ Trustee

**PARTY** (Check One Box Only)
- ☐ Debtor
- ☐ U.S. Trustee/Bankruptcy Admin
- ☐ Creditor
- ☑ Other
- ☐ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

COMPLAINT TO AVOID AND RECOVER FRAUDULENT TRANSFERS
[11 U.S.C. §§ 548, 550]

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- ☐ 11-Recovery of money/property - §542 turnover of property
- ☐ 12-Recovery of money/property - §547 preference
- ☑ 13-Recovery of money/property - §548 fraudulent transfer
- ☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- ☐ 71-Injunctive relief – imposition of stay
- ☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- ☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- ☐ 01-Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
- ☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☑ Check if a jury trial is demanded in complaint | Demand $ Over 1 million dollars |

Other Relief Sought

230287

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>CHANNEL TECHNOLOGIES GROUP, LLC | BANKRUPTCY CASE NO.<br>9:16-bk-11912-DS | |
| DISTRICT IN WHICH CASE IS PENDING<br>CENTRAL | DIVISION OFFICE<br>NORTHERN | NAME OF JUDGE<br>Deborah J. Saltzman |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>October 12, 2018 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Christian Orozco | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.