# EXHIBIT 1

EXECUTION VERSION

# OPERATING AGREEMENT
## of
## CHANNEL TECHNOLOGIES GROUP, LLC

This Operating Agreement (the "Agreement") of Channel Technologies Group, LLC (the "Company") is entered into as of December  28 , 2011 by and between the Company and BW Piezo Holdings, LLC, as the sole member of the Company (the "Member").

## R E C I T A L S

WHEREAS, the Company became a limited liability company pursuant to the filing of articles of organization – conversion with the Office of the Secretary of State of the State of California, which was accepted for record on the ___ day of December (the "Articles of Organization"); prior thereto, the Company was a corporation formed pursuant to the California Corporations Code.

WHEREAS, the Company and the Member desire to enter into this Agreement in order to form and provide for the governance of the Company and the conduct of its business;

NOW, THEREFORE, the Member hereby agrees as follows:

## ARTICLE I: ORGANIZATION

1.1.    <u>Formation</u>.  The Member hereby acknowledges that the Company became a limited liability company on December ___, 2011 pursuant to the Beverly-Killea Limited Liability Company Act, as amended (the "Act"); prior thereto, the Company was a corporation formed pursuant to the California Corporations Code.

1.2.    <u>Name</u>.  The name of the Company is Channel Technologies Group, LLC.

1.3.    <u>Principal Executive Office</u>.  The principal executive office of the Company is at 879 Ward Drive, Santa Barbara, California 93111, or such other place or places as may be determined by the Managers (as such term is defined below) from time to time.

1.4.    <u>Agent for Service of Process</u>.  The initial agent for service of process on the Company shall be Corporation Service Company which will do business in California as CSC-Lawyers Incorporating Service.  The address for the initial agent shall be 2730 Gateway Oaks Drive, Suite 100, Sacramento, CA, 95833.  The Managers may from time to time change the Company's agent for service of process.

1.5.    <u>Purpose</u>.  The Company will be formed for the purposes of engaging in any lawful business permitted under the law.

1.6.    <u>Limited Liability</u>.  The Member intends the Company to be a limited liability company under the Act.  The Member shall not be bound by, or be personally liable for, the expenses, liabilities, or obligations of the Company except as otherwise provided in the Act or in this Agreement.

1.7.    Term.  The term of existence of the Company shall commence on the effective date of filing of Articles of Organization with the California Secretary of State, and shall continue until terminated by the provisions of this Agreement or as provided by law.

## ARTICLE II: FINANCIAL MATTERS

2.1.    Capital Contribution.  The Member shall contribute to the capital of the Company as the Member's initial capital contribution (together with any future contributions of capital, the "Capital Contribution") the amount specified in Exhibit "A" to this Agreement.  The Member may contribute such additional amounts of capital to the Company as the Member deems necessary or appropriate from time to time.

2.2.    Capital Account.  To the extent required by the Internal Revenue Code and the U.S. Treasury Regulations, a capital account shall be maintained for the Member consisting of the Capital Contribution, (1) increased by the Member's share of Company profits, (2) decreased by the Member's share of Company losses, and (3) otherwise adjusted as required in accordance with applicable provisions of such code and regulations.

2.3.    No Interest.  Except as specifically provided for in this Agreement, no interest shall be paid on funds contributed to the capital of the Company or on the balance of the Member's capital account, if any.

2.4.    Loans to Company.  In addition to the Capital Contribution, the Member may, from time to time, loan money to the Company.  Such loans shall be repaid with a reasonable interest based on prevailing loan rates.

2.5.    Allocation of Profits and Losses.  The profits and losses of the Company and all items of Company income, gain, loss, deduction, or credit shall be allocated, for Company book purposes and for tax purposes, to the Member.

2.6.    Distributions.  All cash resulting from the normal business operations of the Company (including cash proceeds from the sale of Company assets, if any) shall be distributed to the Member at such times as the Managers deem appropriate.

2.7.    Certificated Interests.  The membership interests in the Company shall be certificated.  So long as the Company is a single member limited liability company, the certificates shall reference the percentage interest owned by the Member (i.e., 100%).  If the Company becomes a multi-member limited liability company, this Agreement shall be amended and restated so that ownership in the Company is reflected by membership units instead of percentage interests.  The membership interests of the Company shall be securities governed by Article 8 of the Uniform Commercial Code as adopted and in effect in the State of California.

## ARTICLE III: MANAGEMENT

3.1.    Management by Managers.  The responsibility for managing the business and affairs of the Company shall be delegated to two Managers who, effective as of the date of this Agreement, shall be Kevin Ruelas and Pierre Chao (each a "Manager" and together the "Managers").  Any person or entity previously named as manager of the Company is hereby

- 2 -

removed and replaced by the named Managers as of the date of this Agreement. Except as otherwise provided herein, any actions taken by the two Managers must be taken by Managers appointed by the Member. At any time, with or without cause and in its sole discretion, the Member may (i) change the number of Managers, (ii) remove a Manager, (iii) replace a Manager or (iv) become a Manager. If the number of Managers is decreased to one (1), then all references herein to "Managers" shall be read to say "Manager." The Managers may act by vote taken at a meeting of Managers where a quorum is present or by written consent, pursuant to <u>Section 4.6</u>.

3.2.    <u>Compensation</u>. The Managers shall be entitled to such reasonable compensation for his services as the Managers may determine from time to time.

3.3.    <u>Power and Authority of the Managers</u>. Subject to the terms hereof, the Managers will have full, exclusive and complete discretion in the management and control of the affairs of the Company, will make all decisions affecting Company affairs, and will have all of the rights, powers and obligations of a manager under the Act and otherwise as provided by law. Except as otherwise expressly provided in this Agreement, the Managers are hereby granted the right, power and authority to do on behalf of the Company all things that, in their judgment, are necessary or appropriate to manage the Company's affairs and to fulfill the purposes of the Company

3.4.    <u>Officers</u>. The Managers hereby appoint as the initial officers of the Company, Kevin Ruelas as President, Secretary and Treasurer of the Company. The President, Secretary and Treasurer of the Company shall report to the Managers of the Company. The Managers or the Member may from time to time appoint additional officers, in each case by written consent, with such duties, authorities, responsibilities and titles as the Managers may deem appropriate. Such officers shall serve until their successors are duly appointed by the Managers or until their earlier removal by the Managers or their resignation.

3.5.    <u>Title to Company Assets</u>. All Assets of the Company, whether real or personal, shall be held in the name of the Company.

3.6.    <u>Banking</u>. All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company at such locations as shall be determined by the Managers. Withdrawal from such accounts shall require the signature of such person or persons as the Managers may designate.

## ARTICLE IV
## MEETINGS AND CONSENTS OF MANAGERS

4.1    <u>Meetings</u>. Any matter requiring the consent of the Managers under this Agreement may be considered at a meeting of the Managers held not less than two (2) nor more than ten (10) days after notice of that meeting has been given to all Managers. Any notice of a meeting shall be delivered personally, by mail or by other means of written communication addressed to the Manager at its address appearing on the books of the Company. All meetings shall be held at the principal executive office of the Company or such other reasonable place as the Managers designate and during normal business hours, unless waived by all the Managers.

4.2     Records of Meetings.  A record of all actions, meetings or proceedings of the Managers shall be maintained in a Company minute book under the supervision of the Managers.

4.3     Participation.  Managers may participate in any meeting either in person or by means of a conference telephone or similar communications equipment through which all persons participating in the meeting can hear each other.  Participation in a meeting pursuant to this Section 4.3 shall constitute presence in person at the meeting.

4.4     Manner of Acting.  Except as otherwise provided by law or this Agreement, the action of a majority of Managers at any meeting at which a quorum is present shall be the act of the Company.

4.5     Quorum.  For purposes of this Agreement, the presence of a majority of the Managers shall constitute a quorum for the transaction of business.  Though less than a quorum, a majority of Managers present at a meeting may adjourn the meeting, from time to time and without further notice, until a quorum shall be present; provided, however, that any Managers absent from the adjourned meeting shall be provided written notice of such adjournment.

4.6     Consent of Managers in Lieu of Meeting.  Subject to the terms hereof, any action which may be taken at any meeting of the Managers may be taken without a meeting, without prior notice and without a vote if a written consent, setting forth the action so taken, is signed by both Managers.  Such consent shall be filed with the minutes of the meetings of Managers in the records of the Company.  Such written consent may be executed in counterparts, each of which, so executed, shall constitute one and the same original document.  Facsimile signatures shall be deemed originals for purposes of this Section 4.6.

## ARTICLE V
## RESIGNATION OR REPLACEMENT OF MANAGER

5.1     Removal or Replacement of Manager.  The removal or replacement (with or without cause) of any Manager shall be at the Member's (or its, his or her successor's or assign's) request and in such Member's sole discretion.

5.2     Resignation of Manager.  Any person serving in the capacity of a Manager may resign as Manager by giving at least ten (10) days' prior written notice of his or her resignation to the Member.  The resigning Manager shall cooperate fully with the successor Manager so that the responsibilities of the resigning Manager may be transferred to the successor Manager with as little disruption of the Company's business and affairs as is practicable.

5.3     Vacancy in Manager Position.  In the event that any Manager designated hereunder (or by any of its, his or her successors or assigns) for any reason ceases to serve as a Manager during his or her term of office, whether as a result of removal or resignation, the resulting vacancy in such position shall be filled by a new Manager designated by the Member (or such Member's successors or assigns).

5.4     Appointment of a Successor Manager.  The appointment of any person to be a successor Manager under this Article V shall be effective only if that person has accepted and assumed in writing all the terms and provisions of this Agreement.

## ARTICLE VI: ACCOUNTS AND RECORDS

6.1.    <u>Company Books</u>.   Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office.

6.2.    <u>Accounting; Fiscal Year</u>.   A balance sheet and income statement of the Company shall be prepared promptly following the close of each fiscal year in a manner appropriate to and adequate for the Company's business and for carrying out the provisions of this Agreement.   The fiscal year of the Company shall be January 1 through December 31 or as otherwise determined by the Managers.

6.3.    <u>Records to be Maintained</u>.   At all times during the term of existence of the Company, and beyond that term if the Managers deem it necessary, the Managers shall keep or cause to be kept the books of account referred to in <u>Section 6.2</u>, and the following:

       (a)    A document including the full name and current business or residence address of the Member, together with the Capital Contribution and the share in Profits and Losses of the Member;

       (b)    A copy of the Articles of Organization, as amended;

       (c)    Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

       (d)    Executed copy of this Agreement, as amended;

       (e)    Financial statements of the Company for the six most recent fiscal years; and

       (f)    The books and records of the Company as they relate to the Company's internal affairs for the current and past four fiscal years.

6.4.    <u>Information Provided to the Member</u>.   Within 90 days after the end of each taxable year of the Company, the Company shall send to the Member any information requested by the Member.

## ARTICLE VII: DISSOLUTION AND WINDING UP

7.1.    <u>Events Causing Dissolution</u>.   The Company shall be dissolved on the first to occur of the following events:

       (a)    The decision of the Member to dissolve the Company;

       (b)    The sale or disposition of substantially all of the Company's assets;

       (c)    The election by the Managers to dissolve the Company following the distribution to the Members or other sale or disposition at any one time of all or substantially all of the assets of the Company; or

(d)      Entry of a decree of judicial dissolution pursuant to the California Corporations Code.

7.2.    <u>Winding Up</u>.  On the dissolution of the Company, the Company shall engage in no further business other than that necessary to wind up the business and affairs of the Company. The Managers or a liquidating trustee, if one is appointed, shall wind up the affairs of the Company and shall give written notice of the commencement of winding up by mail to all known creditors and claimants against the Company whose addresses appear in the records of the Company.  After paying or adequately providing for the payment of all known debts of the Company (except debts owing to the Member) the remaining assets of the Company shall be distributed or applied in the following order of priority:

(a)      To pay the expenses of liquidation;

(b)      To repay outstanding loans to the Member; and

(c)      To the Member.

## ARTICLE VIII: GENERAL PROVISIONS

8.1.    <u>Entire Agreement</u>.  This Agreement constitutes the whole and entire agreement with respect to the subject matter of this Agreement.  This Agreement may be modified only by written instrument signed by the Member.

8.2.    <u>Governing Law; Severability</u>.  This Agreement shall be construed and enforced in accordance with the internal laws of the State of California.  If any provision of this Agreement is determined by any court of competent jurisdiction or arbitrator to be invalid, illegal, or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or unenforceability or, if that is not possible, such provision shall, to the extent of such invalidity, illegality, or unenforceability, be severed, and the remaining provisions of this Agreement shall remain in effect.

8.3.    <u>Titles and Headings</u>.  The article, section, and paragraph titles and headings contained in this Agreement are inserted as matter of convenience and for ease of reference only and shall be disregarded for all other purposes, including the construction or enforcement of this Agreement or any of its provisions.

8.4.    <u>No Third Party Beneficiary Intended</u>.  This Agreement is made solely for the benefit of the Member and his permitted successors and assigns, and no other person or entity shall have or acquire any right by virtue of this Agreement.

*(Signature Page Follows.)*

IN WITNESS WHEREOF, the undersigned have executed this Agreement on the day and year first above written.

COMPANY:

**CHANNEL TECHNOLOGIES GROUP, LLC**

By: _____
    Name:
    Title:

**SOLE MEMBER:**

**BW PIEZO HOLDINGS, LLC**

By: _____
    Name:
    Title:

*Signature Page to Channel Technologies Group, LLC Operating Agreement*

IN WITNESS WHEREOF, the undersigned have executed this Agreement on the day and year first above written.

**COMPANY:**

**CHANNEL TECHNOLOGIES GROUP, LLC**

By: _____
    Name:
    Title:

**SOLE MEMBER:**

**BW PIEZO HOLDINGS, LLC**

By: _____
    Name: Adam Blumenthal
    Title: President

*Signature Page to Channel Technologies Group, LLC Operating Agreement*

## EXHIBIT A

## MEMBERSHIP INTERESTS

| Member | Membership Interest | Initial Capital Contribution |
| --- | --- | --- |
| BW Piezo Holdings, LLC | 100% | $1,000.00 |

#10835136_v7

# EXHIBIT 2



# Blue Wolf Acquires Channel Technologies Group

January 03, 2012 09:00 AM Eastern Standard Time

NEW YORK--(BUSINESS WIRE)--Blue Wolf Capital Partners LLC, the New York-based private equity firm, today announced that Blue Wolf Capital Fund II, L.P. ("Blue Wolf"), through an affiliate, has acquired Channel Technologies Group, LLC ("Channel Technologies" or the "Company"), a vertically-integrated manufacturer and supplier of piezo-electric ceramics, transducers and complex systems and services, from Channel Technologies, Inc. The Company's executive management team and Gladstone Investment Corporation (NASDAQ: GAIN) are investing in the Company alongside Blue Wolf. Terms of the transaction were not disclosed.

Channel Technologies designs and manufactures products used in military, commercial, geophysical and medical applications. The Company has four divisions: Channel Industries, which manufactures piezoelectric ceramics; International Transducers, which designs, manufactures and repairs acoustic transducers; Sonatech, which provides consulting and highly engineered acoustic solutions for defense-industry customers; and Electro-Optical Industries, which manufactures advanced infrared and visible light spectrum test and calibration equipment. Based in Santa Barbara, CA, the company has approximately 250 employees.

The Company's management team, led by CEO Kevin Ruelas, will remain with Channel Technologies under its new owner. Mr. Ruelas said, "We look forward to continued growth under Blue Wolf's ownership. The financial resources and broad expertise they bring to the table will allow us to augment our organic growth and consider potential acquisitions to keep up with the rapid expansion of our end-markets."

Blue Wolf Partner Adam Blumenthal said, "Channel Technologies serves customers with complex requirements, driven by both U.S. Government defense-spending priorities and the trajectory of the broader market. Channel Technologies has a diverse customer base, has been a market leader virtually since its inception in 1959, and is led by a smart, engaged management team. Blue Wolf's commitment to managing the environmental, social and governance features of companies makes us the ideal partner for a company whose business is so closely tied to important national and global trends."

Blue Wolf Principal Haranjeet Narulla added, "The Company's cutting edge technology has sophisticated applications in many scientific, engineering, medical and military areas. We believe our experience working with government and businesses in the healthcare, energy and other industries, coupled with our operational focus, will make us a good partner for this dynamic organization. We expect to invest in all aspects of the Company, including human capital, capital equipment and information systems, to further strengthen the Company's leadership position."

Blue Wolf was assisted in this acquisition by Renaissance Strategic Advisors, a Washington, D.C.-based defense consulting firm. Holland & Knight served as Blue Wolf's legal counsel.

**About Channel Technologies Group**

Channel Technologies Group (www.channeltechgroup.com) is a vertically integrated manufacturer that specializes in mission critical technologies for military and commercial applications. Since its founding in 1959 as Channel Industries, Channel Technologies has been providing a broad range of highly engineered value added products, components, and systems for use in the most demanding environments. Channel Technologies' products and services are used in a variety of applications and by diverse end users, including medical device manufacturers, oil service and exploration companies, and customers in the defense industry, including several departments of the U.S. Navy and many leading defense contractors.

Blue Wolf Capital Partners LLC is a private equity firm that invests in companies in which effective management of relationships with complex constituencies, such as government and labor, can change organizations and create value. For additional information, please visit www.blue-wolf.com.

**About Gladstone Investment Corporation**

Gladstone Investment Corporation is a publicly traded business development company that seeks to make debt and equity investments in small and mid-sized businesses in the United States in connection with acquisitions, changes in control and recapitalizations. Information on the business activities of all the Gladstone funds can be found at www.gladstonecompanies.com.

## Contacts

Owen Blicksilver Public Relations, Inc.

Caroline Luz, 203-656-2829

caroline@blicksilverpr.com

# EXHIBIT 3

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
9/8/2016 1:41:00 PM
By: Sarah Sisto, Deputy

1  GARY W. NEVERS, ESQ., SB#82512
     gnevers@npwlaw.com
2  SHARLENE D. LEE, ESQ., SB#274033
     slee@npwlaw.com
3  NEVERS, PALAZZO, PACKARD,
   WILDERMUTH & WYNNER, PC
4  31248 Oak Crest Drive, Suite 100
   Westlake Village, California 91361
5  Telephone: (818) 879-9700
   Facsimile: (818) 879-9680
6
   Attorneys for Plaintiff Ralph L. Phillips
7

8  ## SUPERIOR COURT OF THE STATE OF CALIFORNIA

9  ## COUNTY OF SANTA BARBARA

10

11  RALPH L. PHILLIPS,                    CASE NO.  16CV03968

12          Plaintiff,                    **COMPLAINT FOR**

13      vs.                               1.  **FRAUD AND DECEIT BY
                                              INTENTIONAL
14  PIEZO INVESTMENT HOLDINGS, LLC, a         MISREPRESENTATION**
    limited liability company; BW PIEZO   2.  **FRAUD AND DECEIT BY
15  HOLDINGS, LLC, a limited liability        CONCEALMENT**
    company; CHANNEL TECHNOLOGIES       3.  **RESCISSION AND RESTITUTION
16  GROUP, LLC, a limited liability company;     BASED ON FRAUD IN THE
    and DOES 1 through 180, inclusive,        INDUCEMENT**
17                                        4.  **DECLARATORY RELIEF**
            Defendants.                   5.  **MONEY OWED PLAINTIFF**
18                                        6.  **ACCOUNTING**

19                                        **REQUEST FOR JURY TRIAL**

20

21  Plaintiff Ralph L. Phillips alleges as follows:

22                  ## GENERAL ALLEGATIONS

23      1.      Plaintiff Ralph L. Phillips (hereinafter "Plaintiff" or "Phillips") is now, and at all

24  times herein mentioned was, an individual residing in County of Ventura, State of California.

25      2.      Plaintiff is informed and believes and thereon alleges that Defendant Piezo

26  Investment Holdings, LLC (hereinafter "Piezo LLC" or "Piezo") is a limited liability company

27  organized and existing under the laws of Delaware which at all times relevant hereto has been doing

28  business in the County of Santa Barbara, State of California.

1    3.    Plaintiff is informed and believes and thereon alleges that Defendant BW Piezo

2    Holdings, LLC (hereinafter "BW Piezo LLC" or "BW Piezo") is a limited liability company

3    organized and existing under the laws of Delaware which at all times relevant hereto has been doing

4    business in the County of Santa Barbara, State of California, and that Piezo LLC has been at all

5    relevant times an owner of membership interests in BW Piezo LLC.

6    4.    Plaintiff is informed and believe and thereon alleges that Defendant Channel

7    Technologies Group, LLC (hereinafter "CTG LLC" or "CTG") is a limited liability company

8    organized and existing under the laws of California which had its principal place of business in

9    Santa Barbara, California, and that CTG has at all relevant times been a subsidiary of BW Piezo

10   LLC.

11   5.    Plaintiff is ignorant of the true names and capacities of the Defendants sued herein

12   as Does 1 through 180, inclusive, and therefore sue said Defendants by such fictitious names.

13   Plaintiff will seek leave to amend this Complaint to allege the true names and capacities of such

14   Defendants when ascertained. Plaintiff is informed and believes and based thereon alleges that each

15   of the fictitiously named Defendants is responsible in some manner for the occurrences herein

16   alleged, and that Plaintiff's damages as herein alleged were proximately caused by their conduct.

17   6.    Each reference in this Complaint to "defendant," "defendants," "co-defendants,"

18   "defendant companies," "company defendants," "all persons acting under, in concert with, or for

19   him/her/it", or to any specifically named defendant refers also to all Defendants, including those

20   sued or sued and served herein under fictitious names.

21   7.    Plaintiff is informed and believes and thereon alleges that at all times herein

22   mentioned, each of the Defendants was the actual or ostensible duly authorized agent, managing

23   agent, servant, employee, representative, alter ego, co-conspirator, incorporator, officer, director,

24   shareholder, member, parent, brother or sister company or corporation, predecessor and successor-

25   in-interest of each of the remaining co-defendants, and in doing the things hereinafter alleged, was

26   acting within the course and scope of said agency, employment and office, with the express and/or

27   implied permission, consent, resolution, direction, authorization and ratification of the remaining

28   co-defendants, and each of them.

8.     Plaintiff is informed and believes and thereon alleges that Defendants Piezo LLC, BW Piezo LLC, CTG LLC, and Does 1 through 180, inclusive, are controlled and operated as a single enterprise. Plaintiff is informed and believes, and on that basis alleges, that at all times relevant herein, each one of the Defendants Piezo LLC, BW Piezo LLC, CTG LLC, and Does 1 through 180, inclusive, were the alter ego of one another and each of them, and that such a unity of interest and ownership existed between them that separate personalities have not in reality existed; and there would be an inequitable result if the acts and omissions at issue in this case were treated as those of any of the Defendants Piezo LLC, BW Piezo LLC, CTG LLC, and Does 1 through 180 alone. Plaintiff is further informed and believes that the Defendants Piezo LLC, BW Piezo LLC, CTG LLC, and Does 1 through 100 commingle funds and assets among themselves, that the Defendants Piezo LLC, BW Piezo LLC, CTG LLC, and Does 1 through 180 have identical, nearly identical or effectively identical owners, that the Defendants Piezo LLC, BW Piezo LLC, CTG LLC, and Does 1 through 180 have the same offices, directors, and officers and that the Defendants Piezo LLC, BW Piezo LLC, CTG LLC, and Does 1 through 180 use one another as a mere shell or conduit for the affairs of one another. In addition, Plaintiff is informed and believes that each of the Defendants Piezo LLC, BW Piezo LLC, CTG LLC, and Does 1 through 180 disregard requisite formalities, shares employees and each transfers assets or properties away and/or creates or shifts liabilities so that each may be left with insufficient capital to meet the needs of each entity's business and its liabilities and without consideration to the detriment of the entity's creditors.

9.     BW Piezo LLC was a desperate private equity company that owned CTG LLC. BW Piezo had terminated the CEO of CTG LLC, needed money to pay him off, and needed a new CEO with a history of turning companies around to save their company that was losing money and confidence. Defendants started courting Plaintiff, painting a rosy picture of millions of dollars of profits with a glowing bank financing package and a story describing how with the acquisition of a company called HC Materials, the profitable operation of CTG LLC would combine with the even more profitable operation of HC Materials and make everyone a lot of money.

10.     In the weeks prior to signing the Employment Agreement, Plaintiff met with Adam Blumenthal, Haran Narulla, and Charlie Miller, each of whom were principals or managing

3
COMPLAINT

1   members of Piezo LLC, BW Piezo LLC and CTG LLC. Each were representatives of the referenced

2   Defendants, who had authority to speak for the Defendants, to negotiate the terms of the

3   Employment Agreement and to enter that agreement on behalf of CTG LLC. Specifically, Plaintiff

4   met with Mr. Blumenthal, Mr. Narulla, and Mr. Miller in person in New York City, NY, and with

5   Mr. Blumenthal and Mr. Narulla in person in Santa Barbara, CA.  In addition, prior to executing

6   the Employment Agreement, Plaintiff spoke by telephone multiple times with Mr. Blumenthal and

7   Mr. Narulla.

8       11.    Defendants promised Plaintiff 4% of CTG LLC in equity incentives, and Plaintiff

9   was encouraged to buy a bigger stake.  To further encourage him, Defendants promised that for

10  every dollar Plaintiff invested, Plaintiff would receive a matching dollar from Defendants, with no

11  downside.

12      12.    Plaintiff believed the Defendants' story, and was hired as President and Chief

13  Executive Officer of CTG LLC under a written Employment Agreement in 2013. The Employment

14  Agreement provided Plaintiff a salary of $300,000 per year plus discretionary performance bonuses,

15  "Equity Compensation" consisting of restricted units equaling  approximately 4% of the fully-

16  diluted equity of CTG LLC, and the opportunity to invest $500,000 in CTG LLC. CTG LLC agreed

17  in the Employment Agreement that BW Piezo LLC, the parent company of CTG LLC, would lend

18  Plaintiff up to $250,000 of the $500,000 purchase price of units, secured only by the units purchased

19  with the loan. Shortly after signing the Employment Agreement, Plaintiff made his $250,000 cash

20  contribution.

21      13.    In the discussions preceding execution of the Employment Agreement, the

22  representatives of the referenced Defendants, who had authority to speak for the Defendants, to

23  negotiate the terms of the Employment Agreement and enter that agreement on behalf of CTG LLC,

24  made the following material representations to Plaintiff:

25          (a)    The Defendants and in particular CTG LLC, were profitable and were in good

26  financial condition.  This representation was not true.  Defendants overstated the financial

27  performance of Defendants, and in particular CTG LLC. CTG LLC was not profitable.

28          (b)    CTG LLC would be merged with a company that CTG LLC was in the

4

COMPLAINT

1  process of acquiring, HC Materials, such that Plaintiff would be buying a direct ownership in the
2  combined company.  Defendants also represented that the merged CTC LLC/HC entity would be
3  very profitable, and together be in excellent financial condition.  This representation was not true.
4  Defendants overstated the financial performance of HC Materials, and the projections for the
5  financial strength of the combined CTC LLC/HC entity were overstated.  Defendants' assertions of
6  the reasonably achievable performance of the combined CTC LLC/HC entity were overstated and
7  not warranted by the facts known to Defendants.  Additionally, HC Materials and CTG LLC were
8  not merged, but HC Materials was instead acquired by BW Piezo.

9          (c)      When Plaintiff purchased the units by investing $250,000, Defendants would
10  match Plaintiff's investment as a loan, with all units purchased thereby belonging to Plaintiff, and
11  the loan would be repayable only on the sale of CTG LLC or out of a 50% of the amount of any
12  annual performance bonus above a $150,000 bonus target with the sole remedy of Defendants being
13  recourse against the shares purchased with the loaned funds, so that Plaintiff would never be sued
14  for collection of the Note and his other assets other than the units purchased with the loaned funds
15  would not be subject to collection for any liability under the Note. This representation was not true.

16          14.     After Plaintiff accepted the offered position, signed the Employment Agreement,
17  began working as CEO and President of CTG LLC, and contributed $250,000 in cash, Defendants
18  presented documents to Plaintiff stating that they documented the agreement regarding Plaintiff's
19  purchase of units and the loan for the purchase. A copy of the Piezo Investment Holdings, LLC
20  Mirror Unit Grant Agreement as of October 11, 2013 (the "October 11, 2013 Grant Agreement") is
21  attached hereto as Exhibit A and incorporated by this reference.  A copy of the Piezo Investment
22  Holdings, LLC Mirror Unit Grant Agreement as of October 14, 2013 (the "October 14, 2013 Grant
23  Agreement") (collectively, with the October 11, 2013 Grant Agreement, the "October Grant
24  Agreements") is attached hereto as Exhibit B and incorporated by this reference.  A copy of the
25  Promissory Note ("Note") made by Phillips as of October 11, 2013 in favor of BW Piezo LLC for
26  $250,000 is attached hereto as Exhibit C and incorporated by this reference.  A copy of the Pledge
27  Agreement ("Pledge') between Phillips and BW Piezo LLC dated as of October 11, 2013 is attached
28  hereto as Exhibit D and incorporated by this reference.

1    15.    Plaintiff reviewed the Note, Pledge, and October Grant Agreements before signing

2  them but did not have them reviewed by an attorney. Plaintiff did not understand before signing the

3  Note, Pledge, and October Grant Agreements that the terms of the Note, Pledge and October Grant

4  Agreements were inconsistent in material respects from the terms of the Employment Agreement,

5  as well as from the representations made by Defendants prior to commencement of Plaintiff's

6  employment. For example:

7        (a)    The Employment Agreement states that the loan will be repayable only on

8  sale of the company or out of a 50% of the amount of any annual performance bonus above a

9  $150,000 bonus target. However, the Note states that the Note is due in 5 years, or on an earlier

10  cessation of Phillips' employment.

11        (b)    The Employment Agreement states that the loan will be secured only by the

12  units purchased by the loan. However, the Note and Pledge state that the loan is not only collectible

13  by resort to the units purchased, but at BW Piezo's election could be collected by a suit for a money

14  judgment against Plaintiff personally in the full amount of the Note, interest and attorney fees and

15  costs. The Note and Pledge also state that the units are not the only recourse but BW Piezo LLC

16  could collect in any manner, and purports to name BW Piezo LLC as Plaintiff's attorney in fact in

17  the event of default to transfer Plaintiff's units and assume the benefits thereof to the exclusion of

18  Plaintiff.

19        (c)    The Employment Agreement states that Plaintiff would have the opportunity

20  to invest up to $500,000 in CTG LLC. However, under the October 11, 2013 Grant Agreement,

21  Piezo LLC granted Plaintiff 269 "Mirror Preferred Units" and 268,908 "Mirror Common Units" in

22  Piezo LLC. Similarly, under the October 14, 2013 Grant Agreement, Piezo LLC granted Plaintiff

23  1,208,841 "Mirror Common Units" in Piezo LLC. Thus, Plaintiff was not issued ownership units

24  in CTG LLC as promised in the Employment Agreement, but units of membership interest in Piezo

25  LLC called mirror units. These mirror units purported to tie performance of Piezo, LLC membership

26  interests with units of membership interest in BW Piezo LLC owned by Piezo LLC.

27    16.    Plaintiff signed the Note, the Pledge, and the October Grant Agreements without

28  consulting counsel and without understanding the discrepancy or the details concerning the nature

1  of the units granted.

2      17.    Defendants did not use Plaintiff's $250,000 cash investment as working capital for
3  CTG LLC, but instead used the funds to pay off the CEO Plaintiff had replaced.  Plaintiff later
4  became aware that other executives of CTG LLC whose employment had ended received their
5  invested funds back and were forgiven amounts loaned to them to make their investments.

6      18.    The bank also bought Defendants' story, and loaned Defendants the majority of the
7  cash they needed to acquire HC Materials.  Although Defendants represented that CTG LLC and
8  HC Materials were profitable and in good financial condition, that HC Materials would be merged
9  with CTG LLC, that the merged CTC LLC/HC entity would be very profitable, and that together
10  the merged entity's profits would generate sufficient cash flow to comfortably service its debt
11  obligations, Plaintiff discovered that these representations were not true.  CTG LLC was not
12  profitable but instead had been losing money.  BW Piezo LLC acquired HC Materials for $48
13  million in October 2013 and changed its name to CTG Advanced Materials, but HC Materials and
14  CTG LLC were not merged as previously represented by Defendants.  Instead HC Materials was
15  acquired by BW Piezo, and Plaintiff was told to run the HC Materials as if it were combined with
16  CTG LLC.  Plaintiff pushed forward, working hard to make CTG LLC and HC Materials profitable.
17  But he eventually discovered that (i) the overall financial condition of BW Piezo LLC, CTG LLC's
18  parent company, was poor because of heavy debt load, and BW Piezo LLC was in violation of lender
19  covenants, (ii) Defendants had overstated the financial performance of CTG LLC and HC Materials
20  and the projections for the financial strength of the merged CTC LLC/HC entity had been overstated,
21  and (iii) Defendants' assertions of the reasonably achievable performance of the merged CTC
22  LLC/HC entity had been overstated and not warranted by the facts known to Defendants.  BW Piezo
23  had put so much debt on CTC LLC that the payment burden of the debt was crushing CTC's growth.
24  While HC Materials continued to generate operating profit throughout the time it was owned by BW
25  Piezo LLC, the acquisition of HC Materials saddled Defendants with a heavy debt load and
26  Defendants' operating profits were insufficient to meet their debt obligations, and they became in
27  violation of lender covenants.

28      19.    Defendants thought another acquisition was the key to getting out of their debt

7
COMPLAINT

1    problem, and convinced Plaintiff in Fall 2014 to put up another $190,000 to help Defendants acquire

2    another company, MSI, and as an equity cure for Defendants' violation of the lender covenants.

3    Thus, in September 2014, Plaintiff was given the opportunity to purchase additional preferred units

4    in the company. However, Plaintiff was again not issued ownership units in CTG LLC, but units of

5    Piezo LLC. Plaintiff purchased 89 additional preferred units for $167,966.34 in cash, under a Grant

6    Agreement dated September 30, 2014 (the "September 30, 2014 Grant Agreement"). In December

7    2014, Plaintiff purchased 11 additional preferred units in Piezo LLC for $22,834.43 in cash, under

8    a Grant Agreement dated December 31, 2014 (the "December 31, 2014 Grant Agreement").

9    Plaintiff's total investment in units of Piezo LLC thus is $690,800.77. A copy of the September 30,

10   2014 Grant Agreement is attached hereto as Exhibit E and incorporated by this reference. A copy

11   of the December 31, 2014 Grant Agreement is attached hereto as Exhibit F and incorporated by this

12   reference.

13       20.    In October 2014, BW Piezo acquired MSI. Plaintiff continued to work hard and

14   brought in major contracts worth tens of millions of dollars. The going was hard, cash was always

15   scarce, and one Chief Financial Officer after another quit. Throughout 2015, the Defendants

16   continued to be highly leveraged, with bank debt almost equaling the combined sales of CTG LLC

17   and HC Materials.

18       21.    Plaintiff continued to push forward, but in the fall of 2015, he hit a new roadblock-

19   discovery of a hidden liability that could cost the company millions of dollars, ruin his reputation

20   and result in regulatory disaster. Plaintiff learned that prior to his joining CTG LLC, Defendants

21   had received reports and other information demonstrating significant material actual and potential

22   liability which would result in expenses to CTG LLC of upwards of $2 million or more and could

23   result in substantially more liability. Plaintiff had not been advised of the significant material actual

24   and potential liability prior to his employment, prior to making his $500,000 investment relating to

25   the October 11, 2013 Grant Agreement, prior to making his $167,966.34 investment relating to the

26   September 30, 2014 Grant Agreement, or prior to making his $22,834.43 investment relating to the

27   December 31, 2014 Grant Agreement.

28       22.    In January 2016, Plaintiff's employment as CEO and President of CTG LLC was

1  terminated. However, Plaintiff still had a sizeable investment in the company. Although the new

2  contracts brought in by Plaintiff were ramping up, CTG LLC still had little available cash. Adam

3  Blumenthal, President of BW Piezo LLC and Piezo LLC, advised Plaintiff that Defendants were

4  unable to repurchase his membership interests by returning his purchase payments and canceling

5  the Note after his employment terminated, as was done with his predecessor and other employees

6  upon termination. Instead, Mr. Blumenthal told Plaintiff that Defendants would allow him to keep

7  his equity and benefit from the fruits of his labors. Mr. Blumenthal advised Plaintiff of negotiations

8  underway for BW Piezo to sell the HC Materials business for approximately $70 million, that the

9  imminent sale would result in a significant paydown of bank debt and the accrued 8% accrued annual

10  return to preferred unit holders, and that Plaintiff's equity would be allowed to remain in place and

11  would likely result in at least a two times capital return when it was sold.

12        23.    In March 2016, HC Materials was sold for $73 million. Plaintiff is informed and

13  believes, and thereon alleges that Defendants used the money from the sale of HC Materials to pay

14  off $48 million in debt to the bank. Plaintiff is informed and believes, and thereon alleges that some

15  of sales proceeds was used to buy out the old owner of HC Materials, who had taken units of Piezo

16  LLC in connection with his sale of HC Materials but was tired of waiting for his money. Plaintiff

17  is informed and believes and thereon alleges that some of the sales proceeds was used to attempt to

18  mitigate some of the undisclosed liabilities described above. Plaintiff is informed and believes and

19  thereon alleges that $11.5 million was distributed to preferred unit holders.

20        24.    Instead of paying Plaintiff his share of the distribution, on April 20, 2016, Adam

21  Blumenthal on behalf of BW Piezo LLC sent Plaintiff a Notice of Default under the Note and the

22  Pledge Agreement, with the termination of his employment described as the default event. The

23  Notice of Default demanded immediate payment and declared that a 12% default interest would

24  apply instead of the 3.5% original rate.

25        25.    On April 29, 2016, Charlie Miller sent an e-mail message to Plaintiff informing him

26  that a Preferred Return had been declared and distributed to preferred unit holders other than

27  Plaintiff. The e-mail message advised that Plaintiff's $143,751 preferred return that Plaintiff should

28  have received had been retained by Piezo LLC (without notice to or consent of Plaintiff) and used

1   to pay down Plaintiff's Note in favor of BW Piezo LLC. Plaintiff was also advised that he owed a

2   remaining balance on his Note of $128,173, which he needed to pay immediately or he would be

3   sued personally for the money with 12% penalty interest. The April 29, 2016 e-mail told Plaintiff

4   that instead of paying the Note, he could just give all his equity back and he would not be sued.

5   Counsel for Defendants later informed Plaintiff that his $690,800 investment in units of Piezo LLC

6   is virtually worthless, such that Plaintiff should be happy to surrender his units to Piezo LLC, and

7   if he did not, he would be sued in Delaware, a jurisdiction 3,000 miles from his home and from CTG

8   LLC.

9                     **FIRST CAUSE OF ACTION**

10   **(By Plaintiff Ralph L. Phillips for Damages for Fraud and Deceit by Intentional**

11   **Misrepresentation against Defendants Piezo LLC, BW Piezo LLC, CTG LLC and DOES 1 to**

12   **30, inclusive)**

13        26.   Plaintiff refers to and incorporates herein by this reference each of the allegations set

14   forth in paragraphs 1 through 25 of this Complaint as though here set forth in full.

15        27.   In 2013, prior to execution by Plaintiff of the Employment Agreement between

16   Plaintiff and CTG LLC, the Note, the Pledge, and the October 11, 2013 Grant Agreement,

17   Defendants Piezo LLC, BW Piezo LLC, CTG LLC and Does 1 through 30, each represented to

18   Plaintiff that

19          (a)   The Defendants and in particular CTG LLC, were profitable and were in good

20   financial condition.

21          (b)   CTG LLC would be merged with a company that CTG LLC was in the

22   process of acquiring, HC Materials, such that Plaintiff would be buying a direct ownership in the

23   combined company. Defendants also represented that the combined CTC LLC/HC entity would be

24   very profitable, and together be in excellent financial condition.

25          (c)   When Plaintiff purchased the preferred units by investing up to $250,000,

26   Defendants would match Plaintiff's investment as a loan, with all units purchased thereby belonging

27   to Plaintiff, and the loan would be repayable only on sale of the company or out of a 50% of the

28   amount of any annual performance bonus above a $150,000 bonus target, with the sole remedy of

1    the company being recourse against the shares purchased with the loaned funds, so that Plaintiff

2    would never be sued for collection of the Note and his other assets other than the units purchased

3    with the loaned funds would not be subject to collection for any liability under the Note ((a), (b),

4    and (c) collectively, the "Representations").

5          28.     The Representations made by Defendants were false.

6          29.     The true facts were as follows:

7             (a)     The Defendants, and in particular CTG LLC, were losing money. Defendants

8    overstated the financial performance of Defendants, and in particular CTG LLC. CTG LLC was

9    not profitable.

10            (b)     Defendants also overstated the financial performance of HC Materials, and

11    the projections for the financial strength of the merged CTC LLC/HC entity were overstated and

12    phony. Defendants' assertions of the reasonably achievable performance of the combined CTC

13    LLC/HC entity were overstated and not warranted by the facts known to Defendants. Additionally,

14    HC Materials and CTG LLC were not merged, but HC Materials was instead acquired by BW Piezo.

15            (c)     The Note states that the Note is due in five years, or on an earlier cessation

16    of Phillips' employment. Under the Note and Pledge, the loan is not only collectible by resort to the

17    shares purchased, but at BW Piezo's election can be collected by a suit for a money judgment against

18    Plaintiff personally in the full amount of the Note, interest and attorney fees and costs without

19    proceeding against the pledged units. The Note and Pledge also state that the units are not the only

20    recourse but BW Piezo can collect in any manner and purports to name BW Piezo LLC as Plaintiff's

21    attorney in fact in the event of default to transfer Plaintiff's units and assume the benefits thereof to

22    the exclusion of Plaintiff.

23            (d)     Prior to Plaintiff's joining CTG LLC, BW Piezo had received reports and

24    other information demonstrating significant material actual and potential liability which would

25    result in expenses to CTG LLC of upwards of $2 million or more and could result in substantially

26    more liability.

27          30.     When Defendants made and published the Representations, they knew or should

28    have known them to be false and made these Representations with the intention to induce Plaintiff

1 to act in reliance on these Representations in the manner alleged herein or with the expectation that

2 Plaintiff would so act.

3      31.    Plaintiff, at the time of the Representations were made by Defendants and at the time

4 Plaintiff took the actions herein alleged, were ignorant of the falsity of Defendants' representations

5 and believed them to be true.

6      32.    In justifiable reliance on the Representations, Plaintiff was induced to and did enter

7 into the Employment Agreement, invested $250,000 cash, and signed the $250,000 Note and Pledge

8 to purchase the units in the October 11, 2013 Grant Agreement. Had Plaintiff known the actual

9 facts, he would not have taken such actions. Plaintiff's reliance on Defendants' Representations was

10 justified because Defendants held themselves out as reputable and honest business entities and

11 persons and Plaintiff trusted Defendants' claims, representations and assertions.

12      33.    As a direct, legal and proximate result of the fraudulent Representations and conduct

13 of Defendants, and each of them, as herein alleged, Plaintiff was induced to enter into the Note,

14 Pledge, and the October 11, 2013 Grant Agreement, to purchase $500,000 in units in October 2013,

15 and to incur expenses and forgo other opportunities and has been damaged in the sum of not less

16 than $2,000,000, according to proof.

17      34.    As a further proximate result of the conduct of Defendants as herein alleged, Plaintiff

18 sustained and suffered, and continues to sustain and suffer, special damages in a sum or sums

19 according to proof at time of trial. Plaintiff will seek leave to amend this Complaint to insert herein

20 the true and correct amount of all such damages at such time as the same are ascertained, or upon

21 proof thereof at the time of trial.

22      35.    In acting as herein alleged, Defendants, and each of them, acted with fraud,

23 oppression and malice and with the intent to cause injury to Plaintiff. The conduct of Defendants

24 and each of them was fraudulent, despicable, oppressive and was taken in conscious disregard of

25 the rights of Plaintiff. Accordingly, Plaintiff is entitled to recover exemplary and punitive damages

26 from Defendants, and each of them, jointly and severally, in a sum sufficient to punish and make an

27 example of Defendants and each of them, which sum shall be shown according to proof at trial.

28 ///

## SECOND CAUSE OF ACTION

**(By Plaintiff Ralph L. Phillips for Damages for Fraud and Deceit by Concealment against Defendants Piezo LLC, BW Piezo LLC, CTG LLC and DOES 31 to 60, inclusive)**

36.    Plaintiff refers to and incorporates herein by this reference each of the allegations set forth in paragraphs 1 through 27 and 27 through 35 of this Complaint as though here set forth in full.

37.    In 2013 before commencement by Plaintiff of his position as CEO and President of CTG LLC, Piezo LLC, BW Piezo LLC CTG LLC, through their Managers Adam Blumenthal, Haran Narulla, and Charlie Miller and Does 31 through 60, and each of them concealed and suppressed material information which they were each obligated to disclose to Plaintiff, and each of them, in order to make their disclosures of other information not misleading, or that would materially affect the value of Plaintiff's decision to enter into the Employment Agreement, Note, Pledge and the October 11, 2013 Grant Agreement (the "2013 Concealed Information"). The 2013 Concealed Information was as follows:

(a)    The Defendants, and in particular CTG LLC, were losing money;

(b)    Defendants were planning to have HC Materials acquired by BW Piezo instead of CTG LLC;

(c)    The pro forma projections of HC Material's performance showed that HC Material's operating profits, as well as CTG LLC's operating profits, would be insufficient to meet Defendants' debt obligations;

(d)    Under the Note and Pledge, the loan would be not only collectible by resort to the shares purchased, but at BW Piezo's election could be collected by a suit for a money judgment against Plaintiff personally in the full amount of the Note, interest and attorney fees and costs; and

(e)    Prior to Plaintiff's joining CTG LLC, BW Piezo had received reports and other information demonstrating significant material actual and potential liability which would result in expenses to CTG LLC of upwards of $2 million or more and could result in substantially more liability.

38.    Defendants' suppression and concealment of the 2013 Concealed Information

13

1   materially reduced the value of Plaintiff's opportunity as CEO and President of CTG LLC, and the

2   units he purchased in the October 11, 2013 Grant Agreement.  When Defendants concealed and

3   suppressed the 2013 Concealed Information, they did so with the intention to induce Plaintiff to

4   enter the Employment Agreement, Note, Pledge and the October 11, 2013 Grant Agreement under

5   which he purchased the units, and to act in reliance on the state of affairs as represented by

6   Defendants in the manner alleged herein or with the expectation that Plaintiff would so act.

7        39.    Plaintiff, at the time these concealments were made by Defendants and at the time

8   Plaintiff took the actions herein alleged, was ignorant of the true state of affairs.

9        40.    In justifiable reliance on the accuracy of the represented state of affairs, Plaintiff was

10  induced to and did enter into the Employment Agreement, Note, Pledge and the October 11, 2013

11  Grant Agreement under which he purchased the units, and to take all actions he took in the belief in

12  the state of affairs as represented by Defendants.  Had Plaintiff known the actual facts, he would not

13  have taken such actions. Plaintiff's reliance on the state of affairs as represented by Defendants was

14  justified because Defendants held themselves out as reputable and trustworthy business entities and

15  persons, and Plaintiff trusted Defendants.

16       41.    In 2014 before Plaintiff entered into the September 30, 2014 Grant Agreement and

17  the December 31, 2014 Grant Agreement, under which Plaintiff purchased the units, Piezo LLC,

18  BW Piezo LLC CTG LLC, through their Managers Mr. Blumenthal, Mr. Narulla and Does 31

19  through 60, and each of them concealed and suppressed material information which they were each

20  obligated to disclose to Plaintiff, and each of them, in order to make their disclosures of other

21  information not misleading, or that would materially affect the value of Plaintiff's decision to enter

22  into the September 30, 2014 Grant Agreement and the December 31, 2014 Grant Agreement (the

23  "2014 Concealed Information").   The 2014 Concealed Information was that prior to Plaintiff's

24  joining CTG LLC, BW Piezo had received reports and other information demonstrating significant

25  material actual and potential liability which would result in expenses to CTG LLC of upwards of $2

26  million or more and could result in substantially more liability.

27       42.    Defendants' suppression and concealment of the 2014 Concealed Information

28  materially reduced the value of the units Plaintiff purchased in the September 30, 2014 Grant

1    Agreement and December 31, 2014 Grant Agreement. When Defendants concealed and suppressed

2    the Concealed Information, they did so with the intention to induce Plaintiff to enter the September

3    30, 2014 Grant Agreement and the December 31, 2014 Grant Agreement under which Plaintiff

4    purchased the units, and to act in reliance on the value of the state of affairs as represented by

5    Defendants in the manner alleged herein or with the expectation that Plaintiff would so act.

6        43.    Plaintiff, at the time these concealments were made by Defendants and at the time

7    Plaintiff took the actions herein alleged, was ignorant of the true state of affairs.

8        44.    In justifiable reliance on the accuracy of the represented state of affairs, Plaintiff was

9    induced to and did enter into the September 30, 2014 Grant Agreement and the December 31, 2014

10    Grant Agreement under which he purchased the units, and to take all actions he took in the belief

11    in the state of affairs as represented by Defendants. Had Plaintiff known the actual facts, he would

12    not have taken such actions. Plaintiff's reliance on the state of affairs as represented by Defendants

13    was justified because Defendants held themselves out as reputable and trustworthy business entities

14    and persons, and Plaintiff trusted Defendants.

15        45.    As a direct, legal and proximate result of the conduct of Defendants, and each of

16    them, as herein alleged, Plaintiff was induced to enter into the Employment Agreement, Note,

17    Pledge, the October 11, 2013 Grant Agreement, the September 30, 2014 Grant Agreement and the

18    December 31, 2014 Grant Agreement, to incur expenses and to forgo other opportunities, and has

19    been damaged in the sum of not less than $2,000,000, according to proof.

20        46.    As a further proximate result of the conduct of Defendants as herein alleged, Plaintiff

21    sustained and suffered, and continues to sustain and suffer, special damages in a sum or sums

22    according to proof at time of trial. Plaintiff will seek leave to amend this Complaint to insert herein

23    the true and correct amount of all such damages at such time as the same are ascertained, or upon

24    proof thereof at the time of trial.

25        47.    In acting as herein alleged, Defendants, and each of them, acted with fraud,

26    oppression and malice and with the intent to cause injury to Plaintiff. The conduct of Defendants

27    and each of them was fraudulent, despicable, oppressive and was taken in conscious disregard of

28    the rights of Plaintiff. Accordingly, Plaintiff is entitled to recover exemplary and punitive damages

1    from Defendants, and each of them, jointly and severally, in a sum sufficient to punish and make an

2    example of Defendants and each of them, which sum shall be shown according to proof at trial.

3                                  **THIRD CAUSE OF ACTION**

4    **(By Plaintiff Ralph L. Phillips for Rescission and Restitution based on Fraud in the**

5             **Inducement against Defendants Piezo LLC, BW Piezo LLC and Does 61-90)**

6         48.      Plaintiff refers to and incorporates herein by this reference each of the allegations set

7    forth in paragraphs 1 through 25, 27 through 35 and 37 through 47 of this Complaint as though here

8    set forth in full.

9         49.      In justifiable reliance on the intentional misrepresentations and concealments alleged

10    above, Plaintiff was induced to enter the Note, Pledge, the October 11, 2013 Grant Agreement, the

11    September 30, 2014 Grant Agreement, and the December 31, 2014 Grant Agreement and to pay the

12    following amounts for preferred units in Piezo LLC:

13                   October 11, 2013              $250,000 in cash and $250,000 through the

14                                                   Note

15                   September 20, 2014          $167,966.34

16                   December 31, 2014           $22,834.43

17         50.      By the filing of this Complaint Plaintiff gives notice to BW Piezo LLC of his

18    rescission of the Note and Pledge. By the filing of this complaint Plaintiff gives notice to BW Piezo

19    LLC of his rescission of the Grant Agreements of the following dates and his purchase of preferred

20    units of Piezo LLC thereunder:

21                   October 11, 2013              $250,000 in cash and $250,000 through the

22                                                   Note

23                   September 20, 2014          $167,966.34

24                   December 31, 2014           $22,834.43

25         51.      By this pleading, subject to the Court's entry of a judgment in Plaintiff's favor of

26    rescission of the Note and Pledge and conditioned upon Piezo's return of Plaintiff's funds in the

27    amount of $690,800 plus interest thereon at the legal rate, Plaintiff hereby tenders a return of the

28    $250,000 loaned to him under the Note.

1    52.    By this pleading, subject to the Court's entry of a judgment in Plaintiff's favor of

2 rescission of the three referenced Grant Agreements and Piezo's return of Plaintiff's funds paid

3 thereunder in the amount of $690,800 plus interest thereon at the legal rate, Plaintiff hereby tenders

4 return to Piezo LLC of his 396 preferred units in Piezo LLC and any distributions he has received

5 based on his ownership of such units.

6    53.    Plaintiff seeks restitution of benefits conferred on Defendants, and each of them, as

7 a result of the rescinded transactions and consequential damages not including duplicate or

8 inconsistent items of recovery.  Plaintiff seeks payments or other relief which the Court deems

9 proper to adjust the equities between the parties following rescission.

10    54.    Plaintiff seeks such further relief in law and equity as is appropriate based upon the

11 Court's ordering rescission and restitution as requested herein.

12 **FOURTH CAUSE OF ACTION**

13 **(By Plaintiff Ralph L. Phillips for Declaratory Relief against Defendant BW Piezo LLC,**

14 **Piezo LLC and Does 91-120)**

15    55.    Plaintiff refers to and incorporates herein by this reference each of the allegations set

16 forth in paragraphs 1 through 25, 27 through 35, 37 through 47, 49 through 54 of this Complaint as

17 though here set forth in full.

18    56.    An actual controversy has arisen between Plaintiff on the one hand and Defendants

19 BW Piezo LLC and Does 91-120 on the other hand.  Plaintiff is informed and believes and thereon

20 alleges that Defendant BW Piezo LLC and Does 91-120 contend that :

21    (a)    There is now due and owing from Plaintiff Phillips to BW Piezo LLC and

22 Does 91-120 under the terms of the Note the amount of $128,173 plus interest at either the 3.5%

23 annual rate specified in the note or the 12% default interest rate specified in the Note, plus attorney

24 fees and costs,

25    (b)    Defendants BW Piezo LLC and Does 91-120 have security interests in

26 Plaintiff's preferred units he purchased under one or more of the referenced Grant Agreements and

27 are entitled under the Pledge to exercise remedies to acquire, sell, or otherwise realize on or benefit

28 from such collateral under the terms of the Pledge or provisions of law.

1    57.    Plaintiff Phillips on the other hand denies the contentions of Defendants BW Piezo

2  and Does 91-120 set forth in the preceding paragraph and instead contends that no such amount is

3  due and said defendants have no rights to acquire, sell or otherwise realize on or benefit from the

4  referenced collateral for the reasons set forth in the incorporated paragraphs of this Complaint.

5    58.    Plaintiff desires a judicial determination and declaration that:

6      (a)    As a result of the conduct alleged herein, no amount is due under the Note;

7  and

8      (b)    Defendants BW Piezo LLC and Does 91-120  have no rights to acquire, sell

9  or otherwise realize on or benefit from the referenced collateral.

10    59.    A judicial declaration regarding the items in controversy is necessary and appropriate

11  at this time in order to clarify the rights, interests and obligations of the parties with respect to the

12  matters in dispute and to avoid further litigation

13                  **FIFTH CAUSE OF ACTION**

14  **(By Plaintiff Ralph L. Phillips For Money Owed Plaintiff by Defendants Piezo LLC and**

15                  **Does 121-150)**

16    60.    Plaintiff refers to and incorporates herein by this reference each of the allegations set

17  forth in paragraphs 1 through 25, 27 through 35, 37 through 47, 49 through 54 and 56 through 59 of

18  this Complaint as though here set forth in full.

19    61.    Within the past two years Defendants Piezo LLC and Does 121-150 became indebted

20  to Plaintiff in the amount of $143,751 for money owed as a result of a distribution declared to be

21  paid  to all preferred unit holders in Piezo LLC which was paid to other preferred unit holders but

22  not paid to Plaintiff.

23    62.    $143,751 is due and unpaid to Plaintiff by said defendants despite Plaintiff's demand,

24  plus prejudgment interest at the legal rate from the date of such distribution according to proof.

25                  **SIXTH CAUSE OF ACTION**

26  **(By Plaintiff Ralph L. Phillips For An Accounting by Defendants Piezo LLC, BW Piezo LLC**

27                  **and Does 151-180)**

28    63.    Plaintiff refers to and incorporates herein by this reference each of the allegations set

1  forth in paragraphs 1 through 25, 27 through 35, 37 through 47, 49 through 54, 56 through 59, and

2  61 through 62 of this Complaint as though here set forth in full.

3      64.    Plaintiff was provided in August 2016 a copy of his K-1 for Piezo which shows on

4  Line 1 of Part III an ordinary business loss of $189,513, an amount which differs significantly from

5  a draft he had previously been provided.  The K-1 shows at item J of Part II that Plaintiffs share of

6  loss was 59.16% at the beginning of the year, and 67.19% at the end of the year, percentages which

7  Plaintiff does not understand and which have not been explained to him.

8      65.    As alleged above, Defendant BW Piezo in 2016 sold the business formerly known

9  as HC Materials for $73 million.  Plaintiff is informed and believes that approximately $50 million

10  of the proceeds were used to pay debt.  Plaintiff is informed that a distribution of approximately $11

11  million was made to preferred unit holders.  Plaintiff has requested an accounting of the funds

12  generated by the referenced sale and the uses and application of those funds which affects the

13  valuation of units owned by Plaintiff.  Defendants have refused to produce such documents and

14  information relating to the sale proceeds and their use.

15      66.    Defendants Piezo LLC, BW Piezo LLC and Does 151-180 should be required to

16  provide a full accounting relating to the 2015 K-1, including revenues and expenses for 2015, as

17  well as the funds generated by the referenced sale, the uses and application of those funds which

18  affects the valuation of units owned by Plaintiff and the losses allocated to Plaintiff's units.

19      WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, jointly

20  and severally, as follows:

21      As to the First and Second Causes of Action:

22      1.    For compensatory damages in an amount not less than $2,000,000, according to

23  proof;

24      2.    For special damages according to proof;

25      3.    For punitive damages, according to proof;

26      As to the Third Cause of Action:

27      4.    For a judicial decree and judgment that the Note and Pledge have been rescinded;

28      5.    For a judicial decree and judgment that the Grant Agreements between Plaintiff and

1  Piezo LLC dated as of October 11, 2013, September 30, 2014 and December 31, 2014 have been

2  rescinded;

3       6.     That Defendant Piezo LLC and Does 61-90 shall pay to Plaintiff restitution of

4  $690,800 plus interest at the legal rate of 10% per annum from dates according to proof at trial;

5       7.     That the Court grant Plaintiff such further relief in law and equity as is appropriate

6  based upon the Court's ordering rescission and restitution as requested herein;

7       As to the Fourth Cause of Action

8       8.     For a judicial declaration and judgment that:

9       (a)     There is no amount due and owing from Plaintiff Phillips to BW Piezo LLC,

10 Piezo LLC, Does 91-120, or any other party under the terms of the Note and such Defendants may

11 not attempt to collect from Plaintiff the amount of $128,173 or any other amount, any interest or

12 any attorney fees or costs:

13      (b)     Neither Defendant BW Piezo LLC, Piezo LLC nor any of Does 91-120 has

14 any security interest in Plaintiff's preferred units he purchased under one or more of the Grant

15 Agreements dated October 11, 2013, September 30, 2014 and December 31, 2014 and none of such

16 defendants is entitled under the Pledge to exercise any remedy to acquire, sell, or otherwise realize

17 on or benefit from such collateral under the terms of the Pledge or any provision of law.

18      As to the Fifth Cause of Action

19      9.     For an award to Plaintiff and against Defendant Piezo LLC and Does 121-150 for

20 money owed to Plaintiff by each such defendant in the amount of $143,751 plus interest at the legal

21 rate from a date or dates according to proof at trial.

22      10.     For reasonable attorneys' fees and costs pursuant to contract or statute, according to

23 proof;

24      As to the Sixth Cause of Action

25      11.     For a full accounting from Defendants Piezo LLC, BW Piezo LLC and Does 151-

26 180 of any and all distributions and capitalizations involving Plaintiff's units, including without

27 limitation relating to the 2015 K-1, including revenues and expenses for 2015, the funds generated

28 by the HC Materials sale, the uses and application of these funds which affects the valuation of units

1  owned by Plaintiff, and the losses allocated to the Plaintiff's units, to be performed at the expense

2  of Defendants Piezo LLC, BW Piezo LLC and Does 151-180 by an independent certified public

3  accountant firm familiar with such matters in accordance with generally accepted accounting

4  principles;

5        <u>On all Causes of Action:</u>

6        12.    For interest on the damages, according to proof, at the legal rate from and after dates

7  according to proof;

8        13.    For reasonable attorneys' fees and costs pursuant to contract or statute, according to

9  proof;

10        14.    For costs of suit and expenses herein incurred; and

11        15.    For such other and further relief as the Court deems just, fair and proper.

12  DATED:  September 8, 2016          Nevers, Palazzo, Packard,

13                        Wildermuth & Wynner, PC

14

15                  By:

16                        Gary W. Nevers

17                        Sharlene D. Lee

                      Attorneys for Plaintiff Ralph L. Phillips

18

19

20

21

22

23

24

25

26

27

28

1

## REQUEST FOR JURY TRIAL

2

Plaintiff respectfully requests a jury trial of all issues appropriately to be tried to a jury.

3

DATED: September 8, 2016

4

5

6

By:

7

Gary W. Nevers

8

Sharlene D. Lee

Attorneys for Plaintiff Ralph L. Phillips

9

Nevers, Palazzo, Packard,
Wildermuth & Wynner, PC

W:\Working\16423\01\W0148338.DOCX v6

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

COMPLAINT

**Piezo Investment Holdings, LLC**
**Mirror Unit Grant Agreement**

October 11, 2013

Ralph Phillips
1290 Heritage Place
Westlake Village, CA 91362

**Re: Grant of Mirror Units in Piezo Investment Holdings, LLC**

Piezo Investment Holdings, LLC (the "Company") is pleased to grant to you (the "Participant") all rights, title and interest in the ownership of Two Hundred Sixty Nine (269) Mirror Preferred Units and Two Hundred Sixty Eight Thousand Nine Hundred Eight (268,908) Mirror Common Units of the Company (collectively, the "Mirror Units").

Such Mirror Units are being issued in connection with the issuance by BW Piezo Holdings, LLC ("HoldCo") of Two Hundred Sixty Nine (269) Series A-2 Preferred Units and Two Hundred Sixty Eight Thousand Nine Hundred Eight (268,908) Class A-2 Common Units (collectively, the "Underlying Units"), and is subject to the terms and conditions set forth in this agreement (this "Agreement"), the Company LLC Agreement, the HoldCo LLC Agreement, and the grant agreement between the Company and HoldCo regarding the corresponding Units issued by HoldCo to the Company.

Capitalized terms used herein but not defined herein have the meanings set forth in Exhibit A hereto or otherwise given to such terms in the Company LLC Agreement or the HoldCo LLC Agreement, as the context requires.

1.      Issuance of Units. Subject to the restrictions, terms and conditions of this Agreement, the Company hereby awards to the Participant the Mirror Units.

2.      Mirror Units. The Mirror Units shall have no voting rights. The Participant shall have the right to receive and retain any distributions payable to holders of the Underlying Units, and to exercise all other rights, powers and privileges, and shall be subject to the liabilities and obligations, of a holder of Mirror Units, with the exceptions that any distributions will be subject to the restrictions provided in Section 3 and the obligation to return tax distributions under certain circumstances pursuant to Section 6.1(d) of the Company LLC Agreement.

3.      Company Transfer Restrictions. Call Rights: Required Sale.

(a)      The Mirror Units are subject to the restrictions on transfer, call rights and Required Sale provisions as provided in the LLC Agreements.

(b)      In addition to the foregoing, in the event of the Participant's Termination for any reason or no reason, the Company may at any time within one year after such Termination repurchase (or may cause its designee to purchase) from the Participant any or all Mirror Units at a repurchase price equal to the Fair Market Value on the date of Termination. If the Company

1

Exhibit 

elects to exercise its rights under this Section 3(b), it shall do so by delivering to the Participant a notice of such election, specifying the number of Mirror Units to be purchased and the closing date and time. Such closing shall take place at the Company's principal executive offices. At such closing, the Company (or its designee) will pay the Participant the repurchase price as specified in this Section (b) in cash, by issuing a promissory note (such promissory note to have a five year term, bear interest at the prime rate then in effect, and be payable in full upon a Change in Control of HoldCo) in favor of the Participant, or any combination of the foregoing.

4.    Ownership Rights/Dividends: Profits Interest. The Participant acknowledges that the Participant's rights to receive distributions from the Company shall be limited to those distributions received by the Company in respect of the Underlying Units. Participant further acknowledges that the Mirror Common Units and corresponding Underlying Units are intended to be treated as "profits interests." Accordingly, if (i) HoldCo's assets were sold for their respective fair market values immediately after the date hereof, (ii) HoldCo was liquidated as of such date and its creditors paid and (iii) the remaining assets of HoldCo were distributed in accordance with the terms of the HoldCo LLC Agreement, then (A) no amounts would be distributable by HoldCo to the Company in respect of the corresponding Underlying Units granted by HoldCo to the Company in connection with the grant of the Mirror Common Units to the Participant and (B) no amounts would be distributable by the Company to the Participant in respect of the Mirror Common Units.

5.    Withholding of Taxes. The Company shall have the right to take any action as may be necessary or appropriate to satisfy any federal, state or local tax withholding obligations of the Company or HoldCo in connection with the Mirror Units, including, but not limited to, the right to redeem Mirror Units and cause a corresponding number of Underlying Units to be redeemed by HoldCo or its assignee, with the proceeds of such redemption being used to satisfy such withholding obligation. In the event that the proceeds of such sale shall exceed the legally required withholding amount, the Company shall remit the difference in cash to the Participant. In the event that the proceeds of such sale are less than the legally required withholding amount, HoldCo and/or the Company may withhold the difference from any cash or other amounts then or thereafter payable to the Participant.

6.    Securities Representations. Unless and until the Underlying Units are registered pursuant to the Securities Act, the Company shall rely upon the following express representations and warranties of the Participant:

(a)    The Participant is acquiring and will hold the Mirror Units for investment for the Participant's account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act.

(b)    The Participant has been advised that the Mirror Units have not been registered under the Securities Act or other applicable securities laws on the grounds that no distribution or public offering of the securities is to be effected (it being understood, however, that the securities are being issued and sold in reliance on the exemption provided under Rule 701 promulgated under the Securities Act), and that such Mirror Units must be held indefinitely, unless subsequently registered under the applicable securities laws or the Participant obtains an opinion of counsel (in the form and reasonably satisfactory to the Company and its counsel) that

2

registration is not required. In connection with the foregoing, the Company is relying in part on the Participant's representations set forth in this Section 6. The Participant further acknowledges and understands that the Company is under no obligation hereunder to register such Mirror Units.

(c)     The Participant is aware of the adoption of Rule 144 by the United States Securities and Exchange Commission under the Securities Act, which permits limited public resales of securities acquired in a non-public offering, subject to the satisfaction of certain conditions. The Participant acknowledges that the Participant is familiar with the conditions for resale set forth in Rule 144, and acknowledges and understands that the conditions for resale set forth in Rule 144 have not been satisfied and that the Company has no plans to satisfy these conditions in the foreseeable future.

(d)     The Participant will not Transfer the Mirror Units in violation of the LLC Agreements, this Agreement, the Securities Act (or the rules and regulations promulgated thereunder) or under any other applicable securities laws. The Participant agrees that the Participant will not dispose of such Mirror Units unless and until the Participant has complied with all requirements of the LLC Agreements and this Agreement applicable to the disposition of such Mirror Units and the Underlying Units.

(e)     The Participant has been furnished with, and has had access to, such information as the Participant considers necessary or appropriate for deciding whether to invest in the Mirror Units, and the Participant has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the issuance of such Mirror Units.

(f)     The Participant is aware that an investment in the Company is a highly speculative investment that has limited liquidity and is subject to the risk of complete loss. The Participant is able, without impairing the Participant's financial condition, to hold the Mirror Units for an indefinite period and to suffer a complete loss of his investment in such Mirror Units.

(g)     The Participant agrees (i) that any certificate representing such Mirror Units may bear such legend or legends as the Manager deems appropriate in order to assure compliance with applicable securities laws and (ii) that the Company may refuse to register the transfer of the Mirror Units acquired pursuant to this Agreement on the unit transfer records of the Company if such proposed transfer would, in the opinion of counsel satisfactory to Company, constitute a violation of any applicable securities law.

7.     Reorganization of the Company.  The existence of this Agreement shall not affect in any way the right or power of the Company, the Manager, HoldCo or its Members to make or authorize any or all adjustments, recapitalizations, reorganizations or other changes in the Company's or HoldCo's capital structure or its business; any merger or consolidation of the Company or HoldCo; any issuance of bonds, debentures, preferred or prior preference units ahead of or affecting the Mirror Units or units of HoldCo or the rights thereof; the dissolution or liquidation of the Company or HoldCo; any sale or transfer of all or any part of its assets or business; or any other act or proceeding, whether of a similar character or otherwise.

3

8.    Recapitalization Events.  In the event of Mirror Unit distributions or distributions of Units of HoldCo, spin-offs of assets or other extraordinary distributions, recapitalizations, mergers, consolidations, reorganizations, liquidations, issuances of rights or warrants and similar transactions or events involving the Company or HoldCo ("Recapitalization Events"), then for all purposes references herein to Mirror Units or Units of HoldCo shall mean and include all securities or other property (other than cash) that holders of Mirror Units or Units of HoldCo are entitled to receive in respect of Mirror Units or Units of HoldCo, as applicable, by reason of each successive Recapitalization Event, which securities or other property (other than cash) shall be treated in the same manner and shall be subject to the same restrictions as the underlying Mirror Units, in each case, to the extent determined by the Manager.

9.    Certain Restrictions.  By executing this Agreement, the Participant acknowledges that the Participant will enter into such further written representations, warranties and agreements and execute such documents as the Company may reasonably request in order to comply with the terms of this Agreement, the LLC Agreements, any securities laws or any other applicable laws, rules or regulations. The Participant hereby acknowledges that the Participant (i) has read this Agreement and the LLC Agreements and (ii) accepts and agrees to become a Member of the Company and be bound by the terms of the Company LLC Agreement directly and the HoldCo LLC Agreement indirectly.

10.    No Obligation to Continue Employment.  This Agreement is not an agreement of employment. This Agreement does not guarantee that the Company or its Affiliates will employ or retain, or to continue to, employ or retain the Participant during the entire, or any portion of the, term of this Agreement, including but not limited to any period during which the Mirror Units are outstanding, nor does it modify in any respect the Company or its Affiliate's right to terminate or modify the Participant's employment or compensation.

11.    Irrevocable Proxy and Power of Attorney.  The Company, its successors and assigns, is hereby appointed the proxy and attorney-in-fact, with full right of substitution and resubstitution, of the Participant for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instruments which such proxy and attorney-in-fact may deem necessary or advisable to accomplish the purposes hereof. The Company, as proxy and attorney-in-fact for the Participant, may in the name and stead of the Participant, make and execute all conveyances, assignments and transfers of the Mirror Units and property provided for herein, and the Participant hereby ratifies and confirms all that the Company, as said attorney-in-fact, shall do by virtue hereof. Nevertheless, the Participant shall, if so requested by the Company, execute and deliver to the Company all such instruments as may, in the judgment of the Company, be advisable for the purpose. Each of the proxy and power of attorney granted pursuant to this Section 11 is given in consideration of the agreements and covenants of the Company and HoldCo in connection with the transactions contemplated by this Agreement and, as such, each is coupled with an interest and shall be irrevocable. The Participant hereby revokes any and all previous proxies or powers of attorney with respect to the Mirror Units and shall not hereafter, unless and until this Agreement terminates, purport to grant any other proxy or power of attorney with respect to any of the Mirror Units, deposit any of the Mirror Units into a voting trust or enter into any agreement (other than this Agreement), arrangement or understanding with any person, directly or indirectly, to vote, grant any proxy or give instructions with respect to the voting of any of the Mirror Units, in each case, with respect to any of the matters set forth herein.

4

12.    <u>Miscellaneous</u>.

(a)    This Agreement may not be amended, waived or discharged except by a writing signed by the Company and the Participant.

(b)    Any notices permitted or required hereunder may be given in the manner set forth in the Company LLC Agreement.

(c)    This Agreement shall be binding upon and shall inure to the benefit of the respective heirs, successors, permitted assigns and legal representatives of the parties hereto.

(d)    In the event that any provision of this Agreement shall be held illegal, invalid or unenforceable for any reason, such provision shall be fully severable and shall not affect the remaining provisions of this Agreement, and this Agreement shall be construed and enforced as if the illegal, invalid or unenforceable provision had never been included herein.

(e)    The Participant agrees to execute such further documents and take such other actions as may be permitted or required by law to implement the purposes, objectives, terms, and provisions of this Agreement.

(f)    The failure of any party hereto at any time to require performance by another party of any provision of this Agreement shall not affect the right of such party to require performance of that provision, and any waiver by any party of any breach of any provision of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, a waiver of the provision itself, or a waiver of any right under this Agreement.

(g)    Any matter, dispute, claim or controversy arising out of or related to this Agreement shall be construed by, subject to and governed in accordance with the internal laws of the State of Delaware without giving effect to conflict of laws or other principles which would result in the application of laws other than the internal laws of the State of Delaware.

(h)    This Agreement may be executed in one or more counterparts, all of which taken together shall constitute one contract.

*[Signature page to follow]*

5

Please sign below to confirm you are in agreement with this Agreement.

Sincerely,

PIEZO INVESTMENT HOLDINGS, LLC

By: _____
Name: Adam Blumenthal
Title:  President

[Signature Page- Mirror Unit Grant Agreement]

Agreed and accepted:

_____
Ralph Phillips

[Signature Page- Mirror Unit Grant Agreement]

## Exhibit A

### Certain Definitions

1.      "Company LLC Agreement" means the Limited Liability Company Agreement of the Company, dated as of December 29, 2011, as originally executed and as it may be amended, modified, restated or supplemented from time to time, as the context requires.

2.      "HoldCo LLC Agreement" means the Second Amended and Restated Limited Liability Company Agreement of HoldCo, dated as of October 11, 2013, as originally executed and as it may be amended, modified, restated or supplemented from time to time, as the context requires.

3.      "LLC Agreements" means, collectively, the HoldCo LLC Agreement and the Company LLC Agreement.

4.      "Securities Act" means the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder. Any reference to any section of the Securities Act shall also be a reference to any successor provision.

5.      "Termination" means that the Participant is no longer acting as an employee of or consultant to the Employer. Any question as to whether and when there has been a Termination and the cause of such Termination, shall be determined by the Manager in its sole discretion, and its determination shall be final.

**Piezo Investment Holdings, LLC**
**Mirror Unit Grant Agreement**

October 14, 2013

Ralph Phillips
1290 Heritage Place
Westlake Village, CA 91362

Re:  Grant of Mirror Units in Piezo Investment Holdings, LLC

   Piezo Investment Holdings, LLC (the "Company") is pleased to grant to you (the "Participant") all rights, title and interest in the ownership of One Million Two Hundred Eight Thousand Eight Hundred Forty One (1,208,841) Mirror Common Units of the Company (the "Mirror Units").

   Such Mirror Units are being issued in connection with the issuance by BW Piezo Holdings, LLC ("HoldCo") of One Million Two Hundred Eight Thousand Eight Hundred Forty One (1,208,841) Class C Common Units (the "Underlying Units") to the Company, and are subject to the terms and conditions set forth in this agreement (this "Agreement"), the Company LLC Agreement, the HoldCo LLC Agreement, and the grant agreement between the Company and HoldCo regarding the corresponding Units issued by HoldCo to the Company.

   Capitalized terms used herein but not defined herein have the meanings set forth in Exhibit A hereto or otherwise given to such terms in the Company LLC Agreement or the HoldCo LLC Agreement, as the context requires.

1.  Issuance of Units.  Subject to the restrictions, terms and conditions of this Agreement, the Company hereby awards to the Participant the Mirror Units.  Pursuant to Section 4 hereof, the Mirror Units are subject to certain restrictions, which restrictions relate to the passage of time as an employee of HoldCo or any of its direct or indirect majority-owned subsidiaries (collectively, the "Employer").  While such restrictions are in effect, the Mirror Units subject to such restrictions shall be referred to herein as "Restricted Units."

2.  Restricted Units.

   (a)  Rights with Regard to Mirror Units.  The Mirror Units shall have no voting rights.  The Participant shall have the right to receive and retain any distributions payable to holders of the Underlying Units, and to exercise all other rights, powers and privileges, and shall be subject to the liabilities and obligations, of a holder of Mirror Units, with the exceptions that: (i) the Company (or its designated agent) will retain custody of any certificates or other items representing the Mirror Units and the other Restricted Property (as defined below) until the Mirror Units are fully vested; (ii) no Restricted Property shall bear interest or be segregated in separate accounts at any time; and (iii) any distributions will be subject to the restrictions provided in Section 3(b) and Section 4 and the obligation to return tax distributions under certain circumstances pursuant to Section 6.1(d) of the Company LLC Agreement.



Exhibit B

(b)      Treatment of Distributions and Restricted Property.  In the event the Participant receives a distribution on the Restricted Units other than money, whether in securities or other property (collectively "Restricted Property"), the Participant will also immediately deposit with and deliver to the Company any of such Restricted Property, including any certificates representing shares duly endorsed in blank or accompanied by stock powers duly executed in blank, and such Restricted Property shall be subject to the same restrictions, including that of Section 4, as the Restricted Units with regard to which they are issued and shall herein be encompassed within the term "Restricted Units."

3.      Vesting.  The Restricted Units granted pursuant to Section 1 above shall become vested and cease to be subject to the first sentence of Section 3(b) below as follows, provided that the Participant has not had a Termination any time prior to the applicable vesting date:

| Vesting Date | Percentage Vested |
| --- | --- |
| October 14, 2014 | 20% |
| October 14, 2015 | 40% |
| October 14, 2016 | 60% |
| October 14, 2017 | 80% |
| October 14, 2018 | 100% |

(a)      Change in Control.  Immediately prior to and conditioned upon the closing of a Change in Control, all unvested Restricted Units shall become fully vested Mirror Units.

(b)      Forfeiture.  Except as provided in Section 3(a) above, the Participant shall forfeit to the Company, without compensation, any and all unvested Restricted Units and Restricted Property upon the Participant's Termination for any reason or no reason.  In addition, in the event the Participant's employment with the Employer terminates for Cause, the Participant shall also forfeit to the Company, without compensation, fifty percent (50%) of the vested Mirror Units owned by the Participant or any transferee thereof.  In the event the Participant engages in Detrimental Activity prior to, or during the one year period after, any vesting of Restricted Units, the Manager may direct that all unvested Restricted Units, together with any Mirror Units and Restricted Property which has vested shall be immediately forfeited to the Company.

4.      Company Transfer Restrictions, Call Rights; Required Sale.

(a)      The Mirror Units are subject to the restrictions on transfer, call rights and Required Sale provisions as provided in the LLC Agreements.

(b)      In addition to the foregoing, in the event of the Participant's Termination for any reason or no reason, the Company may at any time within one year after such Termination repurchase (or may cause its designee to purchase) from the Participant any or all vested Mirror Units at a repurchase price equal to the Fair Market Value on the date of Termination.  If the Company elects to exercise its rights under this Section 4(b), it shall do so by delivering to the Participant a notice of such election, specifying the number of Mirror Units to be purchased and the closing date and time.  Such closing shall take place at the Company's principal executive offices.  At such closing, the Company (or its designee) will pay the Participant the repurchase price as specified in this Section 4(b) in cash, by issuing a promissory note (such promissory note to have a five year term, bear interest at the prime rate then in effect, and be

payable in full upon a Change in Control of HoldCo) in favor of the Participant, or any combination of the foregoing.

5.    Ownership Rights/Dividends; Profits Interest.    The Participant acknowledges that the Participant's rights to receive distributions from the Company shall be limited to those distributions received by the Company in respect of the Underlying Units. Participant further acknowledges that the Mirror Units and corresponding Underlying Units are intended to be treated as "profits interests." Accordingly, if (i) HoldCo's assets were sold for their respective fair market values immediately after the date hereof, (ii) HoldCo was liquidated as of such date and its creditors paid and (iii) the remaining assets of HoldCo were distributed in accordance with the terms of the HoldCo LLC Agreement, then (A) no amounts would be distributable by HoldCo to the Company in respect of the corresponding Underlying Units granted by HoldCo to the Company in connection with the grant of the Mirror Units to the Participant and (B) no amounts would be distributable by the Company to the Participant in respect of the Mirror Units.

6.    Withholding of Taxes; Section 83(b) Election.

(a)    The Company shall have the right to take any action as may be necessary or appropriate to satisfy any federal, state or local tax withholding obligations of the Company or HoldCo in connection with the Mirror Units, including, but not limited to, the right to redeem Mirror Units and cause a corresponding number of Underlying Units to be redeemed by HoldCo or its assignee, with the proceeds of such redemption being used to satisfy such withholding obligation. In the event that the proceeds of such sale shall exceed the legally required withholding amount, the Company shall remit the difference in cash to the Participant. In the event that the proceeds of such sale are less than the legally required withholding amount, HoldCo and/or the Company may withhold the difference from any cash or other amounts then or thereafter payable to the Participant. The Participant acknowledges that it is his or her sole responsibility, and not the Company's, to file timely and properly the election under Section 83(b) of the Code and any corresponding provisions of state tax laws if he or she elects to utilize such election.

(b)    As a further condition to the grant of Mirror Units under this Agreement, no later than 30 days following the date hereof, the Participant shall file an election pursuant to Section 83(b) of the Code with respect to the Mirror Units. Unless otherwise determined by the Manager, if the Participant refuses or fails to file such election, the Participant will forfeit the unvested Mirror Units granted under this Agreement, the Company shall forfeit the corresponding units of HoldCo, this Agreement shall be each null and void *ab initio* and of no force or effect, the Company shall have no obligations to the Participant with respect to the forfeited Mirror Units and HoldCo shall have no obligations to the Company with respect to the forfeited corresponding units of HoldCo. The Participant shall promptly provide the Company with a copy of any such election that the Participant files or that is filed on behalf of the Participant, along with a copy of proof of mailing. The Participant should consult with the Participant's tax advisor to determine the tax consequences of acquiring the unvested Mirror Units subject to this Agreement. The Participant acknowledges that it is the Participant's sole responsibility, and not that of the Company or HoldCo, to file a timely election under Section 83(b) of the Code, even if the Participant requests the Company or HoldCo or its representatives to make this filing on the Participant's behalf.

7.    Securities Representations. Unless and until the Underlying Units are registered pursuant to the Securities Act, the Company shall rely upon the following express representations and warranties of the Participant:

(a)    The Participant is acquiring and will hold the Mirror Units for investment for the Participant's account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act.

3

(b)      The Participant has been advised that the Mirror Units have not been registered under the Securities Act or other applicable securities laws on the grounds that no distribution or public offering of the securities is to be effected (it being understood, however, that the securities are being issued and sold in reliance on the exemption provided under Rule 701 promulgated under the Securities Act), and that such Mirror Units must be held indefinitely, unless subsequently registered under the applicable securities laws or the Participant obtains an opinion of counsel (in the form and reasonably satisfactory to the Company and its counsel) that registration is not required.  In connection with the foregoing, the Company is relying in part on the Participant's representations set forth in this Section 7.  The Participant further acknowledges and understands that the Company is under no obligation hereunder to register such Mirror Units.

(c)      The Participant is aware of the adoption of Rule 144 by the United States Securities and Exchange Commission under the Securities Act, which permits limited public resales of securities acquired in a non-public offering, subject to the satisfaction of certain conditions.  The Participant acknowledges that the Participant is familiar with the conditions for resale set forth in Rule 144, and acknowledges and understands that the conditions for resale set forth in Rule 144 have not been satisfied and that the Company has no plans to satisfy these conditions in the foreseeable future.

(d)      The Participant will not Transfer the Mirror Units in violation of the LLC Agreements, this Agreement, the Securities Act (or the rules and regulations promulgated thereunder) or under any other applicable securities laws.  The Participant agrees that the Participant will not dispose of such Mirror Units unless and until the Participant has complied with all requirements of the LLC Agreements and this Agreement applicable to the disposition of such Mirror Units and the Underlying Units.

(e)      The Participant has been furnished with, and has had access to, such information as the Participant considers necessary or appropriate for deciding whether to invest in the Mirror Units, and the Participant has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the issuance of such Mirror Units.

(f)      The Participant is aware that an investment in the Company is a highly speculative investment that has limited liquidity and is subject to the risk of complete loss.  The Participant is able, without impairing the Participant's financial condition, to hold the Mirror Units for an indefinite period and to suffer a complete loss of his investment in such Mirror Units.

(g)      The Participant agrees (i) that any certificate representing such Mirror Units may bear such legend or legends as the Manager deems appropriate in order to assure compliance with applicable securities laws and (ii) that the Company may refuse to register the transfer of the Mirror Units acquired pursuant to this Agreement on the unit transfer records of the Company if such proposed transfer would, in the opinion of counsel satisfactory to Company, constitute a violation of any applicable securities law.

8.      Reorganization of the Company.  The existence of this Agreement shall not affect in any way the right or power of the Company, the Manager, HoldCo or its Members to make or authorize any or all adjustments, recapitalizations, reorganizations or other changes in the Company's or HoldCo's capital structure or its business; any merger or consolidation of the Company or HoldCo; any issuance of bonds, debentures, preferred or prior preference units ahead of or affecting the Mirror Units or units of HoldCo or the rights thereof; the dissolution or liquidation of the Company or HoldCo; any sale or transfer of all or any part of its assets or business; or any other act or proceeding, whether of a similar character or otherwise.

4

9.    Recapitalization Events.  In the event of Mirror Unit distributions or distributions of Units of HoldCo, spin-offs of assets or other extraordinary distributions, recapitalizations, mergers, consolidations, reorganizations, liquidations, issuances of rights or warrants and similar transactions or events involving the Company or HoldCo ("Recapitalization Events"), then for all purposes references herein to Mirror Units or Units of HoldCo shall mean and include all securities or other property (other than cash) that holders of Mirror Units or Units of HoldCo are entitled to receive in respect of Mirror Units or Units of HoldCo, as applicable, by reason of each successive Recapitalization Event, which securities or other property (other than cash) shall be treated in the same manner and shall be subject to the same restrictions as the underlying Mirror Units, in each case, to the extent determined by the Manager.

10.    Certain Restrictions.  By executing this Agreement, the Participant acknowledges that the Participant will enter into such further written representations, warranties and agreements and execute such documents as the Company may reasonably request in order to comply with the terms of this Agreement, the LLC Agreements, any securities laws or any other applicable laws, rules or regulations. The Participant hereby acknowledges that the Participant (i) has read this Agreement and the LLC Agreements and (ii) accepts and agrees to become a Member of the Company and be bound by the terms of the Company LLC Agreement directly and the HoldCo LLC Agreement indirectly.

11.    No Obligation to Continue Employment.  This Agreement is not an agreement of employment. This Agreement does not guarantee that the Company or its Affiliates will employ or retain, or to continue to, employ or retain the Participant during the entire, or any portion of the, term of this Agreement, including but not limited to any period during which the Mirror Units are outstanding, nor does it modify in any respect the Company or its Affiliate's right to terminate or modify the Participant's employment or compensation.

12.    Irrevocable Proxy and Power of Attorney.  The Company, its successors and assigns, is hereby appointed the proxy and attorney-in-fact, with full power of substitution and resubstitution, of the Participant for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instruments which such proxy and attorney-in-fact may deem necessary or advisable to accomplish the purposes hereof. The Company, as proxy and attorney-in-fact for the Participant, may in the name and stead of the Participant, make and execute all conveyances, assignments and transfers of the Mirror Units and property provided for herein, and the Participant hereby ratifies and confirms all that the Company, as said attorney-in-fact, shall do by virtue hereof. Nevertheless, the Participant shall, if so requested by the Company, execute and deliver to the Company all such instruments as may, in the judgment of the Company, be advisable for the purpose. Each of the proxy and power of attorney granted pursuant to this Section 12 is given in consideration of the agreements and covenants of the Company and HoldCo in connection with the transactions contemplated by this Agreement and, as such, each is coupled with an interest and shall be irrevocable. The Participant hereby revokes any and all previous proxies or powers of attorney with respect to the Mirror Units and shall not hereafter, unless and until this Agreement terminates, purport to grant any other proxy or power of attorney with respect to any of the Mirror Units, deposit any of the Mirror Units into a voting trust or enter into any agreement (other than this Agreement), arrangement or understanding with any person, directly or indirectly, to vote, grant any proxy or give instructions with respect to the voting of any of the Mirror Units, in each case, with respect to any of the matters set forth herein.

13.    Miscellaneous.

       (a)    This Agreement may not be amended, waived or discharged except by a writing signed by the Company and the Participant.

(b)     Any notices permitted or required hereunder may be given in the manner set forth in the Company LLC Agreement.

(c)     This Agreement shall be binding upon and shall inure to the benefit of the respective heirs, successors, permitted assigns and legal representatives of the parties hereto.

(d)     In the event that any provision of this Agreement shall be held illegal, invalid or unenforceable for any reason, such provision shall be fully severable and shall not affect the remaining provisions of this Agreement, and this Agreement shall be construed and enforced as if the illegal, invalid or unenforceable provision had never been included herein.

(e)     The Participant agrees to execute such further documents and take such other actions as may be permitted or required by law to implement the purposes, objectives, terms, and provisions of this Agreement.

(f)     The failure of any party hereto at any time to require performance by another party of any provision of this Agreement shall not affect the right of such party to require performance of that provision, and any waiver by any party of any breach of any provision of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, a waiver of the provision itself, or a waiver of any right under this Agreement.

(g)     Any matter, dispute, claim or controversy arising out of or related to this Agreement shall be construed by, subject to and governed in accordance with the internal laws of the State of Delaware without giving effect to conflict of laws or other principles which would result in the application of laws other than the internal laws of the State of Delaware.

(h)     This Agreement may be executed in one or more counterparts, all of which taken together shall constitute one contract.

*[Signature page to follow]*

6

Please sign below to confirm you are in agreement with this Agreement.

Sincerely,

PIEZO INVESTMENT HOLDINGS, LLC

By: _____
Name: Adam Blumenthal
Title:  President

[Signature Page- Mirror Unit Grant Agreement]

Agreed and accepted:

Ralph Phillips

[Signature Page- Mirror Unit Grant Agreement]

## Exhibit A

## Certain Definitions

1.      "Cause" means, with respect to the Participant's Termination, the following:  (a) in the event there is no employment agreement, consulting agreement, change in control agreement or similar agreement in effect between the Company or an Affiliate and the Participant on the date hereof (or where there is such an agreement but it does not define "cause" (or words of like import)), termination due to the Participant's dishonesty, fraud, material insubordination, moral turpitude, willful misconduct, refusal to perform his or her duties or responsibilities for any reason other than illness or incapacity, as determined by the Committee in its sole discretion; or (b) in the case where there is an employment agreement, consulting agreement, change in control agreement or similar agreement in effect between the Company or an Affiliate and the Participant on the date hereof, "cause" as defined under such agreement; provided, however, that with regard to any agreement under which the definition of "cause" only applies on occurrence of a change in control, such definition of "cause" shall not apply until a change in control actually takes place and then only with regard to a termination thereafter.

2.      "Change in Control" means the occurrence of any of the following events:  (i) any "person" or "group" (as such terms are used in Section 13(d) and Section 14(d) of the Securities Exchange Act of 1934, as amended), other than a corporation owned directly or indirectly by the members of HoldCo in substantially the same proportions as their ownership of Units of HoldCo, is or becomes the "beneficial owner" (as defined in Rule 13d-3 under said Act), directly or indirectly, of securities of the Company representing more than 50% of the total voting power represented by the Company's then outstanding voting securities, (ii) the Company merges or consolidates with any other entity, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) a majority of the total voting power represented by the voting securities of the Company or such surviving entity outstanding immediately after such merger or consolidation, (iii) the sale or disposition by the Company, in one transaction or a series of transactions, of all or substantially all the Company's assets, or (iv) the dissolution, liquidation or winding up of the Company.

3.      "Code" means the Internal Revenue Code of 1986, as amended.  Any reference to any section of the Code shall also be a reference to any successor provision and any Treasury Regulation promulgated thereunder.

4.      "Company LLC Agreement" means the Limited Liability Company Agreement of the Company, dated as of December 29, 2011, as originally executed and as it may be amended, modified, restated or supplemented from time to time, as the context requires.

5.      "Detrimental Activity" means:

a.      disclosing, divulging, furnishing or making available to anyone at any time, except as necessary in the furtherance of Participant's responsibilities to the Company or any of its Affiliates, either during or subsequent to Participant's service relationship with the Company or its Affiliates, any knowledge or information with respect to confidential or proprietary information, methods, processes, plans or materials of the Company or any of its Affiliates, or with respect to any other confidential or proprietary aspects of the business of the Company or any of its Affiliate, acquired by the Participant at any time prior to the Participant's Termination;

        b.     any activity while employed or performing services that results, or if known could reasonably be expected to result, in the Participant's Termination that is classified by the Company as a termination for Cause;

        c.     (i) directly or indirectly soliciting, enticing or inducing any employee of the Company or of any of its Affiliates to be employed by any person, firm or corporation that is, directly or indirectly, in competition with the business or activities of the Company or any of its Affiliates; (ii) directly or indirectly approaching any such employee for these purposes; (iii) authorizing or knowingly approving the taking of such actions by other persons on behalf of any such person, firm or corporation, or assisting any such person, firm or corporation in taking such action; (iv) directly or indirectly soliciting, raiding, enticing or inducing any person, firm or corporation who or which is, or at any time from and after the date of this Agreement was, a customer or prospective customer of the Company or of any of its Affiliates to become a customer for the same or similar products or services that it purchased from the Company or any of its Affiliates, or any other person, firm or corporation, or approaching any such customer for such purpose or authorize or knowingly approving the taking of such actions by any other person;

        d.     the rendering of services for any organization, or engaging, directly or indirectly, in any business, which is competitive with the Company or an Affiliate, or the rendering of services to such organization or business if such organization or business is otherwise prejudicial to or in conflict with the interests of the Company or an Affiliate;

        e.     the Participant's Disparagement, or inducement of others to do so, of the Company or an Affiliate or their past and present officers, directors, employees or products; or

        f.     a breach of any agreement between the Participant and the Company or an Affiliate (including, without limitation, any employment agreement or non-competition or non-solicitation or confidentiality agreement).

Detrimental Activity shall not be deemed to occur after the end of the one-year period following the Participant's Termination.

        6.     "Disparagement" means making comments or statements to the press, the Company's or its Affiliates' employees, consultants or any individual or entity with whom the Company or its Affiliates has a business relationship that could reasonably be expected to adversely affect in any manner: (a) the conduct of the business of the Company or its Affiliates (including, without limitation, any products or business plans or prospects); or (b) the business reputation of the Company or its Affiliates, or any of their products, or their past or present officers, directors or employees.

        7.     "Fair Market Value" means, with respect to any Mirror Unit, the value of the corresponding Underlying Unit in the event HoldCo was sold to a third party purchaser in an arms length transaction in which such purchaser purchased all of the outstanding equity interest in HoldCo for a purchase price equal to the value of the entire business and operations of HoldCo as a going concern, and the proceeds of such sale were distributed in accordance with the applicable provisions of the LLC Agreements, as determined in good faith by the Manager in whatever manner it considers appropriate.

        8.     "HoldCo LLC Agreement" means the Second Amended and Restated Limited Liability Company Agreement of HoldCo, dated as of October 11, 2013, as originally executed and as it may be amended, modified, restated or supplemented from time to time, as the context requires.

9.    "LLC Agreements" means, collectively, the HoldCo LLC Agreement and the Company LLC Agreement.

10.    "Securities Act" means the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder.  Any reference to any section of the Securities Act shall also be a reference to any successor provision.

11.    "Termination" means that the Participant is no longer acting as an employee of or consultant to Employer or any of its Affiliates.  Any question as to whether and when there has been a Termination and the cause of such Termination, shall be determined by the Manager in its sole discretion, and its determination shall be final.

PROMISSORY NOTE

$250,000                                                      As of October 11, 2013

FOR VALUE RECEIVED, the undersigned, Ralph Phillips, an individual having an address at 1290 Heritage Place, Westlake, CA 91362 (the "*Maker*"), hereby promises to pay to the order of BW Piezo Holdings, LLC, a Delaware limited liability company having an address at c/o Blue Wolf Capital, One Liberty Plaza, 52nd Floor, (165 Broadway), New York, NY 10006, Attention: Adam Blumenthal and Chief Compliance Officer, Facsimile Nos.: (646) 349-2244 and (646) 607-3889 ("*Payee*"), or any other place designated in writing by the holder of this Promissory Note ("*Note*"), the principal sum of $250,000 (the "*Principal Sum*"), together with interest, payable in immediately available funds as follows:

1.       Interest. Interest shall accrue at 3.5% per annum (the "*Interest Rate*").

2.       Required and Optional Prepayment. If Maker receives any bonus or other distribution (other than a tax distribution, a "*Bonus*") from Payee or one of its affiliates including Piezo Investment Holdings, LLC ("*InvestCo*"), then Maker will pay to Payee 50% of the post-tax amount of such Bonus (until this Note has been paid in full). Maker may, at any time and from time to time without penalty, prepay all or any portion of the outstanding obligations under this Note.

3.       Repayment and Maturity. On or before the first to occur of (each of (a), (b) or (c), the "*Maturity Date*"): (a) a Change of Control, (b) the five (5) year anniversary of the date of this Note, or (c) such earlier date, upon acceleration, in the event of default hereunder or otherwise, Maker will pay to Payee the unpaid Principal Sum together with all then accrued and unpaid interest thereon at the Interest Rate. All interest payable hereunder will be calculated on the basis of a three hundred sixty (360) days per year factor applied to the actual days on which there exists an unpaid balance hereunder. For purposes of this Note, "*Change of Control*" means any of the following transactions: (i) the sale of more than 50% of the then outstanding equity interests of Payee to persons or entities that did not hold equity interests in Payee prior to such transaction; (ii) the sale of more than 80% of the then outstanding equity interests of InvestCo to persons or entities that did not hold equity interests in Payee or InvestCo prior to such transaction; (iii) the consummation of a merger or consolidation of the Payee with or into another entity or any other reorganization, if more than 50% of the combined voting power of the continuing or surviving entity's securities outstanding immediately after the merger, consolidation or other reorganization is owned by persons or entities who were not equity holders of Payee immediately before the merger, consolidation or other reorganization, (iv) the consummation of a merger or consolidation of InvestCo with or into another entity or any other reorganization, if more than 80% of the combined voting power of the continuing or surviving entity's securities outstanding immediately after the merger, consolidation or other reorganization is owned by persons or entities who were not equity holders of Payee or InvestCo immediately before the merger, consolidation or other reorganization; or (v) the sale, transfer or other disposition of all or substantially all of the Payee's assets (excluding, however, any pledge of a security interest in the assets). A transaction will not constitute a Change in Control if its sole purpose is to change the state of the Payee's or InvestCo's formation, to create a holding company that will be owned in substantially the same proportions by the persons who held the

1

Exhibit C

equity interests of the Payee or InvestCo immediately before the transaction, or to convert the Payee or InvestCo to another form of legal entity.

4.  Default.  The following will constitute a "*Default*" hereunder:

(a)  *Nonpayment*.  Failure of Maker to make any payment hereunder within three (3) days of the date required hereunder.

(b)  *Nonperformance*.  Material breach by Maker of any provision under this Note or any other instrument, agreement or document in connection with this Note or in connection with Maker's services to Payee or InvestCo (including without limitation any operating agreement, employment agreement or pledge agreement), which breach that continues for twenty (20) days after Maker learns of or receives notice of such breach.

(c)  *Bankruptcy*.  Institution of bankruptcy, insolvency, reorganization or receivership proceedings by or against Maker in any state or federal court or the appointment of a receiver, assignee, custodian, trustee or similar official under any federal or state insolvency or creditors' rights law for any property of Maker, or the inability of Maker to pay its debts when due; provided that Maker will have sixty (60) days to dismiss any involuntary bankruptcy proceeding to which it does not consent.

(d)  *Employment*.  Maker ceasing to be an employee of Payee, InvestCo or one of their affiliates (for any reason including without limitation termination without cause).

5.  Remedies on Default.  Upon the occurrence of a Default hereunder: (A) the whole of the Principal Sum or any part thereof and all accrued and unpaid interest, will forthwith and thereafter, at the option of the Payee, become immediately due and payable; provided, that upon a Default of the type described in Section 4(c), such amounts will automatically become due and payable; (B) interest will accrue thereafter on the unpaid Principal Sum and all other amounts due hereunder at the rate of twelve percent (12%) per annum; (C) Payee may, inter alia, proceed to protect and enforce its rights by an action at law, suit in equity or other appropriate proceeding, whether for the specific performance of any agreement contained in this Note, or for an injunction against a violation of any of the terms hereof or the exercise of any power granted hereby or by law.  No right conferred upon Payee by this Note shall be exclusive of any other right referred to herein or now or hereafter available at law, in equity, by statute or otherwise. Maker shall not have the right to set-off any amounts owed hereunder.

6.  Negative Covenants.  Maker covenants and agrees that, so long as any obligations under this Note remain unpaid and/or outstanding, unless otherwise agreed to in writing signed by Payee, Maker will not transfer or encumber any equity interests in Payee or InvestCo or their affiliates ("*Units*") owned by Maker without the express written consent of Payee, or fail to take an action that would avoid an encumbrance on the Units.

7.  Security Agreement.  As collateral security for the prompt and complete payment and performance when due of all the obligations under this Note, and in order to induce Payee to cause this Note to be made, Maker hereby enters into that certain Pledge Agreement dated of even date herewith.  For the avoidance of doubt, such pledge shall not be the sole recourse in connection with a Default.

2

8.    Waiver.  Maker hereby waives presentment for payment, demand, notice of non-payment and dishonor, protest and notice of protest; consents to any renewals, extensions and partial payments of this Note or the indebtedness for which it is given, and consents that no such renewals, extensions or partial payments will discharge Maker from liability herein in whole or in part. The rights and remedies of the holder hereof under this Note will be deemed cumulative and the exercise of any right or remedy will not be regarded as barring any other remedy or remedies.  The institution of any action to recover any portion of the indebtedness evidenced by this Note will not be deemed a waiver of any other rights of the holder of this Note.  MAKER (AND HOLDER BY ITS ACCEPTANCE HEREOF) HEREBY WAIVES ANY AND ALL RIGHTS HE OR IT MAY HAVE TO A JURY TRIAL IN CONNECTION WITH ANY LITIGATION, PROCEEDING OR COUNTERCLAIM ARISING WITH RESPECT TO RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO OR WITH RESPECT TO ANY CLAIMS ARISING OUT OF ANY DISCUSSIONS, NEGOTIATIONS OR COMMUNICATIONS INVOLVING OR RELATED TO ANY PROPOSED RENEWAL, EXTENSION, AMENDMENT, MODIFICATION, RESTRUCTURE, FORBEARANCE, WORKOUT, OR ENFORCEMENT OF THE TRANSACTIONS CONTEMPLATED HEREUNDER.

9.    Collection.  Maker hereby agrees to pay to Payee on demand all reasonable costs and expenses of collection, enforcement, modification, restatement, replacement or amendment of this Note, including all costs and expenses of any action, including attorneys' fees whether or not suit is brought, together with any disbursements incurred, which will be added to, and recoverable with the amount due under this Note.

10.    Amendment.  This Note may not be changed, amended, modified or terminated orally but only by an instrument signed by Maker and Payee.

11.    Transfer of Note.  This Note may not be assigned by Maker without the written consent of Payee.  This Note may be assigned, conveyed, pledged or otherwise transferred by Payee to any affiliate of Payee, or any of their respective lenders.

12.    Interest and Adjustments.  If the provisions of this Note would at any time otherwise require payment by Maker to the holder of an amount of interest in excess of the maximum amount then permitted by law, then the interest payments to the holder will be reduced to the extent necessary so that the holder will not receive interest in excess of such maximum amount.

13.    Notices.  All payments, notices, communications, demands and requests to be made under this Note must be in writing and will be effective (a) upon delivery, if delivered by hand or a nationally recognized overnight courier service, or given by electronic facsimile transmission, and (b) within three (3) business days, if mailed by first class certified mail, return receipt requested, postage prepaid.  All notices will be addressed as set forth in the first paragraph hereof, or to such other address as either Maker or Payee will have furnished to the other in writing in accordance herewith.

14.    Governing Law and Jurisdiction.  This Note is and will be deemed to have been made and delivered in the State of Delaware and in all respects will be governed and construed in accordance with the laws of that State.  Maker and Payee (by acceptance hereof) each hereby

3

irrevocably consent to the non-exclusive jurisdiction of the state and federal courts located in the State of Delaware in any and all actions and proceedings whether arising hereunder or under any other agreement or undertaking. Maker waives any objection which Maker may have based upon lack of personal jurisdiction, improper venue or forum non conveniens. Maker irrevocably agrees to service of process by certified mail, return receipt requested to the address of the appropriate party set forth herein.

15.   Miscellaneous.

(a)   The word "*Maker*" will include Maker's successors and permitted assigns and the word "*Payee*" will include Payee's successors and permitted assigns.

(b)   The provisions of this Note are severable. If any clause or provision will be held invalid or unenforceable, in whole or in part, then such invalidity or unenforceability will affect only such clause or provision, or part thereof, and will not in any manner affect any other clause or provision in this Note.

(c)   No modification or waiver of or with respect to any provision of this Note, or consent by Payee to any departure by Maker from any of the terms or conditions hereof, will, in any event, be effective unless it will be in writing and executed by Payee. Such waiver or consent will, in any event, be effective only in the specific instance and for the purpose for which it was given. No notice to or demand on Maker in any case will, of itself, entitle Maker to any other or further notice or demand in similar or other circumstances.

(d)   No failure or delay by the holder in exercising any right, power or privilege under this Note will operate as a waiver thereof, nor will any single or partial exercise thereof preclude any other or further exercise of any such right, power or privilege.

(e)   Maker, by execution hereof, hereby acknowledges that Maker has had the opportunity to be represented by counsel of its choice. Accordingly, the rule of construction against the drafter is hereby waived.

(f)   This Note, and all other agreements, documents and instruments executed by Maker and delivered pursuant to or in connection with this Note which evidence or secure the indebtedness described herein or any other obligation of Maker to Payee arising as set forth therein, contain the entire agreement between Maker and Payee relating to the subject matter hereof and thereof. Maker expressly acknowledges that Payee has not made and Maker is not relying on any oral representations, agreements or commitments of Payee or any officer, employee, agent or representative thereof.

[SIGNATURE PAGE TO IMMEDIATELY FOLLOW]

IN WITNESS WHEREOF, this Promissory Note has been duly executed by Maker on the date referenced above.

MAKER:

Print name: Ralph Phillips

WITNESS:

Name: Maria Miller
Date:   October 11, 2013

5

## PLEDGE AGREEMENT

This Pledge Agreement (this *"Agreement"*) is entered into as of October 11, 2013 by and among BW Piezo Holdings, LLC, a Delaware limited liability company, having an address at c/o Blue Wolf Capital, One Liberty Plaza, 52nd Floor, (165 Broadway), New York, NY 10006, Attention: Adam Blumenthal and Chief Compliance Officer, Facsimile No.: (646) 349-2244 and (646) 607-3889 (*"Company"*), and Ralph Phillips, having an address for notices at 1290 Heritage Place, Westlake, VA 91362 (the *"Pledgor"*).

### RECITALS

A.     Pledgor is also party to an operating agreement (the *"Operating Agreement"*) pursuant to which Piezo Investment Holdings, LLC a limited liability company that owns equity in the Company (*"InvestCo"*) is issuing Pledgor units of InvestCo (collectively, the *"Units"*).

B.     Pledgor has incurred certain obligations to Company, including without limitation the obligation to pay indebtedness under a certain Promissory Note with the Company, dated of even date herewith (the *"Note"*).

C.     The obligations of Pledgor under the Note are to be secured by the pledge of the Units as provided herein.

NOW, THEREFORE, in consideration of the premises and mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto incorporate the Recitals into this Agreement and agree as follows:

1.     <u>Grant of Security Interest</u>:  Subject to the terms and conditions of this Agreement, Pledgor grants to Company a security interest in the Units as security for Pledgor's obligations under the Note.

2.     <u>Perfection of Security Interest</u>:  The Units shall not be transferred on the books of the Company, except upon the occurrence of an Event of Default as provided in Paragraph 5 of this Agreement.  So long as an Event of Default has not occurred and subject to the terms of the Note, Pledgor shall retain all rights with respect to the Units, including the right to all dividends and distributions in respect of the Units.  In furtherance of perfecting the Company's security interest, Pledgor hereby agrees (a) to the filing of a Form UCC-1 Financing Statement evidencing the pledge hereunder and (b) to take any actions requested by the Company in connection therewith.

3.     <u>Warranties and Representations</u>:  Pledgor represents and warrants to the Company that:

(a)     All of the representations and warranties made by Pledgor in the Operating Agreement, any related subscription agreement, and Note are true, correct and complete, and Pledgor has performed all of Pledgor's obligations under, and is in compliance with, all agreements, covenants, terms and other provisions contained in the Operating Agreement, any such subscription agreement and the Note.



Exhibit ___D___

(b)  Except as specified herein and in the Operating Agreement, Pledgor has title to all the Units and no other person has or purports to have or, upon acquisition, will have any right, title, encumbrance, adverse claim, interest, or lien in any of the Units.

(c)  Pledgor has the authority to enter into this Agreement and has duly executed this Agreement.

(d)  Any and all information now or hereafter supplied to the Company by Pledgor under the Operating Agreement, any subscription agreement, the Note or hereunder, whether or not at Company's request or instruction, is or shall be correct.

4.  <u>Affirmative and Negative Covenants of Pledgor</u>.  Pledgor hereby covenants with Company that, from the date of this Agreement and for so long as this Agreement remains in effect, or any amount due under the Note (or any successor obligation relating to the Note) shall be outstanding:

(a)  Pledgor shall perform and observe all of his obligations, covenants and agreements under, and shall comply with every provision of, the Note.

(b)  All of the representations and warranties made in Paragraph 3 of this Agreement shall remain true and correct.

(c)  Pledgor shall promptly notify Company of any condition or event which constitutes, or with the lapse of time and/or giving notice would constitute, an Event of Default under this Agreement.

5.  <u>Events of Default</u>.  The occurrence of any one of the following events, acts, or omissions, shall constitute an "Event of Default" under this Agreement:

(a)  the occurrence of any "Default" as defined under the Note; or

(b)  Pledgor's failure to perform any other agreement or other obligation required under this Agreement and the continuation of such failure for a period of five (5) days after Company gives Pledgor written notice of such failure to perform.

6.  <u>Remedies</u>.  Upon the occurrence of an Event of Default, after ten (10) days' notice in writing to Pledgor, Company shall have all of the rights of a secured creditor under the Uniform Commercial Code or as otherwise provided by law.  Company shall also have the right to immediately transfer the Units into the name of Company or Company's designee (including without limitation InvestCo), and thereafter the Company or such designee shall have the right to exercise all rights appurtenant thereto and to exclude Pledgor therefrom.  In this regard, Pledgor hereby appoints Company, acting through its managers (or board of managers), as Pledgor's attorney-in-fact, which power of attorney shall be deemed a power coupled with an interest and therefore irrevocable, to do any and all acts and to execute any and all documents as may be required to enable Company or InvestCo to transfer the Units and to exercise the rights established by this Agreement under applicable law.  The Company shall have the right to be reimbursed for all reasonable attorneys' fees incurred by the Company to effectuate or protect its rights under this Agreement.

2

7.   Additional Documents.  The parties agree to execute such additional documents, including transactions, as may reasonably be required an order to effectuate the provisions of Paragraph 2 above pertaining to the pledge of the Units.   To the extent that the Units are certificated, the Company shall have the right to possess such certificate(s) until the Note has been paid in full.

8.   Miscellaneous Provisions.

(a)   Time of Essence.  Time is of the essence of the Agreement.

(b)   Waiver.  Company's acceptance of partial or delinquent payments or failure of Company to exercise any right or remedy shall not be a waiver of any obligation of Pledgor or right of Company nor constitute a modification of the Agreement, nor constitute a waiver of any other similar default subsequently occurring.

(c)   Entire Agreement.  This Agreement and the other agreements and instruments executed in connection herewith contain the entire agreement between Company and Pledgor with respect to the subject matter hereof.

(d)   Assignments, etc.  The provisions of this Agreement are hereby made applicable to and shall inure to the benefit of Company's successors in interest, and assigns, and bind Pledgor's personal representatives, successors in interest and assigns.

(e)   Notices.  All payments, notices, communications, demands and requests to be made under this Agreement must be in writing and will be effective (a) upon delivery, if delivered by hand or a nationally recognized overnight courier service, or given by electronic facsimile transmission, and (b) within three (3) business days, if mailed by first class certified mail, return receipt requested, postage prepaid.  All notices will be addressed as set forth in the first paragraph hereof, or to such other address as either the Company or Pledgor will have furnished to the other in writing in accordance herewith.

(f)   This Agreement is and will be deemed to have been made and delivered in the State of Delaware and in all respects will be governed and construed in accordance with the laws of that State.   Each party hereto hereby irrevocably consents to the non-exclusive jurisdiction of the state and federal courts located in the State of Delaware in any and all actions and proceedings whether arising hereunder or under any other agreement or undertaking.  Each party hereto waives any objection which such party may have based upon lack of personal jurisdiction, improper venue or forum non conveniens.  Each party hereto irrevocably agrees to service of process by certified mail, return receipt requested to the address of the appropriate party set forth herein.

*{Signature page(s) follows.}*

IN WITNESS WHEREOF, the parties hereto have caused this PLEDGE AGREEMENT to be executed and delivered as of the date first set forth above.

BW PIEZO HOLDINGS, LLC:

By: _____

Name: Adam Blumenthal
Title:  President

PLEDGOR:

_____

Print name: Ralph Phillips

4

IN WITNESS WHEREOF, the parties hereto have caused this PLEDGE AGREEMENT to be executed and delivered as of the date first set forth above.

BW PIEZO HOLDINGS, LLC:

By: _____
Name: Adam Blumenthal
Title:  President

PLEDGOR:

_____
Print name:  Ralph Phillips

4

**Piezo Investment Holdings, LLC**
**Mirror Unit Grant Agreement**

September 30, 2014

Ralph Phillips
1290 Heritage Place
Westlake Village, CA 91362

Re: Grant of Mirror Units in Piezo Investment Holdings, LLC

Piezo Investment Holdings, LLC (the "Company") is pleased to grant to you (the "Participant") all rights, title and interest in the ownership of Eighty Nine (89) Mirror Preferred Units and Eighty Eight Thousand Seven Hundred Seventy Eight (88,778) Mirror Common Units of the Company (collectively, the "Mirror Units").

Such Mirror Units are being issued in connection with the issuance by BW Piezo Holdings, LLC ("HoldCo") of Eighty Nine (89) Series A-2 Preferred Units and Eighty Eight Thousand Seven Hundred Seventy Eight (88,778) Class A-2 Common Units (collectively, the "Underlying Units"), and is subject to the terms and conditions set forth in this agreement (this "Agreement"), the Company LLC Agreement, the HoldCo LLC Agreement, and the grant agreement between the Company and HoldCo regarding the corresponding Units issued by HoldCo to the Company.

Capitalized terms used herein but not defined herein have the meanings set forth in Exhibit A hereto or otherwise given to such terms in the Company LLC Agreement or the HoldCo LLC Agreement, as the context requires.

1.      Issuance of Units. Subject to the restrictions, terms and conditions of this Agreement, the Company hereby awards to the Participant the Mirror Units.

2.      Mirror Units. The Mirror Units shall have no voting rights. The Participant shall have the right to receive and retain any distributions payable to holders of the Underlying Units, and to exercise all other rights, powers and privileges, and shall be subject to the liabilities and obligations, of a holder of Mirror Units, with the exceptions that any distributions will be subject to the restrictions provided in Section 3 and the obligation to return tax distributions under certain circumstances pursuant to Section 6.1(d) of the Company LLC Agreement.

3.      Company Transfer Restrictions. Call Rights; Required Sale.

        (a)     The Mirror Units are subject to the restrictions on transfer, call rights and Required Sale provisions as provided in the LLC Agreements.

        (b)     In addition to the foregoing, in the event of the Participant's Termination for any reason or no reason, the Company may at any time within one year after such Termination repurchase (or may cause its designee to purchase) from the Participant any or all Mirror Units at a repurchase price equal to the Fair Market Value on the date of Termination. If the Company

1



Exhibit

elects to exercise its rights under this Section 3(b), it shall do so by delivering to the Participant a notice of such election, specifying the number of Mirror Units to be purchased and the closing date and time. Such closing shall take place at the Company's principal executive offices. At such closing, the Company (or its designee) will pay the Participant the repurchase price as specified in this Section (b) in cash, by issuing a promissory note (such promissory note to have a five year term, bear interest at the prime rate then in effect, and be payable in full upon a Change in Control of HoldCo) in favor of the Participant, or any combination of the foregoing.

4.    Ownership Rights/Dividends; Profits Interest. The Participant acknowledges that the Participant's rights to receive distributions from the Company shall be limited to those distributions received by the Company in respect of the Underlying Units. Participant further acknowledges that the Mirror Common Units and corresponding Underlying Units are intended to be treated as "profits interests." Accordingly, if (i) HoldCo's assets were sold for their respective fair market values immediately after the date hereof, (ii) HoldCo was liquidated as of such date and its creditors paid and (iii) the remaining assets of HoldCo were distributed in accordance with the terms of the HoldCo LLC Agreement, then (A) no amounts would be distributable by HoldCo to the Company in respect of the corresponding Underlying Units granted by HoldCo to the Company in connection with the grant of the Mirror Common Units to the Participant and (B) no amounts would be distributable by the Company to the Participant in respect of the Mirror Common Units.

5.    Withholding of Taxes. The Company shall have the right to take any action as may be necessary or appropriate to satisfy any federal, state or local tax withholding obligations of the Company or HoldCo in connection with the Mirror Units, including, but not limited to, the right to redeem Mirror Units and cause a corresponding number of Underlying Units to be redeemed by HoldCo or its assignee, with the proceeds of such redemption being used to satisfy such withholding obligation. In the event that the proceeds of such sale shall exceed the legally required withholding amount, the Company shall remit the difference in cash to the Participant. In the event that the proceeds of such sale are less than the legally required withholding amount, HoldCo and/or the Company may withhold the difference from any cash or other amounts then or thereafter payable to the Participant.

6.    Securities Representations. Unless and until the Underlying Units are registered pursuant to the Securities Act, the Company shall rely upon the following express representations and warranties of the Participant:

(a)    The Participant is acquiring and will hold the Mirror Units for investment for the Participant's account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act.

(b)    The Participant has been advised that the Mirror Units have not been registered under the Securities Act or other applicable securities laws on the grounds that no distribution or public offering of the securities is to be effected (it being understood, however, that the securities are being issued and sold in reliance on the exemption provided under Rule 701 promulgated under the Securities Act), and that such Mirror Units must be held indefinitely, unless subsequently registered under the applicable securities laws or the Participant obtains an opinion of counsel (in the form and reasonably satisfactory to the Company and its counsel) that

2

registration is not required. In connection with the foregoing, the Company is relying in part on the Participant's representations set forth in this Section 6. The Participant further acknowledges and understands that the Company is under no obligation hereunder to register such Mirror Units.

(c)     The Participant is aware of the adoption of Rule 144 by the United States Securities and Exchange Commission under the Securities Act, which permits limited public resales of securities acquired in a non-public offering, subject to the satisfaction of certain conditions. The Participant acknowledges that the Participant is familiar with the conditions for resale set forth in Rule 144, and acknowledges and understands that the conditions for resale set forth in Rule 144 have not been satisfied and that the Company has no plans to satisfy these conditions in the foreseeable future.

(d)     The Participant will not Transfer the Mirror Units in violation of the LLC Agreements, this Agreement, the Securities Act (or the rules and regulations promulgated thereunder) or under any other applicable securities laws. The Participant agrees that the Participant will not dispose of such Mirror Units unless and until the Participant has complied with all requirements of the LLC Agreements and this Agreement applicable to the disposition of such Mirror Units and the Underlying Units.

(e)     The Participant has been furnished with, and has had access to, such information as the Participant considers necessary or appropriate for deciding whether to invest in the Mirror Units, and the Participant has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the issuance of such Mirror Units.

(f)     The Participant is aware that an investment in the Company is a highly speculative investment that has limited liquidity and is subject to the risk of complete loss. The Participant is able, without impairing the Participant's financial condition, to hold the Mirror Units for an indefinite period and to suffer a complete loss of his investment in such Mirror Units.

(g)     The Participant agrees (i) that any certificate representing such Mirror Units may bear such legend or legends as the Manager deems appropriate in order to assure compliance with applicable securities laws and (ii) that the Company may refuse to register the transfer of the Mirror Units acquired pursuant to this Agreement on the unit transfer records of the Company if such proposed transfer would, in the opinion of counsel satisfactory to Company, constitute a violation of any applicable securities law.

7.     Reorganization of the Company.   The existence of this Agreement shall not affect in any way the right or power of the Company, the Manager, HoldCo or its Members to make or authorize any or all adjustments, recapitalizations, reorganizations or other changes in the Company's or HoldCo's capital structure or its business; any merger or consolidation of the Company or HoldCo; any issuance of bonds, debentures, preferred or prior preference units ahead of or affecting the Mirror Units or units of HoldCo or the rights thereof; the dissolution or liquidation of the Company or HoldCo; any sale or transfer of all or any part of its assets or business; or any other act or proceeding, whether of a similar character or otherwise.

8.    Recapitalization Events.  In the event of Mirror Unit distributions or distributions of Units of HoldCo, spin-offs of assets or other extraordinary distributions, recapitalizations, mergers, consolidations, reorganizations, liquidations, issuances of rights or warrants and similar transactions or events involving the Company or HoldCo ("Recapitalization Events"), then for all purposes references herein to Mirror Units or Units of HoldCo shall mean and include all securities or other property (other than cash) that holders of Mirror Units or Units of HoldCo are entitled to receive in respect of Mirror Units or Units of HoldCo, as applicable, by reason of each successive Recapitalization Event, which securities or other property (other than cash) shall be treated in the same manner and shall be subject to the same restrictions as the underlying Mirror Units, in each case, to the extent determined by the Manager.

9.    Certain Restrictions.  By executing this Agreement, the Participant acknowledges that the Participant will enter into such further written representations, warranties and agreements and execute such documents as the Company may reasonably request in order to comply with the terms of this Agreement, the LLC Agreements, any securities laws or any other applicable laws, rules or regulations. The Participant hereby acknowledges that the Participant (i) has read this Agreement and the LLC Agreements and (ii) accepts and agrees to become a Member of the Company and be bound by the terms of the Company LLC Agreement directly and the HoldCo LLC Agreement indirectly.

10.    No Obligation to Continue Employment. This Agreement is not an agreement of employment. This Agreement does not guarantee that the Company or its Affiliates will employ or retain, or to continue to, employ or retain the Participant during the entire, or any portion of the, term of this Agreement, including but not limited to any period during which the Mirror Units are outstanding, nor does it modify in any respect the Company or its Affiliate's right to terminate or modify the Participant's employment or compensation.

11.    Irrevocable Proxy and Power of Attorney. The Company, its successors and assigns, is hereby appointed the proxy and attorney-in-fact, with full power of substitution and resubstitution, of the Participant for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instruments which such proxy and attorney-in-fact may deem necessary or advisable to accomplish the purposes hereof. The Company, as proxy and attorney-in-fact for the Participant, may in the name and stead of the Participant, make and execute all conveyances, assignments and transfers of the Mirror Units and property provided for herein, and the Participant hereby ratifies and confirms all that the Company, as said attorney-in-fact, shall do by virtue hereof. Nevertheless, the Participant shall, if so requested by the Company, execute and deliver to the Company all such instruments as may, in the judgment of the Company, be advisable for the purpose. Each of the proxy and power of attorney granted pursuant to this Section 11 is given in consideration of the agreements and covenants of the Company and HoldCo in connection with the transactions contemplated by this Agreement and, as such, each is coupled with an interest and shall be irrevocable. The Participant hereby revokes any and all previous proxies or powers of attorney with respect to the Mirror Units and shall not hereafter, unless and until this Agreement terminates, purport to grant any other proxy or power of attorney with respect to any of the Mirror Units, deposit any of the Mirror Units into a voting trust or enter into any agreement (other than this Agreement), arrangement or understanding with any person, directly or indirectly, to vote, grant any proxy or give instructions with respect to the voting of any of the Mirror Units, in each case, with respect to any of the matters set forth herein.

4

12.  <u>Miscellaneous.</u>

(a)  This Agreement may not be amended, waived or discharged except by a writing signed by the Company and the Participant.

(b)  Any notices permitted or required hereunder may be given in the manner set forth in the Company LLC Agreement.

(c)  This Agreement shall be binding upon and shall inure to the benefit of the respective heirs, successors, permitted assigns and legal representatives of the parties hereto.

(d)  In the event that any provision of this Agreement shall be held illegal, invalid or unenforceable for any reason, such provision shall be fully severable and shall not affect the remaining provisions of this Agreement, and this Agreement shall be construed and enforced as if the illegal, invalid or unenforceable provision had never been included herein.

(e)  The Participant agrees to execute such further documents and take such other actions as may be permitted or required by law to implement the purposes, objectives, terms, and provisions of this Agreement.

(f)  The failure of any party hereto at any time to require performance by another party of any provision of this Agreement shall not affect the right of such party to require performance of that provision, and any waiver by any party of any breach of any provision of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, a waiver of the provision itself, or a waiver of any right under this Agreement.

(g)  Any matter, dispute, claim or controversy arising out of or related to this Agreement shall be construed by, subject to and governed in accordance with the internal laws of the State of Delaware without giving effect to conflict of laws or other principles which would result in the application of laws other than the internal laws of the State of Delaware.

(h)  This Agreement may be executed in one or more counterparts, all of which taken together shall constitute one contract.

*[Signature page to follow]*

Please sign below to confirm you are in agreement with this Agreement.

Sincerely,

PIEZO INVESTMENT HOLDINGS, LLC

By: _____
    Name: Adam Blumenthal
    Title: President

[Signature Page- Mirror Unit Grant Agreement]

Agreed and accepted:

Ralph Phillips

[Signature Page – Mirror Unit Grant Agreement]

## Exhibit A

### Certain Definitions

1.     "Company LLC Agreement" means the Limited Liability Company Agreement of the Company, dated as of December 29, 2011, as originally executed and as it may be amended, modified, restated or supplemented from time to time, as the context requires.

2.     "HoldCo LLC Agreement" means the Second Amended and Restated Limited Liability Company Agreement of HoldCo, dated as of October 11, 2013, as amended by that certain First Amendment, dated as of September 30, 2014, as originally executed and as it may be amended, modified, restated or supplemented from time to time, as the context requires.

3.     "LLC Agreements" means, collectively, the HoldCo LLC Agreement and the Company LLC Agreement.

4.     "Securities Act" means the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder. Any reference to any section of the Securities Act shall also be a reference to any successor provision.

5.     "Termination" means that the Participant is no longer acting as an employee of or consultant to the Employer. Any question as to whether and when there has been a Termination and the cause of such Termination, shall be determined by the Manager in its sole discretion, and its determination shall be final.

#30483931_v1

**Piezo Investment Holdings, LLC**
**Mirror Unit Grant Agreement**

December 31, 2014

Ralph Phillips
1290 Heritage Place
Westlake Village, CA 91362

Re: Grant of Mirror Units in Piezo Investment Holdings, LLC

Piezo Investment Holdings, LLC (the "Company") is pleased to grant to you (the "Participant") all rights, title and interest in the ownership of Eleven (11) Mirror Preferred Units and Eleven Thousand Two Hundred Seventy Three (11,273) Mirror Common Units of the Company (collectively, the "Mirror Units").

Such Mirror Units are being issued in connection with the issuance by BW Piezo Holdings, LLC ("HoldCo") of Eleven (11) Series A-2 Preferred Units and Eleven Thousand Two Hundred Seventy Three (11,273) Class A-2 Common Units (collectively, the "Underlying Units"), and is subject to the terms and conditions set forth in this agreement (this "Agreement"), the Company LLC Agreement, the HoldCo LLC Agreement, and the grant agreement between the Company and HoldCo regarding the corresponding Units issued by HoldCo to the Company.

Capitalized terms used herein but not defined herein have the meanings set forth in Exhibit A hereto or otherwise given to such terms in the Company LLC Agreement or the HoldCo LLC Agreement, as the context requires.

1.      Issuance of Units. Subject to the restrictions, terms and conditions of this Agreement, the Company hereby awards to the Participant the Mirror Units.

2.      Mirror Units. The Mirror Units shall have no voting rights. The Participant shall have the right to receive and retain any distributions payable to holders of the Underlying Units, and to exercise all other rights, powers and privileges, and shall be subject to the liabilities and obligations, of a holder of Mirror Units, with the exceptions that any distributions will be subject to the restrictions provided in Section 3 and the obligation to return tax distributions under certain circumstances pursuant to Section 6.1(d) of the Company LLC Agreement.

3.      Company Transfer Restrictions. Call Rights; Required Sale.

(a)      The Mirror Units are subject to the restrictions on transfer, call rights and Required Sale provisions as provided in the LLC Agreements.

(b)      In addition to the foregoing, in the event of the Participant's Termination for any reason or no reason, the Company may at any time within one year after such Termination repurchase (or may cause its designee to purchase) from the Participant any or all Mirror Units at a repurchase price equal to the Fair Market Value on the date of Termination. If the Company elects to exercise its rights under this Section 3(b), it shall do so by delivering to the Participant a

1


Exhibit_____

notice of such election, specifying the number of Mirror Units to be purchased and the closing date and time. Such closing shall take place at the Company's principal executive offices. At such closing, the Company (or its designee) will pay the Participant the repurchase price as specified in this Section (b) in cash, by issuing a promissory note (such promissory note to have a five year term, bear interest at the prime rate then in effect, and be payable in full upon a Change in Control of HoldCo) in favor of the Participant, or any combination of the foregoing.

4.      Ownership Rights/Dividends: Profits Interest. The Participant acknowledges that the Participant's rights to receive distributions from the Company shall be limited to those distributions received by the Company in respect of the Underlying Units. Participant further acknowledges that the Mirror Common Units and corresponding Underlying Units are intended to be treated as "profits interests." Accordingly, if (i) HoldCo's assets were sold for their respective fair market values immediately after the date hereof, (ii) HoldCo was liquidated as of such date and its creditors paid and (iii) the remaining assets of HoldCo were distributed in accordance with the terms of the HoldCo LLC Agreement, then (A) no amounts would be distributable by HoldCo to the Company in respect of the corresponding Underlying Units granted by HoldCo to the Company in connection with the grant of the Mirror Common Units to the Participant and (B) no amounts would be distributable by the Company to the Participant in respect of the Mirror Common Units.

5.      Withholding of Taxes. The Company shall have the right to take any action as may be necessary or appropriate to satisfy any federal, state or local tax withholding obligations of the Company or HoldCo in connection with the Mirror Units, including, but not limited to, the right to redeem Mirror Units and cause a corresponding number of Underlying Units to be redeemed by HoldCo or its assignee, with the proceeds of such redemption being used to satisfy such withholding obligation. In the event that the proceeds of such sale shall exceed the legally required withholding amount, the Company shall remit the difference in cash to the Participant. In the event that the proceeds of such sale are less than the legally required withholding amount, HoldCo and/or the Company may withhold the difference from any cash or other amounts then or thereafter payable to the Participant.

6.      Securities Representations. Unless and until the Underlying Units are registered pursuant to the Securities Act, the Company shall rely upon the following express representations and warranties of the Participant:

(a)      The Participant is acquiring and will hold the Mirror Units for investment for the Participant's account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act.

(b)      The Participant has been advised that the Mirror Units have not been registered under the Securities Act or other applicable securities laws on the grounds that no distribution or public offering of the securities is to be effected (it being understood, however, that the securities are being issued and sold in reliance on the exemption provided under Rule 701 promulgated under the Securities Act), and that such Mirror Units must be held indefinitely, unless subsequently registered under the applicable securities laws or the Participant obtains an opinion of counsel (in the form and reasonably satisfactory to the Company and its counsel) that registration is not required. In connection with the foregoing, the Company is relying in part on

2

the Participant's representations set forth in this Section 6. The Participant further acknowledges and understands that the Company is under no obligation hereunder to register such Mirror Units.

(c)    The Participant is aware of the adoption of Rule 144 by the United States Securities and Exchange Commission under the Securities Act, which permits limited public resales of securities acquired in a non-public offering, subject to the satisfaction of certain conditions. The Participant acknowledges that the Participant is familiar with the conditions for resale set forth in Rule 144, and acknowledges and understands that the conditions for resale set forth in Rule 144 have not been satisfied and that the Company has no plans to satisfy these conditions in the foreseeable future.

(d)    The Participant will not Transfer the Mirror Units in violation of the LLC Agreements, this Agreement, the Securities Act (or the rules and regulations promulgated thereunder) or under any other applicable securities laws. The Participant agrees that the Participant will not dispose of such Mirror Units unless and until the Participant has complied with all requirements of the LLC Agreements and this Agreement applicable to the disposition of such Mirror Units and the Underlying Units.

(e)    The Participant has been furnished with, and has had access to, such information as the Participant considers necessary or appropriate for deciding whether to invest in the Mirror Units, and the Participant has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the issuance of such Mirror Units.

(f)    The Participant is aware that an investment in the Company is a highly speculative investment that has limited liquidity and is subject to the risk of complete loss. The Participant is able, without impairing the Participant's financial condition, to hold the Mirror Units for an indefinite period and to suffer a complete loss of his investment in such Mirror Units.

(g)    The Participant agrees (i) that any certificate representing such Mirror Units may bear such legend or legends as the Manager deems appropriate in order to assure compliance with applicable securities laws and (ii) that the Company may refuse to register the transfer of the Mirror Units acquired pursuant to this Agreement on the unit transfer records of the Company if such proposed transfer would, in the opinion of counsel satisfactory to Company, constitute a violation of any applicable securities law.

7.    <u>Reorganization of the Company</u>.  The existence of this Agreement shall not affect in any way the right or power of the Company, the Manager, HoldCo or its Members to make or authorize any or all adjustments, recapitalizations, reorganizations or other changes in the Company's or HoldCo's capital structure or its business; any merger or consolidation of the Company or HoldCo; any issuance of bonds, debentures, preferred or prior preference units ahead of or affecting the Mirror Units or units of HoldCo or the rights thereof; the dissolution or liquidation of the Company or HoldCo; any sale or transfer of all or any part of its assets or business; or any other act or proceeding, whether of a similar character or otherwise.

8.    Recapitalization Events.  In the event of Mirror Unit distributions or distributions of Units of HoldCo, spin-offs of assets or other extraordinary distributions, recapitalizations, mergers, consolidations, reorganizations, liquidations, issuances of rights or warrants and similar transactions or events involving the Company or HoldCo ("Recapitalization Events"), then for all purposes references herein to Mirror Units or Units of HoldCo shall mean and include all securities or other property (other than cash) that holders of Mirror Units or Units of HoldCo are entitled to receive in respect of Mirror Units or Units of HoldCo, as applicable, by reason of each successive Recapitalization Event, which securities or other property (other than cash) shall be treated in the same manner and shall be subject to the same restrictions as the underlying Mirror Units, in each case, to the extent determined by the Manager.

9.    Certain Restrictions.  By executing this Agreement, the Participant acknowledges that the Participant will enter into such further written representations, warranties and agreements and execute such documents as the Company may reasonably request in order to comply with the terms of this Agreement, the LLC Agreements, any securities laws or any other applicable laws, rules or regulations. The Participant hereby acknowledges that the Participant (i) has read this Agreement and the LLC Agreements and (ii) accepts and agrees to become a Member of the Company and be bound by the terms of the Company LLC Agreement directly and the HoldCo LLC Agreement indirectly.

10.    No Obligation to Continue Employment. This Agreement is not an agreement of employment. This Agreement does not guarantee that the Company or its Affiliates will employ or retain, or to continue to, employ or retain the Participant during the entire, or any portion of the, term of this Agreement, including but not limited to any period during which the Mirror Units are outstanding, nor does it modify in any respect the Company or its Affiliate's right to terminate or modify the Participant's employment or compensation.

11.    Irrevocable Proxy and Power of Attorney.  The Company, its successors and assigns, is hereby appointed the proxy and attorney-in-fact, with full power of substitution and resubstitution, of the Participant for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instruments which such proxy and attorney-in-fact may deem necessary or advisable to accomplish the purposes hereof. The Company, as proxy and attorney-in-fact for the Participant, may in the name and stead of the Participant, make and execute all conveyances, assignments and transfers of the Mirror Units and property provided for herein, and the Participant hereby ratifies and confirms all that the Company, as said attorney-in-fact, shall do by virtue hereof. Nevertheless, the Participant shall, if so requested by the Company, execute and deliver to the Company all such instruments as may, in the judgment of the Company, be advisable for the purpose. Each of the proxy and power of attorney granted pursuant to this Section 11 is given in consideration of the agreements and covenants of the Company and HoldCo in connection with the transactions contemplated by this Agreement and, as such, each is coupled with an interest and shall be irrevocable. The Participant hereby revokes any and all previous proxies or powers of attorney with respect to the Mirror Units and shall not hereafter, unless and until this Agreement terminates, purport to grant any other proxy or power of attorney with respect to any of the Mirror Units, deposit any of the Mirror Units into a voting trust or enter into any agreement (other than this Agreement), arrangement or understanding with any person, directly or indirectly, to vote, grant any proxy or give instructions with respect to the voting of any of the Mirror Units, in each case, with respect to any of the matters set forth herein.

4

12.   <u>Miscellaneous</u>.

(a)      This Agreement may not be amended, waived or discharged except by a writing signed by the Company and the Participant.

(b)      Any notices permitted or required hereunder may be given in the manner set forth in the Company LLC Agreement.

(c)      This Agreement shall be binding upon and shall inure to the benefit of the respective heirs, successors, permitted assigns and legal representatives of the parties hereto.

(d)      In the event that any provision of this Agreement shall be held illegal, invalid or unenforceable for any reason, such provision shall be fully severable and shall not affect the remaining provisions of this Agreement, and this Agreement shall be construed and enforced as if the illegal, invalid or unenforceable provision had never been included herein.

(e)      The Participant agrees to execute such further documents and take such other actions as may be permitted or required by law to implement the purposes, objectives, terms, and provisions of this Agreement.

(f)      The failure of any party hereto at any time to require performance by another party of any provision of this Agreement shall not affect the right of such party to require performance of that provision, and any waiver by any party of any breach of any provision of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, a waiver of the provision itself, or a waiver of any right under this Agreement.

(g)      Any matter, dispute, claim or controversy arising out of or related to this Agreement shall be construed by, subject to and governed in accordance with the internal laws of the State of Delaware without giving effect to conflict of laws or other principles which would result in the application of laws other than the internal laws of the State of Delaware.

(h)      This Agreement may be executed in one or more counterparts, all of which taken together shall constitute one contract.

*[Signature page to follow]*

5

Please sign below to confirm you are in agreement with this Agreement.

Sincerely,

PIEZO INVESTMENT
HOLDINGS, LLC

By: _____
Name: Adam Blumenthal
Title:  President

[Signature Page – Mirror Unit Grant Agreement]

Agreed and accepted:

Signed: _____

Print Name:   R. L. PHILLIPS

[Signature Page – Mirror Unit Grant Agreement]

## Exhibit A

## Certain Definitions

1. "Company LLC Agreement" means the Limited Liability Company Agreement of the Company, dated as of December 29, 2011, as originally executed and as it may be amended, modified, restated or supplemented from time to time, as the context requires.

2. "HoldCo LLC Agreement" means the Second Amended and Restated Limited Liability Company Agreement of HoldCo, dated as of October 11, 2013, as amended by that certain First Amendment, dated as of September 30, 2014, and that certain Second Amendment, dated as of December 31, 2014, as originally executed and as it may be amended, modified, restated or supplemented from time to time, as the context requires.

3. "LLC Agreements" means, collectively, the HoldCo LLC Agreement and the Company LLC Agreement.

4. "Securities Act" means the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder. Any reference to any section of the Securities Act shall also be a reference to any successor provision.

5. "Termination" means that the Participant is no longer acting as an employee of or consultant to the Employer. Any question as to whether and when there has been a Termination and the cause of such Termination, shall be determined by the Manager in its sole discretion, and its determination shall be final.

A-1

ORIGIN ID:BLVA (618) 219-3700
RALPH PHILLIPS
EHRHARDT TOOL & MACHINE CO.
#25 CENTRAL INDUSTRIAL DRIVE

GRANITE CITY, IL 62040
UNITED STATES US

SHIP DATE: 12JUL17
ACTWGT: 1.00 LB
CAD: 100404100/INET3850

BILL SENDER

TO C/O PRIME CLERK, LLC
CTG,LLC CLAIMS PROCESSING CENTER
830 3RD AVENUE, 3RD FLOOR

NEW YORK NY 10022
(855) 628-7541 REF
INV
PO DEPT

546J1/00C253C1

FedEx Express

E

THU - 13 JUL 10:30A
PRIORITY OVERNIGHT

TRK# 0201 7796 1098 7740

10022
NY-US EWR

XA JRBA

PRIME CLERK LLC
JUL 13 2017
RECEIVED

**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

# EXHIBIT 4

**BACK TO TRANSACTIONS**

# CTG, a portfolio company of Blue Wolf, has acquired HC Materials



Lincoln International ("Lincoln"), a leading global mid-market investment bank, announced today the successful completion of a financing for an affiliate of Channel Technologies Group, LLC ("Channel Technologies" or the "Company"), a portfolio company of Blue Wolf Capital Fund II, L.P. ("Blue Wolf"). Channel Technologies is a vertically integrated manufacturer and supplier of mission-critical components and systems that utilize piezoelectric ceramic technology.

Lincoln acted as the exclusive financial advisor to the Company and Blue Wolf and completed the placement of an undisclosed amount of debt financing, consisting of a senior credit facility provided by OneWest Bank and subordinated notes funded by Avante Mezzanine Partners and Fidus Investment Corporation. Proceeds from the transaction were used to refinance Channel Technologies' existing credit facility and partially fund the acquisition of the assets of H.C. Materials Corporation ("HC Materials"), the leading producer of piezoelectric crystals. Together, Channel Technologies and HC Materials are the leading developers and manufacturers of mission-critical imaging components using piezoelectric ceramics and crystals, primarily used in defense, healthcare and energy applications.

As the Company's exclusive financial advisor, Lincoln International worked closely with Blue Wolf and Channel Technologies' management team to structure and arrange the financing. Haranjeet Narulla, Principal of Blue Wolf, commented, "Lincoln did an excellent job preparing materials and educating lenders on a highly technical industry. By outsourcing the financing process, we were able to focus our attention on a complex add-on M&A transaction, while Lincoln helped us secure multiple sources of debt capital that are well-suited to support the Company's future growth and strategic initiatives."

## About Channel Technologies Group, LLC

Located in Santa Barbara, California, Channel Technologies Group designs and manufactures piezoelectric based advanced materials, sensors, and completed integrated systems that support mission critical applications for military and commercial markets. Since its founding in 1959 as Channel Industries, Channel Technologies has been providing a broad range of highly-engineered value-added products, components, and systems for use in the most demanding environments. Channel Technologies' products and services are used in a variety of applications and by diverse end users, including medical device manufacturers, oil service and exploration companies, and customers in the defense industry, including numerous departments of the U.S. Navy and many leading defense contractors.

## About H.C. Materials Corporation

Located in Bolingbrook, Illinois, H.C. Materials Corporation is a worldwide leader in the development and manufacture of giant-piezoelectric single crystals, specializing in lead magnesium niobate-lead titanate (PMN-PT) based piezocrystals and finished crystal elements. H.C. Materials also supplies crystal products for next generation acoustic transduction devices in a variety of applications such as medical ultrasound imaging, ocean

**Senior Credit Facilities and Junior Debt**

**2013**
Close Year

**Aerospace & Defense**
Industry

**Private Equity**
Client Type

**Financial | Domestic**
Transaction Type

**USA**
Countries

mining, sensors, transducers and sonar systems. H.C. Materials has two production lines located in Bolingbrook, Illinois, a western suburb of Chicago.

## About Blue Wolf Capital

Blue Wolf Capital is a private equity firm that takes control stakes in middle market companies based in the United States and Canada, and works with those companies to resolve complexities and achieve sustainable growth. Blue Wolf invests in strong businesses whose value can be increased by constructive resolutions of complex challenges, particularly those involving financial or operational distress, troubled labor relations, or governmental or regulatory issues. In July 2013, Blue Wolf closed on $300 million in limited partner equity commitments for its latest fund, Blue Wolf Capital Fund III, L.P. For more information about Blue Wolf visit www.blue-wolf.com.

# Meet our Senior Team





**Natalie Marjancik**
Managing Director
Chicago

**Adam Hunia**
Director
Chicago

# View More Transactions









Residential business of

has been sold to

Sell-Side

VIEW ALL

Who We Are

Our People

What We Do

Mergers & Acquisitions

Valuations & Opinions

Capital Advisory

Joint Ventures & Partnering

Who We Serve

Our Thinking

Careers

Transactions

Worldwide

Connect with Us

Lincoln Alumni

News & Media

Brochures & Collateral

Search

Privacy Policy and Disclosures

© 2019 Lincoln International



# EXHIBIT 5

*Execution Copy*

AMENDED AND RESTATED CREDIT AGREEMENT

among

BW PIEZO HOLDINGS, LLC,
CHANNEL TECHNOLOGIES GROUP, LLC,
ELECTRO-OPTICAL INDUSTRIES, LLC,
CTG ADVANCED MATERIALS, LLC,
and the other Borrowers from time to time Parties hereto

THE LENDERS PARTIES HERETO

and

ONEWEST BANK, FSB
as Administrative Agent

Dated as of October 11, 2013

100037025

<u>AMENDED AND RESTATED CREDIT AGREEMENT</u>

THIS AMENDED AND RESTATED CREDIT AGREEMENT, dated as of October 11, 2013, among (1) BW PIEZO HOLDINGS, LLC, a Delaware limited liability company, ("BWP"), CHANNEL TECHNOLOGIES GROUP, LLC, a California limited liability company ("CTG"), ELECTRO-OPTICAL INDUSTRIES, LLC, a California limited liability company ("EOI"), CTG ADVANCED MATERIALS, LLC, a Delaware limited liability company ("CTG Advanced") and such additional Subsidiaries of BWP that may from time to time hereafter become party to this Agreement pursuant to Section 5.12 hereof (each of the foregoing a "Borrower" and collectively, the "Borrowers"), (2) the several banks and other lenders from time to time parties to this Agreement (the "Lenders"), and (3) ONEWEST BANK, FSB (in its individual capacity, "OneWest Bank"), as administrative agent for the Lenders (in such capacity, the "Agent").

<div align="center">RECITALS</div>

A.      BWP, CTG and EOI are party to that certain Credit Agreement dated as of April 22, 2013 with OneWest Bank, as amended by that certain First Amendment to Credit Agreement dated as of September 23, 2013 (the "Existing Credit Agreement") pursuant to which OneWest Bank made available to the Borrowers a revolving credit facility in the maximum principal amount of $5,000,000.  As of the date hereof $3,500,000 in principal amount of revolving loans are outstanding under the Existing Credit Agreement, $500,000 of which is to be repaid on the Closing Date.

B.      BWP and CTG Advanced have entered into that certain Asset Purchase and Contribution Agreement dated as of September 20, 2013 with H.C. Materials Corporation, an Illinois corporation ("HCMC"), DHAN LLC, an Illinois limited liability company ("DHAN", and together with HCMC, the "Sellers") and Dr. Pengdi Han (as it may be amended, modified, supplemented or restated from time to time, the "Acquisition Agreement"), pursuant to which DHAN will contribute to BWP all of the equipment and related intellectual property (the "DHAN Assets") of DHAN, and CTG Advanced will purchase from HCMC substantially all of the assets of HCMC, all as more specifically set forth therein (such purchases and contributions are, collectively, the ("HCMC/DHAN Acquisition").

C.      The Borrowers have requested that the Credit Agreement be amended and restated to (i) increase the revolving loan facility to $10,000,000, (ii) provide for a term loan facility of $31,000,000, (iii) provide for a capital expenditures and acquisition facility of $8,000,000 and (iv) make other changes to the Credit Agreement as set forth herein.  The Agent and the Lenders have agreed to extend such facilities and make such changes, in each case on the terms and conditions set forth in this Agreement.

Accordingly, the parties hereto agree that the Existing Credit Agreement is hereby amended and restated as set forth in this Agreement.

<div align="center">- 1 -</div>

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto hereby agree as follows:

SECTION 1.   DEFINITIONS

1.1     <u>Defined Terms</u>.  As used in this Agreement, the following terms shall have the following meanings:

"<u>Acquisition</u>":  any transaction, or any series of related transactions, consummated after the Closing Date, by which any Borrower and/or any Subsidiary directly or indirectly (a) acquires any ongoing business, division or all or substantially all of the assets of any Person (other than individual), whether through purchase of assets, merger or otherwise, (b) acquires in one transaction or as the most recent transaction in a series of transactions control of securities of a Person engaged in an ongoing business representing more than 50% of the ordinary voting power for the election of directors or other governing position if the business affairs of such Person are managed by a board of directors or other governing body or (c) acquires control of more than 50% of the ownership interest in any partnership, joint venture, limited liability company, business trust or other Person that is not managed by a board of directors or other governing body.

"<u>Acquisition Agreement</u>":  as defined in the recitals to this Agreement.

"<u>Acquisition Documents</u>":  the Acquisition Agreement and all "Ancillary Agreements" (as defined in the Acquisition Agreement), which, for avoidance of doubt, shall not include the Loan Documents or the Subordinated Debt Documents.

"<u>Adjusted EBITDA</u>":  with respect to the Borrowers, on a consolidated basis, for any applicable period, Net Income for such period, plus (a) to the extent deducted in determining Net Income, the sum for such period of (i) Net Interest Expense, <u>plus</u> (ii) all amounts treated as expenses for depreciation and amortization (including amortization of intangibles of any kind), <u>plus</u> (iii) the aggregate amount of Permitted Tax Distributions made; <u>plus</u> (b) to the extent included in determining Net Income, the sum for such period of any extraordinary, unusual or non-recurring non-cash expenses or losses, less non-cash gains, in each case, acceptable to the Agent, such acceptance not to be unreasonably withheld, delayed or conditioned, <u>plus</u> (c) Management Fees for such period to the extent paid; <u>plus</u> (d) reasonable expenses of members of the board of directors or any similar governing body of any Borrower, observers of any such board or body and any board of advisors (collectively, "<u>Board Fees</u>"), in each case reimbursed by the Borrowers during such period and not included under clause (c) above, in amounts not to exceed $225,000 in the aggregate in any consecutive 12-month period, <u>plus</u> (e) integration expenses incurred during the applicable period and on or before December 31, 2014 in connection with the HCMC/DHAN Acquisition, including, without limitation, (i) any duplicative costs relating to consolidation of operations, and (ii) to the extent not included in clause (i), any one-time, non-capitalized costs for technology transfer and security, duplication of crystal growing stations, and non-recurring employee retention payments in an aggregate amount not exceeding $2,000,000 for all such integration costs ("<u>Integration Costs</u>"), <u>plus</u> (f) Transaction Costs not to exceed an aggregate amount of $6,000,000. Adjusted EBITDA for periods prior to the Closing Date is set forth on <u>Schedule 1.1(A)</u> attached hereto.

100037025

"Affiliate":  as to any Person, (a) any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person or (b) any Person who is a director, officer, shareholder, member or partner (i) of such Person, (ii) of any Subsidiary of such Person or (iii) of any Person described in the preceding clause (a).  For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (i) vote securities having 10% or more of the ordinary voting power for the election of directors or managers of such Person or (ii) direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"Agreement":  this Credit Agreement, as amended, restated, supplemented or otherwise modified from time to time.

"Agent":  as defined in the preamble hereto.

"Aggregate CapEx Commitment":  the sum of the CapEx Commitments.

"Aggregate Revolving Loan Commitment":  the sum of the Revolving Loan Commitments.

"Aggregate Term Loan Commitment":  the sum of the Term Loan Commitments.

"Aggregate Total Commitment":  on any date of determination, collectively, the sum of the Aggregate Revolving Loan Commitment, the Aggregate Term Loan Commitment and the Aggregate CapEx Commitment.

"Aggregate Total Commitment Percentage":  with respect to each Lender, the percentage equivalent to the ratio which such Lender's Commitments bears to the Aggregate Total Commitment.

"Anti-Terrorism Laws":  any Requirements of Law relating to terrorism or money laundering, including Executive Order No. 13224, the PATRIOT Act, the Bank Secrecy Act, the Money Laundering Control Act of 1986 (i.e., 18 U.S.C. §§ 1956 and 1957), the Requirements of Law administered by OFAC, and all Requirements of Law comprising or implementing these laws.

"Applicable Margin":  with respect to LIBOR Loans and Base Rate Loans, subject to Section 2.8(d), the applicable per annum rate for such Type of Loan as set forth below:

| Leverage Level | LIBOR Margin | Base Rate Margin |
| --- | --- | --- |
| 1 | 4.25% | 3.25% |
| 2 | 4.00% | 3.00% |
| 3 | 3.75% | 2.75% |

; provided that, notwithstanding the foregoing, during the period from and including the Closing Date through the date that is three Business Days after the Agent's receipt of the audited financial statements required by Section 5.1(a) for the period ended December 31, 2013 and the related Covenant Compliance Certificate, the Applicable Margin shall be that set forth for Leverage Level 1.

- 3 -

"Approved Fund":  with respect to any Lender, any Person (other than a natural Person) that (a) (i) is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of business or (ii) temporarily warehouses loans for any Lender or any Person described in clause (i) above and (b) is advised or managed by (i) such Lender, (ii) any Affiliate of such Lender or (iii) any Person (other than an individual) or any Affiliate of any Person (other than an individual) that administers or manages such Lender.

"Asset Disposition":  the sale, transfer, conveyance, exchange, lease or disposal of any properties, business or assets of any Borrower or any Subsidiary, other than (a) the sale of inventory in the ordinary course of business, (b) sales or other dispositions of equipment that is substantially worn, damaged or obsolete in the ordinary course of business, (c) the use or transfer of money or cash equivalents in a manner not prohibited by the terms of this Agreement or the other Loan Documents, (d) the contribution of the DHAN Assets by BWP to CTG Advanced, (e) other disposition of assets by and among the Borrowers, (f) the sale, discount or write-off of past due or impaired accounts receivable for collection purposes (but not for factoring, securitization or other financing purposes), and the termination and unwinding of Hedging Agreements permitted hereunder, and (g) the sale or other disposition of assets pursuant to any casualty event, provided any Net Cash Proceeds therefrom are reinvested or, if required, applied to the prepayment of the Loans as provided herein.

"Assignment and Acceptance":  an Assignment and Acceptance in the form of Exhibit E to this Agreement.

"Available CapEx Commitment":  with respect to each CapEx Lender on the date of determination thereof, the amount by which (a) the CapEx Term Commitment of such Lender on such date exceeds (b) the principal sum of such Lender's CapEx Term Loans outstanding.

"Available Revolving Loan Commitment":  with respect to each Revolving Loan Lender on the date of determination thereof, the amount by which (a) the Revolving Loan Commitment of such Lender on such date exceeds (b) the principal sum of such Lender's Revolving Loans outstanding.

"Bankruptcy Code":  Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Base Rate":  for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greater of (a) the Prime Rate in effect on such day and (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1%.  "Prime Rate" shall mean the rate of interest per annum as published in The Wall Street Journal on the date of measurement or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board as determined by the Agent as the "bank prime loan" rate.  "Federal Funds Effective Rate" shall mean, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for the day of such transactions received by the Agent from three federal funds

- 4 -

brokers of national recognized standing selected by it. If, for any reason, the Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, including the inability or failure of the Agent to obtain sufficient quotations in accordance with the terms hereof, the Base Rate shall be determined without regard to clause (b) of the first sentence of this definition until the circumstances giving rise to such inability no longer exist. Any change in the Base Rate due to a change in the Base Rate or the Federal Funds Effective Rate shall be effective on the effective date of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

"Base Rate Loans": Loans the rate of interest applicable to which is based upon the Base Rate.

"Blocked Person": a Person (i) listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224, (ii) owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224, (iii) with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law, (iv) that commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224 or (v) that is named a "specially designated national" or "blocked person" on the most current list published by OFAC or other similar list.

"Borrowers": as defined in the preamble hereto.

"Borrowing Base": as of any date of determination, an amount determined with reference to the most recent Borrowing Base Certificate to be equal to the sum of (i) 80% of the book value of Eligible Accounts, as determined by the Agent plus (ii) 50% of the value of the Eligible Inventory, as determined by the Agent (and less any rent reserve contemplated by Section 5.14(b)); provided that (i) the advance rate for Eligible Inventory may be increased to 60% (the "Seasonal Advance Rate") for a three-calendar month period (the "Seasonal Period") following written request received by Agent from Borrowers provided that (x) such notice is received at least ten Business Days prior to the commencement of the first month of such desired Seasonal Period (or such lesser notice period as may be agreed to by the Agent in its discretion), (y) there shall be not more than one Seasonal Period in any fiscal year of the Borrowers and (z) at the time of such increase, no Default or Event of Default shall have occurred and be continuing. The "value" of Eligible Inventory shall be based on the lower of cost or market value, less the Borrower's current inventory reserve.

"Borrowing Base Certificate": a certificate duly executed by the chief financial officer of the Borrowers, substantially in the form attached hereto as Exhibit F.

"Borrowing Notice": a notice from the Borrowers to the Agent requesting a borrowing of Loans, substantially in the form of Exhibit C hereto.

"Business Day": a day other than a Saturday, Sunday or other day on which commercial banks in the State of California are authorized or required by law to close and which, in the case of a LIBOR Loan, is a Eurodollar Business Day.

"BWCP" means Blue Wolf Capital Partners LLC, a Delaware limited liability company.

- 5 -

"BWP": as defined in the preamble hereto.

"CapEx Term Commitment":  the commitment of a Lender listed on the signature pages hereof, or in an Assignment and Acceptance, to make CapEx Loans, as the same may be adjusted pursuant to the provisions hereof.

"CapEx Lender": each Lender having (i) a CapEx Term Commitment or (ii) CapEx Loans outstanding.

"CapEx Term Commitment Expiration Date":  October 11, 2015, or such earlier date as the CapEx Commitments shall expire or be terminated in accordance with the terms hereof (whether pursuant to Section 7.1 or otherwise).

"CapEx Term Loan": as defined in Section 2.3(a).

"CapEx Term Loan Maturity Date":  October 11, 2018, or such earlier date as the CapEx Commitments shall expire or be terminated in accordance with the terms hereof (whether pursuant to Section 7.1 or otherwise).

"CapEx Term Note": as defined in Section 2.3(c).

"CapEx Term Reduction Installment":  as defined in Section 2.3(e).

"Capital Expenditures":  for any period, collectively, for any Person, the aggregate of all expenditures (including, for avoidance of doubt, related capitalized labor costs) which are made during such period (whether paid in cash or accrued as liabilities) by such Person for property, plant or equipment and which would be reflected as additions to property, plant or equipment on a balance sheet of such Person prepared in accordance with GAAP, including all Capitalized Lease Obligations; provided that "Capital Expenditures" shall not include Permitted Acquisitions.

"Capitalized Lease Obligations":  obligations for the payment of rent for any real or personal property under leases or agreements to lease that, in accordance with GAAP, have been or should be capitalized on the books of the lessee and, for purposes hereof, the amount of any such obligation shall be the capitalized amount thereof determined in accordance with GAAP.

"Capital Stock":  any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), any and all warrants, options or rights to purchase or any other securities convertible into any of the foregoing.

"Cash Equivalents": investments having a maturity of not greater than 12 months from the date of acquisition thereof in (a) obligations issued or unconditionally guaranteed by the United States of America or any agency thereof, (b) certificates of deposit of any commercial bank organized under the laws of the United States of America or any state thereof and having combined capital and surplus of at least $250,000,000, (c) commercial paper with a rating of at least Prime-1 by Moody's Investors Service, Inc. or A-1 by Standard & Poor's Ratings Group (a division of The McGraw Hill Companies, Inc.), (d) a readily redeemable "money market mutual

fund" sponsored by a bank described in clause (b) hereof, or a broker or dealer registered under the Securities Exchange Act of 1934, as amended, and having on the date of the investment capital of at least $50,000,000, which fund maintains an investment policy limiting its investments primarily to instruments of the types described in clauses (a) through (c) hereof and given on the date of such investment a credit rating of at least AA by Moody's Investors Service, Inc. or AA by Standard & Poor's Ratings Group (a division of The McGraw-Hill Companies, Inc.) or (e) other investments agreed to from time to time between the Borrower and the Agent.

"Cash Management Obligations": means obligations of the Loan Parties to OneWest under one or more cash management agreements, deposit account agreements, treasury agreements, sweep agreements or similar agreements pertaining to cash management services.

"CFC": a controlled foreign corporation (as that term is defined in the Code).

"Change in Law":  the occurrence, after the date of this Agreement, of any of the following: (i) the adoption or taking effect of any law, rule, regulation or treaty, (ii) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (iii) the making or issuance of any rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control": any event, transaction or occurrence as a result of which (a) Sponsor shall cease to own or control, directly or indirectly, more than 50% of the outstanding equity interests of BWP on a fully diluted basis; (b) BWP shall cease to directly own 100% of the outstanding equity interests of CTG, CTG Advanced and EOI on a fully-diluted basis; (c) Sponsor shall cease to have the right to appoint to the board of directors or similar governing body of BWP at least a majority of the total members of such board or body; or (d) an underwritten public offering of the equity or debt securities of BWP shall become effective.

"Closing Date":  the date on which the conditions set forth in Section 4.1 are satisfied or waived and the initial Loans are made.

"Code":  the Internal Revenue Code of 1986, as amended from time to time.

"Collateral":  all of the property (tangible or intangible) purported to be subject to the lien or security interest purported to be created by any Collateral Document executed by any Loan Party as security for all or part of the Obligations.

"Collateral Documents":  the Security Agreement, the Control Agreements and all other instruments, documents and agreements encumbering the Collateral or evidencing or perfecting a security interest therein for the benefit of the Agent, or any Lender executed by any Loan Party,

- 7 -

as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof.

"Commitment":  a Revolving Loan Commitment, a Term Loan Commitment, or a CapEx Loan Commitment, as applicable.

"Commodity Exchange Act": means  the Commodity Exchange Act (7 U.S.C. § 1 et seq.) as amended from time to time, and any successor statute.

"Confidential Information":  all non-written information designated as confidential and all written information, in each case, received from any Borrower, or any of their Affiliates and their employees, officers, directors or advisors relating to an Acquisition, Sponsor, any Borrower or their operations, other than any such information that becomes generally available to the public or becomes available to any Lender, any Affiliate or Approved Fund of any Lender or Agent from a source other than Sponsor, any Borrower or any of their Affiliates and their employees, officers, directors or advisors and that is not known to such recipient to be subject to confidentiality obligations.

"Consulting Agreement":  the Consulting Services Agreement, by and between Dr. Pengdi Han, CTG, and BWP, dated as of the date hereof.

"Contingent Purchase Price Obligations":  any earnout obligations or similar deferred or contingent purchase price obligations (including all purchase price adjustments) and any indemnity obligations of the Borrowers incurred or created in connection with an Acquisition, including the HCMC/DHAN Acquisition.

"Continuation Notice":  a request for continuation or conversion of a Loan as set forth in Section 2.6, substantially in the form of Exhibit B.

"Contractual Obligation":  as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking (other than a Loan Document) to which such Person is a party or by which it or any of its property is bound.

"Control Agreement":  a control agreement, restricted account agreement or similar agreement or document, in each case in form and substance reasonably satisfactory to the Agent and entered into for the purpose of perfecting a security interest in one or more deposit accounts or securities accounts of the Loan Parties.

"Covenant Compliance Certificate":  a certificate of a Responsible Officer or other senior officer of each Borrower substantially in the form of Exhibit D hereto.

"CTG":  as defined in the preamble hereto.

"CTG Advanced":  as defined in the preamble hereto.

"Debt Offering":  the incurrence, sale or issuance by any Borrower or any Subsidiary of any debt securities or other Indebtedness, other than any Indebtedness permitted by Section 6.2.

"Default":  any of the events specified in Section 7.1, whether or not any requirement for the giving of notice, the lapse of time, or both, or any other condition, has been satisfied.

"Defaulting Lender" means any Lender that (i) has failed to (a) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Agent and the Borrower in writing that such failure is the result of such Lender's reasonable determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable Default, shall be specifically identified in such writing) has not been satisfied, or (b) pay to the Agent or any Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (ii) has notified the Borrowers or the Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable Default, shall be specifically identified in such writing or public statement) cannot be satisfied), (iii) has failed, within three Business Days after written request by the Agent or the Borrower, to confirm in writing to the Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided, such Lender shall cease to be a Defaulting Lender pursuant to this clause (iii) upon receipt of such written confirmation by the Agent and the Borrowers), or (iv) has, or has a direct or indirect parent company that has, (a) become the subject of a proceeding under any Debtor Relief Law, or (b) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided, a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in such Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Agent that a Lender is a Defaulting Lender under any one or more of clauses (i) through (iv) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender  upon delivery of written notice of such determination to the Borrowers and each Lender.

"DHAN": as defined in Section 6.6(a)(v).

"Dollars" and "$":  dollars in lawful currency of the United States.

"Eligible Account":  as of any date of determination, an account receivable of any Borrower arising from the sale of goods in the ordinary course of business in which the Lender has a first-priority perfected Lien (which, for the avoidance of doubt, shall include accounts receivable under which the US federal government or any state is the account debtor):

(a)    that is not subject to any defense, counterclaim, set-off or dispute asserted by the applicable account debtor in writing (provided, that in the event of a set-off or dispute,

the amount of the account receivable less the amount of the set-off or dispute nonetheless shall be an Eligible Account);

(b)    that is paid within 90 days from the invoice date; and

(c)    that is otherwise acceptable to the Agent in its reasonable discretion from the perspective of a secured lender.

"Eligible Inventory": as of any date of determination, inventory consisting of first-quality finished goods, work-in-process and raw materials of any Borrower in which the Lender has a first-priority perfected Lien:

(a)    that is located on premises owned or leased by the Borrowers and is covered by insurance as contemplated by Section 5.5;

(b)    that is otherwise acceptable to the Agent in its reasonable discretion from the perspective of a secured lender.

"Environmental Laws": all federal, state and local laws, rules and regulations governing (a) environmental matters, (b) the generation, use, control, removal, storage, transportation, spill, release or discharge of hazardous materials and (c) the effect of the environment on occupational safety and health, industrial hygiene, land use or the protection of human, plant or animal health or welfare, including without limitation as provided in the provisions of and the regulations under (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendment and Reauthorization Act of 1986, (ii) the Solid Waste Disposal Act, (iii) the Clean Water Act and the Clean Air Act, (iv) the Hazardous Materials Transportation Act, (v) the Resource Conservation and Recovery Act of 1976 and (vi) the Federal Water Pollution Control Act Amendments of 1972.

"EOI": as defined in the preamble hereto.

"Equityholder Agreements": each shareholder agreement, member agreement, partner agreement, voting agreement, buy-sell agreement, option, warrant, put, call, right of first refusal, and other agreement or instrument governing the equity of any Loan Party or any other security with conversion rights into equity of any Loan Party.

"Equity Offering": the sale or issuance (or reissuance) by any Borrower or any Subsidiary of any Capital Stock, provided, however, that the term Equity Offering shall not include the (i) issuance, sale or other disposition of the Capital Stock of BWP issued in connection with the HCMC/DHAN Acquisition, (ii) issuance, sale, or other disposition of the Capital Stock of BWP contemplated by Section 6.9(vi), (iii) issuance, sale or other disposition of Capital Stock of BWP the proceeds of which are used in connection with the Cure Right, (iv) issuance or sale of Capital Stock of BWP the proceeds of which are used to make (in whole or in part), or such Capital Stock is used in connection with, a Permitted Acquisition or Capital Expenditures permitted by this Agreement or (v) issuance, sale or other disposition of Capital Stock of BWP the proceeds of which are used for other business uses of the Borrowers and their Subsidiaries reasonably acceptable to the Agent.

- 10 -

"ERISA":  the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate":  as to any Person, each trade or business including such Person, whether or not incorporated, which together with such Person would be treated as a single employer under Section 4001(a)(14) of ERISA.

"Eurodollar Business Day":  any day on which banks are open for dealings in Dollar deposits in the London interbank market.

"Event of Default":  any of the events specified in Section 7.1, provided that any requirement for the giving of notice, the lapse of time, or both, or any other condition, has been satisfied.

"Excess Cash Flow":  for the Borrowers and their Subsidiaries on a consolidated basis, with respect to any fiscal period, without duplication, the sum of (a) Adjusted EBITDA for such period, minus (b) cash Net Interest Expense paid during such period, minus (c) the aggregate principal amount of scheduled payments on any Indebtedness during such period, minus (d) the aggregate principal amount of any voluntary prepayments of the Term Loans or the CapEx Term Loans made during such period, minus (e) Unfinanced Capital Expenditures made during such period, minus (f) increases (or plus decreases) in Net Working Investment during such period, minus (g) the aggregate amount of federal and state taxes that are paid or funded through distributions in cash during such period (including Permitted Tax Distributions), minus (h) Management Fees paid under the Management Agreement during such period and permitted under Section 6.8., minus (i) Integration Costs incurred during such period, minus (j) Board Fees paid during such period.

"Exchange Act": means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute, and all rules and regulations from time to time promulgated thereunder.

"Excluded Swap Obligations":  means, with respect to any Loan Party (other than the direct counterparty of such Swap Obligation), any Swap Obligation of a Loan Party (other than the direct counterparty of such Swap Obligation) if, and to the extent that, all or a portion of the guarantee of such Loan Party pursuant to the Security Agreement of, or the grant by such Loan Party of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Loan Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time the guarantee of such Loan Party pursuant to the Security Agreement or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"Excluded Taxes":  any of the following taxes imposed on or with respect to any recipient or required to be withheld or deducted from a payment to any recipient (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes) including backup withholding required by Section 3406 of the Code, by the jurisdiction (or any political subdivision hereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which the Lender is located, (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new lending office), or is attributable to such Foreign Lender's failure or inability (other than as a result of a Change in Law) to comply with Section 2.14(d)(ii)(B), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrowers with respect to such withholding tax pursuant to Section 2.14, and (d) any U.S. federal withholding Taxes imposed under FATCA.

"FATCA":  Sections 1471, 1472, 1473 and 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), current or future United States Treasury Regulations promulgated thereunder and published guidance with respect thereto, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any applicable intergovernmental agreements with respect thereto.

"Fee Letter":  as defined in Section 2.16(a).

"Fixed Charge Coverage Ratio":  as of any date of determination, for the Borrowers and their Subsidiaries on a consolidated basis, for the twelve month period most-recently ended, the ratio of (a) (i) Adjusted EBITDA less (ii) maintenance Capital Expenditures which shall equal $500,000 less (iii) cash Permitted Tax Distributions to (b) Fixed Charges for such period; provided that, solely for the purposes of calculating the Fixed Charge Coverage Ratio as of the last day of each of the fourth quarter of fiscal year 2013, the first quarter of fiscal year 2014, the second quarter of fiscal year 2014 and the third quarter of fiscal year 2014, Fixed Charges shall be annualized based on the actual Fixed Charges from the Closing Date until the last day of each such fiscal quarter.

"Fixed Charges":  for the Borrowers and their Subsidiaries on a consolidated basis, for the twelve month period most recently ended, without duplication, the sum of (a) Gross Interest Expense for such period paid or required to be paid in cash, and (b) the aggregate amount of scheduled principal payments on Indebtedness for such period.

 "Foreign Lender":  a Lender that is not a U.S. Person.

"GAAP":  generally accepted accounting principles in the United States in effect from time to time.  If, at any time, GAAP changes in a manner which will materially affect the calculations determining compliance by the Borrowers with any of its covenants in Section 6.1,

- 12 -

such covenants shall continue to be calculated in accordance with GAAP in effect prior to such changes in GAAP.

"Governmental Authority":  any nation or government, any federal, state or other political subdivision thereof and any federal, state or local entity exercising executive, legislative, judicial, regulatory or administrative functions of government.

"Governmental Authorization":  any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"Gross Interest Expense":  with respect to the Borrowers, on a consolidated basis, for any period as at any date of determination, cash interest expense for such period (including all commissions, discounts, fees and other charges under letters of credit and similar instruments and net costs under any Lender Hedging Agreement).

"Guarantee Obligation":  means with respect to any Person, the guarantee obligations of such Person (including any bank under any letter of credit), in respect of, and obligations (contingent or otherwise) to purchase, advance or supply funds, otherwise acquire or otherwise to secure a credit against, a loss, liability or other obligation.  The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lesser of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"HCMC Call":  the call right held by BWP with respect to the Capital Stock of BWP held by DHAN or any Permitted Transferee (as defined in the LLC Agreement) of DHAN to require DHAN or any Permitted Transferee of DHAN to sell to BWP such Capital Stock pursuant to and subject to the terms and conditions of the LLC Agreement.

"HCMC Put":  the put right held by DHAN with respect to the Capital Stock of BWP held by DHAN and/or any Permitted Transferee of DHAN to require BWP to purchase from DHAN and any Permitted Transferee of DHAN such Capital Stock pursuant to and subject to the terms and conditions of the LLC Agreement.

"HCMC/DHAN Acquisition": as defined in the recitals to this Agreement.

"Hedging Agreements":  as defined in the definition of "Hedging Obligations" in this Section 1.1.

"Hedging Obligations":  of any Person, any and all obligations of such Person, whether absolute or contingent and howsoever and whenever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (i) any and all agreements, devices or arrangements designed to protect at least one of the parties thereto from the fluctuations of interest rates, commodity prices, exchange rates or forward rates

- 13 -

applicable to such party's assets, liabilities or exchange transactions, including dollar-denominated or cross-currency interest rate exchange agreements, forward currency exchange agreements, interest rate cap or collar protection agreements, forward rate currency or interest rate options, puts and warrants or any similar derivative transactions ("Hedging Agreements"), and (ii) any and all cancellations, buy-backs, reversals, terminations or assignments of any of the foregoing.

"Indebtedness":  as to any Person, (i) all indebtedness of such Person for borrowed money, or for the deferred purchase price of property or services (other than trade debt incurred and payable in the ordinary course of business), including any Contingent Purchase Price Obligations, (ii) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (iii) all indebtedness created or arising under any conditional-sale or other title-retention agreement with respect to property acquired by such Person, (iv) all Capitalized Lease Obligations of such Person, (v) all obligations of such Person under interest rate or foreign currency swaps or hedges, (vi) all obligations, contingent or otherwise, of such Person under acceptance, letter of credit or similar facilities, (vii) all mandatory redemption, repurchase or dividend obligations of such Person with respect to its stock or other equity interests (other than Permitted Tax Distributions), (viii) all liabilities in respect of unfunded vested benefits under plans covered by Title IV of ERISA, (ix) all indebtedness of the kinds referred to in clauses (i) through (viii) above and (x) below (A) of any partnership or unincorporated joint venture in which such Person is a general partner or joint venturer to the extent such Person is liable therefor or (B) secured by any Lien on any property or asset owned or held by such Person regardless of whether or not the indebtedness secured thereby shall have been incurred or assumed by such Person or is nonrecourse to the credit of such Person, the amount thereof being equal to the value of the property or assets subject to such Lien, and (x) all Guarantee Obligations in respect of, indebtedness or obligations of others of the kinds referred to in clauses (i) through (ix) of this definition.  For avoidance of doubt, "Indebtedness" shall not include the obligations of BWP in respect of the HCMC Put or HCMC Call until and unless the rights in respect thereof have been exercised under the LLC Agreement.

"Insolvency":  with respect to any Multiemployer Plan, the condition that such Multiemployer Plan is insolvent within the meaning of Section 4245 of ERISA.

"Intercreditor Agreement":  that certain Intercreditor Agreement dated as of the Closing Date executed among the Subordinated Agent, the Subordinated Lender, the Agent and the Borrowers with respect to the Subordinated Debt, as it may be amended, modified or restated from time to time in accordance with the terms thereof.

"Interest Payment Date":  (a) as to any Base Rate Loan, the last Business Day of each calendar quarter to occur while any such Loan is outstanding, (b) as to any LIBOR Loan having an Interest Period of three months or less, the last day of such Interest Period, (c) as to any LIBOR Loan having an Interest Period longer than three months, each day which is at the end of each three month-period within such Interest Period after the first day of such Interest Period and the last day of such Interest Period and (d) for each of (a), (b) and (c) above, the day on which any such Loan becomes due and payable in full or is paid or prepaid in full.

- 14 -

100037025

"Interest Period":  with respect to any LIBOR Loan:

(a)    initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such LIBOR Loan and ending one, two, three or six months thereafter, as selected by the Borrowers in its notice of borrowing or its Continuation Notice, as the case may be, given with respect thereto; and

(b)    thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such LIBOR Loan and ending one, two, three or six months thereafter, as selected by the Borrowers by irrevocable notice to the Agent not less than three Eurodollar Business Days prior to the last day of the then current Interest Period with respect thereto;

provided that, all of the foregoing provisions relating to Interest Periods are subject to the following:

(i)    if any Interest Period pertaining to a LIBOR Loan would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(ii)    any Interest Period for any Loan that would otherwise extend beyond the date final payment is due on such Loan shall end on the date of such final payment; and

(iii)    any Interest Period pertaining to a LIBOR Loan that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month.

"Landlord Consent":  each waiver and consent or similar document executed by the landlord of the Borrowers or any Subsidiary, in form and substance reasonably satisfactory to the Agent, as such agreements may be amended, restated modified or supplemented from time to time in accordance with the terms hereof and thereof.

"Lenders":  as defined in the preamble hereto and Section 8.8 hereof.

"Lender Hedging Agreement":  any Hedging Agreement entered into between any Borrower or any Subsidiary and a Lender, or a Person who was a Lender at the time such Hedging Agreement was entered into, the Agent, or an Affiliate thereof.

"Leverage Level":  if the Total Leverage Ratio shall be greater than 3.75:1, the Leverage Level shall be 1; if the Total Leverage Ratio shall be less than or equal to 3.75:1 but greater than 3.25:1, the Total Leverage Level shall be 2; and if the Total Leverage Ratio shall be less than or equal to 3.25:1, the Leverage Level shall be 3.

"LIBOR":  with respect to any LIBOR Loan for any Interest Period, the rate per annum determined by the Agent and equal to the rate (rounded upwards, if necessary, to the nearest 1/16

- 15 -

of 1%) quoted as (i) the rate at which dollar deposits in immediately available funds are offered two (2) Eurodollar Business Days prior to the first day of such Interest Period for delivery on the first day of such Interest Period in the interbank Eurodollar market on or about 9:00 a.m. (Los Angeles time) or (ii) the "LIBOR Rate" set forth in the money rates section of the Wall Street Journal two (2) Business Days prior to the first day of such Interest Period, in each case for a period equal to such Interest Period and in an amount comparable to the amount of such LIBOR Loan.  The Agent currently uses Bloomberg to provide information with respect to the interbank Eurodollar market, but the Agent, in its sole discretion, may change the service providing such information at any time and/or may rely upon the rate quoted in the Wall Street Journal as indicated above.  Each determination of the LIBOR Rate by the Agent shall be conclusive and binding upon the parties hereto, absent manifest error.

"LIBOR Adjusted Rate":  with respect to each day during each Interest Period pertaining to a LIBOR Loan, a rate per annum determined for such day in accordance with the following formula (rounded upward to the nearest 1/100th of 1%):

$$\frac{\text{LIBOR}}{1.00 - \text{LIBOR Reserve Requirements}}$$

"LIBOR Loans":  Loans the rate of interest applicable to which is based upon the LIBOR Adjusted Rate.

"LIBOR Reserve Requirements":  for any day as applied to a LIBOR Loan, the aggregate (without duplication) of the maximum rates (expressed as a decimal fraction) of reserve requirements in effect on such day (including basic, supplemental, marginal and emergency reserves under any regulations of the Board of Governors of the Federal Reserve System or other Governmental Authority having jurisdiction with respect thereto) dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of such Board) maintained by a member bank of such Federal Reserve System.

"Lien":  any mortgage, pledge, charge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), security agreement or other security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement or any Capitalized Lease Obligation having substantially the same economic effect as any of the foregoing).

"LLC Agreement":  the Second Amended and Restated Limited Liability Company Agreement of BWP dated as of the date hereof, as amended, modified, restated or supplemented from time to time.

"Loan":  a Revolving Loan, a Term Loan or a CapEx Term Loan, as applicable; and "Loans" means the aggregate of all Revolving Loans, Term Loans and CapEx Term Loans, as applicable, outstanding at any given time.

"Loan Documents":  this Agreement, the Collateral Documents, the Intercreditor Agreement, each Control Agreement, the Management Sideletter, the Fee Letter, any Notes, any

- 16 -

Sweep Agreement, any Lender Hedging Agreement, any Landlord Consents and any other document or agreement in favor of the Agent or any Lender or to which the Agent or any Lender is party that is executed by any Borrower or any other Loan Party pursuant to this Agreement.

"Loan Parties":  the Borrowers and their Subsidiaries.

"Management Agreement":  the First Amended and Restated Management Agreement dated as of the date hereof by and between BWP and BWCP.

"Management Fees":  subject to Section 6.8, management fees and reasonable expenses to be paid by BWP to BWCP pursuant to the Management Agreement.

"Management Sideletter":  that certain letter executed among BWCP, the Borrowers and the Agent, regarding the subordination of payment of the Management Fees, as such letter may be amended or modified from time to time pursuant to the terms hereof.

"Margin Stock":  as defined in Regulation U.

"Material Adverse Effect":  (a) any material adverse effect upon the properties and assets, business, financial position or results of operations of the Borrowers taken as a whole, (b) the material impairment of the ability of the Borrowers taken as a whole to perform the Obligations, or (c) the material impairment of (i) the enforceability or priority of the Agent's Liens with respect to a material portion of the Collateral, or (ii) the legality, validity, binding effect or enforceability of this Agreement or any of the other Loan Documents.

"Material Agreements":  the Acquisition Documents, the Management Agreement, the Consulting Agreement and the Subordinated Debt Documents.

"Maturity Date":  October 11, 2018, or such earlier date as the Loans shall become due and payable in full in accordance with the terms hereof (whether by acceleration or otherwise).

"Multiemployer Plan":  a plan which is a multiemployer plan as defined in Section 4001(a)(3) of ERISA and which is subject to Title IV of ERISA.

"Net Income":  with respect to the Borrowers, on a consolidated basis for any applicable period, the aggregate of all amounts which, in accordance with GAAP, would be included as net income (or net loss, including any extraordinary losses) on a consolidated statement of income for such period.

"Net Interest Expense":  with respect to the Borrowers on a consolidated basis, for any period as at any date of determination, (a) the sum of PIK Interest and any other non-cash interest accrued during such period and Gross Interest Expense less (b) interest income for such period and payments received under any Lender Hedging Agreement.

"Net Proceeds":  (A) with respect to any Asset Disposition, the net amount equal to the aggregate amount received in cash (including any cash received by way of deferred payment pursuant to a note receivable, other non-cash consideration or otherwise, but only as and when such cash is so received) in connection with such Asset Disposition minus the sum of (a) the

reasonable attorneys', accountants', investment banking, financial advisory and other customary fees, commissions and expenses incurred by the Borrowers or any of its Subsidiaries in connection with such Asset Disposition (including any such bona fide fees, commissions, costs and expenses payable to any Affiliate of the Loan Parties), (b) Indebtedness, other than the Loans, required to be paid as a result of such Asset Disposition and (c) United States federal, state and local and non-United States taxes paid or required to be paid as a result of such Asset Disposition; and (B) with respect to any Equity Offering or Debt Offering, the net amount equal to the aggregate amount received in cash (including any cash received by way of deferred payment pursuant to a note receivable, other non-cash consideration or otherwise, but only as and when such cash is so received) in connection with such Equity Offering or Debt Offering minus the reasonable attorneys', accountants', investment banking, financial advisory and other customary fees, commissions and expenses incurred by the Borrowers in connection with such Equity Offering or Debt Offering (including any such bona fide fees, commissions, costs and expenses payable to any Affiliate of the Loan Parties).

"Net Working Investment":  for the Borrowers and their Subsidiaries on a consolidated basis, (i) current assets (excluding cash and Cash Equivalents) less (ii) current liabilities (excluding the current portion of Total Funded Debt).

"Non-Defaulting Lender": at any time, each Lender that is not a Defaulting Lender at such time.

"Note": a Revolving Note, a Term Note or a CapEx Term Note; and "Notes" means the aggregate of all Revolving Notes, all Term Notes and all CapEx Term Notes.

 "Obligations":  the unpaid principal of and interest on (including interest accruing after the maturity of the Loans and interest accruing on or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to any Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding and whether or not at a default rate) the Loans, and all other obligations and liabilities of the Borrowers and the other Loan Parties to the Agent and the Lenders, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, the Notes, any other Loan Document and any other document made, delivered or given in connection herewith or therewith, including any and all Lender Hedging Agreements, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all reasonable fees and disbursements of counsel, and the allocated reasonable cost of internal counsel, to the Agent and the Lenders that are required to be paid by the Loan Parties pursuant to the terms of this Agreement) or otherwise; provided that Obligations shall not include Excluded Swap Obligations.

"Occupancy Agreements":  as defined in Section 5.10.

"OFAC":  the U.S. Department of Treasury Office of Foreign Assets Control, or any successor thereto.

- 18 -

"OFAC Lists":  collectively, the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to any of the rules and regulations of OFAC or pursuant to any applicable executive orders, including Executive Order No. 13224, as that list may be amended from time to time.

"Organic Documents":  with respect to any entity, in each case to the extent applicable thereto, its certificate or articles of incorporation or organization, its by-laws or operating agreement, its partnership agreement, all other formation and/or governing documents, and all Equityholder Agreements, voting agreements and similar arrangements applicable to any of its authorized shares of capital stock, its partnership interests or its membership interests, and any other arrangements relating to the control or management of any such entity (whether existing as corporation, a partnership, a limited liability company or otherwise).

"Participant":  as defined in Section 9.6(b).

"Participant Register":  as defined in Section 9.6(b).

"PBGC":  the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA or any successor thereto.

"Permitted Acquisition":  an Acquisition by any Borrower of any ongoing business, division or all or substantially all of the assets of, or all of the Capital Stock of, a Person (each, an "Acquired Person"), provided that each of the following conditions is satisfied with respect to such Acquisition:

(a)     if such Acquisition is of all of the Capital Stock of an Acquired Person, such Acquisition is not opposed by the board of directors or management of the Acquired Person;

(b)     such Acquisition will not cause the Borrowers to violate Section 6.13;

(c)     at the time of such Acquisition, no Event of Default shall have occurred and be continuing and no Event of Default would occur as a result thereof on a pro forma basis immediately after giving effect to such Acquisition;

(d)     in the case of the acquisition of all or substantially all of the assets of a Person, all such assets shall be owned 100% by the Borrowers, and the Borrowers shall have taken all actions to subject such assets to the Lien of the Agent (subject to Liens permitted by Section 6.3), in accordance with the terms and conditions hereof and of the other Loan Documents;

(e)     in the case of the acquisition of Capital Stock, all of the Capital Stock (except for any such securities in the nature of directors' qualifying shares required pursuant to applicable Law) acquired or otherwise issued by such Person or any newly formed Subsidiary of the Borrowers in connection with such acquisition shall be owned 100% by the Borrowers, and the Borrowers shall have taken each of the actions set forth in Section 5.12;

(f)     Borrowers shall have provided to the Agent, no later than ten Business Days prior to the date of consummation of the Acquisition, the following information and documentation pertaining to the Acquisition, in each case in form and substance reasonably satisfactory to the

- 19 -

Agent:  (A) calculations certified by the Borrowers' chief financial officer indicating pro forma compliance by the Borrowers with the covenants contained in Section 6.1 subsequent to the Acquisition, (B) if available, historical financial statements of the Acquired Person for the three full fiscal years of the Acquired Person immediately preceding the date of the consummation of the Permitted Acquisition, and (C) consolidated projections of the Borrowers, by fiscal quarter, incorporating the results of operations of the Acquired Person, and which detail Adjusted EBITDA for each relevant fiscal period for the Acquired Person; and

(g)    on or prior to the closing date for such Permitted Acquisition, the Borrowers shall have delivered to the Agent a certificate of a Responsible Officer of the Borrowers certifying that all of the requirements set forth in this definition of "Permitted Acquisition" have been satisfied or will be satisfied on or prior to the consummation of such Acquisition.

"Permitted Tax Distributions":    distributions by BWP to its members in an amount which shall not exceed, with respect to any fiscal year of the Borrowers, the taxable net income of BWP and its Subsidiaries allocated to its members for such fiscal year multiplied by the highest marginal federal, state and local combined effective income tax rate applicable to an individual Person resident in New York City, New York during such fiscal year.

"Person":  any individual, firm, partnership, joint venture, corporation, limited liability company, association, business enterprise trust, unincorporated organization, government or department or agency thereof or other entity, whether acting in an individual, fiduciary or other capacity.

"PIK Interest": as defined in the Subordinated Investment Agreement, as in effect on the Closing Date.

"Plan":  any plan (other than a Multiemployer Plan) subject to Title IV of ERISA maintained for employees of the Borrower or any ERISA Affiliate of the Borrower (and any such plan no longer maintained by the Borrower or any of the Borrower's ERISA Affiliates to which the Borrower or any of the Borrower's ERISA Affiliates has made or was required to make any contributions within any of the five preceding years).

"Pricing Certificate":    a certificate of a Responsible Officer of the Borrowers, substantially in the form of Exhibit G hereto.

"Purchasing Lender":  as defined in Section 9.6(c) hereof.

"Register":  as defined in Section 9.6(d).

"Regulation D":  Regulation D of the Board of Governors of the Federal Reserve System, as the same is from time to time in effect, and all official rulings and interpretations thereunder or thereof and any successor regulation thereto.

"Regulation U":  Regulation U of the Board of Governors of the Federal Reserve System, as the same is from time to time in effect, and all official rulings and interpretations thereunder or thereof and any successor regulation thereto.

- 20 -

"<u>Reorganization</u>":  with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"<u>Reportable Event</u>":  the occurrence of any of the events set forth in Section 4043(b) of ERISA with respect to a Plan for which notice to the PBGC is required, other than those events as to which the thirty day notice period is waived under PBGC regulations.

"<u>Required Lenders</u>":  Lenders having Commitments equal to or more than 50.1% of the Aggregate Total Commitment, or, if any Commitment has terminated, with respect to such Commitment, Lenders with the outstanding Loans under such Commitment having an unpaid principal balance equal to or more than 50.1% of the sum of the unpaid principal balance of all Loans outstanding, excluding from such calculation any Defaulting Lender; <u>provided</u> that at all times that there are only two Lenders, the Required Lenders shall mean both such Lenders.

"<u>Requirement of Law</u>":  as to any Person, its Organic Documents, and any law, treaty, rule, order, judgment or regulation of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"<u>Responsible Officer</u>":  with respect to any Loan Party, the president, the chairman, the chief executive officer, the chief operating officer or the chief financial officer of such Loan Party.

"<u>Restricted Payments</u>":  as defined in Section 6.6.

"<u>Revolving Loan</u>":  as defined in Section 2.1(b).

"<u>Revolving Loan Commitment</u>":  the commitment of a Lender listed on the signature pages hereof to make Revolving Loans as set forth on the signature pages hereof, as the same may be adjusted pursuant to the provisions hereof.

"<u>Revolving Loan Commitment Expiration Date</u>":  October 11, 2018, or such earlier date as the Revolving Loan Commitments shall expire in accordance with the terms hereof (whether pursuant to Section 7.1 or otherwise).

"<u>Revolving Loan Commitment Percentage</u>":  with respect to each Revolving Loan Lender, the percentage equivalent of the ratio which such Lender's Revolving Loan Commitment bears to the Aggregate Revolving Loan Commitment.

"<u>Revolving Loan Lender</u>":  each Lender having (i) a Revolving Loan Commitment or (ii) Revolving Loans outstanding.

"<u>Revolving Note</u>":  as defined in Section 2.1(c).

"<u>Secured Parties</u>":  shall have the meaning assigned to such term in the Security Agreement.

"Security Agreement":  the Amended and Restated Security Agreement dated as of the date hereof, made by each Borrower in favor of the Agent for the benefit of the Secured Parties, as it may be further amended or otherwise modified from time to time in accordance with the terms thereof.

"Single Employer Plan":  any Plan which is covered by Title IV of ERISA, but which is not a Multiemployer Plan.

"Solvent":  when used with respect to any Person, that:

(a)    such Person is not "insolvent" within the meaning of 11 U.S.C. Section 101(32) and the cases interpreting the same;

(b)    such Person is generally able to pay its debts as they become due; or

(c)    such Person does not have unreasonably small capital to carry on such Person's business as theretofore operated and all businesses in which such Person is about to engage.

"Specified Loan Party":  means any Loan Party that is not then an "eligible contract participant" under the Commodity Exchange Act.

"Sponsor":  Blue Wolf Capital Fund II, L.P., a Delaware limited partnership.

"Subordinated Debt":  up to $14,000,000 in principal amount of subordinated loans extended by the Subordinated Lenders to the Borrowers pursuant to the Subordinated Investment Agreement, subject at all times to the Intercreditor Agreement.

"Subordinated Debt Documents":  the Subordinated Investment Agreement and the "Investment Documents" (as defined in the Subordinated Investment Agreement), in each case as amended, modified or restated from time to time as permitted by the Intercreditor Agreement.

"Subordinated Agent": Fidus Mezzanine Capital II, L.P., a Delaware limited partnership, as Collateral Agent under the Subordinated Debt Documents, and any successor thereto in such capacity.

"Subordinated Investment Agreement":  the Investment Agreement dated as of Closing Date executed by and among the Subordinated Lender, the Subordinated Agent and the Borrowers, as it may be amended, modified or restated from time to time as permitted by the Intercreditor Agreement.

"Subordinated Lender":  collectively, each "Lender" from time to time party to the Subordinated Investment Agreement.

"Subsidiary":  as to any Person at any time of determination, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of

directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries or Subsidiaries, or both, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Swap Obligation" means, with respect to any Loan Party, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Sweep Agreement": any account sweep or similar agreement entered into between the Lender and the Borrowers from time to time with respect to the Borrowers' cash management, pursuant to which the Lender will automatically credit Revolving Loans to the Borrowers' general account maintained with the Lender and automatically debit repayment of Revolving Loans to such general account to the extent provided therein.

"Taxes": as defined in Section 2.14 hereof.

"Term Loan": as defined in Section 2.2(a).

"Term Loan Facility": as described in the preamble hereto.

"Term Loan Commitment": the commitment of a Lender listed on the signature pages hereof, or in an Assignment and Acceptance, to make a Term Loan, as the same may be adjusted pursuant to the provisions hereof.

"Term Loan Commitment Percentage": with respect to each Term Loan Lender, the percentage equivalent of the ratio which such Lender's Term Loan Commitment bears to the Aggregate Term Loan Commitment.

"Term Loan Lender": each Lender having a Term Loan Commitment or Term Loans outstanding.

"Term Note": as defined in Section 2.2(c).

"Term Loan Reduction Installment": as defined in Section 2.2(d) hereof.

"Termination Event": (a) a Reportable Event, (b) the institution of proceedings to terminate a Single Employer Plan by the PBGC under Section 4042 of ERISA, (c) the appointment by the PBGC of a trustee to administer any Single Employer Plan or (d) the existence of any other event or condition that would reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment by the PBGC of a trustee to administer, any Single Employer Plan.

"Total Leverage Ratio": for the Borrowers and their Subsidiaries on a consolidated basis, for the fiscal quarter most recently ended and the immediately preceding three fiscal quarters, the ratio of Total Funded Debt as of the last day of such quarter to Adjusted EBITDA for such period.

- 23 -

"Total Funded Debt":  as of any date of determination, without duplication, the sum of all Indebtedness of the Borrowers or any Subsidiary on such date, including the Subordinated Debt and any Guarantee Obligations in respect of Funded Debt, but excluding (i) Indebtedness of the types referred to in clause (v), (vii), (viii), and (x) of the definition of "Indebtedness" and (ii) Contingent Purchase Price Obligations.

"Tranche":  the collective reference to LIBOR Loans the Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such LIBOR Loans shall originally have been made on the same day).

"Transaction Costs": all legal, accounting, broker, consulting and other fees, costs and expenses paid by the Borrowers, in each case in connection with the closing of the transactions contemplated by the Loan Documents and the HCMC/DHAN Acquisition.

"Transferee":  as defined in Section 9.6(f) hereof.

"Type":  as to any Loan, its nature as a Base Rate Loan or a LIBOR Loan.

"Unfinanced Capital Expenditures":  Capital Expenditures made by the Borrowers or their Subsidiaries using the proceeds of the issuance, sale or other disposition of Capital Stock of BWP or the cash flow of the Borrowers, but not the proceeds of Loans made hereunder or term loans made under the Subordinated Investment Agreement.

"U.S. Person":   any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

1.2   Other Definitional Provisions.  (a)  Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in any other Loan Document or any certificate or other document made or delivered pursuant hereto or thereto.

(b)   As used herein, in any other Loan Document, and in any certificate or other document made or delivered pursuant hereto or thereto, accounting terms not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP.  Unless otherwise provided herein, all financial calculations made with respect to the Borrowers for the purpose of determining compliance with the terms of this Agreement shall be made on a consolidated basis and in accordance with GAAP.  For the avoidance of doubt, notwithstanding any change in GAAP after the Closing Date that would require lease obligations that would be treated as operating leases as of the Closing Date to be classified and accounted for as capital leases or otherwise reflected on the Borrowers' consolidated balance sheet, such obligations shall continue to be excluded from the definition of Indebtedness.

(c)   The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, subsection, Schedule and Exhibit references are to this Agreement unless otherwise specified.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation".

- 24 -

(d)    Any financial ratios required to be maintained by the Borrowers pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed in this Agreement and rounding the result up or down to the nearest number (with a round-up if there is no nearest number) to the number of places by which such ratio is expressed in this Agreement.

(e)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(f)    References to agreements, other contractual instruments and other documents include all subsequent amendments and other modifications to such agreement and documents, but only to the extent such amendments and other modifications are not prohibited by the terms of any Loan Document.

(g)    Notwithstanding anything herein to the contrary, whenever any document, agreement or other item is required by any Loan Document to be delivered on a day that is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day.

SECTION 2.    AMOUNT AND TERMS OF LOANS; COMMITMENT
                      AMOUNTS

2.1    <u>Revolving Loans; Revolving Loan Commitments</u>.  (a)  Effective as of the Closing Date, upon satisfaction of the conditions precedent set forth in Section 4.1, all "Revolving Loans" (as defined in the Existing Credit Agreement) outstanding under the Existing Credit Agreement shall be deemed outstanding under this Agreement.  All "Interest Periods" for "LIBOR Loans", if any, that have commenced and are continuing under the Existing Credit Agreement shall be deemed to have been elected pursuant to and outstanding under this Agreement, in each case with the same remaining term as existing immediately prior to the Closing Date, notwithstanding anything to the contrary contained in this Agreement.

(b)    Subject to the terms and conditions hereof, each Revolving Loan Lender severally agrees to make loans on a revolving credit basis to the Borrowers from time to time from and including the Closing Date to but excluding the Revolving Loan Commitment Expiration Date (each a "<u>Revolving Loan</u>," and collectively, the "<u>Revolving Loans</u>") in accordance with the terms of this Agreement; <u>provided</u>, <u>however</u>, that (i) the aggregate principal amount of all Revolving Loans outstanding shall not exceed the lesser of Aggregate Revolving Loan Commitment or the Borrowing Base at any time and (ii) not more than $3,000,000 in Revolving Loans may be borrowed on the Closing Date.  Within the limits of each Revolving Loan Lender's Revolving Loan Commitment and the Borrowing Base, the Borrower may borrow, prepay and reborrow Revolving Loans.

With respect to each Revolving Loan Lender, the principal amount of each Revolving Loan to be made by such Revolving Loan Lender shall be in an amount equal to the product of (i) such Revolving Loan Lender's Revolving Loan Commitment Percentage (expressed as a fraction) and (ii) the total amount of the Revolving Loan(s) requested; <u>provided</u> that in no event shall any Revolving Loan Lender be obligated to make a Revolving Loan if after giving effect to

such Revolving Loan the sum of such Revolving Loan Lender's Revolving Loans outstanding would exceed its Revolving Loan Commitment or is in excess of such Revolving Loan Lender's Available Revolving Loan Commitment.

(c)    Subject to Sections 2.10 and 2.12, the Revolving Loans may from time to time be (i) LIBOR Loans, (ii) Base Rate Loans or (iii) a combination thereof, as determined by the Borrowers and notified to the Agent in accordance with the terms hereof.  Notwithstanding any provision in this Agreement to the contrary, all Revolving Loans borrowed on the Closing Date shall be Base Rate Loans, unless the Agent receives a notice requesting LIBOR Loans at least two Business Days prior to the Closing Date.

(d)    Each Lender shall maintain in its internal records an account or accounts evidencing the Indebtedness hereunder of the Borrower to such Lender, including the amounts of the Revolving Loans made by it and each repayment and prepayment in respect thereof.  Any such recordation shall be conclusive and binding on the Borrower, absent manifest error; provided, failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Revolving Loan Commitment or the Borrowers' Obligations in respect of any Revolving Loans; and provided further, in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.  If so requested by any Lender by written notice to the Borrower (with a copy to the Agent), the Borrower shall execute and deliver to such Lender a Revolving Note substantially in the form of Exhibit A-1 (a "Revolving Note") to evidence such Lender's Revolving Loans.

(e)    The Borrower shall give the Agent irrevocable written notice (which may be by e-mail to the Agent's operations contact), substantially in the form of a Borrowing Notice (which notice must be received by the Agent prior to 9:00 a.m., Los Angeles time, on the Business Day that is the proposed borrowing date or, if all or any part of the Revolving Loans are requested to be made as LIBOR Loans, at least three (3) Eurodollar Business Days prior to the proposed borrowing date) requesting that the Revolving Loan Lenders make Revolving Loans on the proposed borrowing date and specifying (i) the aggregate amount of Revolving Loans requested to be made, (ii) subject to Sections 2.10 and 2.12, whether the Revolving Loans are to be LIBOR Loans, Base Rate Loans or a combination thereof and (iii) if the Revolving Loans are to be entirely or partly LIBOR Loans, the respective amounts of each such Type of Revolving Loan and the respective lengths of the initial Interest Periods therefor. Notwithstanding the foregoing, such notice may be given by telephone, provided it is promptly confirmed on the same day in writing (which may be by e-mail to the Agent's operations contact) by delivery to the Agent of a written notice, substantially in the form of a Borrowing Notice.  Upon receipt of such notice, the Agent shall promptly notify each Revolving Loan Lender thereof on the date of receipt of such notice.  On the proposed borrowing date, not later than 11:00 a.m., Los Angeles time, each Revolving Loan Lender shall make available to the Agent the amount of such Revolving Loan Lender's pro rata share of the aggregate borrowing amount (as determined in accordance with the second paragraph of Section 2.1(b)) in immediately available funds by wiring such amount to such account as the Agent shall specify. The Agent may, in the absence of notification from any Revolving Loan Lender that such Revolving Loan Lender has not made its pro rata share available to the Agent on such date (or, if each such Lender shall so have made available to the Agent such amount, the Agent shall), credit on such date the account of the Borrower on the books of the Agent (or credit such other

account as the Borrower shall instruct the Agent in writing) with the aggregate amount of Revolving Loans.

(f)    Neither the Agent nor any Revolving Loan Lender shall be responsible for the obligations or Revolving Loan Commitment of any other Revolving Loan Lender hereunder, nor will the failure of any Revolving Loan Lender to comply with the terms of this Agreement relieve any other Revolving Loan Lender or the Borrower of its obligations under this Agreement.

(g)    The Revolving Loan Commitment of each Revolving Loan Lender, and the Aggregate Revolving Loan Commitment, shall terminate on the Revolving Loan Commitment Expiration Date.

(h)    All outstanding Revolving Loans shall be due and payable on the Revolving Loan Commitment Expiration Date.

2.2    Term Loans; Term Loan Commitments.    Subject to the terms and conditions hereof, each Term Loan Lender severally agrees to make a term loan (each a "Term Loan", and collectively, the "Term Loans") to the Borrowers on the Closing Date in an aggregate principal amount equal to the amount of the Term Loan Commitment of such Term Loan Lender.  After the funding of the Term Loans on the Closing Date, the Term Loan Commitments shall expire.

(b)    Subject to Sections 2.10 and 2.12, the Term Loans may from time to time be (i) LIBOR Loans, (ii) Base Rate Loans or (iii) a combination thereof, as determined by the Borrowers and notified to the Agent in accordance with the terms hereof.  Notwithstanding any provision in this Agreement to the contrary, all Term Loans borrowed on the Closing Date shall be Base Rate Loans, unless the Agent receives a notice requesting LIBOR Loans at least two Business Days prior to the Closing Date.

(c)    Each Term Loan Lender shall maintain in its internal records an account or accounts evidencing the Indebtedness of the Borrowers to such Lender, including the amount of the Term Loan made by it and each payment, repayment and prepayment in respect thereof. Any such recordation shall be prima facie evidence thereof; provided, failure to make any such recordation, or any error in such recordation, shall not affect the Borrowers' Obligations in respect of any Term Loans.  If so requested by any Lender by written notice to the Borrowers (with a copy to the Agent) the Borrowers shall execute and deliver to such Lender a Term Note substantially in the form of Exhibit A-2 (a "Term Note") to evidence such Lender's Term Loan.

(d)    On each date set forth below, the Borrower shall repay the principal of the Term Loans in an aggregate amount equal to the corresponding amount set forth below (each such amount a "Term Reduction Installment"):

| | |
|---|---|
| December 31, 2013 | $387,500 |
| March 31, 2014 | $387,500 |
| June 30, 2014 | $387,500 |
| September 30, 2014 | $387,500 |
| December 31, 2014 | $581,250 |

- 27 -

| | |
|---|---|
| March 31, 2015 | $581,250 |
| June 30, 2015 | $581,250 |
| September 30, 2015 | $581,250 |
| December 31, 2015 | $775,000 |
| | |
| March 31, 2016 | $775,000 |
| June 30, 2016 | $775,000 |
| September 30, 2016 | $775,000 |
| December 31, 2016 | $775,000 |
| | |
| March 31, 2017 | $775,000 |
| June 30, 2017 | $775,000 |
| September 30, 2017 | $775,000 |
| December 31, 2017 | $968,750 |
| | |
| March 31, 2018 | $968,750 |
| June 30, 2018 | $968,750 |

provided, that the final Term Reduction Installment shall be due on the Term Loan Maturity Date and shall be in an amount equal to all principal and interest outstanding with respect to the Term Loans.  The aggregate amount payable to any Term Loan Lender on any date set forth in this Section 2.2(d) shall be determined in accordance with the provisions of Section 2.11.

(e)     The Borrower shall give the Agent irrevocable written notice, substantially in the form of a Borrowing Notice (which notice must be received by the Agent prior to 10:00 a.m., Los Angeles time, one Business Day prior to the requested borrowing date) requesting that the Term Loan Lenders make the Term Loans in accordance with their respective Term Loan Commitments on such borrowing date.

(f)     Neither the Agent nor any Term Loan Lender shall be responsible for the obligations or Term Loan Commitment of any other Term Loan Lender hereunder, nor will the failure of any Term Loan Lender to comply with the terms of this Agreement relieve any other Term Loan Lender or the Borrower of its obligations under this Agreement.

2.3     CapEx Term Loans; CapEx Commitment.     (a) Subject to the terms and conditions hereof, each CapEx Lender severally agrees to make terms loans (each, a "CapEx Term Loan" and collectively the "CapEx Term Loans") to the Borrowers from time to time from and including the Closing Date to but excluding the CapEx Commitment Expiration Date for its use in making Capital Expenditures and consummating Permitted Acquisitions in accordance with the terms of this Agreement; provided, however, that (1) the aggregate principal amount of CapEx Term Loans outstanding shall not exceed the CapEx Term Loan Commitment, and (2) each CapEx Term Loan shall be in the minimum principal amount of $200,000.  The CapEx Term Loan Commitment shall terminate on the CapEx Commitment Expiration Date.

- 28 -

(b)   Subject to Sections 2.10 and 2.12, the CapEx Term Loans may from time to time be (i) LIBOR Loans, (ii) Base Rate Loans or (iii) a combination thereof, as determined by the Borrowers and notified to the Agent in accordance with the terms of this Agreement. No CapEx Term Loans shall be available for borrowing on the Closing Date.

(c)   Each Lender shall maintain in its internal records an account or accounts evidencing the Indebtedness of the Borrowers to such Lender, including the amount of the CapEx Term Loans made by it and each payment, repayment and prepayment in respect thereof. Any such recordation shall be prima facie evidence thereof; provided, failure to make any such recordation, or any error in such recordation, shall not affect the Borrowers' Obligations in respect of any CapEx Term Loans. If so requested by any Lender by written notice to the Borrowers (with a copy to the Agent) the Borrowers shall execute and deliver to such Lender a CapEx Term Note substantially in the form of Exhibit A-3 (a "CapEx Term Note") to evidence such Lender's CapEx Term Loans.

(d)   The Borrower shall give the Agent irrevocable written notice (which may be by e-mail to the Agent's operations contact), substantially in the form of a Borrowing Notice (which notice must be received by the Agent prior to 9:00 a.m., Los Angeles time, on the Business Day preceding the proposed borrowing date or, if all or any part of the CapEx Loans are requested to be made as LIBOR Loans, at least three (3) Eurodollar Business Days prior to the proposed borrowing date) requesting that the CapEx Loan Lenders make CapEx Loans on the proposed borrowing date and specifying (i) the aggregate amount of CapEx Loans requested to be made, (ii) subject to Sections 2.10 and 2.12, whether the CapEx Loans are to be LIBOR Loans, Base Rate Loans or a combination thereof, (iii) if the CapEx Loans are to be entirely or partly LIBOR Loans, the respective amounts of each such Type of CapEx Loan and the respective lengths of the initial Interest Periods therefor, and (iv) the equipment to be purchased (and attaching the invoice therefor), or the Permitted Acquisition to be consummated, with the CapEx Term Loan. Upon receipt of such notice, the Agent shall promptly notify each CapEx Loan Lender thereof on the date of receipt of such notice. On the proposed borrowing date, not later than 11:00 a.m., Los Angeles time, each CapEx Loan Lender shall make available to the Agent the amount of such CapEx Loan Lender's pro rata share of the aggregate borrowing amount in immediately available funds by wiring such amount to such account as the Agent shall specify. The Agent may, in the absence of notification from any CapEx Loan Lender that such CapEx Loan Lender has not made its pro rata share available to the Agent on such date (or, if each such Lender shall so have made available to the Agent such amount, the Agent shall), credit the account of the Borrower on the books of the Agent (or credit such other account as the Borrowers shall instruct the Agent in writing) with the aggregate amount of CapEx Loans.

(e)   On the CapEx Commitment Expiration Date, the aggregate principal amount of all outstanding CapEx Term Loans shall be considered a single term loan (the "Combined CapEx Term Loan") and shall thereafter amortize as follows, with principal payments shall be due in equal quarterly installments (each such amount a "CapEx Term Reduction Installment"), on the last Business Day of each fiscal quarter, commencing on December 31, 2015:  (i) the first four such Installments shall each be in the principal amount necessary to cause 5.0% of the Combined CapEx Term Loan to amortize during such 4-quarter period; (ii) the second four such Installments shall each be in the principal amount necessary to cause 7.5% of the Combined CapEx Term Loan to amortize during such 4-quarter period; and

- 29 -

(iii) the third four such Installments shall each be in the principal amount necessary to cause 10.0% of the Combined CapEx Term Loan to amortize during such 4-quarter period.  The remaining principal balance of all outstanding CapEx Term Loans shall be due and payable on the CapEx Term Loan Maturity Date.  No portion of any CapEx Term Loan repaid hereunder shall be available for re-borrowing.

(f)    Neither the Agent nor any other Lender shall be responsible for the obligations or CapEx Commitment of any other Lender hereunder, nor will the failure of any CapEx Lender to comply with the terms of this Agreement relieve any other Lender or the Borrowers of its obligations under this Agreement.

2.4    Optional Prepayments.  The Borrowers may, at any time and from time to time, subject to Section 2.15, prepay the Loans, in whole or in part, without premium or penalty, upon at least three Business Days' irrevocable written notice in the case of LIBOR Loans and upon at least one Business Day's irrevocable written notice in the case of Base Rate Loans, from the Borrowers to the Agent, specifying the date and amount of prepayment, and whether the prepayment is of LIBOR Loans, Base Rate Loans or a combination thereof and, if of a combination thereof, the amount allocable to each.  Upon receipt of any such notice from the Borrowers, the Agent shall promptly notify each Lender thereof.  If any such notice is given, the amount specified in such notice shall be due and payable by the Borrowers on the date specified therein, together with accrued interest to such date on the amount prepaid.  Each prepayment of Term Loans under this Section 2.4 shall be applied to the remaining Term Loan Reduction Installments in the order specified by the Borrowers in their written notice of prepayment; provided that if no order is so specified, the prepayment will be applied to the remaining Term Loan Reduction Installments in inverse order of maturity.  Each prepayment of CapEx Term Loans under this Section 2.4 shall be applied to the remaining CapEx Term Loan Reduction Installments in the order specified by the Borrowers in their written notice of prepayment; provided that if no order is so specified, the prepayment will be applied to the remaining CapEx Term Loan Reduction Installments in inverse order of maturity.  No CapEx Term Loans prepaid under this Section 2.4 shall be available for re-borrowing.  Partial prepayments of Loans shall be in the aggregate principal amount of $200,000 or an integral multiple of $100,000 in excess thereof, except, in each case, the outstanding amount owed with respect to the Loans is less than such amount, in which case such minimum amounts shall not apply.

2.5    Mandatory Prepayments.  (a)  If at any time the aggregate principal amount of all Revolving Loans outstanding exceeds the lesser of the Aggregate Revolving Loan Commitment and the Borrowing Base, then the Borrowers shall immediately, without notice or request by the Agent, prepay the Revolving Loans in an aggregate amount equal to such excess.

(b)    Within five Business Days of receipt by the Borrowers or any of their Subsidiaries of any Net Proceeds of an Asset Disposition, the Borrowers shall prepay the Loans in an amount equal to 100% of such Net Proceeds; provided that, so long as no Event of Default has occurred and is continuing, no prepayment shall be required with respect to an Asset Disposition to the extent that, within 90 days following such Asset Disposition, such Net Proceeds are used to repair or restore the assets disposed of, or to replace the assets disposed of with assets of the same or similar type and use as those disposed of, or to acquire other assets or property necessary or useful to the Borrowers' or any Subsidiary's business (as reasonably

determined by the Borrowers) and provided that the Agent shall have a first-priority Lien thereon (subject to the Liens permitted by Section 6.3), provided further that the Borrowers notify the Agent of the Borrowers' or such Subsidiary's intent to reinvest and of the completion of such reinvestment at the time such proceeds are received and when such reinvestment occurs, respectively.  On or prior to the date such prepayment is to be made, the Borrowers agree to provide the Agent with calculations used by the Borrowers in determining the amount of any such prepayment under this Section 2.5(b).

(c)    Within five Business Days of receipt by the Borrowers or any of its Subsidiaries of any Net Proceeds with respect to a Debt Offering, the Borrowers shall prepay the Loans in an amount equal to 100% of the Net Proceeds of such Debt Offering.  On or prior to the date such prepayment is to be made, the Borrowers agree to provide the Agent with calculations used by the Borrowers in determining the amount of any such prepayment under this Section 2.5(c).  Nothing in this Section 2.5(c) shall be deemed to constitute a waiver to or modification of Section 6.2.

(d)    Within five Business Days of receipt by the Borrowers or any of its Subsidiaries of any Net Proceeds with respect to an Equity Offering, the Borrowers shall prepay the Loans in an amount equal to 100% of the Net Proceeds of such Equity Offering.  On or prior to the date such prepayment is to be made, the Borrowers agree to provide the Agent with calculations used by the Borrowers in determining the amount of any such prepayment under this Section 2.5(d).  Nothing in this Section 25.(d) shall be deemed to constitute a waiver or modification of Section 7.1(j).

(e)    If any Loan Party receives casualty or property insurance proceeds or condemnation proceeds aggregating more than $100,000 (or in any amount after the occurrence and during the continuance of an Event of Default) with respect to any damage, destruction or other loss of or to property which proceeds are not fully applied (or contractually committed) toward the repair or replacement of such damaged or condemned property by the earlier of (i) 90 days after the receipt thereof and (ii) the occurrence of an Event of Default, within three Business Days thereof, the Borrowers shall prepay the Loans in an amount equal to the amount of such proceeds not so applied.  The Borrowers shall give the Agent prompt written notice of all casualty or property insurance and condemnation proceeds received by any Loan Party on or after the Closing Date in excess of $50,000 per occurrence.

(f)    In the event that for any fiscal year of the Borrowers ending on or after December 31, 2014, there shall exist Excess Cash Flow with respect to such fiscal year, then on the earlier of (i) ten Business Days after receipt by the Borrowers of the audited financial statements of the Borrowers for such fiscal year and (ii) May 15, the Borrowers shall prepay the Loans in an amount equal to 50% of such Excess Cash Flow.  On or prior to the date of any prepayment required by this Section 2.5(f), the Borrowers agree to provide the Agent with the calculations used by the Borrowers in determining the amount of any such prepayment.

(g)    Each prepayment of the Loans pursuant to Sections 2.5(b), (c), (e) and (f) shall be applied first, to the outstanding principal balance of Term Loans, second, to the outstanding principal balance of the CapEx Term Loans and third, to the outstanding principal balance of Revolving Loans.  Each prepayment of the Loans pursuant to Section 2.5(d) shall be

- 31 -

applied <u>first</u>, to the outstanding principal balance of Revolving Loans, <u>second</u>, to the outstanding principal balance of the Term Loans and <u>third</u>, to the outstanding principal balance of CapEx Term Loans.   Any prepayment proceeds remaining after application of such prepayment in accordance with the terms hereof shall, so long as no Default has occurred and is continuing, be returned to the Borrowers.   Each prepayment under this Section 2.5 shall be accompanied by payment in full of all accrued interest and, if applicable, accrued commitment fees thereon to and including the date of such prepayment, together with any additional amounts owing pursuant to Section 2.15.   Each prepayment of Term Loans under this Section 2.5 shall be applied to the remaining Term Reduction Installments on a pro rata basis, and no such amounts shall be available for reborrowing.   Each prepayment of CapEx Term Loans under this Section 2.5 shall be applied to the remaining CapEx Term Reduction Installments on a pro rata basis, and no such amounts shall be available for reborrowing.

 2.6 <u>Conversion and Continuation Options</u>.

  (a) The Borrowers may elect from time to time to convert LIBOR Loans to Base Rate Loans, by the Borrowers giving the Agent at least two Business Days' prior irrevocable written notice of such election pursuant to a Continuation Notice, <u>provided</u> that any such conversion of LIBOR Loans may only be made on the last day of an Interest Period with respect thereto.   The Borrowers may elect from time to time to convert Base Rate Loans to LIBOR Loans by the Borrowers giving the Agent at least three Eurodollar Business Days' prior irrevocable written notice of such election pursuant to a Continuation Notice.   Any such notice of conversion to LIBOR Loans shall specify the length of the initial Interest Period or Interest Periods therefor.   All or any part of outstanding LIBOR Loans and, subject to Sections 2.10 and 2.12, Base Rate Loans, may be converted as provided herein, <u>provided</u> that (i) any such conversion may only be made if, after giving effect thereto, Section 2.7 shall not have been contravened, (ii) no such Loan may be converted into a LIBOR Loan after the date that is one month prior to the Maturity Date and (iii) unless the Agent shall otherwise agree in writing, the Borrowers shall not have the right to elect to continue at the end of the applicable Interest Period, or to convert to, a LIBOR Loan if an Event of Default shall have occurred and be continuing.

  (b) Any LIBOR Loan may be continued as such upon the expiration of the then current Interest Period with respect thereto by the Borrowers giving notice to the Agent, in accordance with the applicable provisions of the term "Interest Period" set forth in Section 1.1, of the length of the next Interest Period to be applicable to such LIBOR Loan, <u>provided</u> that no LIBOR Loan may be continued as such (i) if, immediately after giving effect thereto, Section 2.7 would be contravened, (ii) after the date that is one month prior to the Maturity Date or (iii) unless the Agent shall otherwise agree in writing, if an Event of Default shall have occurred and be continuing and <u>provided</u>, <u>further</u>, that if the Borrowers shall fail to give any required notice as described above in this Section 2.6 or if such continuation is not permitted pursuant to the preceding proviso, such Loans shall be automatically converted to Base Rate Loans on the last day of such then-expiring Interest Period.

 2.7 <u>Minimum Amounts of Tranches; Minimum Borrowings</u>.   All borrowings, conversions and continuations of LIBOR Loans hereunder and all selections of Interest Periods hereunder shall be in such amounts and be made pursuant to such elections so that, after giving

- 32 -

effect thereto, the aggregate principal amount of the Loans comprising each Tranche shall be equal to $250,000 or a whole multiple of $100,000 in excess thereof and, in any case, there shall not be more than seven Tranches.  All borrowings of Base Rate Loans shall be in a minimum amount of $250,000 or a whole multiple of $100,000 in excess thereof.

2.8    Interest Rates and Payment Dates.

(a)    Each Loan shall (i) if a LIBOR Loan, bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the LIBOR Adjusted Rate plus the Applicable Margin and (ii) if a Base Rate Loan, bear interest at a rate per annum equal to the Base Rate plus the Applicable Margin.

(b)    If any Event of Default shall have occurred and be continuing, all amounts outstanding hereunder shall, at the written election of the Required Lenders, bear interest at a rate per annum equal to the rate determined pursuant to Section 2.8(a) plus 2% per annum, from the date of the occurrence of such Event of Default until such Event of Default is no longer continuing (after as well as before judgment).

(c)    Interest shall be payable in arrears on each Interest Payment Date; provided, however, that interest accruing pursuant to paragraph (b) of this Section 2.8 shall be payable on demand.

(d)    For purposes of determining the Applicable Margin, subject to the proviso in the definition thereof, interest rates on the Loans shall be calculated on the basis of the Total Leverage Ratio set forth in the most recent Pricing Certificate received by the Agent.  A Pricing Certificate may be delivered to the Agent by the Borrowers no more frequently than quarterly, and shall be accompanied by the financial statements and other deliveries referred to in Section 5.1(b) and 5.2(a) for the quarter then most-recently ended.  For accrued and unpaid interest only (no changes being made for interest payments previously made), changes in interest rates on the Loans attributable to changes in the Applicable Margin caused by changes in the Total Leverage Ratio shall be calculated upon the delivery of a Pricing Certificate, and such change shall be effective with respect to Base Rate Loans and LIBOR Loans from the day which is five Business Days after receipt by the Agent of such Pricing Certificate.  If, for any reason, the Borrowers shall fail to deliver a Pricing Certificate within 45 days following the end of its fiscal quarter at any time when the Total Leverage Ratio has increased, or shall fail to deliver a Covenant Compliance Certificate when due in accordance with Section 5.2(a), and such failure shall continue for a period of ten days, then the Leverage Level shall be deemed to be Leverage Level 1 retroactive to the date on which the Borrowers should have delivered such Pricing Certificate or Covenant Compliance Certificate, and shall continue until a Pricing Certificate or Covenant Compliance Certificate indicating a different Leverage Level is delivered to the Agent.

2.9    Computation of Interest and Fees.  Interest on Base Rate Loans shall be calculated on the basis of a year of 365/366 days, for the actual days elapsed, and interest on LIBOR Loans and all other Obligations shall be calculated on the basis of a year of 360 days, for the actual days elapsed.  Each determination of an interest rate by the Agent pursuant to any provision of

- 33 -

this Agreement shall be conclusive and binding on the Borrowers and the Lenders in the absence of manifest error.

2.10    Inability to Determine Interest Rate.  In the event that, prior to the first day of any Interest Period, (a) the Agent shall have reasonably determined (which determination shall be conclusive and binding upon the Borrowers absent manifest error) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the LIBOR Adjusted Rate for such Interest Period or (b) the Agent shall have received notice from the Required Lenders providing that the LIBOR Adjusted Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lenders (as conclusively certified by such Lenders) of making or maintaining their affected Loans during such Interest Period, the Agent shall give email, telecopy or telephonic notice thereof to the Borrowers and the Lenders as soon as practicable thereafter.  If such notice is given, (i) any LIBOR Loans requested to be made after such notice is given on the first day of such Interest Period shall accrue interest at the Base Rate, (ii) Loans that were to have been converted after such notice is given on the first day of such Interest Period to LIBOR Loans shall be continued as Base Rate Loans and (iii) any outstanding LIBOR Loans shall be converted, on the last day of the current Interest Period, to Base Rate Loans.  Until such notice has been withdrawn by the Agent (which Agent agrees to promptly withdraw such notice as soon as clauses (a) and (b) in the first sentence of this Section 2.10 no longer apply), no further LIBOR Loans shall be made or continued as such, nor shall the Borrowers have the right to convert Base Rate Loans to LIBOR Loans.

2.11    Pro Rata Treatment and Payments.  Each payment (including each prepayment) by the Borrowers on account of principal of and interest on the Loans shall be made pro rata according to the respective Revolving Loan Commitment Percentages, Term Loan Commitment Percentages and CapEx Term Loan Commitment Percentages, as applicable, then held by the Lenders.  All payments (including prepayments) to be made by the Borrowers hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff, deduction or counterclaim and shall be made prior to 11:00 a.m., Los Angeles time, on the due date thereof to the Agent, for the account of the Lenders, at its office specified in Section 9.2, in Dollars and in immediately available funds.  The Agent shall distribute such payments to the applicable Lenders promptly upon receipt in like funds as received.  If any payment hereunder (other than payments on the LIBOR Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day, and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.  If any payment on a LIBOR Loan becomes due and payable on a day other than a Eurodollar Business Day, the maturity thereof shall be extended to the next succeeding Eurodollar Business Day (and interest shall continue to accrue thereon at the applicable rate) unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Eurodollar Business Day.  Each Borrower authorizes the Agent to debit any of its bank accounts with the Agent or make a draw of Revolving Loans for the purpose of effecting payment when due of principal, interest or, to the extent not paid as set forth herein, costs and expenses payable by the Borrowers under the Loan Documents.

- 34 -

2.12    Illegality.  Notwithstanding any other provision herein, if any change after the Closing Date in any Requirement of Law or in the interpretation or application thereof shall make it unlawful for any Lender to maintain LIBOR Loans as contemplated by this Agreement, upon written notice to the Borrowers, (a) the commitment of such Lender hereunder to continue LIBOR Loans as such and convert Base Rate Loans to LIBOR Loans shall forthwith be suspended during such period of illegality and (b) the Loans of such Lender then outstanding as LIBOR Loans, if any, shall be converted automatically to Base Rate Loans on the respective last days of the then current Interest Periods with respect to such Loans or within such earlier period as required by law.  If any such conversion of a LIBOR Loan occurs on a day which is not the last day of the then current Interest Period with respect thereto, the Borrowers shall pay to such Lender such amounts, if any, as may be required pursuant to Section 2.15.  To the extent that a Lender's LIBOR Loans have been converted to Base Rate Loans pursuant to this Section 2.12, all payments and prepayments of principal that otherwise would be applied to such Lender's LIBOR Loans shall be applied instead to its Base Rate Loans.

2.13    Increased Costs.  (a)   In the event that any Change in Law:

(i)    shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirements against assets held by, letters of credit issued by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such Lender which is not otherwise included in the determination of the LIBOR Adjusted Rate hereunder; or

(ii)    shall impose on such Lender any other condition;

and the result of any of the foregoing is to increase the cost to any Lender of converting into, continuing or maintaining LIBOR Loans, or to reduce any amount of principal or interest receivable hereunder in respect of any LIBOR Loans, in any case by an amount which such Lender deems to be material, then, in any such case, the Borrowers shall pay to the Agent, on behalf of such Lender, within three Business Days after written demand of the Agent, any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable.  If any Lender becomes entitled to claim any additional amounts pursuant to this Section 2.13, it shall promptly notify the Borrowers in writing of the event by reason of which it has become so entitled.  A certificate as to any additional amounts payable pursuant to this Section 2.13 submitted by the Agent, or such Lender through the Agent, to the Borrowers, which (A) shall be delivered by the Agent or such Lender at least five Business Days prior to the due date of any amounts payable pursuant to this Section 2.13 and (B) shall demonstrate in reasonable detail the computation of such amounts, shall be conclusive evidence of the accuracy of the information so recorded, absent manifest error.  This covenant shall survive the termination of this Agreement and the payment of all Obligations.

(b)    If, after the date of this Agreement, any Change in Law shall affect the amount of capital required or expected to be maintained by any Lender or any corporation controlling any Lender, and such Lender (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy) reasonably determines that the amount of capital maintained by such Lender or such corporation which is attributable to or based upon the Loans or this Agreement must be increased as a consequence of such Change in Law by an

- 35 -

amount deemed by such Lender to be material, then, within five Business Days after written demand of the Agent, the Borrowers shall pay to the Agent, for the account of such Lender, additional amounts sufficient to compensate such Lender or such corporation for the increased costs to such Lender or corporation of such increased capital, provided that the Borrowers shall not be required to compensate such Lender or such corporation pursuant to this Section 2.13(b) for any increased costs incurred more than 210 calendar days prior to the date the Borrowers receipt of such demand.  Any such demand shall be accompanied by a certificate of such Agent setting forth in reasonable detail the computation of any such increased costs, which certificate shall be conclusive, absent manifest error.   The obligations of the Borrowers under this Section 2.13(b) shall survive the termination of this Agreement and the payment of all Obligations.

2.14   <u>Taxes</u>.  (a)  All payments made by the Borrowers in respect of the Obligations shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority or any political subdivision or taxing authority thereof or therein, including any interest, additions to tax, penalties or other liabilities applicable thereto (all such items being referred to as "<u>Taxes</u>"), other than Excluded Taxes. If any Taxes are required to be withheld from any amounts payable to the Agent or any Lender in respect of the Obligations, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant governmental authority in accordance with applicable law and the amounts so payable to the Agent or such Lender shall be increased to the extent necessary to ensure that the net amount actually received by the Agent or such Lender will equal the full amount the Agent or such Lender would have received had no such deduction or withholding for Taxes (other than Excluded Taxes) been required.

(b)   Each Borrower agrees to indemnify the Agent and the Lenders for the full amount of Taxes but not Excluded Taxes (including any Taxes imposed or asserted by any Governmental Authority on amounts payable under this Section) paid by the Agent and/or any Lender, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  Whenever any Taxes are payable by the Borrowers, as promptly as possible thereafter, the Borrowers shall send to the Agent a copy of an original official receipt received by the Borrowers showing payment thereof or such other evidence of payment reasonably satisfactory to the Agent.  If the Borrowers fails to pay any Taxes when due to the appropriate taxing authority or fails to remit to the Agent the required receipts or other required documentary evidence, the Borrowers shall indemnify the Agent and each Lender for any incremental taxes, interest or penalties, except to the extent attributable to the gross negligence or willful misconduct of the Agent or any Lender misconduct as determined by the final non-appealable judgment of a court of competent jurisdiction (and related reasonable and documented fees and expenses of counsel) that may become payable by the Agent or any Lender as a result of any such failure.  The agreements in this Section shall survive the termination of this Agreement and the payment of all Obligations.

(c)   Each Lender shall severally indemnify the Agent, within 10 days after demand therefor, for (i) any Taxes attributable to such Lender (but only to the extent that the

Borrowers has not already indemnified the Agent for such Taxes and without limiting the obligation of the Borrowers to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.6 relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant governmental authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Agent to the Lender from any other source against any amount due to the Agent under this paragraph (c).

(d)    (i) Any Lender (for purposes of this Section 2.14(d), the term "Lender" includes the Agent) that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrowers and the Agent, at the time or times reasonably requested by the Borrowers or the Agent, such properly completed and executed documentation reasonably requested by the Borrowers or the Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrowers or the Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrowers or the Agent as will enable the Borrowers or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.14(d) (ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii) Without limiting the generality of the foregoing,

(A)    any Lender that is a U.S. Person shall deliver to the Borrowers and the Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Agent), executed originals of IRS Form W-9 certifying that such Lender is not subject to U.S. federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrowers and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and to the extent it is legally entitled to do so, from time to time thereafter upon the reasonable request of the Borrowers or the Agent), whichever of the following is applicable:

(i)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with

- 37 -

respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN (or any successor form) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN (or any successor form) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(ii)    executed originals of IRS Form W-8ECI (or any successor form);

(iii)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate in form and substance acceptable to the Agent and the Borrowers to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrowers within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed originals of IRS Form W-8BEN (or any successor form);

(iv)    to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W-8IMY (or any successor form), accompanied by IRS Form W-8ECI (or any successor form), IRS Form W-8BEN,  and such certification documents in form and substance acceptable to the Borrowers and the Agent as the Agent may request from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide such certification documents on behalf of each such direct and indirect partner; or

(v)    in the case of a Foreign Lender not described in clauses (i) through (iv), executed originals of IRS Form W-8BEN (or any successor form);

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrowers and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such

- 38 -

supplementary documentation as may be prescribed by applicable law to permit the Borrowers or the Agent to determine the withholding or deduction required to be made; and

        (D)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrowers and the Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrowers or the Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrowers or the Agent as may be necessary for the Borrowers and the Agent to comply with their obligations under FATCA and to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

      Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrowers and the Agent in writing of its legal inability to do so.

        (e)    If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.14 (including by the payment of additional amounts pursuant to this Section 2.14), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant governmental authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (e) (plus any penalties, interest or other charges imposed by the relevant governmental authority) in the event that such indemnified party is required to repay such refund to such governmental authority. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

      2.15    <u>Indemnity</u>.  Each Borrower agrees to indemnify each Lender and to hold each Lender harmless from and to pay each Lender within five Business Days of demand the amount of any liability, loss or expense directly arising from the reemployment of funds obtained by it or from fees payable to terminate the deposits from which such funds were obtained (including reasonable fees and expenses of counsel but excluding any loss of the interest margin on any such Loan) which such Lender sustains or incurs as a consequence of (a) default by the Borrowers in payment when due of the principal amount of or interest on any LIBOR Loan, (b) default by the Borrowers in making a borrowing of, conversion into or continuation of LIBOR Loans after the Borrowers has given a notice requesting the same in accordance with the provisions of this Agreement, (c) default by the Borrowers in making any prepayment after the

Borrowers has given a notice thereof in accordance with the provisions of this Agreement or (d) the making by the Borrowers of a prepayment or conversion of LIBOR Loans on a day which is not the last day of an Interest Period with respect thereto (including any prepayment required as a result of acceleration of the Loans under Section 7).  Such Lender's certificate as to such liability, loss or expense, provided that it sets forth a reasonably detailed calculation thereof, shall be deemed conclusive, absent manifest error.  This covenant shall survive the termination of this Agreement and the payment of all Obligations.

2.16    Fees.

(a)    Fees.  The Borrowers shall pay to Agent, for the Agent's own account, fees in the amounts and at the times set forth in a letter agreement between the Borrowers and the Agent dated of even date herewith (as amended, modified or restated from time to time, the "Fee Letter").

(b)    Unused Commitment Fees.   The Borrowers agree to pay to the Agent, for the benefit of the Revolving Loan Lenders, an unused commitment fee for the period from and including the Closing Date to but excluding the Revolving Loan Commitment Expiration Date, based on the aggregate amount, for each day during such period, of the Available Revolving Loan Commitment, and computed at a rate equal to 0.50% per annum.  The Borrowers agree to pay to the Agent, for the benefit of the CapEx Lenders, an unused commitment fee for the period from and including the Closing Date to but excluding the CapEx Commitment Expiration Date, based on the aggregate amount, for each day during such period, of the Available CapEx Term Loan Commitment, and computed at a rate equal to 0.50% per annum. Such unused commitment fees shall be payable in installments quarterly in arrears on the last Business Day of each March, June, September and December and on the Revolving Loan Commitment Expiration Date (in the case of the fees payable with respect to the Available Revolving Loan Commitment) and the CapEx Term Loan Commitment Expiration Date (in the case of the fees payable with respect to the Available CapEx Term Loan Commitment), as applicable.

2.17    Defaulting Lenders.

(a)    Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender:

(i)    Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of Required Lenders.

(ii)    Any payment of principal, interest, fees or other amounts received by the Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 7.1 or otherwise) or received by the Agent from a Defaulting Lender pursuant to Section 9.7(a) shall be applied at such time or times as may be determined by the Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Agent hereunder; and second, as the Borrowers may

- 40 -

request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement; third, if so determined by the Agent and the Borrowers, to be held in a deposit account with the Agent and released in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; fourth, to the payment of any amounts owing to the Agent or the Lenders as a result of any judgment of a court of competent jurisdiction obtained by the Agent or any Lender against such Defaulting Lender; and fifth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction.

(iii)   No Defaulting Lender shall be entitled to receive any commitment fees for any period during which such Lender is a Defaulting Lender (and the Borrowers shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

2.18   Substitution of Lenders.  If any Lender makes a claim under Section 2.12 or requests compensation under Section 2.13 or 2.14, or if any Lender is a Defaulting Lender, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 9.6(c)), all of its interests, rights (other than its existing rights to payments pursuant to Section 2.13 or Section 2.14) and obligations under this Agreement and the related Loan Documents to a Lender that shall assume such obligations (which assignee may be a new Lender or an existing Lender, if an existing Lender accepts such assignment); provided that:

(a)   the Borrowers shall have paid to the Agent the assignment fee specified in Section 9.6(c);

(b)   such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts); and

(c)   such assignment does not conflict with applicable law; and

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.  If a Lender is so required to make any such assignment or delegation, it promptly shall execute and deliver to the applicable Person such documents as the Borrowers reasonably require to evidence such assignment or delegation.

2.19   Sweep Agreement. Notwithstanding any provision hereof to the contrary, and subject to Section 4.2, the Borrowers authorize and direct the Agent from time to time to make Revolving Loans into the Borrowers' general operating account maintained with the Agent at such times as are contemplated by, and otherwise in accordance with, the provisions of the

- 41 -

Sweep Agreement. Notwithstanding any other provision of this Agreement to the contrary, each Loan made in accordance with the Sweep Agreement shall be a Base Rate Loan, subject to conversion pursuant to Section 2.6. With respect to borrowings made in accordance with the Sweep Agreement, no borrowing request shall be required, and the minimum amounts set forth herein shall be inapplicable. In the event of a conflict between the provisions of this Agreement and the Sweep Agreement, the provisions of this Agreement shall control.

SECTION 3.    REPRESENTATIONS AND WARRANTIES

To induce the Agent and the Lenders to enter into this Agreement and to make the Loans, the Borrowers hereby represent and warrant to the Agent and the Lenders that:

3.1    <u>Financial Condition</u>.    (a)    BWP's (i) audited consolidated balance sheet and statements of operations, members' equity and cash flows for the fiscal year ended December 31, 2012 and (ii) unaudited balance sheet and statement of operations for the seven-month period ended July 31, 2013, have been prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby, present fairly the financial condition and results of operation of each Borrower as of such dates, are correct and complete in all material respects on such dates, and are consistent with the books and records of each Borrower (which books and records are correct and complete in all material respects), and there is no material contingent liability or guarantee or other similar obligation which is not set forth therein or in the footnotes thereto.

(b)    The <u>pro</u> <u>forma</u> balance sheet of the Borrowers as of August 31, 2013, a copy of which has heretofore been furnished to the Agent and the Lenders, have been prepared based on stated assumptions made in good faith and having reasonable basis set forth therein and presents fairly in all material respects the <u>pro</u> <u>forma</u> financial condition of the Borrowers as at such date, assuming (i) the Loans to be made on the Closing Date had been made, (ii) the Subordinated Debt had been incurred by the Borrowers, (iii) CTG Advanced had become a Borrower hereunder, (iv) the HCMC/DHAN Acquisition had been consummated on the Closing Date in accordance with the terms of the Acquisition Agreement and (v) all Indebtedness to be repaid on the Closing Date had been repaid.

(c)    From December 31, 2012 through the Closing Date, there has not been an occurrence of a "material weakness" (as defined in statement on Auditing Standards No. 60) in, or fraud that involves management or other employees who have a significant role in, the Loan Parties' internal controls over financial reporting, in each case as described in Section 404 of the Sarbanes-Oxley Act of 2002 and all rules and regulations promulgated thereunder and the accounting and auditing principles, rules, standards and practices promulgated or approved with respect thereto.

(d)    As of the Closing Date, neither (i) the board of directors (or similar governing body) of any Loan Party, a committee thereof or an authorized officer of any Loan Party has concluded that any financial statement previously furnished to the Agent or the Lenders should no longer be relied upon because of an error, nor (ii) has any Loan Party been advised by its auditors or reviewers that a previously issued audit or review report or interim review cannot be relied on.

100037025

3.2     Corporate Existence; Compliance with Law, Etc.   (a)  Each Borrower and each Subsidiary (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (ii) is duly qualified as a foreign entity and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification, except where the failure to be so qualified would not have a material and adverse effect on its business or operations, (iii) is in compliance in all respects with all laws, rules and regulations applicable to it, and all contractual obligations to which it is party, the non-compliance with which in each case, could reasonably be expected to have a Material Adverse Effect and (iv) has the corporate, partnership or limited liability company power, as the case may be, and authority, and the legal right, to own and operate its properties, to lease the property it operates as lessee and to conduct the business in which it is currently engaged and in which it proposes to be engaged after the Closing Date

(b)     Without limiting the foregoing clause (a), (i) none of the Loan Parties or their Affiliates is (A) in violation of any Anti-Terrorism Law, (B) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law, or (C) is a Blocked Person; (ii) none of the Loan Parties or their Affiliates, (A) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or (B) deals in, or otherwise engages in any transaction relating to, any property or interest in property blocked pursuant to Executive Order No. 13224, any similar executive order or other Anti-Terrorism Law, and (iii) neither the making of the Loans hereunder nor the use of the proceeds thereof will violate the PATRIOT Act, the Trading with the Enemy Act, as amended, the Foreign Corrupt Practices Act or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto.  The Loan Parties are in compliance in all material respects with the PATRIOT Act.

3.3     Corporate Power; Authorization; Consents; Enforceable Obligations; Compliance with Laws.

(a)     The execution, delivery and performance by each Loan Party of the Loan Documents and the Acquisition Agreement, in each case to which it is party, are within its powers, have been duly authorized by all necessary action and do not contravene any applicable law, rule, regulation or order or any contractual restriction binding on or affecting such Loan Party, the contravention of which could reasonably be expected to have a Material Adverse Effect.

(b)     No consent or authorization of, filing with or other act by or in respect of, any Governmental Authority or any other Person is required in connection with the borrowings hereunder or the execution, delivery and performance by the Loan Parties or the validity or enforceability against the Loan Parties of the Loan Documents and the Acquisition Agreement except for (i) any consent, authorization, filing or other act which has been made or obtained and is in full force and effect, (ii) any consent, authorization, filing or other act which has been waived, (iii) with respect to the Loan Documents, the filings required to perfect the Liens created by the Loan Documents and (iv) with respect to the Acquisition Agreement, non-material consents, except where the failure to obtain such consents, individually or in the

- 43 -

aggregate, could reasonably be expected to have a Material Adverse Effect. Each Loan Document and the Acquisition Agreement has been, duly executed and delivered by each Loan Party party thereto. This Agreement and the Acquisition Agreement constitute, and each of the other Loan Documents when executed and delivered will constitute, the legal, valid and binding obligation of each Loan Party, enforceable against it in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles.

(c)    The subordination provisions contained in the Management Sideletter are enforceable against BWP and BWCP, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally, by general equitable principles or by principles of good faith and fair dealing (regardless of whether enforcement is sought in equity or at law).

(d)    Each Borrower is in compliance with all applicable Requirements of Law in respect of the conduct of its business and the ownership and operation of its properties, except in each case to the extent that the failure to comply therewith, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

3.4    <u>No Legal Bar</u>.  The execution, delivery and performance of this Agreement, the other Loan Documents and the Acquisition Agreement, and the borrowings hereunder and the use of the proceeds thereof, will not violate any Requirement of Law applicable to the Borrowers or any Subsidiary or Contractual Obligation of the Borrowers or any Subsidiary, except where such violations, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, and will not result in, or require, the creation or imposition of any Lien on any of its properties pursuant to any such Requirement of Law or such Contractual Obligation, except pursuant to the Loan Documents.

3.5    <u>No Material Litigation</u>.    There is no litigation, proceeding, labor strike, condemnation or other dispute pending, or, to the knowledge of each Borrower, threatened in writing against or affecting each Borrower or any Subsidiary or its property, (i) as of the Closing Date, with respect to the Loan Documents, the HCMC/DHAN Acquisition or the Acquisition Agreement or (ii) otherwise that could reasonably be expected to have a Material Adverse Effect.

3.6    <u>Ownership of Property; Liens; Condition of Properties</u>.  Except as set forth in <u>Schedule 3.6</u>, the Borrowers and the Subsidiaries have good and, as applicable, valid record title to all properties purported to be owned thereby, free and clear of any Liens, except those permitted by Section 6.3.  The property and assets owned, leased or licensed by the Borrowers and their Subsidiaries constitute all property and assets necessary for the business of the Borrowers and their Subsidiaries and are in good order and repair (ordinary wear, tear and obsolescence excepted).  Neither the Borrowers nor any Subsidiary has used any legal name at any time during the five years immediately preceding the execution of this Agreement, except as identified on Schedule 3.6. Except as set forth on Schedule 3.6, as of the Closing Date, (x) no Loan Party is in default or alleged to be in default with respect to any of its material obligations under any real property lease to which it is a party the absence of which could reasonably be expected to have a Material Adverse Effect, and (y) to the Borrowers' knowledge, no counter-

- 44 -

party to any such lease is in default with respect to such party's material obligations under any such lease.

3.7    <u>Environmental Matters</u>.    (a)    Except as set forth on Schedule 3.7, (i) all real property owned, leased or occupied by the Borrowers or any Subsidiary, and all operations at such properties, are in compliance with all applicable Environmental Laws, except for such noncompliance as could not reasonably be expected to have a Material Adverse Effect and (ii) there is no contamination at, under or about such properties, which has caused or could reasonably be expected to cause a Material Adverse Effect.

(b)    Except as set forth on Schedule 3.7, neither the Borrower nor any Subsidiary has received any notice from any Governmental Authority of violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to any of such properties or the business conducted at such properties, nor does any Borrower have knowledge that any such notice will be received or is being threatened, except in each case for such notices the subject matter of which could not reasonably be expected to have a Material Adverse Effect.

(c)    Except as set forth on Schedule 3.7, no judicial proceedings or governmental or administrative action is pending, or, to the knowledge of the Borrowers, threatened, under any Environmental Law to which any Loan Party is named as a party with respect to such properties or the business conducted at such properties, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial requirements outstanding under any Environmental Law with respect to such properties or such business, except for such proceedings, actions, decrees, orders or requirements as could not reasonably be expected to have a Material Adverse Effect.

3.8    <u>Intellectual Property</u>.    Except as set forth on Schedule 3.8, each Borrower and each Subsidiary owns, or is licensed to use, all trademarks, trade names, patents and copyrights (the "<u>Intellectual Property</u>") necessary for the conduct of its business, the absence of which could reasonably be expected to have a Material Adverse Effect.    In the event of the enforcement by the Agent of its rights as a secured creditor under the Loan Documents, the Agent will not be required to own or otherwise possess the right to use any Intellectual Property, or any license to use the same, in order to sell any inventory of the Loan Parties.    No written claim has been asserted and is pending by any Person against any Loan Party challenging or questioning the use of any Intellectual Property by any Loan Party or the validity or effectiveness of any Intellectual Property owned by such Loan Party, nor do the Borrowers or the Subsidiaries know of any valid basis for any such claim, in each case, which could reasonably be expected to have a Material Adverse Effect.    The use of Intellectual Property by the Borrowers and their Subsidiaries does not infringe in any material respect on the rights of any Person, nor, to the knowledge of the Borrowers, does the use by other Persons of Intellectual Property infringe in any material respect on the rights of the Borrowers or any Subsidiary, in each case, which could reasonably be expected to have a Material Adverse Effect.

3.9    <u>Taxes</u>.    The Borrowers and the Subsidiaries have filed or caused to be filed all federal, state and other material tax returns which are required to be filed by it and have paid all taxes shown to be due and payable on said returns or on any assessments made against it or any

- 45 -

of its property and all other material taxes, fees or other charges imposed on it or any of its property by any Governmental Authority (other than any not yet delinquent or the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the Borrowers or such Subsidiary, as appropriate); and no tax Lien has been filed and no claim is being asserted against any Loan Party with respect to any material tax, fee or other charge. Such returns accurately reflect in all material respects all liability for taxes of the Loan Parties for the periods covered thereby. As of the Closing Date, there is no ongoing audit or examination or, to the knowledge of any Borrower, other investigation by any Governmental Authority of the tax liability of any of the Loan Parties and there is no material unresolved claim by any Governmental Authority concerning the tax liability of any Loan Party for any period for which tax returns have been or were required to have been filed, other than unsecured claims for which adequate reserves have been established in accordance with GAAP. As of the Closing Date, no Loan Party has waived or extended or has been requested to waive or extend the statute of limitations relating to the payment of any taxes.

3.10   Federal Regulations. No Loan and no part of the proceeds thereof will be used, directly or indirectly, for "purchasing" or "carrying" any Margin Stock within the respective meanings of each of the quoted terms under Regulation U or for any purpose which violates the provisions of Regulations T, U or X of the Board of Governors of the Federal Reserve System or any provision of the Exchange Act.

3.11   ERISA Compliance.

(a)   With respect to any Plan, the Borrowers, each Subsidiary and each ERISA Affiliate thereof, is in compliance in all respects with all applicable provisions of ERISA and the Code, and all rules, regulations and orders implementing ERISA, except to the extent that the failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)   Except as would not have a Material Adverse Effect, neither the Borrowers, nor any Subsidiary or any ERISA Affiliate thereof maintains or contributes to (or has maintained or contributed to) any Multiemployer Plan under which the Borrowers, any Subsidiary or any ERISA Affiliate thereof could reasonably be expected to have any withdrawal liability.

(c)   Except as would not have a Material Adverse Effect, neither the Borrowers, nor any Subsidiary or any ERISA Affiliate thereof sponsors or maintains any Plan under which there is a material accumulated funding deficiency within the meaning of Section 412 of the Code, whether or not waived.

(d)   Except as would not have a Material Adverse Effect, the liability for accrued benefits under each Plan that will be sponsored or maintained by the Borrowers, any Subsidiary or any ERISA Affiliate thereof (determined on the basis of the actuarial assumptions utilized by the PBGC) does not exceed the aggregate fair market value of the assets under each such Plan.

(e)     Except as would not have a Material Adverse Effect, there does not exist any material unfunded liability (determined on the basis of actuarial assumptions utilized by the actuary for the plan in preparing the most recent annual report) of the Borrowers, any Subsidiary or any ERISA Affiliate thereof under any plan, program or arrangement providing post-retirement, life or health benefits.

(f)     Except as would not have a Material Adverse Effect, no Reportable Event and no "Prohibited Transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) has occurred or is occurring with respect to any plan of the Borrowers or any Subsidiary or any ERISA Affiliate thereof.

3.12   Investment Company Act; Regulated Industries.  No Borrower and no Subsidiary is (i) registered as an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended or (ii) subject to regulation under the Public Utility Holding Company Act of 2005, as amended, the ICC Termination Act of 1995, as amended, or the Federal Power Act, as amended.

3.13   Subsidiaries.  As of the Closing Date, no Borrower has any Subsidiary (other than, in the case of BWP, CTG, EOI and CTG Advanced and, in the case of CTG, EOI).

3.14   Purpose of Loans.  (a)   The proceeds of the Revolving Loans are intended to be and shall be used by the Borrowers (i) to consummate the HCMC/DHAN Acquisition, including the payment of fees and expenses in connection therewith and (ii) for working capital and general corporate purposes of the Borrowers and their Subsidiaries.

(b)     The proceeds of the Term Loans are intended to be and shall be used by the Borrower to (i) consummate the HCMC/DHAN Acquisition, including the payment of fees and expenses in connection therewith and (ii) repay on the Closing Date all Indebtedness not permitted by Section 6.2.

(c)     The proceeds of the CapEx Term Loans are intended to be and shall be used by the Borrower for making Capital Expenditures and the consummation of Permitted Acquisitions.

3.15   Accuracy and Completeness of Information.  To the knowledge of the Borrowers, all information contained in any application, schedule, report, certificate, or any other document relating to the Borrowers, any Subsidiary or any property of the Borrowers or any Subsidiary given to the Agent or any Lender by the Borrowers or any Subsidiary (or given to any consultant, appraiser, accountant or other advisor by the Borrowers or any Subsidiary, which consultant, appraiser, accountant or other advisor has then delivered any report or other document to the Agent or any Lender based on such information in connection with this Agreement), and prepared by or on behalf of the Borrowers or any Subsidiary, in connection with the Loan Documents (other than financial projections), is, when taken as a whole, true, accurate and complete in all material respects as of the date referred to therein, and no such Person has omitted to state therein (or failed to include in any such document) any material fact or any fact necessary to make such information, when taken as a whole, not materially misleading.  All projections given to the Agent and the Lenders by or on behalf of the Borrowers or any

- 47 -

Subsidiary represent the Borrowers' good faith estimate, on the date such projections are delivered, of the future performance of the Borrowers and the Subsidiaries for the periods covered thereby based upon assumptions believed by the Borrowers to be reasonable at the time of the delivery thereof to the Agent or any Lender (it being understood that such projections are subject to uncertainties and contingencies, many of which are beyond the control of the Borrowers and their Subsidiaries, that no assurances can be given that such projections will be realized, and that actual results may differ in a material manner from such projections).

3.16    <u>Real Property Assets</u>.  Schedule 3.16 sets forth all real property that, as of the Closing Date, is owned, leased or occupied by the Borrowers and their Subsidiaries.

3.17    <u>Permits, Etc</u>.  The Borrowers and their Subsidiaries have all permits, licenses, authorizations and approvals required for each of them lawfully to own, lease, control, manage and operate their properties and businesses, the absence of which could reasonably be expected to have a Material Adverse Effect.  No condition exists or event has occurred which, in itself or with the giving of notice or lapse of time or both, would result in the suspension, revocation, impairment, forfeiture or non-renewal of any such permit, license, authorization or approval, the suspension, revocation, impairment, forfeiture or non-renewal thereof which could reasonably be expected to result in a Material Adverse Effect.

3.18    <u>Nature of Business</u>. Neither the Borrowers nor any Subsidiary is engaged in any business other than (a) the manufacturing and sale of piezoelectric ceramics, transducers made from piezoelectric ceramics, and advanced sonar systems engineered from components including such ceramics and transducers, (b) the manufacturing, sale and engineering of advanced infrared and visible light spectrum test and calibration equipment, (c) the development and manufacturing of piezoelectric single crystals and other derivatives and similar crystal products and items, (d) the resale of (i) quasi-static piezo d33/d31 meters and (ii) agate mortar pestles, and (e) any business incident to the foregoing.

3.19    <u>Capital Structure and Equity Ownership</u>.  Schedule 3.19 hereto accurately and completely discloses, as of the Closing Date, (i) the number and classes of equity ownership rights and interests in the Borrowers (whether existing as common or preferred stock, general or limited partnership interests, or limited liability company membership interests, or warrants, options or other instruments convertible into such equity) and (ii) the ownership thereof.  All such shares and interests are validly existing, fully paid and non-assessable, as applicable.  As of the Closing Date, none of such rights and interests is subject to any Equityholder Agreement other than those that are set forth on Schedule 3.19.

3.20    <u>Insolvency</u>.  On the Closing Date, immediately after giving effect to (i) the funding of the Loans to be made on the Closing Date, (ii) the funding of the Subordinated Debt on the Closing Date, (iii) consummation of the HCMC/DHAN Acquisition on the Closing Date in accordance with the terms of the Acquisition Agreement, (iv) repayment of all Indebtedness to be repaid on the Closing Date and (v) the payment of all legal, underwriting, investment banking, accounting and other fees related hereto and thereto contemplated to be paid on the Closing Date, the Borrowers and their Subsidiaries, taken as a whole, are Solvent.

3.21    <u>Labor Matters</u>.    There are no strikes or labor disputes against the Borrowers or any Subsidiary pending, or to the Borrowers' knowledge, threatened in writing against it or any Subsidiary, (i) on the Closing Date or (ii) otherwise, that could reasonably be expected to have a Material Adverse Effect.

3.22    <u>Condemnation</u>.    No taking of any of the real property owned or leased by the Loan Parties or any part thereof through eminent domain, conveyance in lieu thereof, condemnation or similar proceeding is pending or, to the knowledge of the Borrowers, threatened in writing by any Governmental Authority, (i) on the Closing Date or (ii) otherwise, that would reasonably be expected to have a Material Adverse Effect.

3.23    <u>No Material Adverse Effect</u>.    As of the Closing Date, there have been no Material Adverse Effects since December 31, 2012, and there exists no event, condition or state of facts that could reasonably be expected to result in a Material Adverse Effect.

SECTION 4.    CONDITIONS PRECEDENT

4.1 <u>Conditions to Closing Date</u>.    The agreement of the Lenders to amend and restate the Existing Credit Agreement on the terms set forth herein, and the agreement of each Lender to make the Term Loans and the Revolving Loans requested to be made by it on the Closing Date, if any, is subject to the satisfaction, in each case in form and substance reasonably acceptable to the Agent, immediately prior to or concurrently with the making of the Term Loans and any such Revolving Loans on the Closing Date, of the following conditions precedent:

(a)    <u>Credit Agreement</u>.    The Agent shall have received this Agreement, executed and delivered by a Responsible Officer of each Borrower and each Lender.

(b)    <u>Other Loan Documents</u>.    The Agent shall have received the Security Agreement, the Intercreditor Agreement, each Patent Security Agreement required pursuant to the Security Agreement, the Management Sideletter, each Landlord Consent (with regard to Borrowers' properties in Bolingbrook, Illinois), and any Notes requested by any Lender to be issued hereunder, each duly executed and delivered by an appropriate officer of the relevant Loan Party or other party thereto, as applicable.

(c)    <u>Incumbency Certificate</u>.    The Agent shall have received an incumbency certificate of each Loan Party, each dated the Closing Date, executed by an appropriate officer thereof.

(d)    <u>Organizational Proceedings, Etc</u>.    The Agent shall have received a copy of the resolutions of the Board of Directors, or similar governing body, of each Loan Party (i) authorizing the Loan Documents to which it is or will be a party, and (ii) in the case of the Borrowers, authorizing the borrowings contemplated hereunder, in each case certified by an appropriate officer of such Loan Party, as of the Closing Date, which certificate states that the resolutions thereby certified have not been amended, modified, revoked or rescinded and are in full force and effect.

(e)    <u>Certain Agreements</u>.    The Agent shall have received copies of (A) the Organic Documents of each Loan Party, (B) the Acquisition Documents and (C) each other

- 49 -

Material Agreement, in each case certified by an appropriate officer of the applicable Loan Party to be true and correct and in full force and effect.

(f)    <u>Costs</u>.  The Agent shall have received payment or evidence of payment by the Borrowers of all reasonable costs expenses (including reasonable and documented legal fees of counsel to the Agent), accrued and unpaid and otherwise due and payable on or before the Closing Date by the Borrowers pursuant to this Agreement.

(g)    <u>Fees</u>.  The Agent shall have received the fees to be paid on the Closing Date pursuant to the Fee Letter.

(h)    <u>Legal Opinion</u>.  The Agent shall have received the executed legal opinion of Holland & Knight LLP, counsel to the Loan Parties, in form and substance reasonably satisfactory to the Agent and dated the Closing Date.

(i)    <u>Lien Searches</u>.  The Agent shall have received such UCC searches and other Lien searches in respect of the Loan Parties as it shall request.

(j)    <u>Good Standing Certificates</u>.  The Agent shall have received, with respect to each Loan Party, a certificate, dated a recent date, of the Secretary of State (or other relevant state authority) of the state of formation of such Loan Party and each other jurisdiction where such Loan Party is required to be qualified to do business under such jurisdiction's law if the failure to so qualify could reasonably be expected to have a Material Adverse Effect, certifying as to the existence and good standing of, and, if generally available in such jurisdiction, the payment of taxes by, such Loan Party in such state.

(k)    [Intentionally omitted].

(l)    <u>No Default/Representations</u>.  No Default shall have occurred and be continuing on the Closing Date or would occur after giving effect to (i) the funding of the Loans to be made on the Closing Date, (ii) the funding of the Subordinated Debt on the Closing Date, (iii) consummation of the HCMC/DHAN Acquisition on the Closing Date in accordance with the terms of the Acquisition Agreement, (iv) repayment of all Indebtedness to be repaid on the Closing Date and (v) the payment of all estimated legal, underwriting, investment banking, accounting and other fees related hereto and thereto, and the representations and warranties contained in this Agreement and each other Loan Document, and the representations and warranties contained in each certificate delivered to the Agent by the Borrowers or any other Loan Party in connection with this Agreement prior to or on the Closing Date, except (x) to the extent such representations and warranties expressly relate to an earlier date, shall be correct in all material respects on and as of the Closing Date and (y) for those representations and warranties that are conditioned by materiality, which shall be true and correct in all respects.

(m)    <u>Subordinated Debt</u>.  The Agent shall have received evidence that the Subordinated Debt, in the principal amount of $14,000,000, has been, or concurrently with the Closing Date will be, funded in full in cash to the Loan Parties.

(n)    <u>HCMC/DHAN Acquisition</u>.  The HCMC/DHAN Acquisition shall have been consummated in accordance with the Acquisition Documents, and the Agent shall have

- 50 -

received a certificate of a Responsible Officer of BWP and CTG Advanced to the effect that the transactions contemplated by the Acquisition Documents have been consummated without any material amendment, material waiver or material modification of the terms thereof (other than any such amendments waivers or modifications approved by the Agent).

(o)    Equity Investment.    The Agent shall have received evidence (i) that the Sponsor and certain other Persons have made a cash investment in the Borrowers on the Closing Date in an aggregate amount not less than $13,000,000, (ii) that BWP has received a rollover contribution of the its existing equity holders of approximately $26,000,000, and (iii) a rollover equity contribution was made by the stockholders of HCMC valued at not less than $9,200,000 (in lieu of cash proceeds to such sellers in connection with the sale of HCMC).

(p)    Solvency Certificate.    The Agent shall have received a certificate of a Responsible Officer of the Borrowers to the effect that the Borrowers and their Subsidiaries are, taken as a whole, Solvent immediately after giving effect to (i) the funding of the Loans to be made on the Closing Date, (ii) the funding of the Subordinated Debt on the Closing Date, (iii) consummation of the HCMC/DHAN Acquisition on the Closing Date in accordance with the terms of the Acquisition Agreement, (iv) repayment of all Indebtedness to be repaid on the Closing Date and (v) the payment of all legal, underwriting, investment banking, accounting and other fees related hereto and thereto contemplated to be paid on the Closing Date.

(q)    Insurance Policies.    The Agent shall have received evidence that the insurance policies required under Section 5.5 are in full force and effect, together with appropriate evidence showing the Agent as an additional named insured or loss payee, as appropriate, all in form and substance satisfactory to the Agent.

(r)    Closing Covenant Compliance.    The Agent shall have received a Covenant Compliance Certificate prepared on a pro forma basis using Adjusted EBITDA as of August 31, 2013, assuming (i) the funding of the Loans to be made on the Closing Date, (ii) the funding of the Subordinated Debt on the Closing Date, (iii) consummation of the HCMC/DHAN Acquisition on the Closing Date in accordance with the terms of the Acquisition Agreement, (iv) repayment of all Indebtedness to be repaid on the Closing Date and (v) the payment of all legal, underwriting, investment banking, accounting and other fees related hereto and thereto contemplated to be paid on the Closing Date and showing a Total Leverage Ratio of less than 4.25:1.00.

(s)    Borrowing Base.    The Agent shall have received a Borrowing Base Certificate as of August 31, 2013 showing availability of at least $3,500,000 after giving effect to (i) the funding of the Loans to be made on the Closing Date, (ii) the funding of the Subordinated Debt on the Closing Date, (iii) consummation of the HCMC/DHAN Acquisition on the Closing Date in accordance with the terms of the Acquisition Agreement, (iv) the repayment of all Indebtedness to be repaid on the Closing Date and (v) the payment of all legal, underwriting, investment banking, accounting and other fees related hereto and thereto contemplated to be paid on the Closing Date.

(t)    <u>Existing Debt</u>.  The Agent shall have received evidence satisfactory to it that all Indebtedness of the Loan Parties not permitted by Section 6.2 has been repaid, and all Liens in connection therewith released.

(u)    <u>Funding Notice</u>.    The Agent shall have received a fully executed Borrowing Notice with respect to the Term Loans and any Revolving Loans to be borrowed on the Closing Date.

(v)    <u>Funds Flow</u>.  The Agent shall have received a funds flow, in form and substance reasonably satisfactory to the Agent, executed by a Responsible Officer of the Borrowers certifying as to the flow of funds between the parties to the transactions to be consummated on the Closing Date.

4.2    <u>Conditions to Each Loan</u>.    The agreement each Lender to make Loans in accordance with the terms of this Agreement is subject to the satisfaction, immediately prior to or concurrently with the making of such Loan of the following conditions precedent:

(a)    <u>Representations and Warranties; No Default</u>.  The following statements shall be true and the Borrowers' acceptance of the proceeds of such Loan shall be deemed to be a representation and warranty of the Borrowers, on the date of such Loan that:

(i)    The representations and warranties contained in this Agreement, each other Loan Document and each certificate or other writing delivered by any Loan Party to the Agent in connection with this Agreement or any other Loan Document, are correct on and as of such date in all material respects as though made on and as of such date except (x) to the extent that such representations and warranties expressly relate to an earlier date and (y) for those representations and warranties that are conditioned by materiality, which shall be true and correct in all respects;

(ii)    No Default has occurred and is continuing or would result from the making of the Loans to be made on such date; and

(iii)    No event shall have occurred and be continuing, and no condition shall exist, which could reasonably be expected to have a Material Adverse Effect.

(b)    <u>Legality</u>.  The making of such Loans shall not contravene, in any material respect, any law, rule or regulation applicable to any Lender, the Agent, the Borrowers or any other Loan Party.

(c)    <u>Borrowing Notice</u>.  The Agent shall have received a Borrowing Notice pursuant to the provisions of this Agreement from the Borrowers.

- 52 -

SECTION 5.   AFFIRMATIVE COVENANTS

The Borrowers hereby agrees that from and after the Closing Date, so long as any Loan remains outstanding and unpaid, any Commitment remains in effect or any other Obligation (other than contingent indemnification obligations that are not due and payable) is due and owing to any Lender or the Agent hereunder:

5.1     Financial Statements.  The Borrowers shall furnish to the Agent:

(a)     as soon as possible, but in any event within 150 days after the fiscal year of the Borrowers ending December 31, 2013, and 120 days after the end of each fiscal year of the Borrowers thereafter, a copy of the audited consolidated balance sheet of the Borrowers and their Subsidiaries as at the end of such year and the related audited income statement, statement of members' equity and operating cash flow statement, reported on without qualification or exception by Grant Thornton, LLC or another firm of independent certified public accountants satisfactory to the Agent (and accompanied by a management letter and by a certificate signed by such accountants stating that the financial statements fairly present in all material respects the consolidated financial condition of each Borrower and its Subsidiaries as of the date thereof and for the period covered thereby); and

(b)     as soon as possible, but in any event not later than 60 days after the end of each fiscal quarter of the Borrowers for the first four fiscal quarters of the Borrowers after the date hereof, and not later than 45 days after the end of each fiscal quarter of the Borrowers thereafter, the unaudited consolidated balance sheet of the Borrowers and their Subsidiaries as at the end of such quarter and the related unaudited income statement and cash flow statement for such quarter and the portion of the fiscal year through the end of such quarter, such quarterly financial statements to include a summary of the results for such period, and including a comparison of the results of such period with (A) the budgeted results set forth in the budget delivered to the Agent prior to the Closing Date or, thereafter, referred to in Section 5.2(b), and (B) the same period in the prior fiscal year, all certified by the chief financial officer of each Borrower as being fairly stated in all material respects (subject to normal year-end audit adjustments and the absence of footnotes);

all such financial statements to be complete and correct in all material respects and to be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein and with prior periods.

5.2     Certificates; Other Information.  The Borrowers shall:

(a)     furnish to the Agent, concurrently with the delivery of the financial statements referred to in Section 5.1(a) and (b), a Covenant Compliance Certificate with respect to such fiscal quarter or fiscal year, as the case may be;

(b)     furnish to the Agent, as soon as available but in any event by (i) the 60th day after the commencement of the 2014 fiscal year of the Borrowers and (ii) the 30th day after the commencement of subsequent fiscal years of the Borrowers, a copy of the annual operating budget for the Borrowers and their Subsidiaries for such fiscal year, in form and detail reasonably satisfactory to the Agent;

- 53 -

(c)     within 20 days after the end of each fiscal month of the Borrowers, a Borrowing Base Certificate, an accounts payable and accounts receivable agings report and an inventory report;

(d)     furnish to the Agent, within five Business Days after the same are filed, copies of all financial statements and material reports and notices which the Borrowers or any Subsidiary may make to, or file with, the Securities and Exchange Commission or any successor or analogous Governmental Authority;

(e)     furnish to the Agent promptly but, in any event within five Business Days after the Borrowers' receipt thereof, copies of all final financial reports (including management letters), if any, submitted to the Borrowers by its accountants in connection with any annual or interim audit of the books thereof;

(f)     furnish to the Agent as soon as possible and in any event within five Business Days after a Responsible Officer has knowledge of (i) the occurrence of a Default or, in the good faith determination of a Responsible Officer of the Borrowers, a Material Adverse Effect or (ii) the cancellation or termination, or threatened cancellation or termination, of any Material Agreement, the written statement by a Responsible Officer of the Borrowers, setting forth, in the case of (i), the details of such Default or Material Adverse Effect and the action which the Borrowers proposes to take with respect thereto;

(g)     furnish to the Agent (i) as soon as possible and in any event within five Business Days after the Borrowers knows that any Termination Event with respect to any Plan has occurred, a statement of a Responsible Officer of the Borrowers describing such Termination Event and the action, if any, which the Borrowers proposes to take with respect thereto, (ii) promptly and in any event within five Business Days after receipt thereof by the Borrowers or any Subsidiary from the PBGC, copies of each notice received by the Borrowers or any Subsidiary of the PBGC's intention to terminate any Plan or to have a trustee appointed to administer any Plan, (iii) promptly and in any event within five Business Days after the filing thereof with the Internal Revenue Service, copies of each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) with respect to each Single Employer Plan maintained for or covering employees of the Borrowers or any of its Subsidiaries if the present value of the accrued benefits under the Plan (determined on the basis of the actuarial assumptions used in the minimum funding calculations reflected on such Schedule B) exceeds its assets by an amount which could cause a Material Adverse Effect and (iv) promptly and in any event within five Business Days after receipt thereof by the Borrowers or any Subsidiary from a sponsor of a Multiemployer Plan or from the PBGC, a copy of each notice received by the Borrowers or any Subsidiary concerning the imposition or amount of withdrawal liability under Section 4202 of ERISA or indicating that such Multiemployer Plan may enter Reorganization status under Section 4241 of ERISA;

(h)     furnish to the Agent promptly upon the Borrowers obtaining knowledge thereof, notice of each action, suit or proceeding before any court or other Governmental Authority or any arbitrator involving an amount that could reasonably be expected to have a Material Adverse Effect;

100037025

(i)       if requested by the Agent, furnish to the Agent a statement to the effect set forth in Section 3.10 in conformity with the requirements of Form U-1 referred to in Regulation U;

(j)       furnish to the Agent promptly such additional financial and other information relating to any Loan Party as the Agent or any Lender may from time to time reasonably request; including, without limitation, monthly financial statements of the Borrowers and their Subsidiaries of the type referred to in Section 5.1(b) above.

(k)       furnish to the Agent promptly upon the receipt thereof, copies of all material notices received or delivered pursuant to the Subordinated Debt Documents; and

(l)       furnish to the Agent promptly upon (and in any event within five Business Days after) any Responsible Officer of any Loan Party obtaining knowledge thereof, written notice of any of the following:

(i)       the receipt by any Loan Party from any Governmental Authority of (A) any notice asserting any failure by any Loan Party to be in compliance with applicable Requirements of Law or that threatens the taking of any action against any Loan Party or sets forth circumstances that could reasonably be expected to have a Material Adverse Effect, or (B) any notice of any actual or threatened suspension, limitation or revocation of, failure to renew, or imposition of any restraining order, escrow or impoundment of funds in connection with, any license, permit, accreditation or authorization of any Loan Party, where such action could reasonably be expected to have a Material Adverse Effect; and

(ii)       (x) any dispute with, or claim against, any person or entity for which any Loan Party has a claim under the Acquisition Agreement which has a reasonably estimated value in excess of $500,000; and (y) copies of all material notices and demands sent or received by any Loan Party pursuant to the Acquisition Agreement.

5.3       Payment of Obligations.   The Borrowers shall, and shall cause each of its Subsidiaries to, pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its obligations of whatever nature, except (i) where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on the books of the Borrowers or such Subsidiary, as applicable, or (ii) as could not reasonably be expected to have a Material Adverse Effect.

5.4       Conduct of Business and Maintenance of Existence.   The Borrowers shall, and shall cause each of its Subsidiaries to, (i) continue to engage in business of the same general type as conducted by the Borrowers and their Subsidiaries as of the Closing Date or as otherwise permitted by Section 3.18, (ii) preserve, renew and keep in full force and effect its corporate or other legal existence, as applicable, (iii) maintain all rights, registrations, authorizations, licenses, privileges and franchises necessary in the normal conduct of its business except to the extent the failure to do so would not reasonably be expected to have a Material Adverse Effect, (iv) comply with all Contractual Obligations except for such noncompliance as would not reasonably be

- 55 -

expected to have a Material Adverse Effect, (v) pay all lawful claims which if unpaid would become a Lien upon any of its Properties and (vi) comply with all other Requirements of Law except for such noncompliance as would not reasonably be expected to have a Material Adverse Effect.

5.5     Maintenance of Property; Insurance. (a)   The Borrowers shall, and shall cause each of its Subsidiaries to, keep all property necessary to its business in good working order and condition (ordinary wear and tear and obsolescence excepted).

(b)     The Borrowers shall, and shall cause each of its Subsidiaries to, maintain with financially sound and reputable insurance companies or associations insurance on such of its property in at least such amounts and against such risks as are usually insured against in the same general area by companies engaged in the same or a similar business, which insurance shall be in the same or greater amount and the same or greater levels of coverage as in existence on the date hereof (other than (x) the existing environmental pollution insurance policy and (y) the representations and warranties insurance policy obtained by BWP in connection with the Acquisition Agreement); and furnish to the Agent, upon request, full information as to the insurance carried.  All such policies of insurance (other than worker's compensation, public liability, public property, directors and officers, employment practice liability and fiduciary liability insurance policies) shall (i) designate the Agent, on behalf of the Lenders, as additional insured or loss payee, as appropriate, and (ii) provide that the insurance companies will give the Agent at least 30 days' (or 10 days for notice of nonpayment) prior written notice before any such policy or policies of insurance shall be canceled.  The Borrowers shall deliver to the Agent insurance certificates certified by the Loan Parties' insurance brokers as to the existence and effectiveness of each policy of insurance and evidence of payment of all premiums then due and payable therefor.  In addition, the Borrowers shall notify the Agent promptly of any occurrence causing a material loss of any insured property and the estimated (or actual, if available) amount of such loss.

5.6     Inspection of Property; Books and Records; Discussions.  The Borrowers shall, and shall cause each Subsidiary to, keep adequate records and books of account in which full and correct entries in conformity with GAAP shall be made of all their financial transactions, assets and business; at any reasonable time and from time to time upon reasonable prior written notice (which in no event shall be less than five Business Days unless an Event of Default has occurred and is continuing), but in no event more than once per calendar quarter (or, if an Event of Default shall have occurred and be continuing, at such frequency as the Agent shall reasonably determine), permit the Agent and the Lenders or any agents or representatives thereof, to examine and make copies and abstracts from the records and books of account of, and visit the properties of, the Borrowers and the Subsidiaries, and to discuss the affairs, finances and accounts of each Borrower and the Subsidiaries with any of its officers and its independent accountants; and, once per calendar year (or more frequently if an Event of Default has occurred and is continuing), permit the Agent to conduct collateral audits of the Loan Parties.

5.7     Use of Proceeds.  The Borrowers will use the proceeds of the Loans as set forth in Section 3.14, and not for the purchasing or carrying of any Margin Stock.

5.8     Interest Rate Protection.  The Borrowers shall not, and shall not permit any of its Subsidiaries to, incur any Hedging Obligation, except that the Borrowers or any Subsidiary may enter into any Hedging Obligation that (i) is of a non-speculative nature and (ii) is for the purpose of hedging the Borrowers' or such Subsidiary's reasonably estimated interest rate or currency exposure.

5.9     Acquisition of Real Property.  The Borrowers shall promptly notify the Agent of any fee simple real property interest to be acquired by any Loan Party for consideration in excess of $500,000.  With respect to any real property interest of the Loan Parties, the Required Lenders may require that such Loan Party enter into a mortgage or deed of trust to cause any such real property interest to become part of the Collateral, and that the Borrowers provide to the Agent, in connection therewith, title insurance, a Phase I environmental site assessment report, opinions of counsel and such other documents as the Agent shall reasonably request with respect thereto.

5.10     Lease and License Compliance; Landlord Consents.  (a)  The Borrowers shall, and shall cause each Subsidiary to, perform and carry out in all material respects the terms and provisions of all leases, licenses, permits and other occupancy agreements relating to real property or real property interests that are owned, leased or occupied by the Borrowers or any Subsidiary a default or breach under which could reasonably expect to have a Material Adverse Effect (the "Occupancy Agreements").

(b)     With respect to each property leased by any Borrower or any Subsidiary or any warehouse used by any Borrower or any Subsidiary, in each case where material records are kept or where Collateral is stored or located, the Borrowers shall cause a Landlord Consent or warehouse letter, in each case in form and substance reasonably acceptable to the Agent, to be executed by the landlord or warehouse operator thereof, and delivered to the Agent and, in the case of a Landlord Consent, if requested by the Agent, recorded against such property in the relevant real property records.  Notwithstanding the foregoing, no Landlord Consent or warehouse letter shall be required with respect to any location at which no material records are kept and at which Collateral with a value of less than $100,000, as to any one location, is held.

5.11     Environmental Laws.  The Borrowers shall, and shall cause each Subsidiary to:

(a)     comply with, and take commercially reasonable steps to ensure compliance by all tenants and subtenants, if any, with, all applicable Environmental Laws and obtain and comply with any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws except for such noncompliance or failure to obtain as would not reasonably be expected to have a Material Adverse Effect;

(b)     conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other reasonable actions required under applicable Environmental Laws due to a material release of hazardous materials at the real property owned, leased or occupied by the Borrowers or any Subsidiary and timely comply with all orders and directives of all Governmental Authorities regarding such Environmental Laws, except to the extent that the same are being contested in good faith by appropriate proceedings; and

- 57 -

(c)    defend, indemnify and hold harmless the Agent, each Lender, and their respective employees, agents, officers and directors, shareholders, successors, attorneys and assigns from and against any and all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature known or unknown, contingent or otherwise, arising out of, or in any way relating to (i) the presence of contamination on any of the Properties, (ii) any violation of, noncompliance with or liability under any Environmental Laws applicable to the operations of the Borrowers or any Subsidiary, or the Properties, or (iii) any orders, requirements or demands of Governmental Authorities related thereto, including reasonable attorneys' and consultants' fees, investigation and laboratory fees, response costs, court costs and litigation expenses, except to the extent that any of the foregoing arise out of the gross negligence or willful misconduct of the party seeking indemnification therefor.  This indemnity shall continue in full force and effect and survive the termination of this Agreement, and the payment of all Obligations.

5.12    <u>Covenants Regarding Subsidiaries</u>.  (a)  cause each Subsidiary hereafter formed or acquired to execute and deliver to the Agent, upon the formation or acquisition thereof, (i) a joinder to this Agreement in form and substance reasonably acceptable to the Agent, pursuant to which it will become a Borrower hereunder and under the other Loan Documents and (ii) a joinder to the Security Agreement in form and substance reasonably acceptable to the Agent, together with appropriate Lien searches requested by the Agent indicating the Agent's Lien on such Subsidiary's personal property subject only to Liens permitted by Section 6.3 and, in connection with such deliveries, cause to be delivered to the Agent the following, in each case in form and substance acceptable to the Agent, (A) a favorable written opinion of counsel reasonably satisfactory to the Agent as to such matters relating thereto as the Agent may request, (B) to the extent certificated, original stock certificates or other certificates evidencing equity ownership, accompanied by stock or other appropriate transfer powers duly executed in blank, with regard to the Capital Stock of such Subsidiary, (C) certified copies of the organizational documents, resolutions and incumbency certificates of such Subsidiary (D) unless the Required Lenders agree otherwise in writing, a mortgage or deed of trust with respect to any owned interest of such Subsidiary in real property and (E) such other agreements, instruments, approvals or other documents as the Agent may reasonably request with respect thereto.

(b)    Notwithstanding any other provision of this Agreement or the other Loan Documents, in no event shall (i) more than 65% of the total outstanding voting Capital Stock of any first tier Subsidiary of the Borrowers that is a CFC be required to be pledged, (ii) any shares of a non-U.S. Subsidiary that is not a first-tier non-U.S. Subsidiary be required to be pledged or otherwise serve as security hereunder, (iii) any non-U.S. Subsidiary be a Guarantor or a Borrower or otherwise be required to guarantee any obligation of any Person under the Loan Documents or (iv) any assets of any non-U.S. Subsidiary be required to be pledged as Collateral.

5.13    <u>Bank Accounts</u>.  Within 120 days after the Closing Date, the Borrowers shall, and shall cause each Subsidiary to, (i) maintain its primary treasury management and its operating accounts with OneWest Bank and (ii) as to any account not maintained with OneWest Bank, cause Control Agreements with respect thereto to be executed and delivered to the Agent; <u>provided</u> that, for the avoidance of doubt, the Borrowers shall not be obligated to obtain Control Agreements with respect to, any account having a balance of less than $75,000 or $150,000 in

- 58 -

the aggregate for all such accounts and shall not be obligated to obtain Control Agreements with respect to any payroll or similar benefits account. Notwithstanding the foregoing, with regard to the deposit accounts of the Borrowers held at Wells Fargo Bank, N.A. (in its capacity as depository "Wells Fargo"), in the event such accounts are not either closed or made subject to a Control Agreement within 15 days prior to the expiration of such 120 day period, the Borrowers shall give irrevocable written instructions to Wells Fargo (with a copy to the Agent) with regard to any deposit account not covered by a Control Agreement, pursuant to which instructions Wells Fargo shall wire transfer on each Business Day any funds in any such deposit accounts to a deposit account of the Borrowers (or one of them) maintained with OneWest Bank; provided that within one year after giving such instructions to Wells Fargo, the Borrowers shall have closed such deposit accounts with Wells Fargo.

5.14    Post-Closing Deliveries.  The Borrowers shall deliver to the Agent each of the following, in each case in form and substance acceptable to the Agent, by the respective due dates set forth below:

(a)  Within seven Business Days after the Closing Date, original certificates representing all outstanding stock or membership interests owned by BWP in each other Borrower (other than CTG Advanced) and any other Subsidiary, in each case together with an undated transfer power for each of such certificates, duly executed in blank by an authorized officer of the pledgor thereof; and

(b)  Within 90 days after the Closing Date, a Landlord Consent for the Borrowers' property located in Santa Barbara, California; provided that, in the event the Borrowers are unable to deliver such Landlord Consent, the Agent shall, immediately following such 90th day, impose a rent reserve against the Borrowing Base in an amount equal to three months' rent on such premises (it being represented by the Borrowers that, as of the Closing Date, base rent for such premises is approximately $124,000 per month), which rent reserve shall remain in place until such Landlord Consent is delivered.

SECTION 6.  NEGATIVE COVENANTS

The Borrowers hereby agrees that from and after the Closing Date, so long as any Loan remains outstanding and unpaid, any Commitment remains in effect or any other Obligation (other than contingent indemnification obligations that are not due and payable) is due and owing to any Lender or the Agent hereunder:

6.1    Financial Condition Covenants.  The Borrowers shall not:

(a)    Total Leverage Ratio.  Permit the Total Leverage Ratio as of the end of any fiscal quarter of the Borrowers, commencing with the fiscal quarter ending December 31, 2013, to be greater than the following with respect to the fiscal quarter set forth opposite each such ratio below:

| Quarter | Total Funded Debt Ratio |
| --- | --- |

- 59 -

| | |
|---|---|
| December 31, 2013 | 5.25:1.00 |
| March 31, 2014 | 5.25:1.00 |
| June 30, 2014 | 5.25:1.00 |
| September 30, 2014 | 5.25:1.00 |
| December 31, 2014 | 5.25:1.00 |
| March 31, 2015 | 5.10:1.00 |
| June 30, 2015 | 5.00:1.00 |
| September 30, 2015 | 4.85:1.00 |
| December 31, 2015 | 4.75:1.00 |
| March 31, 2016 | 4.60:1.00 |
| June 30, 2016 | 4.50:1.00 |
| September 30, 2016 | 4.25:1.00 |
| December 31, 2016 | 4.00:1.00 |
| March 31, 2017 | 4.00:1.00 |
| June 30, 2017 | 3.75:1.00 |
| September 30, 2017 | 3.50:1.00 |
| December 31, 2017 and thereafter | 3.25:1.00 |

(b)      <u>Fixed Charge Coverage Ratio</u>.  Permit the Fixed Charge Coverage Ratio as of the end of any fiscal quarter of the Borrowers, commencing with the fiscal quarter ending December 31, 2013, to be less than the following with respect to the fiscal quarter set forth opposite each such ratio below:

| Quarter Ending | Fixed Charge Coverage Ratio |
|---|---|
| December 31, 2013, through and including | 1.25:1.00 |

| September 30, 2015 | |
| --- | --- |
| December 31, 2015 and thereafter | 1.15:1.00 |

(c)      <u>Maximum Capital Expenditures</u>.    Permit Capital Expenditures made by the Borrowers and their Subsidiaries in any fiscal year to exceed the following applicable amount:  (i) for the fiscal year ending December 31, 2013, $4,550,000, (ii) for the fiscal year ending December 31, 2014, $5,200,000 and (iii) for each fiscal year thereafter, $2,500,000 per fiscal year; provided that, if the Borrowers and the Subsidiaries do not use the entire amount of Capital Expenditures permitted in any fiscal year, they may carry forward 50.0% of such unused amount to the immediately succeeding fiscal year.

6.2      <u>Limitation on Indebtedness</u>.    The Borrowers shall not, and shall not permit any Subsidiary to, create, issue, incur, assume or suffer to exist any Indebtedness except for:

(a)      Indebtedness created hereunder and under the other Loan Documents;

(b)      the Subordinated Debt, so long as it remains subject to the Intercreditor Agreement;

(c)      Indebtedness (i) under any Hedging Agreement permitted under Section 5.8, (ii) evidenced by performance, bid, appeal and surety bonds and completion guarantees issued in the ordinary course of business or reimbursement obligations in respect thereof, (iii) constituting endorsements for collection made in the ordinary course of business or (iv) for bank overdrafts incurred in the ordinary course of business that are promptly repaid;

(d)      Capitalized Lease Obligations and Indebtedness for the acquisition of equipment secured by purchase money Liens, and any renewals, replacements, refinancing or extensions thereof, in an aggregate principal amount (for all Indebtedness under this clause (d)) not exceeding $300,000 outstanding at any time;

(e)      Intercompany Indebtedness among the Borrowers;

(f)      Guarantee Obligations of the Borrowers or any of its Subsidiaries with respect to Indebtedness permitted by this Section 6.2;

(g)      Indebtedness in the form of subordinated debt of the Borrowers incurred pursuant to the last paragraph of Section 7.3;

(h)      Indebtedness arising from the HCMC Put or any promissory note relating thereto, in each case, subject to the subordination agreement contemplated by Section 6.6 hereof;

(i)      Contingent Purchase Price Obligations incurred in connection with Permitted Acquisitions;

(j)      any other Indebtedness not to exceed $250,000 in the aggregate at any one time; and

100037025

(k)    Indebtedness referred to on Schedule 6.2 attached hereto.

6.3    <u>Limitation on Liens</u>.    The Borrowers shall not, and shall not permit any Subsidiary to, create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, except for:

(a)    Liens created hereunder or under any of the other Loan Documents;

(b)    Liens in favor of the Subordinated Agent and the Subordinated Lender under the Subordinated Debt Documents, at all times subject to the Intercreditor Agreement;

(c)    Liens for taxes not yet delinquent or which are being contested in good faith by appropriate proceedings, <u>provided</u> that adequate reserves with respect thereto are maintained on the books of such Loan Party;

(d)    Liens in the form of deposits or pledges for goods or services made in the ordinary course of business, pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation and deposits securing liability to insurance carriers;

(e)    Liens arising by operation of law in favor of warehousemen, carriers, mechanics, materialmen, laborers, or suppliers incurred in the ordinary course of business for sums not constituting borrowed money that are not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP (if so required);

(f)    rights of offset or common law or statutory banker's Liens arising in the ordinary course of business in favor of commercial banks, provided that any such Lien shall only extend to deposits and property in possession of such commercial bank;

(g)    Liens on amounts deposited as security for surety or appeal bonds in connection with obtaining such bonds in the ordinary course of business;

(h)    Liens securing Indebtedness permitted by Section 6.2(d);

(i)    statutory and common law Liens affecting real property of landlords of the Borrowers;

(j)    inchoate Liens arising from judgments other than judgments described in Section 7.1(i);

(k)    Liens referred to on Schedule 6.3 attached hereto; and

(l)    with respect to any real property occupied by the Borrowers or any of their Subsidiaries (a) all easements, rights of way, reservations, licenses, encroachments, variations and similar restrictions, charges and encumbrances on title that do not secure monetary obligations and do not materially impair the use of such property for its intended purpose or the

- 62 -

value thereof and (b) any other Lien or exception to coverage described in mortgagee policies of title insurance issued in favor of and accepted by the Agent.

6.4    <u>Limitation on Fundamental Changes</u>.  The Loan Parties shall not, and shall not permit any Subsidiary to, (i) make any amendment to its Organic Documents in a manner materially adverse to the Agent and the Lenders, or (ii) enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution) except any merger, consolidation or amalgamation of a Subsidiary into a Borrower, with such Borrower being the survivor thereof, or between or among the Borrowers; provided that no Event of Default has occurred and is continuing, the Borrowers shall give the Agent 30 days prior written notice thereof and shall comply with all reasonable actions requested by the Agent to protect and maintain its Liens granted pursuant to the Loan Documents; or (iii) except as permitted by Section 6.5, convey, sell, lease, assign, transfer or otherwise dispose of, all or substantially all of its property, business or assets.

6.5    <u>Limitation on Sale of Assets</u>.  The Borrowers shall not, and shall not permit any of their Subsidiaries to, make any Asset Disposition unless (i) such Asset Disposition is for fair market value, (ii) the consideration for such Asset Disposition is all cash, (iii) no Event of Default has occurred and is continuing or would result from such Asset Disposition and (iv) the consideration for such Asset Disposition, when aggregated with the consideration for all previous Asset Dispositions during the same fiscal year, does not exceed $500,000.

6.6    <u>Limitation on Restricted Payments</u>.  The Borrowers shall not, and shall not permit any of its Subsidiaries to, (a) if a corporation, declare or pay any dividend on (other than dividends payable solely in Capital Stock of the Borrowers or its Subsidiaries), or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any shares of any class of Capital Stock of the Borrowers or its Subsidiaries or any warrants or options to purchase any such Capital Stock, whether now or hereafter outstanding, (b) if a partnership, limited liability company or other entity, make any distribution (other than dividends payable solely in Capital Stock of the Borrowers or its Subsidiaries) with respect to the ownership interests therein, or, in either case, any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of the Borrowers or any Subsidiary and (c) make any payments on the Subordinated Debt except to the extent permitted by the Intercreditor Agreement (such declarations, payments, setting apart, purchases, redemptions, defeasance, retirements, acquisitions and distributions being herein called "<u>Restricted Payments</u>"); <u>provided</u>, <u>however</u>, that the following Restricted Payments may be made:

(i)    Restricted Payments by any Subsidiary to any Borrower;

(ii)    Restricted Payments by any Borrower to another Borrower;

(iii)    payments to the Subordinated Lender not prohibited by the Intercreditor Agreement;

(iv)    Permitted Tax Distributions by BWP;

(v)    Management Fees permitted to be paid under Section 6.8;

- 63 -

(vi)    so long as no Event of Default shall have occurred and be continuing or would result therefrom, BWP may purchase, redeem, retire or otherwise acquire shares of its Capital Stock (or options or rights to acquire its Capital Stock) held by former officers, directors or employees of any Borrower following termination of service or employment, in an aggregate cash amount not exceeding $100,000 during any fiscal year or $500,000 for all such purchases, redemptions, retirements and acquisitions from and after the Closing Date, in each case net of any proceeds received by BWP as a result of resales of any such Capital Stock;

(vii)    in connection with the exercise by DHAN or its Permitted Transferees (as defined in the LLC Agreement) of the HCMC Put, Restricted Payments to DHAN and/or such Permitted Transferees of the Put Right Purchase Price (as defined in the LLC Agreement) or in respect of any promissory note related thereto to the extent permitted by the Subordination Agreement; provided that, at the time of making any such Restricted Payment, (i) no Event of Default has occurred and is continuing or would be caused thereby, (ii) such exercise does not occur prior to the fifth anniversary of the Closing Date, (iii) prior to such exercise and payment, the Borrowers and DHAN shall have entered into a subordination agreement in favor of the Agent (including with respect to permitted payments and enforcement actions) acceptable to the Agent with respect to any Indebtedness arising from such exercise, and (iv) such payment shall be permitted by the Subordinated Debt Documents.  Notwithstanding any provision herein to the contrary, the Borrowers will not be entitled to exercise the Call Right without the prior written consent of the Agent.

6.7    <u>Limitation on Acquisitions, Investments, Etc</u>.  The Borrowers shall not, and shall not permit any Subsidiary to, consummate any Acquisition, make any advance, loan, extension of credit or capital contribution to, or purchase any stock, bonds, notes, debentures or other securities of or any assets constituting a business unit of, or make any other investment in (any of the foregoing, an "<u>investment</u>"), any Person, except:

(a)    investments in cash and Cash Equivalents;

(b)    the HCMC/DHAN Acquisition;

(c)    Permitted Acquisitions having a purchase price (excluding, for the avoidance of doubt, transaction costs and any portion of such purchase price funded with proceeds of the issuance, sale or other disposition of the Capital Stock of BWP) not in excess of $10,000,000 in the aggregate for all Acquisitions consummated after the Closing Date;

(d)    investments in securities or notes payable issued by account debtors and received pursuant to a plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any such account debtor, or with respect to the settlement of such account debtor's accounts;

(e)    advances made in connection with the purchases of goods or services in the ordinary course of business;

(f)    loans and advances to officers and employees of the Loan Parties in an aggregate amount not to exceed $500,000 at any time outstanding;

(g)        advances to employees in the form of prepayment of expenses incurred in the ordinary course of business;

(h)        investments made by any Borrower in any other Borrower; and

(i)        investments in the form of Lender Hedging Agreements.

6.8    <u>Management Fees</u>.    The Borrowers and their Subsidiaries shall not pay any management fees to any Affiliate thereof for services rendered; provided that BWP may pay the Management Fees in an aggregate amount not exceeding the amount set forth in Sections F.1 and F.2(a) of the Management Agreement (as in effect on the Closing Date), in any fiscal year, so long as no Event of Default has occurred and is continuing or would result therefrom; provided, further, that, in the event payment of all or part of the Management Fees is prohibited under this Section or is deferred (such fees, the "<u>Deferred Management Fees</u>"), payment of Management Fees, including payment of Deferred Management Fees, may resume upon cure of such Event of Default, so long as no other Event of Default has occurred and is continuing or would result therefrom.

6.9    <u>Transactions with Affiliates</u>.    The Borrowers shall not, and shall not permit any Subsidiary to, enter into any transaction, including any purchase, sale, lease or exchange of property or the rendering of any service, with any Affiliate of any Loan Party or the Sponsor except (i) arms-length transactions in the ordinary course of business; (ii) the HCMC Put or HCMC Call; (iii) payment of the Management Fees, subject to Section 6.8; (iv) the payment of Board Fees of up to $225,000 in any fiscal year; (v) transactions described on <u>Schedule 6.9</u>; (vi) other transactions by and among the Borrowers not prohibited by this Agreement and (vii) the issuance, sale or other disposition of Capital Stock of BWP to directors, officers and employees (other than the Sponsor and any officer, director, employee, consultant, principal, founder, equityholders, manager, general partner or agent of the Sponsor or any non-Borrower Affiliate thereof).

6.10    <u>Fiscal Year</u>.    The Borrowers shall not permit the fiscal year of the Borrowers or any Subsidiary to end on a day other than December 31.

100037025

6.11    Prohibitions on Certain Agreements, Modifications to Certain Agreements.

(a)    The Borrowers shall not, nor shall it permit any Subsidiary to, enter into or permit to exist any indenture, agreement, instrument or other arrangement, other than the Loan Documents and the Subordinated Debt Documents that, directly or indirectly, prohibits or restrains, or has the effect of prohibiting or restraining (such provisions, a "Restrictive Provision"), the incurrence or payment of indebtedness, the granting of any Liens, the declaration or payment of dividends, the making of loans, advances or investments or the sale, assignment, transfer or other disposition of property except, in each case, to the extent such property is subject to a Lien permitted pursuant to Section 6.2(d), or which imposes any financial covenants on any Borrower or any Subsidiary, and in each case, where the existence of such Restrictive Provision could reasonably be expected to have a Material Adverse Effect.

(b)    No Loan Party shall consent to any amendment to any Material Agreement if the effect thereof would reasonably be expected to be materially adverse to the interests of the Agent and the Lenders.

6.12    Sale-Leaseback Transactions.  The Borrowers shall not, and shall not permit any Subsidiary to, sell, assign or otherwise transfer any of its properties, rights or assets (whether now owned or hereafter acquired) to any Person and thereafter directly or indirectly lease back the same or similar property.

6.13    Line of Business; Activities of BWP.

(a)    Neither the Borrowers nor any of its Subsidiaries shall engage in any business other than as described in Section 3.18.

(b)    Notwithstanding the provisions of Section 6.13(a) or any other provision of this Agreement, BWP shall not (i) hold any assets other than (w) the Capital Stock of CTG, CTG Advanced and any Subsidiary created or acquired in connection with a Permitted Acquisition, (x) cash, (y) the DHAN Assets and (z) its interest as beneficiary under the Life Insurance Policy and insured under the R&W Insurance Policy (each as defined in the Acquisition Agreement) and any similar insurance policies acquired or obtained in connection with a Permitted Acquisition, and BWP shall not engage in any business or activity other than (a) the ownership of such Capital Stock; (b) maintaining its limited liability company existence; (c) participating in tax, accounting and other administrative activities as the parent of the consolidated group of companies, including the Borrowers; (d) the execution and delivery of the Subordinated Debt Documents and the Loan Documents to which it is or will become a party and the performance of its obligations thereunder; (e) the execution and delivery of the Acquisition Agreement or any other acquisition documents to which it is a party relating to Permitted Acquisitions, and the performance of its obligations thereunder; (f) the contribution by BWP of the DHAN Assets to CTG Advanced; (g) the making of capital contributions to its Subsidiaries, (h) engaging in transactions permitted by Section 6; and (i) other business activities incidental to the foregoing and other business activities customary for a holding company.

6.14    Anti-Terrorism Laws.  The Borrowers shall not, nor shall it permit any of its Subsidiaries to, directly or indirectly (a) knowingly enter into any Contractual Obligation with

- 66 -

any Person listed on the OFAC Lists; (b) conduct any business or engage in any transaction or dealing with any Blocked Person, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any Blocked Person; (c) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224, any similar executive order or other Anti-Terrorism Law; or (d) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in Executive Order No. 13224 or other Anti-Terrorism Law.

SECTION 7.   EVENTS OF DEFAULT

7.1     Events of Default.

(a)     The Borrowers shall fail to pay (i) any principal of any Loan when due; (ii) any interest on any Loan when due or (iii) any other Obligation within two Business Days after any such other amount becomes due; or

(b)     Any representation or warranty made by any Loan Party herein or in any other Loan Document, as applicable, or which is contained in any certificate, document or financial or other statement furnished at any time under or in connection with this Agreement or any other Loan Document shall prove to have been incorrect or misleading in any material respect when made or deemed made; or

(c)     (i) The Borrowers shall default in the observance or performance of any agreement contained in Section 5.1, 5.2, 5.4, 5.5, 5.6, 5.7, 5.12, 5.13 or 5.14; or (ii) the Borrowers shall default in the observance or performance of any provision of Section 6; or (iii) any default shall occur under the Intercreditor Agreement; or

(d)     Any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or the other Loan Documents (other than as provided in paragraphs (a) through (c) of this Section 7.1), and such default shall continue unremedied for a period of 30 days after the earlier of (i) written notice thereof from the Agent to the Borrowers and (ii) actual knowledge thereof by a Responsible Officer of such Loan Party; or

(e) Any material provision of any Loan Document shall at any time for any reason be declared null and void, or the validity or enforceability of any Loan Document shall at any time be contested by any Loan Party or, if applicable, BWCP,in writing, or a proceeding shall be commenced by any Loan Party, BWCP, or by any Governmental Authority having jurisdiction over any Loan Party or BWCP, seeking to establish the invalidity or unenforceability thereof, or any Loan Party or BWCP shall deny in writing that it has any liability or obligation purported to be created under any Loan Document or any Loan Document shall cease to be in full force and effect; or

(f)     Any Loan Party shall (A) default in any payment of principal or interest, regardless of the amount, due (after giving effect to all grace periods and waivers thereof, if any) in respect of any (1) Indebtedness (other than (x) as described in Section 7.1(a) above, (y) the Subordinated Debt or (z) any debt arising from the exercise of the HMCM Put so long as such debt is covered by a subordination agreement in favor of Agent as contemplated by Section

- 67 -

6.6(vii) hereof), issued under the same indenture or other agreement, if the maximum principal amount of Indebtedness covered by such indenture or agreement is $500,000 or greater or (2) Guarantee Obligation with respect to an amount of $500,000 or greater; or (B) default in the observance or performance of any other material agreement or condition relating to any such Indebtedness or Guarantee Obligation or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness or beneficiary or beneficiaries of such Guarantee Obligation (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or such Guarantee Obligation to become payable or such Indebtedness to be required to be defeased or purchased; or any "Event of Default" (as defined in the Subordinated Note Purchase Agreement or any other Subordinated Debt Documents) shall occur and be continuing; or

(g)      (i) The Borrowers or any other Loan Party shall commence any voluntary case, proceeding or other action (A) under the Bankruptcy Code or any other existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, or the Borrowers or any other Loan Party shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against the Borrowers or any other Loan Party any involuntary case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief or any such adjudication or appointment and (B) remains undismissed, undischarged, unstayed or unbonded for a period of 60 consecutive days; or (iii) there shall be commenced against the Borrowers or any other Loan Party any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which shall not have been vacated, discharged, stayed or bonded pending appeal within 60 consecutive days from the entry thereof; or (iv) the Borrowers or any other Loan Party shall take any action in writing in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) the Borrowers or any other Loan Party shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due or there shall be a general assignment for the benefit of creditors; or

(h)      Any of the following occurs and a Material Adverse Effect will result: (i) any Person shall engage in any non-exempt "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) any "accumulated funding deficiency" (as defined in Section 302 of ERISA), whether or not waived, shall exist with respect to any Plan, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee would reasonably be expected to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Single Employer Plan shall terminate for purposes of Title IV of ERISA (other than a standard termination within the meaning of Section 4041(b) of

- 68 -

ERISA) or (v) the Borrowers or any ERISA Affiliate thereof would reasonably be expected to incur any liability in connection with a withdrawal from, or the Insolvency or Reorganization of, a Multiemployer Plan; or

(i)    One or more judgments or decrees shall be entered against one or more of the Loan Parties involving in the aggregate a liability (to the extent not covered by insurance and the insurance carrier has not reserved the right to disallow all or any portion of such claims) for all Loan Parties of $500,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 30 consecutive days from the entry thereof or in any event five days before the date of any sale pursuant to such judgment or decree; or

(j)    A Change of Control shall occur; or

(k)    Any Lien created under any Loan Document and perfected in accordance with the terms of the Loan Documents, shall for any reason other than pursuant to the terms thereof, cease to be a valid and perfected first priority (except for Liens permitted by Section 6.3) Lien in any material portion of the Collateral or the property purported to be covered thereby, except as a result of (i) a disposition of the applicable Collateral in a transaction permitted under this Agreement or (ii) an action or failure to act on the part of the Agent or any other Secured Party;

(l)    Any one or more licenses, permits, accreditations or authorizations of any Borrower or any other Loan Party shall be suspended, limited or terminated or shall not be renewed, or any other action shall be taken, by any Governmental Authority in response to any alleged failure by any Borrower or any other Loan Party to be in compliance with applicable Requirements of Law, and such action, individually or in the aggregate, has or could reasonably be expected to have a Material Adverse Effect; or

(m)    There shall occur (i) any uninsured damage to, or loss, theft or destruction of any Collateral or other assets or properties of the Loan Parties that has had or could reasonably be expected to have a Material Adverse Effect or (ii) any labor dispute, act of God or other casualty that has had or could reasonably be expected to have a Material Adverse Effect;

then, and in any such event, (A) if such event is an Event of Default specified in paragraph (g) above, automatically each Commitment shall immediately terminate and the Loans made to the Borrowers hereunder (with accrued interest thereon) and all other Obligations shall immediately become due and payable and (B) if such event is any other Event of Default, with the consent of the Required Lenders the Agent may, or upon the request of the Required Lenders the Agent shall, take any or all of the following actions:  (i) by written notice to the Borrowers declare the Commitments to be terminated forthwith, whereupon the Commitments shall immediately terminate; and (ii) by written notice to the Borrowers, declare the Loans (with accrued interest thereon) and all other Obligations to be due and payable forthwith, whereupon the same shall immediately become due and payable.  In all cases, with the consent of the Required Lenders, the Agent may enforce any or all of the Liens and other rights and remedies created pursuant to any Loan Document or available at law or in equity.  Presentment, demand, protest and all other notices of any kind are hereby expressly waived by the Borrowers, to the extent permitted by

- 69 -

applicable law.  For purposes of clauses (A) and (B) of this paragraph of this Section 7.1, "Loan Documents" shall not include any Lender Hedging Agreement and "Obligations" shall not include obligations pursuant to any Lender Hedging Agreement.

7.2    <u>Application of Payments and Proceeds</u>.  Upon the occurrence and during the continuance of an Event of Default and after the acceleration of the principal amount of any of the Loans, all payments and proceeds in respect of any of the Obligations received by the Agent or any Lender under any Loan Document, including any proceeds of any sale of, or other realization upon, all or any part of the Collateral, shall be applied as follows:

> <u>first</u>, to all fees, costs, indemnities, liabilities, obligations and expenses incurred by or owing to the Agent with respect to this Agreement, the other Loan Documents or the Collateral;

> <u>second</u>, to all fees, costs, indemnities, liabilities, obligations and expenses incurred by or owing to any Lender with respect to this Agreement, the other Loan Documents or the Collateral;

> <u>third</u>, to accrued and unpaid interest on the Obligations (including any interest which, but for the provisions of the Bankruptcy Code, would have accrued on such amounts);

> <u>fourth</u>, to the principal amount of the Obligations, to the Obligations owing to any counterparty in respect of any Lender Hedging Agreement, and to any Cash Management Obligations;

> <u>fifth</u>, to any other Obligations owing to the Agent or any Lender under the Loan Documents; and

> <u>sixth</u>, to the Borrowers or to whoever may be lawfully entitled to receive such balance or as a court of competent jurisdiction may direct.

In carrying out the foregoing, (a) amounts received shall be applied in the numerical order provided until exhausted prior to the application to the next succeeding category, and (b) each of the Persons entitled to receive a payment in any particular category shall receive an amount equal to its pro rata share of amounts available to be applied pursuant thereto for such category. Excluded Swap Obligations with respect to any Loan Party shall not be paid with amounts received from such Loan Party or its assets, but appropriate adjustments shall be made with respect to payments from other Loan Parties to preserve the allocation to Secured Obligations otherwise set forth in this Section.

7.3 <u>Equity Cure Right</u>.  (a) Upon the occurrence of an Event of Default under Section 6.1(a) or (b) (a "<u>Financial Covenant Default</u>") as of the end of any fiscal quarter of BWP (a "<u>Relevant Quarter</u>"), the Borrowers shall have the right to cure such Financial Covenant Default (the "<u>Cure Right</u>") by causing the Sponsor and/or any other member of BWP to make a cash equity contribution to BWP during the period of 10 Business Days following the Agent's receipt of the Covenant Compliance Certificate for such Relevant Quarter, provided that:

- 70 -

(i)    the Borrowers shall deliver to the Agent written notice of their intent to exercise the Cure Right with respect to any Financial Covenant Default (a "<u>Cure Notice</u>") concurrently with their delivery to the Agent of the Covenant Compliance Certificate for such Relevant Quarter;

(ii)    such equity contribution shall be added to Adjusted EBITDA for such Relevant Quarter, but only to the extent necessary to cure the relevant Financial Covenant Default; any equity contribution added to Adjusted EBITDA for such Relevant Quarter shall be added to Adjusted EBITDA for the following three fiscal quarters in addition to such Relevant Quarter;

(iii)    the Borrowers may exercise the Cure Right not more than one time during each fiscal year of the Borrowers, and in no event in consecutive fiscal quarters;

(iv)    such equity contribution must be used to immediately prepay the Term Loans and the Revolving Loans, on a pro rata basis;

(v)    in no event will the aggregate equity contributions made to the Borrowers pursuant to the Cure Right exceed $5,000,000; and

(vi)    no such contributions shall result in a Change of Control.

Notwithstanding anything in the foregoing, any cure payments made pursuant to this Section may be in the form of equity or subordinated debt; <u>provided</u>, that the documents evidencing and securing any such subordinated debt and providing for the subordination of such subordinated debt and Liens, if any, to the Obligations shall be acceptable to Agent in its sole discretion.

(b)    Upon receipt of evidence satisfactory to Agent of the Borrowers' receipt of such equity contribution and compliance with the conditions set forth in the immediately preceding clause (a), together with a restated Covenant Compliance Certificate evidencing compliance with the Financial Covenants for the Relevant Quarter after giving effect to the exercise of the Cure Right, in each case within such ten Business Day period, the Borrowers shall be deemed to have satisfied the Financial Covenants for the Relevant Quarter with the same effect as though there had been no initial failure to comply therewith, and any Event of Default existing from a breach of such Financial Covenants that had occurred shall be deemed cured for the purposes of this Agreement and the other Loan Documents with no further action required by the Agent.

SECTION 8.   THE AGENT

8.1    <u>Appointment</u>. Each Lender hereby irrevocably designates and appoints OneWest Bank, as Agent for such Lender under this Agreement and the other Loan Documents, and each such Lender irrevocably authorizes OneWest Bank, as the Agent for such Lender, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Agent, by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement, the Agent shall not have any duties or responsibilities, except those expressly set

- 71 -

forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Agent in such capacity.

8.2    Delegation of Duties.    The Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  The Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

8.3    Exculpatory Provisions.    Neither the Agent nor any of its officers, directors, employees, agents, attorneys-in-fact, Subsidiaries or Affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except for its or such Person's own gross negligence or willful misconduct as determined by the final non-appealable judgment of a court of competent jurisdiction) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by the Borrowers, any other Loan Party, or any other party to the Loan Documents, or any officer thereof, contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Agent under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of the Borrowers, any other Loan Party, or any other party to the Loan Documents to perform its obligations hereunder or thereunder.  The Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of the Borrowers, any other Loan Party, or any other party to the Loan Documents.

8.4    Reliance by Agent.    The Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice (including any telephonic or electronic notice), consent, certificate, affidavit, letter, cablegram, telegram, telecopy, telex or teletype message, statement, order or other document or conversation reasonably believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including, without limitation, counsel to the Borrowers), the Accountants and independent accountants and other experts selected by the Agent.  The Agent may deem and treat the payee of any Note or the holder of any Loan as set forth in the Register as the owner thereof for all purposes unless a written Assignment and Acceptance with respect thereto shall have been filed with the Agent.  The Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders or all Lenders, as it deems appropriate, or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense (except those incurred solely as a result of the Agent's gross negligence or willful misconduct as determined by the final non-appealable judgment of a court of competent jurisdiction) which may be incurred by it by reason of taking or continuing to take any such action.  The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders or all Lenders, as may be required, and such request and any action

- 72 -

taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Obligations.

8.5    <u>Notice of Default</u>.  Neither the Agent nor any Lender shall be deemed to have knowledge or notice of the occurrence of any Default hereunder unless such Person has received notice from the Agent, a Lender or the Borrowers referring to this Agreement, describing such Default and stating that such notice is a "notice of default".  In the event that the Agent or any Lender receives such a notice, the Agent or such Lender, as the case may be, shall give notice thereof to the Agent and the Lenders.  The Agent shall take such action with respect to such Default as shall be reasonably directed by the Required Lenders or all Lenders as appropriate; <u>provided</u> that unless and until the Agent shall have received such directions, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default as it shall deem advisable in the best interests of the Lenders or as the Agent shall believe necessary to protect the Agent and the Lenders' interests in the Collateral.

8.6    <u>Non-Reliance on Agent and Other Lenders</u>.  Each Lender expressly acknowledges that none of the Agent or any of its respective officers, directors, employees, agents, attorneys-in-fact, Subsidiaries or Affiliates has made any representations or warranties to it and that no act by the Agent hereafter taken, including any review of the affairs of the Borrowers, any other Loan Party, or any other party to the Loan Documents, shall be deemed to constitute any representation or warranty by the Agent to any Lender.  Each Lender represents to the Agent that it has, independently and without reliance upon the Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Borrowers, the other Loan Parties, and any other party to the Loan Documents and made its own decision to make its Loans hereunder and enter into this Agreement.  Each Lender also represents that it will, independently and without reliance upon the Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Borrowers, the other Loan Parties, and any other party to the Loan Documents.  The Agent agrees to promptly furnish to each Lender a copy of all notices, reports and other documents received by it from the Borrowers pursuant to the terms hereof; <u>provided that</u> the Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of the Borrowers, any other Loan Party, or any other party to the Loan Documents which may otherwise come into the possession of the Agent or any of its officers, directors, employees, agents, attorneys-in-fact, Subsidiaries or Affiliates.

8.7    <u>Indemnification</u>.  The Lenders hereby indemnify the Agent in its capacity as such (to the extent not reimbursed by the Borrowers and without limiting the obligation of the Borrowers to do so), ratably according to the respective amounts of their Aggregate Total Commitment Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs (including, without limitation, the allocated cost of internal counsel), expenses or disbursements of any kind whatsoever which may at any time

(including, without limitation, at any time following the payment of the Obligations) be imposed on, incurred by or asserted against the Agent in any way relating to or arising out of this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by the Agent under or in connection with any of the foregoing; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements to the extent resulting from the Agent's gross negligence or willful misconduct as determined by the final non-appealable judgment of a court of competent jurisdiction.  The agreements in this Section 8.7 shall survive the termination of this Agreement and the payment of all Obligations.

8.8    Agent in Its Individual Capacity.  The Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with the Borrowers, the other Loan Parties and any other party to the Loan Documents as though the Agent were not the Agent hereunder and under the other Loan Documents.  With respect to the Agent, the Loans made by the Agent, and the Notes issued to the Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and the Agent may exercise the same as though it were not the Agent and the terms "Lender" and "Lenders" shall include the Agent in its individual capacity.

8.9    Successor Agent.  The Agent may resign as Agent upon thirty days' notice to the Lenders and the Borrowers.  If the Agent shall resign as Agent under this Agreement and the other Loan Documents, then the Required Lenders shall appoint (with the approval of the Borrowers, such approval not to be unreasonably withheld or delayed and not to be required if an Event of Default shall have occurred and be continuing) from among the Lenders a successor agent for the Lenders, whereupon such successor agent shall succeed to the rights, powers and duties of the Agent and the term "Agent" shall mean such successor agent, effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement or any holders of any of the Obligations.  Notice of such appointment shall be given by such successor agent to the Borrowers and each Lender.  Whether or not a successor has been appointed, such resignation shall nonetheless become effective in accordance with such notice on such thirtieth day.  After any retiring Agent's resignation as Agent, the provisions of this Section 8.9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent, under this Agreement and the other Loan Documents.

8.10    Administrative Agent May File Proofs of Claim.  In case of the pendency of any proceeding under the Bankruptcy Code or any similar debtor relief law or any other judicial proceeding relative to any Loan Party, the Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on the Borrowers) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Agent (including any claim for the reasonable compensation, expenses,

- 74 -

100037025

disbursements and advances of the Lenders and the Agent and their respective agents and counsel) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Agent.

8.11    Collateral Matters.

(a)    The Lenders hereby authorize the Agent, at its option and in its discretion, to release any Lien granted to or held by the Agent upon any Collateral (i) upon termination of the Commitments and payment and satisfaction of all monetary Obligations (other than contingent indemnification obligations that are not then due and payable) at any time arising under or in respect of this Agreement or the Loan Documents or the transactions contemplated hereby or thereby, (ii) constituting property being sold or otherwise disposed of upon the sale or other disposition thereof in compliance with Section 6.5, (iii) if approved, authorized or ratified in writing by the Required Lenders or all Lenders, as applicable.  Upon request by the Agent at any time, the Lenders will confirm in writing the Agent's authority to release particular types or items of Collateral pursuant to this Section 8.11.  The Lenders hereby authorize the Agent, at its option and in its discretion to release any Subsidiary Guarantor from its obligations under the Subsidiary Guarantee if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder.

(b)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Borrowers or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, Agent for the benefit of all Lenders; provided, however, that the foregoing shall not prohibit (a) Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Agent) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights hereunder, or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of any bankruptcy or similar proceeding relative to any Borrower.

(c)    The Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of any Lien thereon, or any certificate prepared by any Loan Party in connection therewith, and the Agent shall not be responsible or liable to the Lenders or any other Secured Party for any failure to monitor or maintain any portion of the Collateral.

SECTION 9.    MISCELLANEOUS

9.1    Amendments and Waivers.    Neither this Agreement, any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in

- 75 -

accordance with the provisions of this Section 9.1.  With the prior written consent of the Required Lenders, the Borrowers and the other Loan Parties may, from time to time, enter into written amendments, supplements or modifications hereto and to the other Loan Documents for the purposes of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders, the Borrowers or any other Loan Party hereunder or thereunder or waiving, on such terms and conditions as may be specified in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; provided, however, that no such waiver and no such amendment, supplement or modification shall:  (a) reduce the amount or extend the maturity of any Loan or any installment due thereon, or reduce the rate or extend the time of payment of interest thereon (it being agreed that waiver of the default interest margin shall only require the consent of Required Lenders), or reduce the amount or extend the time of payment of any fee, indemnity or reimbursement payable to any Lender hereunder, or increase any Commitment, in each case without the written consent of the Lender affected thereby; or (b) (i) amend, modify or waive any provision of this Section 9.1 or reduce the percentage specified in or otherwise modify the definition of Required Lenders, or consent to the assignment or transfer by any Loan Party of any of its rights and obligations under this Agreement and the other Loan Documents; or (ii) release any Loan Party from any liability under its respective Loan Documents; or (iii) release all or substantially all of the Collateral; or (iv) amend, modify or waive, directly or indirectly, any of the provisions of Section 2.1(f), 2.2(f), 2.3(f), 2.11 (first sentence) or 7.2; or (v) amend, modify or waive any provision of this Agreement requiring the consent or approval of all Lenders, in each case without the written consent of all the Lenders; or (c) amend, modify or waive any provision of Section 8 without the written consent of the Agent. Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Borrowers, the other Loan Parties, the Lenders, the Agent, and all future holders of the Obligations.

Notwithstanding the foregoing, (i) any amendment, restatement or other modification to the Fee Letter shall require the written consent of the Borrowers and the Agent only, (ii) no amendment, modification or waiver of any Loan Document altering the priority of any Lender Hedging Agreement under Section 7.2 in a manner adverse to the counterparty to such Lender Hedging Agreement, or resulting in any Lender Hedging Agreement becoming unsecured (other than releases of Liens permitted in accordance with the terms of this Agreement) shall be effective without the written consent of such counterparty and (iii) the Agent and the Borrowers may amend or modify this Agreement and any other Loan Document to cure any ambiguity, omission, defect or inconsistency therein.

In the case of any waiver, the Borrowers, the other Loan Parties, the Lenders and the Agent shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default, or impair any right consequent thereon.

9.2    Notices; Effectiveness; Electronic Communication.

(a)    Notices Generally.  Except as provided in paragraph (b) below, all notices and other communications provided for herein shall be in writing and shall be delivered by hand

- 76 -

or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows:

        (i)      if to any Borrower, to it c/o Blue Wolf Capital Fund II, L.P., One Liberty Plaza, 52nd Floor, New York, NY 10006 Attention: Adam Blumenthal/Charles Miller, Facsimile: (646) 607-3889;

        with a copy to (which shall not constitute notice):

        Holland & Knight LLP
        10 St. James Avenue
        Boston, MA  02116
        Attention:  Kerry S. Kehoe, Esq.
        Facsimile:  617-523-6850

        (ii)     if to the Agent::

        with respect to credit matters:

        888 East Walnut Street
        HQ-06-03
        Pasadena, California 91101
        Attention: David Ligon/ Jason Prather
        Facsimile: (866) 486-5720

        with a copy to (which shall not constitute notice):

        Katten Muchin Rosenman LLP
        515 South Flower Street, Suite 1000
        Los Angeles, CA  90017
        Attention:  Jan Harris Cate, Esq.
        Telecopy Number: (213) 947-1151
        Telephone Number: (213) 788-7447

        with respect to operational matters:

        OneWest Bank, FSB
        Commercial Loan Operations
        Mail code: HQ-05-01
        888 E. Walnut St., 5th Floor
        Pasadena, CA 91101
        Fax No.: (866) 518-6540
        Email: CL_Ops@owb.com

100037025

(iii)    if to a Lender, to it at its address (or facsimile number) set forth in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).   Notices delivered through electronic communications, to the extent provided in paragraph (b) below, shall be effective as provided in said paragraph (b).

(b)    <u>Electronic Communications</u>.   Notices and other communications to the Lenders may be delivered or furnished by electronic communication (including e mail and Internet or intranet websites) pursuant to procedures approved by the Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Section 2 of this Agreement if such Lender has notified the Agent that it is incapable of receiving notices under such Section by electronic communication.   The Agent or the Borrowers may, in their discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

(c)    <u>Change of Address, etc</u>.   Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto.

(d)    <u>Platform</u>.

(i)    The Borrowers agree that the Agent may, but shall not be obligated to, make the Communications (as defined below) available to the Lenders by posting the Communications (as defined below) on Debt Domain, Intralinks, Syndtrak or a substantially similar electronic transmission system (the "<u>Platform</u>").

(ii)    The Platform is provided "as is" and "as available."   The Agent Parties (as defined below) do not warrant the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Communications.   No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or

- 78 -

freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or the Platform. In no event shall the Agent or any agent or affiliate thereof collectively, the "Agent Parties") have any liability to the Borrowers or the other Loan Parties, any Lender or any other Person or entity for damages of any kind, including, without limitation, direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of the Borrowers', any Loan Party's or the Agent's transmission of communications through the Platform. "Communications" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to any Loan Document or the transactions contemplated therein which is distributed to the Agent or any Lender by means of electronic communications pursuant to this Section, including through the Platform.

9.3    No Waiver; Cumulative Remedies.    No failure to exercise and no delay in exercising, on the part of the Agent, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

9.4    Survival of Representations and Warranties.    All representations and warranties made hereunder and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement.

9.5    Payment of Expenses and Taxes.    The Borrowers agree, whether or not the transactions contemplated hereby are consummated, (a) to pay or reimburse the Agent for all its reasonable costs and out-of-pocket expenses incurred in connection with the preparation and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby (including the transactions to occur on the Closing Date), including due diligence expenses, appraisal and audit expenses, syndication expenses and the reasonable and documented fees and disbursements of outside counsel to the Agent (including any local counsel to the Agent) and as to any amendment, supplement or modification to this Agreement or any other Loan Document and the administration of the transactions contemplated thereby, including in connection with any proceeding or negotiation of the type referred to in clause (b) below, regardless of whether an Event of Default has occurred and is continuing and with respect to the foregoing legal fees, without duplication thereof, the allocated costs of internal counsel to the Agent, (b) after the occurrence and during the continuance of an Event of Default, to pay or reimburse the Agent and the Lenders for all their reasonable costs and out-of-pocket expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Loan Documents and any such other documents or in connection with any refinancing or restructuring of the Loans provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceeding, including reasonable legal fees and disbursements of outside counsel to the Agent and the Lenders (which shall be limited to one counsel on behalf of the Agent and one counsel on behalf of the Lenders) and, without duplication, the allocated cost of internal counsel to the Agent and the Lenders, as applicable, (c) to pay, and indemnify and hold harmless the

- 79 -

Agent and the Lenders from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other taxes (other than Excluded Taxes), if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Loan Documents and any such other documents, and (d) to pay, and indemnify and hold harmless the Agent and the Lenders from and against, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, reasonable out of pocket costs, expenses or disbursements of any kind or nature whatsoever (including without duplication, the allocated cost of internal counsel to the Agent and the Lenders, as applicable), subject to the limitations set forth above, with respect to the execution, delivery and enforcement of this Agreement and the other Loan Documents, and the use of the proceeds of the Loans and any such other documents (all the foregoing, collectively, the "indemnified liabilities"), provided, that the Borrowers shall have no obligation hereunder to the Agent or any Lender with respect to indemnified liabilities arising from the gross negligence, bad faith, willful misconduct of the Agent or such Lender as determined by the final non-appealable judgment of a court of competent jurisdiction.  The agreements in this Section 9.5 shall survive the termination of this Agreement and the payment of all Obligations.

9.6     Successors and Assigns; Participation; Purchasing Lenders.

(a)     This Agreement shall be binding upon and inure to the benefit of the Borrowers, the Agent and their respective successors and assigns, except that the Borrowers may not assign, transfer or delegate any of its rights or obligations under this Agreement without the prior written consent of the Lenders.

(b)     Any Lender may at any time sell to one or more banks or other entities that are an Affiliate of a Lender, an Approved Fund, or to one or more additional banks or entities that are approved by the Borrowers  (such approval not to be unreasonably withheld or delayed and not to be required if an Event of Default has occurred or is continuing) ("Participants") participating interests in the rights of such Lender hereunder and under the other Loan Documents; provided any such sale must result in the Participant acquiring at least a $3,000,000 risk participation interest in the aggregate amount of obligations under this Agreement and the other Loan Documents.  A Participant shall have the right only to vote on the extension of regularly scheduled maturity of principal or interest on the Loans, or reduction of the principal amount or rate of interest on the Loans.  In the event of any such sale by a Lender of participating interests to a Participant, such Lender's obligations under this Agreement to the other parties to this Agreement shall remain unchanged, such Lender shall remain solely responsible for the performance thereof, such Lender shall remain the holder of its Loans for all purposes under this Agreement and the other Loan Documents, and the Borrowers and the Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents. Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the

100037025

identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(c)     Any Lender may at any time sell to one or more Lenders, an Affiliate of a Lender or an Approved Fund or to one or more additional lenders that are approved by the Borrowers ("Purchasing Lenders"), such approval not to be unreasonably withheld or delayed and not to be required if an Event of Default has occurred and is continuing, and the Agent, all or any part of its rights and obligations under this Agreement and the other Loan Documents pursuant to an Assignment and Acceptance executed by such Purchasing Lender and such transferor Lender, and delivered to the Agent for its acceptance and recording in the Register, accompanied by a $3,500 processing fee; provided, however, that any such sale (other than a sale of all of the selling Lender's interest hereunder or contemporaneous sales to related Approved Funds that equal at least the following amount in the aggregate) must result in the Purchasing Lender having an interest in at least $3,000,000 in aggregate amount of obligations under this Agreement and the other Loan Documents unless otherwise agreed to by the Agent. Upon such execution and delivery from and after the transfer effective date determined pursuant to such assignment document, (x) the Purchasing Lender thereunder shall be a party hereto and, to the extent provided in the Assignment and Acceptance, have the rights and obligations of a Lender hereunder with Commitments as set forth therein, and (y) the transferor Lender thereunder shall, to the extent of such assigned portion and as provided in the Assignment and Acceptance, be released from its obligations and relinquish its rights (except for those surviving termination of this Agreement and the payment in full of the Obligations) under this Agreement and the other Loan Documents (and, in the case of an Assignment and Acceptance covering all or the remaining portion of a transferor Lender's rights and obligations under this Agreement, such transferor Lender shall cease to be a party hereto); provided, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender. Any such Assignment and Acceptance shall be deemed to amend this Agreement to the extent, and only to the extent, necessary to reflect the addition of such Purchasing Lender and the resulting adjustment of Aggregate Total Commitment Percentages arising from the purchase by such Purchasing Lender of all or a portion of the rights and obligations of such transferor Lender under this Agreement and the other Loan Documents. Notwithstanding the foregoing, no Purchasing Lender shall be (i) a Borrower or an Affiliate thereof, (ii) a Defaulting Lender or (iii) a natural person. Such Purchasing Lender, if it is not a Lender, shall deliver to the Agent an Administrative Questionnaire in the form provided by the Agent.

(d)     The Agent shall maintain at its address referred to in Section 9.2 a copy of each Assignment and Acceptance delivered to it and a register (the "Register") for the recordation of the names and addresses of the Lenders and the Commitments of, and principal amounts (and stated interest) of the Loans owing to. The entries in the Register shall be

- 81 -

conclusive, in the absence of manifest error, and the Borrowers, the Agent and Lenders may treat each Person whose name is recorded in the Register as the owner of the Loans recorded therein for all purposes of this Agreement. The Register shall be available for inspection by the Borrowers or any Lender at any reasonable time and from time to time upon reasonable prior notice.

(e)     Upon its receipt of an Assignment and Acceptance executed by a transferor Lender and Purchasing Lender (and, in the case of a Purchasing Lender that is not then a Lender or an Affiliate thereof, by the Borrowers (if required) and the Agent), the Agent shall (i) accept such Assignment and Acceptance and (ii) on the effective date determined pursuant thereto record the information contained therein in the Register.

(f)     The Borrowers authorize each Lender to disclose to any Participant or Purchasing Lender (each, a "Transferee") and any prospective Transferee any and all information in such Lender's possession concerning the Borrowers, the other Loan Parties, and the Affiliates and Subsidiaries of any of the foregoing which has been delivered to such Lender by or on behalf of the Borrowers pursuant to this Agreement or any other Loan Document or which has been delivered to such Lender by or on behalf of the Borrowers in connection with such Lender's credit evaluation of the Borrowers and the other Loan Parties; provided that such Transferee or prospective Transferee agrees in writing to maintain the confidentiality of such information in accordance with the provisions of Section 9.15.

(g)     Nothing herein shall prohibit any Lender from pledging or assigning any of its interest and rights under this Agreement to any Federal Reserve Bank in accordance with applicable law.

(h)     Each Lender (and each Person becoming a Lender pursuant to Section 9.6(c)) represents, warrants and agrees with the Agent that it shall reimburse, indemnify and hold the Agent harmless from any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed upon, incurred by or asserted against the Agent due to its reliance upon any representations made by such Lender that it is exempt from withholding of tax.

9.7     Adjustments; Set-Off. (a) If any Lender (a "benefitted Lender") shall at any time receive any payment of all or part of its Loans or interest thereon, or fees, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Section 7.1(g) or 8.8, or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of such other Lender's Loans or interest thereon or fees, such benefitted Lender shall purchase for cash from the other Lenders such portion of each such other Lender's Loans, or fees, or shall provide such other Lenders with the benefits of any such collateral, or the proceeds thereof, as shall be necessary to cause such benefitted Lender to share the excess payment or benefits of such collateral or proceeds ratably with each of the Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such benefitted Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest. The Borrowers agree that each Lender so purchasing a portion of another Lender's Loans may exercise all rights of payment

- 82 -

(including, without limitation, rights of set-off) with respect to such portion as fully as if such Lender were the direct holder of such portion.

(b)     In addition to any rights and remedies of the Agent and the Lenders provided by law, the Agent and the Lenders shall have the right, exercisable upon the occurrence and during the continuance of an Event of Default, without prior notice to the Borrowers, any such notice being expressly waived by the Borrowers to the extent permitted by applicable law, to set-off and appropriate and apply against any such Obligations any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by the Agent, any Lender or any branch or agency thereof or bank controlling the Agent or any Lender to or for the credit or the account of the Borrowers or any other Loan Party.  No Lender shall execute any such right without the prior written consent of the Agent.  The Agent or any Lender executing such right , as the case may be, agrees promptly to notify the Borrowers after any such set-off, provided that the failure to give such notice shall not affect the validity of such set-off.

9.8     Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by telecopier or in electronic format shall be effective as delivery of a manually executed counterpart of this Agreement.

9.9     Severability.   Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

9.10     Integration.  This Agreement, together with the other Loan Documents, represents the entire agreement of the Borrowers, the Lenders and the Agent with respect to the subject matter hereof, and there are no promises, undertakings, representations or warranties by the Agent or any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

9.11     Governing Law; Jurisdiction.

(a)     This Agreement and the rights and obligations of the Borrowers hereunder shall be governed by, and shall be construed and enforced in accordance with, the laws of the State of New York without regard to conflict of laws principles thereof.

(b)     All judicial proceedings brought against the Borrowers arising out of or relating hereto, or any of the Borrowers' obligations hereunder, may be brought in any state or Federal court of competent jurisdiction in the State, County and City of New York.  By executing and delivering this Agreement, the Borrowers, for itself and in connection with its properties, irrevocably (a) accepts generally and unconditionally the nonexclusive jurisdiction and venue of such courts; (b) waives any defense of forum non conveniens; (c) agrees that

- 83 -

service of all process in any such proceeding in any such court may be made by registered or certified mail, return receipt requested, to the Borrowers at its address provided on the first page hereof; (d) agrees that service as provided in clause (c) above is sufficient to confer personal jurisdiction over the Borrowers in any such proceeding in any such court, and otherwise constitutes effective and binding service in every respect; and (e) agrees that the Agent retains the right to serve process in any other manner permitted by law or to bring proceedings against the Borrowers in the courts of any other jurisdiction.

9.12   WAIVER OF JURY TRIAL.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.  EACH OF THE PARTIES HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THE WAIVER IN EXECUTING AND ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS.  EACH OF THE PARTIES HERETO WARRANTS AND REPRESENTS THAT EACH HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.

9.13   Acknowledgements.  The Borrowers hereby acknowledge that:

(a)   they have been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)   neither the Agent nor any Lender has any fiduciary relationship to the Borrowers solely by virtue of any of the Loan Documents, and the relationship pursuant to the Loan Documents between the Agent and the Lenders on one hand, and the Borrowers on the other hand, is solely that of creditor and debtor; and

(c)   no joint venture exists among the Agent or the Lenders, or among the Borrowers, the Agent and the Lenders.

9.14   Headings.  Section headings herein are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

9.15   Confidentiality.  Each Lender and the Agent shall exercise commercially reasonable efforts (on a several and neither a joint nor a joint and several basis) to maintain in confidence, in accordance with its customary procedures for handling confidential information, all Confidential Information; provided, that each Lender and Agent and their respective Affiliates shall have the right to disclose Confidential Information to the following Persons (and with respect to Persons covered under clauses (i), (ii), (iii), (iv), (v) and (vi), if it directs such Persons not to disclose such Confidential Information as required under this Agreement):

(i)   such Person's Affiliates;

(ii)    such Person's or such Person's Affiliates' lenders, funding or financing sources and rating agencies;

(iii)    such Person's or such Person's Affiliates' directors, officers, trustees, partners, members, managers, employees, agents, advisors, representatives, attorneys, equity owners, professional consultants and portfolio management services;

(iv)    any other Lender and any successor or assign of any Lender;

(v)    any Person to whom any Lender offers to sell, assign or transfer any Loan or any part thereof or any interest or participation therein;

(vi)    any Person that provides statistical analysis and/or information services to such Lender or its Affiliates;

(vii)    any Person (A) to the extent required by applicable law, (B) in response to any subpoena or other legal process or informal investigative demand, (C) in connection with any litigation, or (D) in connection with the actual or potential exercise or enforcement of any right or remedy under any Loan Document;

(viii)    any Person to the extent required by the Intercreditor Agreement or any other subordination agreement relating to the Obligations; and

(ix)    any Person to the extent demanded by any Governmental Authority (including, without limitation, in connection with filings, submissions and any other similar documentation required or customary to comply with Securities and Exchange Commission filing requirements).

; provided further, with the prior written consent of the Borrowers, which shall not be unreasonably withheld, delayed or conditioned, the Agent and any Lender may (at its own expense) place advertisements in financial and other newspapers and periodicals or on a home page or similar place for dissemination of information on the Internet or worldwide web as it may choose, and circulate similar promotional materials, in the form of a "tombstone" or otherwise describing the names of the Borrowers and their Affiliates (or any of them), and the amount, type and closing date with respect to the transactions contemplated hereby.

9.16    Interest Rate Limitation.    Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lender in accordance with applicable law, the rate of interest payable in respect of such Loan, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to the Lenders in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by the Lender.

9.17     Joint and Several Liability of Borrowers.  (a)      The Borrowers shall be jointly and severally liable for the Obligations, however incurred (and whether or not so specified in the Loan Documents), and all references to the term "Borrowers" with respect to the Obligations or any portion thereof shall mean each Borrower on a joint and several basis. Each Borrower agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Obligations.

(b)     In furtherance of the joint and several liability of the Borrowers for the Obligations, each Borrower hereby waives to the extent not prohibited by applicable law, for the benefit of the Lender: (i) any right to require the Agent or any Lender, as a condition of payment or performance by such Borrower, to (1) proceed against the other Borrower of the Obligations or any other Person, (2) proceed against or exhaust any security held from the other Borrower or any other Person, (3) proceed against or have resort to any balance of any account or credit on the books of the Lenders in favor of the other Borrower or any other Person, or (4) pursue any other remedy in the power of the Lenders or the Agent whatsoever; (ii) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the other Borrower including any defense based on or arising out of the lack of validity or the unenforceability of the Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the other Borrower from any cause other than payment in full of the Obligations; (iii) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (iv) any defense based upon the Lender's errors or omissions in the administration of the Obligations, except behavior which amounts to gross negligence, bad faith or willful misconduct; (v) (1) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of any other Borrower's obligations hereunder, (2) the benefit of any statute of limitations affecting any other Borrower's liability hereunder or the enforcement hereof, and (3) promptness, diligence and any requirement that the Agent or any Lender protect, secure, perfect or insure any security interest or Lien or any property subject thereto; (vi) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder or any agreement or instrument related thereto except as set forth herein, notices of any renewal, extension or modification of the Obligations or any agreement related thereto, notices of any extension of credit to the other Borrower; and (vii) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

(c)     Until all non-contingent monetary Obligations shall have been paid in full and all Commitments shall have terminated, to the extent permitted by applicable law, (i) each Borrower hereby defers any claim, right or remedy, direct or indirect, that such Borrower now has or may hereafter have against any other Borrower or any of its assets in connection with the performance by such Borrower of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including without limitation (1) any right of subrogation, reimbursement or indemnification that such Borrower now has or may hereafter have against any other Borrower with respect to the payment by such Borrower of Obligations, (2) any right to enforce, or to participate in, any claim, right or remedy that the Lender now has or may hereafter have against any other Borrower, and (3) any

- 86 -

rights to set-offs, recoupments and counterclaims, and (4) any benefit of, and any right to participate in, any collateral or security now or hereafter held by the Agent or any Lender, and (ii) each Borrower shall withhold exercise of any right of contribution such Borrower may have against any other guarantor (including any other Borrower) of the Obligations. Each Borrower further agrees that, to the extent the agreement to defer the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Borrower may have against any other Borrower or against any collateral or security, and any rights of contribution such Borrower may have against any such other guarantor, shall be junior and subordinate to any rights the Lender may have against any other Borrower, to all right, title and interest the Agent or any Lender may have in any such collateral or security, and to any right the Lender may have against such other guarantor. If any amount shall be paid to any Borrower on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all non-contingent monetary Obligations shall not have been paid in full, such amount shall be held in trust for the Agent and the Lenders and shall forthwith be paid over to the Agent to be credited and applied against the Obligations, whether matured or unmatured, in accordance with the terms hereof.

9.18    Patriot Act. Each Lender subject to Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56) (the "Patriot Act") hereby notifies the Borrowers that, pursuant to the requirements of the Patriot Act, such Lender is required to obtain, verify and record information that identifies the Borrowers, which information includes the name and address of the Borrowers and other information that will allow such Lender to identify the Borrowers in accordance with the Patriot Act.

9.19    Classified Information. The rights of the Agent and the Lenders under this Agreement and the other Loan Documents as they pertain to government contracts or other materials that contain classified or sensitive unclassified information are subject to applicable laws, including, without limitation, DOD Directive 5220.22-M, National Industrial Security Program Operations Manual, and nothing in this Agreement or the other Loan Document shall cause the Borrowers to violate such applicable laws.

9.20    Intercreditor Agreement. Notwithstanding anything herein to the contrary, the Obligations evidenced by this Agreement and the other Loan Documents, the Liens and security interests granted to the Agent pursuant to the terms hereof and thereof and the exercise of any right or remedy by the Agent or the Lenders hereunder or thereunder are subject to the provisions of the Intercreditor Agreement. In the event of any conflict between the terms of the Intercreditor Agreement and any other Loan Document, the terms of the Intercreditor Agreement shall govern. Notwithstanding anything that may be contained herein to the contrary, all of the provisions of the Loan Documents, including the covenants of the Loan Parties contained herein and therein and all of the rights, remedies and powers provided for herein and therein, are subject to the provisions of the Intercreditor Agreement (it being understood that any breach by any Loan Party of its obligations hereunder or thereunder shall nonetheless constitute a default (and to the extent provided herein or therein, an Event of Default) hereunder or thereunder, as applicable, notwithstanding the foregoing).

100037025

[remainder of page intentionally left blank]

100037025

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

BW PIEZO HOLDINGS, LLC

By: _____
Name: _Adam Blumenthal_____
Title: ___President_____

CHANNEL TECHNOLOGIES GROUP, LLC

By: _____
Name: _Gary Douville_____
Title: ___President_____

ELECTRO-OPTICAL INDUSTRIES, LLC

By: _____
Name: _Gary Douville_____
Title: ___President_____

CTG ADVANCED MATERIALS, LLC

By: _____
Name: _Adam Blumenthal_____
Title: ___Chairman_____

S-1                                   Credit Agreement

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

BW PIEZO HOLDINGS, LLC

By: _____
Name: ___Adam Blumenthal___
Title: ___President___

CHANNEL TECHNOLOGIES GROUP, LLC

By: _____
Name: _Gary Douville_
Title: ___President___

ELECTRO-OPTICAL INDUSTRIES, LLC

By: _____
Name: _Gary Douville_
Title: ___President___

CTG ADVANCED MATERIALS, LLC

By: _____
Name: _Adam Blumenthal___
Title: ___Chairman___

Credit Agreement

ONEWEST BANK, FSB, as Agent and as a Lender

By: _____

Name:     DAVID LIGON

Title:      EXECUTIVE VICE PRESIDENT

Revolving Loan Commitment: $10,000,000
Term Loan Commitment: $31,000,000
CapEx Term Commitment: $8,000,000


Agreed to:

ONEWEST BANK, FSB, as Secured Party
under the Existing Credit Agreement

By: _____

Name:     DAVID LIGON

Title:     EXECUTIVE VICE PRESIDENT

Credit Agreement

## TABLE OF CONTENTS

Page

SECTION 1.  DEFINITIONS................................................................................ 2
    1.1  Defined Terms ........................................................................... 2
    1.2  Other Definitional Provisions ................................................... 24

SECTION 2.  AMOUNT AND TERMS OF LOANS; COMMITMENT AMOUNTS ............. 25
    2.1  Revolving Loans; Revolving Loan Commitments ............... 25
    2.2  Term Loans; Term Loan Commitments. ................................. 27
    2.3  CapEx Term Loans; CapEx Commitment. .......................... 28
    2.4  Optional Prepayments .............................................................. 30
    2.5  Mandatory Prepayments .......................................................... 30
    2.6  Conversion and Continuation Options................................... 32
    2.7  Minimum Amounts of Tranches; Minimum Borrowings.......... 32
    2.8  Interest Rates and Payment Dates ........................................ 33
    2.9  Computation of Interest and Fees .......................................... 33
    2.10  Inability to Determine Interest Rate........................................ 34
    2.11  Pro Rata Treatment and Payments ........................................ 34
    2.12  Illegality ...................................................................................... 35
    2.13  Increased Costs. ........................................................................ 35
    2.14  Taxes .......................................................................................... 36
    2.15  Indemnity ................................................................................... 39
    2.16  Fees ............................................................................................ 40
    2.17  Defaulting Lenders.................................................................... 40
    2.18  Substitution of Lenders ............................................................ 41
    2.19  Sweep Agreement .................................................................... 41

SECTION 3.  REPRESENTATIONS AND WARRANTIES....................................... 42
    3.1  Financial Condition.................................................................... 42
    3.2  Corporate Existence; Compliance with Law, Etc. .............. 43
    3.3  Corporate Power; Authorization; Consents; Enforceable Obligations ................ 43
    3.4  No Legal Bar.............................................................................. 44
    3.5  No Material Litigation ............................................................... 44
    3.6  Ownership of Property; Liens; Condition of Properties ...... 44
    3.7  Environmental Matters.............................................................. 45
    3.8  Intellectual Property................................................................. 45
    3.9  Taxes .......................................................................................... 45
    3.10  Federal Regulations ................................................................ 46
    3.11  ERISA Compliance ................................................................... 46
    3.12  Investment Company Act ....................................................... 47
    3.13  Subsidiaries................................................................................ 47
    3.14  Purpose of Loans...................................................................... 47
    3.15  Accuracy and Completeness of Information......................... 47
    3.16  Real Property Assets ................................................................ 48

| | | |
|---|---|---|
| 3.17 | Permits, Etc ................................................................................................. | 48 |
| 3.18 | Nature of Business ....................................................................................... | 48 |
| 3.19 | Capital Structure and Equity Ownership ...................................................... | 48 |
| 3.20 | Insolvency .................................................................................................... | 48 |
| 3.21 | Labor Matters ............................................................................................... | 49 |
| 3.22 | Condemnation ............................................................................................... | 49 |
| 3.23 | No Material Adverse Effect. ......................................................................... | 49 |

**SECTION 4.    CONDITIONS PRECEDENT** ....................................................... 49
| | | |
|---|---|---|
| 4.1 | Conditions to Closing Date ........................................................................... | 49 |
| 4.2 | Conditions to Each Loan ............................................................................... | 52 |

**SECTION 5.    AFFIRMATIVE COVENANTS** ..................................................... 53
| | | |
|---|---|---|
| 5.1 | Financial Statements ..................................................................................... | 53 |
| 5.2 | Certificates; Other Information ..................................................................... | 53 |
| 5.3 | Payment of Obligations ................................................................................ | 55 |
| 5.4 | Conduct of Business and Maintenance of Existence ..................................... | 55 |
| 5.5 | Maintenance of Property; Insurance ............................................................. | 56 |
| 5.6 | Inspection of Property; Books and Records; Discussions ............................. | 56 |
| 5.7 | Use of Proceeds ............................................................................................ | 56 |
| 5.8 | Interest Rate Protection ................................................................................ | 57 |
| 5.9 | Acquisition of Real Property ........................................................................ | 57 |
| 5.10 | Lease and License Compliance; Landlord Consents ..................................... | 57 |
| 5.11 | Environmental Laws ..................................................................................... | 57 |
| 5.12 | Covenants Regarding Subsidiaries ............................................................... | 58 |
| 5.13 | Bank Accounts .............................................................................................. | 58 |

**SECTION 6.    NEGATIVE COVENANTS** ............................................................ 59
| | | |
|---|---|---|
| 6.1 | Financial Condition Covenants ..................................................................... | 59 |
| 6.2 | Limitation on Indebtedness ........................................................................... | 61 |
| 6.3 | Limitation on Liens ....................................................................................... | 62 |
| 6.4 | Limitation on Fundamental Changes ............................................................ | 63 |
| 6.5 | Limitation on Sale of Assets ......................................................................... | 63 |
| 6.6 | Limitation on Restricted Payments ............................................................... | 63 |
| 6.7 | Limitation on Acquisitions, Investments, Etc ............................................... | 64 |
| 6.8 | Management Fees .......................................................................................... | 65 |
| 6.9 | Transactions with Affiliates .......................................................................... | 65 |
| 6.10 | Fiscal Year .................................................................................................... | 65 |
| 6.11 | Prohibitions on Certain Agreements, Modifications to Certain Agreements. ..................................................................................................... | 66 |
| 6.12 | Sale-Leaseback Transactions ........................................................................ | 66 |
| 6.13 | Line of Business; Activities of BWP. ............................................................ | 66 |
| 6.14 | Anti-Terrorism Laws .................................................................................... | 66 |

**SECTION 7.    EVENTS OF DEFAULT** ................................................................. 67
| | | |
|---|---|---|
| 7.1 | Events of Default .......................................................................................... | 67 |
| 7.2 | Application of Payments and Proceeds .......................................................... | 70 |

7.3     Equity Cure Right ............................................................................ 70

SECTION 8.    THE AGENT ................................................................................ 71
8.1     Appointment ...................................................................................... 71
8.2     Delegation of Duties ......................................................................... 72
8.3     Exculpatory Provisions ..................................................................... 72
8.4     Reliance by Agent ............................................................................. 72
8.5     Notice of Default ............................................................................... 73
8.6     Non-Reliance on Agent and Other Lenders ...................................... 73
8.7     Indemnification ................................................................................. 73
8.8     Agent in Its Individual Capacity ....................................................... 74
8.9     Successor Agent ................................................................................ 74
8.10    Administrative Agent May File Proofs of Claim ............................... 74
8.11    Collateral Matters .............................................................................. 75

SECTION 9.    MISCELLANEOUS ....................................................................... 75
9.1     Amendments and Waivers ................................................................. 75
9.2     Notices; Effectiveness; Electronic Communication. ......................... 76
9.3     No Waiver; Cumulative Remedies ..................................................... 79
9.4     Survival of Representations and Warranties ...................................... 79
9.5     Payment of Expenses and Taxes ........................................................ 79
9.6     Successors and Assigns; Participation; Purchasing Lenders. ............. 80
9.7     Adjustments; Set-Off ......................................................................... 82
9.8     Counterparts ...................................................................................... 83
9.9     Severability ....................................................................................... 83
9.10    Integration ......................................................................................... 83
9.11    Governing Law; Jurisdiction .............................................................. 83
9.12    WAIVER OF JURY TRIAL ............................................................... 84
9.13    Acknowledgements ............................................................................ 84
9.14    Headings ............................................................................................ 84
9.15    Confidentiality ................................................................................... 84
9.16    Interest Rate Limitation ..................................................................... 85
9.17    Joint and Several Liability of Borrowers ........................................... 86
9.18    Patriot Act ......................................................................................... 87
9.19    Classified Information ........................................................................ 87
9.20    Intercreditor Agreement. .................................................................... 87

Exhibits

| | |
|---|---|
| A-1 | Form of Revolving Note |
| A-2 | Form of Term Note |
| A-3 | Form of CapEx Note |
| B | Form of Continuation Notice |
| C | Form of Borrowing Notice |
| D | Form of Covenant Compliance Certificate |
| E | Form of Assignment and Acceptance |
| F | Form of Borrowing Base Certificate |
| G | Form of Pricing Certificate |

Schedules

| | |
|---|---|
| 1.1(A) | Adjusted EBITDA |
| 3.6 | Legal and Operating Names |
| 3.7 | Environmental Matters |
| 3.8 | Intellectual Property |
| 3.16 | Real Property |
| 3.19 | Capital Structure and Equity Ownership |
| 6.2 | Permitted Indebtedness |
| 6.3 | Permitted Liens |
| 6.9 | Affiliate Transactions |

EXHIBIT A-1

FORM OF REVOLVING NOTE

$_____                                                    Dated as of _____

FOR VALUE RECEIVED, the undersigned, BW Piezo Holdings, LLC, a Delaware limited liability company, Channel Technologies Group, LLC, a California limited liability company, Electro-Optical Industries, LLC, a California limited liability company and CTG Advanced Materials, LLC, a Delaware limited liability company (each, a "Borrower" and collectively, the "Borrowers"), jointly and severally, hereby unconditionally promises to pay to the order of _____ (the "Lender"), in lawful money of the United States and in immediately available funds, the aggregate unpaid principal amount of all Revolving Loans made by the Lender to the undersigned pursuant to Section 2.1 of the Credit Agreement (as hereinafter defined), in accordance with, and subject to, the provisions of the Credit Agreement. Such payment shall be made for the account of the Lender at the office of OneWest Bank, FSB, located at 888 East Walnut Street, HQ-05-03, Pasadena, California 91101, Attention: David Ligon / Jason Prather, or at such other office as the holder of this Note may notify the undersigned and as agreed to by OneWest Bank, FSB, as Agent.  The undersigned further agrees to pay interest in like money at such office or such other office on the unpaid principal amount hereof from time to time at the rates per annum and on the dates specified in the Credit Agreement until paid in full (both before and after judgment to the extent permitted by law).

This Note is one of the Revolving Notes referred to in that certain Amended and Restated Credit Agreement dated as of October 11, 2013 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among the undersigned, as a Lender, the other Lenders parties thereto and OneWest Bank, FSB, as administrative agent for the Lenders, is entitled to the benefits thereof and of the other Loan Documents and is subject to optional and mandatory prepayment in whole or in part as provided therein.  Reference is hereby made to the Credit Agreement for a more complete statement of the terms and conditions under which the Revolving Loans evidenced hereby are made and are to be repaid. Capitalized terms used herein which are defined in the Credit Agreement shall have such meanings unless otherwise defined herein or unless the context otherwise requires.

Upon the occurrence and continuation of any one or more of the Events of Default specified in the Credit Agreement, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable, all as provided therein.

**THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (INCLUDING SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, BUT EXCLUDING ALL OTHER CHOICE OF LAW AND CONFLICTS OF LAW RULES).**

<u>BORROWERS:</u>

BW PIEZO HOLDINGS, LLC
a Delaware limited liability company


By: _____
Name: _____
Title: _____


CHANNEL TECHNOLOGIES GROUP, LLC
a California limited liability company


By: _____
Name: _____
Title: _____


ELECTRO-OPTICAL INDUSTRIES, LLC
a California limited liability company


By: _____
Name: _____
Title: _____


CTG ADVANCED MATERIALS, LLC
a Delaware limited liability company


By: _____
Name: _____
Title: _____


Revolving Note

EXHIBIT A-2

FORM OF TERM NOTE

$_____                                    Dated as of _____

        FOR VALUE RECEIVED, the undersigned, BW Piezo Holdings, LLC, a Delaware limited liability company, Channel Technologies Group, LLC, a California limited liability company, Electro-Optical Industries, LLC, a California limited liability company and CTG Advanced Materials, LLC, a Delaware limited liability company (each, a "<u>Borrower</u>" and collectively, the "<u>Borrowers</u>"), jointly and severally, hereby unconditionally promises to pay to the order of _____ (the "<u>Lender</u>"), in lawful money of the United States and in immediately available funds, the aggregate unpaid principal amount of all Term Loans made by the Lender to the undersigned pursuant to Section 2.2 of the Credit Agreement (as hereinafter defined), in installments and in amounts in accordance with, and subject to, the provisions of the Credit Agreement. Such payment shall be made for the account of the Lender at the office of OneWest Bank, FSB, located at 888 East Walnut Street, HQ-05-03, Pasadena, California 91101, Attention: David Ligon/ Jason Prather, or at such other office as the holder of this Note may notify the undersigned and as agreed to by OneWest Bank, FSB, as Agent. The undersigned further agrees to pay interest in like money at such office or such other office on the unpaid principal amount hereof from time to time at the rates per annum and on the dates specified in the Credit Agreement until paid in full (both before and after judgment to the extent permitted by law).

        This Note is one of the Term Notes referred to in that certain Amended and Restated Credit Agreement dated as of October 11, 2013 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>") among the Borrowers, the Lender, the other Lenders parties thereto and OneWest Bank, FSB, as administrative agent for the Lenders, is entitled to the benefits thereof and of the other Loan Documents and is subject to optional and mandatory prepayment in whole or in part as provided therein. Reference is hereby made to the Credit Agreement for a more complete statement of the terms and conditions under which the Term Loans evidenced hereby are made and are to be repaid. Capitalized terms used herein which are defined in the Credit Agreement shall have such meanings unless otherwise defined herein or unless the context otherwise requires.

        Upon the occurrence and continuation of any one or more of the Events of Default specified in the Credit Agreement, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable, all as provided therein.

        **THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (INCLUDING SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, BUT EXCLUDING ALL OTHER CHOICE OF LAW AND CONFLICTS OF LAW RULES).**

<u>BORROWERS:</u>

BW PIEZO HOLDINGS, LLC
a Delaware limited liability company


By: _____
Name: _____
Title: _____


CHANNEL TECHNOLOGIES GROUP, LLC
a California limited liability company


By: _____
Name: _____
Title: _____


ELECTRO-OPTICAL INDUSTRIES, LLC
a California limited liability company


By: _____
Name: _____
Title: _____


CTG ADVANCED MATERIALS, LLC
a Delaware limited liability company


By: _____
Name: _____
Title: _____

EXHIBIT A-3

FORM OF CAPEX TERM NOTE

$_____                          Dated as of _____

     FOR VALUE RECEIVED, the undersigned, BW Piezo Holdings, LLC, a Delaware limited liability company, Channel Technologies Group, LLC, a California limited liability company, Electro-Optical Industries, LLC, a California limited liability company and CTG Advanced Materials, LLC, a Delaware limited liability company (each, a "Borrower" and collectively, the "Borrowers"), jointly and severally, hereby unconditionally promises to pay to the order of _____ (the "Lender"), in lawful money of the United States and in immediately available funds, the aggregate unpaid principal amount of all CapEx Term Loans made by the Lender to the undersigned pursuant to Section 2.3 of the Credit Agreement (as hereinafter defined), in installments and in amounts in accordance with, and subject to, the provisions of the Credit Agreement. Such payment shall be made for the account of the Lender at the office of OneWest Bank, FSB, located at 888 East Walnut Street, HQ-05-03, Pasadena, California 91101, Attention: David Ligon/ Jason Prather, or at such other office as the holder of this Note may notify the undersigned and as agreed to by OneWest Bank, FSB, as Agent.  The undersigned further agrees to pay interest in like money at such office or such other office on the unpaid principal amount hereof from time to time at the rates per annum and on the dates specified in the Credit Agreement until paid in full (both before and after judgment to the extent permitted by law).

     This Note is one of the CapEx Term Notes referred to in that certain Amended and Restated Credit Agreement dated as of October 11, 2013 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement") among the Borrowers, the Lender, the other Lenders parties thereto and OneWest Bank, FSB, as administrative agent for the Lenders, is entitled to the benefits thereof and of the other Loan Documents and is subject to optional and mandatory prepayment in whole or in part as provided therein. Reference is hereby made to the Credit Agreement for a more complete statement of the terms and conditions under which the CapEx Term Loans evidenced hereby are made and are to be repaid.  Capitalized terms used herein which are defined in the Credit Agreement shall have such meanings unless otherwise defined herein or unless the context otherwise requires.

     Upon the occurrence and continuation of any one or more of the Events of Default specified in the Credit Agreement, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable, all as provided therein.

**THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (INCLUDING SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, BUT EXCLUDING ALL OTHER CHOICE OF LAW AND CONFLICTS OF LAW RULES).**

<u>BORROWERS:</u>

BW PIEZO HOLDINGS, LLC
a Delaware limited liability company


By: _____
Name: _____
Title: _____


CHANNEL TECHNOLOGIES GROUP, LLC
a California limited liability company


By: _____
Name: _____
Title: _____


ELECTRO-OPTICAL INDUSTRIES, LLC
a California limited liability company


By: _____
Name: _____
Title: _____


CTG ADVANCED MATERIALS, LLC
a Delaware limited liability company


By: _____
Name: _____
Title: _____

<u>EXHIBIT B</u>

<center>FORM OF CONTINUATION NOTICE</center>

Date: _____, 20__

To:    OneWest Bank, FSB, as Agent
       888 East Walnut Street
       HQ-05-03
       Pasadena, California 91101
       Attention: Commercial Loan Operations

Re:    BW Piezo Holdings, LLC, a Delaware limited liability company, Channel
       Technologies Group, LLC, a California limited liability company, Electro-Optical
       Industries, LLC, a California limited liability company, and CTG Advanced
       Materials, LLC, a Delaware limited liability company (each, a "<u>Borrower</u>,"
       collectively, the "<u>Borrowers</u>")

We refer to that certain Amended and Restated Credit Agreement dated as of October 11,
2013 among (1) the Borrowers, (2) the Lenders parties thereto and (3) OneWest Bank, FSB, as
administrative agent to the Lenders (such agreement, as amended, modified, restated or
supplemented from time to time, the "<u>Credit Agreement</u>").  Capitalized terms used herein and
not defined have the meanings assigned to them in the Credit Agreement.

[Pursuant to Section 2.6(a) of the Credit Agreement, the undersigned elects to convert the
following LIBOR Loans to Base Rate Loans at the end of the current Interest Period for such
LIBOR Loans:

| <u>LIBOR Loan Amount</u> | <u>Last Day of Current Interest Period</u> |
|---|---|
| 1. | |
| 2. | |
| 3.    [and so on] | ] |

[Pursuant to Section 2.6(a) of the Credit Agreement, the undersigned elects to convert
Base Rate Loans in the aggregate amount of $_____ to LIBOR Loan(s) as follows:

| <u>LIBOR Loan Amount</u> | <u>Desired Date of Conversion</u> | <u>Length of Interest Period</u> |
|---|---|---|
| 1. | | |
| 2. | | |

3.      [and so on]                                                                                      ]


        [Pursuant to Section 2.6(b) of the Credit Agreement, the undersigned elects to continue the Interest Periods with respect to the following LIBOR Loans for the following additional Interest Period:

| LIBOR Loan Amount | Last Day of Current Interest Period | Length of Continued Interest Period |
|---|---|---|
| 1. | | |
| 2. | | |
| 3.      [and so on] | | ] |

                                    BORROWERS:


                                    BW PIEZO HOLDINGS, LLC,
                                    a Delaware limited liability company on behalf
                                    of all Borrowers to the Credit Agreement


                                    By:  _____
                                    Name:  _____
                                    Title:  _____

EXHIBIT C

FORM OF BORROWING NOTICE

_____, 20___

OneWest Bank, FSB, as Agent
888 East Walnut Street
HQ-05-03
Pasadena, California 91101
Attention: Commercial Loan Operations

Ladies and Gentlemen:

BW PIEZO HOLDINGS, LLC, a Delaware limited liability company, CHANNEL TECHNOLOGIES, LLC, a California limited liability company, ELECTRO-OPTICAL INDUSTRIES, LLC, a California limited liability company and CTG ADVANCED MATERIALS, LLC, a Delaware limited liability company (each, a "Borrower" and collectively, the "Borrowers"), refer to that certain Amended and Restated Credit Agreement dated as of October 11, 2013 (as it may be amended, restated, modified or supplemented from time to time, the "Credit Agreement") among the Borrowers, the Lenders parties thereto and OneWest Bank, FSB, as administrative agent for said Lenders (in such capacity, the "Agent"). Terms defined in the Credit Agreement and not otherwise defined herein have the same respective meanings when used herein. Pursuant to the Credit Agreement, the undersigned hereby requests Loans under the Credit Agreement and in that connection sets forth below the information relating thereto (collectively, the "Proposed Loan").

1.    The date of the Proposed Loan is _____, _____.

2.    The aggregate amount of the Proposed Loan is $_____, comprised of [$_____] in Revolving Loans, [$_____] in CapEx Term Loans and [$_____] in Term Loans[1].

3.    The Type of Proposed Loan will be [a LIBOR Loan/a Base Rate Loan/a combination of a LIBOR Loan in the amount of $_____ and a Base Rate Loan in the amount of $_____].[2]

4.    [With regard to the LIBOR Loan, the length of the initial Interest Period shall be ____ months.][3]

---

[1]    Bracketed alternatives to be used as appropriate.

[2]    Bracketed alternatives to be used as appropriate.

[3]    Use if Proposed Loan will include a LIBOR Loan.

5.      [The Agent and the Lenders are agreeing to make available to the Borrowers the above-contemplated LIBOR Loans even though, as of today, the Amended and Restated Credit Agreement has not yet become effective.  By submitting this request for LIBOR Loans, each Borrower agrees to the provisions of 2.15 of the Credit Agreement, and agrees to indemnify the Agent and the Lenders as contemplated by such section with respect to such borrowing as if such provision were currently in effect.][4]

6.      The undersigned hereby certifies that the following statements are true on the date hereof and will be true on the date of the Proposed Loan:

a.      The representations and warranties contained in the Credit Agreement, each other Loan Document and each certificate or other writing delivered by the Borrowers or any other Loan Party to the Agent in connection therewith are correct on and as of such date in all material respects (except for those representations and warranties that are conditioned by materiality, which shall be true and correct in all respects[5]) as though made on and as of such date except (i) to the extent that such representations and warranties expressly relate to an earlier date and (ii) the representations and warranties made under Section 3.1(a) of the Credit Agreement shall be deemed to refer to the most recent financial statements furnished to the Agent pursuant to Section 5.1 of the Credit Agreement[6];

b.      No Default has occurred and is continuing or would result from the making of the Proposed Loan as of the date hereof; and

c.      No event has occurred and is continuing, and no condition exists, which could reasonably be expected to have a Material Adverse Effect.

Very truly yours,

BW PIEZO HOLDINGS, LLC,
a Delaware limited liability company, on behalf of
all Borrowers party to the Credit Agreement

By: _____
Name: _____
Title: _____

---

[4] To be included on the Closing Date Borrowing Notice if requesting LIBOR Loans as of the Closing Date.

[5] This parenthetical will be added to the Credit Agreement in Sections 4.1(l) and 4.2(a)(i).

[6] We need to keep this provision otherwise Section 3.1(a) is not properly dated down at each borrowing.

EXHIBIT D

## FORM OF COVENANT COMPLIANCE CERTIFICATE

This Covenant Compliance Certificate (this "Certificate") is delivered in connection with that certain Amended and Restated Credit Agreement dated as of October 11, 2013 (as further amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among BW Piezo Holdings, LLC, a Delaware limited liability company, ("BWP"), Channel Technologies Group, LLC, a California limited liability company ("CTG"), Electro-Optical Industries, LLC, a California limited liability company ("EOI"), CTG Advanced Materials, LLC, a Delaware limited liability company ("CTG Advanced") and such additional Subsidiaries of BWP that may from time to time hereafter become party to the Credit Agreement pursuant to Section 5.12 of the Credit Agreement (each of the foregoing a "Borrower" and collectively, the "Borrowers"), the lenders from time to time party thereto (the "Lenders") and OneWest Bank, FSB, as administrative agent for the Lenders (in such capacity, the "Agent"). Capitalized terms used herein which are defined in the Credit Agreement shall have such meanings unless otherwise defined herein or unless the context otherwise requires.

This Certificate is delivered by [insert name and title of Responsible Officer] of the Borrowers, who certifies that he/she is a duly elected, qualified and acting officer of the Borrowers holding such title and is authorized to execute this Certificate on behalf of the Borrowers.  This Certificate is a Covenant Compliance Certificate contemplated by Section 5.2(a) of the Credit Agreement.

In such capacity, the undersigned hereby certifies as to the accuracy of the following as of _____, ____ (the "Compliance Date"):

1.    Fixed Charge Coverage Ratio

    a.    Free Cash Flow

       i.    Adjusted EBITDA:

          A.  Net Income:                                                                 $_____

          B.   to the extent deducted in determining Net Income, Net Interest Expense:                           $_____

          C.  to the extent deducted in determining Net Income, all amounts treated as expenses for depreciation and amortization (including amortization of intangibles of any kind):                                     $_____

D.  to the extent deducted in determining
    Net Income, the aggregate amount of
    Permitted Tax Distributions made:                    $_____

E.  to the extent included in determining Net
    Income, the sum for such period of any
    extraordinary, unusual or non-recurring
    non-cash expenses or losses, less non-
    cash gains, in each case, acceptable to
    the Agent (such acceptance not to be
    unreasonably withheld, delayed or
    conditioned):                                         $_____

F.  Management Fees for such period to the
    extent paid:                                          $_____

G.  Board Fees, in each case reimbursed by
    the Borrowers during such period and
    not included under clause F above, in
    amounts not to exceed $225,000 in the
    aggregate in any consecutive 12-month
    period:                                               $_____

H.  Integration Costs not to exceed an
    aggregate amount of $2,000,000:                       $_____

I.  Transaction Costs not to exceed an
    aggregate amount of $6,000,000:                       $_____

J.  A. + B. + C. + D. + E. + F. + G. + H. +
    I.[1] :                                               $_____

ii.    maintenance Capital Expenditures made by
       Borrowers and their Subsidiaries:                  $_____

iii.   cash Permitted Tax Distributions:                  $_____

iv.    i. – ii. – iii. :                                  $_____

---

[1] Note that Adjusted EBITDA for periods prior to the Closing Date is set forth on Schedule 1.1(A) to the Credit Agreement.

b.      Fixed Charges[2]:

    i.      Gross Interest Expense of Borrowers and its Subsidiaries on a consolidated basis paid or required to be paid in cash:    $_____

    ii.      aggregate amount of scheduled principal payments on Indebtedness:    $_____

    iii.      i. + ii.:    $_____

c.      Ratio of a. to b.:    _____:1

d.      Required Fixed Charge Coverage Ratio[3]:    [____]:1

2.    Maximum Capital Expenditures

a.      Actual Capital Expenditures:    $_____

b.      Required Capital Expenditures[4]:    $_____

3.    Total Leverage Ratio

a.      Total Funded Debt:

    i.      all indebtedness for borrowed money, or for the deferred purchase price of property or services (other than trade debt incurred and payable in the ordinary course of business) (including, but not limited to, the Subordinated Debt):    $_____

    ii.      all obligations evidenced by notes, bonds, debentures or other similar instruments:    $_____

---

[2]      Solely for the purposes of calculating the Fixed Charge Coverage Ratio as of the last day of each of the fourth quarter of fiscal year 2013, the first quarter of fiscal year 2014, the second quarter of fiscal year 2014 and the third quarter of fiscal year 2014, Fixed Charges shall be annualized based on the actual Fixed Charges from the Closing Date until the last day of each such fiscal quarter.

[3]      Section 6.1(b) of the Credit Agreement requires the Fixed Charge Coverage Ratio as of the end of any fiscal quarter, beginning with the fiscal quarter ending December 31, 2013, to be (i) no less than 1.25:1 for the fiscal quarter ending December 31, 2013 through September 30, 2015 and (ii) no less than 1.15:1.0 for the fiscal quarter ending December 31, 2015 and thereafter.

[4]      Section 6.1(c) of the Credit Agreement requires that Capital Expenditures made by the Borrowers and their Subsidiaries in any fiscal year not exceed the following applicable amount:  (i) for the fiscal year ending December 31, 2013, $4,550,000, (ii) for the fiscal year ending December 31, 2014, $5,200,000 and (iii) for each fiscal year thereafter, $2,500,000 per fiscal year; provided that, if the Borrowers and the Subsidiaries do not use the entire amount of Capital Expenditures permitted in any fiscal year, they may carry forward 50.0% of such unused amount to the immediately succeeding fiscal year.

     iii.     all indebtedness created or arising under any conditional-sale or other title-retention agreement with respect to property acquired:     $_____

     iv.     all Capitalized Lease Obligations:     $_____

     v.     all obligations, contingent or otherwise, under acceptance, letter of credit or similar facilities:     $_____

     vi.     indebtedness of any Borrower by virtue of it being a general partner or joint venturer in another Person:     $_____

     vii.     indebtedness of another Person secured by any Lien on any property or asset owned or held by any Borrower:     $_____

     viii.     any Guarantee Obligations:     $_____

     ix.     i. + ii. + iii. + iv. + v. + vi. + vii. + viii.:     $_____

b.     Adjusted EBITDA (see 1.a.i.J. above):     $_____

c.     Ratio of a. to b.:     _____:1

d.     Required Total Leverage Ratio[5]:     [____]:1

4.     <u>Funds Subject to Mandatory Prepayment – Asset Dispositions</u>

     Asset Dispositions during the current fiscal year[6]:     $_____

     [Borrowers to insert language describing Asset Dispositions, including the date of sale, the amount of Net Proceeds and a description of the assets sold.]

5.     <u>Funds Subject to Mandatory Prepayment – Debt Offering</u>

---

[5]     Section 6.1(a) of the Credit Agreement requires the Total Leverage Ratio, for any fiscal quarter, beginning with the fiscal quarter ending December 31, 2013, to be greater than (i) 5.25:1.00 for the five fiscal quarter period ending December 31, 2013 through and including December 31, 2014 (ii) 5.10:1.00 for the fiscal quarter period ending March 31, 2015 (iii) 5.00:1.00 for the fiscal quarter period ending June 30, 2015 (iv) 4.85:1.00 for the fiscal quarter period ending September 30, 2015 (v) 4.75:1.00 for the fiscal quarter period ending December 31, 2015 (vi) 4.60:1.00 for the fiscal quarter period ending March 31, 2016 (vii) 4.50:1.00 for the fiscal quarter period ending June 30, 2016 (viii) 4.25:1.00 for the fiscal quarter period ending September 30, 2016 (ix) 4.00:1.00 for the two fiscal quarter period ending December 31, 2016 through and including March 31, 2017 (x) 3.75:1.00 for the fiscal quarter period ending June 30, 2017 (xi) 3.50:1.00 for the fiscal quarter period ending September 20, 2017 and (xii) 3.25:1.00 for the fiscal quarter period ending December 31, 2017 and thereafter.

[6]     Section 6.5 of the Credit Agreement requires Asset Dispositions of the Borrowers and their Subsidiaries to be no greater than $500,000 for any fiscal year.

Net Proceeds with respect to a Debt Offering:                                    $_____

[Borrowers to insert language describing any Net Proceeds received with respect to a Debt Offering.]

6.    <u>Funds Subject to Mandatory Prepayment – Equity Offering</u>

Net Proceeds with respect to an Equity Offering:                                 $_____

[Borrowers to insert language describing any Net Proceeds received with respect to an Equity Offering.]

7.    <u>Funds Subject to Mandatory Prepayment – Insurance Proceeds</u>

Net Proceeds with respect to any insurance proceeds or condemnation proceeds aggregating more than $100,000 (or any amount after the occurrence and continuance of an Event of Default):                        $_____

[Borrowers to insert language describing any Net Proceeds received with respect to insurance proceeds.]

8.    <u>Funds Subject to Mandatory Prepayment – Excess Cash Flow</u>

Excess Cash Flow during the current fiscal year:                                $_____

[Borrowers to insert language describing any Excess Cash Flow as well as such Excess Cash Flow not subject to mandatory prepayment.]


*[Remainder of page intentionally left blank.]*

As of the Compliance Date, the undersigned represents and warrants to the Agent and the Lenders as follows:

a.　　　The representations and warranties contained in the Credit Agreement, each other Loan Document and each certificate or other writing delivered to the Agent prior to, on or after the Closing Date are correct on and as of the date hereof in all material respects (except for those representations and warranties that are conditioned by materiality, which shall be true and correct in all respects) as though made on and as of the date hereof except (i) to the extent that such representations and warranties expressly relate to an earlier date and (ii) the representations and warranties made under Section 3.1 of the Credit Agreement shall be deemed to refer to the most recent financial statements furnished to the Agent pursuant to Section 5.1 of the Credit Agreement;

b.　　　No Event of Default has occurred and is continuing; and

c.　　　No event has occurred and is continuing, and no condition exists, which would reasonably be expected to have a Material Adverse Effect.

Covenant Compliance Certificate　　　　　　　　　　　S-1

IN WITNESS WHEREOF, THE UNDERSIGNED HAS HEREUNTO SIGNED HIS/HER NAME AS OF THIS _____ DAY OF _____, _____:

BW PIEZO HOLDINGS, LLC,
a Delaware limited liability company, on behalf of all Borrowers party to the Credit Agreement

By: _____
Name: _____
Title: _____

<u>EXHIBIT E</u>

<u>FORM OF ASSIGNMENT AND ACCEPTANCE</u>

This Assignment and Acceptance (the "<u>Assignment and Acceptance</u>") is dated as of the Effective Date set forth below and is entered into by and between [the][each][1] Assignor identified in item 1 below ([the][each, an] "<u>Assignor</u>") and [the][each][2] Assignee identified in item 2 below ([the][each, an] "<u>Assignee</u>").  [It is understood and agreed that the rights and obligations of [the Assignors][the Assignees][3] hereunder are several and not joint.][4]  Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as it may be amended, restated, modified or supplemented from time to time, the "<u>Credit Agreement</u>"), receipt of a copy of which is hereby acknowledged by [the][each] Assignee.  The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Acceptance as if set forth herein in full.

For an agreed consideration, [the][each] Assignor hereby irrevocably sells and assigns to [the Assignee][the respective Assignees], and [the][each] Assignee hereby irrevocably purchases and assumes from [the Assignor][the respective Assignors], subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Agent as contemplated below (i) all of [the Assignor's][the respective Assignors'] rights and obligations in [its capacity as a Lender][their respective capacities as Lenders] under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of [the Assignor][the respective Assignors] under the respective facilities identified below (including without limitation any guarantees included in such facilities), and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of [the Assignor (in its capacity as a Lender)][the respective Assignors (in their respective capacities as Lenders)] against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by [the][any] Assignor to [the][any] Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as [the][an] "<u>Assigned Interest</u>").  Each such sale and

---

[1] For bracketed language here and elsewhere in this form relating to the Assignor(s), if the assignment is from a single Assignor, choose the first bracketed language.  If the assignment is from multiple Assignors, choose the second bracketed language.
[2] For bracketed language here and elsewhere in this form relating to the Assignee(s), if the assignment is to a single Assignee, choose the first bracketed language.  If the assignment is to multiple Assignees, choose the second bracketed language.
[3] Select as appropriate.
[4] Include bracketed language if there are either multiple Assignors or multiple Assignees.

1

assignment is without recourse to [the][any] Assignor and, except as expressly provided in this Assignment and Acceptance, without representation or warranty by [the][any] Assignor.

1.    Assignor[s]:    _____

_____

[Assignor [is] [is not] a Defaulting Lender.]

2.    Assignee[s]:    _____

_____

3.    Borrowers:    BW Piezo Holdings, LLC, a Delaware limited liability company
Channel Technologies Group, LLC, a California limited liability company
Electro-Optical Industries, LLC, a California limited liability company
CTG Advanced Materials, LLC, a Delaware limited liability company

4.    Agent:    OneWest Bank, FSB, as the administrative agent under the Credit Agreement

5.    Credit Agreement: Amended and Restated Credit Agreement dated as of October 11, 2013 among the Borrowers, the Lenders parties thereto and the Agent

6.    Assigned Interest[s]:

| Assignor[s][5] | Assignee[s][6] | Facility Assigned[7] | Aggregate Amount of Commitment/Loans for all Lenders[8] | Amount of Commitment/Loans Assigned[8] | Percentage Assigned of Commitment/ Loans[9] |
|---|---|---|---|---|---|
|  |  |  | $ | $ | % |
|  |  |  | $ | $ | % |
|  |  |  | $ | $ | % |

[7.    Trade Date:    _____][10]

---

[5] List each Assignor, as appropriate.

[6] List each Assignee, as appropriate.

[7] Fill in the appropriate terminology for the types of facilities under the Credit Agreement that are being assigned under this Assignment (e.g., "Revolving Loan Commitment," "Term Loan Commitment," etc.).

[8] Amount to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.

[9] Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

[10] To be completed if the Assignor(s) and the Assignee(s) intend that the minimum assignment amount is to be determined as of the Trade Date.

[Page break]

8.    Effective  Date:    _____ ___, 20___  [TO BE INSERTED BY AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The terms set forth in this Assignment and Acceptance are hereby agreed to:

<u>ASSIGNOR[S]</u>[11]

[NAME OF ASSIGNOR]

By: _____
Name:_____
Title: _____

[NAME OF ASSIGNOR]

By: _____
Name:_____
Title: _____

<u>ASSIGNEE[S]</u>[12]

[NAME OF ASSIGNEE]

By: _____
Name:_____
Title: _____

[NAME OF ASSIGNEE]

By: _____
Name:_____
Title: _____

[Consented to and][13] Accepted:

<u>AGENT</u>

ONEWEST BANK, FSB, as Agent

By: _____
Name:_____
Title: _____

---

[11] Add additional signature blocks as needed.
[12] Add additional signature blocks as needed.
[13] To be added only if the consent of the Agent is required by the terms of the Credit Agreement.

[Consented to:]<sup>14</sup>

<u>BORROWERS</u>

BW PIEZO HOLDINGS, LLC,
a Delaware limited liability company


By: _____
Name:_____
Title: _____


CHANNEL TECHNOLOGIES GROUP, LLC,
a California limited liability company


By: _____
Name:_____
Title: _____


ELECTRO-OPTICAL INDUSTRIES, LLC,
a California limited liability company


By: _____
Name:_____
Title: _____


CTG ADVANCED MATERIALS, LLC,
a Delaware limited liability company


By: _____
Name:_____
Title: _____

---

<sup>14</sup> To be added only if the consent of the Borrowers are required by the terms of the Credit Agreement.

ANNEX 1

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ACCEPTANCE

1.      Representations and Warranties.

1.1      Assignor[s].  [The][Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the][the relevant] Assigned Interest, (ii) [the][such] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby and (iv) it is [not] a Defaulting Lender; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrowers, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document, or (iv) the performance or observance by the Borrowers, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2.      Assignee[s].  [The][Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all the requirements to be an assignee under Section 9.6(c) of the Credit Agreement (subject to such consents, if any, as may be required under Section 9.6(c) of the Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of [the][the relevant] Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant thereto, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance and to purchase [the][such] Assigned Interest, (vi) it has, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Acceptance and to purchase [the][such] Assigned Interest, and (vii) attached to the Assignment and Acceptance is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by [the][such] Assignee; and (b) agrees that (i) it will, independently and without reliance on the Agent, [the][any] Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform

1

in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.      <u>Payments</u>.  From and after the Effective Date, the Agent shall make all payments in respect of [the][each] Assigned Interest (including payments of principal, interest, fees and other amounts) to [the][the relevant] Assignee whether such amounts have accrued prior to, on or after the Effective Date.  The Assignor[s] and the Assignee[s] shall make all appropriate adjustments in payments by the Agent for periods prior to the Effective Date or with respect to the making of this assignment directly between themselves.  Notwithstanding the foregoing, the Agent shall make all payments of interest, fees or other amounts paid or payable in kind from and after the Effective Date to [the][the relevant] Assignee.

3.      <u>General Provisions</u>.  This Assignment and Acceptance shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Acceptance may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Acceptance by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Acceptance.  This Assignment and Acceptance shall be governed by, and construed in accordance with, the laws of the State of New York (without reference to its choice of law rules).

# EXHIBIT F

## FORM OF BORROWING BASE CERTIFICATE

[Attached]

### BORROWING BASE CERTIFICATE



**For:**

| # | **ACCOUNTS RECEIVABLE** | | |
|---|---|---|---|
| 1 | Total Accounts Receivable Current Period | | |
| 2 | *Less:*    Total Ineligible Accounts | | |
| 3 | Total Eligible Accounts Receivable *(Line 1 - Line 2)* | $ | - |
| 4 | Accounts Receivable Advance Rate (80%) | | 80% |
| 5 | Accounts Receivable Availability *(Line 3 * Line 4)* | $ | - |

| # | **INVENTORY** | | |
|---|---|---|---|
| 6 | Total Inventory Current Period | | |
| 7 | *Less:*    Total Ineligible Inventory | | |
| 8 | Total Eligible Inventory *(Line 6 - Line 7)* | $ | - |
| 9 | Inventory Advance Rate (50%; may be 60% up to 90 consecutive days) | | 50% |
| 10 | Inventory Availability *(Line 8 * Line 9)* | $ | - |

| | **BORROWING BASE** | | |
|---|---|---|---|
| 11 | Total Collateral Availability *(Line 5 + Line 10)* | $ | - |
| 12 | Total Revolving Line of Credit | $ | 10,000,000 |
| 13 | Borrowing Base *(Lesser of Line 11 or Line 12)* | $ | - |
| 14 | Less: Outstanding L/C's *(enter as negative)* | $ | - |
| 15 | Less: Usage (Outstanding Line of Credit) *(enter as negative)* | | |
| 16 | Total Outstanding | $ | - |
| 17 | **Net Borrowing Availability** | $ | - |

This Borrowing Base Certificate is executed on _____, _____ by a responsible officer of each of the Borrowers (as defined in that certain Amended and Restated Credit Agreement, dated October 11, 2013, by and among BW Piezo Holdings, LLC, a Delaware limited liability company, Channel Technologies Group, LLC, a California limited liability company, Electro-Optical Industries, LLC, a California limited liability company, CTG Advanced Materials, LLC, a Delaware limited liability company, the lenders from time to time party thereto and OneWest Bank, FSB, as Agent.  The undersigned hereby warrants and certifies that each and every matter contained herein is derived from the books and records of the Borrowers and is true and correct in all material respects.

**BW PIEZO HOLDINGS, LLC**

Signed: _____

Title: _____

**CHANNEL TECHNOLOGIES GROUP, LLC**

Signed: _____

Title: _____

**ELECTRO-OPTICAL INDUSTRIES, LLC**

Signed: _____

Title: _____

**CTG Advanced Materials, LLC**

Signed: _____

Title: _____

<u>EXHIBIT G</u>

## FORM OF PRICING CERTIFICATE

_____, a Responsible Officer of BW Piezo Holdings, LLC, a Delaware limited liability company, ("<u>BWP</u>"), Channel Technologies Group, LLC, a California limited liability company ("<u>CTG</u>"), Electro-Optical Industries, LLC, a California limited liability company ("<u>EOI</u>"), CTG Advanced Materials, LLC, a Delaware limited liability company ("<u>CTG Advanced</u>") and such additional Subsidiaries of BWP that may from time to time hereafter become party to the Credit Agreement (as defined below) pursuant to Section 5.12 of the Credit Agreement (each of the foregoing a "<u>Borrower</u>" and collectively, the "<u>Borrowers</u>"), refer to that certain Amended and Restated Credit Agreement dated as of October 11, 2013, by and between the Borrowers, the lenders from time to time party thereto and OneWest Bank, FSB, as administrative agent for said Lenders (in such capacity, the "<u>Agent</u>") (as it may be further amended, restated, modified or supplemented, the "<u>Credit Agreement</u>"; capitalized terms used herein and not defined shall have the meanings assigned to them in the Credit Agreement) and certify as to the accuracy of the following as of the fiscal quarter ended _____ ___, _____ (the "<u>Calculation Date</u>"):

1.      Pursuant to Section 2.8(d) of the Credit Agreement, the Applicable Margin for interest rates on the Loans shall be calculated on the basis of the Total Leverage Ratio set forth in the most recent Pricing Certificate.  The Total Leverage Ratio for the Borrowers and their Subsidiaries on a consolidated basis for the fiscal quarter most recently ended and the immediately preceding three fiscal quarters, is the ratio of Total Funded Debt as of the last day of such quarter to Adjusted EBITDA for such period.

2.      As of the Calculation Date, the Total Leverage Ratio is ____: 1 (as demonstrated in the calculation below), which corresponds to Leverage Level __.  Therefore the Applicable Margin should move from [___]% to [___]% for LIBOR Loans and [___]% to [___]% for Base Rate Loans.  Such change will be effective five (5) Business Days after the Agent's receipt of this Pricing Certificate, as contemplated by Section 2.8(d) of the Credit Agreement.

| <u>Total Leverage Ratio</u>: (A) / (B) = | | | |
|---|---|---|---|
| (A) | Total Funded Debt: i. + ii. + iii. + iv. + v. + vi. + vii. + viii.= | | $_____ |
| | i. | all indebtedness for borrowed money, or for the deferred purchase price of property or services (other than trade debt incurred and payable in the ordinary course of business) (including, but not limited to, the Subordinated Debt): | $_____ |
| | ii. | all obligations evidenced by notes, bonds, debentures or other similar instruments: | $_____ |

| | | | |
|---|---|---|---|
| | iii. | all indebtedness created or arising under any conditional-sale or other title-retention agreement with respect to property acquired: | $_____ |
| | iv. | all Capitalized Lease Obligations: | $_____ |
| | v. | all obligations, contingent or otherwise, under acceptance, letter of credit or similar facilities | $_____ |
| | vi. | indebtedness of any Borrower by virtue of it being a general partner or joint venturer in another Person | $_____ |
| | vii. | indebtedness of another Person secured by any Lien on any property or asset owned or held by any Borrower | $_____ |
| | viii. | any Guarantee Obligations | $_____ |
| (B) | | Adjusted EBITDA[1]: i. + ii. + iii. + iv. + v. + vi. + vii. + viii. + ix. = | $_____ |
| | i. | Net Income for the period: | $_____ |
| | ii. | Net Interest Expense *: | $_____ |
| | iii. | all amounts treated as expenses for depreciation and amortization (including amortization of intangibles of any kind)*: | $_____ |
| | iv. | the aggregate amount of Permitted Tax Distributions made*: | $_____ |
| | v. | the sum for such period of any extraordinary, unusual or non-recurring non-cash expenses or losses, less non-cash gains, in each case, acceptable to the Agent (such acceptance not to be unreasonably withheld, delayed or conditioned)*: | $_____ |
| | vi. | Management Fees for such period to the extent paid: | $_____ |
| | vii. | Board Fees, in each case reimbursed by the Borrowers during such period and not included in clause vi above, in amounts not to exceed $225,000 in the aggregate in any consecutive 12-month period: | $_____ |
| | viii. | Integration Costs not to exceed an aggregate | $_____ |

---

[1] Note that Adjusted EBITDA for periods prior to the Closing Date is set forth on Schedule 1.1(A) to the Credit Agreement.

| | | amount of $2,000,000: | |
|---|---|---|---|
| | ix. | Transaction Costs not to exceed an aggregate amount of $6,000,000: | $_____ |

*to the extent deducted in the calculation of Net Income.

3. Attached hereto are the financial statements required by Section 5.1(b) of the Credit Agreement for the fiscal quarter ending on the Calculation Date.

IN WITNESS WHEREOF, EACH OF THE UNDERSIGNED HAS HEREUNTO SIGNED HIS/HER RESPECTIVE NAME AS OF THIS _____ DAY OF _____, _____

BW PIEZO HOLDINGS, LLC

By: _____
Name: _____
Title: _____

CHANNEL TECHNOLOGIES GROUP, LLC

By: _____
Name: _____
Title: _____

ELECTRO-OPTICAL INDUSTRIES, LLC

By: _____
Name: _____
Title: _____

CTG ADVANCED MATERIALS, LLC

By: _____
Name: _____
Title: _____

## SCHEDULE 1.1(A)

Adjusted EBTIDA

| Period | Actual Adjusted EBITDA |
|--------|------------------------|
| Month ended September 30, 2012 | $1,142,720.90 |
| Month ended October 31,2012 | $  434,106.59 |
| Month ended November 30, 2012 | $  909,724.95 |
| Month ended December 31, 2013 | $1,372,184.56 |
| Month ended January 31, 2013 | $  584,085.36 |
| Month ended February 28, 2013 | $  943,308.54 |
| Month ended March 31, 2013 | $1,855,557.97 |
| Month ended April 30, 2013 | $  570,142.44 |
| Month ended May 31, 2013 | $  797,369.11 |
| Month ended June 30, 2013 | $1,328,598.49 |
| Month ended July 31, 2013 | $  934,746.83 |
| Month ended August 31, 2013 | $  841,721.58 |

**Final Version**

## AMENDED AND RESTATED CREDIT AGREEMENT

## DISCLOSURE SCHEDULE

The following matters are disclosed in connection with the Amended and Restated Credit Agreement, dated as of October 11, 2013 (the "Agreement") by and among BW Piezo Holdings, LLC, CTG Advanced Materials, LLC, Channel Technologies Group, LLC, Electro-Optical Industries, LLC (collectively, the "Borrowers"), the Lenders (as defined therein), and OneWest Bank, FSB, as administrative agent for the Lenders ("Agent").  Capitalized terms used herein and not otherwise defined have the meanings specified in the Agreement.

For purposes of the Disclosure Schedules, the schedule numbers of these Disclosure Schedules correspond to the section numbers of the Agreement.  Any matter disclosed in any particular section of the Disclosure Schedules shall be deemed to be disclosed in reference to any other section of the Disclosure Schedules if the relevance of such information to such other Disclosure Schedule is reasonably apparent on its face.

Certain information set forth in these Disclosure Schedules is included solely for informational purposes and may not be required to be disclosed pursuant to the Agreement.  The disclosure of such information shall not be deemed to constitute an acknowledgment that such information is required to be disclosed in connection with the representations and warranties made by the Borrowers in the Agreement or that such information is material or would have a Material Adverse Effect.

All references herein to any agreement, document, instrument or report shall be deemed to be a reference to such agreement, document, instrument or report, in its entirety and any identified amendments.

SCHEDULE 3.6

In response to the first sentence in Section 3.6:

1. As part of the HCMC/DHAN Acquisition, HCMC assigned to CTG Advanced its trade secrets. These trade secrets, however, have not been fully documented. Pursuant to Section 7.3 of the Acquisition Agreement, HCMC will be required to document such trade secrets following the closing of the HCMC/DHAN Acquisition.

2. See the assets set forth in the attachment to Schedule 3.6 that are identified as "HC Owned/free for Navy to use", "Navy owned/free for HC to use" and "GFE" (government furnished equipment).

In response to the penultimate sentence in Section 3.6:

1. On September 1, 2009, CTG was formed by the merger of two Channel Technologies, Inc. ("CTI") subsidiaries—(i) Channel Industries, Inc., a California corporation ("CII") and (ii) International Transducer Corp., a California corporation ("ITC")—with and into Sonatech, Inc. (another CTI subsidiary), with Sonatech, Inc. as the surviving corporation. The Agreement and Plan of Merger relating to the above merger also amended the Articles of Incorporation of Sonatech to change Sonatech's name to Channel Technologies Group, Inc.

2. In December 2011, Channel Technologies Group, Inc. converted to a limited liability company and therefore became Channel Technologies Group, LLC.

3. In December 2011, Electro-Optical Industries, Inc. converted to a limited liability company and therefore became Electro-Optical Industries, LLC.

2

# HC Materials
Fixed Assets List

## Equipment (List A)

### HC Materials Fixed Asset List as of 8/31/13

**\*\*\*\*\*Custom Specified and Built Equipment**

| ID | Purchase Date | Name | HC | HC Owned/free for Navy to use | Navy owned/Free for HC to Use | GFE | DHAN, LLC |
|----|---------------|------|-----|-------------------------------|-------------------------------|-----|-----------|
| A1001 | 08/03/05 | Disco Dicing Saw, DAD 2H/6T | $29,000 | | | | |
| A1002 | 01/01/04 | Disco Dicing Saw, DAD 2H/6T | 27,600 | | | | |
| A1003 | 04/21/06 | Disco 3" DAD-341 | | | 74,000 | | |
| A1004 | 12/31/07 | Dicing Saw ADT | | | 107,024 | | |
| A1005 | 12/13/08 | Automatic Grinder, DAG810 | | | | | 164,000 |
| A1006 | 08/31/05 | STC ID Saw | 35,000 | | | | |
| A1008 | 02/03/09 | Etching Machine | | | | | 406,055 |
| A1009 | 01/01/98 | DX-3 X-ray diffraction | 6,740 | | | | |
| A1010 | 07/07/06 | Sputtering machine, BC20 | 117,500 | | | | |
| A1011 | 01/01/04 | HP-4294A | 28,316 | | | | |
| A1012 | 01/01/01 | HP-4192 Analyzer | 9,800 | | | | |
| A1013 | 01/01/00 | RF Generator | 32,755 | | | | |
| A1014 | 11/22/06 | RF Generator | 35,000 | | | | |
| A1015 | 01/01/04 | Rolling Mill | 23,114 | | | | |
| A1016 | 10/17/06 | IRM Rolling Mill (down pay) | 32,501 | | | | |
| A1017 | 01/01/04 | KSS Air Hammer | 14,005 | | | | |
| A1018 | 01/01/99 | IRM Rolling Mill | 15,545 | | | | |
| A1019 | 01/01/04 | Keiser Air Package | 8,200 | | | | |
| A1020 | 05/19/06 | RF Vacuum Chamber | 15,000 | | | | |
| A1021 | 07/31/07 | Lathe CDS 625C x 1500 | 10,150 | | | | |
| A1022 | 12/24/07 | Furnace 1500 C | 22,060 | | | | |
| A1023 | 02/12/04 | CIP | 11,200 | | | 28,000 | |
| A1024 | 07/30/04 | Model 1SD Attritor | | | | 25,876 | |
| A1025 | 12/01/04 | Model HD Attritor | | | | 10,847 | |
| A1026 | 12/13/08 | Nanovea Surface profilometer | | | | 40,000 | |
| A1027 | 12/31/08 | Micro Scope (& camera) | | | | 19,451 | |
| A1028 | 05/08/09 | CS 065SC Labline System | | | | 26,248 | |
| A1029 | 05/20/09 | Tek Digital Phosphor Scope | | | | 11,500 | |
| A1030 | 06/06/09 | 2MHz Precision LCR Meter | | | | 16,630 | |
| A1031 | 04/10/09 | SEM | | | | | 119,580 |
| A1032 | 07/10/09 | Energy Dispersed X-Ray m/Analysis | | | | 32,142 | |
| A1033 | 12/28/06 | Shoretel Phone system | 26,576 | | | | |

**HC Materials**   Case 9:18-ap-01058-DS    Doc 156-1    Filed 06/28/19    Entered 06/28/19 14:56:52    Desc
Exhibit 1-29    Page 219 of 500

Fixed Assets List

| A1037 | 06/29/09 | Spinning machine ***** | | 372,241 | | | |
|-------|----------|------------------------|---|---------|---|--------|---|
| A1036 | 10/31/09 | Breaking Jaws | | | | 13,559 | |
| A1038 | 10/31/09 | Auto Weigh | | | | 34,900 | |
| A1039 | 11/01/09 | Silver Printer | | | | 33,266 | |
| A1040 | 07/30/07 | RF Generator, nanoStar | 42,922 | | | | |
| A1041 | 12/20/09 | 360 UV exposurer | 12,444 | | | | |
| A1042 | 05/31/10 | Plasma Pre III Etcher | | | | 14,917 | |
| A1043 | 06/06/10 | fixture for 4294 | | | | 4,228 | |
| | 12/15/10 | 4294, Precision Impedence Analyze | | | | 34,995 | |
| A1044 | 09/21/10 | CMM | | 34,507 | | | |
| A1045 | 10/07/10 | CNC welding machine | | 18,750 | | | |
| A1046 | 12/06/10 | Piezo Analyzer | | | | 68,810 | |
| A1047 | 12/07/10 | Disco DAD2H/6T | 18,000 | | | | |
| A1048 | 03/04/10 | BT-1R1E Plasma Etching | | | | | 66,810 |
| A1055 | 11/22/10 | Clean Room Hood #1 | | | | | 11,460 |
| A1056 | 11/22/10 | Clean Room Hood #2 | | | | | 11,460 |
| A1057 | 11/22/10 | Clean Room Hood #3 | | | | | 11,460 |
| A1058 | 11/22/10 | Clean Room Hood #4 | | | | | 11,460 |
| A1059 | NA | Lab Hood #1 (Transducer Room) | | | | | 5,982 |
| A1049 | 02/25/11 | Dicing Saw ADT | 46,000 | | | | |
| A1050 | 02/28/11 | STC dicing saw | 45,000 | | | | |
| A1051 | 02/28/11 | Disco DAD 321 | 27,500 | | | | |
| A1052 | 02/28/11 | Disco DAD 341 | 25,000 | | | | |
| A1053 | 02/28/11 | Disco DAD 321 | 17,000 | | | | |
| A1054 | 04/24/11 | 30KW Compressor | 21,042 | | | | |
| A1071 | 05/13/11 | Aligner | 63,500 | | | | |
| A1060 | 02/11/11 | CaE Sputtering  Machine MRC 943 | | | | | 210,000 |
| A1067 | 08/02/11 | Dry Vacuum Pump | 11,540 | | | | |
| A1086 | 08/09/11 | Hydro-Pac, CIP Compressor | 9,932 | | | | |
| A1068 | 09/30/12 | TKD-100/34K/T41E, Chillers | 8,332 | | | | |
| A1065 | 03/12/12 | Nabertherm HT 64/17 | 49,565 | | | | |
| A1064 | 03/12/12 | Nabertherm HT 160/17 | | | | | |
| A1066 | 03/20/12 | Lapping machine Model MFL-3B | 12,500 | | | | |
| A1062 | 06/08/11 | VF Vacuum Casting Furnace | | | 404,650 | | |
| A1061 | 06/08/11 | V074 Vacuum Oven | | | | | |
| A1063 | 07/18/11 | High Temp Furnace, Model ST-1650-8812 - SentroTech | | | | 13,276 | |
| A1072 | 05/30/12 | Micro Vu Vertex | 51,781 | | | | |
| A1084 | 08/16/12 | 7200 Series ProDice Fully Automatic Dicing Saw | | | | | 165,880 |
| A1085 | 08/16/12 | 7100 Pro-Vectus Precision Dicing System | | | | | 103,117 |
| A1083 | 08/16/12 | Model 977 Wafer Cleaning System | 28,012 | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| A1075 | | 08/16/12 | Model 966 Wafer Mounting Station | 13,348 | | | | |
| A1074 | | 10/31/12 | DAG810 Automatic Surface Grinder | | | | | 199,011 |
| A1081 | | 08/24/12 | CW-6680 Annealing Furnace | 49,025 | | | | |
| A1077 | | 08/30/12 | ISD Attritor | 33,851 | | | | |
| A1089 | | 04/30/13 | Fast UT340 Pulser receiver System | 15,495 | | | | |
| | | 06/04/13 | Wire Saw down payment | 111,310 | | | | |
| | | 08/31/13 | ONR Owned Platinum as 8/31/13:  226.2 oz | | | | 331,926 | |
| | | | **Total Equipment (List A)** | **$1,213,160** | **$425,498** | **$585,674** | **$760,570** | **$1,486,275** |

| ID | Purchase Date | Name | HC | | Navy | LLC |
|---|---|---|---|---|---|---|
| B1001 | | LabMaster 15 | | | | |
| B1002 | | Chiller TDK-100 | | | | |
| B1003 | 01/01/02 | Box Furnace 4800 | $1,450 | | | |
| B1004 | | Box Furnace 6000 | | | | |
| B1005 | | Box Furnace 4800 | | | | |
| B1006 | 01/01/04 | Hummer 8.0, Sputtering machine | 18,605 | | | |
| B1007 | 01/01/00 | Sputtering machine | 4,446 | | | |
| B1008 | 01/01/99 | MR Silicon SlicingSaw | 11,935 | | | |
| B1009 | 01/01/01 | Ultra6000 dicing saw | 13,000 | | | |
| B1010 | | Crusher | | | | |
| B1011 | | Scaler ARC 120 | | | | |
| B1012 | | Scaler ADK-10 | | | | |
| B1013 | | Scaler OHAUS | | | | |
| B1014 | | Storage Refrigerator | | | | |
| B1015 | 09/04/09 | Temperature Chamber | | | 8,854 | |
| B1016 | 09/04/09 | HP Digital Multimeter | | | 5,366 | |
| B1017 | | High Voltage Amplifier | | | | |
| B1018 | 08/28/06 | Piezo test system | 13,500 | | | |
| B1019 | | Micro Fixture | | | | |
| B1020 | | Ultrasound Thickness gage | | | | |
| B1021 | 01/01/99 | Balance X2 | 2,190 | | | |
| B1022 | 01/01/00 | Lab One polisher | 1,363 | | | |
| B1023 | 01/01/01 | 1700 lindberger furnace | 9,000 | | | |
| B1024 | 06/04/04 | Function Generator | 1,969 | | | |
| B1025 | 01/24/09 | HP PC | 4,252 | | | |
| B1026 | | HP PC | | | | |
| B1027 | | IBM laptop | | | | |
| B1028 | | IBM laptop | | | | |
| B1029 | 04/08/09 | PC | 1,033 | | | |
| B1030 | 08/20/06 | Compaq Computer | 1,348 | | | |
| B | 12/09/09 | Furnace frames | 6,633 | | 6,633 | |
| B | 01/14/10 | Phone switch of 475 | 5,189 | | | |
| B1031 | 04/09/10 | Microscope | 3,815 | | | |
| B | 06/06/10 | Control cabinets | 3,101 | | | |
| B | 06/10/10 | Transformers | 4,200 | | 4,200 | |
| B | 06/10/10 | Data acq/switch systems | 5,026 | | 5,000 | |
| B1032 | 10/20/10 | PC for auto0cat | 1,969 | | | |

**HC Materials**   Case 9:18-ap-01058-DS   Doc 156-1   Filed 06/28/19   Entered 06/28/19 14:56:52   Desc
Exhibit 1-29   Page 222 of 500

Fixed Assets List

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| B | | 01/16/11 | 4 PCs for new furnaces | 1,724 | | | | |
| B | | 01/18/11 | Analog panels | 2,257 | | | | |
| B | | 01/22/11 | 8 PCs for new furnaces | 4,181 | | | | |
| B | | 02/18/11 | eurotherm controllers | 2,866 | | | | |
| B | | 08/11/11 | 6 PC for furnaces | 2,523 | | | | |
| B | | 05/30/12 | 8" Dedicated Chuck Table | 7,450 | | | | |
| B | | 07/19/12 | Scienscope M27-PK5-AN-HD | 5,088 | | | | |
| B | | 08/21/12 | CL-100 Centrifuge | 5,900 | | | | |
| B | | 08/21/12 | IP60-05CX-01, CRITTER High Pressure Intensifier Pump | 5,880 | | | | |
| | | 11/19/12 | IP60-05CX-01, CRITTER High Pressure Intensifier Pump | 1,960 | | | | |
| B | | 09/20/12 | TKD-100/22K/T41G/P2 Chiller | 6,921 | | | | |
| B | | 10/19/12 | FCR-1200 Non-Ducted Fume Hood | 7,048 | | | | |
| B | | 04/24/13 | 3 Laptops for Pengdi, Jian & Weiling | 2,453 | | | | |
| B | | 06/29/13 | Ciso 48 Port Gigabit Switch | 4,006 | | | | |
| B | | 08/19/13 | 2 PC for furnace & 2 Printer for 475 | 1,785 | | | | |
| | | | **Total Equipment (List B)** | **$176,065** | | | $30,052 | $0 |
| | | | | | | | | |
| | | | **Total Equipment (List A and B)** | **$1,389,225** | | | **$790,622** | **$1,486,275** |
| | | | | | | | | |

**HC Materials**   Case 9:18-ap-01058-DS   Doc 156-1   Filed 06/28/19   Entered 06/28/19 14:56:52   Desc
Exhibit 1-29   Page 223 of 500

Fixed Assets List

| | Furniture & Fixtures (List C) | | | | | |
|---|---|---|---|---|---|---|
| **ID** | **Purchase Date** | **Name** | **HC** | | **Navy** | **LLC** |
| C1001 | 02/01/07 | Hon 5 Drawer File Cabinet | $11,505 | | | |
| C1002 | | Hon 5 Drawer File Cabinet | | | | |
| C1003 | | Hon 5 Drawer File Cabinet | | | | |
| C1004 | | Hon 5 Drawer File Cabinet | | | | |
| C1005 | | Hon L type Desk | | | | |
| C1006 | | Hon L type Desk | | | | |
| C1007 | | Hon L type Desk | | | | |
| C1008 | | Hon L type Desk | | | | |
| C1009 | | Hon L type Desk | | | | |
| C1010 | | Hon L type Desk | | | | |
| C1011 | | Hon L type Desk | | | | |
| C1012 | | Hon L type Desk | | | | |
| C1013 | | Hon 5 Shelf Bookcases | | | | |
| C1014 | | Hon 5 Shelf Bookcases | | | | |
| C1015 | | Hon 5 Shelf Bookcases | | | | |
| C1016 | | Hon 5 Shelf Bookcases | | | | |
| C1017 | | Hon 5 Shelf Bookcases | | | | |
| C1018 | | Hon 5 Shelf Bookcases | | | | |
| C1019 | | Hon 5 Shelf Bookcases | | | | |
| C1020 | | Hon 5 Shelf Bookcases | | | | |
| C1021 | 02/12/07 | CEO L type Desk | 1,971 | | | |
| C1022 | 12/31/06 | Conference room Table & Chairs | 2,847 | | | |
| C1023 | 12/01/05 | Chair | 1,890 | | | |
| C1024 | | Chair | | | | |
| C1025 | | Chair | | | | |
| C1026 | | Chair | | | | |
| C1027 | | Chair | | | | |
| C1028 | | Chair | | | | |
| C1029 | | Chair | | | | |
| C1030 | | Chair | | | | |
| C1031 | | Chair | | | | |
| C1032 | | Sofa | | | | |
| C1033 | | Hon L type Desk | | | | |
| C1034 | 01/01/05 | Café table & chairs | 1,441 | | | |
| C | 12/12/09 | Chair | 642 | | | |
| C | 02/20/10 | Workshop Chairs | 960 | | | |
| C | 04/27/12 | 475 furniture | 6,562 | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| C | | 05/18/10 | Rolling Bench 8 Drawer | 1,219 | | | | |
| C | | 06/04/10 | 475 metal cabinets | 13,746 | | | | |
| C | | 06/10/10 | 475 furniture | 6,562 | | | | |
| C | | 08/16/10 | 4 chairs | 405 | | | | |
| C | | 08/16/10 | Coffee table | 252 | | | | |
| C | | 01/06/12 | 4 guest chairs for Steve and Pengdi | 389 | | | | |
| C | | 01/09/12 | Conference table for Steve | 220 | | | | |
| C | | 07/31/12 | MicroVu table | 927 | | | | |
| C | | 12/11/12 | 8 office chairs | 1,155 | | | | |
| C | | 01/17/13 | Cabinets for mechanic finishing room | 5,189 | | | | |
| | | | **Total Furniture & Fixtures (List C)** | **$57,880** | | | | **$0** | **$0** |

| | Facilities | | | | | | |
|---|---|---|---|---|---|---|---|
| ID | | Purchase Date | Name | HC | | Navy | LLC |
| S | | 01/08/13 | New tables for mechanical finishing | $935 | | | |
| S | | 01/09/13 | New tables for mechanical finishing | 432 | | | |
| S | | 01/12/13 | Forklift rental | 288 | | | |
| 10872 | | 01/31/13 | Wafer Clamp 4" Quartz, Upper Surface 205mm, | 2,924 | | | |
| S | | 02/14/13 | Water testing for water waster room | 96 | | | |
| | | | **Total Facilities** | **$4,675** | | | |
| | | | | | | | |

| | | Vehicles | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ID | | Purchase Date | Name | HC | | | Navy | LLC |
| | | 2006 | GMC pickup | $17,168 | | | | |
| | | 2007 | RAV 4 | 24,391 | | | | |
| | | | Total Vehicles | $41,559 | | | $0 | $0 |
| | | | | | | | | |

SCHEDULE 3.7

1.  Items disclosed by that certain Phase I Environmental Site Assessment: 839 Ward Drive, Goleta, California prepared by TRAK Environmental Group, Inc. dated January 19, 2007.

2.  Items disclosed by that certain Phase I Environmental Site Assessment: 859, 861, 869, & 879 Ward Drive, Goleta, California prepared by TRAK Environmental Group, Inc. dated February 9, 2007.

3.  Items disclosed by that certain Phase I Environmental Site Assessment Report; 839, 859, 861, 869, 879 Ward Drive, Goleta, California prepared by URS Corporation, dated August 2011.

4.  Items disclosed by that certain Master Plan and Comprehensive Strategy for Investigation and Corrective Action regarding 839, 859-861, and 869-879 Ward Drive, Goleta, California prepared by TRAK Environmental Group, Inc. dated September 16, 2010.

5.  Items disclosed by that certain letter from TRAK Environmental Group, Inc. to Apieh Claybrook, et al., regarding Proposal for Master Plan Comprehensive Investigation, 839, 859-861, and 869-879 Ward Drive, Goleta, California dated September 27, 2010.

6.  Items disclosed by that certain Report of Master Plan Comprehensive Investigation regarding 839, 859-861, and 869-879 Ward Drive, Goleta, California prepared by TRAK Environmental Group, Inc. dated October 31, 2011.

7.  Items disclosed by the following website: http://geotracker.waterboards.ca.gov/profile_report.asp?global_id=SLT3S2091340.

8.  Items disclosed by that certain memorandum from David Critchfield of EMSOURCE, Inc. to Haran Narulla regarding Environmental Review – Channel Industries, Inc.; Goleta, CA, dated August 31, 2011.

9.  Items disclosed by that certain memorandum from David Critchfield of EMSOURCE, Inc. to Haran Narulla regarding Environmental Review – Channel Industries, Inc.; Goleta, CA, dated September 22, 2011.

10. Items disclosed by that certain Corrective Action Plan Addendum Comprehensive Master Plan regarding 839, 859-861, and 869-879 Ward Drive, Goleta, California prepared by TRAK Environmental Group, Inc. dated August, 31, 2012.

11. Items disclosed by that certain Report of Master Plan Addendum Comprehensive regarding 839, 859-861, and 869-879 Ward Drive, Goleta, California prepared by TRAK Environmental Group, Inc. dated August 31, 2012.

12. Items disclosed by that certain Report of Indoor Air Monitoring regarding 839 Ward Drive, Goleta, California prepared by TRAK Environmental Group, Inc. dated October 31, 2012.

13. Items disclosed by that certain Report of Indoor Air Monitoring 869 and 879 Ward Drive, and 859 Ward Drive, Alta Properties, Inc., Goleta, California prepared by TRAK Environmental Group, Inc., dated July 31, 2013.

14. Items disclosed by that certain Report of Indoor Air Monitoring Follow-up Event, Alta Properties, Inc., Goleta, California prepared by TRAK Environmental Group, Inc., dated July 31, 2013.

15. General Release, dated September 13, 2011, between Sonatech, Inc. (n/k/a Channel Technologies Group, LLC) and Marine Shale Processors Site PRP Group.

16. Settlement Agreement, dated September 13, 2011, between Sonatech, Inc. (n/k/a Channel Technologies Group, LLC) and Marine Shale Processors Site PRP Group.

17. Items disclosed by that certain Phase I Environmental Site Assessment and Limited Compliance Review: 479 & 475 Quadrangle Drive, Bolingbrook, Illinois prepared by ENVIRON International Corporation dated February 2010.

18. Items disclosed by that certain Phase I Environmental Site Assessment: 475 & 479 Quadrangle Drive, Bolingbrook, Illinois prepared by Conestoga-Rovers & Associates dated June 2013.

19. Following the closing of the HCMC/DHAN Acquisition, CTG Advanced will seek a Lifetime Operating Permit issued by the Illinois Environmental Protection Agency.  The application for the Lifetime Operating Permit can be filed with the Illinois Environmental Protection Agency within thirty (30) days following the transfer contemplated by the HCMC/DHAN Acquisition.

SCHEDULE 3.8

As part of the HCMC/DHAN Acquisition, HCMC assigned to CTG Advanced its trade secrets. These trade secrets, however, have not been fully documented.  Pursuant to Section 7.3 of the Acquisition Agreement, HCMC will be required to document such trade secrets following the closing of the HCMC/DHAN Acquisition.

SCHEDULE 3.16

1. 479 Quadrangle Drive, Suites E and F, Bolingbrook, Illinois 60440 is leased by CTG Advanced pursuant to that certain Agreement of Lease, dated the date hereof, between CTG Advanced and DHAN.

2. 475 Quadrangle Drive, Suites C and D, Bolingbrook, Illinois 60440 is leased by CTG Advanced, pursuant to that certain Agreement of Lease, dated the date hereof, between CTG Advanced and DHAN.

3. 839, 859/861, and 869/879 Ward Drive, Santa Barbara, California 93111 are leased by CTG, pursuant to that certain Air Commercial Real Estate Association Standard Industrial/Commercial Single-Tenant Lease – Net, dated December 29, 2011, between CTG and Alta Properties, Inc (f/k/a Channel Technologies, Inc.).  The office space at 861 Ward Drive, Santa Barbara, California 93111 is occupied by GRT, Inc., as a sub-tenant of CTG.

SCHEDULE 3.19

1.  BWPH – See the attached.

2.  CTG Advanced – BWPH owns 100% of the outstanding equity in CTG Advanced.

3.  CTG – BWPH owns 100% of the outstanding membership interests in CTG.

4.  EOI – CTG owns 100% of the outstanding membership interests in EOI

5.  Equity Agreements:

    a.  Limited Liability Company Agreement of CTG Advanced.

    b.  Operating Agreement of CTG.

    c.  Operating Agreement of EOI.

    d.  BWPH Second Amended and Restated Limited Liability Company Agreement, dated the date hereof.

    e.  Subscription Agreement, dated December 29, 2011, between Blue Wolf Capital Fund II, L.P. and BWPH.

    f.  Subscription Agreement, dated December 29, 2011, between GAIN CTG Holdings Inc. and BWPH.

    g.  Unit Grant Agreement, dated December 29, 2011, between Piezo Investment Holdings, LLC and BWPH, as amended on October 11, 2013.

    h.  Capital Expenditures Letter Agreement, dated December 29, 2011, between BWPH and GAIN CTG Holdings Inc.

    i.  Information Rights Letter Agreement, dated December 29, 2011, between BWPH and GAIN CTG Holdings, Inc.

    j.  Letter Agreement between BWPH and DHAN, which will be entered into the day following the Closing Date.

    k.  Unit Grant Agreement, effective as of September 13, 2012, between Piezo Investment Holdings, LLC and BWPH.

    l.  Forfeiture and Termination of Underlying Units Agreement, dated October 11, 2013 and effective as of the date set forth therein, between Piezo Investment Holdings, LLC and BWPH, relating to the repurchase of Art Campbell's mirror units in Piezo Investment Holdings, LLC.

7

m.  Forfeiture and Termination of Underlying Units Agreement, dated October 11, 2013 and effective as of the date set forth therein, between Piezo Investment Holdings, LLC and BWPH relating to the repurchase of Kevin Ruelas' mirror units in Piezo Investment Holdings, LLC.

n.  First Amended and Restated Management Agreement, dated the date hereof, between Blue Wolf Capital Partners LLC and BW Piezo Holdings, LLC.

o.  Subscription Agreement, dated the date hereof, between BWPH and GAIN CTG Holdings Inc.

p.  Subscription Agreement, dated the date hereof, between BWPH and Blue Wolf Capital Fund II, L.P.

q.  Subscription Agreement, dated the date hereof, between Fidus Investment Holdings, Inc.

r.  Joinder to the BWPH Second Amended and Restated Limited Liability Company Agreement, dated the date hereof, executed by Fidus Investment Holdings, Inc.

s.  Subscription Agreement, dated the date hereof, between Avante Mezzanine Partners SBIC, L.P.

t.  Joinder to the BWPH Second Amended and Restated Limited Liability Company Agreement, dated the date hereof, executed by Avante Mezzanine Partners SBIC, L.P.

u.  On the Closing Date and the day following the Closing Date, BWPH will enter into a unit grant agreement with Piezo Investment Holdings, LLC in connection with management equity incentive grants to be issued by Piezo Investment Holdings, LLC in the form of mirror unit grants.

#25979682_v6

## Project Seawolf

**BLUE WOLF**

### Equity Distribution

| | |
|---|---|
| Initial Investment Date | 12/29/11 |
| Transaction Date | 10/11/13 |
| **Investment Period (Days)** | **652.0** |
| Cash Contributed | $13,853,354.12 |
| Preferred Return | 8.0% |
| **Accrued Preferred Return** | **$1,979,701.23** |

### CTG Valuation at 10/11/2013

| | Cash Contributed | Series A-1 Preferred Units | Series B-1 Preferred Units | Total Preferred Units | % of Total Preferred | Accrued Preferred Return | Total Common Units | Total Common Units |
|---|---|---|---|---|---|---|---|---|
| Blue Wolf Capital Fund II, L.P. Equity | $12,129,738.46 | 12,130 | 0 | 12,130 | 87.6% | $1,733,389.47 | 12,129,738 | 85.85% |
| Gladstone Equity | $1,598,615.66 | 1,399 | 200 | 1,599 | 11.5% | $228,448.75 | 1,598,616 | 11.31% |
| Kevin Ruelas Equity | $0.00 | 0 | 0 | 0 | 0.0% | -- | 0 | 0.00% |
| Mark Share Equity | $25,000.00 | 25 | 0 | 25 | 0.2% | $3,572.60 | 25,000 | 0.18% |
| John Ladd Equity | $100,000.00 | 100 | 0 | 100 | 0.7% | $14,290.41 | 100,000 | 0.71% |
| Renaissance Strategic Partners 2011 LLC | -- | -- | -- | -- | -- | -- | 145,647 | 1.03% |
| Mark Share Equity Incentives | -- | -- | -- | -- | -- | -- | 32,547 | 0.23% |
| Gary Douville Equity Incentives | -- | -- | -- | -- | -- | -- | 32,547 | 0.23% |
| Paul Downey Equity Incentives | -- | -- | -- | -- | -- | -- | 40,683 | 0.29% |
| Adm. Jay Donnelly Equity Incentives | -- | -- | -- | -- | -- | -- | 8,137 | 0.06% |
| Adm. Jerry Ellis Equity Incentives | -- | -- | -- | -- | -- | -- | 8,137 | 0.06% |
| Adm. Nevin Carr Equity Incentives | -- | -- | -- | -- | -- | -- | 8,137 | 0.06% |
| **Total** | **$13,853,354.12** | **13,654** | **200** | **13,853** | **100%** | **$1,979,701.23** | **14,129,187** | **100%** |

**NOTES**

RSA was issued 291,293 common units, 25% vest every year beg
Mark was issued 162,733 common units, 20% vest every year beg
Douville was issued 162,734 total units, 20% vest every year beg
Downey was issued 203,417 common units, 20% vest every year
Donnelly was issued 40,683 units, 20% vest every year beginning
Ellis was issued 40,683 units, 20% vest every year beginning on
Carr was issued 40,683 units, 20% vest every year beginning on t

### CTG Valuation at 10/11/2013

| | |
|---|---|
| Negotiated TTM EBITDA at close | $5,777,000.00 |
| Multiple | 8.0x |
| **Enterprise Value** | **$46,216,000.00** |
| Less Debt | (20,259,882.6) |
| **Equity Value** | **$25,956,117.36** |
| Less Preferred Principal and Return | (15,833,055.35) |
| Total Preferred Units Outstanding | |
| **Common Units Value** | **$10,123,062.01** |
| Total Units Outstanding | 14,129,187 |
| **Value Per Common Unit** | **0.72** |
| | |
| Value Per Preferred Unit (excl common component) | $1,142.90 |
| Value of 1,000 Common Units | 716.46 |
| **Total Value/Preferred Unit** | **$1,859.37** |

### CTG Economic Ownership At 10/11/2013 - Write-up

| | Series A-1 Preferred Units | Series B-1 Preferred Units | Total Preferred Units | % of Total Preferred | Face Value + Accrued A-1 Preferred Return | Total Common Units | % of Total | Value of Common | Total Capital Account |
|---|---|---|---|---|---|---|---|---|---|
| Blue Wolf Capital Fund II, L.P. Equity | 12,130 | 0 | 12,130 | 87.6% | $13,863,127.9 | 12,129,738 | 85.8% | $8,690,527.8 | **$22,553,655.7** |
| Gladstone Equity | 1,399 | 200 | 1,599 | 11.5% | $1,827,064.4 | 1,598,616 | 11.3% | $1,145,351.5 | **$2,972,415.9** |
| Mark Share Equity | 25 | 0 | 25 | 0.2% | $28,572.6 | 25,000 | 0.2% | $17,911.6 | **$46,484.2** |
| John Ladd Equity | 100 | 0 | 100 | 0.7% | $114,290.4 | 100,000 | 0.7% | $71,646.5 | **$185,936.9** |
| Renaissance Strategic Partners 2011 LLC | -- | -- | -- | -- | -- | 145,647 | 1.0% | $104,350.6 | **$104,350.6** |
| Mark Share Equity Incentives | -- | -- | -- | -- | -- | 32,547 | 0.2% | $23,318.5 | **$23,318.5** |
| Gary Douville Equity Incentives | -- | -- | -- | -- | -- | 32,547 | 0.2% | $23,318.6 | **$23,318.6** |
| Paul Downey Equity Incentives | -- | -- | -- | -- | -- | 40,683 | 0.3% | $29,148.2 | **$29,148.2** |
| Adm. Jay Donnelly Equity Incentives | -- | -- | -- | -- | -- | 8,137 | 0.1% | $5,829.6 | **$5,829.6** |
| Adm. Jerry Ellis Equity Incentives | -- | -- | -- | -- | -- | 8,137 | 0.1% | $5,829.6 | **$5,829.6** |
| Adm. Nevin Carr Equity Incentives | -- | -- | -- | -- | -- | 8,137 | 0.1% | $5,829.6 | **$5,829.6** |
| **Total** | **13,654** | **200** | **13,853** | **100%** | **$15,833,055.3** | **14,129,187** | **100%** | **$10,123,062.0** | **$25,956,117.4** |
| *check* | | | | | | | | | *ok* |

**Pro Forma Ownership At 10/11/2013**

| | Cash Contributed + Accrued A-1 Preferred Return | Series A-2 Cash Contributed | Series A-1 Preferred Units | Series A-2 Preferred Units | Series B-1 Preferred Units | Series B-2 Preferred Units | Total Preferred Units | % of Total Preferred | Common Capital Account | Total Common Units |
|---|---|---|---|---|---|---|---|---|---|---|
| Legacy BW Capital Fund II, L.P. Equity | $13,863,127.93 | -- | 12,130 | -- | -- | -- | 12,130 | 45.956% | $8,690,527.81 | 12,129,738 |
| Legacy Gladstone | $1,827,064.41 | -- | 1,399 | -- | 200 | -- | 1,599 | 6.057% | $1,145,351.48 | 1,598,616 |
| Legacy Mark Shaw Equity | $28,572.60 | -- | 25 | -- | -- | -- | 25 | 0.095% | $17,911.61 | 25,000 |
| Legacy John Ladd Equity | $114,290.41 | -- | 100 | -- | -- | -- | 100 | 0.379% | $71,646.46 | 100,000 |
| Renaissance Strategic Partners 2011 LLC | -- | -- | -- | -- | -- | -- | 0 | 0.000% | $104,350.56 | 145,647 |
| Mark Shaw Equity Incentives | -- | -- | -- | -- | -- | -- | 0 | 0.000% | $23,318.49 | 32,547 |
| Gary Douville Equity Incentives | -- | -- | -- | -- | -- | -- | 0 | 0.000% | $23,318.63 | 32,547 |
| Paul Downey Equity Incentives | -- | -- | -- | -- | -- | -- | 0 | 0.000% | $29,148.21 | 40,683 |
| Adm. Jay Donnelly Equity Incentives | -- | -- | -- | -- | -- | -- | 0 | 0.000% | $5,829.59 | 8,137 |
| Adm. Jerry Ellis Equity Incentives | -- | -- | -- | -- | -- | -- | 0 | 0.000% | $5,829.59 | 8,137 |
| Adm. Nevin Carr Equity Incentives | -- | -- | -- | -- | -- | -- | 0 | 0.000% | $5,829.59 | 8,137 |
| New BW Equity | -- | $10,030,614.74 | -- | 5,395 | -- | -- | 5,395 | 20.439% | $0.00 | 5,394,635 |
| New Gladstone Equity | -- | $1,265,122.58 | -- | 595 | -- | 85 | 680 | 2.578% | $0.00 | 680,404 |
| Ralph Phillips Equity & Promissory Note | -- | $500,000.00 | -- | 269 | -- | -- | 269 | 1.019% | $0.00 | 268,908 |
| Ralph Phillips Equity Inventive | -- | -- | -- | -- | -- | -- | 0 | 0.000% | -- | -- |
| DHAN LLC | -- | $9,421,913.63 | -- | 5,067 | -- | -- | 5,067 | 19.199% | $0.00 | 5,067,265 |
| Avante | -- | $1,000,000.00 | -- | 538 | -- | -- | 538 | 2.038% | $0.00 | 537,817 |
| Fidus | -- | $1,000,000.00 | -- | 538 | -- | -- | 538 | 2.038% | $0.00 | 537,817 |
| Gary Douville Contribution | -- | $100,000.00 | -- | 54 | -- | -- | 54 | 0.204% | $0.00 | 53,782 |
| Brent Febo Equity Incentive | -- | -- | -- | -- | -- | -- | 0 | 0.000% | -- | -- |
| Steve Dynan Equity Incentive | -- | -- | -- | -- | -- | -- | 0 | 0.000% | -- | -- |
| Huixin (Will) Pan Equity Incentive from Buyer | -- | -- | -- | -- | -- | -- | 0 | 0.000% | -- | -- |
| Huixin (Will) Pan Equity Incentive from Seller | -- | -- | -- | -- | -- | -- | 0 | 0.000% | -- | -- |
| Jian Tian Equity Incentive from Buyer | -- | -- | -- | -- | -- | -- | 0 | 0.000% | -- | -- |
| Jian Tian Equity Incentive from Seller | -- | -- | -- | -- | -- | -- | 0 | 0.000% | -- | -- |
| Reserve | -- | -- | -- | -- | -- | -- | 0 | 0.000% | -- | -- |
| **Total** | **$15,833,055.35** | **$23,317,650.94** | **13,654** | **12,456** | **200** | **85** | **26,394** | **100.0%** | **$10,123,062.01** | **26,669,815** |
| Check | | | | | | ok | | | | ok |

**Pro Forma Ownership At 10/11/2013 (1)**

| | Cash Contributed + Accrued A-1 Preferred Return | Series A-2 Cash Contributed | Series A-1 Preferred Units | Series A-2 Preferred Units | Series B-1 Preferred Units | Series B-2 Preferred Units | Total Preferred Units | % of Total Preferred | Common Capital Account | Total Common Units |
|---|---|---|---|---|---|---|---|---|---|---|
| Legacy BW Capital Fund II, L.P. Equity | $13,863,127.93 | -- | 12,130 | -- | -- | -- | 12,130 | 45.96% | $8,690,527.81 | 12,129,738 |
| Legacy Gladstone | $1,827,064.41 | -- | 1,599 | -- | 200 | -- | 1,599 | 6.06% | $1,145,351.48 | 1,598,616 |
| Legacy Mark Shaw Equity | $28,572.60 | -- | 25 | -- | -- | -- | 25 | 0.09% | $17,911.61 | 25,000 |
| Legacy John Ladd Equity | $114,290.41 | -- | 100 | -- | -- | -- | 100 | 0.38% | $71,646.46 | 100,000 |
| Renaissance Strategic Partners 2011 LLC | -- | -- | -- | -- | -- | -- | 0 | 0.00% | $104,350.56 | 145,647 |
| Mark Shaw Equity Incentives | -- | -- | -- | -- | -- | -- | 0 | 0.00% | $23,318.49 | 32,547 |
| Gary Douville Equity Incentives | -- | -- | -- | -- | -- | -- | 0 | 0.00% | $23,318.63 | 32,547 |
| Paul Downey Equity Incentives | -- | -- | -- | -- | -- | -- | 0 | 0.00% | $29,148.21 | 40,683 |
| Adm. Jay Donnelly Equity Incentives | -- | -- | -- | -- | -- | -- | 0 | 0.00% | $5,829.59 | 8,137 |
| Adm. Jerry Ellis Equity Incentives | -- | -- | -- | -- | -- | -- | 0 | 0.00% | $5,829.59 | 8,137 |
| Adm. Nevin Carr Equity Incentives | -- | -- | -- | -- | -- | -- | 0 | 0.00% | $5,829.59 | 8,137 |
| New BW Equity | -- | $10,030,614.74 | -- | 5,395 | -- | -- | 5,395 | 20.44% | $0.00 | 5,394,635 |
| New Gladstone Equity | -- | $1,265,122.58 | -- | 595 | -- | 85 | 680 | 2.58% | $0.00 | 680,404 |
| Ralph Phillips Equity & Promissory Note | -- | $500,000.00 | -- | 269 | -- | -- | 269 | 1.02% | $0.00 | 268,908 |
| Ralph Phillips Equity Inventive | -- | -- | -- | -- | -- | -- | 0 | 0.00% | -- | -- |
| DHAN LLC | -- | $9,421,913.63 | -- | 5,067 | -- | -- | 5,067 | 19.20% | $0.00 | 4,878,384 |
| Avante | -- | $1,000,000.00 | -- | 538 | -- | -- | 538 | 2.04% | $0.00 | 537,817 |
| Fides | -- | $1,000,000.00 | -- | 538 | -- | -- | 538 | 2.04% | $0.00 | 537,817 |
| Gary Douville Contribution | -- | $100,000.00 | -- | 54 | -- | -- | 54 | 0.20% | $0.00 | 53,782 |
| Brent Febo Equity Incentive | -- | -- | -- | -- | -- | -- | 0 | 0.00% | -- | -- |
| Steve Dynan Equity Incentive | -- | -- | -- | -- | -- | -- | 0 | 0.00% | -- | -- |
| Huixin (Will) Pan Equity Incentive from Buyer | -- | -- | -- | -- | -- | -- | 0 | 0.00% | -- | -- |
| Huixin (Will) Pan Equity Incentive from Seller | -- | -- | -- | -- | -- | -- | 0 | 0.00% | -- | 75,553 |
| Jian Tian Equity Incentive from Buyer | -- | -- | -- | -- | -- | -- | 0 | 0.00% | -- | -- |
| Jian Tian Equity Incentive from Seller | -- | -- | -- | -- | -- | -- | 0 | 0.00% | -- | 113,329 |
| Reserve | -- | -- | -- | -- | -- | -- | 0 | 0.00% | -- | -- |
| **Total** | **$15,833,055.35** | **$23,317,650.94** | **13,654** | **12,456** | **200** | **85** | **26,394** | **100%** | **$10,123,062.01** | **26,669,815** |

*(1) Total common units include equity grants to Will Pan and Jian Tian (effectively contributed) by DHAN LLC. The additional 50% of each
grant is not reflected in this table. Additional equity grants, including those to Steve Dynan, are not reflected in this table. Following those
grants, Steve Dynan's common percentage will be approximately 1.5%, Will Pan's common percentage will be approximately .50% and Jian
Tian's equity percentage will be approximately .75%.*

# EXHIBIT 6

**Execution Copy**

INVESTMENT AGREEMENT

among

BW PIEZO HOLDINGS, LLC, CTG ADVANCED MATERIALS, LLC, CHANNEL
TECHNOLOGIES GROUP, LLC, and ELECTRO-OPTICAL INDUSTRIES, LLC

as Borrowers,

AVANTE MEZZANINE PARTNERS SBIC, LP., as a Lender

and

FIDUS MEZZANINE CAPITAL II, L.P.

as a Lender and Collateral Agent

$14,000,000 Senior Secured Subordinated Term Loans

Dated as of October 11, 2013

THIS INSTRUMENT OR AGREEMENT AND THE RIGHTS AND OBLIGATIONS
EVIDENCED HEREBY ARE SUBORDINATE IN THE MANNER AND TO THE EXTENT SET
FORTH IN THAT CERTAIN INTERCREDITOR AGREEMENT (AS THE SAME MAY BE
AMENDED OR OTHERWISE MODIFIED FROM TIME TO TIME PURSUANT TO THE TERMS
THEREOF, THE "**INTERCREDITOR AGREEMENT**") DATED AS OF OCTOBER 11 2013
AMONG (1) FIDUS MEZZANINE CAPITAL II, L.P. AND AVANTE MEZZANINE PARTNERS
SBIC, L.P. (EACH, A "**SUBORDINATED CREDITOR**" AND COLLECTIVELY, THE
"**SUBORDINATED CREDITORS**"), (2) BW PIEZO HOLDINGS, LLC, CHANNEL
TECHNOLOGIES GROUP, LLC, ELECTRO-OPTICAL INDUSTRIES, LLC, AND SUCH
ADDITIONAL PARTIES AS MAY BECOME BORROWERS UNDER THE CREDIT AGREEMENT
REFERRED TO THEREIN (THE "**BORROWERS**"), AND (3) ONEWEST BANK, FSB, AS
ADMINISTRATIVE AGENT (THE "**SENIOR AGENT**"), TO THE INDEBTEDNESS OWED BY
THE BORROWERS PURSUANT TO THAT CERTAIN CREDIT AGREEMENT DATED AS OF
OCTOBER 11, 2013 AMONG THE BORROWERS, THE LENDERS REFERRED TO THEREIN AND
SENIOR AGENT, AS SUCH CREDIT AGREEMENT MAY BE AMENDED, RESTATED,
SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME AS PERMITTED UNDER
THE INTERCREDITOR AGREEMENT AND TO INDEBTEDNESS REFINANCING THE
INDEBTEDNESS UNDER THE CREDIT AGREEMENT AS PERMITTED BY THE
INTERCREDITOR AGREEMENT; AND EACH HOLDER OF THIS INSTRUMENT OR
AGREEMENT, BY ITS ACCEPTANCE HEREOF, IRREVOCABLY AGREES TO BE BOUND BY
THE PROVISIONS OF THE INTERCREDITOR AGREEMENT

# TABLE OF CONTENTS

**Page**

## ARTICLE I

### DEFINITIONS

| | | |
|---|---|---|
| 1.1 | Defined Terms | 1 |
| 1.2 | Accounting Terms | 18 |
| 1.3 | Other Terms; Construction | 18 |

## ARTICLE II

### AMOUNT AND TERMS OF THE LOANS

| | | |
|---|---|---|
| 2.1 | Loans | 19 |
| 2.2 | Disbursement; Domicile of Loans | 20 |
| 2.3 | Evidence of Debt; Notes | 20 |
| 2.4 | Mandatory Payments and Prepayments | 20 |
| 2.5 | Voluntary Prepayments | 22 |
| 2.6 | Interest | 22 |
| 2.7 | Fees | 23 |
| 2.8 | Method of Payments; Computations; Apportionment of Payments | 23 |
| 2.9 | Recovery of Payments | 24 |
| 2.10 | Use of Proceeds | 25 |
| 2.11 | Pro Rata Treatment | 25 |
| 2.12 | Change in Law; Illegality | 25 |
| 2.13 | Taxes | 26 |
| 2.14 | Mitigation of Costs | 28 |

## ARTICLE III

### CONDITIONS PRECEDENT

| | | |
|---|---|---|
| 3.1 | Conditions of Closing | 28 |

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES

| | | |
|---|---|---|
| 4.1 | Corporate Organization and Power | 32 |
| 4.2 | Authorization; Enforceability | 33 |
| 4.3 | No Violation | 33 |
| 4.4 | Governmental and Third-Party Authorization; Permits | 33 |
| 4.5 | Litigation | 33 |
| 4.6 | Taxes | 34 |
| 4.7 | Subsidiaries; Capitalization | 34 |
| 4.8 | Full Disclosure | 34 |
| 4.9 | Margin Regulations | 34 |
| 4.10 | No Material Adverse Effect | 35 |

-i-

# TABLE OF CONTENTS
### (continued)

**Page**

| | | |
|---|---|---|
| 4.11 | Financial Matters | 35 |
| 4.12 | Ownership of Properties; Leases | 36 |
| 4.13 | ERISA | 36 |
| 4.14 | Environmental Matters | 36 |
| 4.15 | Compliance with Laws | 37 |
| 4.16 | Intellectual Property | 37 |
| 4.17 | Regulated Industries | 37 |
| 4.18 | Insurance | 37 |
| 4.19 | Material Contracts | 38 |
| 4.20 | Security Documents | 38 |
| 4.21 | Labor Relations | 38 |
| 4.22 | Certain Transaction Documents | 39 |
| 4.23 | No Burdensome Restrictions | 39 |
| 4.24 | OFAC; Anti-Terrorism Laws | 39 |
| 4.25 | SBA Matters | 39 |

## ARTICLE V

## AFFIRMATIVE COVENANTS

| | | |
|---|---|---|
| 5.1 | Financial Statements | 40 |
| 5.2 | Other Business and Financial Information | 41 |
| 5.3 | Existence; Franchises; Maintenance of Properties | 43 |
| 5.4 | Compliance with Laws | 43 |
| 5.5 | Payment of Obligations | 43 |
| 5.6 | Insurance | 43 |
| 5.7 | Maintenance of Books and Records; Inspection | 43 |
| 5.8 | Creation or Acquisition of Subsidiaries | 44 |
| 5.9 | Additional Security | 45 |
| 5.10 | Environmental Laws | 46 |
| 5.11 | Board Observation Rights | 46 |
| 5.12 | OFAC, PATRIOT Act Compliance | 47 |
| 5.13 | Further Assurances | 47 |
| 5.14 | SBA Matters | 47 |
| 5.15 | Landlord Agreements | 48 |
| 5.16 | Bank Accounts | 48 |
| 5.17 | Equity Certificates | 49 |

## ARTICLE VI

## FINANCIAL COVENANTS

| | | |
|---|---|---|
| 6.1 | Leverage Ratio | 49 |
| 6.2 | Fixed Charge Coverage Ratio | 50 |
| 6.3 | Capital Expenditures | 50 |

3203309v7 18865.00070

**TABLE OF CONTENTS**

(continued)

Page

## ARTICLE VII

## NEGATIVE COVENANTS

| | | |
|---|---|---|
| 7.1 | Merger; Consolidation | 50 |
| 7.2 | Indebtedness | 51 |
| 7.3 | Liens | 52 |
| 7.4 | Asset Dispositions | 54 |
| 7.5 | Investments | 54 |
| 7.6 | Restricted Payments | 55 |
| 7.7 | Transactions with Affiliates | 56 |
| 7.8 | Transactions with Affiliates | 56 |
| 7.9 | Management Fees | 57 |
| 7.10 | Indemnity Agreements | 57 |
| 7.11 | Lines of Business; Activities of Parent | 57 |
| 7.12 | Sale-Leaseback Transactions | 57 |
| 7.13 | Certain Amendments | 58 |
| 7.14 | Limitation on Certain Restrictions | 58 |
| 7.15 | No Other Negative Pledges | 59 |
| 7.16 | Ownership of Subsidiaries | 59 |
| 7.17 | Fiscal Year | 59 |
| 7.18 | Accounting Changes | 59 |
| 7.19 | No Article 8 Opt-In | 59 |
| 7.20 | HCM Call | 59 |

## ARTICLE VIII

## EVENTS OF DEFAULT

| | | |
|---|---|---|
| 8.1 | Events of Default | 59 |
| 8.2 | Cure Right | 62 |
| 8.3 | Remedies: Acceleration, etc. | 63 |
| 8.4 | Remedies: Set-Off | 63 |

## ARTICLE IX

## THE COLLATERAL AGENT

| | | |
|---|---|---|
| 9.1 | Appointment and Authority | 63 |
| 9.2 | Rights as a Lender | 64 |
| 9.3 | Exculpatory Provisions | 64 |
| 9.4 | Reliance by Collateral Agent | 65 |
| 9.5 | Delegation of Duties | 65 |
| 9.6 | Resignation of Collateral Agent | 65 |
| 9.7 | Non-Reliance on Collateral Agent and Other Lenders | 65 |
| 9.8 | Collateral Matters | 66 |

-iii-

## TABLE OF CONTENTS

(continued)

Page

## ARTICLE X

## MISCELLANEOUS

10.1    Expenses; Indemnity; Damage Waiver .................................................................... 66
10.2    Governing Law; Submission to Jurisdiction; Waiver of Venue; Service of Process ................... 67
10.3    Waiver of Jury Trial ....................................................................................... 68
10.4    Notices; Effectiveness; Electronic Communication ....................................................... 68
10.5    Amendments, Waivers, etc .................................................................................. 69
10.6    Successors and Assigns ..................................................................................... 70
10.7    No Waiver .................................................................................................. 72
10.8    Survival ................................................................................................... 72
10.9    Severability ............................................................................................... 72
10.10   Construction ............................................................................................... 72
10.11   Counterparts; Integration; Effectiveness ................................................................. 73
10.12   Confidentiality ............................................................................................ 73
10.13   USA Patriot Act Notice .................................................................................... 74
10.14   Joint and Several Liability of Borrowers .................................................................. 74
10.15   Intercreditor Agreement ................................................................................... 75
10.16   Classified Information ..................................................................................... 75

## EXHIBITS

Exhibit A        Form of Note
Exhibit B        Form of Compliance Certificate
Exhibit C        Form of Assignment and Assumption
Exhibit D        Form of Security Agreement
Exhibit E        Form of Financial Condition Certificate
Exhibit F        Management's Discussion and Analysis Report

## SCHEDULES

Schedule 1.1(a)      Commitments and Notice Addresses
Schedule 1.1(b)      Consolidated EBITDA; Capital Expenditures
Schedule 3.1(k)      Certain Continuing Indebtedness
Schedule 4.1         Jurisdictions of Organization
Schedule 4.4         Consents and Approvals
Schedule 4.7         Subsidiaries
Schedule 4.12        Real Property Interests
Schedule 4.13(a)     ERISA
Schedule 4.13(b)     ERISA
Schedule 4.14(a)     Environmental Matters
Schedule 4.14(b)     Environmental Matters
Schedule 4.14(c)     Environmental Matters
Schedule 4.15        Compliance with Laws
Schedule 4.16        Intellectual Property

# TABLE OF CONTENTS

(continued)

**Page**

| Schedule 4.18 | Insurance Coverage |
| Schedule 4.19 | Material Contracts |
| Schedule 7.2 | Indebtedness |
| Schedule 7.5 | Investments |
| Schedule 7.7 | Transactions with Affiliates |

3203309v7 18865.00070

## INVESTMENT AGREEMENT

**THIS INVESTMENT AGREEMENT**, dated as of the 11th day of October, 2013, is made among **BW PIEZO HOLDINGS, LLC**, a Delaware limited liability company ("BWP" or the "Parent"), **CTG ADVANCED MATERIALS, LLC**, a Delaware limited liability company and wholly owned subsidiary of BWP ("CTG"), **CHANNEL TECHNOLOGIES GROUP, LLC**, a California limited liability company and wholly owned subsidiary of BWP ("Channel"), and **ELECTRO-OPTICAL INDUSTRIES, LLC**, a California limited liability company and wholly owned subsidiary of Channel ("Electro" and, together with BWP, CTG, and Channel, each, a "Borrower" and, collectively, the "Borrowers"), **AVANTE MEZZANINE PARTNERS SBIC, L.P.**, a Delaware limited partnership, as a Lender (as hereinafter defined), the other Lenders from time to time party hereto, and **FIDUS MEZZANINE CAPITAL II, L.P.**, a Delaware limited partnership, as a Lender and the Collateral Agent (as hereinafter defined).

### BACKGROUND STATEMENT

The Borrowers have requested that the Lenders make available to the Borrowers term loans in the aggregate original principal amount of $14,000,000. The Borrowers will use the proceeds of such loans as provided in **Section 2.10**. The Lenders are willing to make available to the Borrowers the term loans described herein subject to and on the terms and conditions set forth in this Agreement.

### AGREEMENT

**NOW, THEREFORE**, in consideration of the mutual provisions, covenants and agreements herein contained, the parties hereto hereby agree as follows:

### ARTICLE I

### DEFINITIONS

1.1    Defined Terms.  For purposes of this Agreement, in addition to the terms defined elsewhere herein, the following terms have the meanings set forth below (such meanings to be equally applicable to the singular and plural forms thereof):

"Acquisition" means any transaction or series of related transactions, consummated on or after the date hereof, by which the Parent or any of its Subsidiaries, (i) acquires all or substantially all of the assets of any Person or any going business, division thereof or line of business, whether through purchase of assets, merger or otherwise, or (ii) acquires Capital Stock of any Person having at least a majority of combined voting power of the then outstanding Capital Stock of such Person.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, (i) Controls or is Controlled by or is under common Control with the Person specified, (ii) beneficially owns, is owned by or is under common ownership with respect to securities or other ownership interests of such Person having 10% or more of the combined voting power of the then outstanding securities or other ownership interests of such Person ordinarily (and apart from rights accruing under special circumstances) having the right to vote in the election of directors or other governing body of such Person, or (iii) any Person who is a director, officer, shareholder, member or partner of such Person or any Person described in clause (i) or (ii).  Notwithstanding the foregoing, neither the Collateral Agent nor any Lender shall be deemed an "Affiliate" of any Credit Party.

"Agreement" means this Investment Agreement, as amended, modified, restated or supplemented from time to time.

"Approved Fund" means any Person (other than a natural person) that invests in commercial loans in the ordinary course of business and that is advised or managed by (i) a Lender, (ii) an Affiliate of a Lender, or (iii) a Person (or an Affiliate of a Person) that advises or manages a Lender.

"Asset Disposition" means the sale, transfer, conveyance, exchange, lease or disposal of any properties, business or assets of any Borrower or any Subsidiary, other than (a) the sale of inventory in the ordinary course of business, (b) sales or other dispositions of equipment that is substantially worn, damaged or obsolete in the ordinary course of business, (c) the use or transfer of money or cash equivalents in a manner not prohibited by the terms of this Agreement or the other Loan Documents, (d) the contribution of the DHAN Assets by the Parent to CTG Advanced, which shall occur within five (5) Business Days following the Closing Date, (e) other disposition of assets by and among the Borrowers (other than the Parent), (f) the sale, discount or write-off of past due or impaired accounts receivable for collection purposes (but not for factoring, securitization or other financing purposes), and the termination and unwinding of Hedge Agreements permitted hereunder, and (g) the sale or other disposition of assets pursuant to any Casualty Event, provided any Net Cash Proceeds therefrom are reinvested or, if required, applied to the prepayment of the Loans as provided herein.

"Assignment and Assumption" means an Assignment and Assumption entered into by a Lender and an assignee (with the consent of any Person whose consent is required by **Section 10.6(b)**), in substantially the form of **Exhibit C** or any other form approved by the Required Lenders.

"Authorized Officer" means, with respect to any action specified herein to be taken by or on behalf of a Credit Party, any officer of such Credit Party duly authorized by its governing documents or by resolution of its board of directors or other governing body to take such action on its behalf, and whose signature and incumbency shall have been certified to the Lenders by the secretary or an assistant secretary of such Credit Party.

"Avante" means Avante Mezzanine Partners SBIC, L.P., a Delaware limited partnership, and its successors and assigns.

"Bankruptcy Code" means 11 U.S.C. §§ 101 et seq., as amended from time to time, and any successor statute, and all regulations from time to time promulgated thereunder.

"Bankruptcy Event" means the occurrence of an Event of Default pursuant to **Section 8.1(f)** or **Section 8.1(g)**.

"Borrower" has the meaning given to such term in the introductory paragraph hereof.

"Business Day" means any day other than a Saturday or Sunday, a legal holiday or a day on which commercial banks in New York, New York are authorized or required by law to be closed.

"BWCP" means Blue Wolf Capital Partners LLC, a Delaware limited liability company.

"Capital Expenditures" means for any period, collectively, for any Person, the aggregate of all expenditures (including, for avoidance of doubt, related capitalized labor costs) which are made during such period (whether paid in cash or accrued as liabilities) by such Person for property, plant or equipment and which would be reflected as additions to property, plant or equipment on a balance sheet of such Person prepared in accordance with GAAP, including all Capital Lease Obligations; provided that

"Capital Expenditures" shall not include Permitted Acquisitions; provided, further, that notwithstanding the foregoing provisions of this definition, solely for purposes of **Section 6.3**, the amount of Capital Expenditures for periods prior to the Closing Date shall be as set forth on **Schedule 1.1(b)**.

"Capital Lease" means, with respect to any Person, any lease of property (whether real, personal or mixed) by such Person as lessee that is or is required to be, in accordance with GAAP, recorded as a capital lease on such Person's balance sheet.

"Capital Lease Obligations" obligations for the payment of rent for any real or personal property under leases or agreements to lease that, in accordance with GAAP, have been or should be capitalized on the books of the lessee and, for purposes hereof, the amount of any such obligation shall be the capitalized amount thereof determined in accordance with GAAP.

"Capital Stock" means (i) with respect to any Person that is a corporation, any and all shares, interests or equivalents in capital stock (whether voting or nonvoting, and whether common or preferred) of such corporation, and (ii) with respect to any Person that is not a corporation, any and all partnership, membership, limited liability company or other equity interests of such Person; and in each case, any and all rights, warrants or options to purchase or acquire any of the foregoing and any other security or instrument representing, convertible into or exchangeable for any of the foregoing.

"Cash Balance" means the aggregate amount of all unrestricted cash and Cash Equivalents held by the Borrowers and their Wholly Owned Subsidiaries in any bank account or securities account that is subject to a control agreement in favor of, and that is reasonably acceptable to, the Collateral Agent, for the benefit of the Lenders.

"Cash Equivalents" means (i) securities issued or unconditionally guaranteed or insured by the United States of America or any agency or instrumentality thereof, backed by the full faith and credit of the United States of America and maturing within one year from the date of acquisition, (ii) commercial paper issued by any Person organized under the laws of the United States of America, maturing within 180 days from the date of acquisition and, at the time of acquisition, having a rating of at least A-1 or the equivalent thereof by Standard & Poor's Ratings Services or at least P-1 or the equivalent thereof by Moody's Investors Service, Inc., (iii) time deposits and certificates of deposit maturing within 180 days from the date of issuance and issued by a bank or trust company organized under the laws of the United States of America or any state thereof (y) that has combined capital and surplus of at least $500,000,000 or (z) that has (or is a subsidiary of a bank holding company that has) a long-term unsecured debt rating of at least A or the equivalent thereof by Standard & Poor's Ratings Services or at least A2 or the equivalent thereof by Moody's Investors Service, Inc., (iv) repurchase obligations with a term not exceeding 30 days with respect to underlying securities of the types described in clause (i) above entered into with any bank or trust company meeting the qualifications specified in clause (iii) above, and (v) money market funds at least 95% of the assets of which are continuously invested in securities of the foregoing types.

"Casualty Event" means, with respect to any property (including any interest in property) of any Credit Party, any loss of, damage to, or condemnation or other taking of, such property for which such Credit Party receives insurance proceeds, proceeds of a condemnation award or other compensation.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (i) the adoption or taking effect of any law, rule, regulation or treaty, (ii) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation, or application thereof by any Governmental Authority or (iii) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding

anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"Change of Control" means any event, transaction or occurrence as a result of which (a) Sponsor shall cease to own or control, directly or indirectly, more than 50% of the outstanding equity interests of Parent on a fully diluted basis; (b) the Parent shall cease to directly own 100% of the outstanding equity interests of CTG, Channel and Electro on a fully-diluted basis; (c) Sponsor shall cease to have the right to appoint to the board of directors or similar governing body of the Parent at least a majority of the total members of such board or body; (d) an underwritten public offering of the equity or debt securities of the Parent shall become effective; or (e) the Parent or any of its Subsidiaries shall have effected a sale of all or substantially all of their assets.

"Closing Date" means the date upon which the initial extensions of credit are made pursuant to this Agreement, which shall be the date upon which each of the conditions set forth in **Section 3.1** shall have been satisfied or waived in accordance with the terms of this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and any successor statute, and all rules and regulations from time to time promulgated thereunder.

"Collateral" means all the assets, property and interests in property that shall from time to time be pledged or be purported to be pledged as direct or indirect security for the Obligations pursuant to any one or more of the Security Documents.

"Collateral Agent" means Fidus, in its capacity as Collateral Agent appointed under **Section 9.1** and any other Security Documents, and its successors and permitted assigns in such capacity.

"Commitment" means, with respect to any Lender, the commitment of such Lender to make Loans on the Closing Date in an aggregate principal amount up to the amount set forth opposite such Lender's name on **Schedule 1.1(a)**.

"Confidential Information" means all information, in each case, received from any Borrower, or any of their Affiliates and their employees, officers, directors or advisors relating to an Acquisition, Sponsor, any Borrower or their operations, other than any such information that becomes generally available to the public or becomes available to any Lender, any Affiliate or Approved Fund of any Lender or Collateral Agent from a source other than Sponsor, any Borrower or any of their Affiliates and their employees, officers, directors or advisors and that is not known to such recipient to be subject to confidentiality obligations.

"Compliance Certificate" means a fully completed and duly executed certificate in the form of **Exhibit B**, together with a Covenant Compliance Worksheet.

"Consolidated EBITDA" means, with respect to the Borrowers, on a consolidated basis, for any Reference Period, Consolidated Net Income for such period, plus (a) to the extent deducted in determining Consolidated Net Income, the sum for such period of (i) Net Interest Expense, plus (ii) all amounts treated as expenses for depreciation and amortization (including amortization of intangibles of any kind), plus (iii) the aggregate amount of Permitted Tax Distributions made; plus (b) to the extent included in determining Consolidated Net Income, the sum for such period of any extraordinary, unusual

or non-recurring non-cash expenses or losses, less non-cash gains, in each case acceptable to the Required Lenders (such acceptance not to be unreasonably withheld, delayed or conditioned); <u>plus</u> (c) Management Fees for such period to the extent paid; <u>plus</u> (d) reasonable expenses of members of the board of directors or any similar governing body of any Borrower, observers of any such board or body and any board of advisors (collectively, "<u>Board Fees</u>"), in each case reimbursed by the Borrowers during such period and not included under clause (c) above, in amounts not to exceed $225,000 in the aggregate in any consecutive 12-month period, <u>plus</u> (e) integration expenses incurred during such period and on or before December 31, 2014 in connection with the HCM Acquisition, including (i) any duplicative costs relating to consolidation of operations, and (ii) to the extent not included in clause (i), any one-time, non-capitalized costs for technology transfer and security, duplication of crystal growing stations, and non-recurring employee retention payments ("<u>Integration Costs</u>"), not to exceed an aggregate amount of $2,000,0000 , <u>plus</u> (f) Transaction Costs not to exceed an aggregate amount of $6,000,000.  Consolidated EBITDA for periods prior to the Closing Date is set forth on <u>Schedule 1.1(b)</u> attached hereto.

"<u>Consolidated Fixed Charges</u>" for the Borrowers and their Subsidiaries and their Subsidiaries on a consolidated basis, for any Reference Period, without duplication, the sum of (a) Gross Interest Expense for such period paid or required to be paid in cash and (b) the aggregate amount of scheduled principal payments on Indebtedness for such period.

"<u>Consolidated Net Income</u>" means, with respect to the Borrowers and their Subsidiaries, on a consolidated basis for any Reference Period, the aggregate of all amounts which, in accordance with GAAP, would be included as net income (or net loss, including any extraordinary losses) on a consolidated statement of income for such period.

"<u>Contingent Purchase Price Obligations</u>" means any earnout obligations or similar deferred or contingent purchase price obligations (including all purchase price adjustments) and any indemnity obligations of the Parent or any of its Subsidiaries incurred or created in connection with an Acquisition, including the HCM Acquisition.

"<u>Control</u>" means, with respect to any Person, the possession, direct or indirect, of the power to direct or cause the ultimate direction of the management and policies of such Person (but not including day-to-day operational management), whether through the ownership of voting securities, by contract or otherwise; and the terms "Controlled" and "Controlling" have correlative meanings.

"<u>Controlled Investment Affiliate</u>" means, with respect to any Person, any other Person (including any fund or investment vehicle) that (i) directly, or indirectly through one or more intermediaries, is Controlled by the Person specified and (ii) is organized by such specified Person primarily for the purpose of making equity or debt investments in one or more companies.

"<u>Covenant Compliance Worksheet</u>" means a fully completed worksheet in the form of **Attachment A** to **Exhibit B**.

"<u>CTG</u>" has the meaning given to such term in the introductory paragraph hereof.

"<u>Credit Parties</u>" means the Parent, each other Borrower, the Subsidiaries of the Parent and each other Borrower, and their respective successors.

"<u>Cure Right</u>" has the meaning given to such term in **Section 8.2**.

"<u>Debt Issuance</u>" means the incurrence, sale or issuance by any Borrower or any Subsidiary of any debt securities or other Indebtedness, except for any Indebtedness permitted under **Section 7.2**.

"Default" means any event or condition that, with the passage of time or giving of notice, or both, would constitute an Event of Default.

"DHAN" means DHAN LLC, an Illinois limited liability company.

"Disqualified Capital Stock" means, with respect to any Person, any Capital Stock of such Person that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event or otherwise, (i) matures or is mandatorily redeemable or subject to any mandatory repurchase requirement, pursuant to a sinking fund obligation or otherwise, (ii) is redeemable or subject to any mandatory repurchase requirement at the sole option of the holder thereof, or (iii) is convertible into or exchangeable for (whether at the option of the issuer or the holder thereof) (y) debt securities or (z) any Capital Stock referred to in (i) or (ii) above, in each case under (i), (ii) or (iii) above at any time on or prior to the first anniversary of the Maturity Date; provided, however, that only the portion of Capital Stock that so matures or is mandatorily redeemable or subject to any mandatory repurchase requirement, is so redeemable at the option of the holder thereof, or is so convertible or exchangeable on or prior to such date shall be deemed to be Disqualified Capital Stock.

"Dollars" or "$" means dollars of the United States of America.

"Domestic Subsidiary" means any Subsidiary that is not a Foreign Subsidiary.

"Environmental Laws" means  all federal, state and local laws, rules and regulations governing (a) environmental matters, (b) the generation, use, control, removal, storage, transportation, spill, release or discharge of hazardous materials or (c) the effect of the environment on occupational safety and health, industrial hygiene, land use or the protection of human, plant or animal health or welfare, including without limitation as provided in the provisions of and the regulations under (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendment and Reauthorization Act of 1986, (ii) the Solid Waste Disposal Act, (iii) the Clean Water Act and the Clean Air Act, (iv) the Hazardous Materials Transportation Act, (v) the Resource Conservation and Recovery Act of 1976 and (vi) the Federal Water Pollution Control Act Amendments of 1972.

"Equity Capitalization" means the contribution to the capital of the Parent by the Sponsor, its Controlled Investment Affiliates and certain other co-investors (including, but not limited to, Avante and Fidus and/or one or more Affiliates of Avante or Fidus) pursuant to the issuance and sale of the Parent's Capital Stock for cash to such investors under the Equity Investment Documents to finance a portion of the HCM Acquisition.

Equity Investment Documents" means the LLC Agreement and the subscription agreements, each dated on or about the date hereof, and all instruments, documents and certificates now or hereafter executed and delivered in connection therewith, in each case as amended, modified, supplemented or restated from time to time in accordance with the terms hereof and thereof.

"Equity Issuance" means  the sale or issuance (or reissuance) by any Borrower or any Subsidiary of any Capital Stock, provided, however, that the term Equity Issuance shall not include the (i) issuance or sale of the Capital Stock of the Parent issued in connection with the Equity Capitalization, (ii) issuance or sale of the Capital Stock of the Parent contemplated by **Section 7.7(vii)**, (iii) the issuance or sale of Capital Stock of the Parent the proceeds of which are used in connection with the Cure Right, (iv) the issuance or sale of Capital Stock of the Parent the proceeds of which are used to make (in whole or in part), or such Capital Stock is used in connection with, a Permitted Acquisition or Capital Expenditures permitted by this Agreement, or (v) the issuance, sale or other disposition of Capital Stock of the Parent the proceeds of which are used for other business uses of the Borrowers and their Subsidiaries reasonably

acceptable to the Required Lenders (and for purposes of this clause (v), subject to the other provisions of this Agreement).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor statute, and all rules and regulations from time to time promulgated thereunder.

"ERISA Affiliate" means any Person (including any trade or business, whether or not incorporated) deemed to be under "common control" with, or a member of the same "controlled group" as, the Parent or any of its Subsidiaries, within the meaning of Sections 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"ERISA Event" means any of the following with respect to a Plan or Multiemployer Plan, as applicable:  (i) a Reportable Event, (ii) a complete or partial withdrawal by any Borrower or any ERISA Affiliate from a Multiemployer Plan that results in liability under Section 4201 or 4204 of ERISA, or the receipt by any Borrower or any ERISA Affiliate of notice from a Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA or that it intends to terminate or has terminated under Section 4041A of ERISA, (iii) the distribution by any Borrower or any ERISA Affiliate under Section 4041 or 4041A of ERISA of a notice of intent to terminate any Plan or the taking of any action to terminate any Plan, (iv) the commencement of proceedings by the PBGC under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan, or the receipt by any Borrower or any ERISA Affiliate of a notice from any Multiemployer Plan that such action has been taken by the PBGC with respect to such Multiemployer Plan, (v) the institution of a proceeding by any fiduciary of any Multiemployer Plan against any Borrower or any ERISA Affiliate to enforce Section 515 of ERISA, which is not dismissed within 30 days, (vi) the imposition upon any Borrower or any ERISA Affiliate of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, or the imposition or threatened imposition of any Lien upon any assets of any Borrower or any ERISA Affiliate as a result of any alleged failure to comply with the Code or ERISA in respect of any Plan, (vii) the engaging in or otherwise becoming liable for a nonexempt Prohibited Transaction by any Borrower or any ERISA Affiliate, or a violation of the applicable requirements of Section 404 or 405 of ERISA or the exclusive benefit rule under Section 401(a) of the Code by any fiduciary of any Plan for which any Borrower or any of its ERISA Affiliates may be directly or indirectly liable, (viii) the failure of any Plan to satisfy the minimum funding standard of Section 302 of ERISA and Section 412 of the Code, whether or not waived, (ix) with respect to plan years beginning prior to January 1, 2008, the adoption of an amendment to any Plan that, pursuant to Section 307 of ERISA, would require the provision of security to such Plan by any Borrower or an ERISA Affiliate, or (x) with respect to plan years beginning on or after the PPA 2006 Effective Date, the incurrence of an obligation to provide a notice under Section 101(j) of ERISA, the adoption of an amendment which may not take effect due to the application of Section 436(c)(1) of the Code or Section 206(g)(2)(A) of ERISA, or the payment of a contribution in order to satisfy the requirements of Section 436(c)(2) of the Code or Section 206(g)(2)(B) of ERISA.

"Event of Default" has the meaning given to such term in **Section 8.1**.

"Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute, and all rules and regulations from time to time promulgated thereunder.

"Excluded Taxes" means, with respect to the Collateral Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Borrower hereunder, (i) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes) including backup withholding required by Section 3406 of the Code, by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized

or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, (ii) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which the Borrowers are located and (iii) in the case of a Foreign Lender, any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new Lending Office).

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System or any successor thereto.

"Fee Letters" means (i) the letter from Avante to the Borrowers, dated as of the date hereof, relating to certain fees payable by the Borrowers to Avante in respect of the transactions contemplated by this Agreement, as amended, modified, restated or supplemented from time to time, and (ii) the letter from Fidus to the Borrowers, dated as of the date hereof, relating to certain fees payable by the Borrowers to Fidus in respect of the transactions contemplated by this Agreement, as amended, modified, restated or supplemented from time to time.

"Fidus" means Fidus Mezzanine Capital II, L.P., a Delaware limited partnership, and its successors and assigns.

"Financial Condition Certificate" means a fully completed and duly executed certificate, in substantially the form of **Exhibit E**, together with the attachments thereto.

"Financial Officer" means, with respect to each Borrower, the chief financial officer, president, chairman, vice president - finance, principal accounting officer or treasurer of such Borrower.

"fiscal quarter" means a fiscal quarter of the Parent and its Subsidiaries.

"fiscal year" means a fiscal year of the Parent and its Subsidiaries.

"Fixed Charge Coverage Ratio" means, as of any date of determination, for the Borrowers and their Subsidiaries on a consolidated basis, any Reference Period, for the ratio of (a) (i) Consolidated EBITDA less (ii) maintenance Capital Expenditures which shall equal $500,000 less (iii) cash Permitted Tax Distributions to (b) Consolidated Fixed Charges for such period; provided that, solely for purposes of calculating the Fixed Charge Coverage Ratio as of the last day of each of the fourth fiscal quarter of fiscal year 2013, the first fiscal quarter of fiscal year 2014, the second fiscal quarter of fiscal year 2014, and the third fiscal quarter of fiscal year 2014, Consolidated Fixed Charges shall be annualized based on the actual Consolidated Fixed Charges from the Closing Date until the last day of each such fiscal quarter.

"Foreign Lender" means, with respect to the Borrowers, any Lender that is organized under the laws of a jurisdiction other than that in which the Borrowers are resident for tax purposes. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" means a Subsidiary of the Parent that is a "controlled foreign corporation," as such term is defined in Section 957 of the Code.

"Funded Debt" means, as of any date of determination, without duplication, the sum of all Indebtedness of the Borrowers or any Subsidiary on such date, including the Subordinated Debt and any Guaranty Obligations in respect of Funded Debt, but excluding (i) Indebtedness of the types referred to in clause (v), (vii), (viii), and (x) of the definition of "Indebtedness" and (ii) Contingent Purchase Price Obligations.

"GAAP" generally accepted accounting principles in the United States in effect from time to time.  If, at any time, GAAP changes in a manner which will materially affect the calculations determining compliance by the Borrowers with any of its covenants in **Section 6.1** or **Section 6.2**, such covenants shall continue to be calculated in accordance with GAAP in effect prior to such changes in GAAP.

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any tribal governments or authorities) and any supranational bodies such as the European Union or the European Central Bank).

"Gross Interest Expense" means, with respect to the Borrowers, on a consolidated basis, for any Reference Period as at any date of determination, cash interest expense for such period (including all commissions, discounts, fees and other charges under letters of credit and similar instruments and net costs under any Hedge Agreement).

"Guaranty Obligations" mean, with respect to any Person, the guarantee obligations of such Person in respect of, and obligations (contingent or otherwise) to purchase or otherwise acquire, or otherwise to secure a credit against, a loss, liability or other obligation.  The amount of any Guaranty Obligation of any guaranteeing Person shall be deemed to be the lesser of (i) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guaranty Obligation is made and (ii) the maximum amount for which such guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Guaranty Obligation, unless such primary obligation and the maximum amount for which such guaranteeing Person may be liable are not stated or determinable, in which case the amount of such Guaranty Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrowers in good faith.

"Hazardous Substance" means any substance or material meeting any one or more of the following criteria:  (i) it is or contains a substance designated as a hazardous waste, hazardous substance, hazardous material, pollutant, contaminant or toxic substance under any Environmental Law, (ii) it is toxic, explosive, corrosive, ignitable, infectious, radioactive, mutagenic or otherwise hazardous to human health or the environment and is or becomes regulated by any Governmental Authority, (iii) its presence may require investigation or response under any Environmental Law, (iv) it constitutes a nuisance, trespass or health or safety hazard to Persons or neighboring properties, or (v) it is or contains, without limiting the foregoing, asbestos, polychlorinated biphenyls, urea formaldehyde foam insulation, petroleum hydrocarbons, petroleum derived substances or wastes, crude oil, nuclear fuel, natural gas or synthetic gas.

"HCM" means H.C. Materials Corporation, an Illinois corporation.

"HCM Acquisition" means the (i) acquisition, pursuant to the HCM Acquisition Documents, by CTG of substantially all of the assets of HCM and (ii) contribution, pursuant to the HCM Acquisition Documents, of certain assets of DHAN to Parent (the "DHAN Assets").

"HCM Acquisition Agreement" means the Asset Purchase and Contribution Agreement, dated as of September 20, 2013, by and among HCM, DHAN, Dr. Pengdi Han, CTG and Parent, as amended by the First Amendment thereto dated as of October 11, 2013, as amended, modified, restated or supplemented from time to time in accordance with the terms thereof and this Agreement.

"HCM Acquisition Documents" means (i) the HCM Acquisition Agreement, and (ii) all "Ancillary Documents" (as defined in the HCM Acquisition Agreement) (which, for avoidance of doubt, shall not include the Investment Documents or the Senior Loan Documents), as amended, modified, restated or supplemented in accordance with the terms thereof and this Agreement.

"HCM Call" means the call right held by the Parent with respect to the Capital Stock of the Parent held by DHAN or any Permitted Transferee (as defined in the LLC Agreement) to require DHAN or any Permitted Transferee of DHAN to sell to the Parent such Capital Stock pursuant to and subject to the terms and conditions of the LLC Agreement.

"HCM Put" means the put right held by DHAN with respect to the Capital Stock of the Parent held by DHAN and/or any Permitted Transferee of DHAN to require the Parent to purchase from DHAN and any Permitted Transferee of DHAN such Capital Stock pursuant to and subject to the terms and conditions of the LLC Agreement.

"Hedge Agreement" means any interest or foreign currency rate swap, cap, collar, option, hedge, forward rate or other similar agreement or arrangement designed to protect against fluctuations in interest rates, currency exchange rates or spot prices of raw materials.

"Indebtedness" means, as to any Person, (i) all indebtedness of such Person for borrowed money, or for the deferred purchase price of property or services (other than trade debt incurred and payable in the ordinary course of business), including any Contingent Purchase Price Obligations, (ii) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (iii) all indebtedness created or arising under any conditional-sale or other title-retention agreement with respect to property acquired by such Person, (iv) all Capital Lease Obligations of such Person, (v) all obligation of such Person under interest rate or foreign currency swaps or hedges, (vi) all obligations, contingent or otherwise, of such Person under acceptance, letter of credit or similar facilities, (vii) all mandatory redemption, repurchase or dividend obligations of such Person with respect to its stock or other equity interests, other than Permitted Tax Distributions, (viii) all liabilities in respect of unfunded vested benefits under plans covered by Title IV of ERISA, (ix) all indebtedness of the kinds referred to in clauses (i) through (viii) above (A) of any partnership or unincorporated joint venture in which such Person is a general partner or joint venturer to the extent such Person is liable therefor or (B) secured by any Lien on any property or asset owned or held by such Person regardless of whether or not the indebtedness secured thereby shall have been incurred or assumed by such Person or is nonrecourse to the credit of such Person, the amount thereof being equal to the value of the property or assets subject to such Lien, and (x) all Guaranty Obligations in respect of, indebtedness or obligations of others of the kinds referred to in clauses (i) through (ix) of this definition.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Initial Public Offering" means an underwritten initial public offering of Capital Stock of the IPO Issuer pursuant to an effective registration statement filed with the Securities and Exchange Commission under the Securities Act of 1933, as amended.

"Intellectual Property" means (i) all inventions (whether or not patentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissues, continuations, continuations-in-part, divisions, revisions, extensions, and reexaminations thereof, (ii) all trademarks, service marks, trade dress, logos, trade names, and corporate names, together with all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (iii) all copyrightable works and all copyrights (registered and unregistered), (iv) all trade secrets and confidential information (including, without limitation, financial, business and

marketing plans and customer and supplier lists and related information), (v) all computer software and software systems (including, without limitation, data, databases and related documentation), (vi) all Internet web sites and domain names, (vii) all technology, know-how, processes and other proprietary rights, and (viii) all licenses or other agreements to or from third parties regarding any of the foregoing.

"Intercreditor Agreement" means the Intercreditor Agreement, dated as of the date hereof, among the Senior Agent, the Collateral Agent, the Lenders and the Borrowers, as amended, modified, restated or supplemented from time to time in accordance with the terms hereof and thereof.

"Investment Documents" means this Agreement, the Notes, the Fee Letters, the Intercreditor Agreement, the Security Agreement, any other Security Documents, the Management Fee Subordination Agreement, the Equity Investment Documents, and all other agreements, instruments, documents and certificates in favor of the Collateral Agent or any Lender or to which the Collateral Agent or any Lender is party now or hereafter that is executed by any other Credit Party or BWCP with respect to this Agreement or any of the foregoing, in each case as amended, modified, supplemented or restated from time to time.

"Investments" has the meaning given to such term in **Section 7.5**.

"IP Security Agreements" has the meaning given to such term in **Section 3.1(a)(vii)**.

"IPO Issuer" means, in respect of any Initial Public Offering, the Person (as among the Parent, the other Borrowers or any holding company for the Parent or the other Borrowers created in connection therewith) that is the issuer of the Capital Stock offered in such Initial Public Offering.

"Lender" means each Person signatory hereto as a "Lender" and each other Person that becomes a "Lender" hereunder pursuant to **Section 10.6**, and their respective successors and assigns.

"Lending Office" means, with respect to any Lender, the office of such Lender designated as such in writing from time to time by such Lender to any Borrower.

"Leverage Ratio" means, for the Borrowers and their Subsidiaries on a consolidated basis, for any Reference Period, the ratio of Funded Debt as of the last day of such Reference Period to Consolidated EBITDA for such Reference Period.

"Lien" means any mortgage, pledge, hypothecation, assignment, security interest, lien (statutory or otherwise), charge or other encumbrance of any nature, whether voluntary or involuntary, including, without limitation, the interest of any vendor or lessor under any conditional sale agreement, title retention agreement, Capital Lease or any other lease or arrangement having substantially the same effect as any of the foregoing.

"LLC Agreement" means the Second Amended and Restated Limited Liability Company Agreement of the Parent, dated as of the Closing Date, as amended, modified, restated or supplemented from time to time in accordance with the terms thereof and this Agreement.

 "Loans" has the meaning given to such term in **Section 2.1**.

"Management Agreement" means the First Amended and Restated Management Agreement, dated as of the Closing Date, by and between BWP and BWCP, as amended, modified, restated or supplemented from time to time in accordance with the terms thereof and the Management Fee Subordination Agreement.

"<u>Management Fee Subordination Agreement</u>" means the Management Fee Subordination Agreement, dated as of the Closing Date, by and between the Borrowers, BWCP, the Collateral Agent and the Lenders, as amended, modified, restated or supplemented from time to time in accordance with the terms thereof.

"<u>Margin Stock</u>" has the meaning given to such term in Regulation U.

"<u>Material Adverse Effect</u>" means (a) any material adverse effect upon the properties and assets, business, financial position or results of operations of the Borrowers taken as a whole, (b) the material impairment of the ability of the Borrowers taken as a whole to perform the Obligations, or (c) the material impairment of (i) the enforceability or priority of the Collateral Agent's Liens with respect to a material portion of the Collateral, or (ii) the legality, validity, binding effect or enforceability of this Agreement or any of the other Investment Documents.

"<u>Material Contract</u>" has the meaning given to such term in **Section 4.19**.

"<u>Maturity Date</u>" means April 10, 2019.

"<u>Mortgage</u>" means any mortgage, deed of trust, deed to secure debt, collateral assignment of lease or similar agreement or instrument pursuant to which any Credit Party grants in favor of the Collateral Agent, for its benefit and the benefit of the Lenders, a security interest in and Lien upon any fee or leasehold interest in real property owned by it, as amended, modified, restated or supplemented from time to time.

"<u>Multiemployer Plan</u>" means any "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA to which a Borrower or any ERISA Affiliate makes, is making or is obligated to make contributions or has made or been obligated to make contributions.

"<u>Net Cash Proceeds</u>" means, (A) with respect to any Asset Disposition, the net amount equal to the aggregate amount received in cash (including any cash received by way of deferred payment pursuant to a note receivable, other non-cash consideration or otherwise, but only as and when such cash is so received) in connection with such Asset Disposition <u>minus</u> the sum of (a) the reasonable attorneys', accountants', investment banking, financial advisory and other customary fees, commissions and expenses incurred by the Borrowers or any of its Subsidiaries in connection with such Asset Disposition (including any such bona fide fees, commissions, costs and expenses payable to any Affiliate of the Credit Parties), (b) Indebtedness, other than the Loans, required to be paid as a result of such Asset Disposition and (c) United States federal, state and local and non-United States taxes paid or required to be paid as a result of such Asset Disposition; (B) with respect to any Equity Issuance or Debt Issuance, the net amount equal to the aggregate amount received in cash (including any cash received by way of deferred payment pursuant to a note receivable, other non-cash consideration or otherwise, but only as and when such cash is so received) in connection with such Equity Issuance or Debt Issuance <u>minus</u> the reasonable attorneys', accountants', investment banking, financial advisory and other customary fees, commissions and expenses incurred by the Borrowers in connection with such Equity Issuance, or Debt Issuance (including any such bona fide fees, commissions, costs and expenses payable to any Affiliate of the Credit Parties); and (C) with respect to any Casualty Event, the net amount equal to the aggregate amount received in cash (including any cash insurance proceeds and condemnation awards, but only as and when such cash is so received) in connection with such Casualty Event <u>minus</u> the sum of (a) the reasonable fees and out of pocket expenses incurred by the Borrowers or any of its Subsidiaries in connection with such Casualty Event, (b) Indebtedness, other than the Loans, required to be paid as a result of such Casualty Event and (c) United States federal, state and local and non-United States taxes paid or required to be paid as a result of such Casualty Event.

"Net Indemnification Proceeds" means the gross cash proceeds received by any Credit Party as a result of the indemnification provisions, purchase-price-adjustment provisions or similar provisions contained in the HCM Acquisition Documents or prior acquisition documents, or in connection with any Permitted Acquisition, in each case less the liabilities resulting from the circumstance or condition that resulted in the making of such payment to the extent that any Credit Party was required to satisfy such liabilities in cash.

"Net Interest Expense" means with respect to the Borrowers on a consolidated basis, for any period as at any date of determination, (a) the sum of PIK Interest and any other non-cash interest accrued during such period plus Gross Interest Expense; less (b) interest income for such period and payments received under any Hedge Agreement.

"Net Litigation Proceeds" means the gross cash proceeds received by any Credit Party as a result of any settlement, judgment or other disposition of any litigation action, claim, suit or proceeding less the liabilities resulting from any costs, fees or other expenses (including fees and expenses of counsel) incurred with respect to such action, claim, suit or proceeding.

"Note" means, with respect to any Lender requesting the same, the promissory note of the Borrowers in favor of such Lender evidencing the Loan made by such Lender pursuant to **Section 2.1**, in substantially the form of **Exhibit A**, together with any amendments, modifications and supplements thereto, substitutions therefor and restatements thereof.

"Obligations" means all principal of and interest (including interest accruing after the filing of a petition or commencement of a case by or with respect to a Borrower seeking relief under any applicable federal and state laws pertaining to bankruptcy, reorganization, arrangement, moratorium, readjustment of debts, dissolution, liquidation or other debtor relief, specifically including the Bankruptcy Code and any fraudulent transfer and fraudulent conveyance laws, whether or not the claim for such interest is allowed in such proceeding) on the Loans and all fees, expenses, indemnities and other obligations owing, due or payable at any time by the Parent, any other Borrower or any other Credit Party to the Collateral Agent, any Lender or any other Person entitled thereto, under this Agreement or any of the other Investment Documents (other than the Equity Investment Documents), in each case whether direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, and whether existing by contract, operation of law or otherwise.

"OFAC" means the U.S. Department of the Treasury's Office of Foreign Assets Control, and any successor thereto.

"Other Taxes" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Investment Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Investment Document.

"Parent" has the meaning given to such term in the introductory paragraph hereof.

"PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT Act) of 2001, as amended from time to time, and any successor statute, and all rules and regulations from time to time promulgated thereunder.

"PBGC" means the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA, and any successor thereto.

"Permitted Acquisition" means an Acquisition by any Borrower of any ongoing business, division or all or substantially all of the assets of, or all of the Capital Stock of, a Person (each, an "Acquired Person"), provided that each of the following conditions is satisfied with respect to such Acquisition:

(a)    if such Acquisition is of all of the Capital Stock of an Acquired Person, such Acquisition is not opposed by the board of directors or management of the Acquired Person;

(b)    such Acquisition will not cause the Borrowers to violate **Section 7.10**;

(c)    at the time of such Acquisition, no Event of Default shall have occurred and be continuing and no Event of Default would occur as a result thereof on a pro forma basis immediately after giving effect to such Acquisition;

(d)    in the case of the acquisition of all or substantially all of the assets of a Person, all such assets shall be owned 100% by the Borrowers, and the Borrowers shall have taken all actions to subject such assets to the priority (second in priority only to the Lien of the Senior Agent securing the Senior Debt) Lien of the Collateral Agent (subject to Permitted Liens), in accordance with the terms and conditions hereof and of the other Loan Documents;

(e)    in the case of the acquisition of Capital Stock, all of the Capital Stock (except for any such securities in the nature of directors' qualifying shares required pursuant to applicable Law) acquired or otherwise issued by such Person or any newly formed Subsidiary of the Borrowers in connection with such acquisition shall be owned 100% by the Borrowers, and the Borrowers shall have taken each of the actions set forth in **Section 5.8**;

(f)    the Person or business acquired shall have a positive financial contribution to the Borrowers after giving effect to such Acquisition, as determined in the reasonable good faith discretion of the operating committee for the Borrowers;

(g)    Borrowers shall have provided to the Lenders, no later than ten Business Days prior to the date of consummation of the Acquisition, the following information and documentation pertaining to the Acquisition, in each case in form and substance reasonably satisfactory to the Required Lenders: (A) calculations certified by the Borrowers' chief financial officer indicating pro forma compliance by the Borrowers with the covenants contained in **Article VI** subsequent to the Acquisition, (B) if available, historical financial statements of the Acquired Person for the three full fiscal years of the Acquired Person immediately preceding the date of the consummation of the Permitted Acquisition, and (C) consolidated projections of the Borrowers, by fiscal quarter, incorporating the results of operations of the Acquired Person, and which detail Consolidated EBITDA for each relevant fiscal period for the Acquired Person; and

(h)    on or prior to the closing date for such Permitted Acquisition, the Borrowers shall have delivered to the Required Lenders a certificate of a Responsible Officer of the Borrowers certifying that all of the requirements set forth in this definition of "Permitted Acquisition" have been satisfied or will be satisfied on or prior to the consummation of such Acquisition.

"Permitted Liens" has the meaning given to such term in **Section 7.3**.

"Permitted Tax Distributions" means distributions by the Parent to its members in an amount which shall not exceed, with respect to any fiscal year of the Borrowers, the taxable net income of the Parent and its Subsidiaries allocated to its members for such fiscal year multiplied by the highest marginal

federal, state and local combined effective tax rate applicable to an individual Person resident in New York, New York during such fiscal year.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any "employee pension benefit plan" within the meaning of Section 3(2) of ERISA that is subject to the provisions of Title IV of ERISA (other than a Multiemployer Plan) and to which a Borrower or any ERISA Affiliate may have any liability.

"PPA 2006 Effective Date" means, with respect to any Plan, except as hereinafter provided, the first day of the first plan year beginning on or after January 1, 2008.  However, solely with respect to a Plan maintained pursuant to one or more collective bargaining agreements between employee representatives and one or more employers ratified before January 1, 2008, such term means the first day of the first plan year beginning on or after the earlier of (A) and (B), where (A) is the later of (x) the date on which the last collective bargaining agreement relating to the Plan terminates (determined without regard to any extension thereof agreed to after August 17, 2006), or (y) the first day of the first plan year beginning on or after January 1, 2008; and (B) is January 1, 2010.

"Prepayment Percentage" means (i) on or before the first anniversary of the Closing Date (or in the case of an acceleration or mandatory prepayment, if the loans are accelerated or required to be prepaid on or before the first anniversary of the Closing Date), 2.0%, (ii) after the first anniversary of the Closing Date but on or before the second anniversary of the Closing Date (or in the case of an acceleration or mandatory prepayment, if the loans are accelerated or required to be prepaid after the first anniversary of the Closing Date but on or before the second anniversary of the Closing Date), 1.0%, and (iii) after the second anniversary of the Closing Date (or in the case of an acceleration or mandatory prepayment, if the loans are accelerated or required to be prepaid after the second anniversary of the Closing Date), 0.0%.

"Pro Forma Balance Sheet" has the meaning given to such term in **Section 3.1(r)**.

"Pro Forma Basis" has the meaning given to such term in **Section 1.3(b)**.

"Prohibited Transaction" means any transaction described in (i) Section 406 of ERISA that is not exempt by reason of Section 408 of ERISA or by reason of a Department of Labor prohibited transaction individual or class exemption or (ii) Section 4975(c) of the Code that is not exempt by reason of Section 4975(c)(2) or 4975(d) of the Code.

"Put Subordination Agreement" has the meaning given to such term in **Section 7.6(a)(v)**.

"Realty" means all real property and interests in real property now or hereafter acquired or leased by any Credit Party.

"Reference Period" with respect to any date of determination, means (except as may be otherwise expressly provided herein) the period of twelve consecutive fiscal months of the Parent and its Subsidiaries immediately preceding such date or, if such date is the last day of a fiscal quarter, the period of four consecutive fiscal quarters ending on such date.

"Regulations T, U and X" means Regulations T, U and X, respectively, of the Federal Reserve Board, and any successor regulations.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Release" means any release, threatened release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of a Hazardous Substance into or through the environment.

"Reportable Event" means, with respect to any Plan, (i) any "reportable event" within the meaning of Section 4043(c) of ERISA for which the 30-day notice under Section 4043(a) of ERISA has not been waived by the PBGC (including, without limitation, any failure to meet the minimum funding standard of, or timely make any required installment under, Section 412 of the Code or Section 302 of ERISA, regardless of the issuance of any waivers in accordance with Section 412 of the Code), (ii) any such "reportable event" subject to advance notice to the PBGC under Section 4043(b)(3) of ERISA, (iii) any application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code, and (iv) a cessation of operations described in Section 4062(e) of ERISA.

"Required Lenders" means, at any time, the Lenders holding outstanding Loans representing at least 51% of the aggregate, at such time, of all outstanding Loans.  In the event that Avante or Fidus or any of their Affiliates holds any of the then outstanding Loans, the Loans held directly or indirectly by the Sponsor, any Credit Party or any Affiliate of any of the foregoing shall not be included in the determination of Required Lenders and none of the Sponsor, any Credit Party or any Affiliate of the foregoing shall have any rights as Lenders hereunder to vote, approve or consent to any action requiring the vote, approval or consent of the Lenders or Required Lenders (provided that, for the avoidance of doubt, nothing in this sentence shall be deemed to permit any assignment not made in accordance with **Section 10.6**).

"Requirement of Law" means, with respect to any Person, any statute, law, treaty, rule, regulation, order, decree, writ, injunction or determination of any arbitrator or court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject or otherwise pertaining to any or all of the transactions contemplated by this Agreement and the other Investment Documents.

"Responsible Officer" means, with respect to any Credit Party, the chief executive officer or the chief financial officer thereof.

"Sanctioned Country" means a country subject to a sanctions program identified on the list maintained by OFAC and available at http://www.treas.gov/offices/enforcement/ofac/ programs/, or as otherwise published from time to time.

"Sanctioned Person" means (i) a Person named on the list of Specially Designated Nationals or Blocked Persons maintained by OFAC available at http://www.treas.gov/ offices/enforcement/ofac/sdn/index.shtml, or as otherwise published from time to time, or (ii) (A) an agency of the government of a Sanctioned Country, (B) an organization controlled by a Sanctioned Country, or (C) a Person resident in a Sanctioned Country, to the extent subject to a sanctions program administered by OFAC.

"SBA" means the Small Business Administration.

"SBIA" means the Small Business Investment Act of 1958, as amended, and the regulations promulgated thereunder.

"Security Agreement" means the Pledge and Security Agreement made by the Parent, each other Borrower, and the Subsidiaries of the Parent party thereto in favor of the Collateral Agent, in substantially the form of **Exhibit D**, as amended, modified, restated or supplemented from time to time.

"Security Documents" means the Security Agreement, the IP Security Agreements, and all other pledge or security agreements, mortgages, assignments or other similar agreements or instruments executed and delivered by any Credit Party pursuant to **Section 5.8, 5.9, 5.15, 5.16** or **5.17** or otherwise in connection with the transactions contemplated hereby, in each case as amended, modified, restated or supplemented from time to time .

"Senior Agent" has the meaning given to such term in the Intercreditor Agreement.

"Senior Debt" has the meaning given to such term in the Intercreditor Agreement.

"Senior Lenders" has the meaning given to such term in the Intercreditor Agreement.

"Senior Loan Agreement" has the meaning given to the term "Senior Credit Agreement" in the Intercreditor Agreement.

"Senior Loan Documents" has the meaning given to such term in the Intercreditor Agreement.

"Sponsor" means Blue Wolf Capital Partners Fund II, L.P., a Delaware limited partnership.

"Sponsor Party" means any Person who is an officer, director, employee, consultant, principal, founder, equityholder, manager, general partner or agent of the Sponsor or any non-Credit-Party Affiliate thereof.

"Subordinated Indebtedness" means Indebtedness subordinated in right of payment, performance and collection to the Obligations in accordance with **Section 7.2(x)**.

"Subsidiary" means, with respect to any Person, any corporation or other Person of which more than 50% of the outstanding Capital Stock having ordinary voting power to elect a majority of the board of directors, board of managers or other governing body of such Person, is at the time, directly or indirectly, owned or controlled by such Person and one or more of its other Subsidiaries or a combination thereof (irrespective of whether, at the time, securities of any other class or classes of any such corporation or other Person shall or might have voting power by reason of the happening of any contingency).  Except when the context requires otherwise, the term "Subsidiary" shall be deemed to refer to a Subsidiary of a Borrower.

"Subsidiary Guarantor" means any Guarantor that is a Subsidiary of any Borrower.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Terminating Indebtedness" has the meaning given to such term in **Section 3.1(k)**.

"Transaction Costs" all legal, accounting, broker, consulting and other fees, costs and expenses paid by the Borrowers, in each case in connection with the closing of the transactions contemplated by the Investment Documents and the HCM Acquisition.

"Transaction Documents" means, collectively, this Agreement and the other Investment Documents, the Senior Loan Agreement and the other Senior Loan Documents, the HCM Acquisition Documents.

"Transactions" means, collectively, the transactions contemplated by the Transaction Documents, including (i) the HCM Acquisition, (ii) the making of the Loans hereunder, (iii) the extensions of credit under the Senior Loan Documents on the Closing Date, (iv) the Equity Capitalization, (v) the repayment in full of the Terminating Indebtedness, and (vi) the payment of permitted fees and expenses in connection with the foregoing.

"Unfunded Pension Liability" means, with respect to any Plan, the excess of its benefit liabilities under Section 4001(a)(16) of ERISA over the current value of its assets, determined in accordance with the applicable assumptions used for funding under Section 412 of the Code for the applicable plan year.

"Wholly Owned" means, with respect to any Subsidiary of any Person, that 100% of the outstanding Capital Stock of such Subsidiary is owned, directly or indirectly, by such Person.  For the avoidance of doubt, except where the context requires otherwise, the term "Wholly Owned Subsidiary" shall be deemed to refer to a Wholly Owned Subsidiary of a Borrower.

1.2    Accounting Terms.  As used herein, in any other Investment Document, and in any certificate or other document made or delivered pursuant hereto or thereto, accounting terms not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP.  Unless otherwise provided herein, all financial calculations made with respect to the Borrowers for the purpose of determining compliance with the terms of this Agreement shall be made on a consolidated basis and in accordance with GAAP.  For the avoidance of doubt, notwithstanding any change in GAAP after the Closing Date that would require lease obligations that would be treated as operating leases as of the Closing Date to be classified and accounted for as capital leases or otherwise reflected on the Borrowers' consolidated balance sheet, such obligations shall continue to be excluded from the definition of Indebtedness.

1.3    Other Terms; Construction.

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, restated or otherwise modified (subject to any restrictions on such amendments, supplements, restatements or modifications set forth herein or in any other Investment Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns permitted hereunder, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Investment Document, shall be construed to refer to such Investment Document in its entirety and not to any particular provision thereof, (iv) all references in an Investment Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Investment Document in which such references appear, (v) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)      Notwithstanding the foregoing, calculations to determine compliance by the Borrowers for any period with the Leverage Ratio covenant as set forth in **Section 6.1** and calculations of the other financial covenants contained in **Article VI** to determine whether a condition to any transaction or event has been met, shall be determined in each case on a pro forma basis (a "Pro Forma Basis") after giving effect to any Acquisition, Asset Disposition, incurrence or payment of Indebtedness or other transaction (each, a "transaction") occurring during such Reference Period (or proposed to be consummated, as the case may be, whether or not during such Reference Period) as if such transaction had occurred as of the first day of such Reference Period, in accordance with the following:

(i)      any Indebtedness incurred or assumed by any Credit Party in connection with any transaction (including any Indebtedness of a Person acquired in an Acquisition that is not retired or repaid in connection therewith) shall be deemed to have been incurred or assumed as of the first day of the applicable Reference Period (and if such Indebtedness has a floating or formula rate, such Indebtedness shall, for purposes of such determination, have an implied rate of interest during the applicable Reference Period determined by utilizing the rate of interest that is or would be in effect with respect to such Indebtedness as of the date of determination);

(ii)      any Indebtedness retired or repaid in connection with any transaction (including any Indebtedness of a Person acquired in an Acquisition) shall be deemed to have been retired or repaid as of the first day of the applicable period;

(iii)      with respect to any Acquisition, income statement items (whether positive or negative) and balance sheet items attributable to the Person or assets acquired shall (to the extent not otherwise included in the consolidated financial statements of the Parent and its Subsidiaries in accordance with GAAP or in accordance with other provisions of this Agreement) be included in such calculations to the extent relating to the applicable Reference Period, provided that such income statement and balance sheet items are reflected in financial statements or other financial data reasonably acceptable to the Required Lenders; and

(iv)      with respect to any Asset Disposition, income statement items (whether positive or negative) and balance sheet items attributable to the assets disposed of shall be excluded from such calculations to the extent relating to the applicable Reference Period.

## ARTICLE II

## AMOUNT AND TERMS OF THE LOANS

2.1      Loans.  Each Lender severally agrees, subject to and on the terms and conditions of this Agreement, to make a term loan (each, a "Loan," and collectively, the "Loans") to the Borrowers on the Closing Date in an original principal amount of its Commitment.  No Loans shall be made at any time after the Closing Date, and the Commitments shall be automatically and permanently terminated concurrently with the making of the Loans on the Closing Date.  To the extent repaid or prepaid, Loans may not be reborrowed.

2.2      Disbursement; Domicile of Loans.

(a)      The Borrowers hereby authorize the Lenders to disburse the proceeds of the Loans in accordance with the terms of any written instructions from any Authorized Officer of any Borrower.

(b)      Each Lender may, at its option, make and maintain any Loan at, to or for the account of any of its Lending Offices, provided that any exercise of such option shall not affect the obligation of the

Borrowers to repay such Loan to or for the account of such Lender in accordance with the terms of this Agreement.

2.3     <u>Evidence of Debt; Notes.</u>

(a)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to the applicable Lending Office of such Lender resulting from each Loan made by such Lending Office of such Lender from time to time, including the amounts of principal and interest payable and paid to such Lending Office of such Lender from time to time under this Agreement.

(b)     The entries made in the accounts maintained pursuant to **Section 2.3(a)** shall, to the extent permitted by applicable law, be prima facie evidence of the existence and amounts of the obligations of the Borrowers therein recorded; <u>provided</u>, <u>however</u>, that the failure of any Lender to maintain such account, or any error therein, shall not in any manner affect the obligation of the Borrowers to repay (with applicable interest) the Loans made to the Borrowers by such Lender in accordance with the terms of this Agreement.

(c)     The Loans made by each Lender shall, if requested by the applicable Lender (which request shall be made to the Borrowers), be evidenced by a Note appropriately completed in substantially the form of **Exhibit A**, executed by the Borrowers and payable to the order of such Lender and registered in such Lender's name in accordance with **Section 10.6(f)**. Each Note shall be entitled to all of the benefits of this Agreement and the other Investment Documents and shall be subject to the provisions hereof and thereof.

2.4     <u>Mandatory Payments and Prepayments.</u>

(a)     Except to the extent due or paid sooner pursuant to the provisions of this Agreement, the Borrowers shall repay the aggregate outstanding principal of the Loans on the Maturity Date, together with all accrued but unpaid interest and fees thereon.

(b)     Promptly upon (and in any event not later than five (5) Business Days after) receipt thereof by any Credit Party, the Borrowers will prepay the outstanding principal amount of the Loans in an amount equal to 100% of the Net Cash Proceeds from any Equity Issuance and 100% of the Net Cash Proceeds from any Debt Issuance, and will deliver to the Lenders, concurrently with such prepayment, a certificate signed by a Financial Officer of the Borrowers in form and substance reasonably satisfactory to the Lenders and setting forth the calculation of such Net Cash Proceeds.

(c)     Concurrently with (i) any Asset Disposition consisting of all or substantially all of the assets of the Parent or any of the other Borrowers, (ii) a Change of Control or (iii) an Initial Public Offering, the Borrowers shall prepay the Loans in full, together with all accrued but unpaid interest and fees thereon

(d)     Not later than 30 days after receipt by any Credit Party of any proceeds of insurance, condemnation award or other compensation in respect of any Casualty Event (or, if earlier, upon its determination not to repair or replace any property subject to such Casualty Event or to acquire assets used or useable in the business of the Borrowers and their Subsidiaries), the Borrowers will prepay the outstanding principal amount of the Loans in an amount equal to 100% of the Net Cash Proceeds from such Casualty Event (less any amounts theretofore applied (or contractually committed to be applied) to the repair or replacement of property subject to such Casualty Event or to acquire assets used or useable in the business of the Borrowers and their Subsidiaries) and will deliver to the Lenders, concurrently with

such prepayment, a certificate signed by a Financial Officer of the Borrowers in form and substance reasonably satisfactory to the Required Lenders and setting forth the calculation of such Net Cash Proceeds; provided, however, that any such proceeds of insurance, condemnation award or other compensation in respect of any Casualty Event not applied (or contractually committed to be applied) within 30 days to the acquisition of other replacement assets as provided herein shall be applied by the Borrowers as a prepayment of the outstanding principal amount of the Loans no later than the first Business Day immediately following such 30-day period.

(e)    Not later than 30 days after receipt by any Credit Party of proceeds in respect of any Asset Disposition (or, if earlier, upon its determination not to apply such proceeds to the acquisition of assets used or useable in the business of the Borrowers and their Subsidiaries), the Borrowers will prepay the outstanding principal amount of the Loans in an amount equal to 100% of the Net Cash Proceeds from such Asset Disposition (less any amounts theretofore applied (or contractually committed to be applied) to acquire assets used or useable in the business of the Borrowers and their Subsidiaries) and will deliver to the Lenders, concurrently with such prepayment, a certificate signed by a Financial Officer of the Borrowers in form and substance reasonably satisfactory to the Required Lenders and setting forth the calculation of such Net Cash Proceeds; provided, however, that any such Net Cash Proceeds not applied (or contractually committed to be applied) within 30 days to the acquisition of other assets as provided herein shall be applied by the Borrowers as a prepayment of the outstanding principal amount of the Loans no later than the first Business Day immediately following such 30-day period.  Notwithstanding the foregoing, nothing in this **Section 2.4(e)** shall be deemed to permit any Asset Disposition not expressly permitted under **Section 7.4** or any Capital Expenditures not expressly permitted under **Section 6.3**.

(f)    Promptly upon (and in any event not later than one Business Day after) receipt by any Credit Party, the Borrowers will prepay the outstanding principal amount of the Loans in an amount equal to the Net Indemnification Proceeds received by such Credit Party.

(g)    Promptly upon (and in any event not later than one Business Day after) receipt by any Credit Party, the Borrowers will prepay the outstanding principal amount of the Loans in an amount equal to the Net Litigation Proceeds received by such Credit Party.

(h)    Each payment or prepayment of the Loans made pursuant to **Sections 2.4(b)** through **2.4(g)** shall be applied to reduce the outstanding principal amount of the Loans.  Each payment or prepayment pursuant to the provisions of this **Section 2.4** shall be applied ratably among the Lenders holding the Loans being prepaid, in proportion to the principal amount held by each Lender.

(i)    Each prepayment made pursuant to this **Section 2.4** shall be made with any prepayment fee due under **Section 2.7(b)**, if applicable.

(j)    The Borrowers shall use commercially reasonable efforts to give written notice to each Lender at least five Business Days prior to each mandatory prepayment pursuant to this **Section 2.4**.

(k)    Notwithstanding anything to the contrary in this **Section 2.4**, the amount of each partial prepayment or repayment under this **Section 2.4** shall be reduced by the amount required to be prepaid (and actually used for such prepayment) in respect of the Senior Debt with respect to the corresponding triggering events or circumstances; it being understood and agreed that, for the avoidance of doubt, only one prepayment shall be required with respect to the event or circumstance giving rise to such partial prepayment (although such single prepayment may be apportioned among more than one payee if, for example, the required partial prepayment is $2,000,000 and a payment of $1,000,000 under the Senior Loan Agreement satisfies all partial prepayment obligations then required to be satisfied (as a result of

waiver, consent or otherwise) under the Senior Loan Agreement, in which case the remaining $1,000,000 would be paid to the Lenders under this Agreement); provided, however, that for the avoidance of doubt, the foregoing shall not apply to prepayments pursuant to **Sections 2.4(a)**, **2.4(c)** or any other subsection requiring, by its terms, prepayment in full of the Loans.

2.5     Voluntary Prepayments.   At any time and from time to time, the Borrowers shall have the right to prepay the Loans, in whole or in part, without premium or penalty (except as provided in **Section 2.7(b)**), upon written notice given to the Lenders at least three Business Days prior to each intended prepayment.  Each such notice shall specify the proposed date of such prepayment and the aggregate principal amount of the Loans to be prepaid, and shall be irrevocable and shall bind the Borrowers to make such prepayment on the terms specified therein.  Any such prepayments of the Loans pursuant to this **Section 2.5** may not be reborrowed.  Each prepayment of the Loans made pursuant to this **Section 2.5** shall be applied ratably among the Lenders holding the Loans being prepaid, in proportion to the principal amount held by each.

2.6     Interest.

(a)     The Borrowers shall pay to the Lenders interest on the outstanding principal amount of the Loans at a rate equal to 12.25% per annum, compounded quarterly.  Notwithstanding the provisions of **Section 2.6(c)** to the contrary, unless the Borrowers provide written notice to the Lenders not less than three days prior to any interest payment date of its election to pay all of the interest due and payable on such interest payment date in cash, then (i) the Borrowers shall pay and discharge in cash interest accrued on the outstanding principal amount of the Loans (including interest accrued on all PIK Interest previously added to the principal balance of the Loans prior to such interest payment date pursuant to this **Section 2.6(a)**) at the rate of 11% per annum, and (ii) interest accrued on the outstanding principal amount of the Loans at the rate of 1.25% per annum ("PIK Interest") shall be paid and discharged, without the taking of further action, by adding such PIK Interest to the principal balance of the Loans.

(b)     Upon the occurrence and during the continuance of any Event of Default under **Sections 8.1(a)**, **8.1(f)**, or **8.1(g)**, and (at the election of the Required Lenders) upon the occurrence and during the continuance of any other Event of Default, all outstanding principal amounts of the Loans and, to the greatest extent permitted by law, all interest accrued on the Loans and all other accrued and outstanding fees and other amounts hereunder, shall bear interest at a rate per annum equal to the interest rate applicable from time to time thereafter to the Loans plus 2.0% per annum, compounded quarterly, and, in each case, such default interest shall be payable on demand.  To the greatest extent permitted by law, interest shall continue to accrue after the filing by or against any Borrower of any petition seeking any relief in bankruptcy or under any law pertaining to insolvency or debtor relief.

(c)     Notwithstanding anything contained herein, accrued (and theretofore unpaid) interest shall be due and payable (i) in cash (subject to **Section 2.6(a)**) quarterly in arrears on the last day of each March, June, September, and December of each year, commencing December 31, 2013, (ii) in cash, upon the date of any prepayment pursuant to **Sections 2.4** or **2.5**, to the extent such interest has accrued with respect to the principal being prepaid, and (iii) in cash at maturity (whether pursuant to acceleration or otherwise), upon prepayment in full of the Loans and, after maturity, on demand.

(d)     Nothing contained in this Agreement or in any other Investment Document shall be deemed to establish or require the payment of interest to any Lender at a rate in excess of the maximum rate permitted by applicable law.  If the amount of interest payable for the account of any Lender on any interest payment date would exceed the maximum amount permitted by applicable law to be charged by such Lender, the amount of interest payable for its account on such interest payment date shall be automatically reduced to such maximum permissible amount.  In the event of any such reduction affecting

any Lender, if from time to time thereafter the amount of interest payable for the account of such Lender on any interest payment date would be less than the maximum amount permitted by applicable law to be charged by such Lender, then the amount of interest payable for its account on such subsequent interest payment date shall be automatically increased to such maximum permissible amount, <u>provided</u> that at no time shall the aggregate amount by which interest paid for the account of any Lender has been increased pursuant to this sentence exceed the aggregate amount by which interest paid for its account has theretofore been reduced pursuant to the previous sentence.

2.7    Fees.  The Borrowers agree to pay:

(a)    To each Lender, for each such Lender's own account, on the Closing Date, the fees under the Fee Letters in the amounts due and payable on the Closing Date as required by the terms thereof; and

(b)    To each Lender, if the Borrowers prepay, or are required to prepay, the Loans in full or in part (including pursuant to **Section 2.4 (other than Section 2.4(d))** or **Section 2.5**, or an acceleration of the Loans), a fee equal to (i) the principal amount of such prepayment multiplied by (ii) the Prepayment Percentage, which fee shall be payable in connection with such prepayment or required prepayment; provided, however, that in the event that  (x) any material consent, approval or other action is requested by the Borrowers to be given or taken by the Lenders, (y) there are only two Lenders and (z) one Lender has agreed to take or give such consent, approval or other action and the other Lenders has not so agreed, then the Borrowers shall be permitted to prepay the Loans held by the dissenting Lender or the Loans held by both Lenders, in each case in full and not in part, without application of the Prepayment Percentage so long as such prepayment is made within thirty (30) days following the date of such request made by the Borrowers to the Lenders.

2.8    Method of Payments; Computations; Apportionment of Payments.

(a)    All payments by the Borrowers hereunder shall be made without setoff, counterclaim or other defense, in Dollars and in immediately available funds to the Lenders entitled to such payment at the payment office designated by each such Lender prior to 3:00 p.m., New York time, on the date payment is due.  Any payment made as required hereinabove, but after 3:00 p.m. New York time, shall be deemed to have been made on the next succeeding Business Day.  If any payment falls due on a day that is not a Business Day, then such due date shall be extended to the next succeeding Business Day, and such extension of time shall then be included in the computation of payment of interest, fees or other applicable amounts.

(b)    All computations of interest and fees hereunder shall be made on the basis of a year consisting of 360 days with regard to the actual number of days (including the first day, but excluding the last day) elapsed.

(c)    Notwithstanding any other provision of this Agreement or any other Investment Document to the contrary, all amounts collected or received by any Lender or the Collateral Agent after acceleration of the Loans pursuant to **Section 8.2** or in respect of any sale of, collection from or other realization upon all or any part of the Collateral pursuant to the exercise of its remedies shall be applied as follows:

(i)    first, to the payment of all reasonable out-of-pocket costs and expenses (including reasonable attorneys' and consultants' fees irrespective, subject to applicable law, of whether such fees are allowed as a claim after the occurrence of a Bankruptcy Event) of the Collateral Agent in connection with enforcing the rights of the Lenders under the Investment Documents and any protective advances made by the Collateral Agent with respect to the

Collateral under or pursuant to the terms of the Security Documents or other Investment Documents, in each case, as set forth in the Investment Documents;

(ii)     second, to the payment of all reasonable out-of-pocket costs and expenses (including reasonable attorneys' and consultants' fees irrespective, subject to applicable law, of whether such fees are allowed as a claim after the occurrence of a Bankruptcy Event) of each of the Lenders in connection with enforcing its rights under the Investment Documents or otherwise with respect to the Obligations owing to such Lender, in each case, as set forth in the Investment Documents;

(iii)     third, to the payment of all of the Obligations consisting of accrued fees and interest (including fees incurred and interest accruing at the then applicable rate after the occurrence of a Bankruptcy Event, subject to applicable law, irrespective of whether a claim for such fees incurred and interest accruing is allowed in such proceeding);

(iv)     fourth, to the payment of the outstanding principal amount of the Obligations;

(v)     fifth, to the payment of all other Obligations and other obligations that shall have become due and payable under the Investment Documents or otherwise and not repaid; and

(vi)     sixth, to the payment of the surplus (if any) to whomever may be lawfully entitled to receive such surplus.

In carrying out the foregoing, (x) amounts received shall be applied in the numerical order provided until exhausted prior to application to the next succeeding category, and (y) all amounts shall be apportioned ratably among the Lenders in proportion to the amounts of such principal, interest, fees or other Obligations owed to them respectively pursuant to clauses (ii) through (v) above.

2.9     Recovery of Payments.  The Borrowers agree that to the extent any Borrower makes a payment or payments to or for the account of any Lender or the Collateral Agent, which payment or payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy, insolvency or similar state or federal law, common law or equitable cause (whether as a result of any demand, settlement, litigation or otherwise), then, to the extent of such payment or repayment, the Obligation intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been received.  The agreements and obligations in this Section shall survive the payment in full of all Loans and any termination of this Agreement or any of the other Investment Documents.

2.10     Use of Proceeds.  The proceeds of the Loans shall be used solely (i) to finance a portion of the consideration to be paid to HCM in connection with the HCM Acquisition, (ii) to repay the Terminating Indebtedness in full, and (iii) to pay or reimburse fees and expenses in connection with the Transactions.

2.11     Pro Rata Treatment.

(a)     The funding of Loans on the Closing Date shall be made by the Lenders pro rata on the basis of their respective Commitments.  All payments on account of principal of or interest on any Loans, fees or any other Obligations owing to or for the account of any one or more Lenders shall be apportioned ratably among such Lenders in proportion to the amounts of such principal, interest, fees or other Obligations owed to them respectively.

(b)      If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other Obligations hereunder resulting in such Lender's receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon or other such Obligations greater than its pro rata share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the other Lenders of such fact, and (b) purchase (for cash at face value) participations in the Loans and such other Obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them, provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this Section shall not be construed to apply to (x) any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Parent or any Subsidiary thereof (as to which the provisions of this **Section 2.11(b)** shall apply).  Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrowers rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrowers in the amount of such participation.  If under any applicable bankruptcy, insolvency or similar law, any Lender receives a secured claim in lieu of a setoff to which this **Section 2.11(b)** applies, such Lender shall, to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights of the Lenders entitled under this **Section 2.11(b)** to share in the benefits of any recovery on such secured claim.

2.12    Change in Law; Illegality.

(a)      If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender; or

(ii)      impose on any Lender any other condition, cost or expense affecting this Agreement;

and the result of any of the foregoing shall be to increase the cost to such Lender, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount), then, upon request of such Lender, the Borrowers will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender, as the case may be, for such additional costs incurred or reduction suffered.

(b)      If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)      A certificate of a Lender setting forth the amount or amounts (and a reasonably detailed calculation thereof) necessary to compensate such Lender or its holding company, as the case may be, as specified in **Section 2.12(a)** or **Section 2.12(b)** and delivered to the Borrowers shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)      Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrowers shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than six months prior to the date that such Lender notifies the Borrowers of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

2.13    Taxes.

(a)      Any and all payments by or on account of any obligation of the Borrowers hereunder or under any other Investment Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, provided that if the Borrowers shall be required by applicable law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrowers shall make such deductions and (iii) the Borrowers shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)      Without limiting the provisions of **Section 2.13(a)**, the Borrowers shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)      The Borrowers shall indemnify each Lender within 10 days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid by such Lender and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrowers by a Lender shall be conclusive absent manifest error.

(d)      As soon as practicable after any payment of Indemnified Taxes or Other Taxes by any Borrower to a Governmental Authority, the Borrowers shall deliver to the applicable Lenders the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to such Lenders.

(e)      Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrowers are resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Investment Document shall deliver to the Borrowers, at the time or times prescribed by applicable law or reasonably requested by the Borrowers, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate of

withholding.  In addition, any Lender, if requested by the Borrowers, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrowers as will enable the Borrowers to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

Without limiting the generality of the foregoing, in the event that the Borrowers are resident for tax purposes in the United States, any Foreign Lender shall deliver to the Borrowers on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrowers, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(i)    duly completed copies of Internal Revenue Service Form W-8BEN claiming eligibility for benefits of an income tax treaty to which the United States is a party,

(ii)    duly completed copies of Internal Revenue Service Form W-8ECI,

(iii)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrowers within the meaning of Section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (y) duly completed copies of Internal Revenue Service Form W-8BEN, or

(iv)    any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrowers to determine the withholding or deduction required to be made.

(f)    If any Lender determines, in its sole discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrowers or with respect to which the Borrowers have paid additional amounts pursuant to this Section, it shall pay to the Borrowers an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrowers under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Borrowers, upon the request of such Lender agree to repay the amount paid over to the Borrowers (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Lender in the event such Lender is required to repay such refund to such Governmental Authority.  This **Section 2.13(f)** shall not be construed to require any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrowers or any other Person.

2.14    <u>Mitigation of Costs</u>.  If any Lender requests compensation under **Sections 2.12(a)** or **2.12(b)**, or the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to **Section 2.13**, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to **Sections 2.12(a)**, **2.12(b)** or **2.13**, as the case may be, in the future, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

# ARTICLE III

## CONDITIONS PRECEDENT

3.1    <u>Conditions of Closing</u>.  The obligation of each Lender to make Loans on the Closing Date is subject to the satisfaction of the following conditions precedent:

(a)    The Lenders shall have received the following, each dated as of the Closing Date (unless otherwise specified) and in such number of copies as the Lenders shall have requested:

(i)    executed counterparts of this Agreement

(ii)    to the extent requested by any Lender in accordance with **Section 2.3(c)**, a Note or Notes for such Lender, in each case duly completed in accordance with the provisions of **Section 2.3(c)** and executed by the Borrowers;

(iii)    the Equity Investment Documents duly completed and executed by all parties;

(iv)    the Fee Letters, in each case, duly completed and executed by all parties thereto;

(v)    the Security Agreement, duly completed and executed by the Borrowers and each Subsidiary of the Parent;

(vi)    a collateral access agreement from each Person who possesses Collateral of any Credit Party, in form and substance reasonably satisfactory to the Required Lenders (other than with respect to the real property located at 839, 859-61 and 869-79 Ward Drive, Santa Barbara, CA 93111);

(vii)    Grants of Security Interests for the federally registered Intellectual Property referred to in Annexes D, E and F of the Security Agreement, in substantially the form of Exhibits A and B (as applicable) to the Security Agreement, in each case duly completed and executed by each applicable Credit Party (collectively, the "<u>IP Security Agreements</u>");

(viii)    the Intercreditor Agreement, duly completed and executed by all parties thereto;

(ix)    the Management Fee Subordination Agreement, duly completed and executed by all parties thereto;

(x)    the consulting agreement, by and between Dr. Pengdi Han, CTG, and the Parent, dated as of the date hereof, duly completed and executed by all parties thereto, in form and substance satisfactory to the Required Lenders;

(xi)    the favorable opinions of Holland & Knight LLP, counsel to the Parent and its Subsidiaries, in form and substance reasonably satisfactory to the Required Lenders;

(xii)    properly completed SBA Form 652, SBA Form 480 and Parts A and B of SBA Form 1031 from each Borrower.

(b)    The Lenders shall have received a certificate, signed by a Financial Officer of the Borrowers, dated the Closing Date and in form and substance reasonably satisfactory to the Required Lenders, certifying that (i) all representations and warranties of the Credit Parties contained in this

Agreement and the other Investment Documents are true and correct as of the Closing Date, both immediately before and after giving effect to the consummation of the Transactions, the making of the Loans and the application of the proceeds thereof (except to the extent any such representation or warranty is expressly stated to have been made as of a specific date, in which case such representation or warranty shall be true and correct as of such date), (ii) no Default or Event of Default has occurred and is continuing and no "Default" or "Event of Default" has occurred and is continuing under the Senior Loan Documents, in each case, both immediately before and after giving effect to the consummation of the Transactions, the making of the Loans and the application of the proceeds thereof, and (iii) all conditions to the closing set forth in this **Section 3.1** have been satisfied or waived as required hereunder.

(c)     The Lenders shall have received a certificate of the secretary or an assistant secretary of each Credit Party executing any Investment Documents as of the Closing Date, dated the Closing Date and in form and substance reasonably satisfactory to the Required Lenders, certifying (i) that attached thereto is a true and complete copy of the articles or certificate of incorporation, certificate of formation or other organizational document and all amendments thereto of such Credit Party, certified as of a recent date by the Secretary of State (or comparable Governmental Authority) of its jurisdiction of organization, and that the same has not been amended since the date of such certification, (ii) that attached thereto is a true and complete copy of the bylaws, operating or LLC agreement or similar governing document of such Credit Party, as then in effect and as in effect at all times from the date on which the resolutions referred to in clause (iii) below were adopted to and including the date of such certificate, (iii) that attached thereto is a true and complete copy of resolutions adopted by the board of directors (or similar governing body) of such Credit Party, authorizing the execution, delivery and performance of this Agreement and the other Investment Documents to which it is a party, and (iv) as to the incumbency and genuineness of the signature of each officer of such Credit Party executing this Agreement or any of such other Investment Documents, and attaching all such copies of the documents described above.

(d)     The Lenders shall have received (i) a certificate as of a recent date (and, in any event, not more than 30 days prior to the Closing Date) of the good standing of each Credit Party executing any Investment Documents as of the Closing Date, under the laws of its jurisdiction of organization, from the Secretary of State (or comparable Governmental Authority) of such jurisdiction, and (ii) a certificate as of a recent date (and, in any event, not more than 30 days prior to the Closing Date) of the qualification of each Credit Party to conduct business as a foreign corporation in such jurisdictions as the Lenders may have reasonably requested, from the Secretary of State (or comparable Governmental Authority) of such jurisdiction;

(e)     The Lenders shall have received final, executed copies of the HCM Acquisition Documents and all related agreements, documents and instruments as in effect on the Closing Date (including the HCM Acquisition Agreement), all of which shall be in form and substance reasonably satisfactory to the Required Lenders, and the Lenders shall be satisfied that, prior to or substantially concurrently with the making of the Loans hereunder, the HCM Acquisition shall have been consummated in accordance with the terms of the HCM Acquisition Documents and all other applicable documentation and in compliance with all applicable law and regulatory approvals, without any amendment or waiver of any condition or other provision thereof which is materially adverse to the Borrowers or the Lenders, except as approved by the Required Lenders;

(f)     [reserved];

(g)     The Equity Capitalization shall have been consummated and, upon consummation thereof and the other Transactions on the Closing Date and after giving effect thereto, the Parent shall have received (i) a rollover contribution of the Parent's existing equity holders of total equity of BWP immediately prior to the consummation of the Transactions valued at approximately $26,000,000, (ii) a

rollover equity contribution by DHAN valued at not less than $9,200,000 (in lieu of cash proceeds to DHAN in connection with the sale of assets of HCM and contribution of the DHAN Assets), and (iii) a contribution of not less than $13,000,000 in cash by the Sponsor, its Controlled Investment Affiliates, and certain co-investors (including the Lenders or their Affiliates), resulting in a total equity capitalization of not less than approximately $48,200,000.

(h)    The Lenders shall be reasonably satisfied with the terms and amounts of any intercompany Indebtedness among the Credit Parties;

(i)    The Lenders have received a funds flow certificate, in form and substance reasonably satisfactory to the Lenders, executed by a Financial Officer of the Parent certifying as to the flow of funds between the parties to the Transactions in connection with the Transactions.

(j)    The Lenders shall have received final, executed copies of the Senior Loan Documents as in effect on the Closing Date, all of which shall be satisfactory in form and substance to the Required Lenders, and the Lenders shall be satisfied that, prior to or substantially concurrently with the making of the Loans hereunder, the incurrence of Senior Debt pursuant to the terms of the Senior Loan Documents shall have been consummated in accordance with the terms of the Senior Loan Documents and in compliance with all applicable law and regulatory approvals, without any amendment or waiver of any material condition or other provision thereof except as approved by the Required Lenders, and the Senior Lenders shall have (i) advanced to the Borrowers up to $31,000,000 in Term Loans (as defined under the Senior Loan Agreement), (ii) made available to the Borrowers up to $10,000,000 in Revolving Loans (as defined in the Senior Loan Agreement) with not more than $3,000,000 in Revolver Loans (as defined in the Senior Loan Agreement) advanced on the Closing Date, and (iii) made available to the Borrowers up to $8,000,000 in CapEx Term Loans (as defined in the Senior Loan Agreement) which will be completely unfunded on the Closing Date, in each case pursuant to the Senior Loan Agreement.

(k)    Concurrently with the making of the Loans hereunder, (i) all principal, interest and other amounts outstanding of the Indebtedness of the Parent or any of its Subsidiaries (other than (A) Indebtedness listed on **Schedule 7.2** and (B) Indebtedness described on **Schedule 3.1(k)**) (collectively, the "Terminating Indebtedness"), shall be repaid and satisfied in full and all guarantees by the Credit Parties relating thereto extinguished, (ii) all commitments to extend credit under the agreements and instruments relating to the Terminating Indebtedness shall be terminated, (iii) any Liens securing the Terminating Indebtedness shall be released and any related filings (including UCC filings, mortgages, and intellectual property filings) terminated of record (or arrangements satisfactory to the Lenders made therefor), and (iv) any letters of credit outstanding under any Terminating Indebtedness for which any Credit Party is obligated shall have been terminated, canceled or replaced; and the Lenders shall have received evidence of the foregoing satisfactory to them, including escrow agreements and/or payoff letters executed by the lenders or the agent (on behalf of and at the direction of) the lenders thereunder.

(l)    The Lenders shall have received certified reports from an independent search service satisfactory to it listing any judgment or tax lien filing or Uniform Commercial Code financing statement that names the Parent, or any of the Parent's Subsidiaries as debtor in any of the jurisdictions listed beneath its name on Annex B to the Security Agreement, and the results thereof shall be reasonably satisfactory to the Required Lenders.

(m)    The Lenders shall have received evidence in form and substance reasonably satisfactory to them that all filings, recordings, registrations and other actions (including the filing of duly completed UCC-1 financing statements in each jurisdiction listed on Annex A to the Security Agreement) necessary

to perfect the Liens created by the Security Documents shall have been completed, or arrangements satisfactory to the Lenders for the completion thereof shall have been made.

(n)     All material approvals, permits and consents of any Governmental Authority or other Persons required in connection with the execution and delivery of this Agreement, the other Investment Documents and the consummation of the Transactions shall have been obtained, without the imposition of conditions that are not reasonably acceptable to the Lenders, and all related filings, if any, shall have been made, and all such approvals, permits, consents and filings shall be in full force and effect and the Lenders shall have received such copies thereof as they shall have reasonably requested; all applicable waiting periods shall have expired without any adverse action being taken or threatened by any Governmental Authority having jurisdiction; and no action, proceeding, investigation, regulation or legislation shall have been instituted, threatened or proposed before, and no order, injunction or decree shall have been entered by, any court or other Governmental Authority, in each case to enjoin, restrain or prohibit, to obtain substantial damages in respect of, or to impose materially adverse conditions upon, the HCM Acquisition and any other Transaction, this Agreement or any of the other Investment Documents, that would reasonably be expected to have a Material Adverse Effect.

(o)     Each of the representations and warranties of the Credit Parties contained in this Agreement (including **Article IV**) and the other Investment Documents shall be true and correct on and as of the Closing Date, both immediately before and after giving effect to the consummation of the HCM Acquisition and the other Transactions, the making of the Loans and the application of the proceeds thereof (except to the extent any such representation or warranty is expressly stated to have been made as of a specific date, in which case such representation or warranty shall be true and correct as of such date).

(p)     No Default or Event of Default shall have occurred and be continuing, and no "Default" shall have occurred and be continuing under the Senior Loan Documents, in each case both immediately before and after giving effect to the consummation of the HCM Acquisition and the other Transactions, the making of the initial Loans and the application of the proceeds thereof.

(q)     The Lenders shall have received copies of the financial statements referred to in **Section 4.11(a)**, together with copies of unaudited monthly consolidated financial statements of the Parent and its Subsidiaries through August 31, 2013 (the last day of the month most recently ended prior to the Closing Date for which financial statements of the Parent and its Subsidiaries are available), and all other financial information of the Credit Parties reasonably requested by the Lenders.

(r)     The Lenders shall have received an executed Financial Condition Certificate, attaching an unaudited consolidated balance sheet of the Parent and its Subsidiaries as of August 31, 2013 (the last day of the month most recently ended prior to the Closing Date for which financial statements of the Parent and its Subsidiaries are available and for that portion of the current fiscal year then ended), showing adjustments on a Pro Forma Basis to give effect to the consummation of the Transactions, all as if such events had occurred on such date (the "Pro Forma Balance Sheet"), all of which shall be in form and substance satisfactory to the Required Lenders.

(s)     The Lenders shall have received an executed certificate of the chief financial officer of the Parent as to the solvency of the Credit Parties (taken as a whole, after giving effect to the Transactions), addressed to the Collateral Agent and the Lenders, dated as of the Closing Date and in form and substance reasonably satisfactory to the Required Lenders;

(t)     The Lenders shall be satisfied that, on a Pro Forma Basis after giving effect to the Transactions, all as if such events had occurred on the date of the Pro Forma Balance Sheet, (i) the Borrowers are in compliance with the financial covenants set forth in **Article VI** as of August 31, 2013

(assuming such covenants were applicable to the Borrowers at such date at the required levels of such covenants at their respective first measurement dates), (ii) Consolidated EBITDA for the twelve-month period ending on August 31, 2013 ("Closing EBITDA") is not less than $11,600,000, (iii) Funded Debt is not greater than Closing EBITDA multiplied by 4.20, and (iv) Funded Debt represented by the Senior Debt is not greater than Closing EBITDA multiplied by 3.00; and the Lenders shall have received a certificate of a Financial Officer of the Borrower as to the foregoing, together with a completed Covenant Compliance Worksheet and other supporting documentation, all in form and substance satisfactory to the Required Lenders.

(u)      The Lenders shall have received evidence in form and substance reasonably satisfactory to them that all of the requirements of **Section 5.6** have been satisfied, including receipt of certificates of insurance evidencing the insurance coverages described on **Schedule 4.18** and naming the Collateral Agent as loss payee or additional insured, as its interests may appear.

(v)      The Lenders shall have received written instructions from an Authorized Officer of the Borrowers, including wire transfer information, directing the payment of the proceeds of the Loans to be made hereunder.

The request by the Borrower and acceptance by the Borrower of the proceeds of the Loans on the Closing Date shall be deemed to constitute, as of the date thereof, a representation and warranty by the Borrower that the conditions in this **Article III** have been satisfied.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

To induce the Collateral Agent and the Lenders to enter into this Agreement and to induce the Lenders to extend the credit contemplated hereby, each of the Borrowers represents and warrants to the Collateral Agent and each Lender as follows:

4.1      Corporate Organization and Power.  Each Credit Party (i) is a corporation or a limited liability company duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation, as the case may be (which jurisdictions are set forth on **Schedule 4.1**), (ii) has the full corporate or limited liability company power and authority to execute, deliver and perform the Transaction Documents to which it is or will be a party, to own and hold its property and to engage in its business as presently conducted, and (iii) is duly qualified to do business as a foreign corporation or limited liability company and is in good standing in each jurisdiction where the nature of its business or the ownership of its properties requires it to be so qualified, except where the failure to be so qualified, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

4.2      Authorization; Enforceability.  Each Credit Party has taken, or on the Closing Date will have taken, all necessary corporate or limited liability company action, as applicable, to execute, deliver and perform each of the Transaction Documents to which it is or will be a party, and has, or on the Closing Date (or any later date of execution and delivery) will have, validly executed and delivered each of the Transaction Documents to which it is or will be a party.  This Agreement constitutes, and each of the other Transaction Documents upon execution and delivery will constitute, the legal, valid and binding obligation of each Credit Party that is a party hereto or thereto, enforceable against it in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally, by general equitable principles or by principles of good faith and fair dealing (regardless of whether enforcement is sought in equity or at law).

4.3     No Violation.  The execution, delivery and performance by each Credit Party of each of the Transaction Documents to which it is or will be a party, and compliance by it with the terms hereof and thereof, do not and will not (i) violate any provision of its articles or certificate of incorporation or formation, its bylaws or operating or LLC agreement, or other applicable formation or organizational documents, (ii) contravene any other Requirement of Law applicable to it, (iii) conflict with, result in a breach of or constitute (with notice, lapse of time or both) a default under any indenture, mortgage, lease, agreement, contract or other instrument to which it is a party, by which it or any of its properties is bound or to which it is subject, or (iv) except for the Liens granted in favor of the Collateral Agent pursuant to the Security Documents and the Senior Agent pursuant to the Senior Loan Documents, result in or require the creation or imposition of any Lien upon any of its properties, revenues or assets; except, in the case of clauses (ii) and (iii) above, where such violations, conflicts, breaches or defaults, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

4.4     Governmental and Third-Party Authorization; Permits.  No consent, approval, authorization or other action by, notice to, or registration or filing with, any Governmental Authority or other Person is or will be required as a condition to or otherwise in connection with the due execution, delivery and performance by each Credit Party of this Agreement or any of the other Transaction Documents to which it is or will be a party or the legality, validity or enforceability hereof or thereof, other than (i) filings of Uniform Commercial Code financing statements and other instruments and actions necessary to perfect the Liens created by the Security Documents and the Senior Loan Documents, (ii) consents, authorizations and filings that have been (or on or prior to the Closing Date will have been) made or obtained and that are (or on the Closing Date will be) in full force and effect, which consents, authorizations and filings are listed on **Schedule 4.4**, and (iii) consents and filings the failure to obtain or make which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  Each Credit Party has, and is in good standing with respect to, all governmental approvals, licenses, permits and authorizations necessary to conduct its business as presently conducted and to own or lease and operate its properties, except for those the failure to obtain which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

4.5     Litigation.  There are no actions, investigations, suits or proceedings pending or, to the knowledge of any Borrower, threatened, at law, in equity or in arbitration, before any court, other Governmental Authority, arbitrator or other Person, (i) against or affecting any of the Credit Parties or any of their respective properties that could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, or (ii) with respect to this Agreement, any of the other Transaction Documents or any of the transactions contemplated hereby or thereby.

4.6     Taxes.  Each Credit Party has timely filed all federal, state, local and foreign tax returns and reports required to be filed by it and has paid, prior to the date on which penalties would attach thereto or a Lien would attach to any of the properties of a Credit Party if unpaid, all taxes, assessments, fees and other charges levied upon it or upon its properties that are shown thereon as due and payable, other than those that are not yet delinquent or that are being contested in good faith and by proper proceedings and for which adequate reserves have been established in accordance with GAAP.  Such returns accurately reflect in all material respects all liability for taxes of the Credit Parties for the periods covered thereby.  There is no ongoing audit or examination or, to the knowledge of any Borrower, other investigation by any Governmental Authority of the tax liability of any of the Credit Parties, and there is no material unresolved claim by any Governmental Authority concerning the tax liability of any Credit Party for any period for which tax returns have been or were required to have been filed, other than unsecured claims for which adequate reserves have been established in accordance with GAAP.  No Credit Party has waived or extended or has been requested to waive or extend the statute of limitations relating to the payment of any taxes.

4.7    Subsidiaries; Capitalization.  **Schedule 4.7** sets forth, after giving effect to the Transactions, (i) all of the Subsidiaries of the Parent (including the Borrowers) and (ii) as to each Credit Party, (x) the number of shares, units or other interests of each class of Capital Stock outstanding, and the number and effect, if exercised, of all outstanding options, warrants, rights of conversion or purchase and similar rights, (y) the direct holders of all such Capital Stock and the number of shares, units, interests, options, warrants or other purchase rights held by each, and (z) a detailed description of all Disqualified Capital Stock and the material terms thereof (including any conversion, exchange, repurchase, redemption or other payment terms thereof).  All outstanding shares of Capital Stock of the Parent and each of its Subsidiaries are, to the extent applicable, duly and validly issued, fully paid, nonassessable, and free and clear of all Liens other than, with respect to the Capital Stock of the Borrower and Subsidiaries of the Borrower, those in favor of the Collateral Agent pursuant to the Security Documents and those in favor of the Senior Agent pursuant to the Senior Loan Documents.  Except for the shares of Capital Stock and the other equity arrangements expressly indicated on **Schedule 4.7**, there are no shares of Capital Stock, warrants, rights, options or other equity securities, or other Capital Stock of any Credit Party outstanding or reserved for any purpose.

4.8    Full Disclosure.  To the knowledge of the Borrowers, all factual information heretofore, contemporaneously or hereafter furnished in writing to the Collateral Agent or any Lender by or on behalf of any Credit Party for purposes of or in connection with this Agreement, the other Investment Documents and the Transactions is or will be (when taken as a whole) true and accurate in all material respects on the date as of which such information is dated or certified (or, if such information has been updated, amended or supplemented, on the date as of which any such update, amendment or supplement is dated or certified) and not made incomplete by omitting to state a material fact necessary to make the statements contained herein and therein, in light of the circumstances under which such information was provided, not materially misleading.

4.9    Margin Regulations.  No Credit Party is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock.  No proceeds of the Loans will be used, directly or indirectly, to purchase or carry any Margin Stock, to extend credit for such purpose or for any other purpose, in each case that would violate or be inconsistent with Regulations T, U or X or any provision of the Exchange Act.

4.10    No Material Adverse Effect.  There has been no Material Adverse Effect since December 31, 2012, and there exists no event, condition or state of facts that could reasonably be expected to result in a Material Adverse Effect.

4.11    Financial Matters.

(a)    The Borrowers have heretofore furnished to the Lenders copies of (i) the audited consolidated balance sheets of the Parent and its Subsidiaries as of December 31, 2012 and March 31, 2012, in each case with the related statements of income, cash flows and stockholders' equity for the fiscal years then ended, together with the opinion of the applicable accounting firm thereon, and (ii) the unaudited consolidated balance sheet of the Parent and its Subsidiaries as of August 31, 2013, and the related statements of income, cash flows and stockholders' equity for the eight-month period then ended. Such financial statements have been prepared in accordance with GAAP (subject, with respect to the unaudited financial statements, to the absence of notes required by GAAP and to normal year-end adjustments) and present fairly in all material respects the financial condition of the Parent and its Subsidiaries on a consolidated basis as of the respective dates thereof and the results of operations of the Parent and its Subsidiaries on a consolidated basis for the respective periods then ended.  Except as fully reflected in the most recent financial statements referred to above and the notes thereto, there are no material liabilities or obligations with respect to the Parent and its Subsidiaries of any nature whatsoever

(whether absolute, contingent or otherwise and whether or not due) that are required in accordance with GAAP to be reflected in such financial statements and that are not so reflected.

(b)    The Pro Forma Balance Sheet reflects adjustments made on a Pro Forma Basis to give effect to the consummation of the Transactions, all as if such events had occurred on the date as of which the Pro Forma Balance Sheet is prepared.  The Pro Forma Balance Sheet has been prepared based on stated assumptions made in good faith and having a reasonable basis set forth therein, presents fairly in all material respects the consolidated financial condition of the Parent and its Subsidiaries on an unaudited Pro Forma Basis as of the date set forth therein after giving effect to the consummation of the transactions described above.

(c)    [reserved.]

(d)    After giving effect to the consummation of the Transactions, the Credit Parties, taken as a whole, (i) have capital sufficient to carry on their businesses as conducted and as proposed to be conducted, (ii) have assets with a fair saleable value, determined on a going concern basis, which are (y) not less than the amount required to pay the probable liability on their existing debts as they become absolute and matured and (z) greater than the total amount of their liabilities (including identified contingent liabilities, valued at the amount that can reasonably be expected to become absolute and matured in their ordinary course), and (iii) do not intend to, and do not believe that they will, incur debts or liabilities beyond their ability to pay such debts and liabilities as they mature in their ordinary course.

(e)    Since December 31, 2012, there has not been an occurrence of a "material weakness" (as defined in statement on Auditing Standards No. 60) in, or fraud that involves management or other employees who have a significant role in, the Credit Parties' internal controls over financial reporting, in each case as described in Section 404 of the Sarbanes-Oxley Act of 2002 and all rules and regulations promulgated thereunder and the accounting and auditing principles, rules, standards and practices promulgated or approved with respect thereto.

(f)    Neither (i) the board of directors (or similar governing body) of any Credit Party, a committee thereof or an authorized officer of any Credit Party has concluded that any financial statement previously furnished to the Lenders should no longer be relied upon because of an error, nor (ii) has any Credit Party been advised by its auditors or reviewers that a previously issued audit or review report or interim review cannot be relied on.

4.12    Ownership of Properties; Leases.  Each Credit Party (i) owns no real property, (ii) holds interests as lessee under leases which are in full force and effect with respect to all leased real and personal property used in connection with its business, the absence of which could reasonably be expected to result in a Material Adverse Effect, and (iii) has good title to all of its other material properties and assets reflected in the most recent financial statements referred to in **Section 4.11(a)** (except as sold or otherwise disposed of since the date thereof in the ordinary course of business), in each case free and clear of all Liens other than Permitted Liens.  **Schedule 4.12** lists, after giving effect to the Transactions, all Realty of the Credit Parties, indicating in each case the identity of the owner, the address of the property, the nature of use of the premises, and whether such interest is a leasehold or fee ownership interest.  A true and complete copy of each lease of real property by any Credit Party has been made available to the Lenders.  Except as set forth on **Schedule 4.12**, (x) no Credit Party is in default or alleged to be in default with respect to any of its material obligations under any real property lease, the absence of which could reasonably be expected to result in a Material Adverse Effect and (y) to the Borrowers' knowledge, no party other than any Credit Party is in default with respect to such party's material obligations under any such lease.

4.13    <u>ERISA</u>.

(a)    Except as set forth on **Schedule 4.13(a)**, each Credit Party and its ERISA Affiliates is in compliance with the applicable provisions of ERISA, and each Plan is and has been administered in compliance with all applicable Requirements of Law, including the applicable provisions of ERISA and the Code, in each case except where the failure so to comply, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  No ERISA Event that could reasonably be expected to have a Material Adverse Effect (i) has occurred within the five-year period prior to the Closing Date, (ii) has occurred and is continuing, or (iii) to the knowledge of any Borrower, is reasonably expected to occur with respect to any Plan.  Except as could not reasonably be expected to have a Material Adverse Effect, no Plan has any Unfunded Pension Liability as of the most recent annual valuation date applicable thereto, and no Credit Party or any of its ERISA Affiliates has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

(b)    Except as set forth on **Schedule 4.13(b)**, no Credit Party or any of its ERISA Affiliates has any outstanding liability on account of a complete or partial withdrawal from any Multiemployer Plan, and no Credit Party or any of its ERISA Affiliates would become subject to any liability under ERISA if any such Credit Party or ERISA Affiliate were to withdraw completely from all Multiemployer Plans as of the most recent valuation date.  No Multiemployer Plan is in "reorganization" or is "insolvent" within the meaning of such terms under ERISA.

4.14    <u>Environmental Matters</u>.

(a)    Except as set forth on **Schedule 4.14(a)**, (i) all real property ever owned, leased or occupied by the Borrowers or any Subsidiary, and all operations at such properties conducted by Borrowers, their Subsidiaries, are in compliance with all applicable Environmental Laws, except for such noncompliance as could not reasonably be expected to have a Material Adverse Effect and (ii) there is no contamination at, under or about such properties, which has or could reasonably be expected to have a Material Adverse Effect.

(b)    Except as set forth on **Schedule 4.14(b)**, no Credit Party has received any notice from any Governmental Authority of violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to any of such properties or the business conducted by the Borrowers, nor does any Borrower have knowledge that any such notice will be received or is being threatened, except in each case for such notices the subject matter of which could not reasonably be expected to have a Material Adverse Effect.

(c)    Except as set forth on **Schedule 4.14(c)**, no judicial proceedings or governmental or administrative action is pending, or, to the knowledge of the Borrowers, threatened, under any Environmental Law to which any Credit Party is named as a party with respect to such properties or the business conducted by the Borrowers, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial requirements outstanding under any Environmental Law with respect to such properties or such business, except for such proceedings, actions, decrees, orders or requirements as could not reasonably be expected to have a Material Adverse Effect.

4.15    <u>Compliance with Laws</u>.  Except as set forth on **Schedule 4.15**, each Credit Party has timely filed all material reports, documents and other materials required to be filed by it under all applicable Requirements of Law with any Governmental Authority, has retained all material records and documents required to be retained by it under all applicable Requirements of Law, and is otherwise in

compliance with all applicable Requirements of Law in respect of the conduct of its business and the ownership and operation of its properties, except in each case to the extent that the failure to comply therewith, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

4.16    Intellectual Property.  Except as set forth on **Schedule 4.16**, each Borrower and each Subsidiary owns, or is licensed to use, all Intellectual Property necessary for the conduct of its business, the absence of which could reasonably be expected to have a Material Adverse Effect.  In the event of the enforcement by the Collateral Agent of its rights as a secured creditor under the Investment Documents, the Collateral Agent will not be required to own or otherwise possess the right to use any Intellectual Property, or any license to use the same, in order to sell any inventory of the Credit Parties.  No written claim has been asserted and is pending by any Person against any Credit Party challenging or questioning the use of any Intellectual Property by any Credit Party or the validity or effectiveness of any Intellectual Property owned by such Credit Party, nor do the Borrowers or the Subsidiaries know of any valid basis for any such claim, in each case, which could reasonably be expected to have a Material Adverse Effect.  The use of Intellectual Property by the Borrowers and their Subsidiaries does not infringe in any material respect on the rights of any Person, nor, to the knowledge of the Borrowers, does the use by other Persons of Intellectual Property infringe in any material respect on the rights of the Borrowers or any Subsidiary, in each case, which could reasonably be expected to have a Material Adverse Effect.

4.17    Regulated Industries.  No Credit Party is (i) registered as an "investment company" or a company "controlled" by an "investment company," or an "investment advisor," within the meaning of the Investment Company Act of 1940, as amended, or (ii) subject to regulation under the Public Utility Holding Company Act of 2005, as amended, the ICC Termination Act of 1995, as amended, or the Federal Power Act, as amended.

4.18    Insurance.  **Schedule 4.18** sets forth, after giving effect to the Transactions, an accurate and complete list and a brief description (including the insurer, policy number, type of insurance, coverage limits, deductibles, expiration dates and any special cancellation conditions) of all policies of property and casualty, liability (including, but not limited to, product liability), business interruption, workers' compensation, and other forms of insurance owned or held by the Credit Parties or pursuant to which any of their respective assets are insured.  The assets, properties and business of the Credit Parties are insured against such hazards and liabilities, under such coverages and in such amounts, as are customarily maintained by prudent companies similarly situated and under policies issued by insurers of recognized responsibility.

4.19    Material Contracts.  **Schedule 4.19** lists, after giving effect to the Transactions, each agreement to which any Credit Party is a party, by which any Credit Party or its properties is bound or to which any Credit Party is subject, in each instance the breach or termination of which could reasonably be expected to result in a Material Adverse Effect (collectively, "Material Contracts"), and also indicates the parties thereto.  After giving effect to the Transactions, (i) each Material Contract is in full force and effect and is enforceable by each Credit Party that is a party thereto in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally, by general or equitable principles or by principles of good faith and fair dealing, and (ii) no Credit Party or, to the knowledge of any Borrower, any other party thereto is in breach of or default under any Material Contract in any material respect or has given notice of termination or cancellation of any Material Contract.

4.20    Security Documents.

(a)    The provisions of each of the Security Documents (whether executed and delivered prior to or on the Closing Date or thereafter) are and will be effective to create in favor of the Collateral Agent, for its benefit and the benefit of the Lenders, a valid and enforceable security interest in and Lien upon all right, title and interest of each Credit Party that is a party thereto in and to the Collateral purported to be pledged by it thereunder and described therein, and upon (i) the initial extension of credit hereunder, (ii) the filing of appropriately completed Uniform Commercial Code financing statements and continuations thereof in the jurisdictions specified therein, (iii) the filing of appropriately completed short-form assignments in the U.S. Patent and Trademark Office and the U.S. Copyright Office, as applicable, and (iv) the possession by the Collateral Agent of any certificates evidencing the securities pledged thereby, duly endorsed or accompanied by duly executed stock or equivalent powers, such security interest and Lien shall constitute a fully perfected and priority (second in priority only to the Lien of the Senior Agent securing the Senior Debt) security interest in and Lien upon such right, title and interest of the applicable Credit Party in and to such Collateral, to the extent that such security interest and Lien can be perfected by such filings, actions and possession, subject only to Permitted Liens.

(b)    The provisions of each Mortgage (whether executed and delivered prior to or on the Closing Date or thereafter) are and will be effective to create in favor of the Collateral Agent, for its benefit and the benefit of the Lenders, a valid and enforceable security interest in and Lien upon all right, title and interest of each Credit Party that is a party thereto in and to the mortgaged premises described therein, and upon (i) the initial extension of credit hereunder and (ii) the filing of such Mortgage in the applicable real property recording office, such security interest and Lien shall constitute a fully perfected and priority (second in priority only to the Lien of the Senior Agent securing the Senior Debt) security interest in and Lien upon such right, title and interest of such Credit Party in and to such mortgaged premises, in each case prior and superior to the rights of any other Person and subject only to Permitted Liens.

4.21    Labor Relations.  No Credit Party is engaged in any unfair labor practice within the meaning of the National Labor Relations Act of 1947, as amended.  There is (i) no unfair labor practice complaint before the National Labor Relations Board, or grievance or arbitration proceeding arising out of or under any collective bargaining agreement, pending or, to the knowledge of any Borrower, threatened, against any Credit Party, (ii) no strike, lock-out, slowdown, stoppage, walkout or other labor dispute pending or, to the knowledge of any Borrower, threatened, against any Credit Party, and (iii) to the knowledge of any Borrower, no petition for certification or union election or union organizing activities taking place with respect to any Credit Party.  There are no collective bargaining agreements or Multiemployer Plans covering the employees of the Credit Parties.

4.22    Certain Transaction Documents.

(a)    The Borrowers have heretofore furnished to the Lenders true and complete copies of the HCM Acquisition Documents, and the Senior Loan Documents, in each case together with all schedules and exhibits referred to therein or delivered pursuant thereto and all amendments, modifications and waivers relating thereto.  Immediately prior to giving effect to the consummation of the Transactions, (i) none of such Transaction Documents has been amended, modified or supplemented, nor any condition or provision thereof waived, in any respect which is materially adverse to the Borrowers or the Lenders other than as approved by the Required Lenders, and each such Transaction Document is in full force and effect and no Credit Party (nor, to the knowledge of any Borrower, any other party thereto) is in default thereunder or in breach thereof, (ii) all material conditions to the obligations of the Credit Parties under each of such Transaction Documents to consummate the transactions contemplated thereby have been satisfied or, with the consent of the Required Lenders, waived, and (iii) the Transactions will be

consummated in accordance with the terms of such Transaction Documents and in compliance with all applicable Requirements of Law.

(b)      The subordination provisions contained in the Management Fee Subordination Agreement are enforceable against BWP and BWCP and all of the Obligations constitute senior obligations thereunder, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally, by general equitable principles or by principles of good faith and fair dealing (regardless of whether enforcement is sought in equity or at law).

4.23      <u>No Burdensome Restrictions</u>.  No Credit Party is a party to any written agreement or instrument or subject to any other obligations or any charter or corporate restriction or any provision of any applicable Requirement of Law that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

4.24      <u>OFAC; Anti-Terrorism Laws</u>.

(a)      No Credit Party or any Affiliate of any Credit Party (i) is a Sanctioned Person, (ii) has more than 10% of its assets in Sanctioned Countries, or (iii) derives more than 10% of its operating income from investments in, or transactions with, Sanctioned Persons or Sanctioned Countries.  No part of the proceeds of any Loan hereunder will be used directly or indirectly to fund any operations in, finance any investments or activities in or make any payments to, a Sanctioned Person or a Sanctioned Country.

(b)      Neither the making of the Loans hereunder nor the use of the proceeds thereof will violate the PATRIOT Act, the Trading with the Enemy Act, as amended, the Foreign Corrupt Practices Act or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto.  The Credit Parties are in compliance in all material respects with the PATRIOT Act.

4.25      <u>SBA Matters</u>.  The Borrowers acknowledge that Avante and Fidus are, and certain other Lenders may from time to time be or become, a Small Business Investment Company (as defined in the SBIA), subject to the rules and regulations contained in and promulgated under the SBIA.  Each of the Borrowers, together with its "affiliates" (for purposes of this paragraph only, as that term is defined in Title 13, Code of Federal Regulations, §121.401), is a Small Business Concern (as defined in the SBIA's implementing regulations at 13 CFR §121.301(c)).  Neither the Parent nor any of its Subsidiaries presently engages in, and shall not hereafter engage in, any activities for which a Small Business Concern is prohibited from engaging in under the SBIA, nor shall any such Person use directly or indirectly the proceeds of the Loans for any purpose for which a Small Business Investment Company is prohibited from providing funds by SBIA's implementing regulations at 13 CFR §121.301(c).  The representations made by the Borrowers in the SBA forms delivered on the Closing Date pursuant to **Section 3.1(a)(xii)** shall be deemed to be representations made by the Borrowers under this **Section 4.25**.

## ARTICLE V

## AFFIRMATIVE COVENANTS

Each of the Borrowers covenants and agrees that, until the termination of the Commitments and the payment in full in cash of all principal and interest with respect to the Loans, together with all fees, expenses and other non-contingent monetary amounts then due and owing hereunder:

5.1    <u>Financial Statements</u>.  The Borrowers will deliver to each Lender:

(a)    As soon as available and in any event within, (i) for the first twelve (12) months after the date hereof, 45 days after the end of each fiscal month (beginning with October 2013) and (ii) thereafter within 30 days after the end of each fiscal month, unaudited consolidated and consolidating balance sheets of the Parent and its Subsidiaries as of the end of such fiscal month and unaudited consolidated and consolidating statements of income, cash flows and members' equity for the Parent and its Subsidiaries for the fiscal month then ended and for that portion of the fiscal year then ended, in each case setting forth comparative consolidated figures as of the end of and for the corresponding period in the preceding fiscal year together with comparative budgeted figures for the fiscal period then ended, all in reasonable detail and prepared in accordance with GAAP (subject to the absence of notes required by GAAP and subject to normal year-end adjustments) applied on a basis consistent with that of the preceding month or containing disclosure of the effect on the financial condition or results of operations of any change in the application of accounting principles and practices during such month;

(b)    As soon as available and in any event within (i) for the first four (4) fiscal quarters after the date hereof, 60 days after the end of each fiscal quarter (beginning with the fiscal quarter ending December 31, 2013) and (ii) thereafter, 45 days after the end of each fiscal quarter, unaudited consolidated and consolidating balance sheets of the Parent and its Subsidiaries as of the end of such fiscal quarter and unaudited consolidated and consolidating statements of income, cash flows and stockholders' equity for the Parent and its Subsidiaries for the fiscal quarter then ended and for that portion of the fiscal year then ended, in each case setting forth comparative consolidated figures as of the end of and for the corresponding period in the preceding fiscal year together with comparative budgeted figures for the fiscal period then ended, all in reasonable detail and prepared in accordance with GAAP (subject to the absence of notes required by GAAP and subject to normal year-end adjustments) applied on a basis consistent with that of the preceding quarter or containing disclosure of the effect on the financial condition or results of operations of any change in the application of accounting principles and practices during such quarter;

(c)    As soon as available and in any event within (i) 150 days after the fiscal year ending December 31, 2013, and (ii) 120 days after the end of each fiscal year-end thereafter, an audited consolidated and unaudited consolidating balance sheet of the Parent and its Subsidiaries as of the end of such fiscal year and the related audited consolidated and unaudited consolidating statements of income, cash flows and stockholders' equity for the Parent and its Subsidiaries for the fiscal year then ended, including the notes thereto, in each case setting forth comparative consolidated figures as of the end of and for the preceding fiscal year together with comparative budgeted figures for the fiscal year then ended, all in reasonable detail and (with respect to the audited statements) certified by the independent certified public accounting firm regularly retained by the Borrowers or another independent certified public accounting firm of recognized national standing reasonably acceptable to the Required Lenders, together with a report thereon by such accountants that is not qualified as to going concern or scope of audit and to the effect that such financial statements present fairly in all material respects the consolidated financial condition and results of operations of the Parent and its Subsidiaries as of the dates and for the periods indicated in accordance with GAAP applied on a basis consistent with that of the preceding year or containing disclosure of the effect on the financial condition or results of operations of any change in the application of accounting principles and practices during such year; and

(d)    Concurrently with each delivery of the financial statements described in **Sections 5.1(a)** and **5.1(c)**, a management's discussion and analysis report in form and substance substantially similar to the management's discussion analysis report attached hereto as **Exhibit F**.

5.2    <u>Other Business and Financial Information</u>.  The Borrowers will deliver to each Lender:

(a)    Concurrently with each delivery of the financial statements described in **Sections 5.1(b)** and **5.1(c)**, a Compliance Certificate with respect to the period covered by the financial statements being delivered thereunder, executed by a Financial Officer of the Parent, together with a Covenant Compliance Worksheet reflecting the computation of the financial covenants set forth in **Article VI** as of the last day of the period covered by such financial statements;

(b)    As soon as available and in any event by (i) the 60th day after the commencement of the 2014 fiscal year and (ii) the 30th day after the commencement of subsequent fiscal years, a consolidated and consolidating operating budget for the Parent and its Subsidiaries for such fiscal year (prepared on a monthly basis), consisting of consolidated and consolidating balance sheets and consolidated and consolidating statements of income and cash flows, together with a certificate of a Financial Officer of the Parent to the effect that such budget has been prepared in good faith and is a reasonable estimate of the financial position and results of operations of the Parent and its Subsidiaries for the period covered thereby;

(c)    Promptly upon receipt thereof, copies of any "management letter" submitted to any Credit Party by its certified public accountants in connection with each annual, interim or special audit, and promptly upon completion thereof, any response reports from such Credit Party in respect thereof;

(d)    Promptly upon the sending, filing or receipt thereof, copies of (i) all financial statements, reports, notices and proxy statements that any Credit Party shall send or make available generally to its equityholders, (ii) all regular, periodic and special reports, registration statements and prospectuses that any Credit Party shall render to or file with the Securities and Exchange Commission, the National Association of Securities Dealers, Inc. or any national securities exchange, and (iii) all press releases and other statements made available generally by any Credit Party to the public concerning material developments in the business of the Credit Parties, and (iv) all material notices received or delivered pursuant to the Senior Loan Documents;

(e)    Promptly upon (and in any event within five Business Days after) any Responsible Officer of any Credit Party obtaining knowledge thereof, written notice of any of the following:

(i)    the occurrence of any Default or Event of Default, together with a written statement of a Responsible Officer of the Parent specifying the nature of such Default or Event of Default, the period of existence thereof and the action that the Borrowers have taken and proposes to take with respect thereto;

(ii)    the institution or threatened institution of any action, suit, investigation or proceeding against or affecting any Credit Party, including any such investigation or proceeding by any Governmental Authority (other than routine periodic inquiries, investigations or reviews), that could reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect;

(iii)    the receipt by any Credit Party from any Governmental Authority of (A) any notice asserting any failure by any Credit Party to be in compliance with applicable Requirements of Law or that threatens the taking of any action against any Credit Party or sets forth circumstances that could reasonably be expected to have a Material Adverse Effect, or (B) any notice of any actual or threatened suspension, limitation or revocation of, failure to renew, or imposition of any restraining order, escrow or impoundment of funds in connection with, any

license, permit, accreditation or authorization of any Credit Party, where such action could reasonably be expected to have a Material Adverse Effect;

(iv)    the occurrence of any ERISA Event, together with (x) a written statement of a Responsible Officer of the Borrowers specifying the details of such ERISA Event and the action that the applicable Credit Party has taken and proposes to take with respect thereto, (y) a copy of any notice with respect to such ERISA Event that may be required to be filed with the PBGC and (z) a copy of any notice delivered by the PBGC to any Credit Party or an ERISA Affiliate with respect to such ERISA Event;

(v)    the occurrence of (i) any material default under, or any proposed or threatened termination or cancellation of, any Material Contract or other material contract or agreement to which any Credit Party is a party, the default under or termination or cancellation of which could reasonably be expected to have a Material Adverse Effect or (ii) any "Event of Default" under any Senior Loan Document;

(vi)    the occurrence of any of the following: (x) the assertion of any environmental claim against or affecting any Credit Party or any real property leased, operated or owned by any Credit Party, or any Credit Party's discovery of a basis for any such environmental claim; (y) the receipt by any Credit Party of notice of any alleged violation of or noncompliance with any Environmental Laws or release of any Hazardous Substance; or (z) the taking of any investigation, remediation or other responsive action by any Credit Party or any other Person in response to the actual or alleged violation of any Environmental Law by any Credit Party or generation, storage, transport, release, disposal or discharge of any Hazardous Substances on, to, upon or from any real property leased, operated or owned by any Credit Party; but in each case under clauses (x), (y) and (z) above, only to the extent the same could reasonably be expected to have a Material Adverse Effect;

(vii)    (x) any dispute with, or claim against, any person or entity for which any Credit Party has a claim under the HCM Acquisition Agreement which has a reasonably estimated value in excess of $500,000; and (y) copies of all material notices and demands sent or received by any Credit Party pursuant to the HCM Acquisition Agreement; and

(viii)    the occurrence of (i) any unfair labor practice complaint before the National Labor Relations Board which could reasonably be expected to have a Material Adverse Effect, or grievance or arbitration proceeding arising out of or under any collective bargaining agreement, pending or, to the knowledge of any Borrower, threatened, against any Credit Party, or (ii) any strike, lock-out, slowdown, stoppage, walkout or other labor dispute pending or, to the knowledge of any Borrower, threatened, against any Credit Party.

(f)    As promptly as reasonably possible, such other information about the business, condition (financial or otherwise), operations or properties of any Credit Party as any Lender may from time to time reasonably request.

5.3    Existence; Franchises; Maintenance of Properties.  Each Borrower will, and will cause each of its Subsidiaries to, (i) maintain and preserve in full force and effect its legal existence, except as expressly permitted otherwise by **Section 7.1**, (ii) obtain, maintain and preserve in full force and effect all other rights, franchises, licenses, permits, certifications, approvals and authorizations required by Governmental Authorities and necessary to the ownership, occupation or use of its properties or the conduct of its business, except to the extent the failure to do so could not reasonably be expected to have a Material Adverse Effect, and (iii) keep all material properties in good working order and condition

(normal wear and tear and damage by casualty excepted) and from time to time make all necessary repairs to and renewals and replacements of such properties, except to the extent that any of such properties are obsolete or are being replaced or, in the good faith judgment of the Borrowers, are no longer useful or desirable in the conduct of the business of the Credit Parties.

5.4    Compliance with Laws.  Each Borrower will, and will cause each of its Subsidiaries to, comply in all respects with all Requirements of Law applicable in respect of the conduct of its business and the ownership and operation of its properties, except to the extent the failure so to comply could not reasonably be expected to have a Material Adverse Effect.

5.5    Payment of Obligations.  Each Borrower will, and will cause each of its Subsidiaries to, (i) pay, discharge or otherwise satisfy at or before maturity all liabilities and obligations as and when due (subject to any applicable subordination, grace and notice provisions), except to the extent failure to do so could not reasonably be expected to have a Material Adverse Effect, and (ii) pay and discharge all taxes, assessments and governmental charges or levies imposed upon it, upon its income or profits or upon any of its properties, prior to the date on which penalties would attach thereto, and all lawful claims that, if unpaid, would become a Lien (other than a Permitted Lien) upon any of the properties of any Credit Party; provided, however, that no Credit Party shall be required to pay any such tax, assessment, charge, levy or claim that is being contested in good faith and by proper proceedings and as to which such Credit Party is maintaining adequate reserves with respect thereto in accordance with GAAP.

5.6    Insurance.  Each Borrower will, and will cause each of its Subsidiaries to, (i) maintain with financially sound and reputable insurance companies insurance in the same or greater amount and the same or greater levels of coverage as in existence on the date hereof (other than (a) the existing environmental pollution insurance policy and (b) the representations and warranties insurance policy obtained by the Parent in connection with the Acquisition Agreement), and (ii) deliver certificates of such insurance to the Collateral Agent with standard loss payable endorsements naming the Collateral Agent as loss payee (on property and casualty policies) and additional insured (on liability policies) as its interests may appear.  Each such policy of insurance shall contain a clause requiring the insurer to give not less than thirty (30) days' prior written notice to the Collateral Agent before any cancellation of the policies for any reason whatsoever and shall provide that any loss shall be payable in accordance with the terms thereof notwithstanding any act of any Credit Party that might result in the forfeiture of such insurance.

5.7    Maintenance of Books and Records; Inspection.  Each Borrower will, and will cause each of its Subsidiaries to, (i) maintain adequate books, accounts and records, in which full, true and correct entries shall be made of all financial transactions in relation to its business and properties, and prepare all financial statements required under this Agreement, in each case in accordance with GAAP and in compliance with the requirements of any Governmental Authority having jurisdiction over it, and (ii) permit employees or agents of any Lender to visit and inspect its properties and examine or audit its books, records, working papers and accounts and make copies and memoranda of them, and to discuss its affairs, finances and accounts with its officers and employees and, upon notice to the Borrowers, the independent public accountants of the Parent and its Subsidiaries (and by this provision each of the Borrowers authorizes such accountants to discuss the finances and affairs of the Parent and its Subsidiaries (all such rights in this clause (ii), collectively, "Inspections")), all at such times and from time to time, upon reasonable notice (which in no event shall be less than five Business Days) and during business hours, as may be reasonably requested, provided, however, so long as no Event of Default shall have occurred and be continuing, no more than one Inspection can occur in any 12 month period.

5.8    Creation or Acquisition of Subsidiaries.  The Borrowers and their Wholly Owned Subsidiaries may from time to time create or acquire new Wholly Owned Subsidiaries in connection with Permitted Acquisitions or otherwise, provided that:

(a)        Concurrently with (and in any event within ten (10) Business Days after) the creation or direct or indirect acquisition by any Borrower thereof, (i) each such new Subsidiary will execute and deliver to the Collateral Agent and the Lenders (A) a joinder or amendment to this Agreement, pursuant to which such new Subsidiary shall become a Borrower hereunder and shall become bound by each and all of the provisions of this Agreement, in form and substance reasonably satisfactory to the Required Lenders, (B) a joinder to the Security Agreement, pursuant to which such new Subsidiary shall become a party thereto and shall grant to the Collateral Agent a priority Lien, subject only to the Lien of the Senior Agent securing the Senior Debt  and Permitted Liens, upon and security interest in its accounts receivable, inventory, equipment, general intangibles and all other personal property as Collateral for its obligations under the Investment Documents, and (C) unless the Required Lenders agree otherwise in writing, a Mortgage with respect to any owned interests of such new Subsidiary in real property and (ii) the Borrowers will, or will cause the parent Subsidiary that owns the Capital Stock of such new Subsidiary to, execute and deliver to the Collateral Agent an amendment or supplement to the Security Agreement pursuant to which all of the Capital Stock of such new Subsidiary shall be pledged to the Collateral Agent, together with the certificates, if any, evidencing such Capital Stock, along with undated stock or equivalent powers duly executed in blank;

(b)        Concurrently with (and in any event within 10 Business Days after) the creation or acquisition of any new Subsidiary, the Borrowers will deliver to the Collateral Agent and the Lenders:

(i)        a written legal opinion of counsel to such Subsidiary addressed to the Collateral Agent and the Lenders, in form and substance reasonably satisfactory to the Required Lenders and their counsel, which shall cover such matters relating to such Subsidiary and the creation or acquisition thereof incident to the transactions contemplated by this Agreement and this **Section 5.8** and the other Investment Documents as set forth in the legal opinion of counsel delivered to the Collateral Agent and the Lenders on the Closing Date;

(ii)       (A) a copy of the certificate of incorporation (or other charter documents) of such Subsidiary, certified as of a date that is acceptable to the Required Lenders by the applicable Governmental Authority of the jurisdiction of incorporation or organization of such Subsidiary, (B) a copy of the bylaws or operating or LLC agreement or similar organizational document of such Subsidiary, certified on behalf of such Subsidiary as of a date that is acceptable to the Required Lenders by the corporate secretary or assistant secretary of such Subsidiary, (C) an original certificate of good standing for such Subsidiary issued by the applicable Governmental Authority of the jurisdiction of incorporation or organization of such Subsidiary as of a date that is acceptable to the Required Lenders and (D) copies of the resolutions of the board of directors (or similar governing body) and, if required, stockholders or other equity owners of such Subsidiary authorizing the execution, delivery and performance of the agreements, documents and instruments executed pursuant to **Sections 5.8(a)**, certified on behalf of such Subsidiary by an Authorized Officer of such Subsidiary, all in form and substance reasonably satisfactory to the Required Lenders;

(iii)      a report of Uniform Commercial Code financing statement, tax and judgment lien searches performed against such Subsidiary in each jurisdiction in which such Subsidiary is incorporated or organized, has a place of business or maintains any material assets, which report shall show no Liens on its assets (other than Permitted Liens);

(iv)      a certificate of the secretary or an assistant secretary of such Subsidiary as to the incumbency and signature of the officers executing agreements, documents and instruments executed pursuant to **Sections 5.8(a)**;

(v)     a certificate as to the solvency of such Subsidiary taken together with the other Borrowers (after giving effect to the Permitted Acquisition), addressed to the Collateral Agent and the Lenders, dated as of the date of creation or acquisition of such Subsidiary and in form and substance reasonably satisfactory to the Required Lenders;

(vi)     evidence satisfactory to the Required Lenders that no Default or Event of Default shall exist immediately before or after the creation or acquisition of such Subsidiary or be caused thereby; and

(vii)     a certificate executed by an Authorized Officer of each of the Borrowers and such Subsidiary, which shall constitute a representation and warranty by the Borrowers and such Subsidiary as of the date of the creation or acquisition of such Subsidiary that all conditions contained in this Agreement and each other Investment Document to such creation or acquisition have been satisfied, in form and substance reasonably satisfactory to the Required Lenders;

(c)     As promptly as reasonably possible, each Borrower and its Subsidiaries will deliver any such other documents, certificates and opinions as the Required Lenders may reasonably request in connection therewith, in form and substance reasonably satisfactory to the Required Lenders, and will take such other action as the Collateral Agent or the Lenders may reasonably request to create in favor of the Collateral Agent, for the benefit of the Lenders, a perfected security interest in the Collateral being pledged pursuant to the documents described above; and

(d)     Any Subsidiary acquired or created by the Borrowers shall be a Domestic Subsidiary, unless otherwise consented to by the Required Lenders.

5.9     <u>Additional Security</u>.  Each Borrower will, and will cause each of its Subsidiaries to, grant to the Collateral Agent, for the benefit of the Lenders, from time to time security interests, mortgages and other Liens in and upon such of its assets and properties as are not covered by the Security Documents executed and delivered on the Closing Date or pursuant to **Section 5.8** (including and within 10 Business Days after any acquisition of any fee interest in any real property by any Credit Party other than a Foreign Subsidiary, a Mortgage with respect thereto, unless the Required Lenders agree otherwise in writing) but in all events excluding any leasehold interests), and as may be reasonably requested from time to time by the Collateral Agent or the Required Lenders.  Such security interests, mortgages and Liens shall be granted pursuant to documentation in form and substance reasonably satisfactory to the Collateral Agent and shall constitute valid and perfected security interests and Liens, subject to no Liens other than Permitted Liens.  Without limitation of the foregoing, in connection with the grant of any Mortgage, each Borrower will, and will cause each applicable Subsidiary to, at the Borrowers' expense, prepare, obtain and deliver to the Collateral Agent any environmental assessments, appraisals, surveys, title insurance and other matters or documents as the Collateral Agent may reasonably request or as may be required under applicable banking laws and regulations.

5.10     <u>Environmental Laws</u>. The Borrowers shall, and shall cause each Subsidiary to:

(a)     comply with, and take commercially reasonable steps to ensure compliance by all tenants and subtenants, if any, with, all applicable Environmental Laws and obtain and comply with any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws except for such noncompliance or failure to obtain as would not reasonably be expected to have a Material Adverse Effect;

(b)     conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other reasonable actions required under applicable Environmental Laws due to a material

release of hazardous materials at the real property owned, leased or occupied by the Borrowers or any Subsidiary and timely comply with all orders and directives of all Governmental Authorities regarding such Environmental Laws, except to the extent that the same are being contested in good faith by appropriate proceedings; and

(c)    defend, indemnify and hold harmless the Collateral Agent, each Lender, and their respective employees, agents, officers and directors, shareholders, successors, attorneys and assigns from and against any and all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature known or unknown, contingent or otherwise, arising out of, or in any way relating to (i) the presence of contamination on any of the properties of the Credit Parties, (ii) any violation of, noncompliance with or liability under any Environmental Laws applicable to the operations of the Borrowers or any Subsidiary, or any such properties, or (iii) any orders, requirements or demands of Governmental Authorities related thereto, including reasonable attorneys' and consultants' fees, investigation and laboratory fees, response costs, court costs and litigation expenses, except to the extent that any of the foregoing arise out of the gross negligence or willful misconduct of the party seeking indemnification therefor.  This indemnity shall continue in full force and effect and survive the termination of this Agreement, and the payment of all Obligations.

5.11    Board Observation Rights.

(a)    For so long as the Loans remain outstanding, the Lenders shall have the right to appoint two representatives to exercise the rights as conferred pursuant to this **Section 5.11** (each representative being referred to as the "Observation Party") and shall notify the Parent of the identity of such representatives, which representatives shall be subject to the consent of the Borrowers in their sole discretion; provided, that the following representatives shall not require such consent:  (i) Jerri Harman, Dan Moss and Paul Hayama, as representatives of Avante and (ii) Ed Ross, Andy Worth and Matt Shehorn, as representatives of Fidus; provided, further, each of Avante and Fidus, respectively, shall have the right to appoint one representative for so long as it holds any of the Notes.

(b)    The boards of directors, boards of managers or similar governing bodies of the Parent shall hold general meetings at least four times in each calendar year for the purpose of discussing the business and operations of the Parent and its Subsidiaries. At least two such meetings each calendar year shall be held in person at the Parent's principal place of business.  The Parent shall notify each Observation Party of the date and time for each general or special meeting of its board of directors, board of managers or similar governing body (or any committee thereof) or of the adoption of any resolutions by any such body or committee by written consent (describing in reasonable detail the nature and substance of such action) at the time notice is provided to the outside directors or managers of the Parent, and concurrently deliver to each Observation Party any materials delivered to directors or managers of the Parent, including a draft of any resolutions proposed to be adopted by written consent.  Each Observation Party shall be free during the period prior to the meeting to contact the directors of the Parent and discuss the pending actions to be taken.

(c)    Each Observation Party shall be entitled to, or to select one representative to, attend and participate (but not vote) in all meetings of the board of directors, board of managers or other governing body (including any committee thereof) of the Parent, including telephonic meetings, and shall be entitled to reimbursement for reasonable out-of-pocket expenses incurred in connection with such attendance and participation.  Each Observation Party (or its representative) shall be entitled to receive all written materials and other information given to the participants in such meetings.

(d)     The Borrowers shall pay all reasonable out-of-pocket expenses (including reasonable out-of-pocket travel expenses) incurred by each Observation Party or Lender in connection with the exercise by such Observation Party or Lender of its rights under this **Section 5.11**.

(e)     Notwithstanding anything to the contrary contained in this **Section 5.11**, no Observation Party (nor its representative) (i) shall be entitled to any information subject to the attorney/client privilege, (ii) shall be present during any portion of any meeting contemplated by this **Section 5.11** (A) to the extent it involves information or analysis that would pose a conflict of interest relating to the Loans or information that is "highly confidential" about the operations of the business of the Credit Parties, or (B) if such Observation Party's (or its representative's) presence could reasonably be expected to result in a breach or default under any agreement to which any Borrower is party, (iii) shall be entitled to any rights under this **Section 5.11** unless and until the Lender appointing such Observation Party (and its representatives in their official capacity) shall have entered into a confidentiality agreement in form and substance reasonably satisfactory to the Borrowers, and (iv) such Observation Party's (and its representative's) rights under this **Section 5.11** and connection therewith shall be subject to applicable laws, including those described in **Section 10.16**.

5.12    OFAC, PATRIOT Act Compliance.  Each Borrower will, and will cause each of its Subsidiaries to, (i) refrain from doing business in a Sanctioned Country or with a Sanctioned Person in violation of the economic sanctions of the United States administered by OFAC, and (ii) provide, to the extent commercially reasonable, such information and take such actions as are reasonably requested by any Lender in order to assist the Lenders in maintaining compliance with the PATRIOT Act.

5.13    Further Assurances.  Each Borrower will, and will cause each of its Subsidiaries to, make, execute, endorse, acknowledge and deliver any amendments, modifications or supplements hereto and restatements hereof and any other agreements, instruments or documents, and take any and all such other actions, as may from time to time be reasonably requested by the Collateral Agent or the Required Lenders to perfect and maintain the validity and priority of the Liens granted pursuant to the Security Documents and to effect, confirm or further assure or protect and preserve the interests, rights and remedies of the Collateral Agent and the Lenders under this Agreement and the other Investment Documents.

5.14    SBA Matters.  Each Borrower will, and will cause each of its Subsidiaries to:

(a)     Upon the request of any Lender that is a Small Business Investment Company (as defined in the SBIA), repay such Lender's Loan in full (including the applicable prepayment fee), in immediately available funds, in the event that any Borrower or any other Credit Party changes the nature of its business within one year after the Closing Date (or, if applicable, any later borrowing date hereunder) in a manner that would cause such Lender to have provided funds to any Borrower or any other Credit Party pursuant to this Agreement or any other Investment Document in violation of 13 C.F.R. §§107.700 – 107.760 (as amended from time to time).

(b)     Upon the request of any Lender that is a Small Business Investment Company (as defined in the SBIA) or the SBA, (i) submit to such Lender and/or the SBA timely and accurate compliance reports at such times and in such form and containing such information as the SBA may determine to be necessary to enable the SBA to ascertain whether the Borrowers and each other Credit Party have complied or are complying with 13 C.F.R. Part 112 ("Part 112"), (ii) submit to such Lender such information as may be necessary to enable such Lender to meet its reporting requirements under Part 112, and (iii) permit the SBA to have access with advance written notice and during normal business hours to such of its books, records, accounts and other sources of information, and its facilities as may be pertinent to ascertain compliance with Part 112.  Where any information required of the Borrowers or any other

Credit Party is in the exclusive possession of any other agency, institution or Person and such agency, institution or Person shall fail or refuse to furnish this information, the Borrowers and each other Credit Party shall so certify in its report and shall set forth what efforts it has made to obtain this information.

(c)    Upon any Lender's request, take any and all actions required to permit any Lender to comply with SBIA and applicable law, in the event such Lender is restricted or prohibited from holding Loans or Capital Stock in any Credit Party or any Affiliate thereof as a result of any noncompliance thereunder.

5.15    Landlord Agreements.

(a)    For each parcel of real property leased by a Credit Party on or after the Closing Date (including by virtue of any extension or other amendment or restatement of a lease existing on the Closing Date), each Borrower will, and will cause each of its Subsidiaries to, deliver to the Lenders a landlord agreement or waiver in form and substance reasonably acceptable to the Required Lenders not later than the execution and delivery of the lease or lease agreement with respect to such real property; provided, however, (x) no such landlord agreement or waiver shall be required with respect to (i) any one parcel of real property at which no material records are kept and at which Collateral with a value of less than $100,000, is held, and (ii) the real property located at 839, 859-61 and 869-79 Ward Drive, Santa Barbara, CA 93111; and (y) the landlord agreements for real property located at 479 Quadrangle Drive, Suites E and F, Bollingbrook, Illinois 60440 , and 475 Quadrangle Drive, Suites C and D, Bolingbrook, Illinois 60440 shall not be required until 1 business day following the Closing Date.

(b)    For each parcel of real property leased by a Credit Party prior to the Closing Date, each Borrower will, and will cause each of its Subsidiaries to, deliver to the Lenders a landlord agreement or waiver in form and substance reasonably acceptable to the Required Lenders.

5.16    Bank Accounts.  Within one hundred twenty (120) days after the Closing Date, the Borrowers shall, and shall cause each Subsidiary to, (i) maintain its primary treasury management and its operating accounts with OneWest Bank, FSB  and (ii) as to any account not maintained with OneWest Bank, FSB cause a Control Agreement with respect thereto to be executed and delivered to the Senior Agent and the Collateral Agent; provided that, for the avoidance of doubt, the Borrowers shall not be obligated to obtain Control Agreements with respect to, any account having a balance of less than $75,000 or $150,000 in the aggregate for all such accounts and shall not be obligated to obtain Control Agreements with respect to any payroll or similar benefits account.  Notwithstanding the foregoing, with regard to the deposit accounts of the Borrowers held at Wells Fargo Bank, N.A. (in its capacity as depository "Wells Fargo"), in the event such accounts are not either closed or made subject to a Control Agreement within fifteen (15) days prior to the expiration of such one hundred twenty (120)-day period, the Borrowers shall give irrevocable written instructions to Wells Fargo (with a copy to the Collateral Agent) with regard to any deposit account not covered by a Control Agreement, pursuant to which instructions Wells Fargo shall wire transfer on each Business Day any funds in any such deposit accounts to a deposit account of the Borrowers (or one of them) maintained with OneWest Bank, FSB; provided that within one year after giving such instructions to Wells Fargo, the Borrowers shall have closed such deposit accounts with Wells Fargo.

5.17    Equity Certificates.  Within seven (7) Business Days following the Closing Date, the Borrowers shall deliver to the Senior Agent original certificates representing all outstanding stock or membership interests owned by the Parent in each other Borrower (other than CTG) and any other Subsidiary, in each case together with an undated transfer power for each of such certificates, duly executed in blank by an authorized officer of the pledgor thereof.

## ARTICLE VI

## FINANCIAL COVENANTS

Each Borrower covenants and agrees that, until the termination of the Commitments and the payment in full in cash of all principal and interest with respect to the Loans, together with all fees, expenses and other non-contingent monetary amounts then due and owing hereunder:

6.1     Leverage Ratio.  The Borrowers will not permit the Leverage Ratio as of the last day of any fiscal quarter to be greater than the ratio set forth below opposite such fiscal quarter (or opposite the period that includes such fiscal quarter):

| Period | Maximum Leverage Ratio |
|---|---|
| Closing Date through December 31, 2014 | 5.50:1.00 |
| January 1, 2015 through March 31, 2015 | 5.35:1.00 |
| April 1, 2015 through June 30, 2015 | 5.25:1.00 |
| July 1, 2015 through September 30, 2015 | 5.10:1.00 |
| October 1, 2015 through December 31, 2015 | 5.00:1.00 |
| January 1, 2016 through March 31, 2016 | 4.85:1.00 |
| April 1, 2016 through June 30, 2016 | 4.75:1.00 |
| July 1, 2016 through September 30, 2016 | 4.50:1.00 |
| October 1, 2016 through December 31, 2016 | 4.38:1.00 |
| January 1, 2017 through March 31, 2017 | 4.25:1.00 |
| April 1, 2017 through June 30, 2017 | 4.00:1.00 |
| Thereafter | 3.75:1.00 |

6.2     Fixed Charge Coverage Ratio.  The Borrowers will not permit the Fixed Charge Coverage Ratio as of the last day of any fiscal quarter to be less than the ratio set forth below opposite such fiscal quarter (or opposite the period that includes such fiscal quarter):

| Period | Minimum Fixed Charge Coverage Ratio |
|---|---|
| Closing Date through December 31, 2014 | 1.20:1.00 |
| Thereafter | 1.08:1.00 |

6.3     Capital Expenditures.  The Borrowers will not permit Capital Expenditures during any fiscal year set forth below to be greater than the sum of (i) the amount set forth below opposite such fiscal year plus (ii) fifty percent (50%) of the excess, if any, of the amount set forth below applicable to the

immediately preceding fiscal year (without giving effect to any carryover from any prior fiscal year) over the actual amount of Capital Expenditures for such immediately preceding fiscal year:

| Fiscal Year | Maximum Amount of Capital Expenditures |
|---|---|
| 2013 | $4,550,000 |
| 2014 | $5,200,000 |
| Each fiscal year thereafter | $2,500,000 |

## ARTICLE VII

## NEGATIVE COVENANTS

Each Borrower covenants and agrees that, until the termination of the Commitments and the payment in full in cash of all principal and interest with respect to the Loans, together with all fees, expenses and other non-contingent amounts then due and owing hereunder:

7.1    Merger; Consolidation.  Each Borrower will not, and will not permit or cause any of its Subsidiaries to, liquidate, wind up or dissolve, or enter into any consolidation, merger or other combination, or agree to do any of the foregoing; provided, however, that:

(i)    any Wholly Owned Subsidiary of a Borrower may merge or consolidate with, or be liquidated into, (x) such Borrower (so long as such Borrower is the surviving or continuing entity) or (y) any other Wholly Owned Subsidiary (other than a Foreign Subsidiary) (so long as, if either constituent entity is a Wholly Owned Subsidiary Guarantor, the surviving or continuing entity is a Wholly Owned Subsidiary Guarantor), and in each case so long as no Default or Event of Default has occurred and is continuing or would result therefrom;

(ii)    any Wholly Owned Subsidiary of a Borrower may merge or consolidate with another Person (other than another Credit Party), so long as (x) the surviving entity is a Wholly Owned Subsidiary Guarantor that is a Domestic Subsidiary, (y) such merger or consolidation constitutes a Permitted Acquisition and the applicable conditions and requirements of **Section 5.8** are satisfied, and (z) no Default or Event of Default has occurred and is continuing or would result therefrom;

(iii)    a Borrower may merge or consolidate with another Person (other than another Credit Party), so long as (x) such Borrower is the surviving entity, (y) such merger or consolidation constitutes a Permitted Acquisition, and (z) no Default or Event of Default has occurred and is continuing or would result therefrom; and

(iv)    to the extent not otherwise permitted under the foregoing clauses, any Wholly Owned Subsidiary that has sold, transferred or otherwise disposed of all or substantially all of its assets in connection with an Asset Disposition permitted under this Agreement and no longer conducts any active trade or business may be liquidated, wound up and dissolved, so long as no Default or Event of Default has occurred and is continuing or would result therefrom.

7.2    <u>Indebtedness</u>.  Each Borrower will not, and will not permit or cause any of its Subsidiaries to, create, incur, assume or suffer to exist any Indebtedness other than (without duplication):

(i)    Indebtedness of the Credit Parties in favor of the Collateral Agent and the Lenders incurred under this Agreement and the other Investment Documents;

(ii)    Senior Debt in an aggregate principal amount at any time outstanding not exceeding the maximum amount of "Senior Debt" permitted pursuant to the Intercreditor Agreement at such time;

(iii)    purchase money Indebtedness of the Borrowers and their Subsidiaries incurred solely to finance the acquisition, construction or improvement of any equipment, real property or other fixed assets in the ordinary course of business (or assumed or acquired by the Borrowers and their Subsidiaries in connection with a Permitted Acquisition or other transaction permitted under this Agreement), including Capital Lease Obligations, and any renewals, replacements, refinancings or extensions thereof, <u>provided</u> that all such Indebtedness (including any such Indebtedness described in **Schedule 7.2**) shall not exceed $300,000 in aggregate principal amount outstanding at any one time;

(iv)    unsecured loans and advances (A) by and among the Borrowers, (B) by any Borrower or any Wholly Owned Subsidiary Guarantor to any Wholly Owned Subsidiary Guarantor (other than a Foreign Subsidiary), or (C) by any Wholly Owned Subsidiary Guarantor to any Borrower <u>provided</u> in each case that any such loan or advance is subordinated in right and time of payment to the Obligations and is evidenced by a promissory note, in form and substance reasonably satisfactory to the Required Lenders and pledged to the Collateral Agent pursuant to the Security Documents;

(v)    Indebtedness of any Borrower under Hedge Agreements entered into in the ordinary course of business to manage existing or anticipated interest rate or commodity risks and not for speculative purposes;

(vi)    Indebtedness (other than Indebtedness described in **Section 7.2(iv)**) existing on the Closing Date and described in **Schedule 7.2** and any renewals, replacements, refinancings or extensions of any such Indebtedness that do not increase the outstanding principal amount thereof or result in an earlier final maturity date or decreased weighted average life thereof;

(vii)    Indebtedness consisting of Guaranty Obligations of any Borrower or any of its Subsidiaries incurred in the ordinary course of business for the benefit of any other Borrower or any Wholly Owned Subsidiary Guarantor (other than a Foreign Subsidiary), <u>provided</u> that the primary obligation being guaranteed is expressly permitted by this Agreement;

(viii)    Indebtedness that may be deemed to exist pursuant to any performance bond, surety, statutory appeal or similar obligation entered into or incurred by any Borrower or any of its Subsidiaries in the ordinary course of business;

(ix)    Indebtedness of any Borrower and its Subsidiaries arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business, <u>provided</u> that such Indebtedness is extinguished within five Business Days of its incurrence; and

(x)      unsecured Indebtedness of the Borrowers and its Subsidiaries (A) incurred in connection with Permitted Acquisitions (other than any Contingent Purchase Obligations), (B) any exercise of the Cure Right, or (C) arising due solely to the existence of the HCM Put or the HCM Call prior to any exercise thereof (and arising with respect to the HCM Put following exercise thereof), provided that in each case such Indebtedness (other than arising solely due to the existence of the HCM Put or the HCM Call) is subordinated in right of payment, performance and collection to the Obligations pursuant to a subordination agreement (including with respect to permitted payments and enforcement actions) acceptable to the Required Lenders;

(xi)      Contingent Purchase Price Obligations incurred in connection with Permitted Acquisitions; and

(xii)      other unsecured Indebtedness of the Borrowers and their Subsidiaries not exceeding $250,000 in the aggregate amount outstanding at any time.

Notwithstanding any provision herein to the contrary, each Borrower will not, and will not permit or cause any of its Subsidiaries to, create, incur, assume or suffer to exist any Indebtedness that is (a) subordinate or junior in right of payment to the Senior Debt and (b) senior in any respect in right of payment to any of the Obligations.

7.3    Liens.  Each Borrower will not, and will not permit or cause any of its Subsidiaries to, directly or indirectly, (a) make, create, incur, assume or suffer to exist, any Lien upon or with respect to any part of its property or assets, whether now owned or hereafter acquired or (b) cause to be filed any financing statement or other similar notice of any Lien with respect to any such property, asset, income or profits under the Uniform Commercial Code of any state or under any similar recording or notice statute, or agree to do any of the foregoing, other than the following (collectively, "Permitted Liens"):

(i)      Liens in favor of the Collateral Agent and the Lenders created by or otherwise existing under or in connection with this Agreement and the other Investment Documents;

(ii)      Liens in favor of the Senior Agent and the Senior Lenders created under the Senior Loan Documents securing Senior Debt expressly permitted under **Section 7.2(ii)**.

(iii)      Liens imposed by law, such as Liens of carriers, warehousemen, mechanics, materialmen and landlords, incurred in the ordinary course of business for sums not constituting borrowed money that are not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP (if so required);

(iv)      Liens (other than any Lien imposed by ERISA, the creation or incurrence of which would result in an Event of Default under **Section 8.1(k)**) incurred in the ordinary course of business in connection with worker's compensation, unemployment insurance or other forms of governmental insurance or benefits, or to secure the performance of letters of credit, bids, tenders, statutory obligations, surety and appeal bonds, leases, public or statutory obligations, government contracts and other similar obligations (other than obligations for borrowed money) entered into in the ordinary course of business;

(v)      Liens for taxes, assessments or other governmental charges or statutory obligations that are not delinquent or remain payable without any penalty or that are being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP (if so required);

(vi)    any attachment or judgment Lien (other than for payment of taxes, assessments or governmental charges) not constituting an Event of Default under **Section 8.1(h)**;

(vii)    Liens securing the purchase money Indebtedness permitted under **Section 7.2(iii)**, <u>provided</u> that (x) any such Lien shall attach to the property being acquired, constructed or improved with such Indebtedness concurrently with or within 90 days after the acquisition (or completion of construction or improvement) or the refinancing thereof by a Borrower or a Subsidiary, (y) the amount of the Indebtedness secured by such Lien shall not exceed 100% of the cost to such Borrower or such Subsidiary of acquiring, constructing or improving the property and any other assets then being financed solely by the same financing source, and (z) any such Lien shall not encumber any other property of the Parent or any of its Subsidiaries except assets then being financed solely by the same financing source and proceeds thereof;

(viii)    customary rights of set-off, revocation, refund or chargeback under deposit agreements or under the Uniform Commercial Code of banks or other financial institutions where the Parent or any of its Subsidiaries maintains deposits (other than deposits intended as cash collateral) in the ordinary course of business;

(ix)    Liens that arise in favor of banks under Article 4 of the Uniform Commercial Code on items in collection and the documents relating thereto and proceeds thereof;

(x)    Liens arising from the filing (for notice purposes only) of UCC-1 financing statements (or equivalent filings, registrations or agreements in foreign jurisdictions) in respect of true leases otherwise permitted hereunder;

(xi)    with respect to any Realty occupied by the Borrowers or any of their Subsidiaries, (a) all easements, rights of way, reservations, licenses, encroachments, variations and similar restrictions, charges and encumbrances on title that do not secure monetary obligations and do not materially impair the use of such property for its intended purposes or the value thereof and (b) any other Lien or exception to coverage described in mortgagee policies of title insurance issued in favor of and accepted by the Required Lenders;

(xii)    statutory and common law liens affecting Realty; and

(xiii)    other Liens in existence on the Closing Date and described on **Schedule 7.3**.

7.4    <u>Asset Dispositions</u>.  Each Borrower will not, and will not permit or cause any of its Subsidiaries to, directly or indirectly, make or agree to make any Asset Disposition unless such Asset Disposition meets each of the conditions below:

(i)    such Asset Disposition is for fair market value,

(ii)    the consideration for such Asset Disposition is all cash;

(iii)    no Event of Default has occurred and is continuing or would result from such Asset Disposition;

(iv)    the consideration for such Asset Disposition, when aggregated with the consideration for all previous Asset Dispositions during the same fiscal year, does not exceed $500,000.

7.5    <u>Investments</u>.  Each Borrower will not, and will not permit or cause any of its Subsidiaries to, directly or indirectly, purchase, own, invest in or otherwise acquire any Capital Stock, evidence of indebtedness or other obligation or security or any interest whatsoever in any other Person, or make or permit to exist any loans, advances or extensions of credit to, or any investment in cash or by delivery of property in, any other Person, or purchase or otherwise acquire (whether in one or a series of related transactions) any portion of the assets, business or properties of another Person (including pursuant to an Acquisition), or create or acquire any Subsidiary, or become a partner or joint venturer in any partnership or joint venture (collectively, "<u>Investments</u>"), or make a commitment or otherwise agree to do any of the foregoing, other than:

(i)    Investments consisting of Cash Equivalents;

(ii)    Investments consisting of the extension of trade credit, the creation of prepaid expenses and the purchase of inventory, supplies, equipment and other assets, in each case by the Borrowers and their Subsidiaries in the ordinary course of business (but subject to any limitations on Capital Expenditures in **Section 6.3**);

(iii)    Investments consisting of loans and advances to employees, officers or directors of the Borrowers and their Subsidiaries (other than any such Person who is a Sponsor Party) in the ordinary course of business not exceeding $500,000 at any time outstanding;

(iv)    Investments (including equity securities and debt obligations) of the Borrowers and their Subsidiaries received in connection with the bankruptcy or reorganization of suppliers and customers and in good faith settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business;

(v)    without duplication, Investments consisting of intercompany Indebtedness permitted under **Section 7.2(iv)**;

(vi)    Investments existing as of the Closing Date and described on **Schedule 7.5**;

(vii)    Investments of the Borrowers under Hedge Agreements entered into in the ordinary course of business to manage existing or anticipated interest rate or commodity risks and not for speculative purposes;

(viii)    Investments of the Borrowers in their Subsidiaries, in each case to the extent made prior to the Closing Date;

(ix)    Investments consisting of the making of capital contributions or the purchase of Capital Stock by any (A) Borrower in any other Borrower, and (B) Borrower or any Wholly Owned Subsidiary Guarantor in any other Wholly Owned Subsidiary (other than a Foreign Subsidiary) that either is a Wholly Owned Subsidiary Guarantor immediately prior to, or will become a Wholly Owned Subsidiary Guarantor immediately after giving effect to, such Investment, and in compliance with the provisions of **Section 5.8** and all other requirements of this Agreement (including those applicable to Permitted Acquisitions); <u>provided</u>, <u>however</u>, that in no event shall any Foreign Subsidiary create or acquire any Domestic Subsidiary;

(x)    the HCM Acquisition;

(xi)    Permitted Acquisitions, taken together as a whole on a combined basis, having an aggregate purchase price, including Contingent Purchase Price Obligations (other than earn out

obligations) and all transaction costs and expenses, but excluding all earn out obligations and the portion of any such purchase price funded with proceeds of the issuance by the Parent of its Capital Stock (other than Disqualified Capital Stock), in each case associated with such Permitted Acquisitions, not in excess of $13,000,000; and

(xii)    advances to employees in the form of prepayment if expenses incurred in the ordinary course of business.

7.6    <u>Restricted Payments</u>.

(a)    Each Borrower will not, and will not permit or cause any of its Subsidiaries to, directly or indirectly, declare or make any dividend payment, or make any other distribution of cash, property or assets, in respect of any of its Capital Stock or any warrants, rights or options to acquire its Capital Stock, or purchase, redeem, retire or otherwise acquire for value any shares of its Capital Stock or any warrants, rights or options to acquire its Capital Stock, or set aside funds for any of the foregoing, except that:

(i)    the Parent and any of its Wholly Owned Subsidiaries may declare and make dividend payments or other distributions payable solely in its Capital Stock (other than Disqualified Capital Stock);

(ii)    so long as no Event of Default shall have occurred and be continuing or would result therefrom, the Borrowers may declare and make dividend payments and other distributions to the Parent to enable the Parent to purchase, redeem, retire or otherwise acquire shares of its Capital Stock (or options or rights to acquire its Capital Stock) held by former officers, directors or employees (other than the Sponsor or any such Person who is a Sponsor Party) following termination of service or employment, in an aggregate cash amount not exceeding $250,000 during any fiscal year or $500,000 for all such purchases, redemptions, retirements and acquisitions from and after the Closing Date, in each case net of any proceeds received by the Parent as a result of resales of any such Capital Stock;

(iii)    the Parent may make Permitted Tax Distributions;

(iv)    each Subsidiary of any Borrower may declare and make dividend payments or other distributions to such Borrower or to a Wholly Owned Subsidiary Guarantor (other than a Foreign Subsidiary) (but not to any other Person), in each case to the extent not prohibited under applicable Requirements of Law; and

(v)    Restricted Payments to DHAN and/or any Permitted Transferee in connection with the exercise of the HCM Put or any promissory note issued in connection therewith and subject to the terms and conditions of the Put Subordination Agreement (as defined below) and the LLC Agreement; <u>provided</u> that, (i) no Event of Default has occurred and is continuing or would be caused thereby, (ii) such exercise does not occur prior to the fifth anniversary of the Closing Date; and (iii) prior to such exercise, the Borrowers and DHAN shall have entered into a subordination agreement in form and substance acceptable to the Collateral Agent with respect to any payment or any Indebtedness arising from such exercise (the "<u>Put Subordination Agreement</u>").

(b)    Each Borrower will not, and will not permit or cause any of its Subsidiaries to, make (or give any notice in respect of) any payment or prepayment of principal on, or interest, fees or premium (if any) with respect to any Subordinated Indebtedness, or directly or indirectly make any redemption (including pursuant to any change of control or asset disposition provision), retirement, defeasance or

other acquisition for value of any Subordinated Indebtedness, or make any deposit or otherwise set aside funds for any of the foregoing purposes, except to the extent permitted under the applicable subordination agreement to which the Lenders are party in form and substance satisfactory to the Required Lenders in their sole discretion or under the Management Fee Subordination Agreement.

(c)     Each Borrower will not and will not permit any of its Subsidiaries to make any payments in respect of any Contingent Purchase Price Obligations unless (i) the Borrowers will be in compliance on a Pro Forma Basis with **Article VI** determined as of the last day of the last full fiscal quarter ending immediately prior to such payments for which financial statements are required to have been delivered and assuming such payment was made on the first day of the relevant period and (ii) there is no Event of Default that has occurred and remains in existence or would result from the making of any such payments (including with respect to **Sections 7.2(xi)** and **7.5(xi)**).

7.7     <u>Transactions with Affiliates</u>.  The Borrowers shall not, and shall not permit any Subsidiary to, enter into any transaction, including any purchase, sale, lease or exchange of property or the rendering of any service, with any Affiliate of any Credit Party or the Sponsor except:

(i)     arms-length transactions in the ordinary course of business;

(ii)     the HCM Put or HCM Call;

(iii)     payment of the Management Fees, subject to **Section 7.8**;

(iv)     the payment of Board Fees of up to $225,000 in any fiscal year;

(v)     transactions described on **Schedule 7.7**;

(vi)     other transactions by and among the Borrowers not prohibited by this Agreement (<u>provided</u> that such transactions shall remain subject to the any other applicable limitations and restrictions set forth in this Agreement);

(vii)     Equity Issuance with respect to the Parent's Capital Stock to directors, officers and employees (other than the Sponsor or any such Person who is a Sponsor Party) of the Credit Parties pursuant to employee benefit plans, employment agreements or other employment arrangements approved by the Board of Directors of the Parent; and

(viii)     the contribution of the DHAN Assets by the Parent to Channel, which shall occur within five (5) Business Days of the Closing Date.

7.8     <u>Management Fees</u>.  The Borrowers and their Subsidiaries shall not pay any management fees to any Affiliate thereof for services rendered; provided that the Parent may pay the Management Fees pursuant to and in accordance with the Management Agreement as in effect on the Closing Date, so long as no Event of Default has occurred and is continuing or would result therefrom; <u>provided</u>, that, in the event payment of all or part of the Management Fees is prohibited under this Section or is deferred (such fees, the "<u>Deferred Management Fees</u>"), payment of Management Fees, including payment of Deferred Management Fees (without interest), may resume upon (x) cure of such Event of Default, so long as no other Event of Default has occurred and is continuing or would result therefrom, and (y) with respect to the payment of any Deferred Management Fees, the Borrowers are in compliance on a Pro Forma Basis with **Article VI** determined as of the last day of the last full fiscal quarter ending immediately prior to such payments for which financial statements are required to have been delivered and assuming such payment was made on the first day of the relevant period.

7.9     <u>Indemnity Agreements</u>.  Each Borrower will not, and will not permit or cause any of its Subsidiaries to, enter into any agreement to indemnify any third party for any losses of or damages to such third party resulting from the gross negligence or willful misconduct of such third party.

7.10    <u>Lines of Business; Activities of Parent</u>.

(a)     Each of Borrower will not, and will not permit or cause any of its Subsidiaries to, engage in any lines of business other than the businesses engaged in by it on the Closing Date and businesses and activities reasonably related thereto.

(b)     Notwithstanding the provisions of **Section 7.10(a)** or any other provision of this Agreement, the Parent shall not (i) hold any assets other than (w) the Capital Stock of CTG, Channel and any Subsidiary created or acquired in connection with a Permitted Acquisition, (x) cash, (y) on or prior to the fifth (5th) Business Day after the Closing Date, the DHAN Assets and (z) its interest as the beneficiary under the Life Insurance Policy and its interest as the insured under the R&W Insurance Policy (each as defined in the Acquisition Agreement) and any similar insurance policies acquired or obtained in connection with a Permitted Acquisition, and the Parent shall not engage in any business or activity other than (a) the ownership of such Capital Stock; (b) maintaining its limited liability company existence; (c) participating in tax, accounting and other administrative activities as the parent of the consolidated group of companies, including the Borrowers; (d) the execution and delivery of the Investment Documents and the Senior Loan Documents to which it is or will become a party and the performance of its obligations thereunder; (e) the execution and delivery of the HCM Acquisition Documents or any other acquisition documents to which it is a party relating to Permitted Acquisitions, and the performance of its obligations thereunder; (f) the contribution by the Parent of the DHAN Assets to Channel, which shall occur within five (5) Business Days of the Closing Date; (g) the making of capital contributions to its Subsidiaries; (h) engaging in transactions permitted by **Article VII**; and (i) other business activities incidental to the foregoing and other business activities customary for a holding company.

7.11    <u>Sale-Leaseback Transactions</u>.  Each Borrower will not, and will not permit or cause any of its Subsidiaries  to, directly or indirectly, become or remain liable as lessee or as guarantor or other surety with respect to any lease, whether an operating lease or a Capital Lease, of any property (whether real, personal or mixed, and whether now owned or hereafter acquired) (i) that any Credit Party has sold or transferred (or is to sell or transfer) to a Person that is not a Credit Party or (ii) that any Credit Party intends to use for substantially the same purpose as any other property that, in connection with such lease, has been sold or transferred (or is to be sold or transferred) by a Credit Party to another Person that is not a Credit Party, in each case except for transactions otherwise expressly permitted under this Agreement.

7.12    <u>Certain Amendments</u>.

(a)     Each Borrower will not, and will not permit or cause any of its Subsidiaries to, amend, modify or waive (i) any provision of any Senior Loan Document in any manner not permitted by the Intercreditor Agreement, (ii) any provision of any Subordinated Indebtedness, the effect of which would be (A) to increase the principal amount due thereunder or provide for any mandatory prepayments not already provided for by the terms thereof, (B) to shorten or accelerate the time of payment of any amount due thereunder or shorten the average life to maturity thereof, (C) to increase the applicable interest rate or amount of any fees or costs due thereunder, (D) to amend any of the subordination provisions thereunder (including any of the definitions relating thereto), (E) to make any covenant or event of default therein more restrictive or add any new covenant or event of default, (F) to grant any security or collateral to secure payment thereof, or (G) to effect any change in the rights or obligations of the Credit Parties thereunder or of the holders thereof that would be adverse in any material respect to the rights or interests of the Lenders, or designate any Indebtedness other than the Obligations and the Senior Debt as "Senior

Obligations" "Senior Indebtedness" or term of similar import within the meaning of the subordination provisions applicable thereto, (iii) any provision of the HCM Acquisition Agreement or any related Transaction Document contemplated thereby that could reasonably be expected to be adverse in any material respect to the rights or interests of the Borrowers or the Lenders, (iv) any provision of the Management Agreement in any manner not expressly permitted by the Management Fee Subordination Agreement, (v) any material non-compete or non-solicitation provision under any agreement delivered pursuant to **Section 3.1(a)(x)**, or (iv) any provision of its articles or certificate of incorporation or formation, bylaws, operating or LLC agreement or other applicable formation or organizational documents, as applicable, the terms of any class or series of its Capital Stock, or any agreement among the holders of its Capital Stock or any of them, in each case other than in a manner that could not reasonably be expected to adversely affect the Lenders in any material respect (provided that the Borrowers shall give the Lenders notice of any such amendment, modification or change, together with certified copies thereof).

7.13    Limitation on Certain Restrictions.  Except to the extent it does not have and could not reasonably be expected to have a Material Adverse Effect, each Borrower will not, and will not permit or cause any of its Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective, any restriction or encumbrance on (a) the ability of the Credit Parties to perform and comply with their respective obligations under the Investment Documents or (b) the ability of any Subsidiary of any Borrower to make any dividend payment or other distribution in respect of its Capital Stock, to repay Indebtedness owed to the Borrowers or any other Subsidiary, to make loans or advances to the Borrowers or any other Subsidiary, or to transfer any of its assets or properties to the Borrowers or any other Subsidiary, except (in the case of clause (b) only) for such restrictions or encumbrances existing under or by reason of (i) this Agreement and the other Investment Documents, (ii) applicable Requirements of Law, (iii) customary non-assignment provisions in leases and licenses of real or personal property entered into by any Borrower or any Subsidiary as lessee or licensee in the ordinary course of business, restricting the assignment or transfer thereof or of property that is the subject thereof, (iv) customary restrictions and conditions contained in any agreement relating to the sale of assets (including Capital Stock of a Subsidiary) pending such sale, provided that such restrictions and conditions apply only to the assets being sold and such sale is permitted under this Agreement, and (v) the Senior Loan Documents.

7.14    No Other Negative Pledges.  Each Borrower will not, and will not permit or cause any of its Subsidiaries to, enter into or suffer to exist any agreement or restriction that, directly or indirectly, prohibits or conditions the creation, incurrence or assumption of any Lien upon or with respect to any part of its property or assets, whether now owned or hereafter acquired, or agree to do any of the foregoing, except for such agreements or restrictions existing under or by reason of (i) this Agreement and the other Investment Documents, (ii) applicable Requirements of Law, (iii) any agreement or instrument creating a Permitted Lien (but only to the extent such agreement or restriction applies to the assets subject to such Permitted Lien), (iv) customary provisions in leases and licenses of real or personal property entered into by any Borrower or any Subsidiary as lessee or licensee in the ordinary course of business, restricting the granting of Liens therein or in property that is the subject thereof, and (v) customary restrictions and conditions contained in any agreement relating to the sale of assets (including Capital Stock of a Subsidiary) pending such sale, provided that such restrictions and conditions apply only to the assets being sold and such sale is permitted under this Agreement, (vi) the Senior Loan Documents, and (vii) such other agreements the breach or default under which could not reasonably be expected to result in a Material Adverse Effect.

7.15    Ownership of Subsidiaries. Each Borrower will not, and will not permit or cause any of its Subsidiaries to, have any Subsidiaries other than Domestic Subsidiaries that are Wholly Owned

Subsidiaries, in each case, created or acquired in accordance with the terms of the Investment Documents (including, without limitation, **Section 5.8**).

7.16    <u>Fiscal Year</u>.  Each Borrower will not, and will not permit or cause any of its Subsidiaries to, change its fiscal year or its method of determining fiscal quarters.

7.17    <u>Accounting Changes</u>.  Other than as permitted pursuant to **Section 1.2**, each of the Parent and each Borrower will not, and will not permit or cause any of its Subsidiaries to, make or permit any material change in its accounting policies or reporting practices, except as may be required by GAAP (or, in the case of Foreign Subsidiaries, generally accepted accounting principles in the jurisdiction of its organization).

7.18    <u>No Article 8 Opt-In</u>.  If any Pledged Interests (whether now owned or hereafter acquired) (as defined in the Security Agreement) are not "securities" under Article 8 of the Uniform Commercial Code, each Borrower will not, and will not permit any of its Subsidiaries to take any action to cause the issuer of such Pledged Interests to "opt in" to Article 8 of the Uniform Commercial Code.

7.19    <u>HCM Call</u>.  The Parent shall not exercise the HCM Call, or make any payment in connection therewith, until the payment in full of all non-contingent monetary Obligations.

## ARTICLE VIII

## EVENTS OF DEFAULT

8.1    <u>Events of Default</u>.  The occurrence of any one or more of the following events shall constitute an "<u>Event of Default</u>":

(a)    Any Borrower shall fail to pay when due (i) any principal of any Loan, (ii) any interest on any Loan or any fee payable under this Agreement or any other Investment Document, or (iii) except as provided in clauses (i) or (ii) above) any other Obligation and (in the case of this clause (iii) only) such failure shall continue for a period of three Business Days;

(b)    Any Borrower or any other Credit Party shall (i) fail to observe, perform or comply with any condition, covenant or agreement contained in any of **Sections 2.10, 5.1, 5.2(a), 5.2(e)(i), 5.3(i), 5.8, 5.11, 5.14, 5.16** and **5.17** or in **Article VI** or **Article VII** or (ii) fail to observe, perform or comply with any condition, covenant or agreement contained in **Section 5.2** (other than **Sections 5.2(a)** and **5.2(e)(i)**) and (in the case of this clause (ii) only) such failure shall continue unremedied for a period of five days after the earlier of (y) the date on which a Responsible Officer of a Credit Party acquires knowledge thereof and (z) the date on which written notice thereof is delivered by the Collateral Agent or any Lender to any Borrower;

(c)    Any Borrower or any other Credit Party shall fail to observe, perform or comply with any condition, covenant or agreement contained in this Agreement or any of the other Investment Documents other than those enumerated in **Sections 8.1(a)** and **8.1(b)**, and such failure (i) by the express terms of such Investment Document, constitutes an Event of Default, or (ii) shall continue unremedied for any grace period specifically applicable thereto or, if no grace period is specifically applicable, for a period of 30 days after the earlier of (y) the date on which a Responsible Officer of a Credit Party acquires knowledge thereof and (z) the date on which written notice thereof is delivered by the Collateral Agent or any Lender to the Borrowers;

(d)      Any representation or warranty made or deemed made by or on behalf of any Borrower or any other Credit Party in this Agreement, any of the other Investment Documents or in any certificate, instrument, report or other document furnished at any time in connection herewith or therewith shall prove to have been incorrect, false or misleading in any material respect (without duplication of other materiality qualifiers contained therein) as of the time made, deemed made or furnished;

(e)      Any Borrower or any other Credit Party (A) fails to pay when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) any principal of or interest on any Indebtedness (other than Indebtedness hereunder, under the Senior Debt or arising from the exercise of the HCM Put (so long as such Indebtedness arising from the exercise of the HCM Put is covered by a subordination agreement in favor of the Lenders as contemplated by **Section 7.6(a)(v)7.6(c)**) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of at least $500,000 or any termination payment under any Hedge Agreement resulting in a payment obligation of any Credit Party of at least $500,000, (B) fails to observe, perform or comply with any other agreement, covenant or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other default or event of default occurs or condition exists in respect thereof, the effect of which default, event of default or other event is to cause or to permit the holder(s) of such Indebtedness (or a trustee or agent on behalf of such holder(s)) to cause, with the giving of notice, if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased, redeemed or cash-collateralized (automatically or otherwise), or an offer to repurchase, prepay, defease, redeem or cash-collateralize such Indebtedness to be made, prior to its stated maturity (without regard to any subordination terms with respect thereto) or (C) the Senior Agent or the holders of the Senior Debt accelerate and declare all or any part of the Senior Debt to be due and payable prior to its stated maturity;

(f)      Any Borrower or any other Credit Party shall (i) file a voluntary petition or commence a voluntary case seeking liquidation, winding-up, reorganization, dissolution, arrangement, readjustment of debts, composition or any other relief under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to controvert in a timely and appropriate manner, any petition or case of the type described in **Section 8.1(g)**, (iii) apply for or consent to the appointment of or taking possession by a custodian, trustee, receiver, conservator or similar official for or of itself or all or a substantial part of its properties or assets, (iv) fail generally, or admit in writing its inability, to pay its debts generally as they become due, (v) make a general assignment for the benefit of creditors or (vi) take any corporate action to authorize or approve any of the foregoing;

(g)      Any involuntary petition or case shall be filed or commenced against any Borrower or any other Credit Party seeking liquidation, winding-up, reorganization, dissolution, arrangement, readjustment of debts, the appointment of a custodian, trustee, receiver, conservator or similar official for it or all or a substantial part of its properties or any other relief under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, and such petition or case shall continue undismissed and unstayed for a period of 60 days; or an order, judgment or decree approving or ordering any of the foregoing shall be entered in any such proceeding;

(h)      Any one or more money judgments, writs or warrants of attachment, executions or similar processes involving an aggregate amount (to the extent not paid or fully bonded or covered by insurance as to which the surety or insurer, as the case may be, has the financial ability to perform and has acknowledged liability in writing) in excess of $500,000 shall be entered or filed against any Borrower or any other Credit Party or any of their respective properties and the same shall not be paid, dismissed, bonded, vacated, stayed or discharged within a period of 30 days or in any event later than five days prior to the date of any proposed sale of such property thereunder;

(i)  Any one or more non-monetary judgments, orders or decrees shall be rendered against any one or more of the Credit Parties or any of their respective Subsidiaries which has or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, and there shall be any period of ten (10) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(j)  Any Lien created under any Investment Document and perfected in accordance with the terms of the Investment Documents, shall for any reason other than pursuant to the terms thereof, cease to be a valid and perfected  priority Lien (subject to Permitted Liens) in any material portion of the Collateral or the property purported to be covered thereby, except as a result of (i) a disposition of the applicable Collateral in a transaction permitted under this Agreement or (ii) an action or failure to act on the part of the Collateral Agent or any other Lender;

(k)  Any ERISA Event or any other event or condition shall occur or exist with respect to any Plan or Multiemployer Plan and, as a result thereof, together with all other ERISA Events and other events or conditions then existing, any Credit Party and its ERISA Affiliates have incurred, or could reasonably be expected to incur, liability to any one or more Plans or Multiemployer Plans or to the PBGC (or to any combination thereof) that has had or could reasonably be expected to have a Material Adverse Effect;

(l)  Any one or more licenses, permits, accreditations or authorizations of any Borrower or any other Credit Party shall be suspended, limited or terminated or shall not be renewed, or any other action shall be taken, by any Governmental Authority in response to any alleged failure by any Borrower or any other Credit Party to be in compliance with applicable Requirements of Law, and such action, individually or in the aggregate, has or could reasonably be expected to have a Material Adverse Effect;

(m)  [reserved]

(n)  There shall occur any uninsured damage to, or loss, theft or destruction of any Collateral or other assets or properties of the Credit Parties that has had or could reasonably be expected to have a Material Adverse Effect or (ii) any labor dispute, act of God or other casualty that has had or could reasonably be expected to have a Material Adverse Effect;

(o)  A Change of Control or Initial Public Offering shall have occurred;

(p)  Any change in any Borrower or any other Credit Party's business results of operations or condition (financial or otherwise) that has had or could reasonably be expected to have a Material Adverse Effect;

(q)  The Sponsor, any Credit Party or any Affiliate or Subsidiary of any of the foregoing or any other direct or indirect holder of Capital Stock of the Parent (but excluding Avante, Fidus or their respective Affiliates) shall purchase, own or otherwise hold, directly or indirectly, any Senior Debt or any other Indebtedness that is senior or pari passu in any respect in right of payment to any of the Obligations;

(r)  Any Investment Document or any material provision thereof shall for any reason cease to be valid and binding on or enforceable against any Credit Party, any Subsidiary of any Credit Party, the Sponsor, the holder of any Senior Debt (or agent thereof), the holder of any Subordinated Indebtedness (or agent thereof) or any other Person party thereto (other than the Collateral Agent and the Lenders) or any of their respective Affiliates or successors and assigns party thereto, (ii) any such Person or the Sponsor shall contest in any manner the validity, effectiveness or enforceability thereof or deny that it has

any further liability or obligation thereunder, (iii) any such Person shall breach or violate any material provision thereof, or (iv) the Obligations, for any reason, shall cease to have the priority contemplated by this Agreement and the other Investment Documents or the subordination provisions hereof or thereof.

8.2    Cure Right.  (a) Upon the occurrence of an Event of Default under **Section 6.1** or **Section 6.2** (a "Financial Covenant Default") as of the end of any fiscal quarter of the Parent (a "Relevant Quarter"), the Borrowers shall have the right to cure such Financial Covenant Default (the "Cure Right") by causing the Sponsor and/or any other member of the Parent to contribute cash to the Parent in exchange for the issuance of equity or, to the extent permitted by **Section 7.2(x)**, Subordinated Indebtedness during (but only during) the period of 10 Business Days following the earlier of the delivery by the Borrowers of the Compliance Certificate for such Relevant Quarter or the date such delivery is required pursuant to this Agreement, provided that:

(i)    the Borrowers shall deliver to the Lenders written notice of their intent to exercise the Cure Right with respect to any Financial Covenant Default (a "Cure Notice") concurrently with their delivery to the Lenders of the Compliance Certificate for such Relevant Quarter;

(ii)    such contribution shall be added to Consolidated EBITDA for such Relevant Quarter, but only to the extent necessary to cure the relevant Financial Covenant Default; any equity contribution added to Consolidated EBITDA for such Relevant Quarter shall be added to Consolidated EBITDA for the following three fiscal quarters in addition to such Relevant Quarter;

(iii)    the amount of such contribution shall not reduce the amount of Funded Debt for purposes of calculating compliance with the Financial Covenant Default;

(iv)    the Borrowers may exercise the Cure Right not more than one time during any consecutive twelve-month period, and in no event in consecutive fiscal quarters;

(v)    such contribution must be used to immediately prepay the "Term Loans" and the "Revolving Loans" (as each such term is defined in the Senior Loan Agreement), on a pro rata basis;

(vi)    in no event will the aggregate contributions made to the Borrowers pursuant to the Cure Right exceed $5,000,000 in the aggregate for all exercises of the Cure Right; and

(vii)    no such contributions shall result in a Change of Control.

8.3    Remedies: Acceleration, etc.  Upon and at any time after the occurrence and during the continuance of any Event of Default, the Required Lenders may take any or all of the following actions at the same or different times:

(a)    Declare all or any part of the outstanding principal amount of the Loans to be immediately due and payable, whereupon the principal amount so declared to be immediately due and payable, together with all interest accrued thereon and all other amounts payable under this Agreement and the other Investment Documents, shall become immediately due and payable without presentment, demand, protest, notice of intent to accelerate or other notice or legal process of any kind, all of which are hereby knowingly and expressly waived by each Borrower; provided that, upon the occurrence of a Bankruptcy Event, all of the outstanding principal amount of the Loans and all other amounts described in this **Section 8.3(a)** shall automatically become immediately due and payable without presentment,

demand, protest, notice of intent to accelerate or other notice or legal process of any kind, all of which are hereby knowingly and expressly waived by each Borrower;

(b)    Subject to applicable law, appoint or direct the appointment of a receiver for the properties and assets of the Credit Parties, both to operate and to sell such properties and assets, and each Borrower, for itself and on behalf of its Subsidiaries, hereby consents to such right and such appointment and hereby waives any objection any Borrower or any of its Subsidiaries may have thereto or the right to have a bond or other security posted by the Collateral Agent on behalf of the Lenders, in connection therewith; and

(c)    Exercise all rights and remedies available to it under this Agreement, the other Investment Documents and applicable law.

8.4    Remedies: Set-Off.  Upon and at any time after the occurrence and during the continuance of any Event of Default, each Lender and each of its respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of any Borrower against any and all non-contingent monetary obligations of any Borrower now or hereafter existing under this Agreement or any other Investment Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Investment Document.  The rights of each Lender and its respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have.  Each Lender agrees to notify the Borrowers and the Collateral Agent promptly after any such setoff and application; provided that the failure to give such notice shall not affect the validity of such setoff and application.

## ARTICLE IX

## THE COLLATERAL AGENT

9.1    Appointment and Authority.  Each of the Lenders hereby irrevocably appoints Fidus to act on its behalf as the Collateral Agent hereunder and under the other Investment Documents and authorizes the Collateral Agent to take such actions on its behalf and to exercise such powers as are delegated to the Collateral Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Collateral Agent and the Lenders, and neither the Parent nor any other Credit Party shall have rights as a third party beneficiary of any of such provisions.  Notwithstanding any provision to the contrary contained elsewhere in this Agreement or in any other Investment Document, the Collateral Agent shall not have any duties or responsibilities, except those expressly set forth herein, nor shall the Collateral Agent have or be deemed to have any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Investment Document or otherwise exist against the Collateral Agent.  Any action required or permitted to be taken by the Collateral Agent hereunder shall be taken with the prior approval of the Required Lenders.

9.2    Rights as a Lender.  The Person serving as the Collateral Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Collateral Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Collateral Agent hereunder in its individual capacity.  Such Person and its Affiliates may lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any

kind of business with the Parent or any Subsidiary or other Affiliate thereof as if such Person were not the Collateral Agent hereunder and without any duty to account therefor to the Lenders.

9.3     Exculpatory Provisions.  The Collateral Agent shall not have any duties or obligations except those expressly set forth herein and in the other Investment Documents.  Without limiting the generality of the foregoing, the Collateral Agent:

(a)     shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(b)     shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Investment Documents that the Collateral Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Investment Documents), provided that the Collateral Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Collateral Agent to liability or that is contrary to any Investment Document or applicable law; and

(c)     shall not, except as expressly set forth herein and in the other Investment Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Collateral Agent or any of its Affiliates in any capacity.

The Collateral Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Collateral Agent shall believe in good faith shall be necessary, under the circumstances as provided in **Sections 10.5** and **8.2**) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment.  The Collateral Agent shall be deemed not to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Collateral Agent in writing by the Borrowers or a Lender.

The Collateral Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Investment Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Investment Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in **Article III** or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Collateral Agent.

9.4     Reliance by Collateral Agent.  The Collateral Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Collateral Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  The Collateral Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall not be liable for

any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

9.5    Delegation of Duties.  The Collateral Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Investment Document by or through any one or more sub-agents appointed by the Collateral Agent.  The Collateral Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Collateral Agent and any such sub-agent. The Collateral Agent shall not be responsible for the negligence or misconduct of any sub-agent except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Collateral Agent acted with gross negligence or willful misconduct in the selection of such sub-agent.

9.6    Resignation of Collateral Agent.  The Collateral Agent may at any time give notice of its resignation to the Lenders and the Borrowers.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrowers so long as no Default or Event of Default has occurred and is continuing, to appoint a successor.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Collateral Agent gives notice of its resignation, then the retiring Collateral Agent may, on behalf of the Lenders, appoint a successor Collateral Agent.  Upon the acceptance of a successor's appointment as Collateral Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Collateral Agent, and the retiring Collateral Agent shall be discharged from all of its duties and obligations hereunder or under the other Investment Documents (if not already discharged therefrom as provided above in this Section).  After the retiring Collateral Agent's resignation hereunder and under the other Investment Documents, the provisions of this Article and **Section 10.1** shall continue in effect for the benefit of such retiring Collateral Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Collateral Agent was acting as Collateral Agent.

9.7    Non-Reliance on Collateral Agent and Other Lenders.  Each Lender acknowledges that it has, independently and without reliance upon the Collateral Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Collateral Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Investment Document or any related agreement or any document furnished hereunder or thereunder.

9.8    Collateral Matters.

(a)    The Collateral Agent is hereby authorized on behalf of the Lenders, without the necessity of any notice to or further consent from the Lenders, from time to time (but without any obligation) to take any action with respect to the Collateral and the Security Documents that may be deemed by the Collateral Agent in its discretion to be necessary or advisable to perfect and maintain perfected the Liens upon the Collateral granted pursuant to the Security Documents.  The Collateral Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Collateral Agent's Lien thereon, or any certificate prepared by any Credit Party in connection therewith, nor shall the Collateral Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

(b)      The Lenders hereby authorize the Collateral Agent, at its option and in its discretion, (i) to release any Lien granted to or held by the Collateral Agent upon any Collateral (A) upon termination of the Commitments and payment in full of all of the Obligations (other than inchoate indemnity obligations), (B) constituting property sold or to be sold or disposed of as part of or in connection with any disposition expressly permitted hereunder or under any other Investment Document or to which the Required Lenders have consented in writing or (C) otherwise pursuant to and in accordance with the provisions of any applicable Investment Document, and (ii) to subordinate any Lien on any property granted to or held by the Collateral Agent under any Investment Document to the holder of any Lien on such property that is permitted by **Section 7.2(iii)**.  Upon request by the Collateral Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release or subordinate its interest in particular types or items of property pursuant to this **Section 9.8(b)**.

## ARTICLE X

## MISCELLANEOUS

10.1     Expenses; Indemnity; Damage Waiver.

(a)      The Borrowers shall pay (i) all reasonable out-of-pocket expenses incurred by the Collateral Agent and any Lender (including the reasonable fees, charges and disbursements of counsel; provided, that so long as no Default or Event of Default has occurred and is continuing, such fees, charges and disbursements shall be limited to only one set of shared counsel on behalf of the Collateral Agent and all Lenders), in connection with the preparation, negotiation, execution, delivery and administration of this Agreement and the other Investment Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and (ii) all reasonable out-of-pocket expenses incurred by the Collateral Agent and any Lender (including the reasonable fees, charges and disbursements of counsel for the Collateral Agent and for each Lender), in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Investment Documents, including its rights under this Section, or (B) in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)      The Borrowers shall indemnify the Collateral Agent (and any sub agent thereof), each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any Person (including any Borrower or any other Credit Party) other than such Indemnitee and its Related Parties arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Investment Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Substances on or from any property owned or operated by any Credit Party, or any Environmental Claim related in any way to any Credit Party, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower or any other Credit Party, and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence, willful misconduct or bad faith of such Indemnitee, (y) result from a claim brought by any Borrower or any other Credit Party against an

Indemnitee for breach of such Indemnitee's obligations hereunder or under any other Investment Document, if such Borrower or such Credit Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction, or (z) arise or result from any investment by any Lender pursuant to the Equity Investment Documents.

(c)        To the extent that the Borrowers for any reason fails to pay any amount required under **Section 10.1(a)** or **Section 10.1(b)** to be paid by it to the Collateral Agent (or any sub-agent thereof) or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Collateral Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's proportion (based on the percentages as used in determining the Required Lenders as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, <u>provided</u> that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Collateral Agent (or any such sub-agent) or against any Related Party of any of the foregoing acting for the Collateral Agent (or any such sub-agent).

(d)        To the fullest extent permitted by applicable law, the Borrowers and each other Credit Party and each Related Party of any of the foregoing Persons, shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Investment Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee referred to in **Section 10.1(b)** shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Investment Documents or the transactions contemplated hereby or thereby, except to the extent such damages arise from the gross negligence or willful misconduct of such Indemnitee as determined by a court of competent jurisdiction in a final and non-appealable judgment.

(e)        All amounts due under this Section shall be payable by the Borrowers upon demand therefor.

10.2    <u>Governing Law; Submission to Jurisdiction; Waiver of Venue; Service of Process</u>.

(a)        This Agreement and the other Investment Documents shall and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any other Investment Document (except as may be expressly otherwise provided in any Investment Document) shall be governed by, and construed in accordance with, the law of the State of New York (including Sections 5-1401 and 5-1402 of the New York General Obligations Law, but excluding all other choice of law and conflicts of law rules).

(b)        Each Borrower irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against any Lender, the Collateral Agent or any Related Party of any of the foregoing in any way relating to this Agreement or any other Investment Document or the transactions relating hereto or thereto, in any forum other than the courts of (a) the State of New York sitting in the City and County of New York and of the United States District Court of the Southern District of New York, and (b) any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in such state court or, to the fullest extent permitted by applicable law, in such federal court.  Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on

the judgment or in any other manner provided by law.  Nothing in this Agreement or in any other Investment Document shall affect any right that any Lender or the Collateral Agent may otherwise have to bring any action or proceeding relating to this Agreement or any other Investment Document against any Borrower or any other Credit Party or its properties in the courts of any jurisdiction.

(c)        Each Borrower irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Investment Document in any court referred to in **Section 10.2(b)**.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)        Each party hereto irrevocably consents to service of process in the manner provided for notices in **Section 10.4**, provided a copy of any such service of process simultaneously will be sent to such party by nationally recognized overnight courier.  Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable law.

10.3     <u>Waiver of Jury Trial</u>.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER INVESTMENT DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER INVESTMENT DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.4     <u>Notices; Effectiveness; Electronic Communication</u>.

(a)        Except in the cases of notices and other communications expressly permitted to be given by telephone (and except as provided in **Section 10.4(b)**), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows:

(i)        if to a Borrower or the Collateral Agent, to it at the address (or facsimile number) specified for such Person on **Schedule 1.1(a)**; and

(ii)        if to any Lender, to it at its address (or facsimile number) specified for such Person on **Schedule 1.1(a)** or set forth on its signature page to the Assignment and Assumption under which Loans or Commitments are first assigned to such Lender.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices delivered through electronic communications to the extent provided in **Section 10.4(b)** shall be effective as provided in **Section 10.4(b)**.

(b)      Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and internet or intranet websites) pursuant to procedures approved by each Lender.  The Borrowers may, in their discretion, agree to accept notices and other communications to them hereunder by electronic communication pursuant to procedures approved by them, <u>provided</u> that approval of such procedures may be limited to particular notices or communications.  Subject to such agreement by the Borrowers, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), <u>provided</u> that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or other communications posted to an internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)      Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto (except that each Lender need not give notice of any such change to the other Lenders in their capacities as such).

10.5    <u>Amendments, Waivers, etc</u>.  No amendment, modification, waiver or discharge or termination of, or consent to any departure by any Credit Party from, any provision of this Agreement or any other Investment Document shall be effective unless in a writing signed by the Required Lenders, and then the same shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u>, <u>however</u>, that no such amendment, modification, waiver, discharge, termination or consent shall:

(a)      unless agreed to by each Lender directly affected thereby, (i) reduce or forgive the principal amount of any Loan, reduce the rate of or forgive any interest thereon (<u>provided</u> that only the consent of the Required Lenders shall be required to (x) reduce the amount of interest required to be paid in cash (but not the overall interest rate) in respect of the Loans or (y) waive the applicability of any post-default increase in interest rates), or reduce or forgive any fees hereunder, (ii) extend the final scheduled maturity date or any other scheduled date for the payment of any principal of or interest on any Loan (including any scheduled date for the mandatory reduction or termination of any Commitments, but excluding any mandatory prepayment of the Loans pursuant to **Sections 2.4(b)** though **2.4(h)** or reduction or termination of Commitments in connection therewith), or extend the time of payment of any fees hereunder, (iii) increase any Commitment of any such Lender over the amount thereof in effect or extend the maturity thereof (it being understood that a waiver of any condition precedent set forth in **Article III** or of any Default or Event of Default or mandatory reduction in the Commitments, if agreed to by the Required Lenders or all Lenders (as may be required hereunder with respect to such waiver), shall not constitute such an increase) or (iv) reduce the percentage of the aggregate Commitments or of the aggregate unpaid principal amount of the Loans, or the number or percentage of Lenders, that shall be required for the Lenders or any of them to take or approve, or direct the Collateral Agent to take, any action hereunder or under any other Investment Document (including as set forth in the definition of "Required Lenders");

(b)      unless agreed to by all of the Lenders, (i) release all or substantially all of the Collateral (except as may be otherwise specifically provided in this Agreement or in any other Investment Document), (ii) change any other provision of this Agreement or any of the other Investment Documents requiring, by its terms, the consent or approval of all the Lenders for such amendment, modification, waiver, discharge, termination or consent, or (iii) change or waive any provision of **Section 2.11**, any

other provision of this Agreement or any other Investment Document requiring pro rata treatment of any Lenders, or this **Section 10.5**; and

(c)    unless agreed to by the Collateral Agent in addition to the Lenders required as provided hereinabove to take such action, affect the respective rights or obligations of the Collateral Agent, as applicable, hereunder or under any of the other Investment Documents;

(d)    provided, further, that the Fee Letter may only be amended or modified, and any rights thereunder waived, in a writing signed by the parties thereto.

Notwithstanding the fact that the consent of all Lenders is required in certain circumstances as set forth above, each Lender is entitled to vote as such Lender sees fit on any bankruptcy reorganization plan that affects the Loans, and each Lender acknowledges that the provisions of Section 1126(c) of the Bankruptcy Code supersedes the unanimous consent provisions set forth herein.

10.6    Successors and Assigns.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither the Borrowers nor any other Credit Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Collateral Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of **Section 10.6(b)**, or (ii) by way of pledge or assignment of a security interest subject to the restrictions of **Section 10.6(c)** (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of each of the Collateral Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and/or the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan or Commitment assigned;

(ii)    no consent shall be required for any assignment, except:

(A)    the consent of the Borrowers (such consent not to be unreasonably withheld or delayed) shall be required unless (x) an Event of Default has occurred and is continuing at the time of such assignment or (y) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; and

(B)    the consent of the Required Lenders (not to be unreasonably withheld) shall be required unless such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund;

(iii)    no such assignment shall be made to the Sponsor, any Credit Party or any Affiliate or Subsidiary of any of the foregoing; and

(iv)    no such assignment shall be made to a natural person.

All references to assignments in this **Section 10.6** shall include assignments of participation rights in the Notes.

From and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of **Sections 2.12**, **2.13** and **10.1** with respect to facts and circumstances occurring prior to the effective date of such assignment.  If requested by or on behalf of the assignee, each Borrower, at its own expense, will execute and deliver a new Note or Notes to the order of the assignee (and, if the assigning Lender has retained any portion of its rights and obligations hereunder, to the order of the assigning Lender), prepared in accordance with the applicable provisions of **Section 2.3** as necessary to reflect, after giving effect to the assignment, the Commitments and/or outstanding Loans, as the case may be, of the assignee and (to the extent of any retained interests) the assigning Lender, in substantially the form of **Exhibit A**.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this **Section 10.6(b)** shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations.

(c)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Notes, if any) to secure obligations of such Lender or its Affiliates, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(d)    The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act or any state laws based on the Uniform Electronic Transactions Act.

(e)    Any Lender may, in connection with any assignment, participation, pledge or proposed assignment, participation or pledge pursuant to this **Section 10.6**, disclose to the assignee, participant or pledgee or proposed assignee, participant or pledgee any information relating to the Parent and its Subsidiaries furnished to it by or on behalf of any other party hereto.

(f)    The Borrowers shall keep at their principal executive office a register for the registration and registration of transfers of Notes and interests in the Loans.  The name and address of each holder of one or more Notes or interests in the Loans and the amount of outstanding principal and interest related thereto, each transfer thereof and the name and address of each transferee of one or more Notes or interests in the Loans shall be registered by the Borrowers in such register.  Prior to due presentment for registration of transfer, the Person in whose name any Note or interests in the Loans shall be registered shall be deemed and treated as the owner and holder thereof for all purposes hereof.  The Borrowers shall give to any holder of a Note or interests in the Loans promptly upon request therefor, a complete and correct copy of the names and addresses of all registered holders of Notes and interests in the Loans.

10.7    No Waiver. The rights and remedies of the Collateral Agent and the Lenders expressly set forth in this Agreement and the other Investment Documents are cumulative and in addition to, and not exclusive of, all other rights and remedies available at law, in equity or otherwise. No failure or delay on the part of the Collateral Agent or any Lender in exercising any right, power or privilege shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or privilege preclude other or further exercise thereof or the exercise of any other right, power or privilege or be construed to be a waiver of any Default or Event of Default. No course of dealing between any Credit Party, the Collateral Agent or the Lenders or their agents or employees shall be effective to amend, modify or discharge any provision of this Agreement or any other Investment Document or to constitute a waiver of any Default or Event of Default. No notice to or demand upon any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of the Collateral Agent or any Lender to exercise any right or remedy or take any other or further action in any circumstances without notice or demand.

10.8    Survival. All representations, warranties and agreements made by or on behalf of any Borrower or any other Credit Party in this Agreement and in the other Investment Documents shall survive the execution and delivery hereof or thereof, the making and repayment of the Loans. In addition, notwithstanding anything herein or under applicable law to the contrary, the provisions of this Agreement and the other Investment Documents relating to indemnification or payment of costs and expenses, including, without limitation, the provisions of **Sections 2.12**, **2.13** and **10.1**, shall survive the payment in full of all Loans, the termination of the Commitments and any termination of this Agreement or any of the other Investment Documents.

10.9    Severability. To the extent any provision of this Agreement is prohibited by or invalid under the applicable law of any jurisdiction, such provision shall be ineffective only to the extent of such prohibition or invalidity and only in such jurisdiction, without prohibiting or invalidating such provision in any other jurisdiction or the remaining provisions of this Agreement in any jurisdiction.

10.10    Construction. The headings of the various articles, sections and subsections of this Agreement and the table of contents have been inserted for convenience only and shall not in any way affect the meaning or construction of any of the provisions hereof. Except as otherwise expressly provided herein and in the other Investment Documents, in the event of any inconsistency or conflict between any provision of this Agreement and any provision of any of the other Investment Documents, the provision of this Agreement shall control.

10.11    Counterparts; Integration; Effectiveness. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Investment Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof (except for the Fee Letters). Except as provided in **Section 3.1**, this Agreement shall become effective when it shall have been executed by the Lenders and when the Lenders shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic format (e.g., "pdf," "tif" or similar file formats) shall be effective as delivery of a manually executed counterpart of this Agreement.

10.12    Confidentiality. Each Lender and the Collateral Agent shall exercise the same degree of care that it exercises with respect to its own proprietary information of the same types to maintain in confidence, in accordance with its customary procedures for handling confidential information, all Confidential Information; provided, that each Lender and the Collateral Agent and their respective

Affiliates shall have the right to disclose Confidential Information to the following Persons (and with respect to Persons covered under clauses (a) through (f), if it directs such Persons not to disclose such Confidential Information as required under this Agreement):

(a)      such Person's Affiliates;

(b)      such Person's or such Person's Affiliates' lenders, funding or financing sources and rating agencies;

(c)      such Person's or such Person's Affiliates' directors, officers, trustees, partners, members, managers, employees, agents, advisors, representatives, attorneys, equity owners, professional consultants and portfolio management services, or current or prospective investors;

(d)      any other Lender and any successor or assign of any Lender;

(e)      any Person to whom any Lender offers to sell, assign or transfer any Loan or any part thereof or any interest or participation therein;

(f)      any Person that provides statistical analysis and/or information services to such Lender or its Affiliates;

(g)      any Person (A) to the extent required by applicable law, (B) in response to any subpoena or other legal process or informal investigative demand, (C) in connection with any litigation, or (D) in connection with the actual or potential exercise or enforcement of any right or remedy under any Loan Document;

(h)      any Person to the extent required by the Intercreditor Agreement or any other subordination agreement relating to the Obligations;

(i)      any Person to the extent expressly contemplated or permitted by the Investment Documents;

(j)      any Person in order to disclose the tax treatment and tax aspects of the transactions contemplated by the Investment Documents, and all materials of any kind (including opinions or other tax analyses) that are provided to such parties related to such tax treatment and tax aspect;

(k)      any Governmental Authority (including, without limitation, in connection with filings, submissions and any other similar documentation required or customary to comply with Securities and Exchange Commission filing requirements) having or claiming authority to regulate or oversee any aspect of such Person's business or any Affiliate of such Person in connection with the exercise of such authority or claimed authority.

In addition to the foregoing, each the Borrowers agrees and consents that the Collateral Agent, each Lender and each Affiliate thereof shall be permitted to (i) disclose information about the financing transactions in the ordinary course of its business and in a manner consistent with the public disclosures by such Person in respect of similar financings (including, without limitation, (x) the publication of announcements, tombstone and press releases regarding the transactions subject to the consent of the Borrowers, which consent shall not be unreasonably withheld, delayed or conditioned and (y) both during and after the termination of this Agreement, including on its website a link to the website(s) of the Credit Parties), (ii) make any disclosures required by or deemed advisable under applicable Requirements of Law, including federal and state securities laws and applicable securities exchanges and markets; and (iii)

make public disclosures to its investors, potential investors and analysts customary in the ordinary course of its business and in a manner consistent with the public disclosures by such Person in respect of similar financings.  The parties hereto expressly agree that nothing in this Agreement or any other Investment Document shall restrict the Collateral Agent, any Lender or any Affiliate thereof from disclosing the amount of the Loans in the ordinary course of its business, including without limitation in (x) filings with or communications to investors required by the United States Securities and Exchange Commission or applicable foreign counterpart, (y) earnings press releases and (z) finance industry publications for the purpose of obtaining league table credit or similar rankings.

10.13    USA Patriot Act Notice.  Each Lender that is subject to the PATRIOT Act hereby notifies each Borrower that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies each Borrower, which information includes the name and address of the Borrowers and other information that will allow such Lender to identify the Borrowers in accordance with the PATRIOT Act.

10.14    Joint and Several Liability of Borrowers.

(a)    The Borrowers are jointly and severally liable for the Obligations.  The Obligations of the Borrowers are independent of each other, and a separate action or actions may be brought and prosecuted against any Borrower to enforce this Agreement the other Investment Documents, irrespective of whether any action is brought against any other Borrower or whether any other Borrower is joined in any such action or actions.

(b)    Notwithstanding any provision to the contrary contained herein or in any other of the Investment Documents, to the extent the obligations of any Borrower to repay any Obligations incurred by another Borrower shall be adjudicated to be invalid or unenforceable for any reason (including, without limitation, because of any applicable state or federal law relating to fraudulent conveyances or transfers) then the obligations of such Borrower hereunder shall be limited to the maximum amount that is valid and enforceable under applicable law (whether federal or state and including, without limitation, the Bankruptcy Code).

(c)    Each Borrower agrees that all indebtedness and other obligations, whether now or hereafter existing, of any Credit Party to such Borrower, and any intercompany receivables, together with any interest thereon, shall be, and hereby are, subordinated and made junior in right of payment to the Obligations.  Each Borrower further agrees that if any amount shall be paid to or any distribution received by it (i) on account of any such indebtedness at any time after the occurrence and during the continuance of an Event of Default, or (ii) on account of any such rights of subrogation, indemnity, contribution or reimbursement at any time prior to the satisfaction of Obligations hereunder, such amount or distribution shall be deemed to have been received and to be held in trust for the benefit of the Lenders, and shall forthwith be delivered to the Lenders in the form received (with any necessary endorsements in the case of written instruments), to be applied against the Obligations, whether or not matured, in accordance with the terms hereof or the applicable Investment Documents and without in any way discharging, limiting or otherwise affecting the liability of such Borrower under any other provision of this Agreement or any other Investment Document.

(d)    To the fullest extent permitted under applicable law, each Borrower hereby waives any right to require the Collateral Agent or any Lender to (i) proceed against any Borrower, any other guarantor or any other party, or (ii) pursue any other remedy in the Collateral Agent's or any Lender's power whatsoever.  Each Borrower waives any defense based on or arising out of any defense of any other Borrower, any other guarantor or any other party other than the satisfaction in full of the Obligations, including without limitation any defense based on or arising out of the disability of any other

Borrower, any other guarantor or any other party or the cessation from any cause of the liability of any other Borrower other than the satisfaction in full of Obligations.  Each Borrower waives all presentments, demands for performance, protests and notices, including without limitation notices of nonperformance, notices of protest, notices of dishonor, notices of acceptance, and notices of the existence, creation or incurring of new or additional indebtedness.

  10.15 <u>Intercreditor Agreement</u>.  Notwithstanding anything herein to the contrary, the Obligations evidenced by this Agreement and the other Investment Documents, the Liens and security interests granted to the Collateral Agent pursuant to the terms hereof and thereof and the exercise of any right or remedy by the Collateral Agent or the Lenders hereunder or thereunder are subject to the provisions of the Intercreditor Agreement.  In the event of any conflict between the terms of the Intercreditor Agreement and any other Investment Document, the terms of the Intercreditor Agreement shall govern.  Notwithstanding anything that may be contained herein to the contrary, all of the provisions of the Investment Documents, including the covenants of the Credit Parties contained herein and therein and all of the rights, remedies and powers provided for herein and therein, are subject to the provisions of the Intercreditor Agreement, <u>provided</u> that (i) any breach by any Credit Party of its obligations hereunder or thereunder shall nonetheless constitute a default (and to the extent provided herein or therein, an Event of Default) hereunder or thereunder, as applicable, notwithstanding the foregoing and (ii) the requirement to deliver possession or control of any collateral to the Collateral Agent shall be subject to the requirements under the Senior Loan Agreement for the Borrowers to deliver such collateral to the Senior Agent.

  10.16 <u>Classified Information</u>.  The rights of the Investor under this Agreement and the other Investment Documents as they pertain to government contracts or other materials that contain classified or sensitive unclassified information are subject to Applicable Laws, including, without limitation, DOD Directive 5220.22-M, National Industrial Security Program Operations Manual, and nothing in this Agreement or the other Investment Documents shall cause the Borrowers to violate such applicable laws.

*[Remainder of page left blank intentionally; signatures begin on the following page.]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their duly authorized officers as of the date first above written.

**BW PIEZO HOLDINGS, LLC**

By: _____

Name: <u>Adam Blumenthal</u>

Title: <u>President</u>

**CTG ADVANCED MATERIALS, LLC**

By: _____

Name: <u>Adam Blumenthal</u>

Title: <u>Chairman</u>

**CHANNEL TECHNOLOGIES GROUP, LLC**

By: _____

Name: <u>Gary Douville</u>

Title: <u>President</u>

**ELECTRO-OPTICAL INDUSTRIES, LLC**

By: _____

Name: <u>Gary Douville</u>

Title: <u>President</u>

(signatures continued)

Signature Page to Investment Agreement

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed by their duly authorized officers as of the date first above written.

**BW PIEZO HOLDINGS, LLC**

By: _____
Name:  Adam Blumenthal
Title:  President

**CTG ADVANCED MATERIALS, LLC**

By: _____
Name:  Adam Blumenthal
Title:  Chairman

**CHANNEL TECHNOLOGIES GROUP, LLC**

By: _____
Name:  Gary Douville
Title:  President

**ELECTRO-OPTICAL INDUSTRIES, LLC**

By: _____
Name:  Gary Douville
Title:  President

(signatures continued)

Signature Page to Investment Agreement

**AVANTE MEZZANINE PARTNERS SBIC, L.P.**, as a Lender

By: AVANTE MEZZANINE PARTNERS SBIC, LLC,
    its General Partner

By: _____
          Name: Jeri Harman
          Title: Manager

**FIDUS MEZZANINE CAPITAL II, L.P.**, as Collateral Agent and as a Lender

By:     Fidus Investment GP, LLC, its General Partner

By:     Fidus Investment Advisors, LLC, its Manager

By: _____
          Name:
          Title:

Signature Page to Investment Agreement

**AVANTE MEZZANINE PARTNERS SBIC, L.P.**, as a Lender

By: AVANTE MEZZANINE PARTNERS SBIC, LLC,
     its General Partner

By: _____
        Name: Jeri Harman
        Title: Manager

**FIDUS MEZZANINE CAPITAL II, L.P.**, as Collateral Agent and as a Lender

By:    Fidus Investment GP, LLC, its General Partner

By:    Fidus Investment Advisors, LLC, its Manager

By: _____
        Name: W. Andrew Worth
        Title: Manager

Signature Page to Investment Agreement

**Schedule 1.1(a)**

**Commitments and
Notice Addresses**

Commitments

| Lender | Commitment |
|---|---|
| Avante Mezzanine Partners SBIC, L.P. | $7,000,000 |
| Fidus Mezzanine Capital II, L.P. | $7,000,000 |
| **Total** | **$14,000,000** |

Notice Addresses

| Party | Address |
|---|---|
| Borrowers and Parent | c/o Blue Wolf Capital Fund II, L.P.<br>One Liberty Plaza, 52nd Floor<br>New York, NY 10006<br>Attention: Adam Blumenthal/Charles Miller<br>Facsimile: (646) 607-3889<br><br>With a copy to (which shall not constitute notice):<br><br>Holland & Knight LLP<br>10 St. James Avenue<br>Boston, MA 02116<br>Attention: Kerry S. Kehoe, Esq.<br>Facsimile: (617) 523-6850 |
| Avante Mezzanine Partners SBIC, L.P. | Avante Mezzanine Partners SBIC, L.P.<br>c/o Avante Mezzanine Partners<br>11150 Santa Monica Boulevard, Suite 1470<br>Los Angeles, CA  90025<br>Attention:       Cliff A. Lyon<br>Electronic Mail: clyon@avantemezzanine.com<br>Facsimile:       (310) 728-1755<br>Telephone:       (310) 667-9242<br><br>With a copy to:<br><br>Avante Mezzanine Partners SBIC, L.P.<br>c/o Avante Mezzanine Partners<br>11150 Santa Monica Boulevard, Suite 1470<br>Los Angeles, CA  90025<br>Attention: Jeri J. Harman<br>Electronic Mail: jharman@avantemezzanine.com |

| | |
|---|---|
| | Facsimile: (310) 728-1762<br>Telephone:  (310) 667-9242 |
| Fidus Mezzanine Capital II, L.P. | 1603 Orrington Avenue<br>Suite 1005<br>Evanston, IL 60201<br>Attention:  Andy Worth and Cary Schaefer<br>Fax:  (847) 859-3953<br><br>with a copy to (which shall not constitute notice) :<br><br>Robinson, Bradshaw & Hinson, P.A.<br>101 North Tryon Street, Suite 1900<br>Charlotte, NC 28246<br>Attention:  John Herring<br>Fax:  (704) 373-3985 |

**Schedule 1.1(b)**

**Consolidated EBITDA; Capital Expenditures**

| Month | Consolidated EBITDA | Capital Expenditures |
|---|---|---|
| September 2012 | $1,142,700 | $358,300 |
| October 2012 | $ 434,100 | $126,800 |
| November 2012 | $ 909,700 | $582,900 |
| December 2012 | $1,372,200 | $505,900 |
| January 2013 | $ 584,100 | $214,300 |
| February 2013 | $ 943,300 | $ 89,900 |
| March 2013 | $1,855,600 | $101,900 |
| April 2013 | $ 570,100 | $481,400 |
| May 2013 | $ 797,400 | $117,800 |
| June 2013 | $1,328,600 | $233,100 |
| July 2013 | $ 934,700 | $135,500 |
| August 2013 | $ 841,700 | $358,900 |
| September 2013 | Actual Consolidated EBITDA of the Borrowers and their Subsidiaries and HCM calculated in a manner consistent with the calculations used to derive the foregoing amounts and reasonably approved by the Required Lenders | Actual Capital Expenditures of the Borrowers and their Subsidiaries and HCM calculated in a manner consistent with the calculations used to derive the foregoing amounts and reasonably approved by the Required Lenders |
| October 2013 (for periods prior to the Closing Date) | Actual Consolidated EBITDA of the Borrowers and their Subsidiaries and HCM calculated in a manner consistent with the calculations used to derive the foregoing amounts and reasonably approved by the Required Lenders | Actual Capital Expenditures of the Borrowers and their Subsidiaries and HCM calculated in a manner consistent with the calculations used to derive the foregoing amounts and reasonably approved by the Required Lenders |

# EXHIBIT 7

## PLEDGE AND SECURITY AGREEMENT

**THIS PLEDGE AND SECURITY AGREEMENT**, dated as of the 11th day of October, 2013 (this "Agreement"), is made by **BW PIEZO HOLDINGS, LLC**, a Delaware limited liability company ("BWP" or the "Parent"); **CTG ADVANCED MATERIALS, LLC**, a Delaware limited liability company and wholly owned subsidiary of BWP ("CTG"); **CHANNEL TECHNOLOGIES GROUP, LLC**, a California limited liability company and wholly owned subsidiary of BWP ("Channel"); and **ELECTRO-OPTICAL INDUSTRIES, LLC**, a California limited liability company and wholly owned subsidiary of Channel ("Electro" and, together with BWP, CTG, Channel, and certain Subsidiaries of BWP that from time to time after the date hereof become Borrowers under the Investment Agreement, each, a "Borrower" and, collectively, the "Borrowers"), and by each other Subsidiary of the Parent that, after the date hereof, executes an instrument of accession hereto substantially in the form of Exhibit C (a "Pledgor Accession"; the undersigned and such other Subsidiaries, collectively, together with the Parent and the Borrowers, the "Pledgors"), in favor of **FIDUS MEZZANINE CAPITAL II, L.P.**, as Collateral Agent for the Lenders party to the Investment Agreement referred to below (in such capacity, the "Collateral Agent"), for the benefit of the Secured Parties (as hereinafter defined).  Except as otherwise provided herein, capitalized terms used herein without definition have the meanings given to them in the Investment Agreement referred to below.

## RECITALS

A.      The Borrowers, the Lenders and the Collateral Agent are parties to an Investment Agreement, dated as of the date hereof (as amended, modified, restated or supplemented from time to time, the "Investment Agreement"), providing for a term loan in the aggregate original principal amount of $14,000,000 to the Borrowers upon the terms and subject to the conditions set forth therein.

B.      Certain other Subsidiaries of the Borrowers may from time to time after the date hereof become Borrowers under the Investment Agreement by executing a joinder thereto.

C.      It is a condition to the extension of credit to the Borrowers under the Investment Agreement that the Pledgors as of the Closing Date shall have agreed, by executing and delivering this Agreement, to secure the payment in full of their respective obligations under the Investment Agreement and the other Investment Documents (other than the Equity Investment Documents).  The Secured Parties are relying on this Agreement in their decision to extend credit to the Borrowers under the Investment Agreement, and would not enter into the Investment Agreement without the execution and delivery of this Agreement by the Pledgors.

D.      The Pledgors will obtain benefits as a result of the extension of credit to the Borrowers under the Investment Agreement, which benefits are hereby acknowledged, and, accordingly, desire to execute and deliver this Agreement.

## STATEMENT OF AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, to induce the Secured Parties to enter into the Investment Agreement and to induce the Lenders to extend credit to the Borrowers thereunder, each Pledgor hereby agrees as follows:

# ARTICLE I

## DEFINITIONS

1.1     Defined Terms.  The following terms that are defined in the Uniform Commercial Code (as hereinafter defined) are used in this Agreement as so defined (and, in the event any such term is defined differently for purposes of Article 9 of the Uniform Commercial Code than for any other purpose or purposes of the Uniform Commercial Code, the Article 9 definition shall govern): Account, Chattel Paper, Commercial Tort Claim, Commodity Account, Commodity Intermediary, Deposit Accounts, Documents, Electronic Chattel Paper, Equipment, Fixtures, General Intangibles, Goods, Instruments, Inventory, Investment Property, Letter-of-Credit Rights, Record, Securities Account, Securities Intermediary, Software, Supporting Obligations and Tangible Chattel Paper.  In addition, the following terms have the meanings set forth below:

"Acquisition Seller Undertakings" means collectively, all representations, warranties, covenants, indemnification agreements and other agreements by HCM, DHAN and Dr. Pengdi Han (collectively, the "HCM Sellers") under the HCM Acquisition Agreement in favor of any of the Borrowers in each case pursuant to the terms of the HCM Acquisition Agreement and (ii) all representations, warranties, covenant, indemnification agreements and other agreements by any other sellers under any other acquisition agreement in favor of any of the Borrowers or any other Credit Party, in each case pursuant to the terms thereof.

"Collateral" has the meaning given to such term in **Section 2.1**.

"Collateral Accounts" has the meaning given to such term in **Section 6.3**.

"Contracts" means, collectively, all rights of each Pledgor under all leases, contracts and agreements to which such Pledgor is now or hereafter a party, including, without limitation, all rights, privileges and powers under Ownership Agreements and Licenses, together with any and all extensions, modifications, amendments and renewals of such leases, contracts and agreements and all rights of such Pledgor to receive moneys due or to become due thereunder or pursuant thereto and to amend, modify, terminate or exercise rights under such leases, contracts and agreements.

"Copyright Collateral" means, collectively, all Copyrights and Copyright Licenses to which any Pledgor is or hereafter becomes a party.

"Copyright License" means any agreement now or hereafter in effect granting any right to any third party under any Copyright now or hereafter owned by any Pledgor or which any Pledgor otherwise has the right to license, or granting any right to any Pledgor under any property of the type described in the definition of Copyright herein now or hereafter owned by any third party, and all rights of any Pledgor under any such agreement.

"Copyrights" means, collectively, all of each Pledgor's copyrights, copyright registrations and applications for copyright registration, whether under the laws of the United States or any other country or jurisdiction, including all recordings, supplemental registrations and derivative or collective work registrations, and all renewals and extensions thereof, in each case whether now owned or existing or hereafter acquired or arising.

"License" means any Copyright License, Patent License or Trademark License.

"Mobile Goods" means, collectively, all of each Pledgor's motor vehicles, tractors, trailers, aircraft, rolling stock and other like property, whether or not the title thereto is governed by a certificate of title or ownership, in each case whether now owned or existing or hereafter acquired.

"Ownership Agreement" means any partnership agreement, joint venture agreement, limited liability company operating agreement, stockholders agreement or other agreement creating, governing or evidencing any capital stock or equity interests and to which any Pledgor is now or hereafter becomes a party, as any such agreement may be amended, modified, supplemented, restated or replaced from time to time.

"Patent Collateral" means, collectively, all Patents and all Patent Licenses to which any Pledgor is or hereafter becomes a party.

"Patent License" means any agreement now or hereafter in effect granting to any third party any right to make, use or sell any invention on which a Patent, now or hereafter owned by any Pledgor or which any Pledgor otherwise has the right to license, is in existence, or granting to any Pledgor any right to make, use or sell any invention on which property of the type described in the definition of Patent herein, now or hereafter owned by any third party, is in existence, and all rights of any Pledgor under any such agreement.

"Patents" means, collectively, all of each Pledgor's letters patent, whether under the laws of the United States or any other country or jurisdiction, all recordings and registrations thereof and applications therefor, including, without limitation, the inventions and improvements described therein, and all reissues, continuations, divisions, renewals, extensions, substitutions and continuations-in-part thereof, in each case whether now owned or existing or hereafter acquired or arising.

"Pledged Interests" means, collectively, (i) all of the issued and outstanding shares, interests or other equivalents of capital stock of each Person that is a direct Subsidiary of any Pledgor as of the date hereof or that becomes a direct Subsidiary of any Pledgor at any time after the date hereof, at any time now or hereafter owned by any Pledgor, whether voting or non-voting and whether common or preferred; (ii) all partnership, joint venture, limited liability company or other equity interests in each Person not a corporation that is a direct Subsidiary of any Pledgor as of the date hereof or that becomes a direct Subsidiary of any Pledgor at any time after the date hereof, at any time now or hereafter owned by any Pledgor; (iii) all options, warrants and other rights to acquire, and all securities convertible into, any of the foregoing; (iv) all rights to receive interest, income, dividends, distributions, returns of capital and other amounts (whether in cash, securities, property, or a combination thereof), and all additional stock, warrants, options, securities, interests and other property, from time to time paid or payable or distributed or distributable in respect of any of the foregoing (but subject to the provisions of **Section 5.3**), including, without limitation, all rights of such Pledgor to receive amounts due and to become due under any Ownership Agreement or upon the termination thereof; (v) all rights of access to the books and records of any such Person; and (vi) all other rights, powers, privileges, interests, claims and other property in any manner in respect of any of the foregoing, of whatever kind or character (including any tangible or intangible property or interests therein), and whether provided by contract or granted or available under applicable law in connection therewith, including, without limitation, such Person's right to vote and to manage and administer the business of any such Subsidiary pursuant to any applicable Ownership Agreement, in each case together with all certificates, instruments and entries upon the books of financial intermediaries at any time evidencing any of the foregoing.

"Proceeds" has the meaning given to such term in **Section 2.1**.

"Secured Parties" means, collectively, the Lenders and the Collateral Agent.

"Trademark Collateral" means, collectively, all Trademarks and Trademark Licenses to which any Pledgor is or hereafter becomes a party.

"Trademark License" means any agreement now or hereafter in effect granting any right to any third party under any Trademark now or hereafter owned by any Pledgor or which any Pledgor otherwise has the right to license, or granting any right to any Pledgor under any property of the type described in the definition of Trademark herein now or hereafter owned by any third party, and all rights of any Pledgor under any such agreement.

"Trademarks" means, collectively, all of each Pledgor's trademarks, service marks, trade names, corporate and company names, business names, logos, trade dress, trade styles, other source or business identifiers, designs and general intangibles of a similar nature, whether under the laws of the United States or any other country or jurisdiction, all recordings and registrations thereof and applications therefor, all renewals, reissues and extensions thereof, all rights corresponding thereto, and all goodwill associated therewith or symbolized thereby, in each case whether now owned or existing or hereafter acquired or arising.

"Uniform Commercial Code" means the Uniform Commercial Code as the same may be in effect from time to time in the State of New York; provided that if, by reason of applicable law, the validity or perfection of any security interest in any Collateral granted under this Agreement is governed by the Uniform Commercial Code as in effect in another jurisdiction, then as to the validity or perfection, as the case may be, of such security interest, "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction.

1.2    Other Terms; Construction.  All terms in this Agreement that are not capitalized shall, unless the context otherwise requires, have the meanings provided by the Uniform Commercial Code to the extent the same are used or defined therein.

## ARTICLE II

## CREATION OF SECURITY INTEREST

2.1    Pledge and Grant of Security Interest.  Each Pledgor hereby pledges and collaterally assigns to the Collateral Agent, for the ratable benefit of the Secured Parties, and grants to the Collateral Agent, for the ratable benefit of the Secured Parties, a Lien upon and security interest in, all of such Pledgor's right, title and interest in and to the following personal property of such Pledgor, in each case whether now owned or existing or hereafter acquired or arising and wherever located (collectively, the "Collateral"):

        (i)        all Accounts;

        (ii)        all Chattel Paper;

        (iii)        the Commercial Tort Claims (if any) set forth on Annex I hereto;

        (iv)        all Contracts (including, without limitation, all of the Credit Parties' rights and remedies with respect to any and all of the Acquisition Seller Undertakings);

        (v)        all Copyright Collateral;

        (vi)        all Deposit Accounts;

(vii)    all Documents;

(viii)   all Equipment;

(ix)    all Fixtures;

(x)     all General Intangibles;

(xi)    all Goods;

(xii)   all Instruments;

(xiii)  all Inventory;

(xiv)   all Investment Property;

(xv)    all Letter-of-Credit Rights;

(xvi)   all Patent Collateral;

(xvii)  all Pledged Interests;

(xviii) all Software;

(xix)   all Supporting Obligations;

(xx)    all Trademark Collateral;

(xxi)   all cash, cash equivalents and money of such Pledgor, wherever held;

(xxii)   to the extent not covered or not specifically excluded by clauses (i) through (xxi) above, all of such Pledgor's other personal property;

(xxiii)  all Records evidencing or relating to any of the foregoing or that are otherwise necessary or useful in the collection thereof;

(xxiv)   all accessions, additions, attachments, improvements, modifications and upgrades to, replacements of and substitutions for any of the foregoing; and

(xxv)    any and all proceeds, as defined in the Uniform Commercial Code, products, rents, royalties and profits of or from any and all of the foregoing and, to the extent not otherwise included in the foregoing, (w) all payments under any insurance (whether or not the Collateral Agent is the loss payee thereunder), indemnity, warranty or guaranty with respect to any of the foregoing Collateral, (x) all payments in connection with any requisition, condemnation, seizure or forfeiture with respect to any of the foregoing Collateral, (y) all claims and rights (but not obligations) to recover for any past, present or future infringement or dilution of or injury to any Copyright Collateral, Patent Collateral or Trademark Collateral, and (z) all other amounts from time to time paid or payable under or with respect to any of the foregoing Collateral (collectively, "Proceeds").  For purposes of this Agreement, the term "Proceeds" includes whatever is receivable or received when Collateral or Proceeds are sold, exchanged, collected or otherwise disposed of, whether voluntarily or involuntarily.

Notwithstanding the foregoing, the Collateral Agent may, in its sole discretion, reject or refuse to accept for credit toward payment of the Secured Obligations any Collateral that is an Account, Instrument, Chattel Paper, lease or other obligation or property of any kind due or owing from or belonging to a Sanctioned Person.

Notwithstanding anything to the contrary contained herein, the term "Collateral" shall not include: (i) any rights or interests in any permit, lease, license, contract, or agreement, as such, if under the terms of such permit, lease, license, contract or agreement, or applicable law with respect thereto, the valid grant of a security interest or lien therein to the Collateral Agent is prohibited or would result in a default thereunder and such prohibition or default has not been or is not waived or the consent of the other party to such permit, lease, license, contract or agreement has not been or is not otherwise obtained or under applicable law such prohibition or default cannot be waived; provided that, any permit, license, contract or agreement excluded in accordance with the foregoing shall not be so excluded (a) to the extent such terms are, or would be (in the case of after-acquired property or changes to applicable law), rendered ineffective under Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code of any relevant jurisdiction (or any successor provision) or any other applicable law (including the Bankruptcy Code) or principles of equity (as determined by an applicable court); or (b) if the applicable Pledgor has obtained all of the consents of such Governmental Authority or the other parties to such permit, lease, license, contract or agreement necessary for the collateral assignment of, or creation of a security interest in, such permit, lease, license, contract or agreement; provided further that, immediately upon the ineffectiveness, lapse or termination of any such terms in any such permit, lease, license, contract or agreement, the Collateral shall include, and the applicable Pledgor shall be deemed to have granted a security interest in, all such rights and interests therein as if such provision had never been in effect; and (ii) any application for a Trademark filed with the United States Patent and Trademark Office ("PTO") pursuant to 15 U.S.C. § 1501 Section 1(b) unless and until evidence of use of the Trademark in interstate commerce is submitted to the PTO pursuant to 15 U.S.C. § 1501 Section 1(c) or Section 1(d), at which time such Trademark shall automatically become part of the Collateral and subject to the security interest granted hereunder.   In the event that any material personal property of a Pledgor is excluded from the term "Collateral" by virtue of clause (i) above, such Grantor agrees to use commercially reasonable efforts, when requested by the Collateral Agent, to obtain all requisite consents to enable such Grantor to provide a security interest in such property pursuant hereto as promptly as practicable.

2.2    <u>Security for Secured Obligations</u>.  This Agreement and the Collateral secure the full and prompt payment, at any time and from time to time as and when due (whether at the stated maturity, by acceleration or otherwise), of all Obligations of the Borrowers under the Investment Agreement and the other Investment Documents (other than, for avoidance of doubt, the Equity Investment Documents), including, without limitation, all principal of and interest on the Loans, and all fees, expenses, indemnities and other amounts payable by the Borrowers under the Investment Agreement or any other Investment Document other than the Equity Investment Documents (including interest accruing after the filing of a petition or commencement of a case by or with respect to any Borrower seeking relief under any applicable federal and state laws pertaining to bankruptcy, reorganization, arrangement, moratorium, readjustment of debts, dissolution, liquidation or other debtor relief, specifically including, without limitation, the Bankruptcy Code and any fraudulent transfer and fraudulent conveyance laws, whether or not the claim for such interest is allowed in such proceeding), including, but not limited to, (i) all such liabilities and obligations that, but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, would become due, and (ii) all fees, costs and expenses payable by the Pledgors under **Section 8.1**, in each case under (a) and (b) above whether now existing or hereafter created or arising and whether direct or indirect, absolute or contingent, due or to become due (the liabilities and obligations of

the Pledgors described in this **Section 2.2**, collectively, the "Secured Obligations"). Notwithstanding anything to the contrary contained herein, in no event shall "Secured Obligations" include any obligations or liabilities of the Parent under or arising from the Equity Investment Documents.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Each Pledgor represents and warrants as follows:

3.1    Ownership of Collateral. Each Pledgor owns, or has valid rights as a lessee or licensee with respect to, all Collateral purported to be pledged by it hereunder, free and clear of any Liens except for the Liens granted to the Collateral Agent, for the benefit of the Secured Parties, pursuant to this Agreement, and except for other Permitted Liens. No security agreement, financing statement or other public notice with respect to all or any part of the Collateral is on file or of record in any government or public office, and no Pledgor has filed or consented to the filing of any such statement or notice, except (i) Uniform Commercial Code financing statements naming the Collateral Agent as secured party, (ii) security instruments filed in the U.S. Copyright Office or the U.S. Patent and Trademark Office naming the Collateral Agent as secured party, (iii) filings with respect to which termination statements and other necessary releases have been delivered to the Collateral Agent for filing, (iv) termination filings not yet made with respect to which the underlying Liens have been released, and (v) as may be otherwise permitted by the Investment Agreement.

3.2    Security Interests; Filings. This Agreement, together with (i) the filing, with respect to each Pledgor, of duly completed Uniform Commercial Code financing statements naming such Pledgor as debtor, the Collateral Agent as secured party, and describing the Collateral, in the jurisdictions set forth with respect to such Pledgor on Annex A hereto, (ii) to the extent required by applicable law, the filing, with respect to each relevant Pledgor, of duly completed and executed security agreements in the forms set forth as Exhibits A and B with the PTO, as appropriate, with regard to registered Copyright Collateral, Patent Collateral and Trademark Collateral of such Pledgor, as the case may be, (iii) in the case of uncertificated Pledged Interests consisting of capital stock, registration of transfer thereof to the Collateral Agent on the issuer's books or the execution by the issuer of a control agreement satisfying the requirements of Section 8-106 (or its successor provision) of the Uniform Commercial Code, and (iv) the delivery to the Collateral Agent, for its benefit and the benefit of the Secured Parties, of all stock certificates and Instruments included in the Collateral (and assuming continued possession thereof by the Collateral Agent), creates, and, to the extent such Collateral is subject to Article 9 of the Uniform Commercial Code and of such filings, registrations of transfer and delivery, at all times shall constitute, a valid and perfected security interest and Lien upon the Collateral in favor of the Collateral Agent, for the benefit of the Secured Parties, to the extent a security interest therein can be perfected by such filings or possession, as applicable, superior and prior to the rights of all other Persons therein (except for Permitted Liens).

3.3    Locations. Annex B lists, as to each Pledgor, (i) its exact legal name, (ii) the jurisdiction of its incorporation or organization, its federal tax identification number, and (if applicable) its organizational identification number, (iii) the addresses of its chief executive office and each other place of business, (iv) the address of each location of all material books and records or material information evidencing or relating to the Collateral of each Pledgor, and (v) the address of each location at which any material Equipment or material Inventory (other than Mobile Goods and Goods in transit) owned by such Pledgor is kept or maintained. Except as may be otherwise noted therein, all locations identified in Annex B are leased by the applicable Pledgor. No Pledgor (x) presently conducts business under any prior or other corporate or company name or under any trade or fictitious names, except as indicated

beneath its name on <u>Annex B</u>, (y) has entered into any contract or granted any Lien within the past five years under any name other than its legal corporate name or a trade or fictitious name indicated on <u>Annex B</u>, or (z) has filed any tax return under any name other than its exact legal name, except as indicated beneath its name on <u>Annex B</u>.

3.4    <u>Authorization; Consent</u>.  No authorization, consent or approval of, or declaration or filing with, any Governmental Authority (including, without limitation, any notice filing with state tax or revenue authorities required to be made by account creditors in order to enforce any Accounts in such state) is required for the valid execution, delivery and performance by any Pledgor of this Agreement, the grant by it of the Lien and security interest in favor of the Collateral Agent provided for herein, or the exercise by the Collateral Agent of its rights and remedies hereunder, except for (i) the filings described in **Section 3.2**, (ii) in the case of Accounts owing from any federal governmental agency or authority, the filing by the Collateral Agent of a notice of assignment in accordance with the federal Assignment of Claims Act of 1940, as amended, and (iii) in the case of Pledged Interests, such filings and approvals as may be required in connection with a disposition of any such Pledged Interests by laws affecting the offering and sale of securities generally.

3.5    <u>No Restrictions</u>.  There are no statutory or regulatory restrictions, prohibitions or limitations on any Pledgor's ability to grant to the Collateral Agent a Lien upon and security interest in the Collateral pursuant to this Agreement or (except for the provisions of the federal Anti-Assignment Act and Anti-Claims Act, as amended) on the exercise by the Collateral Agent of its rights and remedies hereunder (including any foreclosure upon or collection of the Collateral), and there are no contractual restrictions on any Pledgor's ability to grant such Lien and security interest.

3.6    <u>Pledged Interests</u>.  As of the date hereof, the Pledged Interests required to be pledged hereunder by each Pledgor consist of the number and type of shares of capital stock (in the case of issuers that are corporations) or the percentage and type of other equity interests (in the case of issuers other than corporations) as described beneath such Pledgor's name in <u>Annex C</u>.  All of the Pledged Interests have been duly and validly issued and are fully paid and nonassessable (or, in the case of partnership, limited liability company or similar Pledged Interests, not subject to any capital call or other additional capital requirement) and not subject to any preemptive rights, warrants, options or similar rights or restrictions in favor of third parties or any contractual or other restrictions upon transfer under the applicable organizational documents.  As to each issuer thereof, the Pledged Interests pledged hereunder constitute 100% of the outstanding capital stock of or other equity interests in such issuer, except as set forth in <u>Annex C</u> .

3.7    <u>Intellectual Property</u>.  <u>Annexes D</u>, <u>E</u> and <u>F</u> correctly set forth all registered Copyrights, Patents and Trademarks owned by any Pledgor as of the date hereof (and as amended from time to time pursuant to **Section 4.4**) and used or proposed to be used in its business.  Each such Pledgor owns or possesses the valid right to use all such Copyrights, Patents and Trademarks which are material to the Pledgors business; no claim has been made in writing that any of the registered Copyrights, Patents or Trademarks is invalid or unenforceable or violates or infringes the rights of any other Person to the extent such invalidity, enforceability or infringement could reasonably be expected to have a Material Adverse Effect, and there is no such violation or infringement in existence; and to the knowledge of such Pledgor, no other Person is presently infringing upon the rights of such Pledgor with regard to any such Copyrights, Patents or Trademarks.

3.8    <u>Deposit Accounts</u>.  <u>Annex G</u> lists, as of the date hereof (and as amended from time to time pursuant to **Section 4.6**), all Deposit Accounts maintained by any Pledgor, and lists in each case the name in which the account is held, the name of the depository institution, the account number, and a description of the type or purpose of the account.

3.9     Securities and Commodity Accounts.  Annex H lists, as of the date hereof (and as amended from time to time pursuant to **Section 4.7**), all Securities Accounts and Commodity Accounts maintained by any Pledgor with any Securities Intermediary or Commodity Intermediary, and lists in each case the name in which the account is held, the name of the Securities Intermediary or Commodity Intermediary, the account number, and a description of the type or purpose of the account.

3.10     Documents of Title.  No bill of lading, warehouse receipt or other Document or Instrument of title is outstanding with respect to any Collateral other than Mobile Goods and other than Inventory in transit in the ordinary course of business to a location set forth on Annex B or to a customer of a Pledgor.

3.11     Commercial Tort Claims.  Annex I lists, as of the date hereof and to the knowledge of each Pledgor, all Commercial Tort Claims existing in favor of any Pledgor.

## ARTICLE IV

## COVENANTS

4.1     Change of Name, Locations, etc.  No Pledgor will (i) change its name, identity or corporate structure, (ii) change its chief executive office from the location thereof listed on Annex B, (iii) change the jurisdiction of its incorporation or organization from the jurisdiction listed on Annex B (whether by merger or otherwise), (iv) file any document with the Internal Revenue Service using any name other than its exact legal name listed on Annex B, or (v) remove any Collateral (other than in the ordinary course of business), or any books, records or other information relating to Collateral, from the applicable location thereof listed on Annex B, or keep or maintain any Collateral at a location not listed on Annex B, unless in each case such Pledgor has (1) given twenty (20) days' prior written notice to the Collateral Agent of its intention to do so, together with information regarding any such new location and such other information in connection with such proposed action as the Collateral Agent may reasonably request, and (2) delivered to the Collateral Agent ten (10) days prior to any such change or removal such documents, instruments and financing statements as may be required by the Collateral Agent, all in form and substance reasonably satisfactory to the Collateral Agent, paid all necessary filing and recording fees and taxes, and taken all other actions reasonably requested by the Collateral Agent (including, at the request of the Collateral Agent, delivery of opinions of counsel reasonably satisfactory to the Collateral Agent to the effect that all such actions have been taken), in order to perfect and maintain the Lien upon and security interest in the Collateral provided for herein in accordance with the provisions of **Section 3.2**.

4.2     Records; Inspection.

(a)     Each Pledgor will keep and maintain at its own cost and expense satisfactory and complete records of the Accounts and all other Collateral, including, without limitation, records of all payments received, all credits granted thereon, all merchandise returned and all other documentation relating thereto, and will furnish to the Collateral Agent from time to time such statements, schedules and reports (including, without limitation, accounts receivable aging schedules) with regard to the Collateral as the Collateral Agent may reasonably request.

4.3     Delivery of Certain Collateral; Further Actions.  All certificates or Instruments representing or evidencing any Accounts, Investment Property or other Collateral with a value in excess of $25,000 shall be delivered promptly to the Collateral Agent pursuant hereto to be held as Collateral hereunder, shall be in form suitable for transfer by delivery and shall be delivered together with undated stock powers duly executed in blank, appropriate endorsements or other necessary instruments of

registration, transfer or assignment, duly executed and in form and substance satisfactory to the Collateral Agent, and in each case together with such other instruments or documents as the Collateral Agent may reasonably request.  Each Pledgor will, at its own cost and expense, cooperate with the Collateral Agent in obtaining a control agreement, in form and substance reasonably satisfactory to the Collateral Agent, and in taking such other actions as may be requested by the Collateral Agent from time to time with respect to any Investment Property or other Collateral in which a security interest may be perfected by (or can be perfected only by) control under the Uniform Commercial Code; provided, however, Pledgors shall not be obligated to obtain control agreements with respect to any (i) payroll or similar benefits deposit accounts, (ii) account having a balance of less than $75,000 or $150,000 in the aggregate for all such accounts, (iii) account maintained with the Senior Agent, or (iv) any other account for which a control agreement is not required to be obtained pursuant to Section 5.16(a) of the Investment Agreement.

4.4    Intellectual Property.

(a)    Each applicable Pledgor will, at its own expense, execute and deliver to the Collateral Agent on the Closing Date fully completed assignments in the forms of Exhibits A and B, as applicable, for recordation in the U.S. Copyright Office or the U.S. Patent and Trademark Office with regard to any Copyright Collateral, Patent Collateral or Trademark Collateral, as the case may be, described in Annex D, E or F hereto.  In the event that after the date hereof any Pledgor shall acquire any registered Copyright, Patent or Trademark, or effect any registration of any Copyright, Patent or Trademark or file any application for registration thereof, whether within the United States or any other country or jurisdiction, such Pledgor shall on a monthly basis furnish written notice thereof to the Collateral Agent together with information sufficient to permit the Collateral Agent, upon its receipt of such notice, to (and each Pledgor hereby authorizes the Collateral Agent to) modify this Agreement, as appropriate, by amending Annexes D, E and F hereto or to add additional exhibits hereto to include any Copyright, Patent or Trademark that becomes part of the Collateral under this Agreement, and such Pledgor shall additionally, at its own expense, execute and deliver to the Collateral Agent, as promptly as possible (but in any event within 10 days) after the date of the monthly notice of such acquisition, registration or application, as applicable, with regard to United States Patents, Trademarks and Copyrights, fully completed assignments in the forms of Exhibits A and B, as applicable, for recordation in the U.S. Copyright Office or the U.S. Patent and Trademark Office as more fully described hereinabove, together in all instances with any other agreements, instruments and documents that the Collateral Agent may reasonably request from time to time to further effect and confirm the assignment and security interest created by this Agreement in such Copyrights, Patents and Trademarks, and each Pledgor hereby appoints the Collateral Agent its attorney-in-fact to execute, deliver and record any and all such agreements, instruments and documents for the foregoing purposes, all acts of such attorney being hereby ratified and confirmed and such power, being coupled with an interest, shall be irrevocable for so long as this Agreement shall be in effect with respect to such Pledgor.

(b)    Each Pledgor shall:

(i)    use commercially reasonable efforts so as not to permit the inclusion in any contract with respect to the acquisition of any material intellectual property to which it hereafter becomes a party (other than any shrink-wrap or off-the-shelf license or similar contract of adhesion) any provision that could reasonably be expected to impair or prevent the creation of a security interest in, or the assignment of, such Pledgor's rights and interests in any intellectual property Collateral;

(ii)    take commercially reasonable steps to protect the secrecy of all trade secrets relating to the products and services sold or delivered under or in connection with intellectual property Collateral;

(iii)    use a commercially appropriate standard of quality (which may be consistent with such Pledgor's past practices) in the manufacture, sale and delivery of products and services sold or delivered under or in connection with the Trademarks;

(iv)    promptly notify the Collateral Agent in writing in the event that such Pledgor becomes an exclusive licensee of any material intellectual property Collateral, other than those set forth in Schedule 4.4, and shall execute any and all documents, instruments or agreement and perform any and all actions reasonably requested by the Collateral Agent to give a collateral assignment thereof including procuring the consent of the licensor thereto;

(v)    take all action necessary to preserve and maintain all rights in intellectual property Collateral, to the extent the failure to do so reasonably could be expected to have a Material Adverse Effect (any expenses incurred in connection with the foregoing shall be borne by such Pledgor).

(c)    Except as otherwise provided in this **Section 4.3**, each Pledgor shall use commercially reasonable efforts to continue to collect, at its own expense, all material amounts due or to become due to such Pledgor in respect of intellectual property Collateral or any portion thereof. In connection with such collections, such Pledgor may take (and, after the occurrence and during the continuance of any Event of Default at the Collateral Agent's reasonable direction, shall take) such action as such Pledgor or the Collateral Agent (if applicable) may deem reasonably necessary or advisable to enforce collection of such amounts; provided, the Collateral Agent shall have the right at any time, upon the occurrence and during the continuation of an Event of Default and written notice from the Collateral Agent to such Pledgor, to notify the obligors with respect to any such amounts of the existence of the security interest created hereby and to direct such obligors to make payment of all such amounts directly to the Collateral, and, upon such notification and at the expense of such Pledgor, to enforce collection of any such amounts and to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as such Pledgor might have done. After receipt by any Pledgor of the notice from the Collateral Agent referred to in the proviso to the preceding sentence and upon the occurrence and during the continuance of any Event of Default, (i) all amounts and proceeds (including checks and Instruments) received by each Pledgor in respect of amounts due to such Pledgor in respect of intellectual property Collateral or any portion thereof shall be received in trust for the benefit of the Collateral Agent hereunder, shall be segregated from other funds of such Pledgor and shall be forthwith paid over or delivered to the Collateral Agent in the same form as so received (with any necessary endorsement) to be held as cash Collateral and applied as set forth herein, and (ii) no Pledgor shall adjust, settle or compromise the amount or payment of any such amount or release wholly or partly any obligor with respect thereto or allow any credit or discount thereon, except to the extent consistent with past practices.

(d)    Except as provided herein, each Pledgor, shall have the right to commence and prosecute in its own name, as real party in interest, for its own benefit and at its own expense, such suits, proceedings or other actions for infringement, unfair competition, dilution, misappropriation or other damage, or reexamination or reissue proceedings as are necessary to protect intellectual property collateral. Each Pledgor shall promptly, following its becoming aware thereof, notify the Collateral Agent of the institution of, or of any adverse determination in, any proceeding (whether in any U.S. intellectual property filing office or any federal, state, local or foreign court) or regarding such Pledgor's ownership, right to use, or interest in any material intellectual property Collateral. Each Pledgor shall

provide to the Collateral Agent any information with respect thereto reasonably requested by the Collateral Agent.

4.5     Mobile Goods.  Upon the request of the Collateral Agent at any time, whether or not an Event of Default shall have occurred and be continuing, each Pledgor will deliver to the Collateral Agent originals of the certificates of title or ownership for all Mobile Goods owned by it with a value greater than $50,000, together with the Collateral Agent listed as lienholder and, if applicable, odometer statements and together in all other cases with appropriate instruments or certificates of transfer and delivery, duly completed and executed, and will take such other action as the Collateral Agent may deem reasonably necessary to perfect the security interest created by this Agreement in all such Mobile Goods.

4.6     Deposit Accounts.  Each Pledgor agrees that, unless the Collateral Agent consents otherwise in writing, (i) it will not open or maintain any Deposit Account (other than Deposit Accounts used exclusively for payroll purposes) except with a bank or financial institution, if required under **Section 4.2**, that has executed and delivered to the Collateral Agent a control agreement with respect to such Deposit Account in form and substance reasonably satisfactory to the Collateral Agent, and (ii) in the event any Pledgor opens any Deposit Account not already listed on Annex G, such Pledgor shall (in addition to complying with the other requirements of this Section) furnish written notice thereof to the Collateral Agent within 30 days of any such opening, together with information sufficient to permit the Collateral Agent, upon its receipt of such notice, to (and each Pledgor hereby authorizes the Collateral Agent to) modify this Agreement, as appropriate, by amending Annex G to include such information.

4.7     Securities and Commodity Accounts.  Each Pledgor agrees that, unless the Collateral Agent consents otherwise in writing, (i) it will not open or maintain any Securities Account or Commodity Account unless the Collateral Agent is the entitlement holder or Commodity Intermediary or unless the Securities Intermediary or Commodity Intermediary (as applicable) has executed and delivered to the Collateral Agent a control agreement with respect to such Securities Account or Commodity Account in form and substance reasonably satisfactory to the Collateral Agent, and (ii) in the event any Pledgor opens any Securities Account or Commodity Account not already listed on Annex H, such Pledgor shall (in addition to complying with the other requirements of this Section) promptly furnish written notice thereof to the Collateral Agent together with information sufficient to permit the Collateral Agent, upon its receipt of such notice, to (and each Pledgor hereby authorizes the Collateral Agent to) modify this Agreement, as appropriate, by amending Annex H to include such information.

4.8     Collateral in Possession of Third Party.  Without limiting the generality of any other provision of this Agreement, each Pledgor agrees that it shall not permit any Collateral to be in the possession of any bailee, warehouseman, agent, processor or other third party at any time unless (i) such bailee or other Person shall have been notified of the security interest created by this Agreement (or, if required under applicable law in order to perfect the Collateral Agent's security interest in such Collateral, such bailee or other Person shall have acknowledged to the Collateral Agent in writing that it is holding such Collateral for the benefit of the Collateral Agent and subject to such security interest and to the instructions of the Collateral Agent) and such Pledgor shall have exercised its commercially reasonable efforts to obtain from such bailee or other Person, at such Pledgor's sole cost and expense, the written acknowledgement described above (if not already required by applicable law to perfect the Collateral Agent's security interest) and agreement to waive or subordinate any Lien (whether arising by operation of law or otherwise) it may have with respect to such Collateral, such agreement to be in form and substance reasonably satisfactory to the Collateral Agent, or (ii) no material records are kept at location of such Collateral and the aggregate value of Collateral located at such location is less than $100,000.

4.9    <u>Commercial Tort Claims</u>.  Each Pledgor agrees that it will, promptly upon becoming aware of any Commercial Tort Claim in excess of $100,000 in its favor, furnish to the Collateral Agent a description thereof meeting the requirements of Section 9-108(e) of the Uniform Commercial Code, execute and deliver such documents, financing statements and other instruments, and take such other action, as the Collateral Agent may reasonably request in order to include such Commercial Tort Claim as Collateral hereunder and to perfect the security interest of the Collateral Agent therein.

4.10    <u>Protection of Security Interest</u>.  Each Pledgor agrees that it will, at its own cost and expense, take any and all actions reasonably necessary to warrant and defend the right, title and interest of the Secured Parties in and to material Collateral against the claims and demands of all other Persons.

4.11    <u>Collateral Assignment of HCM Acquisition Agreement and Other Acquisition Agreements</u>.  Each Pledgor acknowledges that pursuant to **Article II**, it hereby collaterally assigns and grants to the Collateral Agent, for its benefit and the benefit of the Lenders, a security interest in all of its rights and remedies with respect to any and all of the Acquisition Seller Undertakings.  Each Pledgor hereby irrevocably authorizes and empowers the Collateral Agent as its agent at any time after the occurrence and during the continuance of an Event of Default to (i) either directly or on behalf of such Pledgor, assert any claims and demands and enforce any rights and remedies as such Pledgor may have, from time to time, against the HCM Sellers or any other Person under the HCM Acquisition Agreement or any other acquisition agreements, as the Collateral Agent may deem proper, and (ii) receive and collect any and all proceeds, awards or amounts due to such Pledgor under the HCM Acquisition Agreement or any other acquisition agreement (including, without limitation, any amounts due such Pledgor in respect of any indemnification claims thereunder) and apply all such amounts in accordance with the terms of this Agreement and the Investment Agreement.  Each Pledgor hereby irrevocably makes, constitutes and appoints the Collateral Agent (and all officers, employees or agents designated by the Collateral Agent) as the Company's true and lawful attorney (and agent-in-fact) for the purpose of enabling the Collateral Agent or its agent to assert, at any time after the occurrence and during the continuance of an Event of Default, any claims and demands or enforce any rights and remedies and collect such proceeds, awards and amounts and to apply such monies in accordance with the terms of this Agreement and the Investment Agreement.  Each Pledgor hereby agrees and acknowledges that neither the Collateral Agent nor any Lender shall be deemed to have assumed any of the obligations or liabilities of such Pledgor under the HCM Acquisition Agreement or any such other acquisition agreement by reason of this **Section 4.11** or otherwise.

4.12    <u>Government Contracts</u>.   After the Senior Debt is paid in full, at the request of the Collateral Agent or the Required Lenders, each Pledgor shall cause the appropriate Governmental Authority to execute and deliver a consent to the assignment of such Pledgor's payment rights under each of its government contracts, such consent to be in compliance with the Assignment of Claims Act of 1940, in favor of the Collateral Agent for the benefit of the Secured Parties, and in form and substance reasonably acceptable to the Collateral Agent; <u>provided</u>, <u>however</u>, so long as no Event of Default has occurred and is continuing, the Collateral Agent shall not make any such request with respect to any government contracts with a remaining duration of less than 12 months or expected annual revenue of less than $500,000.

<div align="center">

**ARTICLE V**

**CERTAIN PROVISIONS RELATING TO PLEDGED INTERESTS**

</div>

5.1    <u>After-Acquired Equity Interests; Ownership</u>.

(a)      If any Pledgor shall, at any time and from time to time after the date hereof, acquire any additional capital stock or other Pledged Interests in any Person of the types described in the definition of the term "Pledged Interests," the same shall be automatically deemed to be Pledged Interests hereunder, and to be pledged to the Collateral Agent pursuant to **Section 2.1**, and such Pledgor will forthwith pledge and deposit the same with the Collateral Agent and deliver to the Collateral Agent any certificates therefor, together with undated stock powers or other necessary instruments of transfer or assignment, duly executed in blank and in form and substance reasonably satisfactory to the Collateral Agent, together with such other certificates and instruments as the Collateral Agent may reasonably request (including Uniform Commercial Code financing statements or appropriate amendments thereto), and will promptly thereafter deliver to the Collateral Agent a fully completed and duly executed amendment to this Agreement in the form of Exhibit D (each, a "Pledge Amendment") in respect thereof. Each Pledgor hereby authorizes the Collateral Agent to attach each such Pledge Amendment to this Agreement, and agrees that all such Collateral listed on any Pledge Amendment shall for all purposes be deemed Collateral hereunder and shall be subject to the provisions hereof; provided that the failure of any Pledgor to execute and deliver any Pledge Amendment with respect to any such additional Collateral as required hereinabove shall not impair the security interest of the Collateral Agent in such Collateral or otherwise adversely affect the rights and remedies of the Collateral Agent hereunder with respect thereto.

(b)      If any Pledged Interests (whether now owned or hereafter acquired) included in the Collateral are "uncertificated securities" within the meaning of the Uniform Commercial Code or are otherwise not evidenced by any certificate or instrument, each applicable Pledgor will promptly notify the Collateral Agent thereof and will promptly take and cause to be taken, and will (if the issuer of such uncertificated securities is a Person other than a Subsidiary of the Parent) use commercially reasonable efforts to cause the issuer to take, all actions required under Articles 8 and 9 of the Uniform Commercial Code and any other applicable law, to enable the Collateral Agent to acquire "control" of such uncertificated securities (within the meaning of such term under Section 8-106 (or its successor provision) of the Uniform Commercial Code) and as may be otherwise necessary to perfect the security interest of the Collateral Agent therein.

(c)      Except to the extent otherwise expressly permitted by or pursuant to the Investment Agreement, the Pledgors will cause the Pledged Interests in each issuer pledged hereunder to constitute at all times 100% of the capital stock or other Pledged Interests in such issuer, such that the issuer shall be a direct or indirect Wholly Owned Subsidiary of the Parent and unless the Collateral Agent shall have given its prior written consent or except as may be expressly permitted by the Investment Agreement, no Pledgor will cause or permit any such issuer to issue or sell any new capital stock, any warrants, options or rights to acquire the same, or other Pledged Interests of any nature to any Person other than such Pledgor, or cause, permit or consent to the admission of any other Person as a stockholder, partner or member of any such issuer.

5.2      Voting Rights. So long as no Event of Default shall have occurred and be continuing and, in an Event of Default shall have occurred and is continue, the Collateral Agent shall not have given the Pledgors notice thereof referring to this **Section 5.2** (a "Triggering Notice"), each Pledgor shall be entitled to exercise all voting and other consensual rights pertaining to its Pledged Interests (subject to its obligations under **Section 5.1(a)**), and for that purpose the Collateral Agent will execute and deliver or cause to be executed and delivered to each applicable Pledgor all such proxies and other instruments as such Pledgor may reasonably request in writing to enable such Pledgor to exercise such voting and other consensual rights; provided, however, that no Pledgor will cast any vote, give any consent, waiver or ratification, or take or fail to take any action, in any manner that would, or could reasonably be expected to, violate with any of the terms of this Agreement, the Investment Agreement or any other Investment Document or have a Material Adverse Effect.

5.3     <u>Dividends and Other Distributions</u>.  So long as no Event of Default shall have occurred and be continuing (or would occur as a result thereof), and except as provided otherwise herein, all interest, income, dividends, distributions and other amounts payable in cash in respect of the Pledged Interests may be paid to and retained by the Pledgors; <u>provided</u>, <u>however</u>, that all such interest, income, dividends, distributions and other amounts shall, at all times after the occurrence and during the continuance of an Event of Default, be paid to the Collateral Agent and retained by it as part of the Collateral (except to the extent applied upon receipt to the repayment of the Secured Obligations).  The Collateral Agent shall also be entitled at all times (whether or not during the continuance of an Event of Default) to receive directly, and to retain as part of the Collateral, (i) all interest, income, dividends, distributions or other amounts paid or payable in cash or other property in respect of any Pledged Interests in connection with the dissolution, liquidation, recapitalization or reclassification of the capital of the applicable issuer to the extent representing (in the reasonable judgment of the Collateral Agent) an extraordinary, liquidating or other distribution in return of capital, (ii) all additional Pledged Interests or other securities or property (other than cash) paid or payable or distributed or distributable in respect of any Pledged Interests in connection with any noncash dividend, distribution, return of capital, spin-off, stock split, split-up, reclassification, combination of shares or interests or similar rearrangement, and (iii) without affecting any restrictions against such actions contained in the Investment Agreement, all additional Pledged Interests or other securities or property (including cash) paid or payable or distributed or distributable in respect of any Pledged Interests in connection with any consolidation, merger, exchange of securities, liquidation or other reorganization.  All interest, income, dividends, distributions or other amounts that are received by any Pledgor in violation of the provisions of this Section shall be received in trust for the benefit of the Collateral Agent, shall be segregated from other property or funds of such Pledgor and shall be forthwith delivered to the Collateral Agent as Collateral in the same form as so received (with any necessary endorsements).  Any and all money and other property paid over to or received by the Collateral Agent pursuant to the provisions of this Section shall be retained by the Collateral Agent in a Collateral Account (as hereinafter defined) upon receipt of such money or other property and shall be applied in accordance with the provisions of **Section 6.2**.  The Collateral Agent shall, within five (5) Business Days after all Events of Default have been cured or waived, repay to each applicable Pledgor all cash interest, income, dividends, distributions and other amounts that such Pledgor would otherwise be permitted to retain pursuant to the provisions of this Section and that remain in such Collateral Account.

## ARTICLE VI

### REMEDIES

6.1     <u>Remedies</u>.  If an Event of Default shall have occurred and be continuing, the Collateral Agent shall be entitled to exercise in respect of the Collateral all of its rights, powers and remedies provided for herein or otherwise available to it under any other Investment Document, by law, in equity or otherwise, including all rights and remedies of a secured party under the Uniform Commercial Code, and shall be entitled in particular, but without limitation of the foregoing, to exercise the following rights, which each Pledgor agrees to be commercially reasonable:

(a)     To notify any or all account debtors or obligors under any Accounts, Contracts or other Collateral of the security interest in favor of the Collateral Agent created hereby and to direct all such Persons to make payments of all amounts due thereon or thereunder directly to the Collateral Agent or to an account designated by the Collateral Agent; and in such instance and from and after such notice, all amounts and Proceeds (including wire transfers, checks and other Instruments) received by any Pledgor in respect of any Accounts, Contracts or other Collateral shall be received in trust for the benefit of the Collateral Agent hereunder, shall be segregated from the other funds of such Pledgor and shall be forthwith deposited into such account or paid over or delivered to the Collateral Agent in the same form

as so received (with any necessary endorsements or assignments), to be held as Collateral and applied to the Secured Obligations as provided herein; and by this provision, each Pledgor irrevocably authorizes and directs each Person who is or shall be a party to or liable for the performance of any Contract, upon receipt of notice from the Collateral Agent to the effect that an Event of Default has occurred and is continuing, to attorn to or otherwise recognize the Collateral Agent as owner under such Contract and to pay, observe and otherwise perform the obligations under such Contract to or for the Collateral Agent or the Collateral Agent's designee as though the Collateral Agent or such designee were such Pledgor named therein, and to do so until otherwise notified by the Collateral Agent;

(b)      To take possession of, receive, endorse, assign and deliver, in its own name or in the name of any Pledgor, all checks, notes, drafts and other Instruments relating to any Collateral, including receiving, opening and properly disposing of all mail addressed to any Pledgor concerning Accounts and other Collateral; to verify with account debtors or other contract parties the validity, amount or any other matter relating to any Accounts or other Collateral, in its own name or in the name of any Pledgor; to accelerate any indebtedness or other obligation constituting Collateral that may be accelerated in accordance with its terms; to take or bring all actions and suits deemed necessary or appropriate to effect collections and to enforce payment of any Accounts or other Collateral; to settle, compromise or release in whole or in part any amounts owing on Accounts or other Collateral; and to extend the time of payment of any and all Accounts or other amounts owing under any Collateral and to make allowances and adjustments with respect thereto, all in the same manner and to the same extent as any Pledgor might have done;

(c)      To notify any or all depository institutions with which any Deposit Accounts are maintained and which Deposit Accounts are subject to Control in favor of the Collateral Agent to remit and transfer all monies, securities and other property on deposit in such Deposit Accounts or deposited or received for deposit thereafter to the Collateral Agent, for deposit in a Collateral Account or such other accounts as may be designated by the Collateral Agent, for application to the Secured Obligations as provided herein;

(d)      To the extent permitted by applicable law, to transfer to or register in its name or the name of any of its Collateral Agents or nominees all or any part of the Collateral, without notice to any Pledgor and with or without disclosing that such Collateral is subject to the security interest created hereunder;

(e)      To require any Pledgor to, and each Pledgor hereby agrees that it will at its expense and upon request of the Collateral Agent forthwith, assemble all or any part of the Collateral as directed by the Collateral Agent and make it available to the Collateral Agent at a place reasonably designated by the Collateral Agent;

(f)      To enter and remain upon the premises of any Pledgor and take possession of all or any part of the Collateral, with or without judicial process; to use the materials, services, books and records of any Pledgor for the purpose of liquidating or collecting the Collateral, whether by foreclosure, auction or otherwise; and to remove the same to the premises of the Collateral Agent or any designated agent for such time as the Collateral Agent may desire, in order to effectively collect or liquidate the Collateral;

(g)      Subsequent to giving a Triggering Notice to the Pledgors, to the extent permitted by applicable law, to exercise (i) all voting, consensual and other rights and powers pertaining to the Pledged Interests (whether or not transferred into the name of the Collateral Agent), at any meeting of shareholders, partners, members or otherwise, and (ii) any and all rights of conversion, exchange, subscription and any other rights, privileges or options pertaining to the Pledged Interests as if it were the absolute owner thereof (including, without limitation, the right to exchange at its discretion any and all of

the Pledged Interests upon the merger, consolidation, reorganization, reclassification, combination of shares or interests, similar rearrangement or other similar fundamental change in the structure of the applicable issuer, or upon the exercise by any Pledgor or the Collateral Agent of any right, privilege or option pertaining to such Pledged Interests), and in connection therewith, the right to deposit and deliver any and all of the Pledged Interests with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Collateral Agent may determine, and give all consents, waivers and ratifications in respect of the Pledged Interests, all without liability except to account for any property actually received by it, but the Collateral Agent shall have no duty to exercise any such right, privilege or option or give any such consent, waiver or ratification and shall not be responsible for any failure to do so or delay in so doing; and for the foregoing purposes each Pledgor will promptly execute and deliver or cause to be executed and delivered to the Collateral Agent, upon request, all such proxies and other instruments as the Collateral Agent may reasonably request to enable the Collateral Agent to exercise such rights and powers; AND IN FURTHERANCE OF THE FOREGOING AND WITHOUT LIMITATION THEREOF, EACH PLEDGOR HEREBY IRREVOCABLY CONSTITUTES AND APPOINTS THE COLLATERAL AGENT AS THE TRUE AND LAWFUL PROXY AND ATTORNEY-IN-FACT OF SUCH PLEDGOR, WITH FULL POWER OF SUBSTITUTION IN THE PREMISES, TO EXERCISE ALL SUCH VOTING, CONSENSUAL AND OTHER RIGHTS AND POWERS TO WHICH ANY HOLDER OF ANY PLEDGED INTERESTS WOULD BE ENTITLED BY VIRTUE OF HOLDING THE SAME, WHICH PROXY AND POWER OF ATTORNEY, BEING COUPLED WITH AN INTEREST, IS IRREVOCABLE AND SHALL BE EFFECTIVE FOR SO LONG AS THIS AGREEMENT SHALL BE IN EFFECT; and

(h)     To sell, resell, assign and deliver, in its sole discretion, all or any of the Collateral, in one or more parcels, on any securities exchange on which any Pledged Interests may be listed, at public or private sale, at any of the Collateral Agent's offices or elsewhere, for cash, upon credit or for future delivery, at such time or times and at such price or prices and upon such other terms as the Collateral Agent may deem satisfactory. If any of the Collateral is sold by the Collateral Agent upon credit or for future delivery, the Collateral Agent shall not be liable for the failure of the purchaser to purchase or pay for the same and, in the event of any such failure, the Collateral Agent may resell such Collateral. In no event shall any Pledgor be credited with any part of the Proceeds of sale of any Collateral until and to the extent cash payment in respect thereof has actually been received by the Collateral Agent. To the extent permitted by applicable law, each purchaser at any such sale shall hold the property sold absolutely, free from any claim or right of whatsoever kind, including any equity or right of redemption of any Pledgor, and to the extent permitted by applicable law, each Pledgor hereby expressly waives all rights of redemption, stay or appraisal, and all rights to require the Collateral Agent to marshal any assets in favor of such Pledgor or any other party or against or in payment of any or all of the Secured Obligations, that it has or may have under any rule of law or statute now existing or hereafter adopted. No demand, presentment, protest, advertisement or notice of any kind (except any notice required by law, as referred to below), all of which are hereby expressly waived by each Pledgor, shall be required in connection with any sale or other disposition of any part of the Collateral. If any notice of a proposed sale or other disposition of any part of the Collateral shall be required under applicable law, the Collateral Agent shall give the applicable Pledgor at least ten (10) days' prior notice of the time and place of any public sale and of the time after which any private sale or other disposition is to be made, which notice each Pledgor agrees is commercially reasonable. The Collateral Agent shall not be obligated to make any sale of Collateral if it shall determine not to do so, regardless of the fact that notice of sale may have been given. The Collateral Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. Upon each public sale and, to the extent permitted by applicable law, upon each private sale, the Collateral Agent may purchase all or any of the Collateral being sold, free from any equity, right of redemption or other claim or demand, and may make payment therefor by endorsement and application

(without recourse) of the Secured Obligations in lieu of cash as a credit on account of the purchase price for such Collateral.

6.2     Application of Proceeds.

(a)     All Proceeds collected by the Collateral Agent upon any sale, other disposition of or realization upon any of the Collateral, together with all other moneys received by the Collateral Agent hereunder, shall be applied in accordance with the provisions of the Investment Agreement. Unless it has actual knowledge (including by way of written notice from any such Secured Party) to the contrary, the Collateral Agent, in acting hereunder, shall be entitled to assume that no Secured Obligations in respect thereof are in existence between any Secured Party and any Borrower.

(b)     In the event that the proceeds of any such sale, disposition or realization are insufficient to pay all amounts to which the Secured Parties are legally entitled, the Pledgors shall be jointly and severally liable for the deficiency, together with interest thereon at the highest rate specified in any applicable Investment Document for interest on overdue principal or such other rate as shall be fixed by applicable law, together with the costs of collection and all other fees, reasonable costs and expenses payable hereunder.

(c)     Upon any sale of any Collateral hereunder by the Collateral Agent (whether by virtue of the power of sale herein granted, pursuant to judicial proceeding, or otherwise), the receipt of the Collateral Agent or the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold, and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Collateral Agent or such officer or be answerable in any way for the misapplication thereof.

6.3     Collateral Accounts.  Upon the occurrence and during the continuance of an Event of Default, the Collateral Agent shall have the right to cause to be established and maintained, at its principal office or such other location or locations as it may establish from time to time in its discretion, one or more accounts (collectively, "Collateral Accounts") for the collection of cash Proceeds of the Collateral. Such Proceeds, when deposited, shall continue to constitute Collateral for the Secured Obligations and shall not constitute payment thereof until applied as herein provided.  The Collateral Agent shall have sole dominion and control over all funds deposited in any Collateral Account, and such funds may be withdrawn therefrom only by the Collateral Agent.  Upon the occurrence and during the continuance of an Event of Default, the Collateral Agent shall have the right to (and, if directed by the Required Lenders pursuant to the Investment Agreement, shall) apply amounts held in the Collateral Accounts in payment of the Secured Obligations in the manner provided for in **Section 6.2**.

6.4     Grant of License.  Each Pledgor hereby grants to the Collateral Agent an irrevocable, non-exclusive license (exercisable without payment of royalty or other compensation to any Pledgor) to use, license or sublicense any Patent Collateral, Trademark Collateral or Copyright Collateral now owned or licensed or hereafter acquired or licensed by such Pledgor, wherever the same may be located throughout the world, for such term or terms, on such conditions and in such manner as the Collateral Agent shall determine, whether general, special or otherwise, and whether on an exclusive or nonexclusive basis, and including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof.  The use of such license or sublicense by the Collateral Agent shall be exercised, at the option of the Collateral Agent, only upon the occurrence and during the continuation of an Event of Default; provided that any license, sublicense or other transaction entered into by the Collateral Agent in accordance herewith shall be binding upon each applicable Pledgor notwithstanding any subsequent cure of an Event of Default.

6.5     Private Sales.

(a)     Each Pledgor recognizes that the Collateral Agent may be compelled, at any time after the occurrence and during the continuance of an Event of Default, to conduct any sale of all or any part of the Pledged Interests without registering or qualifying such Pledged Interests under the Securities Act of 1933, as amended (the "Securities Act"), and/or any applicable state securities laws in effect at such time. Each Pledgor acknowledges that any such private sales may be made in such manner and under such circumstances as the Collateral Agent may deem necessary or advisable in its sole and absolute discretion, including at prices and on terms that might be less favorable than those obtainable through a public sale without such restrictions (including, without limitation, a public offering made pursuant to a registration statement under the Securities Act), and, notwithstanding such circumstances, agrees that any such sale shall not be deemed not to have been made in a commercially reasonable manner solely because it was conducted as a private sale, and agrees that the Collateral Agent shall have no obligation to conduct any public sales and no obligation to delay the sale of any Pledged Interests for the period of time necessary to permit its registration for public sale under the Securities Act and applicable state securities laws, and shall not have any responsibility or liability as a result of its election so not to conduct any such public sales or delay the sale of any Pledged Interests, notwithstanding the possibility that a substantially higher price might be realized if the sale were deferred until after such registration. Each Pledgor hereby waives any claims against the Collateral Agent or any other Secured Party arising by reason of the fact that the price at which any Pledged Interests may have been sold at any private sale was less than the price that might have been obtained at a public sale or was less than the aggregate amount of the Secured Obligations, even if the Collateral Agent accepts the first offer received and does not offer such Pledged Interests to more than one offeree.

(b)     Each Pledgor agrees that a breach of any of the covenants contained in this Section will cause irreparable injury to the Collateral Agent and the other Secured Parties, that the Collateral Agent and the other Secured Parties have no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section shall be specifically enforceable against the Pledgors.

6.6     The Pledgors Remain Liable.  Notwithstanding anything herein to the contrary, (i) each Pledgor shall remain liable under all Contracts to which it is a party included within the Collateral (including, without limitation, all Ownership Agreements) to perform all of its obligations thereunder to the same extent as if this Agreement had not been executed, (ii) the exercise by the Collateral Agent of any of its rights or remedies hereunder shall not release any Pledgor from any of its obligations under any of such Contracts, and (iii) except as specifically provided for hereinbelow, the Collateral Agent shall not have any obligation or liability by reason of this Agreement under any of such Contracts, nor shall the Collateral Agent be obligated to perform any of the obligations or duties of any Pledgor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.  The powers, rights and remedies conferred on the Collateral Agent hereunder are solely to protect its interest and privilege in such Contracts, as Collateral, and shall not impose any duty upon it to exercise any such powers, rights or remedies.

6.7     Waivers.  Each Pledgor, to the greatest extent not prohibited by applicable law, hereby (i) waives all rights that it has or may have under any rule of law or statute now existing or hereafter adopted to require the Collateral Agent to marshal any Collateral or other assets in favor of such Pledgor or any other party or against or in payment of any or all of the Secured Obligations, and (ii) waives all rights that it has or may have under any rule of law or statute now existing or hereafter adopted to demand, presentment, protest, advertisement or notice of any kind (except notices expressly provided for herein or in the other Investment Documents).  In addition, each Pledgor defers any and all rights of

contribution or subrogation upon the sale or disposition of all or any portion of the Collateral by the Collateral Agent until the occurrence of the Termination Requirements.

## ARTICLE VII

## THE COLLATERAL AGENT

7.1    The Collateral Agent; Standard of Care.  The Collateral Agent will hold all items of the Collateral at any time received under this Agreement in accordance with the provisions hereof.  The obligations of the Collateral Agent as holder of the Collateral and interests therein and with respect to the disposition thereof, and otherwise under this Agreement and the other Investment Documents, are only those expressly set forth in this Agreement and the other Investment Documents.  The Collateral Agent shall act hereunder at the direction, or with the consent, of the Required Lenders on the terms and conditions set forth in the Investment Agreement.  The powers conferred on the Collateral Agent hereunder are solely to protect its interest, on behalf of the Secured Parties, in the Collateral, and shall not impose any duty upon it to exercise any such powers.  Except for treatment of the Collateral in its possession in a manner substantially equivalent to that which the Collateral Agent, in its individual capacity, accords its own property of a similar nature, and the accounting for moneys actually received by it hereunder, the Collateral Agent shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to the Collateral.  Neither the Collateral Agent nor any other Secured Party shall be liable to any Pledgor (i) for any loss or damage sustained by such Pledgor, or (ii) for any loss, damage, depreciation or other diminution in the value of any of the Collateral that may occur as a result of or in connection with or that is in any way related to any exercise by the Collateral Agent or any other Secured Party of any right or remedy under this Agreement, any failure to demand, collect or realize upon any of the Collateral or any delay in doing so, or any other act or failure to act on the part of the Collateral Agent or any other Secured Party, except to the extent that the same is caused by its own gross negligence or willful misconduct.

7.2    Further Assurances; Attorney-in-Fact.

(a)    Each Pledgor hereby irrevocably authorizes the Collateral Agent at any time and from time to time to file in any filing office in any Uniform Commercial Code jurisdiction any financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of such Pledgor or words of similar effect, regardless of whether any particular asset included within the Collateral falls within the scope of Article 9 of the Uniform Commercial Code of any such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) provide any other information required by Part 5 of Article 9 of the Uniform Commercial Code for the sufficiency or filing office acceptance of any financing statement or amendment.

(b)    Each Pledgor agrees that it will do such further acts and things (including, without limitation, making any notice filings with state tax or revenue authorities required to be made by account creditors in order to enforce any Accounts in such state) and to execute and deliver to the Collateral Agent such additional conveyances, assignments, agreements and instruments as the Collateral Agent may reasonably require or deem advisable to perfect, establish, confirm and maintain the security interest and Lien provided for herein, to carry out the purposes of this Agreement or to further assure and confirm unto the Collateral Agent its rights, powers and remedies hereunder.

(c)    Each Pledgor hereby irrevocably appoints the Collateral Agent its lawful attorney-in-fact, with full authority in the place and stead of such Pledgor and in the name of such Pledgor, the Collateral Agent or otherwise, and with full power of substitution in the premises (which power of attorney, being coupled with an interest, is irrevocable for so long as this Agreement shall be in effect), from time to time

in the Collateral Agent's discretion after the occurrence and during the continuance of an Event of Default (except for the actions described in clause (i) below, which may be taken by the Collateral Agent without regard to whether an Event of Default has occurred) to take any action and to execute any instruments that the Collateral Agent may deem necessary or advisable to accomplish the purpose of this Agreement, including, without limitation:

(i)    to sign the name of such Pledgor on any financing statement, continuation statement, notice or other similar document that, in the Collateral Agent's opinion, should be made or filed in order to perfect or continue perfected the security interest granted under this Agreement (including, without limitation, any title or ownership applications for filing with applicable state agencies to enable any motor vehicles now or hereafter owned by such Pledgor to be retitled and the Collateral Agent listed as lienholder thereon);

(ii)    to ask, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral;

(iii)    to receive, endorse and collect any checks, drafts, Instruments, Chattel Paper and other orders for the payment of money made payable to such Pledgor representing any interest, income, dividend, distribution or other amount payable in respect of any of the Collateral and to give full discharge for the same;

(iv)    to obtain, maintain and adjust any property or casualty insurance required to be maintained by such Pledgor under Section 5.6 of the Investment Agreement and direct the payment of proceeds thereof to the Collateral Agent;

(v)    to pay or discharge taxes, Liens or other encumbrances levied or placed on or threatened against the Collateral, the legality or validity thereof and the amounts necessary to discharge the same to be determined by the Collateral Agent in its sole discretion, any such payments made by the Collateral Agent to become Secured Obligations of the Pledgors to the Collateral Agent, due and payable immediately and without demand;

(vi)    to file any claims or take any action or institute any proceedings that the Collateral Agent may deem necessary or advisable for the collection of any of the Collateral or otherwise to enforce the rights of the Collateral Agent with respect to any of the Collateral; and

(vii)    to use, sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with any and all of the Collateral as fully and completely as though the Collateral Agent were the absolute owner of the Collateral for all purposes, and to do from time to time, at the Collateral Agent's option and the Pledgors' expense, all other acts and things deemed necessary by the Collateral Agent to protect, preserve or realize upon the Collateral and to more completely carry out the purposes of this Agreement.

(d)    If any Pledgor fails to perform any covenant or agreement contained in this Agreement after written request to do so by the Collateral Agent (provided that no such request shall be necessary at any time after the occurrence and during the continuance of an Event of Default), the Collateral Agent may itself perform, or cause the performance of, such covenant or agreement and may take any other action that it deems necessary and appropriate for the maintenance and preservation of the Collateral or its security interest therein, and the reasonable expenses so incurred in connection therewith shall be payable by the Pledgors under **Section 8.1**.

## ARTICLE VIII

## MISCELLANEOUS

8.1     Indemnity and Expenses.

(a)     The Pledgors jointly and severally agree to indemnify the Collateral Agent from and against any and all claims, losses and liabilities in any way relating to, growing out of or resulting from this Agreement and the transactions contemplated hereby (including, without limitation, enforcement of this Agreement), except to the extent such claims, losses or liabilities result from the Collateral Agent's gross negligence, bad faith, willful misconduct or Collateral Agent's or any Lender's breach of its obligations hereunder or under any other Loan Document, as applicable, as finally determined by a court of competent jurisdiction.

(b)     The Pledgors jointly and severally agree to pay to the Collateral Agent Agent and the Lenders upon demand the amount of any and all costs and expenses in accordance with Section 10.1 of the Investment Agreement.

(c)     The obligations of the Pledgors in this **Section 8.1** shall survive the termination of this Agreement and the discharge of the Pledgors' other obligations under this Agreement, the Investment Agreement and the other Loan Documents.

8.2     No Waiver.  The rights and remedies of the Secured Parties expressly set forth in this Agreement and the other Investment Documents are cumulative and in addition to, and not exclusive of, all other rights and remedies available at law, in equity or otherwise.  No failure or delay on the part of any Secured Party in exercising any right, power or privilege shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege or be construed to be a waiver of any Default or Event of Default.  No course of dealing between the Pledgors and the Secured Parties or their agents or employees shall be effective to amend, modify or discharge any provision of this Agreement or any other Investment Document or to constitute a waiver of any Default or Event of Default.  No notice to or demand upon any Pledgor in any case shall entitle such Pledgor or any other Pledgor to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of any Secured Party to exercise any right or remedy or take any other or further action in any circumstances without notice or demand.

8.3     Enforcement.  By its acceptance of the benefits of this Agreement, each Lender agrees that this Agreement may be enforced only by the Collateral Agent, acting upon the instructions or with the consent of the Required Lenders as provided for in the Investment Agreement, and that no Lender shall have any right individually to enforce or seek to enforce this Agreement or to realize upon any Collateral or other security given to secure the payment and performance of the Secured Obligations.

8.4     Amendments, Waivers, etc.  No amendment, modification, waiver, discharge or termination of, or consent to any departure by any Pledgor from, any provision of this Agreement, shall be effective unless in a writing signed by the Collateral Agent and such of the Lenders as may be required under the provisions of the Investment Agreement to concur in the action then being taken, and then the same shall be effective only in the specific instance and for the specific purpose for which given.

8.5     Continuing Security Interest; Term; Successors and Assigns; Assignment; Termination and Release; Survival.  This Agreement shall create a continuing security interest in the Collateral and shall secure the payment and performance of all of the Secured Obligations as the same may arise and be

outstanding at any time and from time to time from and after the date hereof, and shall (i) remain in full force and effect until the occurrence of the Termination Requirements (as hereinafter defined), (ii) be binding upon and enforceable against each Pledgor and its successors and assigns (provided, however, that no Pledgor may sell, assign or transfer any of its rights, interests, duties or obligations hereunder without the prior written consent of the Lenders) and (iii) inure to the benefit of and be enforceable by each Secured Party and its successors and assigns. Upon any sale or other disposition by any Pledgor of any Collateral in a transaction expressly permitted hereunder or under or pursuant to the Investment Agreement or any other applicable Investment Document, the Lien and security interest created by this Agreement in and upon such Collateral shall be automatically released, and upon the satisfaction of all of the Termination Requirements, this Agreement and the Lien and security interest created hereby shall terminate (provided, that the provisions of **Section 6.7** shall survive the termination of this Agreement); and in connection with any such release or termination, the Collateral Agent, at the request and expense of the applicable Pledgor, will execute and deliver to such Pledgor such documents and instruments evidencing such release or termination as such Pledgor may reasonably request and will assign, transfer and deliver to such Pledgor, without recourse and without representation or warranty, such of the Collateral as may then be in the possession of the Collateral Agent (or, in the case of any partial release of Collateral, such of the Collateral so being released as may be in its possession). All representations, warranties, covenants and agreements herein shall survive the execution and delivery of this Agreement and any Pledgor Accession. For purposes of this Agreement, "Termination Requirements" means (x) the payment in full in cash of the Secured Obligations (other than contingent and indemnification obligations not then due and payable), and (y) the termination of the Commitments.

       8.6    Additional Pledgors. Each Pledgor recognizes that the provisions of the Investment Agreement require Persons that become Subsidiaries of the Parent, and that are not already parties hereto, to execute and deliver a Pledgor Accession in the form of Exhibit C attached hereto, whereupon each such Person shall become a Pledgor hereunder with the same force and effect as if originally a Pledgor hereunder on the date hereof, and agrees that its obligations hereunder shall not be discharged, limited or otherwise affected by reason of the same, or by reason of the Collateral Agent's actions in effecting the same or in releasing any Pledgor hereunder, in each case without the necessity of giving notice to or obtaining the consent of such Pledgor or any other Pledgor.

       8.7    Notices. All notices and other communications provided for hereunder shall be given to the parties in the manner and subject to the other notice provisions set forth in the Investment Agreement (and any joinder thereto).

       8.8    Governing Law. This Agreement and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York (including Sections 5-1401 and 5-1402 of the New York General Obligations Law, but excluding all other choice of law and conflicts of law rules).

       8.9    Severability. To the extent any provision of this Agreement is prohibited by or invalid under the applicable law of any jurisdiction, such provision shall be ineffective only to the extent of such prohibition or invalidity and only in such jurisdiction, without prohibiting or invalidating such provision in any other jurisdiction or the remaining provisions of this Agreement in any jurisdiction.

       8.10    Construction. The headings of the various sections and subsections of this Agreement have been inserted for convenience only and shall not in any way affect the meaning or construction of any of the provisions hereof. Unless the context otherwise requires, words in the singular include the plural and words in the plural include the singular.

8.11    <u>Counterparts</u>.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic format (e.g, "pdf," "tif" or similar file formats) shall be effective as delivery of a manually executed counterpart of this Agreement.

8.12    <u>Classified Information</u>.  The rights of the Collateral Agent under this Agreement and the other Investment Documents as they pertain to government contracts or other materials that contain classified or sensitive unclassified information are subject to Applicable Laws, including, without limitation, DOD Directive 5220.22-M, National Industrial Security Program Operations Manual, and nothing in this Agreement or the other Investment Documents shall cause the Pledgors to violate such applicable laws.

[The remainder of this page left blank intentionally.]

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed under seal by their duly authorized officers as of the date first above written.

**BW PIEZO HOLDINGS, LLC**

By: _____
Name: Adam Blumenthal
Title: President

**CTG ADVANCED MATERIALS, LLC**

By: _____
Name: Adam Blumenthal
Title: Chairman

**CHANNEL TECHNOLOGIES GROUP, LLC**

By: _____
Name: Gary Douville
Title: President

**ELECTRO-OPTICAL INDUSTRIES, LLC**

By: _____
Name: Gary Douville
Title: President

(signatures continued)

Signature Page to Pledge and Security Agreement

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed under seal by their duly authorized officers as of the date first above written.

**BW PIEZO HOLDINGS, LLC**

By: _____
Name: Adam Blumenthal
Title: President

**CTG ADVANCED MATERIALS, LLC**

By: _____
Name: Adam Blumenthal
Title: Chairman

**CHANNEL TECHNOLOGIES GROUP, LLC**

By: _____
Name: Gary Douville
Title: President

**ELECTRO-OPTICAL INDUSTRIES, LLC**

By: _____
Name: Gary Douville
Title: President

(signatures continued)

Signature Page to Pledge and Security Agreement

Accepted and agreed to:

**FIDUS MEZZANINE CAPITAL II, L.P.**, as
Collateral Agent

By: Fidus Investment GP, LLC, its General
    Partner

By: Fidus Investment Advisors, LLC, its
    Manager

By: _____
    Name: N. Andrew Woth
    Title: Manager

**ANNEX A**

**FILING LOCATIONS**

<u>Name of Pledgor</u>                    <u>Filing Location</u>

**ANNEX B**

**JURISDICTION OF ORGANIZATION, CERTAIN LOCATIONS**

<u>BW PIEZO HOLDINGS, LLC</u>:

Jurisdiction of Incorporation/Organization:     _____

Federal Tax ID no.:     _____

Organizational ID no.:     _____

Chief Executive Office Address:     _____
     _____
     _____

Records Related to Collateral:     _____
     _____
     _____

Locations of Equipment or Inventory:     _____
     _____
     _____

Other places of business:     _____
     _____
     _____

Trade/fictitious or prior corporate names (last five years):     _____

Names used in tax filings (last five years):     _____

<u>CTG ADVANCED MATERIALS, LLC</u>:

Jurisdiction of Incorporation/Organization:    _____

Federal Tax ID no.:    _____

Organizational ID no.:    _____

Chief Executive Office Address:    _____
_____
_____

Records Related to Collateral:    _____
_____
_____

Locations of Equipment or Inventory:    _____
_____
_____

Other places of business:    _____
_____
_____

Trade/fictitious or prior corporate names (last five years):    _____

Names used in tax filings (last five years):    _____

CHANNEL TECHNOLOGIES GROUP, LLC:

Jurisdiction of Incorporation/Organization:          _____

Federal Tax ID no.:          _____

Organizational ID no.:          _____

Chief Executive Office Address:          _____
_____
_____

Records Related to Collateral:          _____
_____
_____

Locations of Equipment or Inventory:          _____
_____
_____

Other places of business:          _____
_____
_____

Trade/fictitious or prior corporate names (last five years):          _____

Names used in tax filings (last five years):          _____

<u>ELECTRO-OPTICAL INDUSTRIES, LLC</u>:

Jurisdiction of Incorporation/Organization:    _____

Federal Tax ID no.:    _____

Organizational ID no.:    _____

Chief Executive Office Address:    _____
_____
_____

Records Related to Collateral:    _____
_____
_____

Locations of Equipment or Inventory:    _____
_____
_____

Other places of business:    _____
_____
_____

Trade/fictitious or prior corporate names (last five
years):    _____

Names used in tax filings (last five years):    _____

**ANNEX C**

**PLEDGED INTERESTS**

| Name of Issuer | Type of Interests | Certificate Number | No. of shares (if applicable) | Percentage of Outstanding Interests in Issuer |
|---|---|---|---|---|

**ANNEX D**

**COPYRIGHTS AND COPYRIGHT APPLICATIONS**

# ANNEX E

## PATENTS AND PATENT APPLICATIONS

**ANNEX F**

**TRADEMARKS AND TRADEMARK APPLICATIONS**

| Owner | Mark | Application or Registration No. | Country | Issue or Filing Date |
|---|---|---|---|---|

**ANNEX G**

**DEPOSIT ACCOUNTS**

# ANNEX H

## SECURITIES ACCOUNTS

## ANNEX I

## COMMERCIAL TORT CLAIMS

## EXHIBIT A

## GRANT OF SECURITY INTEREST IN COPYRIGHTS

**WHEREAS**, [NAME OF PLEDGOR] (the "<u>Pledgor</u>") is the owner of the copyright applications and registrations listed on <u>Schedule A</u> attached hereto (all such copyrights, registrations and applications, collectively, the "<u>Copyrights</u>"); and

**WHEREAS**, the Pledgor has entered into a Pledge and Security Agreement (as amended, modified, restated or supplemented from time to time, the "<u>Security Agreement</u>"), dated as of [_____ ___, 2013], in which the Pledgor has agreed with Fidus Mezzanine Capital II, L.P., as Collateral Agent (the "<u>Collateral Agent</u>"), with offices at 1603 Orrington Avenue, Suite 1005, Evanston, IL 60201, to execute this Grant;

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, as security for the payment and performance of the Secured Obligations (as defined in the Security Agreement), the Pledgor does hereby grant to the Collateral Agent, for the ratable benefit of the Secured Parties (as defined in the Security Agreement), a security interest in all of its right, title and interest in and to the Copyrights, and the use thereof, together with all proceeds and products thereof.  This Grant has been given in conjunction with the security interest granted to the Collateral Agent under the Security Agreement, and the provisions of this Grant are without prejudice to and in addition to the provisions of the Security Agreement, which are incorporated herein by this reference.

This Grant and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Grant shall be governed by and construed and enforced in accordance with the laws of the State of New York (including Sections 5-1401 and 5-1402 of the New York General Obligations Law, but excluding all other choice of law and conflicts of law rules).

**[NAME OF PLEDGOR]**

By:  _____

Title:  _____

**Schedule A**

**COPYRIGHTS AND COPYRIGHT APPLICATIONS**

|        | Application or    |         | Registration or |
|--------|-------------------|---------|-----------------|
| Owner  | Registration No.  | Country | Filing Date     |

**EXHIBIT B**

**GRANT OF SECURITY INTEREST
IN PATENTS AND TRADEMARKS**

      **WHEREAS**, [NAME OF PLEDGOR] (the "Pledgor") is the owner of the trademark applications and registrations listed on Schedule A attached hereto, (all such trademarks, registrations and applications, collectively, the "Trademarks") and is the owner of the patents and patent applications listed on Schedule A attached hereto (all such patents, registrations and applications, collectively, the "Patents"); and

      **WHEREAS**, the Pledgor has entered into a Pledge and Security Agreement (as amended, modified, restated or supplemented from time to time, the "Security Agreement"), dated as of [_____ ___, 2013], in which the Pledgor has agreed with Fidus Mezzanine Capital II, L.P., as Collateral Agent (the "Collateral Agent") , with offices at 1603 Orrington Avenue, Suite 1005, Evanston, IL 60201, to execute this Grant;

      **NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, as security for the payment and performance of the Secured Obligations (as defined in the Security Agreement), the Pledgor does hereby grant to the Collateral Agent, for the ratable benefit of the Secured Parties (as defined in the Security Agreement), a security interest in all of its right, title and interest in and to the Trademarks and the Patents, and the use thereof, together with all proceeds and products thereof and the goodwill of the businesses symbolized by the Trademarks.  This Grant has been given in conjunction with the security interest granted to the Collateral Agent under the Security Agreement, and the provisions of this Grant are without prejudice to and in addition to the provisions of the Security Agreement, which are incorporated herein by this reference.

      This Grant and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Grant shall be governed by and construed and enforced in accordance with the laws of the State of New York (including Sections 5-1401 and 5-1402 of the New York General Obligations Law, but excluding all other choice of law and conflicts of law rules).

**[NAME OF PLEDGOR]**

By: _____

Title: _____

**Schedule A**

**TRADEMARKS AND TRADEMARK APPLICATIONS**

|  |  | Application or |  | Issue or |
|---|---|---|---|---|
| Owner | Mark | Registration No. | Country | Filing Date |

**PATENTS AND PATENT APPLICATIONS**

|  | Application or |  |  | Issue or |
|---|---|---|---|---|
| Owner | Registration No. | Country | Inventor | Filing Date |

EXHIBIT C

FORM OF
PLEDGOR ACCESSION

**THIS PLEDGOR ACCESSION** (this "Accession"), dated as of _____, ____, is executed and delivered by **[NAME OF NEW PLEDGOR]**, a _____ (the "New Pledgor"), in favor of Fidus Mezzanine Capital II, L.P., in its capacity as Collateral Agent under the Investment Agreement referred to hereinbelow (in such capacity, the "Collateral Agent"), pursuant to the Security Agreement referred to hereinbelow.

Reference is made to the Investment Agreement, dated as of October___, 2013, among **BW Piezo Holdings, LLC**, a Delaware limited liability company ("BWP" or the "Parent"); **CTG Advanced Materials, LLC**, a Delaware limited liability company and wholly owned subsidiary of BWP ("CTG"); **Channel Technologies Group, LLC**, a California limited liability company and wholly owned subsidiary of BWP ("Channel"); and **Electro-Optical Industries, LLC**, a California limited liability company and wholly owned subsidiary of Channel ("Electro" and, together with BWP, CTG, and Channel, each, a "Borrower" and, collectively, the "Borrowers"); the Lenders party thereto; and the Collateral Agent (as amended, modified, restated or supplemented from time to time, the "Investment Agreement"). In connection with and as a condition to the initial and continued extensions of credit under the Investment Agreement, the Borrowers, pursuant to a Pledge and Security Agreement, dated as of the date of the Investment Agreement (as amended, modified, restated or supplemented from time to time, the "Security Agreement"), have granted in favor of the Collateral Agent a security interest in and Lien upon the Collateral described therein as security for their obligations under the Investment Agreement and the other Investment Documents. Capitalized terms used herein without definition shall have the meanings given to them in the Security Agreement.

The Parent has agreed under the Investment Agreement to cause each of its future direct and indirect subsidiaries to become a party to the Investment Agreement as a Borrower thereunder and to the Security Agreement as a Pledgor thereunder. The New Pledgor is a direct or indirect subsidiary of the Parent and, as required by the Investment Agreement, has become a Borrower under the Investment Agreement as of the date hereof. The New Pledgor will obtain benefits as a result of the continued extension of credit to the Borrowers under the Investment Agreement, which benefits are hereby acknowledged, and, accordingly, desire to execute and deliver this Accession. Therefore, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to induce the Lenders to continue to extend credit to the Borrowers under the Investment Agreement, the New Pledgor hereby agrees as follows:

1.      The New Pledgor hereby joins in and agrees to be bound by each and all of the provisions of the Security Agreement as a Pledgor thereunder. In furtherance (and without limitation) of the foregoing, pursuant to Section 2.1 of the Security Agreement, and as security for all of the Secured Obligations, the New Pledgor hereby pledges, assigns and delivers to the Collateral Agent, for the ratable benefit of the Secured Parties, and grants to the Collateral Agent, for the ratable benefit of the Secured Parties, a Lien upon and security interest in, all of its right, title and interest in and to the Collateral as set forth in Section 2.1 of the Security Agreement, all on the terms and subject to the conditions set forth in the Security Agreement.

2.      The New Pledgor hereby represents and warrants that (i) Schedule 1 hereto sets forth all information required to be listed on Annexes A, B, C, D, E, F, G, H and I to the Security Agreement in order to make each representation and warranty contained in Article III of the Security Agreement true

and correct with respect to the New Pledgor as of the date hereof and after giving effect to this Accession and (ii) after giving effect to this Accession and to the incorporation into such Annexes, as applicable, of the information set forth in Schedule 1, each representation and warranty contained in Article III of the Security Agreement is true and correct with respect to the New Pledgor as of the date hereof, as if such representations and warranties were set forth at length herein.

3.    This Accession shall be a Investment Document (within the meaning of such term under the Investment Agreement), shall be binding upon and enforceable against the New Pledgor and its successors and assigns, and shall inure to the benefit of and be enforceable by each Secured Party and its successors and assigns.  This Accession and its attachments are hereby incorporated into the Security Agreement and made a part thereof.

**IN WITNESS WHEREOF**, the New Pledgor has caused this Accession to be executed under seal by its duly authorized officer as of the date first above written.

**[NAME OF NEW PLEDGOR]**

By: _____

Name: _____

Title: _____

<u>Schedule 1</u>

Information to be added to <u>Annex A</u> of the Security Agreement:

**FILING LOCATIONS**

<u>Name of Pledgor</u>                                          <u>Filing Location</u>

Secretary of State of _____

Information to be added to <u>Annex B</u> of the Security Agreement:

**JURISDICTION OF ORGANIZATION, CERTAIN LOCATIONS**

[<u>Name of Pledgor</u>:]

Jurisdiction of Incorporation/Organization:         _____

Federal Tax ID no.:                                        _____

Organizational ID no.:                                    _____ **[N/A]**

Chief Executive Office Address:                       _____
                                                                      _____
                                                                      _____

Records Related to Collateral:                          _____
                                                                      _____
                                                                      _____

Locations of Equipment or Inventory:                _____
                                                                      _____
                                                                      _____

Other places of business:                                 _____
                                                                      _____
                                                                      _____

Trade/fictitious or prior corporate names (last five
years):                                                           _____

Names used in tax filings (last five years):         _____

Information to be added to **[**<u>Annexes C/D/E/F/G/H/I</u>**]** of the Security Agreement:

**[Complete as applicable]**

4

**EXHIBIT D**

**PLEDGE AMENDMENT**


      **THIS PLEDGE AMENDMENT**, dated as of _____, _____, is delivered by [NAME OF PLEDGOR] (the "Pledgor") pursuant to Section 5.1 of the Security Agreement referred to hereinbelow.  The Pledgor hereby agrees that this Pledge Amendment may be attached to the Pledge and Security Agreement, dated as of [_____ ___, 2013], made by the Pledgor and certain other pledgors named therein in favor of Fidus Mezzanine Capital II, L.P., as Collateral Agent (as amended, modified, restated or supplemented from time to time, the "Security Agreement," capitalized terms defined therein being used herein as therein defined), and that the Pledged Interests listed on Schedule 1 to this Pledge Amendment shall be deemed to be part of the Pledged Interests within the meaning of the Security Agreement and shall become part of the Collateral and shall secure all of the Secured Obligations as provided in the Security Agreement.  This Pledge Amendment and its attachments are hereby incorporated into the Security Agreement and made a part thereof.


**[NAME OF PLEDGOR]**


By:     _____

Name:  _____

Title:    _____

**Schedule 1**

**PLEDGED INTERESTS**

| Name of Issuer | Type of Interests | Certificate Number | No. of shares (if applicable) | Percentage of Outstanding Interests in Issuer |
|---|---|---|---|---|

# EXHIBIT 8

## *PE-backed Channel Tech makes first add-on deal*

The Deal Pipeline

October 15, 2013 Tuesday

Copyright 2013 The Deal, L.L.C. All Rights Reserved

**Length:** 435 words

**Byline:** by Tatjana Kulkarni

# Body

Private equity-backed ***Channel Technologies Group*** LLC has acquired piezoelectric crystal producer H.C. Materials Inc. for an undisclosed amount, its first add-on deal since **Blue Wolf Capital Partners LLC** annexed it to its portfolio nearly two years ago.

Santa Barbara, Calif.-based CTG, a ceramic solutions manufacturer, acquired H.C. Materials from entrepreneur Pingdi Han, who will remain in a management role.

"We are working on strengthening and growing CTG," said Adam Blumenthal, managing partner of New York PE firm Blue Wolf Capital, by phone. "We plan on keeping the company in our portfolio for several years before selling it."

CTG, which was acquired by Blue Wolf Capital on Jan. 3, 2012, manufactures and distributes piezoelectric ceramic solutions, transducers and navigation systems.

"The fit is perfect," Blumenthal said about the add-on deal. "H.C. makes the high-quality crystals, which Channel will now use in manufacturing its products."

Prior to the acquisition, CTG's key customers were from the military and navy industries. With the addition of H.C. Materials, CTG will be poised to expand its customer base to markets such as medical ultrasound imaging, ocean mining and sonar systems.

"The quality of crystal H.C. makes will really give (CTG) a huge advantage in the medical and ocean exploration space," Blumenthal stated.

In a statement, CTG CEO Ralph L. Phillips specifically mentioned that the acquisition "strengthens our advanced materials segment."

H.C. Materials will maintain its headquarters in Bolingbrook, Ill.

Geoff Ligibel from **Houlihan Lokey Inc.** was H.C. Materials' financial adviser on the transaction.

CTG's financial adviser was **Lincoln International LLC**. It received legal counsel from **Holland & Knight LLP**.

Blue Wolf typically invests a minimum of $10 million in middle-market companies that have revenues of at least $25 million and are in the midst of some structural, financial or regulatory difficulty.

"We are a special-situation investment firm," Blumenthal said, "so when we noticed that Channel, which had such strong technical capabilities, was going through a lot of financial challenges, we became interested."

PE-backed Channel Tech makes first add-on deal

Blumenthal, who sits on CTG's board, declined to specify what type of financial difficulty CTG was facing at the time. But he did say the company was suffering "from neglect from its previous owners."

"What we have done was really give it the operational and strategic assistance it needed to strengthen ties with its customers, specifically the Navy industry," Blumenthal said.

H.C. Materials officials couldn't be reached for comment.

**DEAL SIZE**

Undisclosed

**Load-Date:** October 29, 2013

---

End of Document

# EXHIBIT 9

**DORSEY**

DORSEY & WHITNEY LLP

NELSON G. DONG
Partner
(206) 903-8871
FAX (206) 260-9085
dong.nelson@dorsey.com

January 6, 2015

**PROPRIETARY & CONFIDENTIAL –
EXEMPT FROM FOIA DISCLOSURE**

**VIA FEDERAL EXPRESS**

Mr. Frederick F. Monroe
Office of Defense Trade Controls Policy
Directorate of Defense Trade Controls
U.S. Department of State
2401 E Street, NW
Washington, DC 20037

Re:    **Export Control Reform follow-Up on Case No. CJ 1226-11**

Dear Mr. Monroe:

Our law firm acts as outside legal counsel to Channel Technologies Group, LLC ("CTG"). CTG is the successor legal entity to H.C. Materials Corporation in Bolingbrook, Illinois, to whom your office issued CJ No. 1226-11 on May 5, 2012 ("CJ 1226-11"), a copy of which is attached as Exhibit A to this letter for your convenience. CJ 1226-11 determined that certain single crystal piezoelectric materials should be ITAR controlled and others should be EAR controlled, depending upon the size and dimension of the material involved. As noted on the face of CJ 1226-11, we believe you were the DDTC analyst who worked on CJ 1226-11, and that CJ directs any future inquiries should be submitted to you directly.

CTG now writes to inform you and your colleagues at DDTC that CTG has just received a CCATS from the Bureau of Industry and Security ("BIS") that confirms two forms of single crystal piezoelectric ("PE") materials in the form of final finished crystals or crystal blanks (regardless of size or dimensions) are now subject to the EAR and, as such, are "EAR99" items as of December 30, 2014. The PE materials in final finished crystals or crystal blanks now are: (1) those made of lead magnesium – lead titanate ("PMN-PT"); and (2) those made of lead indium niobate – lead magnesium – lead titanate ("PIN-PMN-PT"). For convenience, we will refer to CTG's PMN-PT and PIN-PMN-PT single crystal products collectively as "the PE Products." I enclose a copy of CCATS No. Z1429241 dated December 31, 2014 ("CCATS Z1429241") as Exhibit B to this letter.

Because of the Obama Administration's recent Export Control Reform ("ECR") efforts, Category XI (Military Electronics) of the International Traffic in Arms Regulations' U.S. Munitions List ("USML") was revised as of December 30, 2014 (the Effective Date"). Those changes altered the USML basis upon which CJ 1226-11 was originally issued. CCATS Z1429241 from BIS now confirms, from and after that Effective Date, all of CTG's PE Products should be considered subject to the EAR and, as such, are "EAR99" items.

Frederick F. Monroe
January 6, 2015
Page 2



### 1.  Background on CTG and its PE Products.

Channel Industries was originally founded in 1959 in Santa Barbara, California, to produce PE ceramics. The company, later renamed as the "Channel Technologies Group," grew both organically and through a series of acquisitions over the years. In October 2013, CTG acquired H.C. Materials Corporation ("HC Materials"), a worldwide leader in the development and manufacture of large PE single crystals. HC Materials had been founded in 1995 by Dr. Pengdi Han in Bolingbrook, Illinois. (It was HC Materials that originally filed for CJ 1226-11.) Building upon the research and development efforts pioneered by HC Materials, CTG now has the expertise to produce both PMN-PT and PIN-PMN-PT based PE crystals and finished crystal elements. The addition of these PE Products to CTG's portfolio significantly increased the range of devices possible for CTG to create in-house.

### 2.  Items That Have Been Reclassified.

CTG had asked that BIS classify final finished crystals and crystal blanks cut from boules of PMN-PT and PIN-PMN-PT material produced at the CTG facility in Bolingbrook, Illinois (formerly known as the HC Materials facility until CTG purchased it in 2013). In response, through CCATS Z1429241, BIS effectively confirmed CTG's analysis of the new post-ECR rules that PMN-PT or PIN-PMN-PT materials in the form of final finished crystals or crystal blanks (regardless of size or dimension) should be EAR-controlled as of the Effective Date. BIS also confirmed that, under the EAR, such PMN-PT and PIN-PMN-PT materials in the form of final finished crystals and crystal blanks will be considered EAR99 items as of the Effective Date. CTG can furnish such PE Products either unfinished or finished with a gold coating.

### 3.  Legal Analysis of Post-ECR Rule Changes.

This part of our letter repeats the legal analysis we had offered to BIS in reaching the conclusion that Export Control Reform has significantly altered the regulatory framework for the PE Products. The Department of State announced its revised USML Category XI in July 2014 (the "Relevant USML Amendment"). (*See* 79 Fed. Reg. 37536 (July 1, 2014).) The Department of Commerce announced its companion changes to the Commerce Control List ("CCL") to pick up the various items moved by the Relevant USML Amendment from Department of State jurisdiction to Department of Commerce jurisdiction (the "CCL Electronics Amendment"). (*See* 79 Fed. Reg. 37551 (July 1, 2014).) In addition, the Department of Commerce has expressly cited PE materials in its revisions to CCL Category 6 with respect to sensors and lasers (the "CCL Sensors Amendment"). (*See* 79 Fed. Reg. 45288 (August 4, 2014).) This Section 3 of my letter to DDTC will thus review the pertinent portions of the Relevant USML Amendment, the CCL Electronics Amendment and the CCL Sensors Amendment to demonstrate to DDTC (as was done earlier to BIS) that none of these rules sets forth any controls on PMN-PT or PIN-PMN-PT materials in the form of final finished crystals and crystal blanks.

Based on that analysis, CTG believed that, by the process of elimination, as of the Effective Date, neither the USML nor the CCL controls the CTG PE Products and, instead, those items are now entirely subject to the EAR, regardless of size or dimension. CTG further believed such PE Products may be exported as EAR99 items. In CCATS Z1429241 dated December 31, 2014 (attached as Exhibit A to this letter), BIS agreed entirely with this legal analysis by CTG. Accordingly, CTG believes that CJ 1226-11 (Exhibit B to this letter) has become moot and no longer applies to any of its PE Products, regardless of size or dimension.

Frederick F. Monroe
January 6, 2015
Page 3



### 3.1    The Relevant USML Amendment.

As one reads through the Relevant USML Amendment for Category XI, it is quickly evident that none of the "equipment" or "systems" level controls in paragraphs XI(a) or XI(b) can be applied to cover PMN-PT or PIN-PMN-PT materials produced in the form of final finished crystals or crystal blanks. If the revised USML Category XI would have any provision for such parts, that would have to appear in the "parts, components, accessories, attachments and associated equipment" provisions of USML paragraph XI(c). However, when one reviews through all the items enumerated in paragraph XI(c), one sees that item (12) controls:

> underwater sensors (acoustic vector sensors, hydrophones, or transducers) or projectors, specially designed for systems controlled by paragraphs (a)(1) and (a)(2) of this category having any of the following: ...(vi) Designed to withstand pressure during normal operating at depths exceeding 1,000 m and having transducers with any of the following:
> ...
>
> (B) Incorporating other than lead zirconate titanate as the transduction element.

This is plainly a control only on "sensors (acoustic vector sensors, hydrophones or transducers or projectors" but not on PMN-PT or PIN-PMN-PT materials in the form of final finished crystals or crystal blanks as such. Item 12 is therefore not relevant to the two classes of PE Products that CTG sought to have classified by BIS in CCATS Z1429241.

There is also item (13) in USML paragraph XI(c), which covers "[p]arts or components containing [PE] materials which are specially designed for underwater hardware, equipment, or systems controlled under paragraph (c)(12)." Again, the plain language of item (13) speaks to "parts or components containing" such PE materials but not to the PE Products themselves as final finished crystals or crystal blanks, long before they are incorporated by other companies into any other part or component.

Elimination of items (12) and (13) in USML paragraph XI(c) exhausts all the places in which CTG's PMN-PT or PIN-PMN-PT materials in the form of final finished crystals or crystal blanks could be potentially covered as ITAR-controlled defense articles in the post-ECR version of USML Category XI. It thus seems readily apparent that the Department of State does not intend for the PE Products, in and of themselves, to be ITAR-controlled defense articles after the Effective Date.

### 3.2    The CCL Electronics Amendment.

When one reviews the CCL Electronics Amendment, it is clear that the Department of Commerce intends to control devices manufactured from the CTG PE Products, which are only raw materials in the form of final finished crystals or crystal blanks. However, in the CCL Electronics Amendment, there is no entry in the CCL that controls the PE Products themselves. More specifically, there is this technical note for ECCN 3A611.x:

> **Note 2 to ECCN 3A611.x:**  ECCN 3A611.x controls "parts" and "components" "specially designed" for underwater sensors and projectors controlled by USML Category XI(c)(12) containing single-crystal lead magnesium niobate lead titanate (PMN-PT) based piezoelectrics.

Frederick F. Monroe
January 6, 2015
Page 4

 DORSEY™

Significantly, in the CCL Electronics Amendment ECCN 3A611 controls "military electronics;" ECCN 3B611 controls related "test, inspection, and production commodities for military electronics;" ECCN 3D611 controls "specially designed" "software" for military electronics; and ECCN 3E611 controls "technology" "required" for military electronics. However, there is no provision for an ECCN 3C611 that would control "materials" for military electronics.

That omission, CTG submits, is material and highly significant to this CCR, because, when the Department of Commerce clearly had the opportunity to set forth an explicit control on such materials such as the PE Products, which it clearly understands from Note 2 to ECCN 3A611.x to be a vital constituent material from which such underwater sensors and projectors can be produced, it apparently chose not to do so. In the absence of any affirmative ECCN in CCL Category 3 that applies to PMN-PT or PIN-PMN-PT materials in the form of final finished crystals or crystal blanks, the only logical conclusion, again by the process of elimination, is that CTG's PE Products, by themselves and long before they are fabricated by others into sensors or projectors, are not controlled under any Category 3 ECCN. BIS wholly agreed with this logic in CCATS Z1429241 as of December 31, 2014.

### 3.3 The CCL Sensors Amendment.

In the CCL Sensors Amendment published on August 4, 2014, the Department of Commerce was explicit about controlling certain devices made from the PE materials at issue. The Department of Commerce wrote with respect to an explanation of the revised ECCN 6A001:

> 6A001 (Acoustic systems, equipment and components)
>
> Note 3 is added to the introductory paragraph a.1.c, in order to clarify that 6A001.a.1.c applies to projectors or transducers designed and manufactured using either of two high performance transduction materials: 1) lead-magnesium-niobate/lead-titanate ($Pb(Mg_{1/3}Nb_{2/3})O_3$-$PbTiO_3$, or PMN-PT), or 2) lead-indium-niobate/lead-magnesium-niobate/lead-titanate ($Pb(In_{1/2}Nb_{1/2})O_3$-$Pb(Mg_{1/3}Nb_{2/3})O_3$-$PbTiO_3$, PIN-PMN-PT). These materials are currently being used in medical ultrasound applications, but are increasingly being used in high performance military and civil projectors and transducers. . . .
>
> Paragraph a.2.a.3.d (Lead-magnesium-niobate/lead-titanate (i.e., Pb(Mg1/3Nb2/3)O3-PbTiO3, or PMN-PT) piezoelectric single crystals grown from solid solution) and paragraph a.2.3.e (Lead-indium-niobate/lead-magnesium niobate/lead-titanate (i.e., Pb(In1/2Nb1/2)O3-Pb(Mg1/3Nb2/3)O3-PbTiO3, or PIN-PMN-PT) piezoelectric single crystals grown from solid solution) are added as parameters for hydrophone sensing elements, because PMN-PT and PIN-PMN-PT single crystals are a new generation of piezoelectric materials that exhibit superior piezoelectric properties over PZT ceramics. Hydrophones designed using PIN-PMN-PT have greater bandwidth and sensitivity, as well as lower self-noise.

In the above quoted language from the CCL Sensors Amendment, two clear factors emerge: (1) the Department of Commerce is clearly and technically aware of the existence of PMN-PT and PIN-PMN-PT as the raw materials from which sensitive sensors such as transducers or hydrophones can be made; and (2) these materials themselves are acknowledged as being classically "dual use" in nature because the Department of Commerce

Frederick F. Monroe
January 6, 2015
Page 5



expressly notes the utility of such materials in both civilian ("high performance … civil projectors and transducers" and "medical ultrasound applications") and military uses.

Moreover, when one examines updated CCL Category 6 after the CCL Sensors Amendment and looks at all the "materials" entries in Category 6C, one can readily see that ECCNs 6C002 (materials for optical sensors), 6C004 (optical materials), 6C005 (synthetic crystalline laser host material in unfinished form) and 6C992 (optical sensing fibers) do not cover PMN-PT or PIN-PMN-PT materials in the form of final finished crystals or crystal blanks. Once again, the Department of Commerce has had ample opportunity – in collaboration with the other Wassenaar Arrangement member nations -- to develop and promulgate a separate "materials"-type control on the CCL that would fit PMN-PT or PIN-PMN-PT materials in the form of final finished crystals or crystal blanks, but that was not done.

Accordingly, given the "positive" control list philosophy inherent in the CCL's structure, the conclusion must be that there is no applicable ECCN in either Category 3 or Category 6 that applies to PMN-PT or PIN-PMN-PT materials in the form of final finished crystals or crystal blanks, even if devices, systems or equipment made from such PE materials may be controlled items under either Category 3 or Category 6. That means such PMN-PT or PIN-PMN-PT materials in the form of final finished crystals and crystal blanks must be treated as EAR99 items. In CCATS Z1429241, BIS has in fact confirmed to CTG that its PE Products are EAR99 items as December 31, 2014.

## 4.    Prior Commodity Jurisdiction from DDTC.

As noted above in the summary of CTG's history, CTG acquired HC Materials in October 2013. HC Materials had sought a commodity jurisdiction from DDTC on PMN-PT single crystals (cut, partially finished and/or coated for commercial uses such as in medical devices). DDTC responded with CJ 1226-11 dated March 5, 2012 in which it concluded that PMN-PT single crystals were not subject to ITAR controls as long as they have: (a) a thickness of 2 mm or less; (b) a frequency of 1 MHz or higher; and (c) no linear dimension greater than 200 mm, but that materials which exceeded these limitations would be ITAR-controlled. (In CJ 1226-11, DDTC indicated it would later issue a separate CJ as to PIN-PMN-PT materials, but there is no record that DDTC ever did so.) CJ 1226-11 was obviously predicated with the wording of USML Category XI as it existed in March 2012.

CTG believes that CJ 1226-11 became moot on the Effective Date because the basis for that 2012 CJ was the wording of USML Category XI as of March 2012, but USML Category XI was revised on the Effective Date under the Relevant USML Amendment. The new post-ECR ITAR and EAR provisions in the Relevant USML Amendment, the CCL Electronics Amendment and the CCL Sensors Amendment that are summarized above, taken together, now supersede CJ 1226-11 because the Department of State has rewritten the very control rules upon which that CJ 1226-11 was based.

The "positive" list approach in revising the USML means that, to be ITAR-controlled after the Effective Date, the Department of State must list the particular characteristics of the goods that it wishes to cover through the USML. The Department of State has apparently declined to do so in the revised form of USML Category XI(c), as explained at length above in Section 3 of this letter. Once the revised USML Category XI(c) took effect on the Effective Date, the legal predicate for CJ 1226-11 was removed. Any residual ITAR control of PMN-PT material after the

Frederick F. Monroe
January 6, 2015
Page 6

◌ ⟫ DORSEY™

Effective Date must either stand or fall on the basis of the control list shown in the revised form of USML Category XI(c).

Accordingly, CTG believes that, if its PMN-PT materials in the form of final finished crystals or crystal blanks meet the three criteria laid out in CJ 1226-11, then those particular final finished crystals and crystal blanks would be outside ITAR control by the terms of CJ 1226-11. However, with the adoption of the Relevant USML Amendment, the CCL Electronics Amendment and the CCL Sensors Amendment, CTG now also believes that PMN-PT materials in the form of final finished crystals or crystal blanks that do not meet those three criteria are subject to the EAR's jurisdiction after the Effective Date. More specifically, as noted above, CTG believes all PMN-PT materials in the form of final finished crystals or crystal blanks and all PIN-PMN-PT materials in the form of final finished crystals or crystal blanks, regardless of size or dimension, are EAR99 items as of the Effective Date because of the ECR changes to the CCL.

BIS has studied and accepted this CTG legal analysis and, as a result, on December 31, 2014, issued CCATS Z1429241 to CTG. CTG thus believes that CJ 1226-11 is now moot. We bring all this directly to your attention because you were directly involved in the preparation of CJ 1226-11 and in the analysis at DDTC that led up to that earlier CJ.

**5.      Further Information.**

If you or any of your DDTC colleagues require any additional information or have any technical questions about CTG's PE Products, which are PMN-PT or PIN-PMN-PT materials in the form of final finished crystals or crystal blanks, please contact me at the phone number or email address above.

**6.      Conclusion.**

CTG hopes that the enclosed information in this letter will lead DDTC to agree with BIS that all of CTG's PE Products, which are PMN-PT and PIN-PMN-PT single crystal materials in the form of final finished crystals or crystal blanks (regardless of size or dimension), are now not ITAR-controlled but, instead, are all only subject to the EAR. Under the EAR, in CCATS Z1429241, BIS has stated these PE materials are all EAR99 items, which CTG believes took effect as of the Effective Date because of the Relevant USML Amendment, the CCL Electronics Amendment and the CCL Sensors Amendment.

Thank you for your consideration of this letter and the attached materials submitted on CTG's behalf. Please do not hesitate to contact me if you or any of your DDTC colleagues has any further question about CTG's position with respect to the relevant U.S. export controls applicable the PE Products and the mootness of CJ 1226-11 as of the Effective Date, that is, as of December 31, 2014.

Yours truly,

*Nelson G. Dong*

Nelson G. Dong
Special Counsel for Channel Technologies Group, LLC

Frederick F. Monroe
January 6, 2015
Page 7



Exhibits

A     CCATS No. Z1429241 (December 31, 2014)

B     CJ No. 1226-11 (March 5, 2012)

**EXHIBIT A**

**CCATS NO. Z1429241 (DECEMBER 31, 2014)**

**UNITED STATES DEPARTMENT OF COMMERCE**
**BUREAU OF INDUSTRY AND SECURITY**
**WASHINGTON, D.C. 20230**

CASE NUMBER: Z1429241

Channel Technologies Group, LLC
C/O DORSEY & WHITNEY LLP                    December 31, 2014
ATTN: KELLY NAKATA                          G158747
701 FIFTH AVENUE
SUITE 6100
SEATTLE, WA 98104

THE FOLLOWING INFORMATION IS IN RESPONSE TO YOUR INQUIRY OF November 26, 2014
REQUESTING COMMODITY CLASSIFICATION(S) FOR:

| COMMODITY | ECCN | SUBPARAGRAPH |
|---|---|---|
| Single crystal piezoelectric (¿PE¿) materials in final finished crystals or crystal blanks made of lead magnesium ¿ lead titanate (¿PMN-PT¿) | EAR99 | |
| Single crystal piezoelectric (¿PE¿) materials in final finished crystals or crystal blanks made of lead indium niobate ¿ lead magnesium ¿ lead titanate (¿PIN-PMN-PT") | EAR99 | |

COMMENTS FROM LICENSING OFFICER(S):

ITEM #1:
Single crystal piezoelectric ("PE") materials in final finished crystals or crystal
blanks made of lead magnesium - lead titanate ("PMN-PT") is classified as EAR99
and does not require a license to most destinations. The applicant must however
comply with Prohibitions four (4) through ten (10) listed in Part 736 of the Export
Administration Regulations.

ITEM #2:
Single crystal piezoelectric ("PE") materials in final finished crystals or crystal
blanks made of lead indium niobate - lead magnesium - lead titanate ("PIN-PMN-PT") is
classified as EAR99 and does not require a license to most destinations. The applicant
must however comply with Prohibitions four (4) through ten (10) listed in Part 736 of
the Export Administration Regulations.

                                        FOR INFORMATION CONCERNING
                                        THIS CLASSIFICATION CONTACT
                                        DARRELL SPIRES
DENNIS KREPP                            PHONE #: 202-482-1954

FORM BXA-6002L(REV. 7/96)

**UNITED STATES DEPARTMENT OF COMMERCE
BUREAU OF INDUSTRY AND SECURITY
WASHINGTON, D.C. 20230**

DIVISION DIRECTOR                    BIS/EA/STC/SA

FORM BXA-6002L(REV. 7/96)

**EXHIBIT B**

**CJ NO. 1226-11 (MARCH 5, 2012)**

# Status of Commodity Jurisdiction Determination

**United States Department of State**

*Bureau of Political-Military Affairs*
*Directorate of Defense Trade Controls*

Washington, D.C. 20522-0112

MAR 06 2012

In Reply refer to
DDTC Case CJ 1226-11

YOUR LETTER DATED: January 19, 2012

COMMODITY JURISDICTION DETERMINATION FOR:
PMN-PT Piezoelectric Single Crystals: Cut, Partially Finished and or Coated
for Commercial Use (e.g. Medical Devices) (A re-submission of CJ 613-11)

Your commodity jurisdiction (CJ) request was resubmitted (prior CJ Case Number
CJ 613-11) on behalf of H.C. Materials Corporation and was referred to the
Departments of Defense, Commerce and Homeland Security, and the National
Aeronautics and Space Administration for review and recommendations. The
items are single lead indium niobate-lead magnesium niobate – lead titanate
(PMN-PT) piezoelectric single crystals: cut, partially finished, and/or coated. This
determination does not include the boule.

The Department of State has determined that the PMN-PT Piezoelectric Single
Crystals: Cut, Partially Finished and/or Coated for Commercial Use (e.g.
Medical Devices), are not subject to the licensing jurisdiction of the
Department of State as long as they meet all of the following criteria: (a) a
thickness of 2 mm or less; (b) a frequency of 1 MHz or higher; and (c) no linear
dimension greater than 200 mm. However, export may require authorization from
the Department of Commerce (DOC). Please consult the DOC Office of Exporter
Services at (202) 482-4811 to make a Classification Request (CCATS) and satisfy
applicable requirements prior to export.

*Continued on Page Two*

---

Page Two

In Reply Refer to
DDTC Case CJ 1226-11

A separate commodity jurisdiction should be submitted for any PMN-PT
piezoelectric single crystal finished parts that do not meet any of these criteria. A
jurisdiction determination for the bulk (boule) PMN-PT Piezoelectric Single
Crystals will be rendered via a separate final determination letter.

Should you not concur with this determination and have additional facts not
included in the original submission, you may submit a new CJ request. If you do
not concur with this determination and have no additional facts to present, then you
may request that this determination be reviewed by the Deputy Assistant Secretary
of State for Defense Trade and Regional Security.

Should you require further assistance on this matter, please contact
Frederick ("Tad") F. Monroe at MonroeFF@state.gov or 202 663-2920.

Sincerely,



Robert S. Kovac
Managing Director

cc:    Dr. Pengdi Han
       H.C. Materials Corporation
       479 Quadrangle Drive
       Suite E
       Bollingbrook, IL 60440

1

# EXHIBIT 10

**Ewelina Johnson**

---

**From:**         Lynn Chen
**Sent:**         Friday, February 05, 2016 9:58 AM
**To:**           Katherine Carrington
**Subject:**      Re: October Board Minutes
**Attachments:**  CTG Q3 2015 BoD minutes.pdf

Here you go

>>> On 2/5/2016 at 6:31 AM, in message <882846ac0a144e1e901c7d14e21034a5@bw-prod-exch.blue-wolf.com>, Katherine Carrington <Katherine@bluewolfcapital.com> wrote:

Hi Lynn,

Do you mind sending me the October Board minutes?

Best,

Katherine

**Katherine Carrington**

**Blue Wolf Capital Partners**

One Liberty Plaza, 52nd Floor

New York, NY 10006

Phone: 212-488-3685

Fax: 917-677-8233

katherine@bluewolfcapital.com

1

## MINUTES OF THE REGULAR MEETING OF THE
## BOARD OF MANAGERS OF
## BW PIEZO HOLDINGS LLC
### October 29, 2015

**In Attendance:**

Managers:          Adam Blumenthal, Jeremy Kogler, Pengdi Han, Pierre Chao, Ralph Phillips,
                   Lynn Chen

Advisory Board:    Vice Admiral John (Jay) Donnelly, USN, Ret., Rear Admiral Nevin Carr,
                   USN, Ret.

Observers:         Chris Curti, Andy Worth (Fidus), Jeri Harman (Avante), Brian (Fidus)*,
                   Anthony (Fidus), Greg Bowie (Gladstone), Rick Winegar, Vic Caruso,
                   Stephen Dynan*, Arsen Melconian, Katherine Covington

*= via teleconference

A regular meeting of the Board of Directors (the "*Board*") of **BW PIEZO HOLDINGS LLC**
(the "*Company*") was convened at CTG in New York at approximately 9:00 a.m. (EST) on the
date set forth above. Attendees were present in person and via teleconference call. The
Company distributed materials for the meeting to the Board in advance of the meeting, and all
members of the Board confirmed receipt.

A.    <u>Call to Order; Quorum; Secretary of the Meeting</u>

       Mr. Ralph Phillips called the meeting to order and noted that all directors were present
and that a quorum existed. He then went through the agenda for the meeting and made
introductions. Ms. Chen acted as secretary of the meeting and recorded the minutes.

       Mr. Phillips greeted the group and turned the floor over to Mr. Blumenthal to make some
opening comments.

B.    <u>BW Opening comments</u>

       Mr. Blumenthal opened and noted the amount of work, sacrifice and effort managing the
business and cash flow during the recent months, and thanked the team for meeting the financial
covenant for Q3. However, as it is still the case for Q4, we need to be in a better position. The
decision to start the process of the sale of AM, with Raymond James taking the lead as the
Investment Banker was confirmed. We will need to spend time on tactical, financial and strategic
issues in the context of the sale of AM. We will need to focus on SB and how to improve cash
flow to either direct capital to AM or to SB to improve the value before exit. We need to get
people out of sacrificing and into growth.

       Q2 and Q3 was a tightrope, and the team made a lot of sacrifices to make the covenants.
There is a lot happening but the time for certain decisions and business won 2 years ago is
starting to pay off.

C.    **Approval of Prior Meeting Minutes**

The meeting minutes from August 12, 2015 were approved as written without discussion.

D.    **CEO Update**

Mr. Phillips then provided an update to the Board on the Company's Q3 2015 results, beginning with Safety. We have kept a close eye on safety but are still worse than best practices. We have made some changes in headcount to take safety to the next level and be more proactive, which will require some investment, mostly in management. Based on our internal audit of safety, we have some corrective actions to take, which will be driven by the new quality headcount and reorganization or the Ceramics team.

Mr. Blumenthal noted that at another portfolio company, there was a fatality, despite having strong safety policies & procedures on paper, and appropriate training. Need to ensure that the Culture is there, in addition to the People and Policies & Procedures. For next Board meeting, CTG should prepare a presentation on Safety.

September was better than the rest of Q3, with shipments increasing. CTGAM yields also improving in Q3. We are having some challenges on the MK-54, which is being addressed, and will slow us down. Bookings slowed in Q3, with some that were delayed to Q4, but October and November should be good.

R&D efforts have slowed due to clamp down on spend due to cashflow challenges, but will increase spend in 2016. Operations improving and Ceramics delivery improving in OTD and yields. TR-343 on track, but watching daily, as testing is in very early stages.

E.    **Financial Summary**

Ms. Chen provided an update on the Company's Q3 2015 financial performance. Revenues were in line with the last forecast, and lower that the Budget for the quarter. Q3 Gross Margin was unfavorable to both the last forecast and the Budget for the quarter. Q3 SG&A was favorable to the last forecast and to Budget. Q3 Management EBITDA and Bank Adjusted EBITDA were in line with the last forecast at $2.4M and $7.8M, respectively, but below Budget of $3.3M and $8.1M, respectively.

F.    **Q4 Forecast – October**

Ms. Chen provided the Q4 forecast. Q4 revenues consistent with the last Board forecast at $14.4M, with a Management EBTIDA of $3M. In our base case, we are in compliance with the leverage ratio covenant, however, with minimal cushion.

Discussion around Q4 covenants and communication and ask with Lender Group.

G.    **AOP Key Assumptions**

Mr. Phillips and Ms. Chen provided the Board with a preview of the Revenue assumptions and current status of the 2016 AOP Budget preparation. The first pass of Revenues shows a strong Q4, need to level load throughout the year if possible.

H.    Ceramics Action Plan Status

Mr. Melconian provided the Board with an update on the Ceramics Division and the current status on action plans. Yields have improved overall with big progress in TR-343 program, with all trends favorable. Organization fully staffed now. Schedule working well, still some issues with powder manufacturing and deliveries, would like to have more inventory on hand. Having some setbacks on preventative maintenance, due to spending and headcount constraints.

Working closely on EHS activities, assessing lead compliance (monitoring and maximum exposure test), need to spend some money to put in some engineering controls, walls and air flow management to control lead contaminants to other work areas, other buildings or home. Working with consultant and hired EHS full time person to prepare a plan. Need to improve EHS to ensure risk of lead contamination is minimized. CTG should not compromise on safety of people. If we stay in this business, need to be best in class, or don't stay in this business.

Two main actions to take:
1. find Environmental Counsel to ensure liability risk understood and managed. Follow up meeting to be set up with Adam, Charlie, Rick, Ralph and Arsen (and possibly David Critchfield – BW Environmental Consultant) to assess Legal and Environmental risk assessment in California, and do 3rd party review. To do immediately.
2. Need to make strategic decision on Ceramics Strategy. Discussed how much is under long-term supply agreements with external Ceramics customers, which are with Alcon, Syquest (repairs) and Ultra (shown on slide 39). Any make or buy decision needs to consider internal customer demand and impact on Sensors.

I.    Ceramics Strategic Actions

Mr. Melconian's update on the Ceramics Strategic Action is postponed until later.

J.    Advanced Materials Capital Plan Status

Mr. Dynan discussed the addition of the new BD person for AM, and provided the Board an overview of the Advanced Materials proposed expansion plan. Some delay in the investment due to cash constraints during Q3 and A4. Schedule updated based on this, which will begin to generate revenues in early Q3 16. Advanced Technology roadmap includes larger diameter boules (+78% increase in material) and longer boule length (+50% increase in material) during 2016-2018. These advancements will help mitigate the price challenge from customers and maintain margins by reducing costs.

K.    R&D Projects (Preliminary 2016)

Mr. Phillips provided the Board with an overview of R&D activities, which builds on what was started in 2015.

L.    New Business Growth Status

Mr. Phillips provided the Board with an overview of Business Development activities.

Ceramics is still focused on operations and supporting internal demands vs new opportunities. Transducers new business focused on Northrop and Lockeed proposal for MK-48. TR-343 is still significant for the next few years. Pierre to help get information to CTG on the LDUUV opportunity. Systems business has done really well, exceeding expectations. This will continue into next year. MSI has big potential win on MK-54 Mod 1 with Progeny, MLTA still in place, just delayed and smaller.

M.    **Optics**

Mr. Phillips presented an overview of the Optics business, and will have a strategic discussion on this business later this year. Will end up close to Budget for 2015, with 2016 actions to improve bottom line.

N.    **Adjournment**

There being no further business to come before the Board, last comments were made from the participants. Mr. Chao noted that there should be some unlocking of the US Government Budget and potential additional business in Q4 and beyond. Mr. Blumenthal gave a status on the sale of Advanced Materials. Will discuss strategic options tomorrow together with BW and come back with the Board in January with results from that discussion.

Respectfully submitted,

Lynn Chen,
Secretary (acting)

# EXHIBIT 11

**Ewelina Johnson**

| | |
|---|---|
| **From:** | Lynn Chen |
| **Sent:** | Wednesday, January 27, 2016 12:55 PM |
| **To:** | Sergio De Hoyos; John Hager |
| **Cc:** | Art Ortega; Stephen Dynan |
| **Subject:** | Re: CTGAM Cash Flow Forecast |
| **Attachments:** | CTGAM Cash Flow Roll Forward-we 1-25-2015-16 WK.xlsx |

Hi John,

Thanks for doing that quickly, that helps for today.  However, we do need you to stretch your payments out to suppliers as much as possible, at least a week out from your current payment stream.  As you know we are managing our cash very tightly and will need AM to slow down the outflows as well.  We need you to reduce payments by at least $45k over the next week (through Feb 5).

Thanks, lynn

>>> On 1/27/2016 at 9:31 AM, in message
<BY2PR05MB2542A65688434259E29047692D90@BY2PR05MB254.namprd05.prod.outlook.com>, John
Hager <john.hager@hcmat.com> wrote:

> I was able to get it completed – buyers are on a tour.  See attached
>
>
> John P. Hager
>
> Controller
>
> 
>
> CTG Advanced Materials
>
> Formerly HC Materials
>
> John.hager@hcmat.com
>
> 630-754-8630  direct
>
> 479 Quadrangle Dr
>
> Bolingbrook, Il  60440

# EXHIBIT 12

**Ewelina Johnson**

| | |
|---|---|
| **From:** | Lynn Chen |
| **Sent:** | Friday, January 22, 2016 9:37 AM |
| **To:** | Jeff Rumsey |
| **Cc:** | Jim Smith; Vinnie Odell |
| **Subject:** | Re: Payments - NRL & Associates |

Hi Jeff,

I understand your frustration and apologize for the delay. Let me follow up today and let you know what we can do to catch up.

Thanks,

Lynn

> On Jan 22, 2016, at 7:26 AM, Jeff Rumsey <jrumsey@nrlassoc.com> wrote:
>
> Good morning Lynn.  I have been working with Cheryl Hanna for several months and wanted to reach out to you.
>
> I'm writing regarding the recent payment patterns of CTG.  In November, Terry Jamba requested that NRL  push out several deliveries into January 2016.  We accepted his request and moved several orders to January 2016 deliveries to assist CTG with your inventory issues.  Terry agreed to a payment schedule and left a week later for another company. Damon made sure our payments were received as promised.
>
> On January 13, 2016 Damon sent Vinnie Odell a schedule with expected pay dates for our open invoices totaling $424,120.  We expected a payment of $88,601.56 on Jan 15th based on Damon's prior commitment to Terry's payment schedule, our commitment to CTG by delaying shipments, and Damon's expected payment schedule.  We didn't receive a payment until Jan 20th and it was for only $47,178.40.  Per Cheryl, after several emails, we received another $21,120 towards the original amount of $88,601 today.  We are still short of our original expectations by $20,303 and this invoice is now at 53 days.
>
> We are requesting that our invoices be paid as Damon proposed based on our flexibility with CTG at year end and the Net 30 terms we agreed to on the PO's.  We are asking for your commitment to meet these dates.  Cheryl tells us each week that she doesn't know what the payments will be and that she has no say in what gets paid.
>
> Please contact us with any questions or comments.  Thanks in advance for your reply.
>
> Best regards,
>
> Jeff Rumsey
> Controller
> NRL & Associates, Inc
> 410-643-4063 x 315
> <Mime.822>

# EXHIBIT 13

**Ewelina Johnson**

| | |
|---|---|
| **From:** | Sergio De Hoyos |
| **Sent:** | Tuesday, February 09, 2016 12:34 PM |
| **To:** | Lynn Chen |
| **Cc:** | Art Ortega; Cheryl Hanna; David Oldham |
| **Subject:** | Cash Flow Forecast, 2.8.16 |
| **Attachments:** | CTG Daily Cash Flow Forecast_02.08.16.xlsx |

Lynn,

Attached is the latest cash flow forecast.  It does not look good.  I took out the $1.8m of 'existing AP' payments but we still go negative on 3/31 (plenty of liquidity through then) and remain so for most of April.

One reason for the dip versus the prior forecast is that we had ~$650k of collections this quarter for MK-54shipments that have been (and were then already) delayed.

I'll revise again after discussion.

Sergio

# EXHIBIT 14

**Ewelina Johnson**

| | |
|---|---|
| **From:** | Cheryl Hanna |
| **Sent:** | Wednesday, February 17, 2016 9:51 AM |
| **To:** | John Hager |
| **Subject:** | Re: Cash needs |

Okay thanks.  I'll send it now.  Art had on his list that you had 10k in CapEx and  16,484 in AP and  152,534 in fixed costs (PR/401K is 99K so I don't know what the rest was) Is his report correct?  As I stated before it looks like you only have enough for payroll this week.

Thanks,
Cheryl

+ for AP and 155K for PR and I'm assuming more AP, but there isn't enough in your account for that.  Is his forecast incorrect?

Cheryl

>>> John Hager <john.hager@hcmat.com> 2/17/2016 7:49 AM >>>
Cheryl with the addition of another $20K+ today you only need to send us $35K for payroll.

Thanks,

John P. Hager
Controller
[cid:image001.png@01D09213.D3015C20]
CTG Advanced Materials
Formerly HC Materials
John.hager@hcmat.com<mailto:John.hager@hcmat.com>
630-754-8630  direct
479 Quadrangle Dr
Bolingbrook, Il  60440

# EXHIBIT 15

**Ewelina Johnson**

| | |
|---|---|
| **From:** | Chris Holmes |
| **Sent:** | Friday, June 24, 2016 11:21 AM |
| **To:** | Vic Caruso |
| **Subject:** | FW: EOI Sale |

Please review before I send to Adam and Charlie. Thanks

**From:** Bill Cidzik
**Sent:** Friday, June 24, 2016 8:28 AM
**To:** Chris Holmes <CHolmes@channeltech.com>
**Subject:** EOI Sale

As discussed earlier this week…

The sale of EOI to a foreign interest and the way it was handled has far reaching implications that may adversely impact CTG's business going forward.

First off, the Department of State is appalled that they were not notified, as required by law, 60-days in advance of the sale.  Notifications were subsequently submitted however we don't yet know what, if any, fines, penalties, or criminal charges may be levied on CTG or its employees.  There may also be ITC related escapes that occurred during the due diligence process with prospective buyers and the new owners which could compound the situation.

Defense Security Services (DSS) is also distraught that they were not notified of the pending sale and doesn't understand why the FSO was not consulted during the process.  Although we are working collaboratively with DSS to clean up the mess and process the appropriate notifications and update the various government databases and systems, CTG's security accreditation is at risk.  At a minimum, I don't expect CTG's annual audit by DSS to go as smoothly as they have in the past and the corrective actions could be onerous to our business.

And, EOI has a classified contract with NAWC that was awarded 4/18/2016.  NAWC is extremely upset that they were not notified of 1) The pending sale before they entered into the contract and 2) Not notified until after the sale took place which may be a violation of the terms of the contract.  As a result, NAWC is reviewing the situation with their legal department and will be terminating the contract.  The type of termination (default or convenience) is unknown at this time.  Termination for default has long term (7–years) ramifications that may adversely impact our ability to compete for new government contracts.  It may also impact option year awards for IDIQ contracts that we have in-house.

Summary of Discoveries/Actions to Date follows:

- DSS was notified of sale EOI to HGH Infrared Systems, Inc. on Monday 6/13.

- It was determined that EOI had one active classified contract, this order was issued on 4/18/2016, no production work has been done.

- Cecily met with Steve Scopatz, Thierry Campos (HGH President) and Cliff Warren (HGH Consultant) to discuss the facility clearance and the company organizational structure.

- After reporting the organizational structure to DSS it was determined that the Facility Clearance could not be transferred without sponsorship from the Government Customer or a currently cleared defense contractor.

- All classified holdings were pulled from EOI and moved to CTG Security safe while awaiting direction from NAWC Customer.

- All cleared EOI employees were debriefed and removed from our PSM net in JPAS with the exception of Chris Holmes, Linda Akens and Cecily. Chris will be debrief upon his return to the office, Linda and Cecily are waiting for direction from DSS.

- Cecily notified Billie Tomlinson Security Specialist for NAWC of the sale on 6/17 as requested by DSS.

- On 6/22 NAWC decided to cancel the classified contract and will not be sponsoring EOI for a facility clearance at this time because of their foreign ownership.

    o We will be receiving a final dd-254 with disposition of the classified documents involved in the contract.

    o Faith Lagore, Contracting Officer with NAWC will be send a bilateral modification to cancel the contract.  Not sure who will need to sign the modification however, Brent Lindstrom is the POC on the contract.

- Cecily met with Steve and Brent today 6/22 to inform them of NAWC's decision.

    o Steve would like to know what happens with all the purchased parts for the order.

    o Brent will be contacting customer to follow up on decision.

- The 27751 Cage code will stay with BWPH Services LLC and will eventually expire in SAM.

- Linda Akens was called in to handle all Export/ITAR actions, a letter was written and signed by Chris. Maria should have sent it to the state department.

- Cecily left a voicemail for the DSS Rep today 6/22 to find out what our next step is to void the facility clearance and remove it from JPAS.

Let me know if you need anything else.

- Bill

# EXHIBIT 16

**Ewelina Johnson**

| | |
|---|---|
| **From:** | Chris Holmes |
| **Sent:** | Monday, June 20, 2016 5:30 PM |
| **To:** | Vic Caruso |
| **Cc:** | Dave Oldham |
| **Subject:** | EOI Sale |

As expected, the first major issue has emerged regarding the sale.

Within a contract that EOI has is a requirement that DSS be informed 60 days prior to any change in control. In our haste to get the deal done a proper review was not completed nor was the customer informed.

As such, both DSS and Navy legal have been engaged and we have quarantined the product, documentation, de-briefed personnel and removed their names from JPAS.

This will likely cause either an additional audit of CTG and will likely put our company clearance under review during the next audit. We received a commendable rating last time.

The inability of CTG to have a compliant security system will jeopardize existing work and the ability to quote/perform future work in our core array business.

I will have a complete report generated and ready for submittal to BW by week end.

I hope the deal was worth it.

# EXHIBIT 17



# Channel Technologies Group

*Making the Invisible Visible*

# Corporate Organization



**Blue Wolf Capital Partners Acquisitions:**
- **CTG December 2011**
- **HC Material October 2013**



**Strategic Advisory Board**
**Pierre Chao, Renaissance Strategic Advisors**
**Vice Admiral John Donnelly, USN Ret'd**
**Rear Admiral Nevin Carr, USN Ret'd**
**Rear Admiral Jerry Ellis, USN Ret'd**













| **Single Crystal Ceramics** | **Piezoelectric Ceramics** | **Acoustic and Ultrasonic Transducers** | **Underwater Acoustic Systems and Components** | **Optical Test / Calibration Equipment** |
|---|---|---|---|---|

| **Advanced Materials** | **Acoustic & Ultrasound Systems** | **Optics** |
|---|---|---|



## CTG Corporate History

➢ Founded in 1959
➢ Located in Santa Barbara, CA and Bolingbrook, IL
➢ Approximately 275 Employees
  - 60 Program Mgmt and Engineering Personnel



## Revenues

➢ ~$50M Annual Revenues

## Multiple End Markets:

- 50% Defense
- 50% Energy / Medical / Sonar / Ocean Technology

**Engineered High-Quality Piezoelectric Ceramics, Sensors and Systems Since 1959**

# Complimentary Technologies from Materials to Systems



**Advanced Materials**



**Global leader in:**
- **Development of manufacturing of high performance piezoceramic single crystals**
  - **PMN – PT Based**
- **Primary supplier to global tier I ultrasound providers**
- **Critical supplier to meet general USN products and programs**



**Leading manufacturer of piezoelectrical compositions**
- **Lead Zironate Titanate**
- **Barium Titanate**

**Complete Shapes:**
- **Hollow Cylinders, Striped Cylinders, Hemispheres, Spheres, Discs, Rings, Discs with Holes, and Custom Shapes**

**Acoustic and Ultrasound Systems**



**Leading manufacturer of acoustic transducer for**
- **Strip and submarine sonar**
- **Oceanographic survey**
- **Marine life research**
- **Medical devices**
- **Torpedo arrays**



**Global leader in:**
- **Sonar Systems**
- **Navigation and Range Systems**
- **Flexible Arrays**
- **Underwater Acoustic Sciences**
- **Ocean Instrumentation**

**Optics**



**Global leader in:**
- **Advanced infrared and visible light spectrum test and calibration equipment**
- **Solves customers Electro-Optical testing challenges by understanding end use requirements and providing best value solution**

# Management Organization





# Engineering Strengths

**CTG has developed unparalleled in-house expertise, enabling the Company to design and manufacture piezoelectric ceramics to complete turn-key sonar systems.**



- HC Materials is the world leader in high performance single crystal piezoelectric development. HC provides elements for transduction devices such as actuators, position sensors, ultrasound imaging, active vibration control, acoustic transducers and projectors



- CII employs an internationally recognized group of engineers. This engineering talent, specialized design and manufacturing facilities present a significant competitive advantage.

- ITC has developed and manufactured over 5,000 different acoustic transducer designs. ITC builds, standard products, custom designs and partners with customers as part of its customers' product development efforts.



- STI's core strength is its ability to provide a complete acoustic solution for its customers. STI has developed products deployed on virtually every class of underwater system in operation by the US military.

# Manufacturing Strengths




➢ Two state-of-the-art ceramics processing facilities

➢ In-house sub-system and system manufacturing and capabilities
- Prototypes to full high-rate production
- ~ 90+% of assemblies / sub-assemblies produced in-house
- Full Spectrum Machine Shop

➢ Broad spectrum of product / component manufacturing
- State-of-the-art Cloud Based ERP System
- Cellular manufacturing / dedicated resources

➢ Strong manufacturing workforce
- Technical aptitude and experienced technicians
- Excellent safety record



# Selected Key Customers

























# Facilities



**Santa Barbara, CA, 130,000 Sq Ft**

➢ Ceramic Powder Formulation and Manufacture

➢ Transducer Design and Manufacture

➢ Complete Turn-Key System Design and Manufacture

➢ In-House Prototype Machine Shop

➢ Manufacturing

  ▪ Low-Rate Initial Production

  ▪ High-Rate Production

➢ Specialized Test of Undersea Products

➢ ISO9001:2008 Certified



*Aerial Map Of The CTG Campus*



*HC Materials Facility*

**Bolingbrook, IL, 20,000 Sq Ft**

➢ Single crystal scientists and application engineering

➢ Comprehensive crystal growth and processing

➢ Platinum crucible manufacturing, chemical batch purification, crystal orientation, machining and plasma magnetron sputtering

➢ Comprehensive testing capability

➢ ISO9001:2008 Certified

**Well capitalized, State-of-Art Facilities**

# Summary



- ➢ 54 Years of Innovation and Delivery of Value Added Products
- ➢ Comprehensive Design, Build and Test Capability
  - Advanced Materials to Complete Systems
- ➢ Focus on High-Quality / Consistent Performance / Excellent Delivery Performance
- ➢ Strong Private Equity Backing with active Strategic Advisory Board
- ➢ Excellent Track Record in Application of Advanced Materials and Electronics to Provide Our Customers with a Competitive Advantage… from Materials to Systems

**Engineered High-Quality Piezoelectric Ceramics, Sensors and Systems Since 1959**

CTG COMPANY C O N F I D E N T I A L

# EXHIBIT 18



# CTS Acquires Market Leader of Piezoelectric Single Crystals for the Medical Industry

March 14, 2016 08:32 AM Eastern Daylight Time

LISLE, Ill.--(BUSINESS WIRE)--CTS Corporation (NYSE: CTS) has announced the acquisition of CTG Advanced Materials, LLC (CTG-AM) for $73 million in cash. CTG-AM, formerly operated as H.C. Materials, is the market leading designer and manufacturer of single crystal piezoelectric materials, serving major Original Equipment Manufacturers throughout the medical marketplace. These materials enable high definition ultrasound imaging (3D and 4D), as well as intravascular ultrasound technology. Other applications for these materials include wireless pacemakers, implantable hearing aids and defense technologies.

Located in Bolingbrook, Ill., CTG-AM was founded in 1997 and since 2013 has been a portfolio company of Blue Wolf Capital Fund II, L.P. CTG-AM is the only company to have vertically integrated its entire single crystal manufacturing process. With the acquisition of CTG-AM, CTS gains intellectual property and proprietary manufacturing methods that expand its offering of piezoelectric materials. This allows CTS to become the leading large-scale commercial producer of both single crystal materials and traditional piezoelectric ceramics.

"CTG-AM's market leadership, technological expertise and winning spirit are a perfect fit for CTS," stated Kieran O'Sullivan, CEO of CTS Corporation. "The acquisition of CTG-AM increases CTS' involvement in the medical industry, and expands our portfolio of products and technologies around the categories of Sense, Connect and Move."

**About CTS**

CTS (NYSE: CTS) is a leading designer and manufacturer of sensors, actuators and electronic components to OEMs in the aerospace, communications, defense, industrial, information technology, medical and transportation markets. CTS manufactures products in North America, Europe and Asia.

**About Blue Wolf Capital Partners**

Blue Wolf Capital Partners LLC, a private equity firm founded in 2005, specializes in control investments in middle-market companies. Leading by experience, and with a reputation for excellence, Blue Wolf transforms companies. Combining a collaborative approach with strategic and operations resources, Blue Wolf manages challenging situations and complex relationships between business, customers, employees and regulators to build value for stakeholders. For additional information, please visit www.bluewolfcapital.com.

# Contacts

CTS Corporation

Nick Hajewski, Marketing Communications Manager, +1 630-577-8865

E-mail: nick.hajewski@ctscorp.com

# EXHIBIT 19

## Ewelina Johnson

| | |
|---|---|
| **From:** | Lynn Chen |
| **Sent:** | Tuesday, January 26, 2016 5:20 PM |
| **To:** | Cheryl Hanna |
| **Cc:** | Art Ortega |
| **Subject:** | Re: BDO statement to Blue Wolf forwarded to you |

No, we need to pay and book it to BWP to consulting

>>> On 1/26/2016 at 3:11 PM, in message <56A78FF1.8D9F.00F8.0@channeltech.com>, Cheryl Hanna <Hanna@channeltech.com> wrote:

If it's for CTGAM, I can book it to intercompany in CTG to CTGAM and we can pay it, or I can send the invoice to CTGAM to pay it themselves, or we can book pay it in CTG and book it in BWP. Since I don't know what it is for, I don't know which is the correct option. I'll get an invoice and then I'll let you decide once we see what we are getting billed for.

Cheryl

>>> Lynn Chen 1/26/2016 3:02 PM >>>
I dont know about it except that BDO was doing some work for Advanced Materials. So, this would normally be charged to BWP and you definitely dont need to pay it this week. Go ahead and ask for an invoice(s). Do you know where they came from (who gave it to Lia)?

>>> On 1/26/2016 at 2:41 PM, in message <56A78B91.8D9F.00F8.0@channeltech.com>, Cheryl Hanna <Hanna@channeltech.com> wrote:
Hi Lynn

Lia put a statement from BDO on my chair because it was with the Holland and Knight invoices she was given. Am I to pay this? The statement was originally mailed to Blue Wolf so I am assuming they are telling us that we should pay it. Is it okay for me to call BDO and ask for an invoice? The statement doesn't tell me anything. Also, it's for 69,752.14 invoice dated 12/09. Am I to pay it this week? Does it reduce the 300K AP Art said we should pay this week? Damon's Critical list alone was 316K. Mine for CTG is 56K (once again ignoring the 16K customer reimbursements we owe from Aug.) I'm about to look at EOI's aging now.

Thanks,
Cheryl

# EXHIBIT 20

**Ewelina Johnson**

---

**From:**         Lynn Chen
**Sent:**          Tuesday, January 05, 2016 8:39 PM
**To:**            Cheryl Hanna
**Cc:**            Art Ortega
**Subject:**       Re: Funds transfer to CTGAM

Ok

> On Jan 5, 2016, at 6:27 PM, Cheryl Hanna <Hanna@channeltech.com> wrote:
>
> I still need to send CTGAM 100K to cover their payroll, but do you want me to go ahead and send them 75K for AP? They had originally asked for 150K, but since they got 74K in today, I'm guessing I can get away with just sending the 75K.  We do have confirmations for tomorrow from BAE 135K and Northrop 601K so we have the money.
>
> Thanks,
> Cheryl

# EXHIBIT 21

**Ewelina Johnson**

| | |
|---|---|
| **From:** | Lynn Chen |
| **Sent:** | Wednesday, December 02, 2015 8:19 PM |
| **To:** | Cheryl Hanna |
| **Cc:** | Art Ortega |
| **Subject:** | Re: AP Selections  345,579.22 (includes the 56,991.00 for Nabertherm that was supposed to be 80k last week) |

Go ahead and borrow and pay all that you have this week.
Thanks

>>> On 12/2/2015 at 6:14 PM, in message <565F3729.8D9F.00F8.0@channeltech.com>, Cheryl Hanna wrote:

Is that 250K including the 56,991.00 for Nabertherm that was supposed to go out last week?  This week's selections were 288K so we are over 38k.  Do you want me to take off some of mine or Terry's to try to get to 250K?  We would still be short 60K unless anything more money comes in tomorrow that we didn't know about.  CTGAM has only had a deposit on Monday and I took 275K from that as John Hager said that's what he could give us.  He still has 63K available, but he probably is still doing payments this week.


Cheryl

>>> Lynn Chen 12/2/2015 6:07 PM >>>
Hi Cheryl,
Ok.  We were only going to pay out $250k or so per our cash flow.  I suppose all of this is critical? If so, go ahead and borrow what we need to pay these. Do you know if AM has extra cash?
Thanks, lynn

>>> On 12/2/2015 at 6:05 PM, in message <565F3439.8D9F.00F8.0@channeltech.com>, Cheryl Hanna <Hanna@channeltech.com> wrote:
Damon added another 66K for NRL to keep to Terry's original schedule that he had given them that I did not adhere to because that was not what was on the 11/17 file.  Damon also had to add 4,400.00 for Brylen because they won't bring back Hioki equipment (I think that's what Damon said) until we get caught up.  Terry didn't have that until next week.  Mine went up because the projections were not known by week and I have to use the current aging to see what really is due.    The one I just sent out had the most recent updated file by week.  Damon only gave me what had to be paid this week.  He didn't look any further for adjusting the future payments so I left Terry's schedule out there.  Does that answer your question?


Cheryl



>>> Lynn Chen 12/2/2015 5:40 PM >>>

Cheryl,

This went up by about $100k for Terry/Damons input for this week (from the schedule that you sent out to be updated to this one now).  Do you know why?  We still need a schedule that goes out by week, do you have that?

Thanks, lynn

>>> On 12/2/2015 at 5:29 PM, in message <565F9AF8.A8A : 170 : 37913>, Cheryl Hanna <> wrote:
I've attached the updated selections on the combined file and also the detail files from each company that I will use to select from Plex and so you can see the detail and the real days since the combined file has the days old from a 11/17 aging.  I did pick some old invoices that were not very much money on vendors I normally don't select.  They total around 10K so I can take them off if you want.  You can filter on the "x" on column "U" if you want to see what I'm talking about.  I already know of 96,620.00 that is supposed to be deposited in our account tomorrow from Alcon and Raytheon.  After that we will still be short about 100K to cover all of this.  We will need to borrow tomorrow morning before 9:00 to get the funds in our account tomorrow.  Damon's list is critical.  He only picked 4 suppliers, but I kept what Terry had for this week also.    I didn't include Sergio or Katherine on this until it's approved.


Cheryl

CTG257,627.44
EOI27,649.61
MSI3,311.17
288,588.22
56,991.00 ARSEN LAST WEEK'S 80k
345,579.22

# EXHIBIT 22

| | |
|---|---|
| **From:** | Lynn Chen |
| **To:** | Sergio De Hoyos |
| **Subject:** | Re: Fwd: 2016 Budget - Revenues meeting |
| **Date:** | Thursday, January 21, 2016 1:43:50 PM |

Sergio,

When you do this, can you do it in this format:

|  | **Year Total** |
|---|---|
| **Ceramics** | **4,340,074** |
| **Sensors Total** | **30,646,422** |
| *MK-54* | 5,051,938 |
| *TR-343* | 2,900,000 |
| *CPFF* | 4,472,856 |
| *FFP Shipments* | 18,221,628 |
| ***CTG*** | **34,986,496** |
| **Optics** | **5,455,226** |
| ***Santa Barbara*** | **40,441,722** |
| **CTG AM** | **14,817,039** |
| ***CTG Total*** | **55,258,762** |

>>> On 1/21/2016 at 5:50 AM, in message <56A0E215.875 : 248 : 56735>, Lynn Chen <lchen@channeltech.com> wrote:

> Sergio,
>
> Can you give me a one pager for Revenues today that shows 2015 Budget, 2015 Actuals and 2016 Budget by business with the biggest variances by customer or program? I know there is still the POC change to do but can I get one version pre-change and we'll do one after?

Thanks,

Lynn

Begin forwarded message:

> **From:** "Lynn Chen" <LChen@channeltech.com>
> **Date:** January 20, 2016 at 6:27:50 PM PST
> **To:** "Arsen Melconian" <AMelconian@channeltech.com>, "Brad Hinnrichs"
> <BHinnrichs@channeltech.com>, "Greg Hutchison"
> <GHutchison@channeltech.com>, "Maria Miller" <MMiller@channeltech.com>,
> "Tim Jock" <TJock@channeltech.com>, "Stephen Scopatz" <sscopatz@electro-optical.com>, "Brent Febo" <Bfebo@channeltech.com>, "John Mather"
> <mather@channeltech.com>
> **Cc:** "Sergio De Hoyos" <SDeHoyos@channeltech.com>
> **Subject: 2016 Budget - Revenues meeting**
>
> Hi Maria,
>
> Could you set up a meeting for Chris H and those copied on this email to review 2016 Revenues, mid-week next week?
>
> Sergio will send out the most recent Revenues Budget in the next few days to this group.
>
> Arsen, Brad, Greg, John, Tim and Steve,
>
> Could you let us know where you think you will end up for January in the mean time?
>
> Thanks, lynn

# EXHIBIT 23

**Ewelina Johnson**

---

**From:**         Lynn Chen
**Sent:**         Thursday, January 21, 2016 6:58 PM
**To:**           Art Ortega; Cheryl Hanna
**Subject:**      Fwd: Re: Equ

Yes into our CTG account since I think we only have the Escrow account for BWP, right?
So <span style="color:red">CIT account# 1311010565, ABA 322270288</span> ?

>>> On 1/21/2016 at 4:56 PM, in message <56A10F4C.8D9F.00F8.0@channeltech.com>, Cheryl Hanna <Hanna@channeltech.com>
wrote:

So the money is going to come to our CTG bank account?  I know that info, just not any BWP bank accounts :)  The
bank name is now CIT Bank and not OWB

Cheryl

>>> Art Ortega 1/21/2016 4:53 PM >>>
Lynn
See red below.  Money for cure was sent to us and then we sent to bank.
Hope this helps.

Art Ortega
Controller
Office: (805) 690-5236
Cell   : (818) 274-8008
>>> Haran Narulla <haran@bluewolfcapital.com> 12/29/2014 10:17 AM >>>
Thanks, got it.

> On Dec 29, 2014, at 13:13, Cheryl Hanna <Hanna@channeltech.com> wrote:
>
> Attached should be sufficient information.
>
> Cheryl
>
>>>> Haran Narulla <haran@bluewolfcapital.com> 12/29/2014 9:29 AM >>>
> Can you get the full info for the account, including bank location details, etc.?  They sometimes ask that for wire
funding purposes.
>

1

> On Dec 29, 2014, at 11:17 AM, "Art Ortega" <AOrtega@channeltech.com<mailto:AOrtega@channeltech.com>>
wrote:
>
> Haran
> See account information in red below.  Also attached is banking info sheet referenced by Cheryl
> ao
>
>
>
>
> Art Ortega
> Controller
> Office: (805) 690-5236
> Cell   : (818) 274-8008
> > > > Cheryl Hanna 12/29/2014 8:05 AM > > >
> That is the correct account and ABA.  Attached is the banking info sheet we send our customers in case you ever
need it and I am not available.
>
> Cheryl
>
> > > > Art Ortega 12/29/2014 7:39 AM > > >
>
> Cheryl
> See Message from Haran below.
>
> Please confirm right away that this is where the money should be wired to and is there any other info needed - i
don't think so but confirm
> .
> OWB account# 1311010565, ABA 322270288.
>
> thanks
> ao
>
>
>
>
> Art Ortega
> Controller
> Office: (805) 690-5236
> Cell   : (818) 274-8008
> > > > Haran Narulla <haran@bluewolfcapital.com<mailto:haran@bluewolfcapital.com>> 12/29/2014 6:17 AM > > >
>
> Art,
> Can you send us the wire information for your main CTG operating account?  As you know, we need to wire some
funds to OneWest to cure the financial covenant default.  The game plan is for everyone to send wires to the CTG
account, and then for you and Chris to wire the funds to OneWest Bank.  Please send the wire information along

ASAP.

>

> Thanks,

>

>

> _____

> Haranjeet Narulla

> Blue Wolf Capital Partners

> One Liberty Plaza, 52nd Floor

> New York, NY  10006

> p:   212.488.1343

> f:   646.607.3889

> haran@bluewolfcapital.com<mailto:haran@bluewolfcapital.com>

>

> Please note that all Blue Wolf Capital email addresses have changed effective December 8, 2014.

>

> <CTG banking instructions_divisions_05-2014 OWB_1 from Cheryl.pdf>

>

> <OWB CONFIRMATION LETTER ACCT 565.pdf>

# EXHIBIT 24

| | |
|---|---|
| **From:** | Lynn Chen |
| **To:** | Cheryl Hanna |
| **Cc:** | Art Ortega |
| **Subject:** | Re: EH&S Liability Accrual |
| **Date:** | Friday, January 15, 2016 2:16:54 PM |

Whatever is easiest for you, changing it now or doing a JE to fix and change later.
Thanks, lynn

>>> On 1/15/2016 at 12:08 PM, in message <5698E48C.8D9F.00F8.0@channeltech.com>, Cheryl Hanna
<Hanna@channeltech.com> wrote:

Do you want me to override the expense account on the POs that have already been received this month?
The first Advanced Geoenvironmental invoice for 2,000.00 lead awareness training was coded to 6600-01-
4000 (Ceramics training and education manufacturing)  You want all of this to 9132-00-0000 Other expenses
(non-operating), right?  If this is all part of the 640K, I need to correct every invoice that has been received
to something different than the other expense account or do a journal entry to correct the account.  I need
to make all of the invoices received + the accrual equal 640K to 9132-00-0000

Cheryl

>>> Lynn Chen 1/15/2016 11:35 AM >>>
Hi Cheryl,
Why dont you move that back to CTG for now, and accrue in CTG.
Sorry for the confusion, thanks, lynn

>>> On 1/15/2016 at 11:22 AM, in message <5698DAE4.8D9F.00F8.0@channeltech.com>, Cheryl Hanna
<Hanna@channeltech.com> wrote:
I think Lia was told to put the legal as I/C and put that on BWP books.  We already accrued
43K in Dec. in BWP for EHS on a Holland & Knight bill.  Do you want me to move that back to
CTG or accrue the whole 161,000 legal fees portion of the 640K accrual into BWP (less the 43K
already accrued)?

Cheryl

>>> Lynn Chen 1/8/2016 3:23 PM >>>
Hi Cheryl,
As discussed yesterday, please accrue $640K (see attached pdf) to accrued liabilities at
12/31/15 for the EH&S clean up project (non-Capex), less any invoices already paid or accrued
related to this project (see detail list attached of POs for reference). Lets charge all EH&S
clean up (non-Capex) to CTG CO Other Non-Operating Expenses (if possible).
Let me know if you have any questions.
Thanks, lynn

# EXHIBIT 25

**Ewelina Johnson**

| | |
|---|---|
| **From:** | Lynn Chen |
| **Sent:** | Tuesday, February 02, 2016 3:01 PM |
| **To:** | Dave Oldham |
| **Subject:** | Re: Dave expenses |

Yes if it is to be charged to BWP, we do that here.  Bill, for example is charging everything to BW first, who reimburses him, and eventually gets paid by us.

>>> On 2/2/2016 at 12:44 PM, in message <1494711272.500272.1454445844082.JavaMail.yahoo@mail.yahoo.com>, Dave Oldham <dave.oldham@ymail.com> wrote:

> BWP, so that is handled by you guys there, right? Still copying receipts, but use $35k for Feb payment as my round number guess.
>
>
> Thanks.
>
>
>
>
> **From:** Lynn Chen <LChen@channeltech.com>
> **To:** Dave Oldham <dave.oldham@ymail.com>
> **Cc:** Art Ortega <AOrtega@channeltech.com>
> **Sent:** Tuesday, February 2, 2016 2:48 PM
> **Subject:** Dave expenses
>
>
> Hi Dave,
>
> Should we be accruing any consulting or expenses for you? Will you be invoicing BW or CTG?
>
> Thanks, lynn

# EXHIBIT 26

| From: | Cheryl Hanna |
|---|---|
| To: | Art Ortega; Jane Alexander |
| Subject: | Re: Legal Confirmation Templates |
| Date: | Tuesday, March 08, 2016 5:49:09 PM |

All invoices get paid by CTG and I don't have BWP letterhead so I will just use the CTG template.

Thanks,
Cheryl

>>> "Alexander, Jane" <Jane.Alexander@us.gt.com> 3/8/2016 10:52 AM >>>
Hi Cheryl and Art,

Please see attached for legal confirmation templates. There are 3 law firms to confirm with:

1.    Under BWP - McDermott, Will, & Emery

2.    Under CTG - Holland & Knight and Tressler LLP

I wasn't sure if a separate letterhead/letter was needed for BWP, but I attached a BWP version just in case.

Thanks,

Jane Alexander | Audit - Senior Associate, CPA
Grant Thornton LLP
515 S. Flower Street, 7th Floor | Los Angeles, CA | 90071 | United States
T +1 213 596 6728
E jane.alexander@us.gt.com

www.grantthornton.com

_____
[GT Image]
<http://www.grantthornton.com/>Grant Thornton LLP is the U.S. member firm of Grant Thornton International Ltd.
<http://www.grantthornton.com/Legal> Grant Thornton International Ltd and its member firms are not a worldwide
partnership, as each member firm is a separate and distinct legal entity. In the U.S., visit Grant Thornton LLP at
www.GrantThornton.com<http://www.grantthornton.com/>.

Please consider the environment before printing this email.

Please understand that, unless expressly stated otherwise, any written advice given by Grant Thornton LLP that is
contained in, forwarded with, or attached to this e-mail is: (1) limited to the matters and potential tax consequences
specifically addressed herein, and; (2) not intended or written by Grant Thornton LLP as advice on the application
or potential application of any penalties that may be imposed under any federal, state, or foreign statute or regulation
in any manner.

This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or
privileged information. Any review, dissemination, copying, printing or other use of this e-mail by persons or
entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender
immediately and delete the material from any computer.

# EXHIBIT 27

**Ewelina Johnson**

| | |
|---|---|
| **From:** | Lynn Chen |
| **Sent:** | Tuesday, January 12, 2016 3:29 PM |
| **To:** | Cheryl Hanna |
| **Cc:** | Art Ortega; Sergio De Hoyos |
| **Subject:** | Fwd: FW: CTG rent deferral |
| **Attachments:** | Legal fees statement.pdf; Union Bank Escrow fee invoice.pdf |

Cheryl,

Could you please process this wire this week to Alta for $14,045 ($9,545 reimbursement of legal fees) and $4,500 (escrow bank fees), and charge both to BWP GL? Let me know once it is paid.

Thanks, lynn

>>> On 1/12/2016 at 1:10 PM, in message <382910a7aa52431b96886448872358d6@bw-prod-exch.blue-wolf.com>, Charlie Miller <charlie@bluewolfcapital.com> wrote:

Lynn:

See below from  Tom Harding on behalf of Alta properties.

As noted, these amounts must be paid within 10 days.

Please confirm that payment has been made.

Thanks,

Charlie

**From:** Tom Harding [mailto:THARDING@seedmackall.com]
**Sent:** Tuesday, January 12, 2016 4:07 PM
**To:** Charlie Miller <charlie@bluewolfcapital.com>
**Cc:** Apieh Claybrook <aclaybrook@altapropertiesinc.com>; Ralph Phillips <RPhillips@channeltech.com>; Lynn Chen <LChen@channeltech.com>
**Subject:** CTG rent deferral

Charlie

I hope your new year is off to a good start.

I am following up on Section 7 of the letter agreement dated December 9, 2015 executed by BW Piezo Holdings, Channel Technologies Group, and Alta Properties.  It provides that  BWP and CTG will reimburse Alta for legal fees incurred in connection with the negotiation and preparation of the letter agreement.  Attached is our firm's statement in the amount of $9,545.00. The letter agreement provides for payment within 10 days.

Separately, Union Bank (the escrow agent for the transaction) belated determined that it had not billed the annual escrow fee on the environmental escrow for the last three years.  Accordingly, it withheld $9,000 (three years at $3,000 per year) from the final disbursement paid to Alta.  Union Bank's invoice is attached. Section 7 of the Environmental Escrow Agreement provides that BWP and Alta are each responsible for 50% of all fees.  Accordingly, BWP should reimburse Alta for $4,500.00.

Please arrange for a wire transfer of both of these amounts to Alta using the following wire transfer instructions:

| | |
|---|---|
| Bank Name: | Wells Fargo Bank, N.A. |
| Address: | 1026 Anacapa St., Santa Barbara, CA 93101 |
| ABA No.: | 121000248 |
| Account No.: | 153-433-5441 |
| Account Name: | Alta Properties, Inc. (f/k/a Channel Technologies,  Inc.) |

Best regards.

Tom

Thomas N. Harding
Seed Mackall LLP

1332 Anacapa St., Suite 200
Santa Barbara, CA 93101
Phone: (805) 963-0669
Fax: (805) 435-1498
E-Mail:  tharding@seedmackall.com

_This e-mail message and any attachments are intended only for the use of the addressee(s) named above and may contain information that is confidential or subject to attorney-client privilege and/or the attorney work product privilege. If you are not an intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you received this e-mail message in error, please immediately notify the sender by replying to this message or by telephone and delete this e-mail message from your computer._

# EXHIBIT 28

**Ewelina Johnson**

| | |
|---|---|
| **From:** | Lynn Chen |
| **Sent:** | Saturday, December 26, 2015 8:53 AM |
| **To:** | David Ligon; Ryan Lassen |
| **Cc:** | Ralph Phillips; Jeremy Kogler |
| **Subject:** | CTG November MD&A |
| **Attachments:** | CTG November 2015 MD&A - Lender Group.pdf; November 2015 CTG Financials - Lender Group.xlsx |

Hi all,

November results attached.  Let me know if you have any questions or would like to set up a call.

Thanks, and very happy holidays!

lynn

 **Channel Technologies Group**

**November 2015 Monthly Operating Report**

**Management Discussion & Analysis (MD&A) — Lender Group**

# November 2015 Summary


**Channel Technologies Group**

# November Results - Summary

- No reportable Safety incidents in November
- Sales for the month of $3,696K, unfavorable to Plan by $1,095K and unfavorable to last Board Forecast by $183K
- Bookings for the month of $3,899K, unfavorable to Plan by 1,662K
- Backlog at the end of November of $31.5M, down $0.9M from October and below Plan of $36.5M
- Gross Margin for the month at 23% vs. 49% Plan (variance -$1,501K) and 36% Forecast (variance -$856K), primarily driven by mix of low margin sales for all divisions, inventory adjustments in Santa Barbara (scrap, cycle retires), and under absorption of overhead
- SG&A for the month favorable to Plan by $500K and favorable to Forecast by $148K, due primarily to positive headcount trends, cost containment & reduction actions, as well as savings from MSI integration
- Management EBITDA for the month of $248K vs. $1,300K Plan and $1,005K Forecast negatively driven by volume, gross margin, with some offset by favorable SG&A
- $1,288K Bank EBITDA vs. $1,684K Plan
- $2.1M Liquidity; $7.9M Revolver o/s vs. $2.9M plan
- Net Working Capital at $10.7M (slightly down by $0.2M from the end of October) vs Budget of $7.6M – driven by increase in an current liabilities ($0.8M), partially offset by an increase in AR/Unbilled ($0.3M) and increase in Inventory ($0.3M) during the month
- YTD Capital Expenditures of $2.3M, below Plan of $2.6 YTD, with full year expected to be below Plan of $2.8M
- MSI Integration on-track; Project-to-date costs of $930K vs. original plan of $1.7M; Annualized Hard Cost Savings of $1.0M, favorable to budget of $0.4M

 Channel Technologies Group

# Safety



|  | Dec-14 | Jan-15 | Feb-15 | Mar-15 | Apr-15 | May-15 | Jun-15 | Jul-15 | Aug-15 | Sep-15 | Oct-15 | Nov-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| # Recordables | - | 1 | - | 2 | 1 | - | - | 1 | 1 | - | - | - |
| Headcount | 305 | 305 | 310 | 309 | 301 | 304 | 288 | 286 | 273 | 274 | 267 | 262 |
| RIR | 1.5 | 1.9 | 1.9 | 2.5 | 2.9 | 2.5 | 2.0 | 2.4 | 2.8 | 2.8 | 2.5 | 2.1 |

- No reportable incidents in November
- Company reinforcing training to reduce RIR, avoidable accidents

 **Channel Technologies Group**

# Combined Company Results – P&L

| COMBINED COMPANY (CTG SBA, AM, MSI) | Nov 15 Month Actual | Nov 15 Month Plan | Variance | Var% | Nov 15 YTD Actual | Nov 15 YTD Plan | Variance | Var% |
|---|---|---|---|---|---|---|---|---|
| Revenue | 3,696 | 4,791 | (1,095) | -23% | 46,329 | 52,911 | (6,582) | -12% |
| Cost of Sales | 2,859 | 2,453 | (406) | -17% | 29,735 | 30,488 | 752 | 2% |
| Gross Margin | 837 | 2,338 | (1,501) | -64% | 16,594 | 22,423 | (5,829) | -26% |
|  | 23% | 49% | -26% |  | 36% | 42% | -7% |  |
| SG&A | 1,012 | 1,511 | 499 | 33% | 14,029 | 17,352 | 3,322 | 19% |
| (Inc. R&D, B&P) |  |  |  |  |  |  |  |  |
| Operating Income | (175) | 826 | (1,001) | -121% | 2,564 | 5,071 | (2,507) | -49% |
| Management EBITDA | 248 | 1,300 | (1,052) | -81% | 7,461 | 10,074 | (2,613) | -26% |
| % of Sales | 6.7% | 27.1% |  |  | 16.1% | 19.0% |  |  |
| Bank EBITDA | 1,288 | 1,684 | (397) | -24% | 8,500 | 10,458 | (1,958) | -19% |

- Revenues for November below October Board Forecast at Ceramics (-$35K), Systems (-$146K), and Optics (-$131K), and favorable to Forecast at AM (+$54K), Transducers (+$35K) and MSI (+$30K)

- GM% behind plan and behind forecast for the month primarily due to under absorption of overhead costs in Santa Barbara, mix of lower margin sales, plus higher inventory adjustments (scrap and cycle retires) during the month than planned

- SG&A favorable to plan and to forecast, including R&D, B&P Expenses, primarily due to headcount and cost containment actions in place, and lower MSI integration costs.


**Channel Technologies Group**

# Combined Company Results – Balance Sheet

| BALANCE SHEET | 30-Nov Month Actual | 30-Nov Month Plan | Var ($) | Var% |
|---|---|---|---|---|
| *Summary* | | | | |
| Cash | 225 | 249 | *(24)* | -10% |
| Accounts Receivable | 7,405 | 8,816 | *(1,411)* | -16% |
| Unbilled A.R. | 3,734 | 1,291 | *2,442* | 189% |
| Inventory | 9,360 | 6,453 | *2,907* | 45% |
| Other Current Assets | 870 | 857 | *13* | 2% |
| **Total Current Assets** | **21,594** | **17,667** | ***3,927*** | **22%** |
| Fixed Assets | 12,662 | 12,402 | *260* | 2% |
| Other Non-Current Assets | 56,320 | 63,230 | *(6,910)* | -11% |
| **Total Assets** | **90,576** | **93,299** | ***(2,723)*** | **-3%** |
| | | | | |
| Accounts Payable | 3,242 | 1,602 | *1,640* | 102% |
| Deferred Revenue | 1,620 | 1,715 | *(95)* | -6% |
| Other Current Liabilities | 5,789 | 6,528 | *(739)* | -11% |
| **Total Current Liabilities** | **10,651** | **9,845** | ***805*** | **8%** |
| | | | | |
| Revolver | 7,950 | 2,931 | *5,019* | 171% |
| Long-Term Debt | 43,015 | 41,208 | *1,807* | 4% |
| *Less Current Portion* | (3,003) | (2,519) | *(484)* | 19% |
| Other Liabilities | 1,164 | 6,603 | *(5,440)* | -82% |
| **Total Long-Term Liabilities** | **49,126** | **48,224** | ***902*** | **2%** |
| Equity | 30,800 | 35,230 | *(4,430)* | -13% |
| **Total Liabilities & Equity** | **90,576** | **93,299** | ***(2,723)*** | **-3%** |

- **AR (incl. Unbilled) -** $1M higher than Plan and increase of $0.3M from October.  DSO decreased from 43 to 52 during November due to TR-343 milestone billing of $1.1M not in revenue (POC revenue recognition), collected in December.

- **Inventory** - $2.9M higher than Plan and slight increase of $0.3M from October. Inventory turns decreased slightly from 3.8 to 3.7 during November, consistent with to buildup from MK-54, TR-343 and BAE programs.

- **Revolver -** $5.0M unfavorable to Plan, due to delays in shipments of some major programs and cash outlay to build inventory and investments at AM and Ceramics.

- **Long-Term Debt -** $1.3M unfavorable to plan, due to borrowing against Capex Term Loan.



Channel Technologies Group

Confidential    5

# Performance Summary – Key Metrics











**Channel Technologies Group**

Confidential | 6

# Bank Covenant Compliance - November

| | Actual Jan-15 | Actual Feb-15 | Actual Mar-15 | Actual Apr-15 | Actual May-15 | Actual Jun-15 | Actual Jul-15 | Actual Aug-15 | Actual Sep-15 | Actual Oct-15 | Actual Nov-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Management EBITDA | $536,100 | $984,936 | $1,304,615 | $533,495 | $457,671 | $461,596 | $583,602 | $432,610 | $1,401,102 | $516,490 | $248,373 |
| HC Integration Costs Add-Back | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Equity Cure | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| EBITDA incl HC Integ. And Cure | $536,100 | $984,936 | $1,304,615 | $533,495 | $457,671 | $461,596 | $583,602 | $432,610 | $1,401,102 | $516,490 | $248,373 |
| | | | | | | | | | | | |
| LTM EBITDA | $9,802,131 | $10,173,280 | $10,397,986 | $10,550,690 | $9,878,574 | $9,024,151 | $9,298,454 | $9,080,090 | $8,988,591 | $8,434,597 | $7,669,737 |
| Annualized Cost Savings | 611,106 | 877,262 | 852,738 | 942,270 | 827,329 | 1,018,916 | 873,366 | 727,053 | 1,049,088 | 878,803 | 1,039,257 |
| LTM Adjusted EBITDA | $10,413,237 | $11,050,542 | $11,250,725 | $11,492,960 | $10,705,903 | $10,043,067 | $10,171,820 | $9,807,143 | $10,037,679 | $9,313,400 | $8,708,994 |
| | | | | | | | | | | | |
| Net Funded Debt | $48,451,750 | $48,601,750 | $48,606,077 | $49,606,077 | $48,956,077 | $48,410,404 | $49,110,404 | $49,560,404 | $48,364,732 | $51,864,732 | $50,964,732 |
| | | | | | | | | | | | |
| Leverage ratio | 4.65x | 4.40x | 4.32x | 4.32x | 4.57x | 4.82x | 4.83x | 5.05x | 4.82x | 5.57x | 5.85x |
| Senior Covenant | -- | -- | 5.10x | – | – | 5.00x | – | – | 4.85x | – | – |
| Junior Covenant | -- | -- | 5.35x | – | – | 5.25x | – | – | 5.10x | – | – |
| | | | | | | | | | | | |
| Monthly interest expense | 284,402 | $272,312 | $301,213 | $290,852 | $278,580 | $298,140 | $291,836 | $285,356 | $308,064 | $299,489 | $298,174 |
| Quarterly Term Loan Reduction | -- | -- | 545,673 | – | – | 545,673 | – | – | 545,673 | – | – |
| | | | | | | | | | | | |
| TTM Principal Payments | $1,743,750 | $1,743,750 | $1,901,923 | $1,901,923 | $1,901,923 | $2,060,096 | $2,060,096 | $2,060,096 | $2,218,268 | $2,218,268 | $2,218,268 |
| TTM Interest Payments | 3,597,825 | 3,581,751 | 3,591,621 | 3,574,123 | 3,539,212 | 3,538,156 | 3,539,201 | 3,534,337 | 3,530,334 | 3,531,397 | 3,549,541 |
| TTM Fixed Charges | $5,341,575 | $5,325,501 | $5,493,543 | $5,476,046 | $5,441,135 | $5,598,252 | $5,599,296 | $5,594,433 | $5,748,603 | $5,749,666 | $5,767,810 |
| | | | | | | | | | | | |
| LTM Adjusted EBITDA | $10,413,237 | $11,050,542 | $11,250,725 | $11,492,960 | $10,705,903 | $10,043,067 | $10,171,820 | $9,807,143 | $10,037,679 | $9,313,400 | $8,708,994 |
| Less: Capital Expenditures | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) |
| LTM Adjusted EBITDA less CapE | $9,913,237 | $10,550,542 | $10,750,725 | $10,992,960 | $10,205,903 | $9,543,067 | $9,671,820 | $9,307,143 | $9,537,679 | $8,813,400 | $8,208,994 |
| | | | | | | | | | | | |
| Fixed Charge Coverage ratio | 1.86x | 1.98x | 1.96x | 2.01x | 1.88x | 1.70x | 1.73x | 1.66x | 1.66x | 1.53x | 1.42x |
| Senior Covenant | -- | -- | 1.25x | – | – | 1.25x | – | – | 1.25x | – | – |
| Junior Covenant | -- | -- | 1.08x | – | – | 1.08x | – | – | 1.08x | – | – |
| | | | | | | | | | | | |
| Net Funded Debt | | | | | | | | | | | |
| Revolver | 5,500,000 | $5,650,000 | $6,200,000 | $7,200,000 | $6,550,000 | $6,550,000 | $6,850,000 | $7,300,000 | $6,650,000 | $8,850,000 | $7,950,000 |
| Term Loan | 27,101,750 | 27,101,750 | 26,556,077 | 26,556,077 | 26,556,077 | 26,010,404 | 26,010,404 | 26,010,404 | 25,464,732 | 25,464,732 | 25,464,732 |
| Mezz Loans | 14,000,000 | 14,000,000 | 14,000,000 | 14,000,000 | 14,000,000 | 14,000,000 | 14,000,000 | 14,000,000 | 14,000,000 | 14,000,000 | 14,000,000 |
| Capex Line | 1,850,000 | 1,850,000 | 1,850,000 | 1,850,000 | 1,850,000 | 1,850,000 | 2,250,000 | 2,250,000 | 2,250,000 | 3,550,000 | 3,550,000 |
| Total Debt | $48,451,750 | $48,601,750 | $48,606,077 | $49,606,077 | $48,956,077 | $48,410,404 | $49,110,404 | $49,560,404 | $48,364,732 | $51,864,732 | $50,964,732 |

- MSI Annualized Hard Cost Savings are ahead of Plan at the end of November ($1,039K vs $384K Plan) and will stay ahead of Plan ($300K Plan) at the end of Q4 due to additional unplanned departures

- Leverage ratio at the end of Q4 2015 will be very tight against covenant of 4.75x due to higher debt balances and lower EBITDA than Plan.

- Fixed Charge ratio should continue to be ahead of Q4 2015 covenant of 1.15x

**Channel Technologies Group**

Confidential

7

# Sales, Bookings, Backlog

 **Channel Technologies Group**

# Sales vs. Forecast*

| | MONTH (NOV) ACTUAL | MONTH (NOV) FORECAST | VARIANCE | VARIANCE RATIONALE |
|---|---|---|---|---|
| **REVENUE:** | | | | |
| **CERAMICS** | $ 288,945 | $ 330,324 | $ (41,379) | Syqwest $49K unfav to forecast (due to credit issued) |
| **TRANSDUCERS** | $ 1,092,275 | $ 1,594,420 | $ (502,145) | POC revenue ($324K) unfav to fcst BAE ($162K) unfav to fcst (delay) NUWC ($201K) unfav to fcst |
| **SYSTEMS** | $ 668,702 | $ 815,000 | $ (146,298) | AAS ($136K) unfav to fcst |
| **OPTICS** | $ 221,020 | $ 478,963 | $ (257,943) | Nightline ($180K) unfav to fcst New Business ($58K) unfav to fcst |
| **ADV MAT** | $ 1,054,796 | $ 1,094,951 | $ (40,155) | InfraredX ($63K) unfav to fcst |
| **MSI** | $ 446,769 | $ 395,072 | $ 51,697 | MK-54/Progeny $194K fav to fcst; AQS-20 ($127K) unfav to fcst |
| **INTERCOMPANY** | $ (76,646) | $ - | $ (76,646) | |
| **TOTAL CTG REVENUE** | $ 3,695,859 | $ 4,708,729 | $ (1,012,870) | |

\* Forecast presented at Q3 Board Meeting in October


**Channel Technologies Group**

# Sales vs. Budget (Plan)

| | MONTH (NOV) ACTUAL | MONTH (NOV) BUDGET | VARIANCE | VARIANCE RATIONALE |
|---|---|---|---|---|
| **REVENUE:** | | | | |
| **CERAMICS** | $ 288,945 | $ 623,380 | $ (334,435) | Syqwest ($39K) unfav to plan (credit issued); Ultra Electronic ($30K) unfav to plan Ultra-USSI ($35K) unfav to plan; ENL, Kodak, Tenex ($25K) ea. unfav to plan |
| **TRANSDUCERS** | $ 1,092,275 | $ 1,157,815 | $ (65,541) | POC Revenue $464K fav to plan; OTAA ($250K) unfav to plan; DT-511/574 ($70K) unfav to plan; Colleague Medical ($100K unfav to plan) |
| **SYSTEMS** | $ 668,702 | $ 799,142 | $ (130,440) | Navy ($42K) unfav to plan |
| **OPTICS** | $ 221,020 | $ 497,137 | $ (276,117) | Nightline/NV Goggles ($78K) unfav to plan Catalog / Repairs & Cal under plan |
| **ADV MAT** | $ 1,054,796 | $ 1,084,098 | $ (29,302) | Philips ($183K) unfav to plan; Samsung $135K fav to plan |
| **MSI** | $ 446,769 | $ 629,549 | $ (182,780) | MLTA program delay to FY16 |
| **INTERCOMPANY** | $ (76,646) | $ - | $ (76,646) | |
| **TOTAL CTG REVENUE** | $ 3,695,859 | $ 4,791,121 | $ (1,095,262) | |



**Channel Technologies Group**

# Bookings / Backlog vs Plan

| BOOKINGS | Nov 15 Month Actual | Nov 15 Month Plan | Variance | Var% | | Nov 15 YTD Actual | Nov 15 YTD Plan | Variance | Var% |
|---|---|---|---|---|---|---|---|---|---|
| TOTAL COMPANY | 3,899 | 5,562 | (1,662) | -30% | | 44,506 | 55,463 | (10,958) | -20% |
| Ceramics | 65 | 599 | (534) | -89% | | 1,790 | 5,529 | (3,740) | -68% |
| Transducers | (16) | 2,160 | (2,176) | -101% | | 14,462 | 16,410 | (1,948) | -12% |
| Systems | 1,569 | 411 | 1,158 | 282% | | 9,837 | 7,868 | 1,969 | 25% |
| Optics | 619 | 482 | 136 | 28% | | 4,381 | 5,810 | (1,429) | -25% |
| Advanced Materials | 1,663 | 1,788 | (125) | -7% | | 12,561 | 12,478 | 83 | 1% |
| MSI | - | 121 | (121) | -100% | | 1,473 | 7,367 | (5,894) | -80% |

**Bookings**:

- Ceramics behind Plan due to focus on improving operational issues during the year.  November Plan included $117K in Defense customers not booked, plus $120K Ultrasonic, and $180K Western Geco. YTD negative variance primarily due to Defense customers, largest being Ultra Electronics (-$1.2M).

- Transducers Plan in November included $1M for MK-48 (not yet booked), and actuals included a debooking for RA Industries of $668K.  YTD positive to Plan for BAE ($2.1M) and MK-54 ($7M), negative for TR-343 (-$2.7M), MK-54 Mod 0 ($2.5M), Ion ($0.7M) and Baxter ($0.6M)

- Systems ahead YTD primarily due to Navy NT-120/121 $4.0M ($1.4M Plan)

- Optics behind primarily due to lower NV goggles bookings (YTD $0.4M Actuals vs $1.2M Plan YTD)

- AM unfavorable for the month due to Samsung ($-180K), partially offset by a positive variance for Humanscan (+$49K), partially offset by Philips.  YTD actuals include Samsung $2.5M ($2.2M Plan), Philips $5.0M ($5.1M Plan), GE $2.4M ($2.9M Plan)

- MSI YTD actuals include AQS-20 partial award of $.4M with additional $1.6M to book in December ($1.1M Plan), MLTA $0 ($2.0M Plan), Atlas delayed ($.8M Plan), Archerfish ($.6M Plan) and SAES $.1M ($.7M Plan) awarded late.

| BACKLOG | Nov 15 Month Actual | Nov 15 Month Plan | Variance | Var% |
|---|---|---|---|---|
| TOTAL COMPANY | 31,499 | 36,468 | (4,969) | -14% |
| Ceramics | 2,227 | 4,572 | (2,345) | -51% |
| Transducers | 15,522 | 15,850 | (328) | -2% |
| Systems | 4,403 | 3,201 | 1,201 | 38% |
| Optics | 1,975 | 3,070 | (1,094) | -36% |
| Advanced Materials | 6,368 | 6,139 | 229 | 4% |
| MSI | 1,004 | 3,636 | (2,632) | -72% |

**Backlog** – behind Plan due to lower bookings in November for all divisions, except Systems, due to timing vs Plan or weak order activity as noted in Bookings variance explanation

**Channel Technologies Group**

# Divisional Results



# Ceramics

| CERAMICS | Nov 15 Month Actual | Nov 15 Month Plan | Variance $ | Var% | Nov 15 YTD Actual | Nov 15 YTD Plan | Variance | Var% |
|---|---|---|---|---|---|---|---|---|
| **Revenue** | **289** | **623** | *(334)* | *-54%* | **3,925** | **5,319** | *(1,394)* | *-26%* |
| **Cost of Sales** | **752** | **457** | *(295)* | *-65%* | **5,546** | **5,162** | *(384)* | *-7%* |
| **Gross Margin** | **(463)** | **166** | **(629)** | **-378%** | **(1,621)** | **157** | **(1,778)** | **-1133%** |
| GM% | *-160%* | *27%* | *-187%* | | *-41%* | *3%* | *-44%* | |
| **SG&A** | **8** | **2** | *(6)* | *-278%* | **26** | **22** | *(4)* | *-20%* |
| (Inc. R&D, B&P) | | | | | | | | |
| **Operating Income** | **(470)** | **164** | **(635)** | **-386%** | **(1,648)** | **135** | **(1,782)** | **-1321%** |
| **Management EBITDA** | **(419)** | **228** | *(647)* | *-283%* | **(1,079)** | **732** | *(1,811)* | *-247%* |
| *% of Sales* | *-145.0%* | *36.6%* | | | *-27.5%* | *13.8%* | | |

- Sales for the month behind Plan but in line with last Forecast (excluding the Syqwest credits).  Largest customers for the month included Alcon Surgical ($92K), Ultra Electronics ($57K), Kaiyo ($39K), and Syqwest ($38K shipped less credits of $47K)

- Operating Income and EBITDA below Plan, due to unfavorable inventory adjustments ($323K) from scrap and inventory clean up efforts, plus under absorption of OH ($138K).

- Ceramics KPIs show consistent performance in November as the recent months:
  - Consistent G/L scrap charges ~$45K vs $50K in October (over $100K per month during most of 1H)
  - Overtime % at 3.1%, slightly up from 1.7% in October (down from over 14.0% in Q1)
  - Low utilization for the month at 62% (over 80% since June)
  - Continued high yield for the month at 89% (89% in October and 62% target)


**Channel Technologies Group**

# Transducers

| TRANSDUCERS | Nov 15 Month Actual | Nov 15 Month Plan | Variance | Var% | Nov 15 YTD Actual | Nov 15 YTD Plan | Variance | Var% |
|---|---|---|---|---|---|---|---|---|
| Revenue | 1,092 | 1,158 | (66) | -6% | 13,022 | 14,642 | (1,620) | -11% |
| Cost of Sales | 746 | 722 | (24) | -3% | 8,683 | 9,924 | 1,241 | 13% |
| Gross Margin | 346 | 435 | (90) | -21% | 4,339 | 4,718 | (379) | -8% |
| GM% | 32% | 38% | -6% | | 33% | 32% | 1% | |
| SG&A | 18 | 86 | 68 | 79% | 621 | 948 | 326 | 34% |
| (Inc. R&D, B&P) | | | | | | | | |
| Operating Income | 328 | 349 | (21) | -6% | 3,718 | 3,770 | (53) | -1% |
| Management EBITDA | 338 | 367 | (29) | -8% | 3,833 | 3,905 | (71) | -2% |
| % of Sales | 30.9% | 31.7% | | | 29.4% | 26.7% | | |

- Sales for the month behind Plan but in line with forecast. Largest shipments for the month included MK-54 OY1 ($449K), TR-343 ($139K), MK-54 ($72K), BAE ($110K) and NUWC ($65K). YTD variance primarily due to delays in MK-54 and TR-343 deliveries.

- Gross Margin for the month unfavorable to Plan due to higher mix of low margin programs (MK-54 at 15%, MK-54 OY1 at 14%, TR-343 at 0%), under absorption on OH ($83K), offset by positive inventory adjustments ($117KK). YTD GM in line with Plan.

- SG&A favorable to Plan by for the month and YTD due to lower direct R&D and B&P charged to Transducers ($72K for the month and $330K YTD)

- EBITDA in line with Plan for the month and YTD

 **Channel Technologies Group**

Confidential    14

# Systems

| SYSTEMS | Nov 15 Month Actual | Nov 15 Month Plan | Variance | Var% | Nov 15 YTD Actual | Nov 15 YTD Plan | Variance | Var% |
|---|---|---|---|---|---|---|---|---|
| Revenue | 669 | 799 | (130) | -16% | 8,922 | 8,154 | 768 | 9% |
| Cost of Sales | 466 | 508 | 42 | 8% | 5,545 | 5,846 | 301 | 5% |
| Gross Margin | 202 | 291 | (89) | -30% | 3,376 | 2,307 | 1,069 | 46% |
| GM% | 30% | 36% | -6% | | 38% | 28% | 10% | |
| SG&A | 25 | 39 | 13 | 35% | 597 | 427 | (170) | -40% |
| (Inc. R&D, B&P) | | | | | | | | |
| Operating Income | 177 | 252 | (75) | -30% | 2,779 | 1,880 | 899 | 48% |
| Management EBITDA | 190 | 267 | (77) | -29% | 2,925 | 2,036 | 889 | 44% |
| % of Sales | 28.4% | 33.4% | | | 32.8% | 25.0% | | |

- Sales for the month primarily to the Navy ($576K), unfavorable to Plan and Forecast due to NT-120.

- GM unfavorable to Plan for the month due to lower margin recorded for NT-120 sales (20%) and under absorption of OH ($26K). YTD GM favorable to Plan due to mix of higher margin sales.

- SG&A favorable to Plan by for the month and YTD due to higher direct R&D and B&P charged to Systems ($14K for the month and $170K YTD)

- EBITDA unfavorable to Plan for the month due to unfavorable GM%, and favorable YTD due to mix of higher margin sales, partially offset by unfavorable SG&A



**Channel Technologies Group**

# Optics

| OPTICS | Nov 15 Month Actual | Nov 15 Month Plan | Variance | Var% | Nov 15 YTD Actual | Nov 15 YTD Plan | Variance | Var% |
|---|---|---|---|---|---|---|---|---|
| Revenue | 221 | 497 | (276) | -56% | 3,966 | 4,300 | (335) | -8% |
| Cost of Sales | 186 | 279 | 92 | 33% | 3,239 | 2,875 | (364) | -13% |
| Gross Margin | 35 | 218 | (184) | -84% | 727 | 1,426 | (699) | -49% |
| GM% | 16% | 44% | -28% | | 18% | 33% | -15% | |
| SG&A | 98 | 121 | 24 | 20% | 1,297 | 1,265 | (32) | -2% |
| (Inc. R&D, B&P) | | | | | | | | |
| Operating Income | (63) | 97 | (160) | -165% | (570) | 160 | (730) | -456% |
| Management EBITDA | (54) | 107 | (162) | -151% | (470) | 272 | (742) | -272% |
| % of Sales | -24.5% | 21.6% | | | -11.8% | 6.3% | | |

- Sales below Plan and Forecast for the month and year primarily due to Nightline shipment delays and lower catalog sales. Largest shipments for the month include Bost ($73K), Nightline ($72K) and L-3 ($63K).
- Negative GM due primarily to low sales volume and high mix of low margin sales (Nightline and L-3)
- SG&A in line with Plan for the month and YTD with higher R&D costs ($188K), offset by favorable commissions ($106K), reversal of bonus accrual ($28K) and other cost containment efforts and actions



**Channel Technologies Group**

Confidential | 16

# Advanced Materials

| ADVANCED MATERIALS | Nov 15 Month Actual | Nov 15 Month Plan | Variance | Var% | Nov 15 YTD Actual | Nov 15 YTD Plan | Variance | Var% |
|---|---|---|---|---|---|---|---|---|
| Revenue | 1,055 | 1,084 | (29) | -3% | 12,196 | 12,342 | (146) | -1% |
| Cost of Sales | 346 | 305 | (41) | -13% | 3,966 | 3,494 | (472) | -14% |
| | - | - | | | - | - | | |
| Gross Margin | 709 | 779 | (70) | -9% | 8,230 | 8,848 | (618) | -7% |
| GM% | 67% | 72% | -5% | | 67% | 72% | | |
| SG&A | 393 | 401 | 8 | 2% | 4,001 | 4,419 | 419 | 9% |
| (Inc. R&D, B&P) | | | | | | | | |
| Operating Income | 316 | 378 | (62) | -16% | 4,229 | 4,428 | (199) | -4% |
| Management EBITDA | 514 | 593 | (79) | -13% | 6,331 | 6,770 | (440) | -6% |
| % of Sales | 48.7% | 54.7% | | | 51.9% | 54.9% | | |

- November sales in line with Plan with an unfavorable variance with Philips (-$183K) offset by a favorable variance with Samsung (+$135K). Sales ahead of Forecast due to positive variances at GE ($97K), and Samsung ($93K), and a negative variance at Infraredx ($63K). Largest shipments for the month include Philips ($191K), Samsung ($363K), GE ($312K), and Humanscan ($67K),

- GM unfavorable to Plan in the month due primarily to higher temp labor and overtime costs ($31K), and higher scrap than planned.

- SG&A in line with Budget for the month, with lower benefits and costs savings, partially offset by higher sales commissions and rent. Favorable to Plan YTD primarily due to positive adjustments on bonus accruals and other cost containment efforts (lower benefits, R&D, consulting, and recruiting), partially offset by a higher allocation from CTG, legal costs and rent

- EBITDA unfavorable to Plan due to unfavorable GM for the month and YTD, partially offset by savings in SG&A

**Channel Technologies Group**

# MSI

| MSI | Nov 15 Month Actual | Nov 15 Month Plan | Variance | Var% | Nov 15 YTD Actual | Nov 15 YTD Plan | Variance | Var% |
|---|---|---|---|---|---|---|---|---|
| Revenue | 447 | 630 | (183) | -29% | 4,892 | 8,155 | (3,262) | -40% |
| Cost of Sales | 428 | 176 | (252) | -144% | 3,076 | 3,195 | 119 | 4% |
| Gross Margin | 19 | 454 | (435) | -96% | 1,817 | 4,960 | (3,144) | -63% |
| GM% | 4% | 72% | -68% | | 37% | 61% | | |
| SG&A | 131 | 364 | 233 | 64% | 2,814 | 4,459 | 1,645 | 37% |
| (Inc. R&D, B&P) | | | | | | | | |
| Operating Income | (113) | 90 | (202) | -226% | (998) | 501 | (1,499) | -299% |
| Management EBITDA | (77) | 101 | (178) | -177% | (609) | 624 | (1,233) | -198% |
| % of Sales | -17.3% | 16.0% | | | -12.4% | 7.7% | | |

- November sales lower than Plan due to delays in Alion MLTA program, but above Forecast due to a positive variance for Progeny (+$194K), partially offset by a negative variance for AQS-20 (-$127K). Largest shipments for the month include MK-54 (Progeny) ($214K), AQS-20 ($137K), and ARL-UT ($53K)
- GM unfavorable to Plan due to lower sales than Plan and high mix of low margin product
- SG&A ahead of plan due to lower integration costs and more headcount savings than planned


**Channel Technologies Group**

# CTG CO (SG&A)

| CTG CO | Nov 15 Month Actual | Nov 15 Month Plan | Variance | Var% | | Nov 15 YTD Actual | Nov 15 YTD Plan | Variance | Var% |
|---|---|---|---|---|---|---|---|---|---|
| Revenue | - | - | - | - | | - | - | - | - |
| Cost of Sales | 10 | 6 | (4) | -72% | | 274 | (7) | (281) | 3791% |
| Gross Margin | (10) | (6) | (4) | 72% | | (274) | 7 | (281) | -3791% |
| GM% | | | | | | | | | |
| SG&A | 310 | 469 | 159 | 34% | | 4,350 | 5,488 | 1,139 | 21% |
| (Inc. R&D, B&P) | | | | | | | | | |
| Operating Income | (320) | (475) | 155 | -33% | | (4,623) | (5,481) | 858 | -16% |
| Management EBITDA | (243) | (364) | 120 | -33% | | (3,471) | (4,266) | 795 | -19% |

| Cost Center | Actuals | Budget | Variance, Actuals vs. Budget (U) |
|---|---|---|---|
| 0006 - General G&A | (6,165) | 15,793 | 21,958 |
| 1000 - Office of the President | 43,371 | 119,500 | 76,129 |
| 1200 - Business Development | 46,283 | 65,470 | 19,187 |
| 1250 - Advanced Systems | 21,482 | 52,455 | 30,973 |
| 1400 - Support services (Contracts, legal) | 26,794 | 36,538 | 9,744 |
| 1401 - IT | 61,949 | 58,582 | (3,366) |
| 1402 - HR | 25,452 | 22,776 | (2,676) |
| 1600 - Accounting and Finance | 90,906 | 97,897 | 6,991 |
| | 310,071 | 469,011 | 158,940 |

- SG&A for the month favorable due to no bonus accrual booked ($73K), lower spend in Advanced Systems ($31K) and other cost containment actions in all departments

- YTD favorable due to reversal of bonuses accrued ($575K), lower spend in Advanced Systems ($238K), Finance ($148K) and BD ($68K), and cost containment efforts in all departments (less travel, lower discretionary spend, delay in hiring and increases, and PTO actions

**Channel Technologies Group**

Confidential | 19

# Overhead and SG&A



**Channel Technologies Group**

# Total SG&A, including R&D and B&P

| SG&A | Nov 15 Month Actual | Nov 15 Month Plan | Variance | Var% | Nov 15 YTD Actual | Nov 15 YTD Plan | Variance | Var% |
|---|---|---|---|---|---|---|---|---|
| TOTAL SANTA BARBARA | 458 | 717 | 259 | 36% | 6,892 | 8,151 | 1,259 | 15% |
| General G&A | 72 | 167 | 94 | 57% | 1,832 | 1,832 | 0 | 0% |
| Office of the President | 60 | 146 | 85 | 58% | 742 | 1,386 | 644 | 46% |
| Business Development | 99 | 137 | 38 | 28% | 1,435 | 1,618 | 183 | 11% |
| Advanced Systems | 21 | 52 | 31 | 59% | 250 | 487 | 238 | 49% |
| Support services | 27 | 37 | 10 | 27% | 432 | 442 | 10 | 2% |
| IT | 62 | 59 | (3) | -6% | 641 | 657 | 16 | 3% |
| HR | 25 | 23 | (3) | -12% | 272 | 293 | 21 | 7% |
| Accounting and Finance | 91 | 98 | 7 | 7% | 1,288 | 1,436 | 148 | 10% |
| CTG AM | 393 | 401 | 8 | 2% | 4,001 | 4,419 | 419 | 9% |
| MSI | 131 | 364 | 233 | 64% | 2,814 | 4,459 | 1,645 | 37% |
| BWP | 29 | 29 | (0) | 0% | 323 | 323 | - | 0% |
| TOTAL SG&A | 1,012 | 1,511 | 499 | 33% | 14,029 | 17,352 | 3,322 | 19% |

- Total SG&A variance for the month of $259K is a result of $186K favorable for SG&A and $73K favorable for R&D and B&P*.  YTD variance of $1,259K is a result of $1,318K favorable for SG&A and $59K unfavorable for R&D and B&P.

- SG&A variance, excluding R&D and B&P, is primarily due to lower costs for CTG CO (see CTG CO SG&A slide), lower commissions ($106K) and bonus ($28K) at Optics, cost containment efforts at Advanced Materials, and MSI integration costs significantly below plan

- YTD R&D and B&P variance is primarily due to higher R&D costs (-$188K) at EOI than planned for new product development (primarily NV-2500), offset by a favorable B&P variance for Transducers/Systems

*R&D and B&P costs within SG&A departments (including those charged to product lines) are included in the figures above*


Channel Technologies Group

# Overhead Spending (Santa Barbara)

| OVERHEAD | Nov 15 Month Actual | Nov 15 Month Plan | Variance | Var% | Nov 15 YTD Actual | Nov 15 YTD Plan | Variance | Var% |
|---|---|---|---|---|---|---|---|---|
| TOTAL SANTA BARBARA | 1,088 | 1,154 | 67 | 6% | 12,217 | 12,778 | 561 | 4% |
| General Overhead | 131 | 157 | 25 | 16% | 1,326 | 1,649 | 323 | 20% |
| EHS/Facilities | 248 | 226 | (23) | -10% | 2,733 | 2,518 | (215) | -9% |
| Manufacturing | 349 | 320 | (30) | -9% | 3,696 | 3,427 | (268) | -8% |
| Mat & Prod Planning | 91 | 84 | (8) | -9% | 1,138 | 977 | (161) | -16% |
| Quality | 54 | 66 | 12 | 18% | 743 | 785 | 41 | 5% |
| IMS | 21 | 29 | 8 | 27% | 253 | 297 | 44 | 15% |
| Procurement | 30 | 31 | 0 | 1% | 351 | 371 | 20 | 5% |
| Engineering | 132 | 185 | 53 | 29% | 1,617 | 2,079 | 462 | 22% |
| Program Management | 29 | 58 | 29 | 49% | 360 | 675 | 315 | 47% |

- These costs represent the actual incurred overhead costs in Santa Barbara, including Optics, before absorption

- Overhead costs in line with Plan for November overall, favorable from SB ($76K) and unfavorable from EOI (-$9K)

- YTD favorable variance to Plan from SB ($663K) and unfavorable from EOI (-$102K) due to:

  - General Overhead due to lower Depreciation & Amortization ($137K), and Business Insurance ($19K)

  - EHS/Facilities due to higher costs for EH&S, including consulting fees ($82K), higher janitorial costs ($43K), security ($11K), licenses ($17K) and higher general repairs & maintenance and facilities costs offset in Manufacturing below ($99K), slightly offset by lower payroll costs ($37K)

  - Manufacturing supplies and uniforms ($86K), recruiting costs ($19K), consulting ($35K), payroll related costs ($472K), offset by lower maintenance and facilities costs (offset in EHS above) ($96K), travel ($25K), tooling & supplies ($122K)

  - Mat & Prod Planning due to higher payroll costs ($107K), recruiting costs ($12K) and higher freight costs ($59K)

  - Engineering due to lower payroll related costs ($237K), recruiting ($47K), consulting costs ($32K), supplies ($32K), and travel ($55K)

  - Program Management due to lower payroll related costs ($314K)

**Channel Technologies Group**

# Capital Expenditures



# Capital Expenditures

**CTG CAPITAL EXPENDITURES - NOVEMBER 2015**

| Number | Description | | 2015 Jan | 2015 Feb | 2015 Mar | 2015 Apr | 2015 May | 2015 Jun | 2015 Jul | 2015 Aug | 2015 Sep | 2015 Oct | 2015 Nov | 2015 TOTAL | Nov YTD Budget | Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *CTG Santa Barbara* | | | | | | | | | | | | | | | | |
| 2014-C006-01 | Tooling - Ceramics | C | 422 | 640 | - | - | - | - | - | - | - | - | - | 1,062 | | |
| 2015-C001-01 | Multifunction Reconfigurable I/O device | C | - | 7,568 | - | - | - | - | - | - | - | - | - | 7,568 | | |
| 2015-C002-01 | Tooling requirements for pressing equipment | C | - | 18,690 | - | 9,750 | 7,255 | (590) | - | 516 | 4,800 | 9,103 | 9,338 | 58,863 | | |
| 2014-C014-01 | Blanchard | C | - | 20,000 | - | - | - | - | - | - | - | - | - | 20,000 | | |
| 2014-C018-00 | Remodel mezzanine | C | 47,630 | 38,973 | 33,413 | 5,448 | 15,764 | 11,212 | 13,987 | 2,920 | 7,707 | - | - | 177,054 | | |
| 2015-C019-01 | Environmental Chamber | C | - | 5,156 | - | - | - | - | - | - | - | - | - | 5,156 | | |
| 2012-0043-01 | New Powder Room | | - | - | 6,366 | (6,366) | - | - | - | - | - | - | - | - | | |
| 2014-C016-01 | Powder Scales | C | - | - | 5,683 | - | - | - | - | - | - | - | - | 5,683 | | |
| 2015-C005-01 | Weigh Out Improvement | C | - | - | 11,781 | - | 7,683 | 3,031 | - | - | - | - | - | 22,496 | | |
| 2014-T019-00 | Remodel 2nd floor | T | 3,285 | 52,496 | - | - | - | 1,329 | - | 210 | - | - | - | 57,319 | | |
| 2014-T020-01 | Pressers | T | 7,673 | - | - | - | - | - | - | - | - | - | - | 7,673 | | |
| 2015-T003-01 | Test Equipment | T | - | 256 | 37,232 | 132,496 | 87,149 | 131,818 | 85,729 | 17,259 | 16,153 | 1,192 | 137 | 509,421 | | |
| 2015-T004-01 | MSI move to Transducers | T | - | - | 16,633 | (1,102) | - | 400 | 648 | 705 | - | - | 174 | 17,457 | | |
| 2015-T010-01 | Motor Controller for Acoustic Tank #2 | T | - | - | - | - | 3,182 | - | - | - | - | - | - | 3,182 | | |
| 2014-S011-01 | 3 D prototype printer for engineering | S | - | 66 | - | - | - | - | - | - | - | - | - | 66 | | |
| 2015-S006-01 | Systems Engineering Computers | S | - | - | 15,734 | 50 | - | - | - | - | - | - | - | 15,783 | | |
| 2015-0007-01 | SCIF Electronic Locks | | - | - | - | 4,190 | (196) | - | 1,265 | - | - | - | - | 5,260 | | |
| 2015-0008-01 | Workstation | | - | - | - | 2,624 | 42 | - | - | - | - | - | - | 2,666 | | |
| 2013-0009-01 | Planning for Facility Modernization | | - | - | 1,071 | (1,072) | - | - | - | - | - | - | - | (1) | | |
| 2014-0017-01 | Software | | - | - | 1,215 | - | - | - | - | - | - | - | - | 1,215 | | |
| 2014-C015-01 | Inkprint System | C | - | - | - | - | - | - | 7,265 | - | - | - | - | 7,265 | | |
| 2015-0013-01 | Shredder/Alarm upgrade | | - | - | - | - | - | - | 3,153 | - | - | - | - | 3,153 | | |
| 2015-C015-01 | Security cameras | C | - | - | - | - | - | - | 7,068 | - | - | - | - | 7,068 | | |
| 2015-C014-01 | Optical CMM Inspection Equipment | C | - | - | - | - | - | - | 58,978 | 2,590 | - | - | - | 61,568 | | |
| 2015-C012-01 | Coolant filtration systemCeramic grinding | C | - | - | - | - | - | - | - | 1,040 | - | - | - | 1,040 | | |
| 2015-S017-01 | Frequency counters, engineering test lab | S | - | - | - | - | - | - | - | 3,018 | (92) | - | - | 2,926 | | |
| PLEX2015 | Plex Reimplementation 2015 | | 9,648 | 10,720 | 16,088 | 5,360 | 16,080 | 11,801 | 65,318 | 26,111 | 9,495 | 12,637 | 9,495 | 192,751 | | |
| | **CTG Santa Barbara** | | **68,658** | **154,565** | **145,215** | **151,379** | **136,959** | **159,001** | **243,409** | **54,368** | **38,064** | **22,932** | **19,143** | **1,193,694** | **1,535,667** | **341,973** |
| | | | | | | | | | | | | | | | | |
| EOI | EOI | E | - | - | - | - | - | - | - | - | - | - | - | - | 59,000 | 59,000 |
| | | | | | | | | | | | | | | | | |
| Adv Mat | Advanced Materials | AM | 71,900 | 113,609 | 109,767 | 136,680 | 323,449 | 103,058 | 79,609 | 25,810 | - | 67,083 | 30,682 | 1,061,648 | 713,000 | (348,648) |
| MSI | MSI Computers & Equipment | MSI | 5,549 | - | - | - | 5,035 | - | - | - | - | - | - | 10,584 | 276,000 | 265,416 |
| | **CTG AM/MSI** | | **77,449** | **113,609** | **109,767** | **136,680** | **328,484** | **103,058** | **79,609** | **25,810** | **-** | **67,083** | **30,682** | **1,072,231** | | |
| | | | | | | | | | | | | | | | | |
| | **TOTAL** | | **146,107** | **268,174** | **254,982** | **288,059** | **465,443** | **262,059** | **323,019** | **80,178** | **38,064** | **90,014** | **49,825** | **2,265,925** | **2,583,667** | **317,742** |


**Channel Technologies Group**

Confidential   24

# MSI Integration



# MSI Integration – Status Update

### Update

- As of November 30, we are 14 months in.  Both integrations costs and synergies are favorable to plan.
- Integration costs through November 30 are $930K, below the original plan of $1.7M and the revised plan of $953K. Some equipment moves were not completed and are planned for a later date.
- Plans to transition additional programs (MLTA, AQS20, PS60, Archerfish) are being developed as orders arrive using the Stage Gate process.

### Synergies Achieved

- Total synergies to date include:  Carol Bowen (at closing – on target), Thomas Tiano (engineer terminated in April 2014 – favorable to plan), Patricia Modzelewski (on 10/31/2014 – favorable to plan of 01/31/2015), Nazeeh Shaheen (on 12/4/2014 – favorable to plan of 01/31/2015), Gary Douville (favorable to plan of June 2015), Phira Chep (on 2/6/2014 – favorable to plan), and Phil Canada (on 2/13/2015 – favorable to plan). Five MSI operators (Chea, Phouthakhio, Ramos, Urrutia, and Vann) on 3/31/2015 – on target.  Additional synergies on 5/29/2015 include:  Barbara Lilley, Karen Cerritelli, and 2 technicians (Gogoun, Lindsay), Nazeeh Shaheen is the synergy BD position.  Gary Douville is a synergy management position.  Additional savings beginning September 2015  include a Director of Manufacturing, a contracts position, an engineer, and a technician; former Vice President of MSI beginning in November 2015.  Favorable to plan.

### Annualized Hard Cost Savings

- As of November 30,  actual annualized hard cost savings of $1,039K vs Budget of $384K due to additional reductions and timing of planned reductions.


**Channel Technologies Group**

# MSI Integration – Budget vs. Actual

**Integration Costs**

| Item | Original Plan November ITD | | Revised Plan* November ITD | | November ITD Actuals | | November Month Actuals | |
|---|---|---|---|---|---|---|---|---|
| Severance / Relocation Packages | $ | 540 | $ | 349 | $ | 394 | $ | 31 |
| Integration Manager/Professional Services | $ | 280 | $ | 250 | $ | 302 | $ | - |
| Travel | $ | 50 | $ | 50 | $ | 78 | $ | - |
| Elect. Product Data Management S/W | $ | 50 | $ | 44 | $ | - | $ | - |
| Video / Conf. and IT Misc. | $ | 50 | $ | 20 | $ | - | $ | - |
| Move Equipment | $ | 110 | $ | 100 | $ | 24 | $ | - |
| Training | $ | 50 | $ | 10 | $ | 18 | $ | - |
| Scrap (Process Exp.) | $ | 50 | $ | 10 | $ | - | $ | - |
| Recruiting Fees | $ | 60 | $ | 20 | $ | - | $ | - |
| Misc. | $ | 440 | $ | 100 | $ | 113 | $ | 2 |
| **Integration Costs ($000)** | **$** | **1,680** | **$** | **953** | **$** | **930** | **$** | **33** |
| *Budget revised 12Mar15 | | | | | | | | |


**Channel Technologies Group**

Confidential   | 27

# Appendix

- Financial Statements
- Working Capital
- Borrowing Base



# Income Statement

| Nov 15 Month Actual | 2015 Month Plan | 2014 Month Prior Yr | Favorable/ (Unfavorable) Difference Plan | Favorable/ (Unfavorable) Difference Prior Yr | BWP-CTG-EOI-AM-MSI Combined Statement of Earnings | Nov 15 YTD Actual | Nov 15 YTD Plan | 2014 YTD Prior Yr | Favorable/ (Unfavorable) Difference Plan | Favorable/ (Unfavorable) Difference Prior Yr |
|---|---|---|---|---|---|---|---|---|---|---|
| $ 3,695,859 | $ 4,791,121 | $ 5,258,538 | $ (1,095,262) | $ (1,562,679) | Sales/Shipments | $ 46,329,076 | $ 52,910,751 | $ 43,498,302 | $ (6,581,675) | $ 2,830,775 |
| - | - | - | - | - | Inter-Company Sales | - | - | - | - | - |
| 3,695,859 | 4,791,121 | 5,258,538 | (1,095,262) | (1,562,679) | Total Revenue | 46,329,076 | 52,910,751 | 43,498,302 | (6,581,675) | 2,830,775 |
| | | | | | | | | | | |
| 2,858,806 | 2,453,281 | 3,347,203 | (405,526) | 488,396 | Cost of Sales | 29,735,207 | 30,487,537 | 28,489,044 | 752,330 | (1,246,163) |
| 837,053 | 2,337,840 | 1,911,336 | (1,500,788) | (1,074,283) | Gross Margin | 16,593,870 | 22,423,214 | 15,009,258 | (5,829,344) | 1,584,612 |
| 22.6% | 48.8% | 36.3% | -26.1% | -13.7% | Gross Margin % | 35.8% | 42.4% | 34.5% | -6.6% | 1.3% |
| 926,537 | 1,346,615 | 1,118,346 | 420,079 | 191,810 | General & Administrative Expenses | 12,145,199 | 15,453,798 | 9,948,069 | 3,308,599 | (2,197,131) |
| 75,678 | 111,861 | 83,725 | 36,183 | 8,047 | IR&D | 1,506,796 | 1,315,031 | 476,777 | (191,764) | (1,030,018) |
| 9,793 | 53,000 | 26,684 | 43,207 | 16,891 | B&P | 377,499 | 583,000 | 619,507 | 205,501 | 242,007 |
| 1,012,007 | 1,511,476 | 1,228,755 | 499,469 | 216,748 | Total SG&A | 14,029,494 | 17,351,829 | 11,044,352 | 3,322,335 | (2,985,141) |
| (174,954) | 826,364 | 682,581 | (1,001,319) | (857,535) | Operating earnings | 2,564,376 | 5,071,385 | 3,964,905 | (2,507,009) | (1,400,530) |
| -4.7% | 17.2% | 13.0% | -22.0% | -17.7% | Operating earnings % | 5.5% | 9.6% | 9.1% | -4.0% | -3.6% |
| (47,501) | (43,660) | (159,975) | 3,841 | (112,474) | Non-Operation Income (Expenses) | (1,001,914) | (480,260) | (2,003,921) | 521,654 | (1,002,008) |
| (222,455) | 782,704 | 522,606 | (1,005,159) | (745,060) | Income Before Interest Expense | 1,562,462 | 4,591,125 | 1,960,984 | (3,028,662) | (398,522) |
| (298,174) | (256,329) | (280,030) | (41,846) | (18,144) | Interest Expense & Other Financial  Charges | (3,208,418) | (3,002,042) | (3,260,469) | (206,376) | 52,051 |
| (520,629) | 526,376 | 242,576 | (1,047,005) | (763,205) | Pretax Income (Loss) | (1,645,956) | 1,589,083 | (1,299,484) | (3,235,038) | (346,471) |
| - | - | - | - | - | Income Taxes | (32,990) | (2,100) | (2,479) | (30,890) | (30,511) |
| $ (520,629) | $ 526,376 | $ 242,576 | $ (1,047,005) | $ (763,205) | Net Income | $ (1,678,945) | $ 1,586,983 | $ (1,301,963) | $ (3,265,928) | $ (376,982) |


Channel Technologies Group

# EBITDA Detail

| | Nov 15 Month Actual | 2015 Month Plan | 2014 Month Prior Yr | Favorable/ (Unfavorable) Difference Plan | Favorable/ (Unfavorable) Difference Prior Yr | BWP-CTG-EOI-AM-MSI Combined Statement of Earnings | | Nov 15 YTD Actual | Nov 15 YTD Plan | 2014 YTD Prior Yr | Favorable/ (Unfavorable) Difference Plan | Favorable/ (Unfavorable) Difference Prior Yr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $ | (520,629) | $ 526,376 | $ 242,576 | $ (1,047,005) | $ (763,205) | Net Income | $ | (1,678,945) | $ 1,586,983 | $ (1,301,963) | $ (3,265,928) | $ (376,982) |
| | | | | | | | | | | | | |
| $ | - | $ - | $ - | $ - | $ - | Income Taxes | $ | 32,990 | $ 2,100 | $ 2,479 | $ 30,890 | $ 30,511 |
| | 302,015 | 256,329 | 280,030 | 45,687 | 21,985 | Interest Expense and other | | 3,736,183 | 3,002,042 | 3,323,562 | 734,141 | 412,621 |
| | 387,739 | 438,111 | 341,908 | (50,372) | 45,832 | Depreciation & Amortization | | 4,498,641 | 4,610,839 | 3,662,226 | (112,198) | 836,415 |
| | 29,338 | 29,338 | 29,338 | 0 | 0 | G&A Loan Fees | | 322,713 | 322,713 | 322,713 | - | - |
| | 1,993 | 1,993 | 1,993 | - | - | Non Op Loan Fees | | 21,924 | 21,924 | 21,924 | - | 0 |
| | 6,250 | 6,250 | 6,250 | - | - | Board Fees | | 68,750 | 68,750 | 68,750 | - | - |
| | 41,667 | 41,667 | 41,667 | (0) | - | Blue Wolf Management Fees | | 458,333 | 458,336 | 458,334 | (2) | (1) |
| $ | 248,373 | $ 1,300,063 | $ 943,761 | $ (1,051,691) | $ (695,388) | EBITDA | $ | 7,460,589 | $ 10,073,686 | $ 6,558,025 | $ (2,613,097) | $ 902,563 |

| $ | 1,039,257 | $ | 384,394 | Annualized Hard Cost Savings | $ | 1,039,257 | $ | 384,394 |
|---|---|---|---|---|---|---|---|---|
| $ | 1,287,629 | $ | 1,684,458 | Bank EBITDA | $ | 8,499,845 | $ | 10,458,081 |



Channel Technologies Group

# Balance Sheet - Assets

| NOV 2015 CHANNEL TECHNOLOGIES COMBINED Balance Sheet | Total Combined NOV 2015 Actual 15 | Total Combined NOV 2015 Budget | Variance NOV 2015 Actual vs Budget |
|---|---|---|---|
| | Combined | Combined | Combined |
| **Balance Sheet** | **NOV 2015** | **NOV 2015** | **NOV 2015** |
| | | | |
| **CURRENT ASSETS** | | | |
| Cash | $        225,499 | $        249,456 | $         (23,958) |
| Accounts Receivable | 7,408,199 | 8,896,453 | (1,488,255) |
| Unbilled A/R | 3,733,691 | 1,291,353 | 2,442,338 |
| Allowance for bad debt | (3,257) | (80,029) | 76,772 |
| Other Receivables | 235 | 235 | (0) |
| Inventories | 9,360,178 | 6,452,915 | 2,907,262 |
| Prepaid Expenses | 869,631 | 856,412 | 13,219 |
| | | | |
| | | | - |
| **TOTAL CURRENT ASSETS** | **21,594,176** | **17,666,796** | **3,927,380** |
| | | | |
| **FIXED ASSETS** | | | |
| Projects in process | 1,331,743 | 2,201,869 | (870,126) |
| Shop Equipment | 10,255,230 | 10,504,173 | (248,943) |
| Lab. Demo & Test Equip | 1,674,992 | 799,982 | 875,009 |
| Office Equipment | 1,981,876 | 1,926,862 | 55,014 |
| Vehicle Equipment | 24,250 | 24,250 | - |
| Leasehold Improvement | 2,909,160 | 2,736,468 | 172,692 |
| | 18,177,251 | 18,193,604 | (16,354) |
| **Less Depreciation** | (5,514,813) | (5,791,337) | 276,524 |
| **TOTAL FIXED ASSETS** | 12,662,438 | 12,402,268 | 260,170 |
| | | | |
| **OTHER ASSETS** | | | |
| Restricted Cash | 1,138,283 | 6,578,018 | (5,439,735) |
| Deposits | 53,699 | 39,669 | 14,030 |
| Goodwill | 24,888,354 | 28,948,467 | (4,060,113) |
| Identified Intangible Assets: | 26,229,313 | 23,661,465 | 2,567,848 |
| Trained & Assembled Workforce: | 2,715,000 | 2,715,000 | - |
| Long Term Note | 268,351 | 260,500 | 7,851 |
| Prepaid Loan Fee | 1,026,813 | 1,026,813 | - |
| **TOTAL OTHER ASSETS** | 56,319,812 | 63,229,932 | (6,910,119) |
| | | | |
| **TOTAL ASSETS** | $      90,576,426 | $      93,298,995 | $     (2,722,569) |

**Channel Technologies Group**

Confidential

31

# Balance Sheet – Liabilities & Equity

| NOV 2015 CHANNEL TECHNOLOGIES COMBINED Balance Sheet | Total Combined NOV 2015 Actual 15 | Total Combined NOV 2015 Budget | Variance NOV 2015 Actual vs Budget |
|---|---|---|---|
| | Combined | Combined | Combined |
| **Balance Sheet** | **NOV 2015** | **NOV 2015** | **NOV 2015** |
| | | | |
| **CURRENT LIABILITIES** | | | |
| Accounts Payable | $        3,241,999 | $        1,601,917 | $        1,640,082 |
| Accrued Expenses | 2,786,266 | 4,009,650 | (1,223,384) |
| Deferred Revenue | 1,619,505 | 1,715,000 | (95,495) |
| Current Portion Long Term Debt | 3,002,755 | 2,518,750 | 484,005 |
| | | | |
| **TOTAL CURRENT LIABILITIES** | **10,650,525** | **9,845,317** | **805,208** |
| | | | |
| **LONG TERM LIABILITIES** | | | |
| Revolver OWB | 7,950,000 | 2,930,844 | 5,019,156 |
| Contingent Liability -Indemnification & Environmenta | 1,138,283 | 6,578,018 | (5,439,735) |
| OWB Term Loan | 25,464,732 | 25,358,000 | 106,732 |
| Avante Junior Financing | 7,000,000 | 7,000,000 | - |
| Fidus Junior Financing | 7,000,000 | 7,000,000 | - |
| OWB CapEx Term | 3,550,000 | 1,850,000 | 1,700,000 |
| Rent: Security Deposit | 25,413 | 25,413 | - |
| Total Gross Long Term | **52,128,427** | **50,742,275** | **1,386,152** |
| | | | |
| Less Amounts Due in 1 Year | (3,002,755) | (2,518,750) | (484,005) |
| **TOTAL LONG TERM LIABILITIES** | **49,125,672** | **48,223,525** | **902,147** |
| | | | |
| STOCKHOLDERS' EQUITY | | | |
| Members Equity | 32,479,175 | 6,451,000 | 26,028,175 |
| Retained Earnings - | | 27,192,171 | (27,192,171) |
| Net Profit Y-T-D | (1,678,945) | 1,586,983 | (3,265,928) |
| | | | 0 |
| **TOTAL STOCKHOLDERS EQUITY** | 30,800,229 | 35,230,153 | (4,429,924) |
| | | | |
| **TOTAL LIABILITIES &** | | | |
| **STOCKHOLDERS' EQUITY** | $      90,576,426 | $      93,298,995 | $      (2,722,569) |

**Channel Technologies Group**

# Balance Sheet – Trend

| BALANCE SHEET ($K) | DEC-14 | JAN-15 | FEB-15 | MAR-15 | APR-15 | MAY-15 | JUN-15 | JUL-15 | AUG-15 | SEP-15 | OCT-15 | NOV-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Summary* | | | | | | | | | | | | |
| Cash | 234 | 956 | 277 | 161 | 590 | 36 | 81 | 491 | 307 | 53 | 1,069 | 225 |
| Accounts Receivable | 8,572 | 6,187 | 7,348 | 9,106 | 8,508 | 7,618 | 6,566 | 5,185 | 5,917 | 5,828 | 6,364 | 7,405 |
| Unbilled A.R. | 1,189 | 1,865 | 2,317 | 2,987 | 3,328 | 3,391 | 2,031 | 2,686 | 3,195 | 3,651 | 4,490 | 3,734 |
| Inventory | 6,316 | 6,669 | 6,965 | 7,078 | 7,113 | 7,256 | 7,359 | 8,012 | 8,491 | 8,688 | 9,037 | 9,360 |
| Other Current Assets | 871 | 879 | 852 | 744 | 1,525 | 812 | 916 | 811 | 747 | 925 | 900 | 870 |
| **Total Current Assets** | **17,181** | **16,556** | **17,759** | **20,076** | **21,063** | **19,113** | **16,953** | **17,185** | **18,657** | **19,146** | **21,859** | **21,594** |
| Fixed Assets | 12,724 | 12,680 | 12,745 | 12,743 | 12,832 | 13,090 | 13,145 | 13,257 | 13,125 | 12,951 | 12,827 | 12,662 |
| Other Non-Current Assets | 64,297 | 64,055 | 63,811 | 63,577 | 63,344 | 63,040 | 62,805 | 62,536 | 62,303 | 57,072 | 56,566 | 56,320 |
| **Total Assets** | **94,201** | **93,291** | **94,314** | **96,396** | **97,239** | **95,243** | **92,902** | **92,978** | **94,085** | **89,168** | **91,252** | **90,576** |
| | | | | | | | | | | | | |
| Accounts Payable | 2,410 | 1,473 | 1,993 | 2,261 | 1,997 | 1,568 | 2,536 | 2,173 | 2,734 | 3,823 | 3,180 | 3,242 |
| Other Current Liabilities | 6,795 | 6,816 | 6,954 | 8,479 | 8,842 | 8,419 | 6,286 | 6,409 | 6,995 | 6,801 | 6,681 | 7,409 |
| **Total Current Liabilities** | **9,206** | **8,289** | **8,947** | **10,740** | **10,839** | **9,987** | **8,822** | **8,582** | **9,729** | **10,623** | **9,862** | **10,651** |
| | | | | | | | | | | | | |
| Revolver | 5,250 | 5,500 | 5,650 | 6,200 | 7,200 | 6,550 | 6,550 | 6,850 | 7,300 | 6,650 | 8,850 | 7,950 |
| Long-Term Debt | 40,564 | 40,564 | 40,564 | 39,836 | 39,836 | 39,836 | 39,063 | 39,463 | 39,463 | 38,712 | 40,012 | 40,012 |
| Other Liabilities | 6,603 | 6,604 | 6,587 | 6,587 | 6,587 | 6,516 | 6,514 | 6,495 | 6,495 | 1,497 | 1,208 | 1,164 |
| **Total Long-Term Liabilities** | **52,417** | **52,668** | **52,801** | **52,623** | **53,624** | **52,903** | **52,127** | **52,807** | **53,257** | **46,859** | **50,070** | **49,126** |
| Equity | 32,578 | 32,334 | 32,566 | 33,033 | 32,777 | 32,353 | 31,954 | 31,589 | 31,099 | 31,686 | 31,321 | 30,800 |
| **Total Liabilities & Equity** | **94,201** | **93,291** | **94,314** | **96,396** | **97,239** | **95,243** | **92,902** | **92,978** | **94,085** | **89,168** | **91,252** | **90,576** |



**Channel Technologies Group**

# Balance Sheet – Trends



# Cash Flow Statement

| November [▼] . | Combined BWP-CTG NOV 2015 | Combined BWP-CTG-AM NOV 2015 |
|---|---|---|
| BWP-CTG-EOI-AM-MSI | YTD Actual | YTD Budget |
| **Statement of Cash Flow** | | |
| | | |
| Pretax income | $ (1,645,956) | $ 1,589,083 |
| Income taxes | (32,990) | (2,100) |
| | | |
| **Adjustments to reconcile net income to net cash:** | | |
| Depreciation & amortization | 4,498,641 | 4,610,839 |
| **Other adjustments:** | - | |
| Change in Accounts Receivable | 1,243,639 | (244,616) |
| Change in Unbilled Revenue-Milestone Billings | (2,545,130) | 4,797,495 |
| Change in Allowance for bad debt | (76,772) | - |
| Change in Inventories | (3,044,533) | (137,271) |
| Change in Prepaid Expenses | 1,311 | 50,144 |
| Change in Deposits | 1,789 | (19,794) |
| Change in Goodwill/Intangible Assets | (198,601) | (0) |
| Change in Trained & Assembled Workforce: | 198,601 | - |
| Change in Long Term Note | (7,851) | - |
| Change in Prepaid Loan Fee | 322,713 | 322,713 |
| Change in Accts Payable | 831,653 | (808,429) |
| Change in Accrued Expenses | (327,564) | 900,457 |
| Change in Deferred Revenue | 325,820 | (4,478,971) |
| | | |
| **Cash From Operations** | $ (455,229) | $ 6,579,549 |
| | | |
| **Investing & financing activities:** | | |
| Purchase & retirement of property, plant & equipment | (2,217,142) | (2,502,516) |
| | | |
| Cash from internal operations | (2,672,372) | 4,077,034 |
| | | |
| **Cash Flow From Financing Activities** | | |
| Revolver OWB | 2,700,000 | (2,319,156) |
| OWB Term Loan | (1,637,018) | (1,743,750) |
| OWB CapEx Term | 1,700,000 | - |
| Refund of Former President Equity | 25,000 | - |
| Additional Equity Investment | (124,065) | - |
| **Total From Financing Activities** | 2,663,917 | (4,062,906) |
| | | |
| Total Cash Generated (Used) | $ (8,455) | $ 14,128 |
| Net-Inter-company change-borrowing (payback) | 0 | - |
| **Total change in cash** | **($8,455)** | **$14,128** |

- YTD Cash flow from Operations impacted by growth in Unbilled Revenue and Inventory vs. Plan, partially offset by strong collections and increase in AP



**Channel Technologies Group**

# Working Capital – AR, AP

| Metric | Jan-15 | Feb-15 | Mar-15 | Apr-15 | May-15 | Jun-15 | Jul-15 | Aug-15 | Sep-15 | Oct-15 | Nov-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Accounts Receivable Aging** | | | | | | | | | | | |
| Current | $3,485 | $4,884 | $6,336 | $4,440 | $4,067 | $4,233 | $2,988 | $3,579 | $4,944 | $4,660 | $5,193 |
| 31-60 Days | $2,170 | $1,383 | $1,945 | $3,170 | $2,968 | $1,604 | $1,796 | $1,507 | $694 | $1,454 | $1,507 |
| 61-90 Days | $251 | $722 | $426 | $350 | $188 | $593 | $279 | $546 | $22 | $83 | $480 |
| > 90 Days | $309 | $380 | $408 | $552 | $398 | $139 | $125 | $289 | $171 | $169 | $228 |
| | | | | | | | | | | | |
| Gross Trade AR | $ 6,215 | $ 7,369 | $ 9,115 | $ 8,511 | $ 7,622 | $ 6,569 | $ 5,189 | $ 5,921 | $ 5,831 | $ 6,367 | $ 7,408 |
| | | | | | | | | | | | |
| **DSO** | 46.1 | 53.1 | 63.0 | 57.5 | 51.4 | 44.5 | 35.2 | 40.4 | 39.6 | 43.5 | 52.2 |
| | | | | | | | | | | | |
| **Accounts Payable Aging** | Jan-15 | Feb-15 | Mar-15 | Apr-15 | May-15 | Jun-15 | Jul-15 | Aug-15 | Sep-15 | Oct-15 | Nov-15 |
| Current | $1,354 | $1,592 | $1,722 | $1,405 | $1,126 | $1,956 | $1,443 | $1,442 | $1,861 | $2,084 | $1,366 |
| 31-60 Days | $115 | $397 | $472 | $584 | $421 | $506 | $697 | $945 | $994 | $732 | $1,360 |
| 61-90 Days | $3 | $4 | $27 | $7 | $20 | $24 | $9 | $330 | $771 | $109 | $207 |
| > 90 Days | $1 | $1 | $40 | $0 | $1 | $50 | $24 | $16 | $198 | $255 | $308 |
| | | | | | | | | | | | |
| Gross Trade AP | $ 1,473 | $ 1,993 | $ 2,261 | $ 1,997 | $ 1,568 | $ 2,536 | $ 2,173 | $ 2,734 | $ 3,823 | $ 3,180 | $ 3,242 |
| | | | | | | | | | | | |
| **AP Days** | 36.8 | 48.7 | 52.2 | 43.9 | 34.2 | 54.3 | 46.7 | 58.6 | 88.9 | 72.0 | 75.7 |

- Positive trend in accounts receivable collections, with improved and stable DSO in recent months. Increase in November due to invoicing of TR-343 ($1.1M) not included in Revenues in November (POC revenue recognition method)

- Cash outflows at quarter end restricted to critical vendor payments, and therefore higher AP days than the normal trend.



**Channel Technologies Group**

# Working Capital – Inventory

| Metric | Jan-15 | Feb-15 | Mar-15 | Apr-15 | May-15 | Jun-15 | Jul-15 | Aug-15 | Sep-15 | Oct-15 | Nov-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Inventory** | | | | | | | | | | | |
| Raw Material | $ 4,540 | $ 4,544 | $ 4,556 | $ 4,481 | $ 4,328 | $ 4,101 | $ 4,220 | $ 4,673 | $ 4,660 | $ 5,130 | $ 5,369 |
| WIP | $ 5,543 | $ 6,262 | $ 6,781 | $ 7,230 | $ 7,347 | $ 8,145 | $ 8,856 | $ 8,491 | $ 9,679 | $ 10,334 | $ 10,623 |
| Eng/PM | $ 1,419 | $ 1,589 | $ 1,753 | $ 1,979 | $ 2,135 | $ 2,335 | $ 2,485 | $ 2,776 | $ 3,010 | $ 3,611 | $ 3,928 |
| POC | $ (4,808) | $ (5,348) | $ (5,849) | $ (6,412) | $ (6,694) | $ (7,082) | $ (7,139) | $ (7,259) | $ (8,326) | $ (9,553) | $ (10,326) |
| WIP Total | $ 2,154 | $ 2,502 | $ 2,684 | $ 2,797 | $ 2,788 | $ 3,398 | $ 4,203 | $ 4,007 | $ 4,363 | $ 4,392 | $ 4,225 |
| FG | $ 626 | $ 663 | $ 703 | $ 819 | $ 837 | $ 848 | $ 882 | $ 971 | $ 979 | $ 1,019 | $ 1,100 |
| Reserves | $ (651) | $ (745) | $ (865) | $ (984) | $ (697) | $ (987) | $ (1,293) | $ (1,161) | $ (1,315) | $ (1,504) | $ (1,334) |
| Net Inventory | $ 6,669 | $ 6,965 | $ 7,078 | $ 7,113 | $ 7,256 | $ 7,359 | $ 8,013 | $ 8,491 | $ 8,688 | $ 9,037 | $ 9,360 |
| | | | | | | | | | | | |
| **Total Inventory** | **$ 6,669** | **$ 6,965** | **$ 7,078** | **$ 7,113** | **$ 7,256** | **$ 7,359** | **$ 8,013** | **$ 8,491** | **$ 8,688** | **$ 9,037** | **$ 9,360** |
| | | | | | | | | | | | |
| **Inventory Turns** | 5.0 | 4.8 | 4.9 | 5.0 | 4.9 | 4.8 | 4.4 | 4.2 | 4.0 | 3.8 | 3.7 |

- Inventory turns deterioration in last 6 months due to delays in shipping and inventory builds on MK-54, TR-343 and BAE programs

**Channel Technologies Group**

# Borrowing Base – November 30, 2015

**BORROWING BASE CERTIFICATE**

For:    **11/30/15**

OneWest Bank

| # | ACCOUNTS RECEIVABLE | | |
|---|---|---|---|
| 1 | Total Accounts Receivable Current Period | $ | 7,408,199 |
| 2 | *Less:* Total Ineligible Accounts | $ | (226,534) |
| 3 | Total Eligible Accounts Receivable *(Line 1 - Line 2)* | $ | 7,181,665 |
| 4 | Accounts Receivable Advance Rate (80%) | | **80%** |
| 5 | Accounts Receivable Availability *(Line 3 * Line 4)* | $ | 5,745,332 |

| # | INVENTORY | | |
|---|---|---|---|
| 6 | Total Inventory Current Period (A) | $ | 9,360,178 |
| 7 | *Less:* Total Ineligible Inventory | $ | - |
| 8 | Total Eligible Inventory *(Line 6 - Line 7)* | $ | 9,360,178 |
| 9 | Inventory Advance Rate (50%; may be 60% up to 90 consecutive days) | | **50%** |
| 10 | Inventory Availability *(Line 8 * Line 9)* | $ | 4,680,089 |

| | BORROWING BASE | | |
|---|---|---|---|
| 11 | Total Collateral Availability *(Line 5 + Line 10)* | $ | 10,425,421 |
| 12 | Total Revolving Line of Credit | **$** | **10,000,000** |
| 13 | Borrowing Base *(Lesser of Line 11 or Line 12)* | $ | 10,000,000 |
| 14 | Less: Outstanding L/C's (*enter as negative)* | $ | (7,950,000) |
| 15 | Less: Usage (Outstanding Line of Credit) (*enter as negative)* | $ | - |
| 16 | Total Outstanding | $ | (7,950,000) |
| 17 | **Net Borrowing Availability** | $ | 2,050,000 |

**(A) Inventory is net of reserves.**

**Channel Technologies Group**

# EXHIBIT 29

**Ewelina Johnson**

---

| | |
|---|---|
| **From:** | Lynn Chen |
| **Sent:** | Tuesday, January 19, 2016 12:30 PM |
| **To:** | Joshua Cherry-Seto; Tom Ellis |
| **Cc:** | Damon Frier; Kenny Shrainer; Rich Simitian |
| **Subject:** | Re: FW: CTS Corp - CTG Conflict Waiver |
| **Attachments:** | Conflict Waiver Letter_CTS Corp - CTG LC signed.pdf |

Hi Tom,

Here is my signature.

Thanks, lynn


Lynn Chen
Chief Financial Officer




Channel Technologies Group

879 Ward Drive

Santa Barbara, CA  93111

805-690-5132 (direct)

805-403-5488 (cell)

www.channeltechgroup.com

Confidentiality Notice:
This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged
information. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Any
unauthorized review, use, disclosure, or distribution is prohibited.


>>> On 1/19/2016 at 9:05 AM, in message
<DM2PR0801MB556E231C8AAE8FB5F36D42AD3C10@DM2PR0801MB556.namprd08.prod.outlook.com>, "Ellis, Tom"
<Thomas.Ellis@us.gt.com> wrote:

> Mr, Cherry-Seto,
>
>
> Rich Simitian has asked me to revise the subject waiver letter to refer to Blue Wolf Capital Fund II, L.P. rather than
> Blue Wolf Capital Management.  I have attached the amended waiver letter as you requested.
>
>
> If you agree with the changes, please sign and return to me and Rich Simitian.  Ms. Chen may also use the attached
> letter to sign and return to me and Rich as well.

We greatly appreciate your assistance.


Best regards,

Tom


**Thomas Ellis | Managing Director**

Grant Thornton LLP

**T**  214 561 2566

M 214 215-6442

**E** thomas.ellis@us.gt.com | **W** www.grantthornton.com


**From:** Simitian, Rich
**Sent:** Tuesday, January 19, 2016 9:37 AM
**To:** Ellis, Tom <Thomas.Ellis@us.gt.com>
**Subject:** Fwd: CTS Corp - CTG Conflict Waiver




Begin forwarded message:

**From:** Joshua Cherry-Seto <jcs@bluewolfcapital.com>
**Date:** January 19, 2016 at 7:29:51 AM PST
**To:** "Simitian, Rich" <Rich.Simitian@us.gt.com>, Lynn Chen <LChen@channeltech.com>
**Cc:** "Frier, Damon" <Damon.Frier@us.gt.com>
**Subject: RE: CTS Corp - CTG Conflict Waiver**

Rich – please update to reflect Blue Wolf Capital Fund II, L.P. throughout for us.


I can then sign.


Josh


_____
**Joshua Cherry-Seto**

**Blue Wolf Capital Partners**

One Liberty Plaza, 52nd Floor

New York, NY  10006

p:  212.488.1347

f:   917.677.8980

c:  917.204.5967

jcs@bluewolfcapital.com

**From:** Simitian, Rich [mailto:Rich.Simitian@us.gt.com]
**Sent:** Tuesday, January 19, 2016 10:20 AM
**To:** Lynn Chen <LChen@channeltech.com>; Joshua Cherry-Seto <jcs@bluewolfcapital.com>
**Cc:** Frier, Damon <Damon.Frier@us.gt.com>
**Subject:** Fwd: CTS Corp - CTG Conflict Waiver

Josh

Per our phone call this morning I am attaching the conflict waiver. CTS has signed.  I will need both you and Lynn to sign as well

Once in place I will coordinate with Damon on the tax side and we will talk to you about next steps

Thank you

Rich Simitian

7143214481 mobile

Begin forwarded message:

**From:** "Ellis, Tom" <Thomas.Ellis@us.gt.com>
**Date:** January 18, 2016 at 8:31:46 PM PST

**To:** "Simitian, Rich" <Rich.Simitian@us.gt.com>

**Subject: CTS Corp - CTG Conflict Waiver**

Hi, Rich,


I've attached a copy of the subject waiver letter executed by CTS Corp.


Please provide the CTS-executed letter to CTG and Blue Wolf for their files after they have executed and returned the letters you provided to them for signature.


Thanks, Rich!

Tom


**Thomas Ellis | Managing Director**

Grant Thornton LLP

**T**  214 561 2566

M 214 215-6442

**E** thomas.ellis@us.gt.com | **W** www.grantthornton.com

Grant Thornton LLP is the U.S. member firm of Grant Thornton International Ltd. Grant Thornton International Ltd and its member firms are not a worldwide partnership, as each member firm is a separate and distinct legal entity. In the U.S., visit Grant Thornton LLP at www.GrantThornton.com.


Please consider the environment before printing this email.

**Please understand that, unless expressly stated otherwise, any written advice given by Grant Thornton LLP that is contained in, forwarded with, or attached to this e-mail is: (1) limited to the matters and potential tax consequences specifically addressed herein, and; (2) not intended or written by Grant Thornton LLP as advice on the application or potential application of any penalties that may be imposed under any federal, state, or foreign statute or regulation in any manner.**

This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information. Any review, dissemination, copying, printing or other use of this e-mail by persons or entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender immediately and delete the material from any computer.

---

Grant Thornton LLP is the U.S. member firm of Grant Thornton International Ltd. Grant Thornton International Ltd and its member firms are not a worldwide partnership, as each member firm is a separate and distinct legal entity. In the U.S., visit Grant Thornton LLP at www.GrantThornton.com.

Please consider the environment before printing this email.

**Please understand that, unless expressly stated otherwise, any written advice given by Grant Thornton LLP that is contained in, forwarded with, or attached to this e-mail is: (1) limited to the matters and potential tax consequences specifically addressed herein, and; (2) not intended or written by Grant Thornton LLP as advice on the application or potential application of any penalties that may be imposed under any federal, state, or foreign statute or regulation in any manner.**

This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information. Any review, dissemination, copying, printing or other use of this e-mail by persons or entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender immediately and delete the material from any computer.



Grant Thornton LLP
Grant Thornton Tower
171 N. Clark St., Suite 200
Chicago, IL 60601

T 312 856 0200
F 312 565 4719
www.GrantThornton.com

January 18, 2016

Ms. Lynn Chen                          Mr. Ashish Agrawal
Chief Financial Officer                Chief Financial Officer
**Channel Technologies Group**         **CTS Corporation**
879 Ward Drive                         905 West Boulevard North
Santa Barbara, CA 93111                Elkhart, IN 46514

Mr. Joshua Cherry-Seto
Chief Financial Officer
**Blue Wolf Capital Fund II, L.P.**
One Liberty Plaza
165 Broadway, 52nd Floor
New York, NY 10006

Re: Notice and Waiver of Conflict of Interest and Acknowledgement of Grant Thornton LLP's
Professional Responsibilities

Dear Ms. Chen, Mr. Cherry-Seto, and Mr. Agrawal:

Grant Thornton LLP ("Grant Thornton") provides financial statement audit and tax services for
Channel Technologies Group ("Channel Technologies"), which is a portfolio company of Blue
Wolf Capital Fund II, L.P. ("Blue Wolf") for whom Grant Thornton also has provided tax and
diligence services. Collectively, these services for Channel Technologies and Blue Wolf are
referred to herein as the "Existing Services." In addition, Grant Thornton has been requested
to provide professional services to CTS Corporation ("CTS"), a financial statement audit client
of Grant Thornton, with respect to financial and tax diligence on CTG Advanced Materials LLC
("CTG Materials"), a subsidiary of Channel Technologies (the "Proposed Services").

 GrantThornton

Under professional standards, including IRS regulations governing tax practice, performing the Proposed Services may represent a potential or actual conflict of interest, as the interests of Channel Technologies and Blue Wolf may not be in alignment with the interests of CTS. Applicable professional standards require Grant Thornton to assess whether we believe that we are able to perform the Proposed Services and continue performing the Existing Services (collectively, "Professional Services") with the requisite integrity and objectivity. If we determine that we can provide the Professional Services with the requisite integrity and objectivity, we are then required to disclose the potential conflict of interest to both parties and obtain their consent before proceeding with the engagements.

By way of this letter, Grant Thornton affirms to Channel Technologies, Blue Wolf and CTS that based on our internal consultations we have come to the conclusion that we can provide the Professional Services with the requisite integrity and objectivity (subject to certain safeguards being put in place).

Grant Thornton believes that it can perform the Professional Services with the requisite integrity and objectivity by implementing the following safeguards to minimize threats to our integrity and objectivity.

- Grant Thornton will separate the engagement teams to create ethical walls and protect the confidentiality of information. Although the separate engagement teams will not communicate with each other directly (except as noted herein), we will establish a communication channel between the engagement teams using our national office or professional standards personnel to address any issues that arise during the delivery of the Professional Services.

- In certain limited circumstances, the separate engagement teams may need to directly communicate with each other. Such circumstances will be limited to those situations when Grant Thornton determines that professional standards necessitate the two engagement teams to be in direct contact with each other.

- Grant Thornton will not permit access to any of the Channel Technologies and Blue Wolf engagement documentation by any staff members of the CTS engagement team without specific consent from the parties. Similarly, Grant Thornton will not permit access to any of the CTS documentation by any staff members of the Channel Technologies and Blue Wolf engagement teams without receiving specific consent from the applicable parties.

- Unless compelled to do so by law, court order, or subpoena and otherwise consistent with our confidentiality obligations, Grant Thornton will not allow third party access to any of your information in our possession without your specific consent. In addition, access to Grant Thornton workpapers shall only be provided subject to securing a standard Grant Thornton work paper access letter.



3

- Grant Thornton will establish security procedures related to the communication of any of the work product or deliverables provided to either party or its counsel. Further, all documentation relating to the Proposed Services will be stored in a secure Grant Thornton site that will be password protected with access limited only to CTS's engagement team members.

In addition, if during the course of performing the Professional Services, if any matter arises that Grant Thornton perceives as impacting our ability to continue performing the Professional Services with the requisite objectivity and integrity, we will apprise the affected parties to try and resolve the matter.  In the event the matter is not able to be resolved to permit our continuing in the engagement, Grant Thornton may be required to withdraw from performing either the Existing Services or the Proposed Services, or both.

By signing below, you:

- Acknowledge notice of Grant Thornton's possible or actual conflict of interest as stated herein;

- Understand that the written consent of Channel Technologies, Blue Wolf, CTS and the Audit Committee Chairman of CTS all will be required before proceeding with the Professional Services;

- Agree to the sufficiency of the proposed  safeguards described above and authorize our national office or professional standards personnel to communicate with each affected engagement team as we deem necessary;

- Channel Technologies and Blue Wolf consent to Grant Thornton providing the Proposed Services; CTS consents to Grant Thornton continuing to provide Existing Services;

- Waive any claim you might otherwise have against Grant Thornton based on any conflict, real or perceived, arising out of Grant Thornton's performance of both the Existing Services and Proposed Services; and

- Represent that you are legally authorized to execute this letter.

Please return via e-mail a PDF version of this letter once it has been signed and dated to the appropriate Grant Thornton representative.



4

We must receive the executed letter from all parties prior to performing the Proposed Services.

Sincerely,

**GRANT THORNTON LLP**

Rich Simitian
Audit Partner

John Iwanski
Transaction Services Principal

Mick Rennick
Audit Partner

Copy to:  Mr. Lawrence J. Ciancia
              Chairman, Audit Committee
              **CTS Corporation**

**Agreed and accepted by:**

**CHANNEL TECHNOLOGIES GROUP**

Ms. Lynn Chen
Chief Financial Officer

Date: 1/19/2016



5

**BLUE WOLF CAPITAL FUND II, L.P.** _ON BEHALF OF ITSELF, BW PIEZO HOLDINGS LLC, AND CTG ADVANCED MATERIALS LLC

Date: _____

Mr. Joshua Cherry-Seto
Chief Financial Officer

**CTS CORPORATION**

Date: _____

Mr. Ashish Agrawal
Chief Financial Officer